Receipt #062443

ECF

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAR 9 2005
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNISYS CORPORATION<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | Civil Action No. 05- 281C |

## COMPLAINT

1. Plaintiff Unisys Corporation ("Unisys"), for its complaint against Defendant United States of America, alleges as follows:

2. This suit arises from a dispute between Unisys and the United States of America (the "Parties") relating to Unisys' compliance with Cost Accounting Standard ("CAS") 413.50(c)(12) (48 C.F.R. § 9904.413-50(c)(12)) in connection with the sale of four of its business units to Loral Corporation ("Loral") in May of 1995. Unisys brings this action to contest the Final Decision of the Contracting Officer dated December 9, 2004, asserting a Government claim against Unisys of non-compliance with CAS 413 related to the business units' sale and demanding payment from Unisys in the amount of $8,488,809, plus interest as of September 30, 2004, in the amount of $5,622,203.

## THE PARTIES

3. Unisys is a corporation organized under the laws of the State of Delaware, with its headquarters located in Blue Bell, Pennsylvania. Unisys is an information technology services and solutions company.

4. Defendant is the United States of America (the "United States" or the "Government") acting principally by and through the Department of Defense ("DoD") and the Defense Contract Management Agency ("DCMA"), formerly known as the Defense Logistics Agency, Defense Contract Management Command. The Government has designated a Corporate Administrative Contracting Officer (the "Contracting Officer"), Denise D. Chezek, to negotiate with Unisys concerning accounting issues and to issue a Contracting Officer's Final Decision pursuant to the standard Disputes clause in Unisys' Government contracts.

## OVERVIEW OF ISSUES

5. CAS 413.50(c)(12) requires an adjustment of "previously-determined pension costs" when a segment of a company is "closed." At the time of the sale to Loral in 1995, the Unisys pension plan was fully funded.

6. When Unisys sold the four business units at issue to Loral, Unisys transferred to Loral all of the pension liabilities associated with currently active employees to Loral, along with pension assets equal to those liabilities. Unisys transferred to Loral an additional $27,377,056 in pension assets, over and above the assets equal to the liability transferred to Loral. If the requirements of CAS

413.50(c)(12) apply to the 1995 Unisys-Loral transaction, Unisys' transfer of $27,377,056 satisfied the requirements of that regulation.

7. The Government's calculation of the segment closing adjustments under the original CAS 413.50(c)(12) is flawed in several respects. First, the Government fails to account properly for the total pension assets transferred from Unisys to Loral at the time of the transaction. Second, with respect to Unisys' total actuarial liability, the Government erroneously contends that Unisys may not include the $1,585,572 liability for the supplemental executive retirement plan ("SERP"). Finally, the Government position that Unisys must (a) exclude certain contributions made to a specific group annuity contract before the effective date of CAS 413 for purposes of determining the Government's share of pension surplus, but (b) nonetheless include the assets associated with those contributions in computing the amount of surplus subject to adjustment under CAS 413.50(c)(12) is without merit.

8. Even if Unisys' segment closing calculations do not comply with CAS 413.50(c)(12), the Government is not entitled to an adjustment. As demonstrated in Unisys' DSO Segment Closing Calculations and Cost Impact Analysis dated May 25, 2004 ("May 2004 Analysis" or "Cost Impact Analysis"), the benefit that the Government has received as a result of the asset transfer to Loral exceeds the adjustment of "previously-determined pension costs" required by CAS 413, so there is no cost impact to the Government even if the Unisys calculation of the segment closing adjustment did not comply with CAS 413.50(c)(12). The Cost Impact

Analysis also confirms that the Government has saved combined pension and retiree medical costs in excess of $50 million due solely to the manner in which Unisys structured the 1995 transaction.

9. The Government has claimed interest on its segment closing adjustment claim, calculated from the date of sale to Loral. The Government is not entitled to interest before the date of the demand for payment in the Final Decision.

