IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNISYS CORPORATION,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 05-281C<br>(Judge Firestone) |

**PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNISYS' MOTION FOR SUMMARY JUDGMENT**

Terry L. Albertson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2635
Fax (202) 628-5116

Attorney of Record for Unisys Corporation

OF COUNSEL:
Amy Laderberg O'Sullivan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2563
Fax (202) 628-5116

Anne H. Warner
Assistant General Counsel
Unisys Corporation
11720 Plaza America Drive
Reston, VA 20190
Tel. (703) 556-5747
Fax: (703) 556-5870

Dated: October 27, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

INDEX TO APPENDIX ..... iv

CLOSING OF THE DSO SEGMENT ..... 1

CAS 413 ..... 3

TRANSFER OF PENSION ASSETS ..... 5

STATEMENT OF THE ISSUES ..... 10

STATEMENT OF THE CASE ..... 10

STANDARD OF REVIEW ..... 15

ARGUMENT ..... 16

I. Unisys' Transfer of a Portion of the Pension Surplus to Loral Complied with CAS 413.50(c)(12) ..... 16

A. The Government's Calculation Erroneously Excludes the Benefit It Receives from the Surplus Transferred to Loral ..... 20

B. The 1995 Version of CAS 413.50(c)(12) Does Not Guide the Calculation of the Government's Share of the Surplus ..... 24

C. The Government's Position Results in a Windfall ..... 26

D. The Government's Position is Inconsistent with the CASB's Flexible Approach to Implementing Adjustments. ..... 27

II. The Net Cost Impact of the Noncompliance Is the Difference Between the Benefit the Government Will Receive from Reduced Pension Costs as a Result of the Amounts Transferred to Loral and the Benefit the Government Would Have Received if the CAS 413.50(c)(12) Adjustment Had Been Paid Directly. ..... 30

CONCLUSION ..... 34

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adarbe v. United States*, 58 Fed. Cl. 707 (2003) ........................................................ 15

*Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003), *cert denied sub nom*, *Gen. Motors Corp. v. United States*, 540 U.S. 1068 (2003) (No. 03-165) ................................................................................. 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 15

*BAE Systems Information & Electronic Systems Integration, Inc.,* ASBCA No. 44832, 01-2 BCA ¶ 31495 (2001) ............................................................... 24, 27

*In re Bicoastal Corp.*, 136 B.R. 290 (M.D. Fla. 1991) ................................................. 22

*General Electric Co. v. United States*, 60 Fed. Cl. 782 (2004).......................... 2, 21, 26

*ITT Gilfillan, Inc. v. United States*, 471 F.2d 1382 (Ct. Cl. 1973)....................... 23, 24

*LTV Aerospace Corp. v. United States*, 425 F.2d 1237 (Ct. Cl. 1970)........................ 23

*Litton Systems, Inc. v. United States*, 449 F.2d 392 (Ct. Cl. 1971)............................ 27

*Sundstrand Turbo v. United States*, 389 F.2d 406 (Ct. Cl. 1968).............................. 23

*Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001) .........................passim

*Unidynamics Corp. v. Automatic Prod. International, Ltd.*, 157 F.3d 1311 (Fed. Cir. 1998) ............................................................................................. 15, 16

*Viacom, Inc. v. United States*, 70 Fed. Cl. 649 (2006) ............................................... 19

## FEDERAL REGULATIONS

4 C.F.R. § 413.20......................................................................................................... 17

4 C.F.R. § 413.50(c)(12).......................................................................................... 3, 18

4 C.F.R. § 413.80........................................................................................................... 3

48 C.F.R. § 9903.201-4(a) ...................................................................................... 28, 30

48 C.F.R. § 9903.306(a) .......... 30

48 C.F.R. § 9903.306(e) .......... 28, 31

48 C.F.R. § 9904.306(f) .......... 6, 28

48 C.F.R. § 9904.413 .......... 3

48 C.F.R. § 9904.413-50(c)(12) .......... 19

40 Fed. Reg. 43,873 (Sept. 24, 1975) .......... 17

56 Fed. Reg. 41,151 (Aug. 19, 1991) .......... 3

60 Fed. Reg. 16,534 (Mar. 30, 1995) .......... 4, 5

# INDEX TO APPENDIX


| **Exhibit** | **Description** |
|---|---|
| Exhibit 1 | May 12, 1977 Letter from CASB to IRS |
| Exhibit 2 | 56 Fed. Reg. 41,151 (Aug. 19, 1991); CASB, Staff Discussion Paper, "Accounting for Fully-funded Defined Benefit Pension Plans" (Aug. 19, 1991) |
| Exhibit 3 | 60 Fed. Reg. 16,534 (March 30, 1995) |
| Exhibit 4 | Novation Agreement (May 5, 1995) (excerpts) |
| Exhibit 5 | DCAA Audit Report (January 23, 2003) |
| Exhibit 6 | Contracting Officer's Final Decision (December 9, 2004) |
| Exhibit 7 | 40 Fed. Reg. 43,873 (Sept. 24, 1975) |
| Exhibit 8 | DCMA/DCAA Joint Guidance on Implementing the *Teledyne* Decision on CAS 413.50(c)(12) Segment Closing Adjustments (7/23/2004) |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNISYS CORPORATION,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 05-281C<br>(Judge Firestone) |

**PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF UNISYS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(d)(1) of the Court of Federal Claims, Unisys Corporation ("Unisys") hereby submits the following Proposed Findings of Uncontroverted Fact in Support of its Motion for Summary Judgment.

**CLOSING OF THE DSO SEGMENT**

1. Unisys and its various predecessors in interest have performed negotiated Government contracts for many years. Prior to 1995, Unisys and its predecessors in interest operated a number of business units that performed Government contracts and subcontracts that were covered by the Cost Accounting Standards ("CAS"). Those business units were organized in the Government Systems Group ("GSG"). On March 20, 1995, Unisys entered into a contract to sell certain GSG assets, identified as the Defense System Organization ("DSO"), to Loral. The sale included four CAS-covered Unisys segments located at Great Neck, New York; Salt Lake City, Utah; Eagan, Minnesota; and Huntsville, Alabama. The DSO transaction closed on May 4, 1995. Shortly before the sale of DSO, GSG had

been combined with Unisys' Federal Systems Division ("FSD"). The GSG operations that were not sold to Loral were retained by Unisys and continue to operate as FSD.

