IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNISYS CORPORATION,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 05-281C<br>(Judge Firestone) |

# APPENDIX TO PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNISYS' MOTION FOR SUMMARY JUDGMENT

Terry L. Albertson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2635
Fax (202) 628-5116

Attorney of Record for Unisys Corporation

OF COUNSEL:
Amy Laderberg O'Sullivan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2563
Fax (202) 628-5116

Anne H. Warner
Assistant General Counsel
Unisys Corporation
11720 Plaza America Drive
Reston, VA 20190
Tel. (703) 556-5747
Fax: (703) 556-5870

Dated: October 27, 2006

# INDEX TO APPENDIX


| **Exhibit** | **Description** |
|---|---|
| Exhibit 1 | May 12, 1977 Letter from CASB to IRS |
| Exhibit 2 | 56 Fed. Reg. 41,151 (Aug. 19, 1991); CASB, Staff Discussion Paper, "Accounting for Fully-funded Defined Benefit Pension Plans" (Aug. 19, 1991) |
| Exhibit 3 | 60 Fed. Reg. 16,534 (March 30, 1995) |
| Exhibit 4 | Novation Agreement (May 5, 1995) (excerpts) |
| Exhibit 5 | DCAA Audit Report (January 23, 2003) |
| Exhibit 6 | Contracting Officer's Final Decision (December 9, 2004) |
| Exhibit 7 | 40 Fed. Reg. 43,873 (Sept. 24, 1975) |
| Exhibit 8 | DCMA/DCAA Joint Guidance on Implementing the *Teledyne* Decision on CAS 413.50(c)(12) Segment Closing Adjustments (7/23/2004) |

# EXHIBIT 1

May 12, 1977

Mr. Ira Cohen, Director
Actuarial Division - Room 2550
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Dear Mr. Cohen:

On February 3, 1977, the Cost Accounting Standards Board published in the Federal Register a proposed Cost Accounting Standard on the Adjustment and Allocation of Pension Cost. The Board has received numerous comments relative to the proposed Standard. A number of commentators have suggested that certain provisions of the proposed Standard are in conflict with requirements of the Employee Retirement Income Security Act of 1974 (ERISA) and regulations issued thereto. In order to avoid any misunderstandings as to the relationship between provisions of the proposed Standard and the requirements of ERISA, we request that you provide us with the views of the Internal Revenue Service on the following questions.

1. The proposed Standard requires, in effect, that defense contractors perform annual actuarial valuations. Is this requirement consistent with the intent of ERISA?

2. The draft Standard requires that when a pension plan covers employees of different segments of a company, under certain circumstances defense contractors must calculate the pension cost for each segment as if each had its own pension plan. In many cases, contractors may have to separately compute pension cost for one or more segments and make a composite calculation for all other segments covered by the plan. The proposed Standard contemplates that the sum of pension cost calculated for each segment is the total cost for the plan. If the contractor funds the total amount of pension cost so developed, will the contractor fulfill the minimum funding requirements of ERISA?

3. The proposed Standard requires that contractors shall allocate assets and liabilities of a pension plan to segments of a

company in order to determine the pension cost allocable to those segments. The proposed Standard contemplates that such an allocation is for record keeping purposes only. It does not affect the viability of the plan; all of the assets of the plan may still be used to provide benefits for all plan participants. Does the memorandum segregation of assets and liabilities provided for in the proposed Standard conflict with any provision of ERISA?

4. In cases where a segment of a company is closed, the proposed Standard contemplates that the contractor shall calculate the segment's unfunded actuarial liability, using the segment's share of the market value of the plan's assets, allocated to the segment in accordance with Section 413.50(c)(5) of the proposed Standard. The purpose of this provision is to enable the contracting parties to negotiate an appropriate contract adjustment. Any such adjustment would be between the contracting parties; the pension fund would be unaffected thereby. For example, if the contracting parties agree that a payment shall be made to the Government by a contractor, the payment will be made from corporate funds rather than from the pension fund. In making the calculation required by the proposed Standard, it is possible that the asset allocation required by the proposed Standard may differ from an allocation which may be required under Section 4044 of ERISA. Does this provision of the proposed Standard conflict with any provision of ERISA?