## JURISDICTION

10. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.* ("CDA").

11. On December 9, 2004, the Contracting Officer issued a Final Decision claiming that Unisys was noncompliant with CAS 413 and seeking an adjustment to pension costs claimed to be due to the Government as a result of the 1995 transaction. The Contracting Officer claimed in the December 9, 2004 Final Decision that the Government is entitled to an adjustment in its favor of $8,488,809, plus interest through September 30, 2004 in the amount of $5,622,203.

12. This action is timely filed as an appeal from the Contracting Officer's Final Decision on the Government's claim in accordance with 28 U.S.C. § 1491(a)(2).

## SUMMARY OF FACTS

### Transfer of the DSO Segment

13. Unisys and its various predecessors in interest have performed negotiated Government contracts for many years. Prior to 1995, Unisys and its

predecessors in interest (including Sperry Rand) operated a number of business units that performed Government contracts and subcontracts. Those business units were organized in the Government Systems Group ("GSG"). On March 20, 1995, Unisys entered into a contract to sell certain GSG assets, identified as the Defense System Organization ("DSO") to Loral. The sale included Unisys business units located at Great Neck, New York; Salt Lake City, Utah; Eagan, Minnesota; and Huntsville, Alabama. The DSO transaction closed on May 4, 1995. Shortly before the sale of DSO, GSG had been combined with Unisys' Federal Systems Division ("FSD"). The operations that were not sold to Loral were retained by Unisys and continue to operate as FSD.

14. Prior to the sale of DSO, Unisys calculated and allocated pension costs using separate segment accounting at the GSG level. Pension costs were computed for the GSG businesses in the aggregate on a segmented basis and were then allocated to the various segments that comprised GSG, including the four segments that were sold to Loral. In addition, the four sold segments participated in three separate pension plans maintained by Unisys. Since 1994, each of the various Unisys pension plans had been "fully funded." As a result, Unisys had made no contributions to the plans since 1993. Under the relevant regulations, Unisys has been precluded from including pension costs in its cost estimates for new Government contracts after the plans became overfunded. Unisys had recovered no pension costs on any Government contract from 1993 through 1995.

15. Under the terms of the DSO sale agreement, Unisys retained liability for pension payments to employees who had been covered by the Unisys pension plans and retired or otherwise terminated their employment with vesting prior to the date of the sale (the "Retired Employees"). In addition to its pension obligations to the Retired Employees, Unisys has obligations to provide other post-retirement medical benefits ("PRBs") to employees who retired before the sale. As of January 1, 1995, Unisys retained a net actuarial liability of $49.9 million for post-retirement medical benefits ("PRBs") due to the Retired Employees. When updated to May 4, 1995 using the same 4.26% factor that applied for pension purposes, the retained PRB liability was $52 million. Loral became liable for any pension benefits and PRBs due to transferred employees who retire after the effective date of the sale.

<u>CAS 413</u>

16. In 1977, CAS 413 was originally promulgated by the Cost Accounting Standards Board ("CASB"). 4 C.F.R. § 413 (1978) (later recodified as 48 C.F.R. § 9904.413). CAS 413 became effective on March 10, 1978, and was to be followed by each covered contractor "on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable" under 4 C.F.R. § 413.80. Pursuant to this provision, CAS 413 first became applicable to Unisys' Government contracts as of January 1, 1979.

17. When there is a "segment closing," CAS 413 directs the contractor to "determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not

the pension plan is terminated." CAS 413.50(c)(12). The Standard also provides that the "difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs." *Id.*

18. On March 30, 1995, the CASB published revisions to the original CAS 413. 60 Fed. Reg. 16534 (Mar. 30, 1995). Among other things, significant changes were made to CAS 413.50(c)(12) regarding the adjustment due as a result of a segment closing. The revised CAS 413 was not applicable to Unisys' Government contracts until January 1, 1996 under 48 C.F.R. § 9904.413-63(b). Thus, the original version of CAS 413 applies to the calculation of the adjustment related to the segment closings in this case.