2. Prior to the sale of DSO, Unisys calculated and allocated pension costs using separate segment accounting at the GSG level. Pension costs were computed for the GSG businesses in the aggregate on a segmented basis and were then allocated on a composite basis to the segments that comprised GSG, including the four segments that were sold to Loral. The four sold segments participated in three separate qualified pension plans maintained by Unisys. Since 1994, each of the various Unisys pension plans had been "fully funded." As a result, Unisys had made no contributions to the plans since 1993.

3. Under the relevant regulations, Unisys had not included pension costs in its cost estimates for new Government contracts after the plans became overfunded. Unisys had recovered no pension costs on any Government contract awarded from 1993 through 1995. The Unisys situation was common for defense contractors since the early 1980s "due primarily to 'the unexpectedly robust growth of the stock market, and to a lesser extent from the shrinking defense industry workforce, dampened wage inflation for salaried employees below the corporate executive level, funding requirements imposed by the Employee Retirement Income Security Act (ERISA) of 1974, and government contract regulations'." *Gen. Elec. Co. v. United States*, 60 Fed. Cl. 782, 785 n.2 (2004) (quoting Karen L. Manos, *Government Claims to Surplus Pension Assets*, 48 Cath. U. L. Rev. 1139 (1999)).

**CAS 413**

4. In 1977, CAS 413 was promulgated by the Cost Accounting Standards Board ("CASB"). 4 C.F.R. § 413 (1978) (later recodified as 48 C.F.R. § 9904.413). CAS 413 became effective on March 10, 1978, and was to be followed by each covered contractor "on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable" under 4 C.F.R. § 413.80. Pursuant to this provision, CAS 413 first became applicable to Unisys' Government contracts as of January 1, 1979.

5. When there was a "segment closing," the original CAS 413 directed the contractor to "determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated." 4 C.F.R. § 413.50(c)(12). The Standard also provided that the "difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs." *Id.* The purpose of CAS 413.50(c)(12), as described by the CASB, was "to enable the contracting parties to negotiate an appropriate contract adjustment." May 12, 1977 Letter from CASB to IRS, at 2 (Exh. 1).

6. On August 19, 1991, the CASB published a notice seeking public comments on a Staff Discussion Paper on the topic of accounting for the pricing of fully-funded defined benefit pension plan costs. 56 Fed. Reg. 41,151 (Aug. 19, 1991) (Exh. 2). In the Background section of the Staff Discussion Paper, the CASB explained that "Overfunding did not rank among one of the original CASB's major concerns." CASB, Staff Discussion Paper, "Accounting for Fully-funded Defined

Benefit Pension Plans," at 4 (Aug. 19, 1991) (Exh. 2). The CASB observed that during the 1980s, several factors served to "convert a generally underfunded pension environment into a state tending to overfunding." *Id.* at 5.

7. On March 30, 1995, the CASB published revisions to the original CAS 413. 60 Fed. Reg. 16,534 (Mar. 30, 1995) (Exh. 3). Among other things, significant changes were made to CAS 413.50(c)(12) regarding the adjustment due as a result of a segment closing. The revised CAS 413 was not applicable to Unisys' Government contracts until January 1, 1996 under 48 C.F.R. § 9904.413-63(b). Thus, the original version of CAS 413 applies to the calculation of the adjustment related to the segment closings in this case.

8. As revised in 1995, CAS 413.50(c)(12)(v) creates what amounts to a "safe harbor" for contractors that sell segments with pension surpluses. Under that provision, if the contractor transfers to the purchaser *all* plan assets and liabilities that are attributable to the sold segment, no additional adjustment in pension costs is due to the Government. CAS 413.50(c)(12) also states in relevant part: "If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor." 60 Fed. Reg. 16,534, 16,552 (Mar. 30, 1995) (Exh. 3). This language did not appear in the original CAS 413, the advance notice of proposed rulemaking, notice of proposed rulemaking, or any of the CASB's public comments on the revisions to CAS 412 and 413; and the new language was

not added to CAS 413.50(c)(12) until the Final Rule was published on March 30, 1995. The CASB explained, "To address questions concerning overfunded pension plans, the Board ***added*** coverage to CAS [413] defining what constitutes a segment closing and providing greater specificity regarding accounting for pension costs when segments are closed or pension plans are terminated." 60 Fed. Reg. 16,534, 16,535 (March 30, 1995) (Exh. 3) (emphasis added).

9. On August 9, 2001, this Court issued its decision in *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001) ("*Teledyne I*") interpreting, *inter alia*, CAS 413.50(c)(12) and addressing the applicability of the 1995 amendments to CAS 413. This Court's decision was affirmed by the United States Court of Appeals for the Federal Circuit in *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003) ("*Teledyne II*"), *cert denied sub nom*, *Gen. Motors Corp. v. United States*, 540 U.S. 1068 (2003) (No. 03-165).

**TRANSFER OF PENSION ASSETS**

10. At the time of the Unisys/Loral transaction in 1995, long before this Court's comprehensive decisions about CAS 413 cited in the preceding paragraph, there was considerable uncertainty about the meaning of CAS 413. Unisys and at least two other contractors (whose cases are also before this Court[1]) that divested Government contract business units under the pre-1995 version of CAS 413 elected to transfer some, but not all, surplus pension assets to the purchaser. Such asset

---

1 *See Gen. Elec. Co. v. United States* (No. 99-172C); *The DirecTV Group, Inc. v. United States* (No. 04-1414C).

transfers reduced the pension costs that would otherwise have been incurred by the purchaser and charged to the Government after the transaction.

11. Unisys (and other contractors) have argued that the transfer of assets to the successors satisfied the requirements of CAS 413.50(c)(12) if the amount of benefit to the Government was at least equal to the segment closing adjustment that would otherwise have been due to the Government. 48 C.F.R. § 9904.306(f) generally authorizes a variety of alternative methods for making adjustments due under CAS: "Whether cost impact is recognized by modifying a single contract, several but not all contracts, or all contracts, or any other suitable technique, is a contract administration matter. The Cost Accounting Standards rules do not in any way restrict the capacity of the parties to select the method by which the cost impact attributable to a change in cost accounting practice is recognized."

12. Effective May 5, 1995, Unisys, Loral, and the Government entered into a Novation Agreement in connection with the sale of DSO. Pursuant to the Novation Agreement, Loral "assumed all obligations and liabilities of [Unisys] under the contracts" by virtue of the sale and became the "successor in interest in and to the contracts" that were the subject of the sale. Novation Agreement ¶¶ (a)(4), (b)(4) (Exh. 4). Pursuant to the Novation Agreement, Unisys and Loral agreed that "the Government is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or

Agreement would have been obligated to pay or reimburse under the terms of the contracts." Novation Agreement ¶ (b)(6)(i) (Exh. 4). Accordingly, under the novated contacts, Loral was, and remained, unable to recover more pension costs than Unisys would have recovered absent the sale of the DSO.