5. The proposed Standard permits any asset valuation method to be used, provided that the results fall within a 20 percent corridor around market. If the value produced by the method falls outside the corridor, the value must be made equal to the closest boundary of the corridor. Does this provision conflict with any provision of ERISA?

We appreciate your giving consideration to the questions raised and look forward to receiving your answers to these questions at your earliest convenience.

Sincerely yours,

(Signed) A. Schoenhaut

Arthur Schoenhaut
Executive Secretary

cc: chron
subj
reading
Bodenheimber (2)
Sacks

# EXHIBIT 2

8-19-91
Vol. 56 No. 160
Pages 41055-41280

# federal register

Monday
August 19, 1991

Units 1 and 2, located in Berwick, Pennsylvania.

The proposed amendments would have revised the Susquehanna Steam Electric Station technical specifications, to incorporate the addition of isolation signals for Containment Isolation Valves for CRM Panel and Wetwell Panel Sample Lines for Units 1 and 2.

The Commission has previously issued a Notice of Consideration of Issuance of Amendment published in the Federal Register on April 3, 1991 (56 FR 13667). However, by letter dated August 1, 1991, the licensee withdrew the proposed changes.

For further details with respect to this action, see the application for amendments dated January 14, 1991, and the licensee's letter dated August 1, 1991, which withdrew the application for these license amendments. The above documents are available for public inspection at the Commission's Public Document Room, 2120 L Street, NW., Washington, DC, and the Osterhout Free Library, Reference Department, 71 South Franklin Street, Wilkes-Barre, Pennsylvania.

Dated at Rockville, Maryland this 9th day of August 1991.

For the Nuclear Regulatory Commission.

James J. Raleigh,

*Project Manager, Project Directorate I-2, Division of Reactor Projects—II, Office of Nuclear Reactor Regulation.*

[FR Doc. 91-19751 Filed 8-16-91; 8:45 am]

BILLING CODE 7590-01-M

## OFFICE OF MANAGEMENT AND BUDGET

### Office of Federal Procurement Policy

### Cost Accounting Standards Board; Cost Accounting Standard 412, Cost Accounting Standard for Composition and Measurement of Pension Cost, and Cost Accounting Standard 413, Adjustment and Allocation of Pension Cost

**ACTION:** Notice.

**SUMMARY:** the Office of Federal Procurement Policy, Cost Accounting Standards Board (CASB), invites public comments concerning a Staff Discussion Paper on the topic of accounting for the pricing of fully-funded defined benefit pension plan costs in Government contracts.

**DATES:** Requests for copies of the Staff Discussion Paper, and any comments upon its contents, should be received by October 18, 1991.

**ADDRESSES:** Requests for a copy of the Staff Discussion Paper or comments upon its contents should be addressed for Mr. Robert Lynch, Project Director, Cost Accounting Standards Board, Office of Federal Procurement Policy, 725 17th Street, NW., room 9001, Washington, DC 20503. Attn: CASB Docket No. 91-05.

**FOR FURTHER INFORMATION CONTACT:** Robert Lynch, Project Director, Cost Accounting Standards Board (telephone: 202-395-3254).

**SUPPLEMENTARY INFORMATION:** The Office of Federal Procurement Policy, Cost Accounting Standards Board, is releasing a Staff Discussion Paper which outlines various considerations respecting the measurement and assignment of the costs of defined benefit pension plans, to Government contracts, in situations in which plan funding has been subject to certain limitations prescribed in the Internal Revenue Code under the Omnibus Budget Reconciliation Act of 1987, Public Law 100-203, 101 Stat. 1330-1331, see 26 U.S.C. 412(c)(7), as well as the 1986 Tax Reform Act, Public Law 99-514, 100 Stat. 2085.