Results of Audit Letter and Subsequent Audit Reports

19. On January 18, 1996, Unisys met with representatives of DCMA and the Defense Contract Audit Agency ("DCAA") to discuss what adjustment, if any, would be due under CAS 413.50(c)(12) for the 1995 sale to Loral and whether Unisys would be entitled to any compensation for the PRB liabilities that it had retained. At that meeting, a former contracting officer for the Government volunteered that the Government was negotiating an agreement with Teledyne that would permit retained PRB liabilities to be offset against retained pension surplus for purposes of determining a segment closing adjustment, and that such an agreement would be an appropriate model for resolving the PRB obligations and pension surplus retained by Unisys on account of the DSO business. Unisys agreed

at the meeting that the matter should be settled on the basis suggested by the Government, and the Government subsequently provided Unisys with a copy of the "model" Teledyne agreement.

20. Unisys could not have withdrawn surplus assets from the plan in 1995 or thereafter in order to transfer cash to the Government equal to the amount of the segment closing adjustment due under CAS 413 without triggering substantial excise taxes and penalties on the amounts transferred. At the time of the transaction in 1995, there was considerable uncertainty about the meaning of CAS 413. Unisys and other contractors that divested Government contract business units at the time elected to transfer surplus pension assets to the purchaser so that those assets could be used in the future by the purchaser to reduce the pension costs that would otherwise have been incurred by the contractor and charged to the Government. The transfer of assets to the successor satisfied the requirements of CAS 413.50(c)(12) if the amount of benefit to the Government was at least equal to the segment closing adjustment that would otherwise have been due to the Government. 48 C.F.R. § 9904.306(e) and (f) specifically authorize such alternative methods of making adjustments under any CAS requirement.

21. On August 14, 1997, DCAA issued a letter to Unisys enclosing a Results of Audit, which concluded that Unisys was in noncompliance with CAS 413. Unisys responded to the Results of Audit by letter dated October 31, 1997 arguing that no pension cost adjustment was required, or that if an adjustment was required, the transfer of $27,377,056 of pension surplus to Loral satisfied that

obligation. Unisys also pointed out that the parties had previously agreed to settle the issue based on the Teledyne model.

22. DCAA issued an Audit Report dated April 12, 1998, Audit Report No. 6181-97D19200123, which reaffirmed the Results of Audit and provided additional calculations. DCAA's estimated impact of the noncompliance in the April 12, 1998 report was $53,678,857, which was calculated as follows:

| | Amount |
|---|---|
| Market Value of Assets | $962,198,607 |
| Actuarial Accrued Liability | (883,335,980) |
| Excess Assets | $78,862,627 |
| Excess Assets Transferred to Loral | (27,377,055) |
| Excess Assets Retained | $51,485,572 |
| Interest from Measurement Date (1/1/95) To Sale Date (5/5/95) | $2,193,285 |
| Increased Pension Cost | $53,678,857 |

23. In a July 20, 1998 response to the DCAA calculations, Unisys submitted calculations reflecting the fact that the Government had already received the benefit of the $27 million in surplus pension assets transferred to Loral. Unisys explained that the Government share of the surplus should instead be calculated as follows:

| | | |
|---|---|---|
| a. | Market value of DSO assets | $962 million |
| b. | Accrued liability for DSO | (883) million |
| c. | Excess assets (a – b) | $79 million |
| d. | % of DSO work flexibly priced for USG | 33 percent |
| e. | Government share of surplus (c x d) | $26 million |
| f. | Surplus transferred to Loral | (27) million |
| g. | Remaining adjustment due (e – f) | (1) million |

Unisys further noted that, because Loral has been and will be required to recognize the transferred surplus in pricing its Government contracts, the Government had

effectively received credit for the $27 million in surplus pension assets transferred to Loral.