13. Effective May 5, 1995, Unisys, Loral, and the Government also entered into an Advance Agreement under FAR 31.109 relating to Loral's acquisition of Unisys' assets. Pursuant to this agreement, Loral agreed to "maintain segmented pension plan accounting for the employees of the [DSO] unless it adopts a change in cost accounting practices as provided by regulation." Novation Agreement, Exh. B ¶ (II)(I) (Exh. 4). Pursuant to a separate Advance Agreement Addressing Pension Funds (dated April 9, 1996), Unisys, Loral, and the Government "acknowledge that this Agreement is not intended to enlarge the rights of the parties but, rather, is intended to preserve . . . existing rights of the parties as of the effective date of the novation agreement." Novation Agreement, Exh. C at 1 (Exh. 4).

14. When Unisys sold the DSO assets to Loral, the Unisys plan contained assets sufficient to cover all liabilities under the plans, plus a total surplus attributable to the sold segments of $76,253,238. Unisys transferred to Loral all of the pension liabilities associated with currently active employees, along with pension assets in the Unisys plan equal to those liabilities. Unisys also transferred to Loral an additional $27,377,055 in pension assets over and above the assets equal to the liability transferred to Loral. Unisys retained the remaining $48,876,182 of the total pension surplus of $76,253,238.

15. At the time of the sale, if there had been no transfer of assets to Loral, the adjustment due to the Government under CAS 413.50(c)(12) as of May 4, 1995 would have been no more than $13,534,954.[2]

16. Unisys could not have withdrawn surplus assets from the plan in 1995 or thereafter in order to transfer cash to the Government equal to the amount of the segment closing adjustment due under CAS 413 without triggering substantial excise taxes and penalties on the amounts withdrawn.

17. After the purchase of DSO, Loral and its successor in interest were and would continue to be required to recognize the transferred surplus in pricing new Government contracts and in charging contracts that were novated. As a result of the surplus transfer, Loral and its successor in interest have actually charged lower amounts of pension cost to the Government in years following the sale than would have been charged if no surplus had been transferred. The Government auditors have conceded that "since Unisys transferred $27,377,055 of the $76,253,238 surplus pension assets to the successor-in-interest (Loral), the Government and

---

[2] The parties have not agreed on the precise dollar amount of the adjustment that would have been due in 1995, but we do not believe that there is any significant difference in the parties' positions. The total assets and liabilities for the DSO are undisputed. In arriving at the total amount due to the Government if no assets or liabilities had been transferred to Loral, Unisys utilized the Government's own calculation of its share for each of the closed segments (20.70 percent for Great Neck, 13.92 percent for Huntsville, 6.14 percent for Eagan, and 27.90 percent for Salt Lake City). Final Decision at 4-5. Unisys reserves its right to contest portions of the Government calculation if this Motion is denied, but for purposes of this Motion, Unisys has used the Government's numbers.

other customers of the sold segments will continue to benefit from these transferred surplus assets." DCAA Audit Report (January 23, 2003) at 6 (Exh. 5).

18. The DCAA Audit Report confirms that "[t]he proper accounting for the $27,377,055 asset transfer to the successor-in-interest (Loral) . . . is the primary difference between the contractor's computation of the required pension cost adjustment and our audit [DCAA] recommended pension cost adjustment." DCAA Audit Report (Jan. 23, 2003) at 5 (Exh. 5). The Government contends that "[t]he contractor's method represents an 'out-of-sequence' application of the *original* CAS 413.50(c)(12) requirements and does not result in the logical recovery of previously overstated pension costs . . . ." DCAA Audit Report (Jan. 23, 2003) at 6 (Exh. 5) (emphasis in original).

19. The Government argues that it is entitled to an additional cash payment equal to the product of the assets remaining in the plan after the transfer to the successor multiplied by the Government share of the total surplus assets calculated in accordance with the requirements of CAS 413.50(c)(12). The Final Decision cites the original provision of CAS 413.50(c)(12) as the authority for the adjustment that the Government seeks.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNISYS CORPORATION,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 05-281C<br>(Judge Firestone) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNISYS' MOTION FOR SUMMARY JUDGMENT**

## STATEMENT OF THE ISSUES

Whether Unisys Corporation's ("Unisys") transfer of its pension liabilities and certain assets to Loral Corporation ("Loral") complied with the requirements of Cost Accounting Standard ("CAS") 413.50(c)(12) as in effect on the date of the transaction.

Whether, assuming that Unisys failed to comply with CAS 413.50(c)(12), the net impact of the noncompliance is the difference between the benefit that the Government will receive in the form of reduced pension costs as a result of the amounts transferred to Loral and the benefit that the Government would have received if the CAS 413.50(c)(12) adjustment had been paid directly to the Government.

## STATEMENT OF THE CASE

This suit arises from a dispute between Unisys and the United States of America (the "Parties") relating to Unisys' compliance with CAS 413.50(c)(12) in

connection with the sale of four of its business units to Loral in May of 1995. Unisys timely appealed from the Final Decision of the Contracting Officer dated December 9, 2004 ("Final Decision") (Exh. 6), asserting a Government claim against Unisys of non-compliance with CAS 413 related to the business units' sale and demanding payment from Unisys in the amount of $8,488,809, plus interest as of September 30, 2004, in the amount of $5,622,203. The Government's claim is based on its position that the Government's percentage share of the pension surplus may be applied to any surplus assets retained by Unisys, no matter how much benefit the Government may derive from assets transferred by Unisys. Final Decision at 3 (Exh. 6).

In its Final Decision, the Government cites to no direct statutory, regulatory, or contractual support for its position with regard to the calculation of the Government's percentage share of the surplus.[3] The Government's method of calculation produces a windfall for the Government. It is illogical, patently unfair, and inconsistent with the pre-1995 version of CAS 413.50(c)(12) and this Court's decision in *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (2001) ("*Teledyne I*").

---

[3] The 1995 version of CAS 413 (which is not applicable to the transaction at issue) provides at CAS 413.50(c)(12)(v), "If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment amount required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor." The regulation as it existed prior to the 1995 revision simply required an "adjustment" of costs and did not specify how that adjustment was to be made.

In contrast, Unisys' method of calculating the segment closing adjustment appropriately accounts for the entire DSO surplus and the true benefit realized by the Government. Moreover, this Court need not speculate about whether the assets transferred by Unisys in 1995 actually benefited the Government Unisys' successor-in-interest was contractually obligated to give the Government the benefit of those transferred assets and, since the sale of the business units at issue, the Government has *in fact* received more than the share of the benefit of any surplus that would have been due under CAS 413.50(c)(12) if Unisys had not caused the transfer of the surplus assets to Loral.