Section 26(g)(1) of the Office of Federal Procurement Policy Act, 41 U.S.C. 422(g)(1), requires that the Board, prior to the promulgation of any new or revised Cost Accounting Standard, consult with interested persons concerning the advantages, disadvantages and improvements anticipated in the pricing and administration of Government contracts as a result of the adoption of a proposed Standard. The CASB's solicitation of recommendations for agenda items, 55 FR 48714 (11/21/90), revealed considerable sentiment for improvement and clarification of the cost accounting rules to be applied when defined benefit pension plans are subject to the maximum funding limitations contained in the Internal Revenue Code, *supra*. There appears to be considerable contention concerning varying interpretations of Cost Accounting Standards (CAS) 412 and 413 in light of these relatively recent Tax Code changes, as well as the efficacy of these Standards for the appropriate pricing of Government contracts, and the role of funding in the assignment of pension costs, as well as the compatibility of the CAS and contract cost principle (allowability) rules. The Staff Discussion Paper is meant to give effect to the concerns of both industry and the Government.

The purpose of the Staff Discussion Paper is to solicit public views with respect to the Board's consideration of the topic of accounting for fully funded defined benefit pension plans. It reflects research accomplished to date by the staff in the respective subject areas, and as such has not been formally approved by the Board.

Dated: August 12, 1991.

Allan V. Burman,

*Administrator for Federal Procurement Policy and Chairman, Cost Accounting Standards Board.*

[FR Doc. 91-19553 Filed 8-16-91; 8:45am]

BILLING CODE 3110-01-M

## OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

### Intergovernmental Policy Advisory Committee; Meeting

**AGENCY:** Office of the United States Trade Representative.

**SUBJECT:** Intergovernmental Policy Advisory Committee.

**ACTION:** Notice of meeting and determination of closing of meeting.

**SUMMARY:** The meeting of the Intergovernmental Policy Advisory Committee (IGPAC) is to be held Tuesday, August 20, 1991 from 2:15 p.m. to 5:30 p.m. in Seattle, Washington at the Columbia Tower Club. The meeting will include a review and discussion of current issues which influence U.S. trade policy. Pursuant to section 2155(f)(2) of title 19 of the United States Code, I have determined that this meeting will be concerned with matters the disclosure of which would seriously compromise the Government's negotiating objectives or bargaining positions.

**ADDRESSES:** 7600 Columbia SeaFirst Center, 701 Fifth Avenue, Seattle, Washington 98104.

**FOR FURTHER INFORMATION CONTACT:** Mollie Van Heuven, Director, Office of Private Sector Liaison, Office of the United States Trade Representative, Executive Office of the President.

Carla A. Hills,

*United States Trade Representative.*

[FR Doc. 91-19650 Filed 8-16-91; 8:45 am]

BILLING CODE 3190-01-M

### Negotiation of a North American Free Trade Agreement (NAFTA)

**AGENCY:** Office of the U.S. Trade Representative.

**ACTION:** Trade Policy Staff Committee (TPSC) Public Hearings: Notification of locations and times.

**SUMMARY:** A Notice was published in the Federal Register on July 16, 1991 (Vol. 56, No. 136, page 32454) announcing TPSC public hearings to be

# ACCOUNTING FOR FULLY-FUNDED DEFINED BENEFIT PENSION PLANS

*STAFF DISCUSSION PAPER*

*COST ACCOUNTING STANDARDS BOARD*

*AUGUST 19, 1991*

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

OFFICE OF FEDERAL
PROCUREMENT POLICY

AUG 19 1991

**To Members of the Government procurement community:**

The materials contained in this letter and its attachment are sent to you as part of the Cost Accounting Standards Board (CASB) staff's efforts to enhance research of ongoing projects. The purpose of this Staff Discussion Paper is to solicit your views with respect to the Board's consideration of the topic of accounting for fully-funded defined benefit pension plans.

**A. Summary**

The Office of Federal Procurement Policy, Cost Accounting Standards Board, is considering various issues and alternatives related to the topic of accounting for the pricing of defined benefit pension plan costs in Government contracts. This issue was among those identified by respondents to the CASB's "Request for Agenda Items," 55 FR 48714 (11/21/90) as meriting a high priority for early Board action.