24. Following the issuance of the Audit Report, the parties engaged in various rounds of discussions regarding the calculation of the pension cost adjustment and related issues. DCAA auditors subsequently disclaimed any knowledge of the Parties' agreement to settle the matter based on the "model" Teledyne agreement even though those auditors were at the meeting where that settlement was discussed. By letter dated August 28, 2000, the Contracting Officer issued an Initial Finding of Noncompliance with CAS 413.

25. Contemporaneous with the Parties' discussions, litigation about the same issues was progressing in this Court. On August 9, 2001, this Court (Judge Firestone) issued its decision in *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001) ("*Teledyne I*") interpreting, *inter alia*, CAS 413.50(c)(12) and addressing the applicability of the 1995 amendments to CAS 413. This Court's decision was affirmed by the United States Court of Appeals for the Federal Circuit in *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003) ("*Teledyne II*"), *cert denied sub nom*, *General Motors Corp. v. United States*, Supreme Court No. 03-165 (Dec. 1, 2003). Among other things, this Court in *Teledyne I* held that:

(a) the Government is not entitled to a credit for any pension cost adjustment that is attributable to employee contributions;

(b) the Government is not entitled to a credit for any pension cost adjustment that is attributable or paid under contracts that pre-date the effective date of CAS 413.50(c)(12);

(c) the Government is not entitled to a credit for any pension cost adjustment that is not attributable to pension costs reimbursed by the Government, such as pension costs allocated to commercial or foreign contracts; and

(d) prior to the amendment of CAS 413 in 1995, the Government was not entitled to a credit for any pension cost adjustment that was attributable to fixed-price Government contracts (absent an express contract provision to the contrary).

26. On July 23, 2004, the Government issued its "DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments" (the "Joint Guidance"). The Joint Guidance reaffirms and implements the holdings of this Court in *Teledyne I* and provides additional instructions and sample calculations.

27. Many issues raised in the prior discussions and correspondence between the Parties have been resolved by the decisions in the *Teledyne* litigation and subsequent guidance, but several issues related to CAS 413 calculations and PRB costs remain.

28. DCAA issued a Supplemental Audit Report on January 23, 2003, Audit Report No. 6181-97D19200123-S1. DCAA prepared and issued the Audit Report prior to its knowledge of the Federal Circuit's decision in *Teledyne II*. The Report was issued to evaluate assets and liabilities and the Government share computations previously submitted by Unisys. DCAA also revised its segment closing calculations contained in the 1998 Audit Report and stated that its findings were qualified to the extent that further rulings in the *Teledyne* case may modify the calculation of the adjustment.

29. The January 23, 2003 Audit Report acknowledges that "[t]he proper accounting for the $27,377,055 asset transfer to the successor-in-interest (Loral) . . . is the primary difference between the contractor's computation of the required pension cost adjustment and our audit recommended pension cost adjustment." Audit Report at 5. DCAA contended that "[t]he contractor's method represents an 'out-of-sequence' application of the *original* CAS 413.50(c)(12) requirements and does not result in the logical recovery of previously overstated pension costs . . . ." Audit Report at 6.

30. In March of 2003, the Parties met to review the progress made on the segment closing adjustment issues and agreed that several disputed issues had been resolved by the decisions in *Teledyne I* and *Teledyne II*. The parties continued to disagree, however, on what adjustment calculation methods should be applied in light of *Teledyne*. Unisys offered to submit a revised segment closing calculation, applying the *Teledyne* criteria and using data related only to the bargaining unit (union) pension plan at the DSO Great Neck segment. Unisys had selected the Great Neck segment for its calculations because (1) it represented most of the pension plan surplus at all of the DSO segments, and (2) the Great Neck records were more readily available. The analysis of the Great Neck segment would be utilized to estimate pension plan experience at the other three segments. The Government agreed with this approach and directed Unisys to prepare such a submission.