During the lengthy negotiations that preceded the Final Decision, the Parties resolved most issues, so the remaining unresolved issue before the Court is narrow and focused. Unisys moves for summary judgment on two separate legal grounds, and if the Court grants this motion on either ground, this case could easily be resolved in its entirety by the Parties.[4]

The factual issues pertinent to this motion are largely undisputed. Unisys and its predecessors in interest had performed negotiated government contracts for many years. On March 20, 1995, Unisys entered into a contract with Loral Corporation ("Loral") to sell most of the assets associated with Unisys' Government contracts business. The transaction closed on May 4, 1995.

---

[4] Because this is one of a handful of lingering cases involving disputes under the original/pre-1995 version of CAS 413.50(c)(12), it is very unlikely that the decision in this case will have any impact on future transactions under the revised regulation.

At the time of the transaction, the assets in the pension plan attributable to the segments that were sold exceeded the actuarial liabilities attributable to those assets. Under the terms of the sale, Unisys transferred to Loral pension assets equal to the liability transferred to Loral plus additional pension assets of $27,377,055. Unisys' agreement with Loral was not unique. Other contractors involved in similar transactions under the pre-1995 CAS regulations also transferred a portion of the surplus in their pension plans to their successors, as the various cases pending before this Court demonstrate. (For transfers from Teledyne, Inc. to General Dynamics Land Systems, Inc., *see Teledyne I*, 50 Fed. Cl. at 159-60; from General Electric Company to Martin Marietta and Westinghouse, *see* Compl. at 9-12, *General Electric Co.* (No. 99-172C); and from The DirecTV Group, Inc. to Raytheon Company and Boeing Company, *see* Second Am. Compl. at 2, *The DirecTV Group, Inc. v. United States* (No. 04-1414C)). We believe that the fact that several contractors, acting independently and without coordination, entered into transactions under the pre-1995 rules that evidence a shared approach to the meaning of the pre-1995 regulations is a significant factor to be considered in deciding the meaning of the original version of CAS 413.

The Government's calculation of the segment closing adjustment is not in accordance with the original CAS 413.50(c)(12) or with this Court's decision about the meaning of that regulation in *Teledyne I*. The Government's calculation gives Unisys insufficient credit for the value realized by the Government from the transferred assets. Under the Government's theory, if Unisys had written the

Government a check for approximately $13 million and transferred no assets to Loral, Unisys would have completely satisfied its obligations under CAS 413. Instead, Unisys transferred over $27 million in surplus assets to Loral, where the transferred assets were invested in the pension plan and earned income, continuing to reduce costs on Government work. The Government ignores the benefits it received as a result of that transfer. Moreover, under the Government's approach, the more assets a seller transfers to a buyer, the larger the Government's total entitlement to assets would be – a result that is both illogical and inequitable.

There was and is nothing speculative or uncertain about the effect that the transfer of assets from Unisys to Loral would have on Government contracts. If no surplus assets had been transferred, Loral would have been entitled to recover the pension costs it incurred after the asset purchase. As a result of the transfer of a portion of the pension surplus to Loral, the Government continued to enjoy a share of the benefits of the overfunding in the Unisys plans by paying lower pension costs on its contracts with Loral and Loral's successors. More importantly, the dollar benefit that the Government has actually realized as a result of the transfer of surplus has more than exceeded the dollar value of the any cash adjustment that may have been due to the Government in 1995 if Unisys had retained all pension surplus. Accordingly, Unisys has satisfied any obligation it had to "adjust" costs under the original CAS 413.50(c)(12).

Further, even if the Unisys transfer of assets failed to comply with the cost adjustment provisions of CAS 413.50(c)(12), the Government is entitled only to the

net increase in cost paid by the Government as a result of the noncompliance. That amount is the difference between (1) the actual benefit that the Government will receive in the form of reduced pension costs as a result of what Unisys did in attempting to comply with CAS 413 and (2) the benefit that the Government would have received if Unisys had complied with the literal requirement of CAS 413.50(c)(12) and paid the adjustment directly to the Government in 1995. There is no cost impact in this case because the Government has received a greater benefit from the amount of surplus transferred to Loral than the Government would have received had Unisys paid the Government its share of the surplus in cash at the time of the sale.

## STANDARD OF REVIEW

This Court is required to enter summary judgment for a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Unidynamics Corp. v. Automatic Prod. Int'l, Ltd.*, 157 F.3d 1311, 1316 (Fed. Cir. 1998); *Adarbe v. United States,* 58 Fed. Cl. 707, 714 (2003). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is material if it will make a difference in the result of a case under the governing law. *Id.* "In deciding whether a genuine issue of material fact exists, the evidence must be

viewed in the light most favorable to the nonmoving party with doubts resolved in its favor." *Unidynamics*, 157 F.3d at 1316. As this Court held in *Teledyne I*, "determining the proper interpretation of the original . . . version of CAS 413.50(c)(12) is a question of law, which may be properly resolved on summary judgment." *Teledyne I*, 50 Fed. Cl. at 161 (citing *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995)). Although there may be disagreements between Unisys and the Government about the precise amounts at issue, the two issues presented in this motion are the only issues that have prevented the Parties from reaching a negotiated settlement of this matter. The Court's decision on those issues will almost certainly permit the Parties to reach agreement.

## ARGUMENT

### I. Unisys' Transfer of a Portion of the Pension Surplus to Loral Complied with CAS 413.50(c)(12).

The plain language in CAS 412 and 413, the CASB's intent in promulgating these standards, and the actual treatment of the surplus under various agreements between the Parties are consistent with Unisys' interpretation of the segment closing adjustment calculation required under the original CAS 413.50(c)(12). The Unisys interpretation also produces a result that is fair and equitable.

CAS 412 and 413 were promulgated to govern the measurement, assignment, and allocation of pension costs to government contracts. In the preamble to CAS 412, the CASB explained the need for a specific cost accounting standards addressing pension costs:

> The need for such measurement and assignment criteria for contracts is particularly critical because of the long-

> range projections used in computing pension cost and because the many techniques available for measuring and assigning such cost have significant impacts there-on. The significant amounts involved in annual pension cost calculations, the changes in the mix of contractors' Government and commercial business, and the settlement of individual contracts long before actual pension costs can be determined create a special need to provide criteria relative to the assignment of pension costs among cost accounting periods and the allocation of such costs to the cost objectives of the periods.