The issues addressed in the attached paper attempt to provide a framework in which basic policy considerations of both Government and industry participants in the procurement process are appropriately considered as they relate to the topic. This discussion should not be considered an exhaustive examination of the subject matter, but rather a summary of the major issues brought to the Board's attention by both Government and industry as they relate to accounting for the costs of fully-funded defined benefit pension plans in Government contracts.

**B. Background**

Section 26(g)(1) of the Office of Federal Procurement Policy Act, 41 U.S.C. §422(g)(1), requires that the Board, prior to the promulgation of any new or revised Cost Accounting Standard, consult with interested persons concerning the advantages, disadvantages and improvements anticipated in the pricing and administration of Government contracts as a result of the adoption of the proposed Standard. The purpose of this distribution is to request your views for the Board's consideration of the topic of accounting for the costs of fully-funded defined benefit pension plans. This Staff Discussion Paper has not been approved by the CASB. It represents research accomplished to date by the Staff.

The CASB's solicitation of recommendations for agenda items revealed considerable sentiment for improvement and clarification of the cost accounting rules to be applied when defined benefit pension plans are subject to the maximum funding limitations

contained in the Internal Revenue Code under the Omnibus Budget Reconciliation Act of 1987, P.L. 100-203, 101 Stat. 1330-1331, see 26 U.S.C. §412(c)(7), and the 1986 Tax Reform Act, P.L. 99-514, 100 Stat. 2085. There appears to be considerable contention concerning varying interpretations of Cost Accounting Standards (CAS) 412 and 413 in light of these relatively recent Tax Code changes, as well as the efficacy of these Standards for the appropriate pricing of Government contracts, and the role of funding in the assignment of pension costs, as well as the compatibility of the CAS and contract cost principle (allowability) rules.

This Staff Discussion Paper is meant to give effect to the concerns of both industry and the Government. The Board and the staff would be especially appreciative of comments and suggestions that attempt to consider the viewpoints of all parties to the contracting process.

C. Public Comments

Interested persons are invited to participate by submitting data, views, or arguments with respect to this Staff Discussion Paper. We ask that your comments be provided to us by October 18, 1991. All comments must be in writing, and should be submitted to the Board at the following address:

Cost Accounting Standards Board
Office of Federal Procurement Policy
725 17th Street, N.W.
Room 9001
Washington, D.C. 20503
Attn: CASB Docket 91-05

Questions regarding this CASB Staff Discussion Paper may be directed to Mr. Robert Lynch, Project Director, on (202) 395-3254.

Sincerely,

Richard C. Loeb

Richard C. Loeb
Executive Secretary
Cost Accounting Standards Board

**THIS STAFF DISCUSSION PAPER HAS NOT BEEN FORMALLY APPROVED BY THE COST ACCOUNTING STANDARDS BOARD. IT REFLECTS RESEARCH ACCOMPLISHED TO DATE BY THE STAFF IN THE SUBJECT AREA, AND IS ISSUED BY THE BOARD IN ACCORDANCE WITH THE REQUIREMENTS OF 41 U.S.C. §422(g)(1)(A).**

## STAFF DISCUSSION PAPER- FULL FUNDING LIMITATION

### INTRODUCTION

Recently, the Cost Accounting Standards Board (CASB) found it necessary to delegate to agency Procurement Executives discretionary authority to waive the period costing provisions of Cost Accounting Standard (CAS) 412 in situations in which defined benefit pension plans have become full-funded. This strongly suggests that the manner in which this Standard allows for the accrual of pension cost may no longer be satisfactory. Both Government and industry have expressed this dissatisfaction in a number of forums during the past decade. Absent the exercise of the Board's discretionary waiver, many contractors, whose pension plans are in a fully-funded status, have no practical way to avoid an irredeemable disallowance of accrued pension costs except by funding their pension plans in excess of the Internal Revenue Code/Employee Retirement Income Security Act (IRC/ERISA) ceilings. Doing so would generate an excise tax while producing no tax payback. On the other hand, the Government has a dilemma of its own in that it desires to accurately provide for pension costs in prospective and historically determined contract prices, while avoiding the recognition of pension costs which have yet to be funded.