31. By letters dated August 13 and 14, 2003, Unisys submitted to DCAA a calculation for the Great Neck union pension plan. Unisys explained that the cost adjustment due to the Government under CAS 413 for the Great Neck plan at the time of the segment closing was no more than $7.5 million (which is calculated as the Government's share of the surplus as of January 1, 1995 of $7,171,498 adjusted to include earnings at a rate of 4.26% through the date of the transaction). Assuming that the Government share of pension costs for the Great Neck plan (which accounts for approximately 56.7 percent of the aggregate DSO surplus) is representative of the overall Government share for DSO, the adjustment for all four plans would be approximately $13.2 million. Unisys again explained that the Government had already received the benefit of the $27.4 million surplus transferred to Loral (including $15.3 million from the Great Neck union plan alone), so that the total benefit to the Government has been well in excess of whatever adjustment may have been due in 1995.

32. The Government argues that it is entitled to both the benefit of the transferred assets and an additional cash payment equal to the product of the assets remaining in the plan after the transfer to the successor multiplied by the Government share of the assets calculated in accordance with the requirements of CAS 413.50(c)(12). Under the Government's theory of calculating the adjustment, no matter how much Unisys had transferred to Loral for the benefit of the Government on future contracts, the Government would argue that still more must be transferred. The Final Decision cites no statutory, regulatory, or contractual

basis for the Government's method of calculation. The Government method of calculation produces a windfall for the Government and is illogical, patently unfair, and inconsistent with the pre-1995 version of CAS 413.50(c)(12) and with this Court's decision in *Teledyne I.*

The Final Determination of Noncompliance

33. On March 31, 2004, the Contracting Officer issued a Final Determination of Noncompliance with CAS 413 because the Parties could not reach agreement on the treatment of the asset transfer. Again, the Contracting Officer observed that "[t]he primary reason for the wide disparity in the parties' positions is the treatment of the $27M of pension surplus that Unisys transferred to Loral as part of the DSO sale." The Contracting Officer concluded that the "proper calculation under the CAS Standard is based on the pension plan assets and liabilities retained by Unisys in connection with the DSO sale" and that "Unisys' mixture of the pension assets sent to Loral, as purchaser of the segment, with the assets remaining with Unisys, contravenes CAS 413." The Contracting Officer also requested the submission of a cost impact proposal in accordance with FAR 30.602-2(c).

The Cost Impact Analysis

34. By letters dated May 25 and 26, 2004, Unisys responded to the Final Determination and submitted a cost impact proposal, which augmented its August 2003 submission to account for the remaining segments and pension plans using the Great Neck calculations as a baseline. In its proposal, Unisys explained why its

treatment of surplus pension assets in connection with the DSO transaction did not result in any increased costs to the Government and that no cost or price adjustments were required. As reflected in the Unisys calculation, the Government's share of the DSO pension surplus for the Qualified Plans, determined in accordance with CAS 413.50(c)(12) and *Teledyne*, was $10,841,246 as of May 4, 1995. The "cost impact" analysis demonstrated that the total benefit to the Government in the form of reduced pension costs that resulted from the transfer of surplus assets to Loral was $29,008,677 through December 31, 2002, and that the amount of savings will grow in subsequent years. That benefit is substantially in excess of the $10,841,246 pension cost adjustment that would have been due if Unisys had simply transferred cash to the Government and has resulted in net savings to the Government of $18,167,431 (that is, $29,008,677 minus $10,841,246). The Government has also realized savings on the nonqualified SERP plan since May 4, 1995. Since May of 1995, Unisys has also provided retiree medical benefits to Great Neck retirees in the amount of $36.2 million and the Government has avoided retiree medical costs of roughly $32.9 million that would have been allocated to DSO Government contracts if Unisys had not retained the liability for those costs.