40 Fed. Reg. 43,873, 43,874 (Sept. 24, 1975) (Exh. 7).

CAS 413 was promulgated two years later to address issues left unresolved by CAS 412. The CASB's intent in CAS 413 was explained as follows:

> A purpose of this Standard is to provide guidance for adjusting pension cost by measuring actuarial gains and losses and assigning such gains and losses to cost accounting periods. The Standard also provides the bases on which pension cost shall be allocated to segments of an organization. The provisions of this Cost Accounting Standard should enhance uniformity and consistency in accounting for pension costs.

4 C.F.R. § 413.20.

The CASB required that actuarial gains and losses associated with a going concern should be amortized over 15 years and be reflected in pension costs for future cost accounting periods rather than in the year of the gain or loss. The impact of other events on pension funding must be spread over periods ranging from 10 to 40 years. In the long term, that approach produced a fair allocation of pension costs and reduced the risk that there would be disruptively large changes in the amount of pension costs from year to year. The CASB also recognized that as a result of the cost "smoothing" that was inherent in the CASB amortization

requirements, when a segment ceases to do business with the Government, a catch-up adjustment was needed. The "segment closing" concept was created to deal with that catch-up adjustment:

> As a general rule, [CAS 413] . . . is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.

*Id.* Pt. 413, Preamble A.

The purpose of the original CAS 413.50(c)(12), as described by the CASB, was "to enable the contracting parties to negotiate an appropriate contract adjustment." May 12, 1977 Letter from CASB to IRS, at 2 (Exh. 1). The precise calculations required for this "negotiated" adjustment were not provided by the CASB. It was left up to the parties to negotiate fair results on a case-by-case basis. The only guidance in the original CAS 413.50(c)(12) was very general: "[i]f a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. . . . . The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs." 4 C.F.R. § 413.50(c)(12). This Court's prior decisions have articulated the complete formula that is required to calculate the amount of the adjustment due to the Government, and there is fundamentally no dispute in this case about that amount. The question

in this case – a question of first impression – concerns the mechanics of the adjustment. Must the adjustment be exclusively in the form of a check or cash transfer, or may it also be made in the form of an asset transfer that reduces costs on Government contracts?

The 1995 revision of the regulations made substantial changes to CAS 413.50(c)(12), including the introduction of a very specific formula for allocating a pension surplus or deficit between the Government and the contractor. *See Teledyne I*, 50 Fed. Cl. at 178 (holding that the changes made by the 1995 amendments were "significant"); *see also Viacom, Inc. v. United States*, 70 Fed. Cl. 649, 651-52 (2006) (observing that CAS 413.50(c) "was substantially revised in 1995"). That formula was not in the pre-1995 standard. 48 C.F.R. § 9904.413-50(c)(12); *see also* DCMA/DCAA Joint Guidance on Implementing the *Teledyne* Decision on CAS 413.50(c)(12) Segment Closing Adjustments (7/23/2004) at 5 (Exh. 8) ("Original CAS 413 does not expressly provide a method or formula for calculating the Government's share of the segment closing adjustment."). In *Teledyne I* this Court held that "[t]he original CAS 413.50(c)(12) contains no specific provision that sets forth a formula for applying the segment closing adjustment." *Teledyne I*, 50 Fed. Cl. at 158 n.5. This Court has further recognized that the original CAS 413.50(c)(12) "has not been consistently applied," even within the Government. *Id.* at 176.

The omissions in the original CAS 413 generated confusion, but several contractors including at least Unisys; Teledyne, Inc.; and General Electric

Company, elected to transfer a portion of the surplus pension assets to their respective successors-in-interest.

The formula applied to such partial asset transfers in the 1995 revisions to the Standard is basically punitive and clearly intended to encourage contractors to take advantage of the "safe harbor" in CAS 413.50(c)(12)(v) by transferring the entire surplus to the purchaser. Had the current formula been in the regulation prior to 1995, it is almost certain that the transactions in question would have been structured differently. The new formula was a complete surprise when it made its first public appearance in the final rule issued on March 30, 1995, or ten days after the terms of the Unisys/Loral transaction had been agreed upon. There is no basis for applying that formula retroactively to transactions that were entered into before any contractor had any notice of this change in the Government's position.

### A. The Government's Calculation Erroneously Excludes the Benefit It Receives from the Surplus Transferred to Loral

The fundamental flaw in the Government's position is that it fails to take into account the full extent of the benefit that the Government has received (and continues to receive) from the surplus transferred to Loral. The Government seeks to recover a percentage share of the surplus retained by Unisys notwithstanding the fact that the Government has retained and continues to reap substantial benefits on account of the surplus that Unisys transferred to Loral.

CAS 413.50(c)(12) states that the difference between the assets and liabilities is determined "for the segment" – not a portion of the segment – and further explicitly states that in calculating the adjustment, "The market value of the assets

allocated to the segment shall be the segment's proportionate share of the *total market value of the assets of the pension fund*." CAS 413.50(c)(12) (emphasis added). This Court has held that "Section 413.50(c)(12) of the CAS . . . requires that the contractor account for *all of the funds contributed by or on behalf of the segment*." *General Electric Co. v. United States*, 60 Fed. Cl. 782, 796 (2004) (emphasis added). This Court has further cautioned that "incomplete" segments must not be artificially "carve[d] out" from a "complete" segment for purposes of the calculation of a segment closing adjustment. *See id*. The Government's approach is erroneously based on an "incomplete" view of the DSO segment, focused only on the portion of the sold segments' assets and liabilities retained by Unisys. In contrast, Unisys' calculation is appropriately based on a consideration of the entire pension surplus of the sold segments and the entire benefit realized by the Government.

Even though the Government's calculation in the Final Decision completely ignores the true benefit to the Government associated with the surplus transferred to Loral, the Government auditors recognize that the Government will continue to benefit from that surplus: "[S]ince Unisys transferred $27,377,055 of the $76,253,238 surplus pension assets to the successor-in-interest (Loral), the Government and other customers of the sold segments will continue to benefit from these transferred surplus assets." DCAA Audit Report No. 6181-97D19200123-S1, at 6 (Jan. 23, 2003) (Exh. 5); *see also id*. at 11 ("The surplus transferred to the successor-in-interest (Loral) will benefit all continuing work sold to Loral."). Courts have also recognized that the Government retains its interest in any pension

surplus transferred to the successor-in-interest. In *In re Bicoastal Corp.*, 136 B.R. 290 (M.D. Fla. 1991), the Bankruptcy Court held that following a segment closing, the Government had a right to an "equitable share" (in the form of a cash refund) in the pension surplus transferred to the successor-in-interest. *Id.* at 294. Accordingly, not only does the Government retain its "right" to the pension surplus transferred to Loral, but, as discussed in greater detail below, the Government has in fact received a significant benefit from the transferred surplus.