BACKGROUND

The policies for accrual and allowance of pension costs under Government contracts were formed at a time (circa 1975) when it was possible to establish accrual and actuarial parameters that promoted systematic and predictable costing which also comported with Generally Accepted Accounting Principles (GAAP). Additionally, the Tax Code generally permitted deductible funding at those levels. If the procuring agencies desired to have funding as a condition of allowability, the Tax Code did not stand in the way. Other conditions of the mid-1970s also contributed positively to this situation. The stock market was far less volatile and tended to be relatively stable at a level far below that experienced in more recent years. Pension plans tended to be less well funded partly because ERISA's funding requirements were relatively new. Also, because plans were being improved with greater frequency, they tended toward a state of perpetual past service cost amortization. Overfunding did not rank among one of the original CASB's major concerns.

Both asset stability and the tendency toward underfunding disappeared in the 1980s. Dampened wage inflation became a fact of economic life for salaried employees below the corporate executive level. Calculations of pension liability expectations for employees whose projected end pay had been based upon annual salary increments in the 7% to 10% range were adjusted to reflect yearly escalations of 3% to 6% that are now more the routine. On the

asset side, the stock market had at least three major runups summing to more than a tripling of the major indices. Also, pension actuaries have increasingly tended to calculate pension cost in a manner which resulted in conservative funding, i.e., early funding. These three factors, in themselves, were enough to convert a generally underfunded pension environment into a state tending to overfunding. Accounting for pensions began to be characterized by significant amounts of unamortized and unbooked actuarial gains.

The monetary size of these distortions began to attract the interest and concern of several powerful economic interests. Balance sheets which understated pension fund assets and overstated their liabilities enhanced the attractiveness of many companies as acquisition targets. Many such acquisitions were closely followed by pension plan terminations which appeared to be motivated by a desire to remove, and use for other purposes, funds identified as "excess." Indeed, the reversion of pension fund assets was often central to the overall financial planning of the acquisition transaction. Public accountants became increasingly concerned about the size of the unamortized and unbooked actuarial gains and the questions they raised as to whether many corporate balance sheets fairly reflected this situation. The accountants' concerns culminated in 1986 with the issuance of Financial Accounting Standard (FAS) No. 87, which among other prescriptions, moved to

lessen the magnitude and catchup time of unamortized pension cost recognitions.

The situation has been further complicated by the increased incidence of fully funded situations compounded by a more restrictive tax code definition of that status. The long standing, somewhat dormant, definition of overfunding under the Tax Code was an excess of asset current values over the present value of the accrued liabilities measured by the actuarial cost method being used by the contractor. Even using that definition, for all the pension environmental reasons discussed earlier in this paper, the full funding limitation began to assert itself with increasing frequency in the early 1980s. An even more stringent full funding limitation was contained in the 1987 Omnibus Budget Reconciliation Act (OBRA), P.L. 100-203, 101 Stat. 1330-1331. See 26 U.S.C. §412(c)(7). The new limit calls for activation of an alternative limitation if that alternative is more restrictive than the previous limit. That alternative, which often proves to be the operative choice, is 150% of the termination liability. The new alternative is measured by an entirely new and more conservative actuarial calculation. The fact that the alternative snapshot of funding status utilizes a different actuarial method than the less restrictive one, previously prescribed, precluded the Department of Defense (DOD) and the other relevant procurement agencies from making the interpretation of CAS that they had been able to provide under the prior single full funding limitation.

DOD was able to interpret CAS as calling for the immediate amortization of unamortized net actuarial gains because that is what the original full funding test implicitly did. It compared the present value of the liability with assets which have been completely marked to market. Both measurement levels count all known but previously unamortized costs as amortized.