The Final Decision

35. On December 9, 2004, the Contracting Officer issued a Final Decision that Unisys is in noncompliance with CAS 413. The Contracting Officer determined

that the adjustment which is compliant with CAS 413 for the DSO segment closings is as follows:

> The difference between the market value of assets retained by Unisys ($668,271,532) and the actuarial liability retained by Unisys ($619,395,350) for the four closed segments is $48,876,182. The Government's share of this surplus amount is $8,488,809. This was computed using the information in Unisys' August 2003 and May 2004 submissions, namely, historical pension contribution amounts and rate of return on assets (4.26%) between January 1, 1995 and May 4, 1995. However, I increased the Government share percentages of flexibly-priced, CAS-covered contracts at each segment that were proposed by Unisys. Unisys proposed Government-share percentages of 16.58% for Great Neck, 11.15% for Huntsville, 4.92% for Eagan and 22.34% for Salt Lake City. I increased these to 20.70%, 13.92%, 6.14% and 27.90% respectively. This was done to account for the $30,324,982 cost reduction with respect to the GAC 50 insurance plan . . . . The removal of this amount from Unisys' total pension cost base increases the Government's share ratio of flexibly-priced, CAS-covered contracts. The adjustment amount of $8,488,809 represents the combined Government-share percentages at the four segments, applied to the combined surplus amount at the four segments.

In addition to the adjustment in the amount of $8,488,809 for the alleged CAS noncompliance, the Government also demands payment from Unisys in the amount of $5,622,203 in interest, calculated from the date of the sale to Loral in 1995, resulting in a total adjustment of $14,111,012.

36. In addition to the Government's disagreement with Unisys over the treatment of the surplus transferred to Loral, the Government contends that Unisys may not include in its cost impact analysis any allowance for the unfunded $1,585,572 liability retained by Unisys for the Supplemental Executive Retirement Plan ("SERP"), a pay-as-you-go, non-qualified pension plan. The Contracting Officer's position on this issue is unsupported by any citation to any regulations or

other authority and is inconsistent with DCMA's own Special Contractor Insurance/Pension Center ("CIPR") Report No. 077-04 dated July 27, 2004. In this CIPR Report, DCMA concluded:

> [I]t is the opinion of the CIPR Center that upon a CAS 413 Segment Closing event that a non-qualified defined benefit pension plan can have an Actuarial Accrued Liability regardless of the funding policy, which means it can be funded or on a pay-as-you-go basis. This is because of the component of CAS 412 cost that represents the amortization of the future unfunded liability or settlement obligation of the plan.
>
> Therefore, we believe that the $1,585,572 is an appropriate component of the CAS 413 segment closing adjustment amount and should not be removed from the claim.

Special CIPR Report No. 077-04 at 4.

37. The Government also continues to dispute Unisys' inclusion of Group Annuity Contract 50 ("GAC 50), a plan insured by John Hancock Co. in Unisys' total pension contributions for purposes of computing the Government's share of historical pension costs, even while the Government claims a portion of the surplus attributable to those contributions. The Government contends that there is insufficient evidence that the GAC 50 insured pension plan was subject to ERISA minimum funding requirements, and, therefore, concludes that contributions made to the GAC 50 plan should be excluded from the Government share calculation. There is no regulatory or contractual basis for this argument. Alternatively, Unisys believes that the market value of assets under CAS 413.50(c)(12) must be reduced by the assets accumulated under GAC 50 to assure internal consistency in the segment closing calculation.

38. Under the relevant provision in its CAS-covered contracts (FAR 52.230-2(a)(5)), the Government is entitled to interest only if Unisys "fails to comply with an applicable Cost Accounting Standard" and that failure to comply results in the payment of increased costs by the Government. A disagreement about the amount, if any, of adjustment due under CAS 413 is not a failure to comply with applicable CAS requirements that triggers a requirement for the payment of interest. The CAS clause requires that interest be calculated from the "time the payment was made by the United States." No payment was made by the United States on the date of the transaction. The adjustment calculation required by the relevant version of CAS 413.50(c)(12) did not require that the adjustment be made on the date of the transaction or on any specific date thereafter. There is no basis for the Government's claim that it is entitled to interest from the date of the transaction. The Government will only be entitled to interest on the claim and demand for payment made in its Final Decision, as provided in FAR 32.610(b)(2).