In addition to the CAS requirements that apply to the successors to Unisys, the terms of the Novation Agreement between Loral, Unisys, and the Government effective May 4, 1995, guaranteed that the Government's interest in the surplus transferred to Loral would be protected. Pursuant to the Novation Agreement, and therefore with the Government's express approval, Loral "assumed all obligations and liabilities of [Unisys] under the contracts" by virtue of the sale and became the "successor in interest in and to the contracts" that were the subject of the sale. Novation Agreement ¶¶ (a)(4), (b)(4) (Exh. 4). Unisys, Loral, and the Government further agreed that "the Government is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the contracts." *Id.* ¶ (b)(6)(i). The Novation Agreement prohibits Loral (and its successors) from treating the pension assets in a way that would increase

costs on novated contracts over the amount Unisys would have recovered, ensuring the Government's continued benefit from any transferred surplus. *See, e.g., Sundstrand Turbo v. United States*, 389 F.2d 406 (Ct. Cl. 1968); *LTV Aerospace Corp. v. United States*, 425 F.2d 1237 (Ct. Cl. 1970) (holding that as a result of novation agreement, depreciation is only allowable based on contractor's book value, not on stepped-up basis of successor in interest); *ITT Gilfillan, Inc. v. United States*, 471 F.2d 1382, 1386, 1389 (Ct. Cl. 1973) ("cost increases due to accounting changes or evaluations unrelated to substantive or actual changes" are not costs that "the Government would have had to pay" its original contractor).

The novation language is standard boilerplate from FAR 42.1204 and reflects a fundamental policy decision by the Government that changes in ownership and control may not cause increases in the amount the Government is liable to reimburse under any novated contract. As this Court's predecessor explained in *ITT Gilfillan, Inc. v. United States*, 471 F.2d 1382 (Ct. Cl. 1973):

> It follows that the cost inspection officers of the Government, the contracting officers, and the Board, are not called upon to decide such false issues as whether a cost questioned under [the novation clause] will, if incurred, benefit the Government in the long run, whether it is reasonable, whether it is allowable under cost accounting principles, or whether if it were not incurred, other allowable costs would mount even larger. The issue before them is, solely and simply, whether the questioned cost arises directly or indirectly out of the novation and contract transfer, and whether it is one the Government would have had to pay, absent any novation. . . . Whatever uncertainty there may be does not justify the parties going into battle on any of the false issues indicated above.

*Id.* at 1391; *see also BAE Systems Info. & Elecs. Sys. Integration, Inc.*, ASBCA No. 44832, 01-2 BCA ¶ 31495, at 10650 (2001) ("The Government has maintained historically that it should be placed in no worse a position by a change in business ownership than it would have been in had the change not taken place . . . . Indeed, pursuant to the language of the standard novation agreement, courts and administrative boards have repeatedly held costs resulting from a write-up of assets after the acquisition of a contractor are not recoverable by a successor in interest because the costs could not be recovered by the original contractor."). The Government's interest in the surplus transferred to Loral is a benefit that is protected by a written novation agreement between the Parties. That agreement and the obligations it creates must be acknowledged in calculating the segment closing adjustment under CAS 413.50(c)(12).

### B. The 1995 Version of CAS 413.50(c)(12) Does Not Guide the Calculation of the Government's Share of the Surplus

The Government argues that the new formula added in the last redraft of the 1995 version of CAS 413.50(c)(12) is just a restatement of the hidden meaning of the prior rule. Even the Government's own auditors seem to realize that is not a good argument. *See, e.g.,* DCAA Audit Report (Jan. 23, 2003), at 11 (Exh. 5) ("If the *1995* CAS 413 were used to account for the 1995 segment closings, then Unisys would clearly be required to compute the CAS 413.50(c)(12) 'difference' on a <u>retained</u> asset and <u>retained</u> actuarial liability basis . . . ." (emphasis in original)). In *Teledyne I*, this Court determined that the 1995 version of CAS 413 neither applies to

transactions covered by the original CAS 413 nor guides the interpretation of the original language:

> [B]y its plain terms, the new CAS 413 is simply advisory with respect to a pension surplus or deficit that is attributable to pension costs paid by the government under "prior and existing contracts" that do not contain the right to a "price adjustment." Clearly, the CASB would not have included a transition method with respect to prior and existing contracts not subject to price adjustment if recovery of a surplus or deficit of pension costs . . . was otherwise provided for under the original CAS 413.50(c)(12). As the Federal Circuit has noted, the fact that an amendment is expressly made prospective leads to the conclusion that the amended language was not intended by the original enactment.

*Teledyne I*, 50 Fed. Cl. at 176-77. This Court observed that the changes made by the 1995 CAS 413 were "significant," as evidenced by the subsequent amendments to the FAR in order to conform with the CAS revisions. *See id.* at 178. "Importantly, there would have been little reason to amend the FAR if the pension surplus or deficit . . . was recoverable under the original CAS 413 segment closing adjustment. Indeed, the notice of proposed rulemaking indicates that the FAR was amended in response to the 'substantial' changes in the 1995 CAS 413." *Id.*

Neither the regulatory history of the original CAS 413 nor the plain language in CAS 413.50(c)(12) suggest that the CASB intended to impose the post-1995 requirements on pre-1995 segment closing adjustments. The Government has failed to offer any other support (regulatory history, case law, the Parties' course of dealing, or otherwise) for its assertion that the original CAS 413.50(c)(12) required the application of the formula first announced in the final version of the 1995 amendments.

### C. The Government's Position Results in a Windfall

In *Teledyne I* this Court rejected the Government's position regarding the interpretation of CAS 413 when such position "leads to potentially absurd results." *Teledyne I*, 50 Fed. Cl. at 181. This Court has similarly avoided interpretations of CAS 413 that are based on "ignor[ing]" portions of the funds that would result in receipt of a "windfall" by one of the parties. *Gen. Elec. Co.*, 60 Fed. Cl. at 794, 796; *see also id.* at 796 (holding that CAS "requires that the contractor account for *all* of the funds contributed by or on behalf of the segment" (emphasis in original); *Teledyne I*, 50 Fed. Cl. at 183 ("To allow Teledyne to keep the surplus pension assets attributable to pension costs paid by the government would result in a windfall to Teledyne that would be contrary to the contractual intent of the parties."). The Government's position in this case would generate a substantial windfall of the type that this Court has consistently rejected in prior decisions.