Both Government and industry found the DOD interpretation to be useful in that it attenuated contractors' concerns as to risk of ultimate allowability of the costs which otherwise would have been accrued, but could only be funded with certain drawbacks as to deductibility and excise taxes. Also, the interpretation temporarily spared the regulatory system of the need to make the difficult policy adjustments that still remain as to how pension costs are to be accrued. Passage of the 1987 OBRA, with the generally lower alternative maximum funding limit, reasserted the need for these policy changes. As the issues now stand, when the new full-funding limitation is operative, the DOD amortizes unamortized gains and losses down to the level of the former limit. The remaining difference between that level and 150% of the termination liability is still considered by DOD to be accrued pension cost. Since contractors can only fund this delta with monies that are not tax deductible and which incur a 10% excise tax (penalty?), very few have done so. See the 1986 Tax Reform Act, P.L. 99-514, 100 Stat. 2085. The result of not funding accrued pension costs by the tax filing date of the period in which CAS has

assigned them is that they are unallowable in that period under the cost principles (Federal Acquisition Regulation (FAR) 31.205-6(j)(2)(i)). Since cost principles cannot allow a cost in a period in which it is not present under CAS rules, an unallowability status cannot be redeemed by funding in a subsequent period. The temporary discretionary waiver recently granted by the CAS Board seeks to mitigate the effect of these interfaces among the regulations of the three Federal regulatory bodies involved.

DISCUSSION

The current CAS Board faces a number of difficult choices in the pension area that did not have to be confronted in the mid-1970s by the previous Board. At the time, the old CAS Board was able to chart a course that was consistent with the pronouncements of the other various rulemaking bodies. In 1975, it was possible to accrue pension costs in a relatively smooth and predictable manner. It was also possible to make deductible pension fund contributions matching those accruals. The volatility of deductible funding levels has essentially destroyed that compatibility. Perhaps worse than mere volatility, funding levels can also be quite unpredictable even in the short-term. Overfunding appears to be triggered more by stock market levels than any other factor. The upshot of this for contract pricing is that in many not reasonably well anticipated full funding situations, pension costs are included in the prices of fixed price contracts at levels which far exceed those ultimately recognized for the purpose of costing to

Government contracts in the period in which these contracts are performed. Government procurement agencies do not view this phenomena as a part of the equitable risk of fixed price contracting, such as those risks associated with over or under estimating of anticipated hours, materials, or labor-mix, because there is no mirror image of this pricing action when the stock market falls precipitously. Those losses tend to find their way into contract prices because they are amortized and funded over a long period. It is only fair to note that the inequity is a direct result of the previously described interpretations of CAS together with the FAR allowability policies. Implicit in the reduced pension cost recognitions is an immediate amortization of previously unamortized net actuarial gains. There is no consensus that these treatments represent correct interpretations of the current CAS.

The CAS Board has tasked the staff with conducting an assessment of the fundamental objectives of the various rules affecting the pension environment, and their impact upon the contract cost and pricing functions. The staff believes that it is also relevant to assess the degree of influence which the Board's rules may exert on other bodies whose rules have an impact on the contract pricing environment. For example, it seems highly unlikely that the Board will exert any significant influence over the tax regulations as they define pension cost measurement or permissible funding levels. However, since the overwhelming majority of contractors subject to

CAS and having defined benefit pension plans must also file and maintain records according to the Tax Code, it seems practicable to make use of whatever portion of that recordkeeping function which may prove useful to the pricing and costing of contracts. In any event, if the Government is to continue funding to any degree as a condition of allowability, the reality of funding requirements and limits contained in the Tax Code cannot be ignored.

Less distant still, but nonetheless, exerting some degree of independence from the CASB, are the allowability rules for pension costs contained in the cost principles. It would serve no useful purpose for the CASB to promulgate a methodology for the accrual of pension costs which did not contain, as part of the overall coordinated plan, a sense of what the procuring agencies' allowability policies will be. Any solution to this problem that resulted in routinely disallowed pension accruals would, clearly, not be satisfactory.