**COUNT I**
**(Segment Closing Adjustment)**

39. The allegations in paragraphs 1 through 38 are incorporated herein by reference.

40. The Government's calculation of the DSO segment closing adjustment is flawed and not in accordance with the original CAS 413.50(c)(12) or this Court's decision in *Teledyne I*. The Government's calculation penalizes Unisys for transferring any pension surplus to Loral – a surplus from which the Government subsequently benefited. Under the Government's theory, the more Unisys

transferred to Loral, the larger the Government's total claim would be – a result that is both illogical and inequitable. As a result of the segment closing and transfer of a portion of the pension surplus to Loral, the Government paid lower pension costs on new contracts with Loral and avoided entirely nonqualified pension and PRB costs that were clearly generated by Government work but will not be charged to the Government. Unisys has more than satisfied any obligation it may have had to the Government under CAS 413.50(c)(12).

**COUNT II**
**(No Cost Impact)**

41. The allegations in paragraphs 1 through 40 are incorporated herein by reference.

42. Even if the Government is correct that Unisys' transfer of pension costs did not comply with CAS 413, the Government has not paid any increased costs as a result of that noncompliance. As demonstrated in Unisys' Cost Impact Analysis of May 25, 2004, the benefit that the Government has received as a result of the DSO segment transfer to Loral exceeds the adjustment of "previously-determined pension costs" required by CAS 413, so there is no cost impact to the Government even if the Court concludes that Unisys' calculation of the segment closing adjustment did not comply with CAS 413.50(c)(12). The Cost Impact Analysis also demonstrates that the Government has saved combined pension and retiree medical costs in excess of $50 million due solely to the manner in which Unisys structured the 1995 segment closing transaction.

**COUNT III**
**(Offset Against PRB Liability)**

43. The allegations in paragraphs 1 through 42 are incorporated herein by reference.

44. If the Court determines that the Government is entitled to a surplus adjustment amount in accordance with CAS 413.50(c)(12), then Unisys is entitled to offset any pension surplus against its net actuarial liability for PRBs in the amount of $52.0 million due to the Retired Employees.

**COUNT IV**
**(No Interest)**

45. The allegations in paragraphs 1 through 44 are incorporated herein by reference.

46. There is no basis for the Government's claim that it is entitled to interest from the date of the transaction. Interest, if any, runs only from the date of the demand for payment included in the Final Decision.

WHEREFORE, for the reasons set forth above, Unisys prays for relief as follows:

1. That the Court determine that Unisys' cost accounting practices are in compliance with CAS 413, 48 C.F.R. § 9904.413, or, in the alternative, that any noncompliance has not resulted in any increased costs paid by the United States.

2. That the Court determine that Unisys has no liability to the United States for any adjustment amount determined by the Government in accordance with CAS 413.50(c)(12), or, in the alternative, that if Unisys has any liability to the

United States for any adjustment amount in accordance with CAS 413.50(c)(12), that Unisys is entitled to offset any surplus against its net actuarial liability for PRBs due to the Retired Employees.

3. That the Court determine that if any adjustment is due, any interest on that adjustment is due only from the date of the Final Decision.

4. That the Court deny the claims of the Government against Unisys asserted in the Final Decision.

5. That the Court award costs, attorneys' fees, and such other and further relief as the Court may deem just and equitable in the circumstances.

Respectfully submitted,

Terry L. Albertson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2635
Fax (202) 628-5116

Attorney of Record for Unisys Corporation

OF COUNSEL:
Amy E. Laderberg
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2563
Fax (202) 628-5116

Dated: March 9, 2005