For example, if a pension surplus in the amount of $100 is retained in its entirety by the contractor in a segment closing transaction, and the Government's share of the surplus determined in accordance with *Teledyne I* is 10 percent, it is undisputed that the Government would be entitled to an adjustment equal to $10. It logically follows, of course, that the remaining $90 belongs to the contractor. However, based on the Government's position in this case, if the contractor transferred $50 of that surplus to the successor-in-interest, the Government would not only retain the benefit of the $50 in transferred surplus, but it would also claim entitlement to 10 percent of the $50 in surplus remaining with the contractor. If the contractor transferred $99, the Government would keep $99 and claim 10

percent of the $1 remaining in the fund. No matter how much the contractor actually transfers to the successor, the Government would reap a windfall.

The result described in the preceding paragraph, although patently unfair, is clearly required under the post-1995 regulation. There is no evidence in the record about the reason that punitive provision was added to the final version of the regulation in 1995, but one likely motive was to force contractors to avail themselves of the safe harbor in the 1995 version of the regulation by transferring 100 percent of any surplus to the purchaser (which, as demonstrated earlier, maximizes the long-term benefit to the Government). While contractors are *now* aware of that punitive requirement and can structure transactions to avoid it, contractors prior to 1995 had no reason to suspect that the pre-1995 regulation would be interpreted as including such an onerous provision. Retroactive application of a completely new and harshly punitive rule would be legally and equitably unjustified. *See, e.g., Litton Sys., Inc. v. United States*, 449 F.2d 392, 401 (Ct. Cl. 1971); *BAE Sys. Info. & Elec. Sys. Integration, Inc.*, ASBCA No. 44832, 01-2 BCA ¶ 31495 (2001).

### D. The Government's Position is Inconsistent with the CASB's Flexible Approach to Implementing Adjustments.

CAS permits a range of approaches to make the Government whole when implementing adjustments to contract price or cost allowances as a result of a change in accounting practice or failure to comply with a CAS standard or cost accounting practices. The Government position effectively ignores those flexible administrative guidelines.

The Cost Accounting Standards clause required by CAS 9903.201-4(a) merely identifies the amount of the adjustment, not the mechanics of how the adjustment is made:

> [The Contractor shall a]gree to an adjustment of the contract price or cost allowance, as appropriate, if the Contractor a subcontractor fails to comply with an applicable Cost Accounting Standard, or to follow any cost accounting practice consistently and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States, together with the interest thereon . . . for such period, from the time the payment by the United States was made to the time the adjustment is effected. In no case shall the Government recover costs greater than the increased cost to the Government, in the aggregate, on the relevant contracts subject to the price adjustment, unless the Contractor made a change in its accounting practices of which it was aware or should have been aware at the time of price negotiations and which it failed to disclose to the Government.

48 C.F.R. § 9903.201-4(a). Section 9903.306 addresses implementation of CAS adjustments and illustrates the broad range of methods permitted by the CASB for implementing required adjustments. "Whether a cost impact is recognized by modifying a single contract, several but not all contracts, or all contracts, or any other suitable technique, is a contract administration matter." 48 C.F.R. § 9903.306(e); *see also id.* at § 9903.306(f).

As the CAS Board's comments demonstrate, the Board normally expected the parties to negotiate the mechanics of payment. The important issue is whether the Government receives the consideration that is due under the regulations, not the mechanics of payment. In the context of a segment closing, where the segment closing is the result of a corporate divestiture, timely agreement with the

Government in advance of the transaction is virtually impossible to achieve. Corporate divestitures are typically the result of confidential negotiations in which the Government does not play any role. As a realistic matter, when contractors negotiate divestitures that involve segment closings under CAS 413, they must try to structure the transaction on the basis of what they believe to be reasonable interpretations of the regulations.

It is no accident that a number of contractors acting separately and without consultation under the pre-1995 regulations decided to transfer some portion of the pension plan surplus to purchasers. Because tax and labor laws effectively prohibit contractors from removing assets from the pension trust, the only way contractors may use the assets in the pension trust to give the Government fair consideration for the "Government share" of any pension surplus is to transfer assets to the purchaser, where the assets will continue to benefit the Government by reducing costs on current and future contracts.

The Government's convoluted, illogical, and fundamentally unfair interpretation of the adjustment required under the pre-1995 version of CAS 413.50(c)(12) is wholly inconsistent with CASB's intent, which contemplated case-by-case negotiation and resolution of adjustments in a way that is fair and practical. Unisys' transfer of a portion of the pension surplus to Loral at the time of closing was not prohibited by CAS 413.50(c)(12), and, accordingly, its calculation of the segment closing adjustment is embraced as one of a variety of adjustment methods permitted by the CASB.

In sum, the transfer of surplus assets from the Unisys pension plans to the successor plans, where they continued to benefit the Government by reducing future costs, complied with the requirements of CAS 413.50(c)(12).

## II. The Net Cost Impact of the Noncompliance Is the Difference Between the Benefit the Government Will Receive from Reduced Pension Costs as a Result of the Amounts Transferred to Loral and the Benefit the Government Would Have Received if the CAS 413.50(c)(12) Adjustment Had Been Paid Directly.

Even if the Court agrees with the Government and concludes that Unisys' transfer of assets to Loral did not comply with pre-1995 provisions of CAS 413, the Government would be entitled to recover only the net impact of that noncompliance on all CAS-covered contracts in effect on the date of the transaction. As explained in Section I.D above, the adjustment required pursuant to the Cost Accounting Standards clause in CAS 9903.201-4(a) based on a CAS noncompliance "shall provide for recovery of the increased costs to the United States." 48 C.F.R. § 9903.201-4(a). Further, "increased costs" are deemed to have resulted whenever the cost paid by the Government as a result of a noncompliance is "higher than it would have been had the . . . applicable Cost Accounting Standards [been] complied with." 48 C.F.R. § 9903.306(a). Section 9903.306(e) further explains that this adjustment may take into account any offsets for benefits received by the Government on other contracts as a result of the noncompliance:

> An adjustment to the contract price or of cost allowances to the Cost Accounting Standards clause at 9903.201-4(a) may not be required when a . . . failure to follow Standards or cost accounting practices is estimated to result in increased costs being paid under a particular contract by the United States. This circumstance may arise when a contractor is performing two or more covered

> contracts, and the change or failure affects all such contracts. The change or failure may increase the cost paid under one or more of the contracts, while decreasing the cost paid under one or more of the contracts. In such case, the Government will not require price adjustment for any increased costs paid by the United States, so long as the cost decreases under one or more contracts are at least equal to the increased cost under the other affected contracts, provided that the contractor and the affected contracting officers agree on the method by which the price adjustments are to be made for all affected contracts. In this situation, the contracting agencies would, of course, require an adjustment of the contract price or cost allowances, as appropriate, to the extent that the increases under certain contracts were not offset by the decreases under the remaining contracts.