Another rulemaking body that played very little role in the development of CAS 412, but has subsequently made its presence felt in the financial accounting community, is the Financial Accounting Standards Board (FASB). In 1986 the FASB issued FAS No. 87, "Employers' Accounting for Pensions," which greatly expanded the detailed requirements for financial statement presentation. Among its prescriptions are the use of the projected unit credit method and generally faster amortizations of significant actuarial gains

and losses. FAS 87 and CAS 412, in the current pension environment, may not be very compatible. The staff believes that FAS 87 has contributed to producing a volatility of cost levels that may prove troublesome for contract pricing purposes. The staff would welcome commenters' views as to any aspects of FAS 87 that should be considered by the CAS Board.

The CASB staff believes that there are significant and legitimate reasons for the differences that exist between the issuances of the various rulemaking bodies. Each body is acting appropriately within the scope of its mission and objectives. The FASB has as its principal objective, financial statements that can be credibly used by bankers, stockholders, and others who have an interest in a company's state of financial health. To the extent that the FASB's rules tilt, it is generally in the direction of the American accounting profession's traditional and justifiable concern with the presentation of a conservative balance sheet. In the pension area, public accountants have reason to be concerned that known, but yet-to-be amortized gains and losses, are not on the balance sheet. Pre-FAS 87 GAAP tolerated a variety of actuarial costing methods, whereas FAS 87 prescribes the use of the projected unit credit method. FAS 87 also moved to disclose many heretofore undisclosed conditions, and defined amortization and recognition rules more strictly.

In contrast, the rules and regulations of the Tax Code are

primarily aimed at the collection of revenue. They are generally concerned that income not be reported too late or that deductions be taken too early. Usually, the converse of early reporting of income and delayed reporting of deductions is readily tolerated. The more restrictive full funding limit fits squarely within this objective, as does the excise tax on overfunding. Here again, the staff welcomes any suggestions as to parts of pension recordkeeping for tax purposes that would serve contract costing purposes.

Government contract policymakers also have their own set of special needs, some involving the rhythms peculiar to the pricing of Government contracts, and others involving matters of public policy. It seems obvious, that in the pension area, aggregate pension costs included in prices must reasonably and accurately track accruals for pension costs on the books for Government contract costing purposes. In other words, booked pension costs need to be sufficiently <u>predictable</u> so that forward pricing rates for fixed price contracts are not based upon pension cost levels different from those ultimately accrued for the period of contract performance. That has not been happening in many instances when a fully funded status has been reached unexpectedly. Thus, in a number of instances, where estimated pension costs used for negotiating fixed price contracts include a significant element of pension cost, the subsequent achievement of full funding status served to eliminate pension costs altogether for the period of contract performance.

The costing and pricing of Government contracts also requires a systematic scheme for accruing pension cost that precludes the arbitrary assignment of costs to one fiscal period rather than another to gain a pricing advantage. The Government also has a sensitivity to the inclusion of unfunded pension costs in contract prices. Conversely, the staff's research revealed one instance of a contractor who, due to the shortened amortization periods now contained in the Tax Code, faced minimum ERISA funding requirements in excess of the CAS 412 pension cost and, thus could not be reimbursed. That particular contractor felt, understandably, that allowability ought to be tied to funding under the Tax Code. Obviously, given the current tax law climate regarding full funding, complete realization of all of these goals is not achievable. In the staff's opinion, the goals of predictable and systematic accrual outrank that of funding. However, funding still remains an important consideration.

Many in Government feel that allowing pension accruals absent current underlying funding would create a situation in which pension cost measurement lacks many of the actuarial disciplines which tend to flow under a funded plan. There is a traditional reluctance to grant long-term cash flow advantages to those performing Government contracts that is only partly-based upon the ultimate risk of payment. On the other hand, industry representatives point out that there are other situations such as the cost recovery for depreciable assets in which the cash flow

advantage is all to the Government's favor. They regard the payment of unfunded pension accruals as the mirror image of that situation. Both types of costs include factors, i.e., cost-of-money for fixed assets and the interest elements contained in amortizations of actuarial gains and losses, that restore financial equivalence.