48 C.F.R. § 9903.306(e).

Here, because the Government paid no pension costs to Unisys after May 4, 1995, it is not entirely clear what "increased" cost the Government thinks it did pay. The Government has never articulated its claim in terms of "increased costs" that it paid, and it could not do so under the circumstances. The Government's claim is for refunds not made rather than for increased costs paid. Nevertheless, the fundamental concept underlying the proper calculation of the net impact of any noncompliance is that the contractor is liable for the net difference between what the Government would be entitled to receive or be obligated to pay if the contractor complied with the standard and what the Government has received or paid under the noncompliant practice.

If Unisys had simply written a check to the Government for its share of the surplus on the day of the transaction in 1995, the amount of the check would have

been $13,534,954.[5] There is no question that writing a check to the Government for that amount would comply with the requirements of the standard. Instead of writing a check to the Government, Unisys transferred substantial assets to its successor, with a novation agreement that effectively obligated the successor to use the assets to reduce costs on Government contracts. Unisys believes that its transfer of assets complied with CAS 413's requirement for a segment closing adjustment. If the transfer did not comply with those requirements, the Government is entitled to the same remedy it would be entitled to receive for any noncompliance, that is, to an adjustment to compensate it for any increased cost paid "in the aggregate" as a result of the noncompliance.

In order to determine whether "in the aggregate" the Government has paid increased costs as a result of the alleged noncompliance, the first and necessary step is to determine the value that the Government has and will receive in the form of reduced pension costs as a result of the amounts transferred to Loral (the non-

---

5 As indicated above, the Government has never identified this number, but mathematically it is the number produced by calculating the cash adjustment due under the *Teledyne* formula, using the Government's own numbers. In arriving at the total amount due to the Government if no assets or liabilities had been transferred to Loral, Unisys utilized the Government's own calculation of its share for each of the closed segments: 20.70 percent for Great Neck, 13.92 percent for Huntsville, 6.14 percent for Eagan, and 27.90 percent for Salt Lake City. *See* Final Decision at 4-5 (Exh. 6). Unisys next applied those percentage shares to the pension surplus for each of the closed segments: $51,778,743 for Great Neck, $363,120 for Huntsville, $20,744,005 for Eagan, and $3,367,370 for Salt Lake City. *See* Jan. 23, 2003 Audit Report at 5. Accordingly, the Government's share of pension surplus as of January 1, 1995 is $12,981,924, which, adjusted at a rate of 4.26 percent (the
(continued…)

compliant practice) and the immediate cash benefit that the Government would have received if $13,534,954 had been paid directly to the Government.[6]

We emphasize that we do not request the Court to find that the precise dollar amount of the cash adjustment due for the segment closing is $13,534,954 or what precise benefit the Government has realized and will continue to realize for the value of the surplus transferred to Loral. The Parties have generally been able to reach agreement in this case on the numbers. What divides the Parties, and what we ask the Court to find in this motion is whether the method Unisys offers to calculate the impact of its alleged noncompliance is consistent with the regulatory and statutory requirements that contractors make the Government whole for the increased costs "in the aggregate" paid as a result of the noncompliance. Unisys' position is that the net impact to the Government is zero because the benefit that the Government has already received as a result of the surplus asset transfer to Loral exceeds the cash adjustment of "previously-determined pension costs" required by CAS 413. That benefit will continue to grow because the assets generate income that is used to further reduce costs until the assets are exhausted.

(…continued)

undisputed calculated rate of return on assets, *see* Final Decision at 4 (Exh. 6)), results in a share of no more than $13,534,954 as of May 4, 1995.

6 Unisys' Government customers benefited from the strategy adopted by Unisys in other ways as well. If Unisys had written a check for the value of the adjustment due, it would have been deposited in the U.S. Treasury and would not benefit any of the agencies or programs that had paid to fund the Unisys' pension plan. For that reason, Government customers generally favor the kind of adjustment made by Unisys, one that directs the benefit of the adjustment to future programs and customers in the form of lower costs.

Unisys provided the Government with its calculation of the cost impact on May 26, 2004. We do now know whether the Government has audited that calculation, but the information in the cost impact came from the Unisys successors-in-interest and is not difficult for the Government to verify. The simple fact is that the cash adjustment that would have been due is less than half of the $27,377,055 in pension surplus that was actually transferred to Loral at the time of the sale, and the successors-in-interest to that business continued to use the surplus to benefit CAS-covered Government contracts of that business. The Government's own auditors admit the Government continues to benefit to this day from the transfer.

Even if the transfer of assets to Unisys' successor was not CAS-compliant, in the absence of any harm to the Government as a result of that alleged noncompliance, Unisys is entitled to summary judgment.

## CONCLUSION

The Government position in this case is fatally flawed.

First, the Government seeks to apply regulatory provisions that are punitive on their face retroactively to a situation in which the contractor did its best to implement the provisions of a confusing regulation in a rational way. It would never have occurred to any reasonable person that relevant provisions of the original 1977 regulation could possibly have the meaning announced for the first time in 1995 when those regulations were rewritten.

Second, even assuming there was a technical noncompliance with the regulation, the Government urges that the Court adopt a method of calculating damages here that ignores the very real monetary benefits realized by the

Government as a result of that "noncompliant" practice. The Government is entitled to be compensated for CAS noncompliances only if the noncompliance causes the Government harm through increased costs. If the Government has received more benefit from the noncompliant practice than it would have received from a compliant practice, as is the case here, it is not entitled to any damages.

The Court must grant Unisys' motion for summary judgment.

Respectfully submitted,

s/Terry L. Albertson

Terry L. Albertson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2635
Fax (202) 628-5116

Attorney of Record for Unisys Corporation

OF COUNSEL:
Amy Laderberg O'Sullivan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2563
Fax (202) 628-5116

Anne H. Warner
Assistant General Counsel
Unisys Corporation
11720 Plaza America Drive
Reston, VA 20190
Tel. (703) 556-5747
Fax: (703) 556-5870

Dated: October 27, 2006

**CERTIFICATE OF FILING**

I hereby certify that on the 27th day of October, 2006, a copy of the foregoing Proposed Findings of Uncontroverted Facts, Memorandum of Points and Authorities in Support of Unisys' Motion for Summary Judgment, and Appendix were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Terry L. Albertson