Contractors performing under Government contracts require a more stable and predictable contract accounting, cost and pricing environment than is achieved based on the current interplay of the various rules previously described. Pensions are intended to be an allowable and reimbursable cost in the absence of rare situations in which their magnitude is considered unreasonable. The current rules that are embodied in both CAS and the cost principles, taken together, seem to say that certain pension costs falling in the gap between the two maximum funding levels can only be allowable in the current period if they are funded, and that if they are not currently funded, they are permanently unallowable. However, if pension costs in excess of the full funding limit of the Tax Code are funded, there is no tax payback, but there is a 10% excise tax penalty. Effectively, one Government agency penalizes contractors for funding certain pension plans, while another agency penalizes the same contractors for not funding.

The recent waiver to CAS 412 to permit the reassignment of pension period cost to match permissible funding periods should serve to

relieve the anomaly created by the three sets of rules to some extent. However, this waiver is discretionary on the Government's part so that the correction of inequities regarding overpriced fixed price contracts may be considered by the procuring agencies. Moreover, since the waiver has the effect of changing the accrual basis of accounting for the period surrounding the full funding event, it is not an acceptable permanent accounting solution. Even if it were, it would need to be codified. Long-standing broadly-applied waivers strongly imply that the basic rules are flawed.

The CASB staff welcomes comments suggesting alternatives or improvements in accounting for pension costs that would address the problems discussed in this paper. We would be especially appreciative if commenters would analyze how their recommendations would address the concerns that the Government has about predictable and systematic methods of accrual and the desirability of funding. Commenters should also include in their comments, an analysis of how their recommended course of action comports with requirements that contractors have under the Tax Code.

Among the issues to be resolved are the following questions:

What should the Board's objective for pension costs be? Is the statement found at 412-20, "Purpose," of the current coverage which states that "The provisions of this Cost Accounting Standard should enhance uniformity and consistency

in accounting for pension costs and thereby increase the probability that those costs are properly allocated to cost objectives" a sufficient objective? Does such a statement sufficiently address the objective of equitable pricing of Government contracts?

How significant or insignificant are the following objectives of cost accounting standards for defined benefit pension plans?

-- systematic accrual of cost to match causal/beneficial relationships
-- predictable patterns of costs
-- standardized cost or actuarial methods
-- compatibility with IRC regulations
-- funding requirements

How well does CAS 412 measure and assign pension cost? Is it clearly and consistently interpreted as it now stands? Is accrual a good measurement technique? Are there any viable alternatives to an accrual method? How well does CAS 412 handle actuarial gains and losses? Does CAS 412's handling of gains and losses work very well with regard to the pricing of fixed price contracts? Should the amortization period of gains and losses remain at the current 15 years? Should amortization of gains and losses be deferred for a number of

fiscal periods to aid predictability? Should gains and losses be combined and offset on a cumulative basis in a manner similar to that found in FAS 87? Should the amortization periods for assumption changes and plan amendments differ? Are the current CAS methods for treating the interest elements relating to early and late funding proper?

What should be the role of funding and funding status? If funding has a role, should a distinction be made between funding not made for reasons of other Federally-imposed limits and more discretionary non-funding?

Are any other aspects of FAS 87, such as a standardized actuarial method or the amortization corridors, likely to be useful in CAS 412?

Has CAS 412 as it is written been correctly interpreted by Government auditors and Contracting Officers? Does the Standard contain any particular sources of misunderstanding?

Should the Board consider the effect of current FAR allowability rules in considering changes to the Standard? Is the current FAR allowability criteria in conflict with CAS?

Should the Board consider transition rules for emergence from a fully funded status? Should cost of previous periods as

defined by CAS 412 be reassigned to future periods on a deferred basis as an actuarial loss? Is there a distinction to be made in this transition as to full funding which was in excess of the pre-OBRA 1987 limit vs. the excess defined by that Act?