# EXHIBIT 3

federal register

Thursday
March 30, 1995

## Part II

# Office of Management and Budget

## Office of Federal Procurement Policy

48 CFR Parts 9903 and 9904

Cost Accounting Standards Board; Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs; Final Rule

16534 Federal Register / Vol. 60, No. 61 / Thursday, March 30, 1995 / Rules and Regulations

**OFFICE OF MANAGEMENT AND BUDGET**

**Office of Federal Procurement Policy**

**48 CFR Parts 9903, 9904**

# Cost Accounting Standards Board; Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs

**AGENCY:** Cost Accounting Standards Board, Office of Federal Procurement Policy, OMB.

**ACTION:** Final rule.

**SUMMARY:** The Office of Federal Procurement Policy, Cost Accounting Standards Board (CASB), is revising the Cost Accounting Standards relating to accounting for pension costs under negotiated government contracts. Section 26(g)(1) of the Office of Federal Procurement Policy Act, 41 U.S.C. 422(g)(1), requires that the Board, when promulgating any new or revised Cost Accounting Standard, publish a final rule. This final rule addresses certain problems that have emerged since the original promulgation (in the 1970's) of the pension Standards: CAS 9904.412—"Cost Accounting Standard for composition and measurement of pension cost," and CAS 9904.413, "Adjustment and allocation of pension cost." The changes address pension cost recognition for qualified pension plans subject to the tax-deductibility limits of the Federal Tax Code, problems associated with pension plans that are not qualified plans under the Federal Tax Code, and problems associated with overfunded pension plans.

**EFFECTIVE DATE:** March 30, 1995.

**FOR FURTHER INFORMATION CONTACT:** Richard C. Loeb, Executive Secretary, Cost Accounting Standards Board (telephone: 202–395–3254).

**SUPPLEMENTARY INFORMATION:**

## A. Regulatory Process

The Cost Accounting Standards Board's rules and regulations are codified at 48 CFR Chapter 99. Section 26(g)(1) of the Office of Federal Procurement Policy Act, 41 U.S.C. 422(g)(1), requires that the Board, prior to the establishment of any new or revised Cost Accounting Standard, complete a prescribed rulemaking process. This process consists of the following four steps:

1. Consult with interested persons concerning the advantages, disadvantages and improvements anticipated in the pricing and administration of government contracts as a result of a proposed Standard.
2. Promulgate an Advance Notice of Proposed Rulemaking.
3. Promulgate a Notice of Proposed Rulemaking.
4. Promulgate a final rule.

This final rule is step four in the four step process.

## B. Background

*Prior Promulgations:* The previous CASB published CAS 9904.412—"Cost Accounting Standard for Composition and Measurement of Pension Cost" on September 24, 1975 and CAS 9904.413—"Adjustment and Allocation of Pension Cost" on July 20, 1977. The effective dates of these Standards were January 1, 1976 and March 10, 1978, respectively. These Standards were developed in the early years of the applicability of the Employee Retirement Income Security Act (ERISA). At that time, the problems on which this final rule focuses were not significant. Adequate or minimum, rather than excess funding, concerned pension managers of that era. Over the intervening years, government contractors' pension plans have become more adequately funded. At the same time, limits on the maximum amount of benefits that can be provided by a qualified pension plan have been considerably constrained in real terms. At the time the previous coverage was promulgated, there was little or no inconsistency between an orderly method of accruing pension costs and a contractor's ability to concurrently fund those accruals.

The Tax Reform Act of 1986 amended the Federal Tax Code to impose an excise tax on contributions in excess of the maximum tax-deductible amount for qualified pension plans. Immediately thereafter, the Omnibus Budget Reconciliation Act of 1987 (OBRA 87) added a second, often more restrictive full-funding limitation on the determination of the tax-deductible amount. To avoid the incurrence of an unallowable excise tax, government contractors generally did not fund any accrued pension cost in excess of the maximum tax-deductible pension contribution. However, portions of accrued pension costs that were not funded were not allowable. Furthermore, because the Standards prohibited the reassignment of accrued but unfunded pension costs, contractors could not allocate such costs to contracts when funded in future periods. On April 8, 1991, the Board issued a "Memorandum for Agency Senior Procurement Executives" which granted temporary authority to reassign to future periods pension costs that were not funded in the year of accrual because they lacked tax-deductibility.

An overwhelming majority of respondents to the Board's November 1990 solicitation of agenda items gave a high priority to the problems associated with fully-funded qualified plans and those connected with the growing universe of nonqualified pension plans. The Board sought public comments with a set of Staff Discussion Papers. A Paper addressing the "pay-as-you-go" or unfunded plan issue was published by the Board on June 17, 1991. See 56 FR 27780. A Paper seeking views on the "full funding" problem was published on August 19, 1991. See 56 FR 41151. On January 26, 1993, after consideration of the public comments received on these Staff Discussion Papers, the CASB published an Advance Notice of Proposed Rulemaking (ANPRM) in the Federal Register, 58 FR 6103. The ANPRM set forth proposed amendments to deal with both the unfunded pension plan issue related to nonqualified pension plans and the "full-funding" problem of qualified plans.

In the public comments to the ANPRM, the Board found two areas of concern particularly persuasive. These dealt with the ANPRM lacking any full-funding limitation, and the complexities and problems introduced by drastic revisions to the amortization period for actuarial gains and losses.

The ANPRM was premised on the idea that, by reducing such amortization periods, there would be only a relatively short time lag between cost/price recognition and the eventual funding. This premise, as pointed out by the commenters, was unsound. Because the ANPRM lacked any full-funding limitation, it could result in recognition of pension costs in years in which surplus assets existed. This is of particular concern to the Board because of the number of contractors that now have overfunded plans.

The Board also determined that changing amortization periods, in order to improve cost predictability, was unnecessary. Most commenters believed that a satisfactory degree of predictability could be achieved under the existing Standards' amortization rules.

On November 5, 1993, after consideration of the public comments received on the ANPRM, the CASB published a Notice of Proposed Rulemaking (NPRM), 58 FR 58999. The NPRM set forth proposed amendments to resolve the regulatory conflict for qualified pension plans by incorporating into the Standards the ERISA full-funding limitation, while

maintaining the current amortization rules. To address questions concerning overfunded pension plans, the Board added coverage to CAS 9904.413 defining what constitutes a segment closing and providing greater specificity regarding accounting for pension costs when segments are closed or pension plans are terminated. The NPRM retained the accounting approach for nonqualified pension plans included in the ANPRM.

The public comments received in response to the NPRM raised some new issues. In the final rule, the Board addresses these issues focusing on three areas in particular. These deal with the restriction of accrual accounting by an outside limit, incomplete and unclear coverage for segment closings and pension plan terminations, and the lack of accounting for differences between accrued and funded pension costs. A majority of public comments expressed strong opinions, which were divided between support for accrual accounting and support for funding as the basis for determining allocable contract costs. In addition, numerous public comments were submitted concerning specific actuarial and technical issues.

The final rule reflects these and other concerns expressed by commenters to the NPRM. In addition, certain pension actuaries and the Pension Committee of the American Academy of Actuaries submitted suggestions to address the actuarial soundness of the final rule.

*Termination of Temporary Waiver Authority*

The final rule removes the regulatory conflict between the funding limits of ERISA and the period assignment provisions of CAS 9904.412–40(c). Therefore, the Board terminates the temporary waiver authority granted in the "Memorandum for Agency Senior Procurement Executives" issued on April 8, 1991.

*Summary of Proposed Amendments*

The Board's final rule provides for accrual accounting to initially compute the pension cost for a cost accounting period. The Board also recognizes that funding of such cost serves to substantiate the cost and adds to the verifiability of the measurement of cost. For assignment purposes, the computed cost is subject to a corridor with zero as the floor and the maximum tax-deductible amount, where applicable, as the ceiling. The computed cost is also subject to an assignable cost limitation so that cost will not be assigned to an overfunded pension plan. The cost assigned to the period must be funded as specified in the Standard to be allocable to final cost objectives. This four-step process of computing, assigning, funding, and allocating pension cost applies to both qualified and nonqualified defined-benefit pension plans.

This final rule affirms the complementary funding approach for nonqualified plans that takes into account Federal income tax deductibility. The Board views the complementary funding approach as a reasonable compromise addressing the Government's concern that claimed cost be substantiated by funding while providing contractors with relief from adverse cash flow consequences of funding a cost that is not tax-deductible. The Board decided that tax-exempt entities do not experience such cash flow disadvantages, and therefore, they are required to fund all pension cost that is assigned to the period.

For nonqualified defined-benefit plans that do not meet the communication, nonforfeiture, or funding criteria, or for which the contractor chooses to use the pay-as-you-go method, the assigned cost is equal to the amount of benefits paid in that period. To promote consistency between periods, this final rule requires that any lump sum settlements or annuity purchases be amortized.

For qualified defined-benefit pension plans, the conflict between the Standards and ERISA is removed. The cost assigned to a period is limited to the accrued cost that can be funded without penalizing a contractor. A $0 floor was added to the corridor to eliminate any inequity between a requirement to credit negative costs to contracts and the contractor's inability to make withdrawal from the funding agency.

By not requiring the assignment of negative pension cost, the Board has deferred the Government's recovery of excess assets in overfunded plans. This delay is appropriate for on-going pension plans when no assets have reverted or inured to the contractor. The effect of this delay has been mitigated by clarifying and strengthening the Government's rights or obligations for a cost adjustment when there is a segment closing, plan termination, or freezing of benefits.

Portions of pension costs computed for a period that fall outside of the assignable cost corridor ($0 floor and a ceiling based on tax-deductibility) are reassigned to future periods, together with an interest adjustment, as portions of unfunded actuarial liability and are identified as assignable cost deficits or assignable cost credits, respectively. Unfunded portions of assigned cost continue to be separately identified and eliminated from future cost computations.

For nonqualified plans, a clarification in the final rule is made by the addition of the concept of "permitted unfunded accruals"; the portion of the computed and assigned cost of a nonqualified plan exempted from current funding based on the tax rate offset. These amounts are updated and described as the accumulated value of permitted unfunded accruals. All such previously assigned and allocated costs, adjusted for earnings, expenses, and benefit payments, are treated as plan assets retained by the contractor for purposes of assessing the funding status of the plan.

The fundamental requirement for assignment of pension cost has been expanded to include a "CAS balance test" modeled after the Internal Revenue Service "equation of balance". The CAS balance test requires that the entire actuarial accrued liability be accounted for by the assets or the portions of unfunded actuarial liability identified under subparagraphs 9904.412–50(a) (1) and (2). For the CAS balance test to function, the definition of unfunded actuarial liability is revised to clarify that an actuarial surplus exists whenever the actuarial value of assets exceeds the actuarial accrued liability. The accumulated value of prepayment credits, that is, funds that have yet to be applied to assigned costs, is excluded from the assets.

Technical corrections have been made to enhance the actuarial completeness of the final rule. Consistent with recent changes in ERISA and Generally Accepted Accounting Principles, as embodied in Statement 87 of the Financial Accounting Standards Board, and reflecting the sophistication of modern actuarial valuations, this final rule requires the use of explicit actuarial assumptions that are individually reasonable. Revisions have been made to distinguish the actuarial value of assets used for computations of on-going pension costs from the market value of assets used for current period adjustments. In addition, Generally Accepted Actuarial Principles and Practices as promulgated by the Actuarial Standards Board were considered in the drafting of this final rule.

Finally, this rule implements an amendment to the CAS applicability and exemption requirements contained in Section 9903.201–1(b)(11). This amendment is made necessary due to recent statutory changes contained in the Federal Acquisition Streamlining Act, Public Law 103–355.

*Transition*

The Board is aware that contracting officers and contractors have negotiated many pragmatic agreements while awaiting the promulgation of this final rule. The transition methods and illustrations of 9904.412–64 and 9904.413–64 are presented as model solutions. The Board expects that modifications of these methods and alternate approaches may be necessary to ensure equity for both the Government and contractors. Cognizant Federal officials are encouraged to ratify existing agreements that comport with the concepts of this final rule. For prior agreements or interim solutions based on a "fresh-start" amortization of the unfunded actuarial liability of qualified defined-benefit pension plans, the cognizant Federal official should verify that no portion of unfunded actuarial liability for prior unfunded costs that could have been funded, or, for other previously disallowed costs, have in fact been inadvertently included in pension costs.

The transition rules are constructed on a few basic concepts. Prior assigned costs of qualified plans, which were neither funded nor allocated to contracts because they lacked tax-deductibility, may be assigned, with interest, to periods beginning on or after the effective date of this rule. Conversely, unfunded accrued costs of nonqualified plans allocated to contracts should be treated as assets, updated for earnings and benefit payments, and applied against either the actuarial accrued liability used to compute cost accruals or the benefits paid under the pay-as-you-go method.

**C. Paperwork Reduction Act**

The Paperwork Reduction Act, Public Law 96–511, does not apply to this final rule, because this rule imposes no paperwork burden on offerors, affected contractors and subcontractors, or members of the public which requires the approval of OMB under 44 U.S.C. 3501, *et seq.*

**D. Executive Order 12866 and the Regulatory Flexibility Act**

The economic impact of this final rule on contractors and subcontractors is expected to be minor. As a result, the Board has determined that this final rule does not result in the promulgation of a "major rule" under the provisions of Executive Order 12866, and that a regulatory impact analysis will not be required. Furthermore, this final rule does not have a significant effect on a substantial number of small entities because small businesses are exempt from the application of the Cost Accounting Standards. Therefore, this rule does not require a regulatory flexibility analysis under the Regulatory Flexibility Act of 1980.

**E. Public Comments**

*Public Comments*: This final rule is based upon the Board's Notice of Proposed Rulemaking made available for public comment on November 5, 1993, 58 FR 58999. Thirty sets of public comments were received from contractors, Government agencies, professional associations, actuarial firms, law firms, public accounting firms, and individuals. The comments received and the Board's actions taken in response thereto are summarized below:

*Comment*: Twelve commenters expressed concern that the introduction of a funding limit on accrual accounting was a significant departure from the full accrual accounting approach of the ANPRM. Some commenters were also concerned with the complexity inherent in any rule governing pension costs. For these reasons the commenters supported the promulgation of a second NPRM.

*Response*: The Staff Discussion Papers, the ANPRM, and the NPRM each addressed the role of accrual accounting and the role of funding. The Staff Discussion Paper on fully-funded defined-benefit pension plans requested comments on the relative weights the Board should assign to accrual accounting, funding, and predictability as a basis for cost determination. The Staff Discussion Paper on unfunded nonqualified defined-benefit pension plans balanced its avoidance of a funding requirement with a very constrained method of accrual accounting for so-called "accruable" plans.

In response to the comments on the Staff Discussion Papers, the ANPRM adopted accrual accounting for both qualified plans and accruable nonqualified plans, which permitted certain portions of computed pension costs to be unfunded. Because the Board supported the need to substantiate the accrual with funding, the ANPRM required that the accrued costs for qualified plans be funded as soon as practicable. The ANPRM presumed there would not be a lengthy delay between accrual and funding, and so it did not link the period assignment of the accrual to current period funding. For nonqualified plans, the assignment of accrued costs was tied to funding, but the ANPRM introduced an exception for the effect of taxes on contractor cashflows. As with the Staff Discussion Paper, non-accruable plans, and accruable plans that so elect, were limited to the pay-as-you-go method.

The NPRM kept the same accounting approach for nonqualified plans as the ANPRM. Comments from the Government and contractors persuaded the Board that the conflict between full accrual accounting and ERISA funding, not predictability, was the significant problem. Finding that there could be indefinitely extended delays in the funding of the accruals of overfunded plans, the Board determined that it was necessary to link the period assignment of costs to current period funding in order to assure the verifiability of the accrued amounts. To resolve the conflict with ERISA's funding limits, the ERISA full-funding limitation was incorporated into the NPRM. Furthermore, aware of the need to address overfunded plans, the Board added clarity and specificity to the current period adjustment required when a segment closes. The Board explicitly included an adjustment for plan terminations because there has been some uncertainty as to the prior Board's intent.

With this final rule, the Board affirms the accounting approaches of the NPRM. Throughout the four-step promulgation process, accrual accounting consistently has been the starting point for the recognition of pension costs. The period assignment rule is tied to ERISA's tax-deductible maximum to prevent conflict with any of ERISA's funding limits. This final rule retains the complementary funding rule for nonqualified plans. The Board adopted many technical corrections suggested in public comments from actuaries and other professionals. To ensure that the technical corrections did not alter the conceptual approach of the NPRM, the Board sought and received input from certain pension actuaries and the American Academy of Actuaries.

Besides continuing support for either unrestricted accrual accounting or cost recognition based solely on funding, the public comments on the NPRM generally addressed details of the coverage requiring clarification or correction. This final rule does not deviate from the conceptual construct of the NPRM. As intended by the four-step promulgation process, this rule has evolved and the Board has found an informed balance between the advantages of accrual accounting and funding. Further public exposure would not alter the conceptual approach exposed in the NPRM and expressed in this final rule.

*Comment*: Thirteen commenters expressed their opposition to the adoption of the ERISA full-funding

limitation. These commenters supported full accrual accounting as the only method that provides true matching of the incurrence of pension costs with the periods during which benefits were earned. They contend that tax law is not good accrual accounting and that the Board should make accounting rules independently of the concerns of taxability.

*Response*: The Board continues to recognize that one of the primary benefits of accrual accounting, and one of the stated goals of the Board, is the proper matching of benefiting contracts with the incurrence of expense. The Board also continues to support accrual accounting as the most effective means to promote consistency between cost accounting periods.

This final rule is based on the use of accrual accounting to initially compute the pension cost for a period. The assignable cost is then determined by comparing the computed pension cost accrual to a minimum of $0 and to the maximum tax-deductible amount. The Board has determined that funding is needed to substantiate the cost allocation because of the magnitude of the liability and the extended delay between the accrual of the cost and the settlement of the liability. This final rule has not adopted ERISA as an accounting method, but has modified accrual accounting to fit within the confines of practicable funding.

*Comment*: Eleven other commenters supported the imposition of the full-funding limit. Two commenters recommended that the cost accrual be subject to a $0 minimum because contractors are prohibited from withdrawing funds from a qualified trust.

*Response*: In this final rule, the Board refines the NPRM concept of a full-funding limitation. The full-funding limitation of the final rule is implemented through the definition and operation of the "assignable cost limitation" which defines the point when the plan is overfunded for cost recognition purposes. When a pension plan is overfunded, the Government would be violating its fiduciary duty to the taxpayers by advancing any further reimbursements to the contractor. The assignable cost limitation is similar to ERISA's pre-OBRA 87 full funding limitation, but uniquely defined to avoid confusion with ERISA terminology. As with the NPRM, whenever a plan is determined to be overfunded, that is, the actuarial value of assets exceeds the liability, all existing amortization bases are deemed fully amortized and eliminated.

The Board concurs that there should be a $0 floor imposed on the assignable pension cost for the period. The Standard requires the funding agency to be established for the "exclusive benefit" of the participants so that withdrawals by the contractor are prohibited, absent a plan termination. To be internally consistent, this final rule eliminates the assignment of negative costs to a period and the allocation of such credit to contracts, except when either assets revert or inure to the contractor or the segment is no longer continuing.

However, when a contractor makes a voluntary investment decision to not fund the assigned cost of its qualified pension plan, which is otherwise allocable to and payable as cost or price under Government contracts, the contractor has knowingly accepted the consequences of its decision. In this case, because there is no conflict between ERISA and the Standards, there is no reason to alter the cost computation and assignment for the period. Permitting arbitrary reassignment of the cost to other periods would be contrary to the Board's stated goal of enhancing the consistency of costs between periods and could create a potential for gaming.

*Comment*: A major concern of thirteen commenters was that the full-funding limitation is difficult to predict. Some commenters opined that the emphasis on funding made the rule unnecessarily complex.

*Response*: In this final rule, full-funding, which is measured by the assignable cost limitation based on the actuarial value of assets and the actuarial accrued liability, is reasonably predictable. Through the smoothing techniques of an asset valuation method, large swings in assets values are dampened. In a relatively stable population, the actuarial accrued liability can be fairly well predicted using actuarial projection techniques for forward pricing purposes. Other events that dramatically affect the liability are addressed in the provisions on cost method changes, segmentation, segment closings, plan terminations, and frozen plans. Finally, contractors have some flexibility in determining the timing of certain other events, such as assumption changes or plan amendments, that affect the size of the actuarial accrued liability.

When pension plan assets and liabilities are sufficiently different in amount, the impact of the tax-deductible limits of ERISA can be forecast with a fair degree of certainty. The tax-deductible limit, computed without regard to the full-funding limitation, is generally based on the normal cost and 10 year amortization of the unfunded actuarial liability and is also relatively predictable.

A predictability problem does arise when a plan is near the threshold of ERISA's full-funding limitations. The impact of these limits is sensitive to small changes in the market value of assets, the actuarial accrued liability, and prevailing Treasury rates. The Board believes that the "all or nothing" nature and the magnitude of the impact are beyond the normal assumption of risk inherent in firm fixed-priced contracting. However, the Board believes that this is a forward-pricing problem that may be addressed by the contracting officer through the negotiation of an advance agreement reflecting the contractor's unique facts, circumstances, and expected level and mix of Government contracting. Such advance agreements could provide a method for achieving equity in the forecasting of pension costs for contractors whose pension plans are close to entering or emerging from the funding limits of ERISA.

While the special problems of forward-pricing will continue to require attention by the contracting officer, this final rule does not add more complication. The concepts of assignable cost limitation, assignable cost deficit, and assignable cost credit contained in this final rule are simply the accounting and actuarial mechanisms necessary to assign computed costs that fall outside of the funding corridor to future periods.

*Comment*: Twelve commenters noted that, despite the full-funding limitation, the cost assigned under the NPRM could still be greater than the tax-deductible maximum. Seven commenters remarked that ERISA requires amortizations to continue, and a new base be established, when the contribution is affected by the OBRA 87 full-funding limitation only. Seven commenters recommended that subparagraph 9904.412–50(b)(1) be clarified.

*Response*: This has been corrected in the final rule by using the maximum tax-deductible amount, however determined, as the limit on assignable cost for qualified plans. ~~The accrued~~ pension cost not assigned to the current period is reassigned to future periods as an assignable cost deficit. This final rule also specifies that any negative accrued cost be reassigned to future periods as an assignable cost credit.

This final rule specifies that all existing amortization bases are deemed fully amortized when the accrued cost is affected by the assignable cost limitation. This rule provides that any

unfunded actuarial liability, including an actuarial surplus, existing in the next accounting period is deemed to be an actuarial gain or loss unless it is attributable to a change in assumptions, plan amendment, or separately identified portions of unfunded actuarial liability attributable to unfunded and/or disallowed pension costs.

*Comment*: Fifteen commenters stated that funding would not be needed to validate the liability of nonqualified defined-benefit plans if the Board retained the existing requirement that the benefits be "compelled".

*Response*: The Board believes it is reasonable for the Government to require that pension cost of both qualified and nonqualified pension plans allocated to contracts, which the Government pays for through cost or price, be subject to funding. This final rule ensures that any unfunded portion of assigned cost is isolated from the computation of future cost accruals. To prevent windfall gains or losses and to minimize the need for advance agreements discussed above, costs allocated to fixed-priced contracts must be funded to the extent possible.

The Board notes that the excess funding, which occurs when a contractor funds more than the assigned pension cost for the period, is carried forward to future periods with interest. This final rule retains the premature funding provisions of the original Standard through the definition and operation of prepayment credits.

*Comment*: Five commenters stated that current period funding of assigned costs for nonqualified pension plans is necessary to enhance the verifiability of all costs allocated to contracts and to reduce the risk that the promised benefits might never be paid.

*Response*: As already discussed, the Board is persuaded that funding of the assigned cost is necessary to substantiate the liability. The Board is also persuaded that requiring a taxable contractor to fund 100% of the pension cost could impose a cash flow penalty to the extent the amount funded may not be tax-deductible. The Board has modified the funding requirement accordingly. However, the Board does not wish to provide a cash flow advantage to tax-exempt contractors for whom no such cash flow penalty exists. Accordingly, the complementary funding rule is restricted to taxable entities only.

This final rule addresses the risk that unfunded costs will not be verified by providing for an accounting of all assigned costs. Funded costs are captured and accounted for within the assets of the funding agency. Amounts exempted from funding based on the tax-rate are retained in the general assets of the contractor and accounted for within the accumulated value of permitted unfunded accruals. Portions of assigned cost not substantiated by complementary funding must be separately identified and accounted for pursuant to 9904.412–50(a)(2). This final rule ensures that all portions of assigned cost and allocated cost are tracked and accounted for, and thereby removes much of the risk.

*Comment*: Eight commenters were concerned that a "Rabbi" trust would not satisfy the "exclusive benefit" requirement in the definition of a funding agency since creditors might have superior rights to those of the plan participants. Other commenters asked if other nonqualified trust arrangements could qualify as a funding agency under the Standard.

*Response*: The Board's intention when revising the definition of a funding agency was to prohibit the use of bookkeeping reserves, escrow accounts, or any other arrangement under which the rights of the plan participants were not clearly superior to those of the plan sponsor. The basic test of "exclusive benefit" is whether the contractor has relinquished all rights to the funds and that, except for the extraordinary event of bankruptcy, the participants have primary rights to the funds. The solvency of a contractor is always a concern to the Government that is not restricted merely to pension costs.

The Board does not intend that a "Rabbi trust" be the only funding arrangement that satisfies the funding agency definition. Other arrangements such as so-called secular trusts can be satisfactory. The Board expects that as tax law changes and as qualified plan benefit limits possibly become more or less restrictive, other funding arrangements may become more effective and more widely adopted.

The Board does not intend for the "exclusive benefit" clause to prohibit asset reversions where, after settling all benefit obligations to plan participants, the residual assets of the trust revert or inure to a contractor. The funding agency coverage in the pension Standards is intended to be consistent with the coverage for funded insurance reserves found at 9904.416–50(a)(1)(v)(B), which permits a reversion of assets only after all benefit obligations have been satisfied through insurance.

*Comment*: Nine commenters were concerned that taxes and administrative costs associated with Rabbi trusts will increase pension costs. Five commenters believe that the NPRM (and prior ANPRM) complementary funding rule for nonqualified plans creates an administrative burden.

*Response*: The Board recognizes that there will be some additional expenses associated with the use of complementary funding and the use of nonqualified trust funds. The specificity of the final rule gives contractors clear rules under which they can choose to compute, assign, and allocate the costs of a nonqualified plan. The benefits of an accurate accounting of all assigned costs will offset any increased administrative expense to the Government and contractors.

There will be an increase in the cost of such plans for the taxes on the earnings of the nonqualified trust fund that are directly paid by or reimbursed from the fund. These taxes are a valid expense of the pension plan incurred in response to the final rule's requirement that a portion of the assigned cost be funded. The Board notes that, in fact, such increased costs are being returned to the Government through the payment of the tax.

The rule specifies that income taxes on the earnings of a nonqualified trust are treated as administrative expenses and not as decrements to the assumed investment earning rate. This technical correction clarifies that the interest assumption used to compute actuarial values is not reduced to reflect taxes on fund earnings. This rule is not intended to prevent contractors from expressing the actuarial assumption for administrative expenses as a percentage of the earnings.

*Comment*: Two commenters suggested that the final rule address how ERISA's funding limits are allocated to segments.

*Response*: Only the maximum tax-deductible amount and the contribution to the funding agency are determined for the pension plan in its entirety. Under segmented accounting, all other aspects of period cost; i.e., normal cost, unfunded actuarial liability, assignable cost limitation, are measured at the segment level. This final rule requires that the tax-deductible maximum, determined for the plan as a whole, must be apportioned to segments using a basis that considers the assignable costs or the funding levels of the segments. Illustrations of how plan-wide values are apportioned to segments have been added.

In addition, to ease the funding of costs attributable to Government contracts, this final rule allows contractors with predominantly commercial business to apportion contributions for qualified defined-

benefit plans to their Government segments first, but only if the contractor uses segmented accounting. Unfunded assigned costs, whether attributable to Government contracts or commercial business, will be separately identified under 9904.412–50(a)(2) and thereby isolated from future cost computations and future allocation. This provision allows the contractor to determine when to fund costs of its qualified defined-benefit plan for segments that are associated solely with commercial business.

Although the assets of a pension plan are subject to the claims of all plan participants, the Board believes the funding requirements and protections of ERISA will prevent any untenable differences in funding levels of segments from arising. Because nonqualified plans lack the funding requirement protection of ERISA, the funding of such plans must be apportioned across all segments.

*Comment:* Four commenters suggested that the definition of a segment closing should be clarified. Concerns were raised that an internal reorganization would require a current period adjustment for a segment closing even though neither the segment's nor the contractor's relationship to the Government had changed.

*Response:* The definition has been revised to delineate three conditions requiring a current period adjustment. The first condition occurs when there is a change in ownership of the segment, not just a simple reorganization within the contractor's internal structure. The second event is the one addressed in the NPRM; that is, when the contractual relationship ends because the segment operationally ceases to exist. The third case addresses the end of the contractual relationship with the Government, whether the segment continues in operation or not.

*Comment:* Two commenters opposed using the accrued benefit cost method (ABCM) to determine the actuarial liability for a segment closing or plan termination adjustment. These commenters believe the ABCM understates the liability. Four commenters supported limiting the actuarial assumptions used to determine the segment closing and plan termination adjustment. These commenters also supported a phase-in of benefit improvements adopted within 5 years of a segment closing or plan termination.

*Response:* In this final rule, the actuarial accrued liability, used for determining the adjustment for a segment closing or curtailment of benefits, is determined using the accrued benefit cost method. For a curtailment of benefits or for plan participants who are terminated from employment in a segment closing, the accrued benefit is the appropriate measure of the ultimate benefit that will be paid under the plan. If plan participants remain employed by the contractor, whether in the same or another segment, the Board believes the responsibility for future salary increases, which are attributable to future productivity, merit, and inflation, belongs to the future customers that benefit from the participants' continued employment. The Board notes that the ABCM does recognize the cost of vesting earned by the participants' future service.

The Board also believes that when there is an immediate period liquidation of the liability through the payment of lump sum settlements or the purchase of annuities, the cost of such settlements and annuities is an exact measure of the liability, although the Government does have a right to share in any future dividends or refunds. This final rule has been revised accordingly.

Consistent with the requirement that actuarial assumptions be individual best-estimates of future long-term economic and demographic trends, this final rule requires that the assumptions used to determine the actuarial liability be consistent with the assumptions that have been in use. This is consistent with the fact that the pension plan is continuing even though the segment has closed or the earning of future benefits has been curtailed. The Board does not intend this rule to prevent contractors from using assumptions that have been revised based on a persuasive actuarial experience study or a change in a plan's investment policy.

This final rule does include a sixty-month phase-in of voluntary benefit improvements to forestall an increase in the liability in contemplation of a segment closing or plan termination. Improvements mandated by law or granted though collective bargaining negotiations are not considered voluntary. A plan termination or curtailment of benefits is viewed as negating the intent of any recent voluntary benefit improvements.

Under the revised definition of a segment closing, some employees may remain in a segment performing non-Government work while other employees may be transferred to other segments. For consistency, the provisions for transfers of either active or retired participants specify that the assets transferred must equal the actuarial accrued liability determined under the accrued benefit cost method.

*Comment:* One commenter asked if a contractor must determine whether a termination of plan gain or loss has occurred before an adjustment is required. Another commenter asked if a termination of plan gain or loss occurs when a pension plan is "frozen."

*Response:* The definition has been changed to refer to an event; that is, the termination of a pension plan. Any resultant gain or loss for Government contracting purposes is determined by the 9904.413–50(c)(12) adjustment. The "freezing" of a pension plan is addressed by the addition of a definition for a "Curtailment of Benefits."

*Comment:* Two commenters supported the amortization of any segment closing adjustment, rather than an immediate period adjustment.

*Response:* Under this final rule, the 9904.413–50(c)(12) adjustment is determined as a current period adjustment, whether or not assets actually revert from the trust. The Board believes a current period adjustment is appropriate when there is a disruption of the contracting relationship, a discontinuance of the operational segment, or a discontinuance of the pension plan. When such events occur, pension costs can no longer be computed and adjusted on an on-going basis since there are either no future accounting periods in which credits or charges can be allocated to contracts or no future periods in which benefits will be earned.

If a contractor will continue to have a contracting relationship with the Government, the final rule does permit the cognizant Federal official and the contractor to negotiate an amortization schedule. This provision will allow a contractor to allocate an adjustment credit to future years during which it can recover the amount of credited assets either through decreased pension costs or through prices charged to other customers benefiting from the future work performed by plan participants.

*Comment:* Eleven commenters requested that the Board clarify that the 9904.413–50(c)(12) adjustment could result in a charge to final cost objectives if the liabilities exceeded the assets.

*Response:* The final rule refers to the "difference" between assets and liabilities without prejudice towards either adjustment credits or adjustment charges. An illustration of the adjustment when liabilities exceed assets has been added.

*Comment:* Four commenters asked the Board to clarify how the Government's share of the adjustment was to be determined. Five commenters opposed the inclusion of fixed-price contracts in

any formula used to determine the Government's share.

*Response:* The asset value used to determine the adjustment amount is the market value of the assets, including permitted unfunded accruals, plus portions of unfunded liability identified pursuant to 9904.412–50(a)(2), i.e., plan assets retained by the contractor due to allocated but unfunded costs. The asset value is reduced for the accumulated value of any prepayment credits since such assets have never been assigned to past periods nor allocated to Government contracts. Because this asset value represents the current value of assigned costs of prior periods, the sum of previously assigned pension costs is the denominator of the fraction. The portion of these assets attributable to the Government's participation in the funding of the pension plan through cost or price is measured by the sum of costs allocated to Government contracts. The fraction is determined based on data from years that are representative of the Government's participation, which is a factual determination best made by the contracting officer.

Costs allocated to fixed-price contracts subject to CAS 9904.412 and 9904.413 are included since the Government has participated in the funding of the plan through the payment of the estimated pension cost considered in the pricing of the contract. A risk/reward of a fixed-price contract is the deviation of actual costs from the estimated cost considered in the price. If a single period event, e.g., segment closing, plan termination, or benefit curtailment, alters the on-going nature of the pension plan or segment, the effect on fixed-price contracts should be similar to that of an accounting practice change.

*Comment:* Four commenters supported amending the NPRM coverage to explicitly state that the 9904.413–50(c)(12) adjustment is determined net of the excise tax on pension plan asset reversions.

*Response:* The Board agrees. Before applying the fraction that determines the Government's share, subdivision 9904.413–50(c)(12)(vi) reduces the adjustment amount for any excise taxes assessed on assets that revert to the contractor as part of a pension plan termination. The excise tax is intended to discourage plan sponsors from terminating their qualified pension plans, and under this final rule, Government contractors are subject to the same termination penalty as their commercial counterparts. Since the excise tax is returned to the Government, albeit the Internal Revenue Service, the Board believes equity warrants determining the Government's share based on the net adjustment amount.

While the Board believes the Government's allocable share of any adjustment should be net of any reversion excise tax, the allowability of such excise taxes continues to be determined by the applicable cost principles. Income taxes, which are paid to the Internal Revenue Service as an offset against prior tax deductions, continue not to be allocable.

*Comment:* Six commenters suggested that a segment closing adjustment is not necessary if the assets and liabilities of the segment were transferred to the successor contractor.

*Response:* The Board agrees. The appropriate coverage and illustrations have been added.

**List of Subjects in 48 CFR Parts 9903 and 9904**

Cost accounting standards, Government procurement.

**Richard C. Loeb,**

*Executive Secretary, Cost Accounting Standards Board.*

## PART 9903—CONTRACT COVERAGE

1. The authority citations for Parts 9903 and 9904 continue to read as follows:

Authority: Public Law 100–679, 102 Stat 4056, 41 U.S.C. 422.

**9903.201 [Amended]**

2. Subsection 9903.201–1 is amended by removing and reserving paragraph (b)(11).

## PART 9904—COST ACCOUNTING STANDARDS

3. Subsection 9904.412–30 is amended by revising paragraph (a) to read as follows:

**9904.412–30 Definitions.**

(a) The following are definitions of terms which are prominent in this Standard. Other terms defined elsewhere in this chapter 99 shall have the meanings ascribed to them in those definitions unless paragraph (b) of this subsection requires otherwise.

(1) *Accrued benefit cost method* means an actuarial cost method under which units of benefits are assigned to each cost accounting period and are valued as they accrue; that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial accrued liability at a plan's inception date is the present value of the units of benefit credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method without salary projection.)

(2) *Actuarial accrued liability* means pension cost attributable, under the actuarial cost method in use, to years prior to the current period considered by a particular actuarial valuation. As of such date, the actuarial accrued liability represents the excess of the present value of future benefits and administrative expenses over the present value of future normal costs for all plan participants and beneficiaries. The excess of the actuarial accrued liability over the actuarial value of the assets of a pension plan is the Unfunded Actuarial Liability. The excess of the actuarial value of the assets of a pension plan over the actuarial accrued liability is an actuarial surplus and is treated as a negative unfunded actuarial liability.

(3) *Actuarial assumption* means an estimate of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, earnings on pension plan assets, changes in values of pension plan assets.

(4) *Actuarial cost method* means a technique which uses actuarial assumptions to measure the present value of future pension benefits and pension plan administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods. The actuarial cost method includes the asset valuation method used to determine the actuarial value of the assets of a pension plan.

(5) *Actuarial gain and loss* means the effect on pension cost resulting from differences between actuarial assumptions and actual experience.

(6) *Actuarial valuation* means the determination, as of a specified date, of the normal cost, actuarial accrued liability, actuarial value of the assets of a pension plan, and other relevant values for the pension plan.

(7) *Assignable cost credit* means the decrease in unfunded actuarial liability that results when the pension cost computed for a cost accounting period is less than zero.

(8) *Assignable cost deficit* means the increase in unfunded actuarial liability that results when the pension cost computed for a qualified defined-benefit pension plan exceeds the maximum tax-deductible amount for the cost accounting period determined in accordance with the Employee Retirement Income Security Act of 1974

(ERISA), 29 U.S.C. 1001 *et seq.*, as amended.

(9) *Assignable cost limitation* means the excess, if any, of the actuarial accrued liability plus the current normal cost over the actuarial value of the assets of the pension plan.

(10) *Defined-benefit pension plan* means a pension plan in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits.

(11) *Defined-contribution pension plan* means a pension plan in which the contributions are established in advance and the benefits are determined thereby.

(12) *Funded pension cost* means the portion of pension cost for a current or prior cost accounting period that has been paid to a funding agency.

(13) *Funding agency* means an organization or individual which provides facilities to receive and accumulate assets to be used either for the payment of benefits under a pension plan, or for the purchase of such benefits, provided such accumulated assets form a part of a pension plan established for the exclusive benefit of the plan participants and their beneficiaries. The fair market value of the assets held by the funding agency as of a specified date is the Funding Agency Balance as of that date.

(14) *Immediate-gain actuarial cost method* means any of the several cost methods under which actuarial gains and losses are included as part of the unfunded actuarial liability of the pension plan, rather than as part of the normal cost of the plan.

(15) *Market value of the assets* means the sum of the funding agency balance plus the accumulated value of any permitted unfunded accruals belonging to a pension plan. The Actuarial Value of the Assets means the value of cash, investments, permitted unfunded accruals, and other property belonging to a pension plan, as used by the actuary for the purpose of an actuarial valuation.

(16) *Multiemployer pension plan* means a plan to which more than one employer contributes and which is maintained pursuant to one or more collective bargaining agreements between an employee organization and more than one employer.

(17) *Nonforfeitable* means a right to a pension benefit, either immediate or deferred, which arises from an employee's service, which is unconditional, and which is legally enforceable against the pension plan or the contractor. Rights to benefits that do not satisfy this definition are considered forfeitable. A right to a pension benefit is not forfeitable solely because it may be affected by the employee's or beneficiary's death, disability, or failure to achieve vesting requirements. Nor is a right considered forfeitable because it can be affected by the unilateral actions of the employee.

(18) *Normal cost* means the annual cost attributable, under the actuarial cost method in use, to current and future years as of a particular valuation date, excluding any payment in respect of an unfunded actuarial liability.

(19) *Pay-as-you-go cost method* means a method of recognizing pension cost only when benefits are paid to retired employees or their beneficiaries.

(20) *Pension plan* means a deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an integral part of a pension plan.

(21) *Pension plan participant* means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit from a pension plan which covers employees of such employer or members of such organization who have satisfied the plan's participation requirements, or whose beneficiaries are receiving or may be eligible to receive any such benefit. A participant whose employment status with the employer has not been terminated is an active participant of the employer's pension plan.

(22) *Permitted unfunded accrual* means the amount of pension cost for nonqualified defined-benefit pension plans that is not required to be funded under 9904.412–50(d)(2). The Accumulated Value of Permitted Unfunded Accruals means the value, as of the measurement date, of the permitted unfunded accruals adjusted for imputed earnings and for benefits paid by the contractor.

(23) *Prepayment credit* means the amount funded in excess of the pension cost assigned to a cost accounting period that is carried forward for future recognition. The Accumulated Value of Prepayment Credits means the value, as of the measurement date, of the prepayment credits adjusted for interest at the valuation rate and decreased for amounts used to fund pension costs or liabilities, whether assignable or not.

(24) *Projected benefit cost method* means either (i) any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers, or (ii) a modification of the accrued benefit cost method that considers projected compensation levels.

(25) *Qualified pension plan* means a pension plan comprising a definite written program communicated to and for the exclusive benefit of employees which meets the criteria deemed essential by the Internal Revenue Service as set forth in the Internal Revenue Code for preferential tax treatment regarding contributions, investments, and distributions. Any other plan is a Nonqualified Pension Plan.

(b) * * *

4. Subsection 9904.412–40 is revised to read as follows:

**9904.412–40 Fundamental requirement.**

(a) *Components of pension cost.* (1) For defined-benefit pension plans, except for plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are (i) the normal cost of the period, (ii) a part of any unfunded actuarial liability, (iii) an interest equivalent on the unamortized portion of any unfunded actuarial liability, and (iv) an adjustment for any actuarial gains and losses.

(2) For defined-contribution pension plans, the pension cost for a cost accounting period is the net contribution required to be made for that period, after taking into account dividends and other credits, where applicable.

(3) For defined-benefit pension plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are:

(i) The net amount of periodic benefits paid for that period, and

(ii) An amortization installment, including an interest equivalent on the unamortized settlement amount, attributable to amounts paid to irrevocably settle an obligation for periodic benefits due in current and future cost accounting periods.

(b) *Measurement of pension cost.* (1) For defined-benefit pension plans other than those accounted for under the pay-as-you-go cost method, the amount of pension cost of a cost accounting period shall be determined by use of an immediate-gain actuarial cost method.

(2) Each actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations. The validity of each assumption used shall be evaluated solely with respect to that assumption. Actuarial assumptions used in calculating the amount of an unfunded actuarial liability shall be the same as those used for other components of pension cost.

(c) *Assignment of pension cost.* Except costs assigned to future periods by 9904.412–50(c) (2) and (5), the amount of pension cost computed for a cost accounting period is assignable only to that period. For defined-benefit pension plans other than those accounted for under the pay-as-you-go cost method, the pension cost is assignable only if the sum of (1) the unamortized portions of assignable unfunded actuarial liability developed and amortized pursuant to 9904.412–50(a) (1), and (2) the unassignable portions of unfunded actuarial liability separately identified and maintained pursuant to 9904.412–50(a)(2) equals the total unfunded actuarial liability.

(d) *Allocation of pension cost.* Pension costs assigned to a cost accounting period are allocable to intermediate and final cost objectives only if they meet the requirements for allocation in 9904.412–50(d). Pension costs not meeting these requirements may not be reassigned to any future cost accounting period.

5. Subsection 9904.412–50 is revised to read as follows:

9904.412–50 Techniques for application.

(a) *Components of pension cost.* (1) The following portions of unfunded actuarial liability shall be included as a separately identified part of the pension cost of a cost accounting period and shall be included in equal annual installments. Each installment shall consist of an amortized portion of the unfunded actuarial liability plus an interest equivalent on the unamortized portion of such liability. The period of amortization shall be established as follows:

(i) If amortization of an unfunded actuarial liability has begun prior to the date this Standard first becomes applicable to a contractor, no change in the amortization period is required by this Standard.

(ii) If amortization of an unfunded actuarial liability has not begun prior to the date this Standard first becomes applicable to a contractor, the amortization period shall begin with the period in which the Standard becomes applicable and shall be no more than 30 years nor less than 10 years. However, if the plan was in existence as of January 1, 1974, the amortization period shall be no more than 40 years nor less than 10 years.

(iii) Each increase or decrease in unfunded actuarial liability resulting from the institution of new pension plans, from the adoption of improvements, or other changes to pension plans subsequent to the date this Standard first becomes applicable to a contractor shall be amortized over no more than 30 years nor less than 10 years.

(iv) If any assumptions are changed during an amortization period, the resulting increase or decrease in unfunded actuarial liability shall be separately amortized over no more than 30 years nor less than 10 years.

(v) Actuarial gains and losses shall be identified separately from unfunded actuarial liabilities that are being amortized pursuant to the provisions of this Standard. The accounting treatment to be afforded to such gains and losses shall be in accordance with Cost Accounting Standard 9904.413.

(vi) Each increase or decrease in unfunded actuarial liability resulting from an assignable cost deficit or credit, respectively, shall be amortized over a period of 10 years.

(vii) Each increase or decrease in unfunded actuarial liability resulting from a change in actuarial cost method, including the asset valuation method, shall be amortized over a period of 10 to 30 years. This provision shall not affect the requirements of 9903.302 to adjust previously priced contracts.

(2) Except as provided in 9904.412–50(d)(2), any portion of unfunded actuarial liability attributable to either (i) pension costs applicable to prior years that were specifically unallowable in accordance with then existing Government contractual provisions or (ii) pension costs assigned to a cost accounting period that were not funded in that period, shall be separately identified and eliminated from any unfunded actuarial liability being amortized pursuant to paragraph (a)(1) of this subsection. Such portions of unfunded actuarial liability shall be adjusted for interest at the valuation rate of interest. The contractor may elect to fund, and thereby reduce, such portions of unfunded actuarial liability and future interest adjustments thereon. Such funding shall not be recognized for purposes of 9904.412–50(d).

(3) A contractor shall establish and consistently follow a policy for selecting specific amortization periods for unfunded actuarial liabilities, if any, that are developed under the actuarial cost method in use. Such policy may give consideration to factors such as the size and nature of the unfunded actuarial liabilities. Except as provided in 9904.412–50(c)(2) or 9904.413–50(c)(12), once the amortization period for a portion of unfunded actuarial liability is selected, the amortization process shall continue to completion.

(4) Any amount funded in excess of the pension cost assigned to a cost accounting period shall be accounted for as a prepayment credit. The accumulated value of such prepayment credits shall be adjusted for interest at the valuation rate of interest until applied towards pension cost in a future accounting period. The accumulated value of prepayment credits shall be reduced for portions of the accumulated value of prepayment credits used to fund pension costs or to fund portions of unfunded actuarial liability separately identified and maintained in accordance with 9904.412–50(a)(2). The accumulated value of any prepayment credits shall be excluded from the actuarial value of the assets used to compute pension costs for purposes of this Standard and Cost Accounting Standard 9904.413.

(5) An excise tax assessed pursuant to a law or regulation because of excess, inadequate, or delayed funding of a pension plan is not a component of pension cost. Income taxes paid from the funding agency of a nonqualified defined-benefit pension plan on earnings or other asset appreciation of such funding agency shall be treated as an administrative expense of the fund and not as a reduction to the earnings assumption.

(6) For purposes of this Standard, defined-benefit pension plans funded exclusively by the purchase of individual or group permanent insurance or annuity contracts, and thereby exempted from ERISA's minimum funding requirements, shall be treated as defined-contribution pension plans. However, all other defined-benefit pension plans administered wholly or in part through insurance company contracts shall be subject to the provisions of this Standard relative to defined-benefit pension plans.

(7) If a pension plan is supplemented by a separately-funded plan which provides retirement benefits to all of the participants in the basic plan, the two plans shall be considered as a single plan for purposes of this Standard. If the effect of the combined plans is to provide defined-benefits for the plan participants, the combined plans shall

be treated as a defined-benefit plan for purposes of this Standard.

(8) A multiemployer pension plan established pursuant to the terms of a collective bargaining agreement shall be considered to be a defined-contribution pension plan for purposes of this Standard.

(9) A pension plan applicable to a Federally-funded Research and Development Center (FFRDC) that is part of a State pension plan shall be considered to be a defined-contribution pension plan for purposes of this Standard.

(b) *Measurement of pension cost.* (1) For defined-benefit pension plans other than those accounted for under the pay-as-you-go cost method, the amount of pension cost assignable to cost accounting periods shall be measured by an immediate-gain actuarial cost method.

(2) Where the pension benefit is a function of salaries and wages, the normal cost shall be computed using a projected benefit cost method. The normal cost for the projected benefit shall be expressed either as a percentage of payroll or as an annual accrual based on the service attribution of the benefit formula. Where the pension benefit is not a function of salaries and wages, the normal cost shall be based on employee service.

(3) For defined-benefit-plans accounted for under the pay-as-you-go cost method, the amount of pension cost assignable to a cost accounting period shall be measured as the sum of:

(i) The net amount for any periodic benefits paid for that period, and

(ii) The level annual installment required to amortize over 15 years any amounts paid to irrevocably settle an obligation for periodic benefits due in current or future cost accounting periods.

(4) Actuarial assumptions shall reflect long-term trends so as to avoid distortions caused by short-term fluctuations.

(5) Pension cost shall be based on provisions of existing pension plans. This shall not preclude contractors from making salary projections for plans whose benefits are based on salaries and wages, or from considering improved benefits for plans which provide that such improved benefits must be made.

(6) If the evaluation of the validity of actuarial assumptions shows that any assumptions were not reasonable, the contractor shall:

(i) Identify the major causes for the resultant actuarial gains or losses, and

(ii) Provide information as to the basis and rationale used for retaining or revising such assumptions for use in the ensuing cost accounting period(s).

(c) *Assignment of pension cost.* (1) Amounts funded in excess of the pension cost computed for a cost accounting period pursuant to the provisions of this Standard shall be accounted for as a prepayment credit and carried forward to future accounting periods.

(2) For qualified defined-benefit pension plans, the pension cost computed for a cost accounting period is assigned to that period subject to the following adjustments, in order of application:

(i) Any amount of computed pension cost that is less than zero shall be assigned to future accounting periods as an assignable cost credit. The amount of pension cost assigned to the period shall be zero.

(ii) When the pension cost equals or exceeds the assignable cost limitation:

(A) The amount of computed pension cost, adjusted pursuant to paragraph (c)(2)(i) of this subsection, shall not exceed the assignable cost limitation.

(B) All amounts described in 9904.412–50(a)(1) and 9904.413–50(a), which are required to be amortized, shall be considered fully amortized, and

(C) Except for portions of unfunded actuarial liability separately identified and maintained in accordance with 9904.413–50(a)(2), any portion of unfunded actuarial liability, which occurs in the first cost accounting period after the pension cost has been limited by the assignable cost limitation, shall be considered an actuarial gain or loss for purposes of this Standard. Such actuarial gain or loss shall exclude any increase or decrease in unfunded actuarial liability resulting from a plan amendment, change in actuarial assumptions, or change in actuarial cost method effected after the pension cost has been limited by the assignable cost limitation.

(iii) Any amount of computed pension cost of a qualified pension plan, adjusted pursuant to paragraphs (c)(2)(i) and (ii) of this subsection that exceeds the sum of (A) the maximum tax-deductible amount, determined in accordance with ERISA, and (B) the accumulated value of prepayment credits shall be assigned to future accounting periods as an assignable cost deficit. The amount of pension cost assigned to the current period shall not exceed the sum of the maximum tax-deductible amount plus the accumulated value of prepayment credits.

(3) The cost of nonqualified defined-benefit pension plans shall be assigned to cost accounting periods in the same manner as qualified plans (with the exception of paragraph (c)(2)(iii) of this subsection) under the following conditions:

(i) The contractor, in disclosing or establishing his cost accounting practices, elects to have a plan so accounted for;

(ii) The plan is funded through the use of a funding agency; and,

(iii) The right to a pension benefit is nonforfeitable and is communicated to the participants.

(4) The costs of nonqualified defined-benefit pension plans that do not meet all of the requirements in 9904.412–50(c)(3) shall be assigned to cost accounting periods using the pay-as-you-go cost method.

(5) Any portion of pension cost computed for a cost accounting period that exceeds the amount required to be funded pursuant to a waiver granted under the provisions of ERISA shall not be assigned to the current period. Rather, such excess shall be treated as an assignable cost deficit, except that it shall be assigned to future cost accounting periods using the same amortization period as used for ERISA purposes.

(d) *Allocation of pension costs.* The amount of pension cost assigned to a cost accounting period allocated to intermediate and final cost objectives shall be limited according to the following criteria:

(1) Except for nonqualified defined-benefit plans, the costs of a pension plan assigned to a cost accounting period are allocable to the extent that they are funded.

(2) For nonqualified defined-benefit pension plans that meet the criteria set forth at 9904.412–50(c)(3), pension costs assigned to a cost accounting period are fully allocable if they are funded at a level at least equal to the percentage of the complement (i.e., 100%-tax rate % = percentage of assigned cost to be funded) of the highest published Federal corporate income tax rate in effect on the first day of the cost accounting period. If the contractor is not subject to Federal income tax, the assigned costs are allocable to the extent such costs are funded. Funding at other levels and benefit payments of such plans are subject to the following:

(i) Funding at less than the foregoing levels shall result in proportional reductions of the amount of assigned cost that can be allocated within the cost accounting period.

(ii) (A) Payments to retirees or beneficiaries shall contain an amount drawn from sources other than the funding agency of the pension plan that is, at least, proportionately equal to the

accumulated value of permitted unfunded accruals divided by an amount that is the market value of the assets of the pension plan excluding any accumulated value of prepayment credits.

(B) The amount of assigned cost of a cost accounting period that can be allocated shall be reduced to the extent that such payments are drawn in a higher ratio from the funding agency:

(iii) The permitted unfunded accruals shall be identified and accounted for year to year, adjusted for benefit payments directly paid by the contractor and for interest at the actual annual earnings rate on the funding agency balance.

(3) For nonqualified defined-benefit pension plans accounted for under the pay-as-you-go method, pension costs assigned to a cost accounting period are allocable in that period.

(4) Funding of pension cost shall be considered to have taken place within the cost accounting period if it is accomplished by the corporate tax filing date for such period including any permissible extensions thereto.

6. Subsection 9904.412–60 is revised to read as follows:

**9904.412–60 Illustrations.**

(a) *Components of pension cost.* (1) Contractor A has insured pension plans for each of two small groups of employees. One plan is exclusively funded through a group permanent life insurance contract and is exempt from the minimum funding requirements of ERISA. The other plan is funded through a deposit administration contract, which is a form of group deferred annuity contract that is not exempt from ERISA's minimum funding requirements. Both plans provide for defined benefits. Pursuant to 9904.412–50(a)(6), for purposes of this Standard the plan financed through a group permanent insurance contract shall be considered to be a defined-contribution pension plan; the net premium required to be paid for a cost accounting period (after deducting dividends and any credits) shall be the pension cost for that period. However, the deposit administration contract plan is subject to the provisions of this Standard that are applicable to defined-benefit plans.

(2) Contractor B provides pension benefits for certain hourly employees through a multiemployer defined-benefit plan. Under the collective bargaining agreement, the contractor pays six cents into the fund for each hour worked by the covered employees. Pursuant to 9904.412–50(a)(8), the plan shall be considered to be a defined-contribution pension plan. The payments required to be made for a cost accounting period shall constitute the assignable pension cost for that period.

(3) Contractor C provides pension benefits for certain employees through a defined-contribution pension plan. However, the contractor has a separate fund that is used to supplement pension benefits for all of the participants in the basic plan in order to provide a minimum monthly retirement income to each participant. Pursuant to 9904.412–50(a)(7), the two plans shall be considered as a single plan for purposes of this Standard. Because the effect of the supplemental plan is to provide defined-benefits for the plan's participants, the provisions of this Standard relative to defined-benefit pension plans shall be applicable to the combined plan.

(4) Contractor D provides supplemental benefits to key management employees through a nonqualified defined-benefit pension plan funded by a so-called "Rabbi Trust." The trust agreement provides that Federal income taxes levied on the earnings of the Rabbi trust may be paid from the trust. The contractor's actuarial cost method recognizes the administrative expenses of the plan and trust, such as broker and attorney fees, by adding the prior year's expenses to the current year's normal cost. The income taxes paid by the trust on trust earnings shall be accorded the same treatment as any other administrative expense in accordance with 9904.412–50(a)(5).

(5) (i) Contractor E has been using the entry age normal actuarial cost method to compute pension costs. The contractor has three years remaining under a firm fixed price contract subject to this Standard. The contract was priced using the unfunded actuarial liability, normal cost, and net amortization installments developed using the entry age normal method. The contract was priced as follows:

ENTRY AGE NORMAL VALUES

| Cost component | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Normal cost | $100,000 | $105,000 | $110,000 |
| Amortization | 50,000 | 50,000 | 50,000 |
| Pension cost | 150,000 | 155,000 | 160,000 |

(ii) The contractor, after notifying the cognizant Federal official, switches to the projected unit credit actuarial cost method. The unfunded actuarial liability and normal cost decreased when redetermined under the projected unit credit method. Pursuant to 9904.412–50(a)(1)(vii), the contractor determines that an annual installment credit of $20,000 will amortize the decrease in unfunded actuarial liability (UAL) over ten years. The following pension costs are determined under the projected unit credit method:

PROJECTED UNIT CREDIT VALUES

| Cost component | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Normal cost | $80,000 | $85,000 | $90,000 |
| Amortization: | | | |
| Prior method | 50,000 | 50,000 | 50,000 |
| UAL decrease | (20,000) | (20,000) | (20,000) |
| Pension cost | 110,000 | 115,000 | 120,000 |

(iii) The change in cost method is a change in accounting method that decreased previously priced pension costs by $40,000 per year. In accordance with 9903.302, Contractor E shall adjust the cost of the firm fixed-price contract for the remaining three years by $120,000 ($40,000x3 years).

(6) Contractor F has a defined-benefit pension plan for its employees. Prior to being subject to this Standard the contractor's policy was to compute and fund as annual pension cost normal cost plus only interest on the unfunded actuarial liability. Pursuant to 9904.412–40(a)(1), the components of pension cost for a cost accounting period must now include not only the normal cost for the period and interest on the unfunded actuarial liability, but also an amortized portion of the unfunded actuarial liability. The amortization of the liability and the interest equivalent on the unamortized portion of the liability must be computed in equal annual installments.

(b) *Measurement of pension cost.* (1) Contractor G has a pension plan whose costs are assigned to cost accounting periods by use of an actuarial cost method that does not separately identify actuarial gains and losses or the effect on pension cost resulting from changed actuarial assumptions. Contractor G's method is not an immediate-gain cost method and does not comply with the provisions of 9904.412–50(b)(1).

(2) For several years Contractor H has had an unfunded nonqualified pension plan which provides for payments of $200 a month to employees after retirement. The contractor is currently making such payments to several retired employees and recognizes those payments as its pension cost. The contractor paid monthly annuity benefits totaling $24,000 during the current year. During the prior year, Contractor H made lump sum payments to irrevocably settle the benefit liability of several participants with small benefits. The annual installment to amortize these lump sum payments over fifteen years at the valuation interest rate assumption is $5,000. Since the plan does not meet the criteria set forth in 9904.412–50(c)(3)(ii), pension cost must be accounted for using the pay-as-you-go cost method. Pursuant to 9904.412–50(b)(3), the amount of assignable cost allocable to cost objectives of that period is $29,000, which is the sum of the amount of benefits actually paid in that period ($24,000) plus the second annual installment to amortize the prior year's lump sum settlements ($5,000).

(3) Contractor I has two qualified defined-benefit pension plans that provide for fixed dollar payments to hourly employees. Under the first plan, the contractor's actuary believes that the contractor will be required to increase the level of benefits by specified percentages over the next several years. In calculating pension costs, the contractor may not assume future benefits greater than that currently required by the plan. With regard to the second plan, a collective bargaining agreement negotiated with the employees' labor union provides that pension benefits will increase by specified percentages over the next several years. Because the improved benefits are required to be made, the contractor can consider such increased benefits in computing pension costs for the current cost accounting period in accordance with 9904.412–50(b)(5).

(4) In addition to the facts of 9904.412–60(b)(3), assume that Contractor I was required to contribute at a higher level for ERISA purposes because the plan was underfunded. To compute pension costs that are closer to the funding requirements of ERISA, Contractor I decides to "fresh start" the unfunded actuarial liability being amortized pursuant to 9904.412–50(a)(1); i.e., treat the entire amount as a newly established portion of unfunded actuarial liability, which is amortized over 10 years in accordance with 9904.412–50(a)(1)(ii). Because the contractor has changed the periods for amortizing the unfunded actuarial liability established pursuant to 9904.412–50(a)(3), the contractor has made a change in accounting practice subject to the provisions of Cost Accounting Standard 9903.302.

(c) *Assignment of pension cost.* (1) Contractor J maintains a qualified defined-benefit pension plan. The actuarial value of the assets of $18 million is subtracted from the actuarial accrued liability of $20 million to determine the total unfunded actuarial liability of $2 million. Pursuant to 9904.412–50(a)(1), Contractor J has identified and is amortizing twelve separate portions of unfunded actuarial liabilities. The sum of the unamortized balances for the twelve separately maintained portions of unfunded actuarial liability equals $1.8 million. In accordance with 9904.412–50(a)(2), the contractor has separately identified, and eliminated from the computation of pension cost, $200,000 attributable to a pension cost assigned to a prior period that was not funded. The sum of the twelve amortization bases maintained pursuant to 9904.412–50(a)(1) and the amount separately identified under 9904.412–50(a)(2) equals $2 million ($1,800,000+200,000). Because the sum of all identified portions of unfunded actuarial liability equals the total unfunded actuarial liability, the plan is in actuarial balance and Contractor J can assign pension cost to the current cost accounting period in accordance with 9904.412–40(c).

(2) Contractor K's pension cost computed for 1996, the current year, is $1.5 million. This computed cost is based on the components of pension cost described in 9904.412–40(a) and 9904.412–50(a) and is measured in accordance with 9904.412–40(b) and 9904.412–50(b). The assignable cost limitation, which is defined at 9904.412–30(a)(9), is $1.3 million. In accordance with the provisions of 9904.412–50(c)(2)(ii)(A), Contractor K's assignable pension cost for 1996 is limited to $1.3 million. In addition, all amounts that were previously being amortized pursuant to 9904.412–50(a)(1) and 9904.413–50(a) are considered fully amortized in accordance with 9904.412–50(c)(2)(ii)(B). The following year, 1997 Contractor K computes an unfunded actuarial liability of $4 million. Contractor K has not changed his actuarial assumptions nor amended the provisions of his pension plan. Contractor K has not had any pension costs disallowed or unfunded in prior periods. Contractor K must treat the entire $4 million of unfunded actuarial liability as an actuarial loss to be amortized over fifteen years beginning in 1997 in accordance with 9904.412–50(c)(2)(ii)(C).

(3) Assume the same facts shown in illustration 9904.412–60(c)(2), except that in 1995, the prior year, Contractor K's assignable pension cost was $800,000, but Contractor K only funded and allocated $600,000. Pursuant to 9904.412–50(a)(2), the $200,000 of unfunded assignable pension cost was separately identified and eliminated from other portions of unfunded actuarial liability. This portion of unfunded actuarial liability was adjusted for 8% interest, which is the interest assumption for 1995 and 1996, and was brought forward to 1996 in accordance with 9904.412–50(a)(2). Therefore, $216,000 ($200,000x1.08) is excluded from the amount considered fully amortized in 1996. The next year 1997, Contractor K must eliminate $233,280 ($216,000x1.08) from the $4 million so that only $3,766,720 is treated as an actuarial loss in accordance with 9904.412–50(c)(2)(ii)(C).

(4) Assume, as in 9904.412–60(c)(2), the 1996 pension cost computed for Contractor K's qualified defined-benefit pension plan is $1.5 million and the assignable cost limitation is $1.7

million. However, because of the ERISA limitation on tax-deductible contributions, Contractor K cannot fund more than $1 million without incurring an excise tax, which 9904.412–50(a)(5) does not permit to be a component of pension cost. In accordance with the provisions of 9904.412–50(c)(2)(iii), Contractor K's assignable pension cost for the period is limited to $1 million. The $500,000 ($1.5 million – $1 million) of pension cost not funded is reassigned to the next ten cost accounting periods beginning in 1997 as an assignable cost deficit in accordance with 9904.412–50(a)(1)(vi).

(5) Assume the same facts for Contractor K in 9904.412–60(c)(4), except that the accumulated value of prepayment credits equals $700,000. Therefore, in addition to the $1 million, Contractor K can apply $500,000 of the accumulated value of prepayment credits towards the pension cost computed for the period. In accordance with the provisions of 9904.412–50(c)(2)(iii), Contractor K's assignable pension cost for the period is the full $1.5 million ($1 million+$500,000) computed for the period. The $200,000 of remaining accumulated value of prepayment credits ($700,000 – $500,000) is adjusted for interest at the valuation rate and carried forward until needed in future accounting periods in accordance with 9904.412–50(a)(4).

(6) Assume the same facts for Contractor K in 9904.412–60(c)(4), except that the 1996 assignable cost limitation is $1.3 million. Pension cost of $1.5 million is computed for the cost accounting period, but the assignable cost is limited to $1.3 million in accordance with 9904.412–50(c)(2)(ii)(A). Pursuant to 9904.412–50(c)(2)(ii)(B), all existing amortization bases maintained in accordance with subparagraph 9904.412–50(a)(1) are considered fully amortized. The assignable cost of $1.3 million is then compared to the maximum tax-deductible amount of $1 million. Pursuant to 9904.412–50(c)(2)(iii), Contractor K's assignable pension cost for the period is limited to $1 million. The $300,000 ($1.3 million – $1 million) excess of the assignable cost limitation over the tax-deductible maximum is assigned to future periods as an assignable cost deficit.

(7) Contractor L is currently amortizing a large decrease in unfunded actuarial liability over a period of ten years. A similarly large increase in unfunded actuarial liability is being amortized over 30 years. The absolute value of the resultant net amortization credit is greater than the normal cost so that the pension cost computed for the period is a negative $200,000. Contractor L first applies the provisions of 9904.412–50(c)(2)(i) and determines the assignable pension cost is $0. The negative pension cost of $200,000 is assigned to the next ten cost accounting periods as an assignable cost credit in accordance with 9904.412–50(a)(1)(vi). However, when Contractor L applies the provisions of 9904.412–50(c)(2)(ii), the assignable cost limitation is also $0. Because the assignable cost of $0 determined under 9904.412–50(c)(2)(i) is equal to the assignable cost limitation, the assignable cost credit of $200,000 is considered fully amortized along with all other portions of unfunded actuarial liability being amortized pursuant to 9904.412–50(a)(1). Conversely, if the assignable cost limitation had been greater than zero, the assignable cost credit of $200,000 would have carried-forward and amortized in future periods.

(8) Contractor M has a qualified defined-benefit pension plan which is funded through a funding agency. It computes $1 million of pension cost for a cost accounting period. However, pursuant to a waiver granted under the provisions of ERISA, Contractor M is required to fund only $800,000. Under the provisions of 9904.412–50(c)(5), the remaining $200,000 shall be accounted for as an assignable cost deficit and assigned to the next five cost accounting periods in accordance with the terms of the waiver.

(9) Contractor N has a company-wide defined-benefit pension plan, wherein benefits are calculated on one consistently applied formula. That part of the formula defining benefits within ERISA limits is administered and reported as a qualified plan and funded through a funding agency. The remainder of the benefits are considered to be a supplemental or excess plan which, while it meets the criteria at 9904.412–50(c)(3)(iii) as to nonforfeitability and communication, is not funded. The costs of the qualified portion of the plan shall be comprised of those elements of costs delineated at 9904.412–40(a)(1), while the supplemental or excess portion of the plan shall be accounted for and assigned to cost accounting periods under the pay-as-you-go cost method provided at 9904.412–40(a)(3) and 9904.412–50(c)(4).

(10) Assuming the same facts as in 9904.412–60(c)(9), except that Contractor N funds its supplemental or excess plan using a so-called "Rabbi Trust" vehicle. Because the nonqualified plan is funded, the plan meets the criteria set forth at 9904.412–50(c)(3)(ii). Contractor N may account for the supplemental or excess plan in the same manner as its qualified plan, if it elects to do so pursuant to 9904.412–50(c)(3)(i).

(11) Assuming the same facts as in 9904.412–60(c)(10), except that under the nonqualified portion of the pension plan a former employee will forfeit his pension benefit if the employee goes to work for a competitor within three years of terminating employment. Since the right to a benefit cannot be affected by the unilateral action of the contractor, the right to a benefit is considered to be nonforfeitable for purposes of 9904.412–30(a)(17). The nonqualified plan still meets the criteria set forth at 9904.412–50(c)(3)(iii), and Contractor N may account for the supplemental or excess plan in the same manner as its qualified plan, if it elects to do so.

(12) Assume the same facts as in 9904.412–60(c)(11), except that Contractor N, while maintaining a "Rabbi Trust" funding vehicle elects to have the plan accounted for under the pay-as-you-go cost method so as to have greater latitude in annual funding decisions. It may so elect pursuant to 9904.412–50(c)(3)(i).

(13) The assignable pension cost for Contractor O's qualified defined-benefit plan is $600,000. For the same period Contractor O contributes $700,000, which is the minimum funding requirement under ERISA. In addition, there exists $75,000 of unfunded actuarial liability that has been separately identified pursuant to 9904.412–50(a)(2). Contractor O may use $75,000 of the contribution in excess of the assignable pension cost to fund this separately identified unfunded actuarial liability, if he so chooses. The effect of the funding is to eliminate the unassignable $75,000 portion of unfunded actuarial liability that had been separately identified and thereby eliminated from the computation of pension costs. Contractor O shall then account for the remaining $25,000 of excess contribution as a prepayment credit in accordance with 9904.412–50(a)(4).

(d) *Allocation of pension cost.* (1) Assume the same set of facts for Contractor M in 9904.412–60(c)(8) except there was no ERISA waiver; i.e., only $800,000 was funded against $1 million of assigned pension cost for the period. Under the provisions of 9904.412–50(d)(1), only $800,000 may be allocated to Contractor M's intermediate and final cost objectives. The remaining $200,000 of assigned cost, which has not been funded, shall be separately identified and maintained in accordance with 9904.412–50(a)(2) so

that it will not be reassigned to any future accounting periods.

(2) Contractor P has a nonqualified defined-benefit pension plan which covers benefits in excess of the ERISA limits. Contractor P has elected to account for this plan in the same manner as its qualified plan and, therefore, has established a "Rabbi Trust" as the funding agency. For the current cost accounting period, the contractor computes and assigns $100,000 as pension cost. The contractor funds $65,000, which is equivalent to a funding level equal to the complement of the highest published Federal corporate income tax rate of 35%. Under the provisions of 9904.412–50(d)(2), the entire $100,000 is allocable to cost objectives of the period.

(3) Assume the set of facts in 9904.412–60(d)(2), except that Contractor P's contribution to the Trust is $59,800. In that event, the provisions of 9904.412–50(d)(2)(i) would limit the amount of assigned cost allocable within the cost accounting period to the percentage of cost funded (i.e., $59,800/ $65,000 = 92%). This results in allocable cost of $92,000 (92% of $100,000) for the cost accounting period. Under the provisions of 9904.412–40(c) and 9904.412–50(d)(2)(i), respectively, the unallocable $8,000 may not be assigned to any future cost accounting period. In addition, in accordance with 9904.412–50(a)(2), the $8,000 must be separately identified and no amount of interest on such separately identified $8,000 shall be a component of pension cost in any future cost accounting period.

(4) Again, assume the set of facts in 9904.412–60(d)(2) except that, Contractor P's contribution to the Trust is $105,000 based on a valuation interest assumption of 8%. Under the provisions of 9904.412–50(d)(2) the entire $100,000 is allocable to cost objectives of the period. In accordance with the provisions of 9904.412–50(c)(1) Contractor P has funded $5,000 ($105,000—$100,000) in excess of the assigned pension cost for the period. The $5,000 shall be accounted for as a prepayment credit. Pursuant to 9904.412–50(a)(4), the $5,000 shall be adjusted for interest at the 8% valuation rate of interest and excluded from the actuarial value of assets used to compute the next year's pension cost computations. The accumulated value of prepayment credits of $5,400 (5,000 × 1.08) may be used to fund the next year's assigned pension cost, if needed.

(5) Contractor Q maintains a nonqualified defined-benefit pension plan which satisfies the requirements of 9904.412–50(c)(3). As of the valuation date, the reported funding agency balance is $3.4 million excluding any accumulated value of prepayment credits. When the adjusted funding agency balance is added to the accumulated value of permitted unfunded accruals of $1.6 million, the market value of assets equals $5.0 million ($3.4 million + $1.6 million) in accordance with 9904.412–30(a)(13). During the plan year, retirees receive monthly benefits totalling $350,000. Pursuant to 9904.412–50(d)(2)(ii)(A), at least 32% ($1.6 million divided by $5 million) of these benefit payments shall be made from sources other than the funding agency. Contractor Q, therefore, draws $238,000 from the funding agency assets and pays the remaining $112,000 using general corporate funds.

(6) Assume the same facts as 9904.412–60(d)(5), except that by the time Contractor Q receives its actuarial valuation it has paid retirement benefits equalling $288,000 from funding agency assets. The contractor has made deposits to the funding agency equal to the tax complement of the $500,000 assignable pension cost for the period. Pursuant to 9904.412–50(d)(2)(ii)(B), the assignable $500,000 shall be reduced by the $50,000 ($288,000—$238,000) of benefits paid from the funding agency in excess of the permitted $238,000, unless the contractor makes a deposit to replace the $50,000 inadvertently drawn from the funding agency. If this corrective action is not taken within the time permitted by 9904.412–50(d)(4), Contractor Q shall allocate only $450,000 ($500,000–$50,000) to final cost objectives. Furthermore, the $50,000, which was thereby attributed to benefit payments instead of funding, must be separately identified and maintained in accordance with 9904.412–50(a)(2).

(7) Contractor R has a nonqualified defined-benefit plan that meets the criteria of 9904.412–50(c)(3). For 1996, the funding agency balance was $1,250,000 and the accumulated value of permitted unfunded accruals was $600,000. During 1996 the earnings and appreciation on the assets of the funding agency equalled $125,000, benefit payments to participants totalled $300,000, and administrative expenses were $60,000. All transactions occurred on the first day of the period. In accordance with 9904.412–50(d)(2)(ii)(A), $200,000 of benefits were paid from the funding agency and $100,000 were paid directly from corporate assets. Pension cost of $400,000 was assigned to 1996. Based on the current corporate tax rate of 35%, $260,000 ($400,000 × (1–35%)) was deposited into the funding agency at the beginning of 1996. For 1997 the funding agency balance is $1,375,000 ($1,250,000 + $260,000 + $125,000—$200,000—$60,000). The actual annual earnings rate of the funding agency was 10% for 1996 Pursuant to 9904.412–50(d)(2)(iii), the accumulated value of permitted unfunded accruals is updated from 1996 to 1997 by (i) adding $140,000 (35% × $400,000), which is the unfunded portion of the assigned cost; (ii) subtracting the $100,000 of benefits paid directly by the contractor and (iii) increasing the value of the assets by $64,000 for imputed earnings at 10% (10% × ($600,000 + $140,000—$100,000)). The accumulated value of permitted unfunded accruals for 1997 is $704,000 ($600,000 + $140,000—$100,000 + $64,000).

7 Subsection 9904.412–63 is revised to read as follows:

**9904.412–63 Effective date.**

(a) This Standard is effective as of March 30, 1995

(b) This Standard shall be followed by each contractor on or after the start of its next cost accounting period beginning after the receipt of a contract or subcontract to which this Standard is applicable.

(c) Contractors with prior CAS-covered contracts with full coverage shall continue to follow the Standard in 9904.412 in effect prior to March 30, 1995, until this Standard, effective March 30, 1995, becomes applicable following receipt of a contract or subcontract to which this Standard applies.

8. A new subsection 9904.412–64 is added to read as follows.

**9904.412–64 Transition method.**

To be acceptable, any method of transition from compliance with Standard 9904.412 in effect prior to March 30, 1995, to compliance with the Standard effective March 30, 1995, must follow the equitable principle that costs, which have been previously provided for, shall not be redundantly provided for under revised methods Conversely costs that have not previously been provided for must be ~~provided for under~~ the revised method. This transition subsection is not intended to qualify for purposes of assignment or allocation, pension costs which have previously been disallowed for reasons other than ERISA tax-deductibility limitations. The sum of all portions of unfunded actuarial liability identified pursuant to Standard 9904.412, effective March 30 1995, including such portions of unfunded actuarial liability determined for transition purposes, is subject to the

provisions of 9904.412–40(c) on requirements for assignment. The method, or methods, employed to achieve an equitable transition shall be consistent with the provisions of Standard 9904.412, effective March 30, 1995, and shall be approved by the contracting officer. Examples and illustrations of such transition methods include, but are not limited to, the following:

(a) *Reassignment of certain prior unfunded accruals.*

(1) Any portion of pension cost for a qualified defined-benefit pension plan, assigned to a cost accounting period prior to [insert date of publication in the Federal Register], which was not funded because such cost exceeded the maximum tax-deductible amount, determined in accordance with ERISA, shall be assigned to subsequent accounting periods, including an adjustment for interest, as an assignable cost deficit. However, such costs shall be assigned to periods on or after March 30, 1995, only to the extent that such costs have not previously been allocated as cost or price to contracts subject to this Standard.

(2) Alternatively, the transition method described in paragraph (d) of this subsection may be applied separately to costs subject to paragraph (a)(1) of this subsection.

(b) *Reassignment of certain prior unallocated credits.*

(1) Any portion of pension cost for a defined-benefit pension plan, assigned to a cost accounting period prior to March 30, 1995, which was not allocated as a cost or price credit to contracts subject to this Standard because such cost was less than zero, shall be assigned to subsequent accounting periods, including an adjustment for interest, as an assignable cost credit.

(2) Alternatively, the transition method described in paragraph (d) of this subsection may be applied separately to costs subject to paragraph (b)(1) of this subsection.

(c) *Accounting for certain prior allocated unfunded accruals.* Any portion of unfunded pension cost for a nonqualified defined-benefit pension plan, assigned to a cost accounting period prior to March 30, 1995, that was allocated as cost or price to contracts subject to this Standard, shall be recognized in subsequent accounting periods, including adjustments for imputed interest and benefit payments, as an accumulated value of permitted unfunded accruals.

(d) *"Fresh start" alternative transition method.* The transition methods of paragraphs (a)(1), (b)(1), and (c) of this subsection may be implemented using the so-called "fresh start" method whereby a portion of the unfunded actuarial liability of a defined-benefit pension plan, which occurs in the first cost accounting period after March 30, 1995, shall be treated in the same manner as an actuarial gain or loss. Such portion of unfunded actuarial liability shall exclude any portion of unfunded actuarial liability that must continue to be separately identified and maintained in accordance with 9904.412–50(a)(2), including interest adjustments. If the contracting officer already has approved a different amortization period for the fresh start amortization, then such amortization period shall continue.

(e) *Change to pay-as-you-go method.* A change in accounting method subject to 9903.302 will have occurred whenever costs of a nonqualified defined-benefit pension plan have been accounted for on an accrual basis prior to March 30, 1995, and the contractor must change to the pay-as-you-go cost method because the plan does not meet the requirement of 9904.412–50(c)(3), either by election or otherwise. In such case, any portion of unfunded pension cost, assigned to a cost accounting period prior to March 30, 1995 that was allocated as cost or price to contracts subject to this Standard, shall be assigned to future accounting periods, including adjustments for imputed interest and benefit payments, as an accumulated value of permitted unfunded accruals. Costs computed under the pay-as-you-go cost method shall be charged against such accumulated value of permitted unfunded accruals before such costs may be allocated to contracts.

(f) *Actuarial assumptions.* The actuarial assumptions used to calculate assignable cost deficits, assignable cost credits, or accumulated values of permitted unfunded accruals for transition purposes shall be consistent with the long term assumptions used for valuation purposes for such prior periods unless the contracting officer has previously approved the use of other reasonable assumptions.

(g) *Transition illustrations.* Unless otherwise noted, paragraphs (g) (1) through (9) of this subsection address pension costs and transition amounts determined for the first cost accounting period beginning on or after the date this revised Standard becomes applicable to a contractor. For purposes of these illustrations an interest assumption of 7% is presumed to be in effect for all periods.

(1) For the cost accounting period immediately preceding the date this revised Standard was applicable to a contractor, Contractor S computed and assigned pension cost of $1 million for a qualified defined-benefit pension plan. The contractor made a contribution equal to the maximum tax-deductible amount of $800,000 for the period leaving $200,000 of assigned cost unfunded for the period. Except for this $200,000, no other assigned pension costs have ever been unfunded or otherwise disallowed. Using the transition method of paragraph (a)(1) of this subsection, the contractor shall establish an assignable cost deficit equal to $214,000 ($200,000 × 1.07), which is the prior unfunded assigned cost plus interest. If this assignable cost deficit amount, plus all other portions of unfunded actuarial liability identified in accordance with 9904.412–50(a) (1) and (2), equal the total unfunded actuarial liability, pension cost may be assigned to the current period.

(2) Assume that Contractor S in 9904.412–64(g)(1) priced the entire $1 million into firm fixed-price contracts. In this case, no assignable cost deficit amount may be established. In addition, the $214,000 ($200,000 × 1.07) shall be separately identified and maintained in accordance with 9904.412–50(a)(2). If all portions of unfunded actuarial liability identified in accordance with 9904.412–50(a) (1) and (2), equal the total unfunded actuarial liability, pension cost may be assigned to the period.

(3) Assume the same facts as in 9904.412–64(g)(1), except Contractor S only funded and allocated $500,000. The $300,000 of assigned cost that was not funded, but could have been funded without exceeding the tax-deductible maximum, may not be recognized as an assignable cost deficit. Instead, the $300,000 must be separately identified and maintained in accordance with 9904.412–50(a)(2). If the $321,000 ($300,000 × 1.07) plus the $214,000 already identified as an assignable cost deficit plus all other portions of unfunded actuarial liability identified in accordance with 9904.412–50(a) (1) and (2), equal the total unfunded actuarial liability, pension cost may be assigned to the period.

(4) Assume that, for Contractor S in 9904.412–64(g)(3), the only portion of unfunded actuarial liability that must be identified under 9904.412–50(a)(2) is the $321,000. If Contractor S chooses to use the "fresh start" transition method, the $321,000 of unfunded assigned cost must be subtracted from the total unfunded actuarial liability in accordance with 9904.412–63(d). The net amount of unfunded actuarial liability shall then be amortized over a

period of fifteen years as an actuarial loss in accordance with 9904.412–50(a)(1)(v) and Cost Accounting Standard 9904.413.

(5) For the cost accounting period immediately preceding the date this revised Standard becomes applicable to a contractor, Contractor T computed and assigned pension cost of negative $400,000 for a qualified defined-benefit plan. Because the contractor could not withdraw assets from the trust fund, the contracting officer agreed that instead of allocating a current period credit to contracts, the negative costs would be carried forward, with interest, and offset against future pension costs allocated to the contract. Using the transition method of paragraph (b)(1) of this subsection, the contractor shall establish an assignable cost credit equal to $428,000 ($400,000 × 1.07). If this assignable cost credit amount, plus all other portions of unfunded actuarial liability identified in accordance with 9904.412–50(a) (1) and (2), equals the total unfunded actuarial liability, pension cost may be assigned to the period.

(6) Assume that in 9904.412–64(g)(5), following guidance issued by the contracting agency the contracting officer had deemed the cost for the prior period to be $0. In order to satisfy the requirements of 9904.412–40(c) and assign pension cost to the current period, Contractor S must account for the prior period negative accruals that have not been specifically identified. Following the transition method of paragraph (b)(1) of this subsection, the contractor shall identify $428,000 as an assignable cost credit.

(7) Assume the facts of 9904.412–64(g)(5), except Contractor S uses the "fresh start" transition method. In addition, for the current period the plan is overfunded since the actuarial value of the assets is greater than the actuarial accrued liability. In this case, an actuarial gain equal to the negative unfunded actuarial liability; i.e., actuarial surplus, is recognized since there are no portions of unfunded actuarial liability that must be identified under 9904.412–50(a)(2).

(8) Since March 28, 1989 Contractor U has computed, assigned, and allocated pension costs for a nonqualified defined-benefit plan on an accrual basis. The value of these past accruals, increased for imputed interest at 7% and decreased for benefits paid by the contractor, is equal to $2 million as of the beginning of the current period. Contractor U elects to establish a "Rabbi trust" and the plan meets the other criteria at 9904.412–50(c)(3). Using the transition method of paragraph (c) of this subsection, Contractor U shall recognize the $2 million as the accumulated value of permitted unfunded accruals, which will then be included in the market value and actuarial value of the assets. Because the accumulated value of permitted unfunded accruals is exactly equal to the current period market value of the assets, 100% of benefits for the current period must be paid from sources other than the funding agency in accordance with 9904.412–50(d)(2)(ii).

(9) Assume that Contractor U in 9904.412–64(g)(8) establishes a funding agency, but elects to use the pay-as-you-go method for current and future pension costs. Furthermore, plan participants receive $500,000 in benefits on the last day of the current period. Using the transition method of paragraph (e) of this subsection to ensure prior costs are not redundantly provided for, the contractor shall establish assets; i.e., an accumulated value of permitted unfunded accruals, of $2 million. Since these assets are sufficient to provide for the current benefit payments, no pension costs can be allocated in this period. Furthermore, previously priced contracts subject to this Standard shall be adjusted in accordance with 9903.302. The accumulated value of permitted unfunded accruals shall be carried forward to the next period by adding $140,000 (7% x $2 million) of imputed interest, and subtracting the $500,000 of benefit payments made by the contractor. The accumulated value of permitted unfunded accruals for the next period equals $1,640,000 ($2 million + $140,000—$500,000).

**9904.413 [Amended]**

9. Subsection 9904.413–30 is amended by revising paragraph (a) to read as follows:

**9904.413–30 Definitions.**

(a) The following are definitions of terms which are prominent in this Standard. Other terms defined elsewhere in this chapter 99 shall have the meaning ascribed to them in those definitions unless paragraph (b) of this subsection requires otherwise.

(1) *Accrued benefit cost method* means an actuarial cost method under which units of benefits are assigned to each cost accounting period and are valued as they accrue; that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial accrued liability at a plan's inception date is the present value of the units of benefit credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method without salary projection.)

(2) *Actuarial accrued liability* means pension cost attributable, under the actuarial cost method in use, to years prior to the current period considered by a particular actuarial valuation. As of such date, the actuarial accrued liability represents the excess of the present value of future benefits and administrative expenses over the present value of future normal costs for all plan participants and beneficiaries. The excess of the actuarial accrued liability over the actuarial value of the assets of a pension plan is the Unfunded Actuarial Liability. The excess of the actuarial value of the assets of a pension plan over the actuarial accrued liability is an actuarial surplus and is treated as a negative unfunded actuarial liability.

(3) *Actuarial assumption* means an estimate of future conditions affecting pension cost, for example, mortality rate, employee turnover, compensation levels, earnings on pension plan assets, changes in values of pension plan assets.

(4) *Actuarial cost method* means a technique which uses actuarial assumptions to measure the present value of future pension benefits and pension plan administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods. The actuarial cost method includes the asset valuation method used to determine the actuarial value of the assets of a pension plan.

(5) *Actuarial gain and loss* means the effect on pension cost resulting from differences between actuarial assumptions and actual experience.

(6) *Actuarial valuation* means the determination, as of a specified date, of the normal cost, actuarial accrued liability, actuarial value of the assets of a pension plan, and other relevant values for the pension plan.

(7) *Curtailment of benefits* means an event; e.g., a plan amendment, in which the pension plan is frozen and no further material benefits accrue. Future service may be the basis for vesting of nonvested benefits existing at the time of the curtailment. The plan may hold assets, pay benefits already accrued, and receive additional contributions for unfunded benefits. Employees may or may not continue working for the contractor.

(8) *Funding agency* means an organization or individual which provides facilities to receive and

accumulate assets to be used either for the payment of benefits under a pension plan, or for the purchase of such benefits, provided such accumulated assets form a part of a pension plan established for the exclusive benefit of the plan participants and their beneficiaries. The fair market value of the assets held by the funding agency as of a specified date is the Funding Agency Balance as of that date.

(9) *Immediate-gain actuarial cost method* means any of the several cost methods under which actuarial gains and losses are included as part of the unfunded actuarial liability of the pension plan, rather than as part of the normal cost of the plan.

(10) *Market value of the assets* means the sum of the funding agency balance plus the accumulated value of any permitted unfunded accruals belonging to a pension plan. The Actuarial Value of the Assets means the value of cash, investments, permitted unfunded accruals, and other property belonging to a pension plan, as used by the actuary for the purpose of an actuarial valuation.

(11) *Normal cost* means the annual cost attributable, under the actuarial cost method in use, to current and future years as of a particular valuation date, excluding any payment in respect of an unfunded actuarial liability.

(12) *Pension plan* means a deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an integral part of a pension plan.

(13) *Pension plan participant* means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit from a pension plan which covers employees of such employer or members of such organization who have satisfied the plan's participation requirements, or whose beneficiaries are receiving or may be eligible to receive any such benefit. A participant whose employment status with the employer has not been terminated is an active participant of the employer's pension plan.

(14) *Pension plan termination* means an event; i.e., plan amendment, in which either the pension plan ceases to exist and all benefits are settled by purchase of annuities or other means, or the trusteeship of the plan is assumed by the Pension Benefit Guarantee Corporation or other conservator. The plan may or may not be replaced by another plan.

(15) *Permitted unfunded accruals* means the amount of pension cost for nonqualified defined-benefit pension plans that is not required to be funded under 9904.412–50(d)(2). The Accumulated Value of Permitted Unfunded Accruals means the value, as of the measurement date, of the permitted unfunded accruals adjusted for imputed earnings and for benefits paid by the contractor.

(16) *Prepayment credit* means the amount funded in excess of the pension cost assigned to a cost accounting period that is carried forward for future recognition. The Accumulated Value of Prepayment Credits means the value, as of the measurement date, of the prepayment credits adjusted for interest at the valuation rate and decreased for amounts used to fund pension costs or liabilities, whether assignable or not.

(17) *Projected benefit cost method* means either (i) any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers, or (ii) a modification of the accrued benefit cost method that considers projected compensation levels.

(18) *Qualified pension plan* means a pension plan comprising a definite written program communicated to and for the exclusive benefit of employees which meets the criteria deemed essential by the Internal Revenue Service as set forth in the Internal Revenue Code for preferential tax treatment regarding contributions, investments, and distributions. Any other plan is a nonqualified pension plan.

(19) *Segment* means one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service. The term includes Government-owned contractor-operated (GOCO) facilities, and joint ventures and subsidiaries (domestic and foreign) in which the organization has a majority ownership. The term also includes those joint ventures and subsidiaries (domestic and foreign) in which the organization has less than a majority ownership, but over which it exercises control.

(20) *Segment closing* means that a segment has (i) been sold or ownership has been otherwise transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard.

(21) *Termination of employment gain or loss* means an actuarial gain or loss resulting from the difference between the assumed and actual rates at which plan participants separate from employment for reasons other than retirement, disability, or death.

(b) * * *

10. Subsection 9904.413–40 is amended by revising paragraphs (b) and (c) to read as follows:

**9904.413–40 Fundamental requirement.**

(a) * * *

(b) *Valuation of the assets of a pension plan.* The actuarial value of the assets of a pension plan shall be determined under an asset valuation method which takes into account unrealized appreciation and depreciation of the market value of the assets of the pension plan, including the accumulated value of permitted unfunded accruals, and shall be used in measuring the components of pension costs.

(c) *Allocation of pension cost to segments.* Contractors shall allocate pension costs to each segment having participants in a pension plan. A separate calculation of pension costs for a segment is required when the conditions set forth in 9904.413–50(c)(2) or (3) are present. When these conditions are not present, allocations may be made by calculating a composite pension cost for two or more segments and allocating this cost to these segments by means of an allocation base. When pension costs are separately computed for a segment or segments, the provisions of Cost Accounting Standard 9904.412 regarding the assignable cost limitation shall be based on the assets and liabilities for the segment or segments for purposes of such computations. In addition, the amount of pension cost assignable to a segment or segments shall not exceed the maximum tax-deductible amount computed for the plan as a whole and apportioned among the segment(s).

11. Subsection 9904.413–50 is revised to read as follows:

**9904.413–50 Techniques for application.**

(a) *Assignment of actuarial gains and losses.* (1) In accordance with the provisions of Cost Accounting Standard 9904.412, actuarial gains and losses shall be identified separately from other unfunded actuarial liabilities.

(2) Actuarial gains and losses determined under a pension plan whose

costs are measured by an immediate-gain actuarial cost method shall be amortized over a 15 year period in equal annual installments, beginning with the date as of which the actuarial valuation is made. The installment for a cost accounting period shall consist of an element for amortization of the gain or loss plus an element for interest on the unamortized balance at the beginning of the period. If the actuarial gain or loss determined for a cost accounting period is not material, the entire gain or loss may be included as a component of the current or ensuing year's pension cost.

(3) Pension plan terminations and curtailments of benefits shall be subject to adjustment in accordance with 9904.413–50(c)(12).

(b) *Valuation of the assets of a pension plan.* (1) The actuarial value of the assets of a pension plan shall be used:

(i) In measuring actuarial gains and losses, and

(ii) For purposes of measuring other components of pension cost.

(2) The actuarial value of the assets of a pension plan may be determined by the use of any recognized asset valuation method which provides equivalent recognition of appreciation and depreciation of the market value of the assets of the pension plan. However, the actuarial value of the assets produced by the method used shall fall within a corridor from 80 to 120 percent of the market value of the assets, determined as of the valuation date. If the method produces a value that falls outside the corridor, the actuarial value of the assets shall be adjusted to equal the nearest boundary of the corridor.

(3) The method selected for valuing pension plan assets shall be consistently applied from year to year within each plan.

(4) The provisions of paragraphs (b)(1) through (3) of this subsection are not applicable to plans that are treated as defined-contribution plans in accordance with 9904.412–50(a)(6).

(5) The market and actuarial values of the assets of a pension plan shall not be adjusted for any fee, reserve charge, or other investment charge for withdrawals from or termination of an investment contract, trust agreement, or other funding arrangement, unless such fee is determined in an arm's length transaction, and actually incurred and paid.

(c) *Allocation of pension cost to segments.* (1) For contractors who compute a composite pension cost covering plan participants in two or more segments, the base to be used for allocating such costs shall be representative of the factors on which the pension benefits are based. For example, a base consisting of salaries and wages shall be used for pension costs that are calculated as a percentage of salaries and wages; a base consisting of the number of participants shall be used for pension costs that are calculated as an amount per participant. If pension costs are separately calculated for one or more segments, the contractor shall make a distribution among the segments for the maximum tax-deductible amount and the contribution to the funding agency as follows:

(i) When apportioning the maximum tax-deductible amount, which is determined for a qualified defined-benefit pension plan as a whole pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001 *et seq.*, as amended, to segments, the contractor shall use a base that considers the otherwise assignable pension costs or the funding levels of the individual segments.

(ii) When apportioning amounts deposited to a funding agency to segments, contractors shall use a base that is representative of the assignable pension costs, determined in accordance with 9904.412–50(c) for the individual segments. However, for qualified defined-benefit pension plans, the contractor may first apportion amounts funded to the segment or segments subject to this Standard.

(2) Separate pension cost for a segment shall be calculated whenever any of the following conditions exist for that segment, provided that such condition(s) materially affect the amount of pension cost allocated to the segment:

(i) There is a material termination of employment gain or loss attributable to the segment,

(ii) The level of benefits, eligibility for benefits, or age distribution is materially different for the segment than for the average of all segments, or

(iii) The appropriate actuarial assumptions are, in the aggregate, materially different for the segment than for the average of all segments. Calculations of termination of employment gains and losses shall give consideration to factors such as unexpected early retirements, benefits becoming fully vested, and reinstatements or transfers without loss of benefits. An amount may be estimated for future reemployments.

(3) Pension cost shall also be separately calculated for a segment under circumstances where—

(i) The pension plan for that segment becomes merged with that of another segment, or the pension plan is divided into two or more pension plans, and in either case,

(ii) The ratios of market value of the assets to actuarial accrued liabilities for each of the merged or separated plans are materially different from one another after applying the benefits in effect after the pension plan merger or pension plan division.

(4) For a segment whose pension costs are required to be calculated separately pursuant to paragraphs (c) (2) or (3) of this subsection, such calculations shall be prospective only; pension costs need not be redetermined for prior years.

(5) For a segment whose pension costs are either required to be calculated separately pursuant to paragraph (c)(2) or (c)(3) of this subsection or calculated separately at the election of the contractor, there shall be an initial allocation of a share in the undivided market value of the assets of the pension plan to that segment, as follows:

(i) If the necessary data are readily determinable, the funding agency balance to be allocated to the segment shall be the amount contributed by, or on behalf of, the segment, increased by income received on such assets, and decreased by benefits and expenses paid from such assets. Likewise, the accumulated value of permitted unfunded accruals to be allocated to the segment shall be the amount of permitted unfunded accruals assigned to the segment, increased by interest imputed to such assets, and decreased by benefits paid from sources other than the funding agency; or

(ii) If the data specified in paragraph (c)(5)(i) of this subsection are not readily determinable for certain prior periods, the market value of the assets of the pension plan shall be allocated to the segment as of the earliest date such data are available. Such allocation shall be based on the ratio of the actuarial accrued liability of the segment to the plan as a whole, determined in a manner consistent with the immediate gain actuarial cost method or methods used to compute pension cost. Such assets shall be brought forward as described in paragraph (c)(7) of this subsection.

(iii) The actuarial ~~value of the assets~~ of the pension plan shall be allocated to the segment in the same proportion as the market value of the assets.

(6) If, prior to the time a contractor is required to use this Standard, it has been calculating pension cost separately for individual segments, the amount of assets previously allocated to those segments need not be changed.

(7) After the initial allocation of assets, the contractor shall maintain a record of the portion of subsequent

contributions, permitted unfunded accruals, income, benefit payments, and expenses attributable to the segment and paid from the assets of the pension plan: Income and expenses shall include a portion of any investment gains and losses attributable to the assets of the pension plan. Income and expenses of the pension plan assets shall be allocated to the segment in the same proportion that the average value of assets allocated to the segment bears to the average value of total pension plan assets for the period for which income and expenses are being allocated.

(8) If plan participants transfer among segments, contractors need not transfer assets or actuarial accrued liabilities unless a transfer is sufficiently large to distort the segment's ratio of pension plan assets to actuarial accrued liabilities determined using the accrued benefit cost method. If assets and liabilities are transferred, the amount of assets transferred shall be equal to the actuarial accrued liabilities, determined using the accrued benefit cost method, transferred.

(9) Contractors who separately calculate the pension cost of one or more segments may calculate such cost either for all pension plan participants assignable to the segment(s) or for only the active participants of the segment(s). If costs are calculated only for active participants, a separate segment shall be created for all of the inactive participants of the pension plan and the cost thereof shall be calculated. When a contractor makes such an election, assets shall be allocated to the segment for inactive participants in accordance with paragraphs (c) (5), (6), and (7) of this subsection. When an employee of a segment becomes inactive, assets shall be transferred from that segment to the segment established to accumulate the assets and actuarial liabilities for the inactive plan participants. The amount of assets transferred shall be equal to the actuarial accrued liabilities, determined under the accrued benefit cost method, for these inactive plan participants. If inactive participants become active, assets and liabilities shall similarly be transferred to the segments to which the participants are assigned. Such transfers need be made only as of the last day of a cost accounting period. The total annual pension cost for a segment having active employees shall be the amount calculated for the segment plus an allocated portion of the pension cost calculated for the inactive participants. Such an allocation shall be on the same basis as that set forth in paragraph (c)(1) of this subsection.

(10) Where pension cost is separately calculated for one or more segments, the actuarial cost method used for a plan shall be the same for all segments. Unless a separate calculation of pension cost for a segment is made because of a condition set forth in paragraph (c)(2)(iii) of this subsection, the same actuarial assumptions may be used for all segments covered by a plan.

(11) If a pension plan has participants in the home office of a company, the home office shall be treated as a segment for purposes of allocating the cost of the pension plan. Pension cost allocated to a home office shall be a part of the costs to be allocated in accordance with the appropriate requirements of Cost Accounting Standard 9904.403.

(12) If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously-determined pension costs.

(i) The determination of the actuarial accrued liability shall be made using the accrued benefit cost method. The actuarial assumptions employed shall be consistent with the current and prior long term assumptions used in the measurement of pension costs. If there is a pension plan termination, the actuarial accrued liability shall be measured as the amount paid to irrevocably settle all benefit obligations or paid to the Pension Benefit Guarantee Corporation.

(ii) In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraphs (c)(5) (i) and (ii) of this subsection. The market value of the assets shall be reduced by the accumulated value of prepayment credits, if any. Conversely, the market value of the assets shall be increased by the current value of any unfunded actuarial liability separately identified and maintained in accordance with 9904.412–50(a)(2).

(iii) The calculation of the difference between the market value of the assets and the actuarial accrued liability shall be made as of the date of the event (e.g., contract termination, plan amendment, plant closure) that caused the closing of the segment, pension plan termination, or curtailment of benefits. If such a date is not readily determinable, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date.

(iv) Pension plan improvements adopted within 60 months of the date of the event which increase the actuarial accrued liability shall be recognized on a prorata basis using the number of months the date of adoption preceded the event date. Plan improvements mandated by law or collective bargaining agreement are not subject to this phase-in.

(v) If a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment amount pursuant to this paragraph (c)(12) is required. If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment amount required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor. In either case, the effect of the transferred assets and liabilities is carried forward and recognized in the accounting for pension cost at the successor contractor.

(vi) The Government's share of the adjustment amount determined for a segment shall be the product of the adjustment amount and a fraction. The adjustment amount shall be reduced for any excise tax imposed upon assets withdrawn from the funding agency of a qualified pension plan. The numerator of such fraction shall be the sum of the pension plan costs allocated to all contracts and subcontracts (including Foreign Military Sales) subject to this Standard during a period of years representative of the Government's participation in the pension plan. The denominator of such fraction shall be the total pension costs assigned to cost accounting periods during those same years. This amount shall represent an adjustment of contract prices or cost allowance as appropriate. The adjustment may be recognized by modifying a single contract, several but not all contracts, or all contracts, or by use of any other suitable technique.

(vii) The full amount of the Government's share of an adjustment is allocable, without limit, as a credit or charge during the cost accounting period in which the event occurred and contract prices/costs will be adjusted accordingly. However, if the contractor continues to perform Government contracts, the contracting parties may negotiate an amortization schedule,

including interest adjustments. Any amortization agreement shall consider the magnitude of the adjustment credit or charge, and the size and nature of the continuing contracts.

12. Subsection 9904.413-60 is revised to read as follows:

**9904.413-60 Illustrations.**

(a) *Assignment of actuarial gains and losses.* Contractor A has a defined-benefit pension plan whose costs are measured under an immediate-gain actuarial cost method. The contractor makes actuarial valuations every other year. In the past, at each valuation date, the contractor has calculated the actuarial gains and losses that have occurred since the previous valuation date and has merged such gains and losses with the unfunded actuarial liabilities that are being amortized. Pursuant to 9904.413-40(a), the contractor must make an actuarial valuation annually. Any actuarial gains or losses measured must be separately amortized over a 15-year period beginning with the period for which the actuarial valuation is made in accordance with 9904.413-50(a) (1) and (2).

(b)(1) *Valuation of the assets of a pension plan.* Contractor B has a qualified defined-benefit pension plan, the assets of which are invested in equity securities, debt securities, and real property. The contractor, whose cost accounting period is the calendar year, has an annual actuarial valuation of the pension plan assets in June of each year; the effective date of the valuation is the beginning of that year. The contractor's method for valuing the assets of the pension plan is as follows: debt securities expected to be held to maturity are valued on an amortized basis running from initial cost at purchase to par value at maturity; land and buildings are valued at cost less depreciation taken to date; all equity securities and debt securities not expected to be held to maturity are valued on the basis of a five-year moving average of market values. In making an actuarial valuation, the contractor must compare the values reached under the asset valuation method used with the market value of all the assets as required by 9904.413-40(b). In this case, the assets are valued as of January 1 of that year. The contractor established the following values as of the valuation date.

| | Asset valuation method | Market |
|---|---|---|
| Cash | $100,000 | 100,000 |
| Equity securities | 6,000,000 | 7,800,000 |
| Debt securities, expected to be held to maturity | 550,000 | 600,000 |
| Other debt securities | 600,000 | 750,000 |
| Land and Buildings, net of depreciation | 400,000 | 750,000 |
| Total | 7,650,000 | 10,000,000 |

(2) Section 9904.413-50(b)(2) requires that the actuarial value of the assets of the pension plan fall within a corridor from 80 to 120 percent of market. The corridor for the plan's assets as of January 1 is from $12 million to $8 million. Because the asset value reached by the contractor, $7,650,000, falls outside that corridor, the value reached must be adjusted to equal the nearest boundary of the corridor: $8 million. In subsequent years the contractor must continue to use the same method for valuing assets in accordance with 9904.413-50(b)(3). If the value produced falls inside the corridor, such value shall be used in measuring pension costs.

(c) *Allocation of pension costs to segments.* (1) Contractor C has a defined-benefit pension plan covering employees at five segments. Pension cost is computed by use of an immediate-gain actuarial cost method. One segment (X) is devoted primarily to performing work for the Government. During the current cost accounting period, Segment X had a large and unforeseeable reduction of employees because of a contract termination at the convenience of the Government and because the contractor did not receive an anticipated follow-on contract to one that was completed during the period. The segment does continue to perform work under several other Government contracts. As a consequence of this termination of employment gain, a separate calculation of the pension cost for Segment X would result in materially different allocation of costs to the segment than would a composite calculation and allocation by means of a base. Accordingly, pursuant to 9904.413-50(c)(2), the contractor must calculate a separate pension cost for Segment X. In doing so, the entire termination of employment gain must be assigned to Segment X and amortized over fifteen years. If the actuarial assumptions for Segment X continue to be substantially the same as for the other segments, the termination of employment gain may be separately amortized and allocated only to Segment X; all other Segment X computations may be included as part of the composite calculation. After the termination of employment gain is amortized, the contractor is no longer required to separately calculate the costs for Segment X unless subsequent events require each separate calculation.

(2) Contractor D has a defined-benefit pension plan covering employees at ten segments, all of which have some contracts subject to this Standard. The contractor's calculation of normal cost is based on a percentage of payroll for all employees covered by the plan. One of the segments (Segment Y) is entirely devoted to Government work. The contractor's policy is to place junior employees in this segment. The salary scale assumption for employees of the segment is so different from that of the other segments that the pension cost for Segment Y would be materially different if computed separately. Pursuant to 9904.413-50(c)(2)(iii), the contractor must compute the pension cost for Segment Y as if it were a separate pension plan. Therefore, the contractor must allocate a portion of the market value of pension plan's assets to Segment Y in accordance with 9904.413-50(c)(5). Memorandum records may be used in making the allocation. However, because the necessary records only exist for the last five years, 9904.413-50(c)(5)(ii) permits an initial allocation to be made as of the earliest date such records are available. The initial allocation must be made on the basis of the immediate gain actuarial cost method or methods used to calculate prior years' pension cost for the plan. Once the assets have been allocated, they shall be brought forward to the current period as described in 9904.413-50(c)(7). A portion of the undivided actuarial value of assets shall then be allocated to the segment based on the segment's proportion of the market value of assets in accordance with 9904.413-50(c)(5)(iii). In future cost accounting periods, the contractor shall make separate pension cost calculations for Segment Y based on the appropriate salary scale assumption. Because the factors comprising pension cost for the other nine segments are relatively equal, the contractor may compute pension cost for these nine segments by using composite factors. As required by 9904.413-50(c)(1), the base to be used for allocating such costs shall be representative of the factors on which the pension benefits are based.

(3) Contractor E has a defined-benefit pension plan which covers employees at twelve segments. The contractor uses composite actuarial assumptions to

develop a pension cost for all segments. Three of these segments primarily perform Government work; the work at the other nine segments is primarily commercial. Employee turnover at the segments performing commercial work is relatively stable. However, employment experience at the Government segments has been very volatile; there have been large fluctuations in employment levels and the contractor assumes that this pattern of employment will continue to occur. It is evident that separate termination of employment assumptions for the Government segments and the commercial segments will result in materially different pension costs for the Government segments. Therefore, the cost for these segments must be separately calculated, using the appropriate termination of employment assumptions for these segments in accordance with 9904.413–50(c)(2)(iii).

(4) Contractor F has a defined-benefit pension plan covering employees at 25 segments. Twelve of these segments primarily perform Government work; the remaining segments perform primarily commercial work. The contractor's records show that the termination of employment experience and projections for the twelve segments are so different from that of the average of all of the segments that separate pension cost calculations are required for these segments pursuant to 9904.413–50(c)(2). However, because the termination of employment experience and projections are about the same for all twelve segments, Contractor F may calculate a composite pension cost for the twelve segments and allocate the cost to these segments by use of an appropriate allocation base in accordance with 9904.413–50(c)(1).

(5) After this Standard becomes applicable to Contractor G, it acquires Contractor H and makes it Segment H. Prior to the merger, each contractor had its own defined-benefit pension plan. Under the terms of the merger, Contractor H's pension plan and plan assets were merged with those of Contractor G. The actuarial assumptions, current salary scale, and other plan characteristics are about the same for Segment H and Contractor G's other segments. However, based on the same benefits at the time of the merger, the plan of Contractor H had a disproportionately larger unfunded actuarial liability than did Contractor G's plan. Any combining of the assets and actuarial liabilities of both plans would result in materially different pension cost allocation to Contractor G's segments than if pension cost were computed for Segment H on the basis that it had a separate pension plan. Accordingly, pursuant to 9904.413–50(c)(3), Contractor G must allocate to Segment H a portion of the assets of the combined plan. The amount to be allocated shall be the market value of Segment H's pension plan assets at the date of the merger determined in accordance with 9904.413–50(c)(5), and shall be adjusted for subsequent receipts and expenditures applicable to the segment in accordance with 9904.413–50(c)(7). Pursuant to 9904.413–40(b)(1) and 9904.413–50(c)(5)(iii), Contractor G must use these amounts of assets as the basis for determining the actuarial value of assets used for calculating the annual pension cost applicable to Segment H.

(6) Contractor I has a defined-benefit pension plan covering employees at seven segments. The contractor has been making a composite pension cost calculation for all of the segments. However, the contractor determines that, pursuant to this Standard, separate pension costs must be calculated for one of the segments. In accordance with 9904.413–50(c)(9), the contractor elects to allocate pension plan assets only for the active participants of that segment. The contractor must then create a segment to accumulate the assets and actuarial accrued liabilities for the plan's inactive participants. When active participants of a segment become inactive, the contractor must transfer assets to the segment for inactive participants equal to the actuarial accrued liabilities for the participants that become inactive.

(7) Contractor J has a defined-benefit pension plan covering employees at ten segments. The contractor makes a composite pension cost calculation for all segments. The contractor's records show that the termination of employment experience for one segment, which is performing primarily Government work, has been significantly different from the average termination of employment experience of the other segments. Moreover, the contractor assumes that such different experience will continue. Because of this fact, and because the application of a different termination of employment assumption would result in significantly different costs being charged the Government, the contractor must develop separate pension cost for that segment. In accordance with 9904.413–50(c)(2)(ii), the amount of pension cost must be based on an acceptable termination of employment assumption for that segment; however, as provided in 9904.413–50(c)(10), all other assumptions for that segment may be the same as those for the remaining segments.

(8) Contractor K has a five-year contract to operate a Government-owned facility. The employees of that facility are covered by the contractor's overall qualified defined-benefit pension plan which covers salaried and hourly employees at other locations. At the conclusion of the five-year period, the Government decides not to renew the contract. Although some employees are hired by the successor contractor, because Contractor K no longer operates the facility, it meets the 9904.413–30(a)(20)(i) definition of a segment closing. Contractor K must compute the actuarial accrued liability for the pension plan for that facility using the accrued benefit cost method as of the date the contract expired in accordance with 9904.413–50(c)(12)(i). Because many of Contractor K's employees are terminated from the pension plan, the Internal Revenue Service considers it to be a partial plan termination, and thus requires that the terminated employees become fully vested in their accrued benefits to the extent such benefits are funded. Taking this mandated benefit improvement into consideration in accordance with 9904.413–50(c)(12)(iv), the actuary calculates the actuarial accrued liability to be $12.5 million. The contractor must then determine the market value of the pension plan assets allocable to the facility, in accordance with 9904.413–50(c)(5), as of the date agreed to by the contracting parties pursuant to 9904.413–50(c)(12)(iii), the date the contract expired. In making this determination, the contractor is able to do a full historical reconstruction of the market value of the assets allocated to the segment. In this case, the market value of the segment's assets amounted to $13.8 million. Thus, for this facility the value of pension plan assets exceeded the actuarial accrued liability by $1.3 million. Pursuant to 9904.413–50(c)(12)(vi), this amount indicates the extent to which the Government over-contributed to the pension plan for the segment and, accordingly, is the amount of the adjustment due to the Government.

(9) Contractor L operated a segment over the last five years during which 80% of its work was performed under Government CAS-covered contracts. The Government work was equally divided each year between fixed-price and cost-type contracts. The employees of the facility are covered by a funded nonqualified defined-benefit pension plan accounted for in accordance with 9904.412–50(c)(3). For each of the last five years the highest Federal corporate income tax rate has been 30%. Pension costs of $1 million per year were

computed using a projected benefit cost method. Contractor L funded at the complement of the tax rate ($700,000 per year). The pension plan assets held by the funding agency earned 8% each year. At the end of the five-year period, the funding agency balance; i.e., the market value of invested assets, was $4.4 million. As of that date, the accumulated value of permitted unfunded accruals; i.e., the current value of the $300,000 not funded each year, is $1.9 million. As defined by 9904.413-30(a)(20)(i), a segment closing occurs when Contractor L sells the segment at the end of the fifth year. Thus, for this segment, the market value of the assets of the pension plan determined in accordance with 9904.413-30(a)(10) is $6.3 million, which is, the sum of the funding account balance ($4.4 million) and the accumulated value of permitted unfunded accruals ($1.9 million). Pursuant to 9904.413-50(c)(12)(i), the contractor uses the accrued benefit cost method to calculate an actuarial accrued liability of $5 million as of that date. There is no transfer of plan assets or liabilities to the buyer. The difference between the market value of the assets and the actuarial accrued liability for the segment is $1.3 million ($6.3 million—$5 million). Pursuant to 9904.413-50(c)(12)(vi), the adjustment due the Government for its 80% share of previously-determined pension costs for CAS-covered contracts is $1.04 million (80% times $1.3 million). Because contractor L has no other Government contracts the $1.04 million is a credit due to the Government.

(10) Assume the same facts as in 9904.413-60(c)(9), except that Contractor L continues to perform substantial Government contract work through other segments. After considering the amount of the adjustment and the current level of contracts, the contracting officer and the contractor establish an amortization schedule so that the $1.04 million is recognized as credits against ongoing contracts in five level annual installments, including an interest adjustment based on the interest assumption used to compute pension costs for the continuing contracts. This amortization schedule satisfies the requirements of 9904.413-50(c)(12)(vii).

(11) Assume the same facts as in 9904.413-60(c)(9). As part of the transfer of ownership, Contractor L also transfers all pension liabilities and assets of the segment to the buyer. Pursuant to 9904.413-50(c)(12)(v), the segment closing adjustment amount for the current period is transferred to the buyer and is subsumed in the future pension cost accounting of the buyer. If the transferred liabilities and assets of the segment are merged into the buyer's pension plan which has a different ratio of market value of pension plan assets to actuarial accrued liabilities, then pension costs must be separately computed in accordance with 9904.413-50(c)(3).

(12) Contractor M sells its only government segment. Through a contract novation, the buyer assumes responsibility for performance of the segment's government contracts. Just prior to the sale, the actuarial accrued liability under the actuarial cost method in use is $18 million and the market value of assets allocated to the segment of $22 million. In accordance with the sales agreement, Contractor M is required to transfer $20 million of assets to the new plan. In determining the segment closing adjustment under 9904.413-12(c)(12) the actuarial accrued liability and the market value of assets are reduced by the amounts transferred to the buyer by the sale. The adjustment amount, which is the difference between the remaining assets ($2 million) and the remaining actuarial liability ($0), is $2 million.

(13) Contractor N has three segments that perform primarily government work and has been separately calculating pension costs for each segment. As part of a corporate reorganization, the contractor closes the production facility for Segment A and transfers all of that segment's contracts and employees to Segments B and C, the two remaining government segments. The pension assets from Segment A are allocated to the remaining segments based on the actuarial accrued liability of the transferred employees. Because Segment A has discontinued operations, a segment closing has occurred pursuant to 9904.413-30(a)(20)(ii). However, because all pension assets and liabilities have been transferred to segments that are the successors in interest of the contracts of Segment A, an immediate period adjustment is not required if Contractor N and the cognizant Federal official negotiate an amortization schedule pursuant to 9904.413-50(c)(12)(vii).

(14) Contractor O does not renew its government contract and decides to not seek additional government contracts for the affected segment. The contractor reduces the work force of the segment that had been dedicated to the government contract and converts the segment's operations to purely commercial work. In accordance with 9904.413-30(a)(20)(iii), the segment has closed. Immediately prior to the end of the contract the market value of the segment's assets was $20 million and the actuarial accrued liability determined under the actuarial cost method in use was $22 million. An actuarial accrued liability of $16 million is determined using the accrued benefit cost method as required by 9904.413-50(c)(12)(i). The segment closing adjustment is $4 million ($20 million—$16 million).

(15) Contractor P terminated its underfunded defined-benefit pension plan for hourly employees. The market value of the assets for the pension plan is $100 million. Although the actuarial accrued liability exceeds the $100 million of assets, the termination liability for benefits guaranteed by the Pension Benefit Guarantee Corporation (PBGC) is only $85 million. Therefore, the $15 million of assets in excess of the liability for guaranteed benefits are allocated to plan participants in accordance with PBGC regulations. The PBGC does not impose an assessment for unfunded guaranteed benefits against the contractor. The adjustment amount determined under 9904.413-50(c)(12) is zero.

(16) Assume the same facts as 9904.413-60(c)(17), except that the termination liability for benefits guaranteed by the Pension Benefit Guarantee Corporation (PBGC) is $120 million. The PBGC imposes a $20 million ($120 million—$100 Million) assessment against Contractor P for the unfunded guaranteed benefits. The contractor then determines the Government's share of the pension plan termination adjustment charge of $20 million in accordance with 9904.413-50(c)(12)(vi). In accordance with 9904.413-50(c)(12)(vii), the cognizant Federal official may negotiate an amortization schedule based on the contractor's schedule of payments to the PBGC.

(17) Assume the same facts as in 9904.413-60(c)(16), except that pursuant to 9904.412-50(a)(2) Contractor P has an unassignable portion of unfunded actuarial liability for prior unfunded pension costs which equals $8 million. The $8 million represents the value of assets that would have been available had all assignable costs been funded and, therefore, must be added to the assets used to determine the pension plan termination adjustment in accordance with 9904.413-50(c)(12)(ii). In this case, the adjustment charge is determined to be $12 million ($20 million − $8 million).

(18) Contractor Q terminates its qualified defined-benefit pension plan without establishing a replacement plan. At termination, the market value

of assets are $85 million. All obligations for benefits are irrevocably transferred to an insurance company by the purchase of annuity contracts at a cost of $55 million, which thereby determines the actuarial liability in accordance with 9904.413-50(c)(12)(i). The contractor receives a reversion of $30 million ($85 million − $55 million). The adjustment is equal to the reversion amount, which is the excess of the market value of assets over the actuarial liability. However, ERISA imposes a 50% excise tax of $15 million (50% of $30 million) on the reversion amount. In accordance with 9904.413-50(c)(12)(vi), the $30 million adjustment amount is reduced by the $15 million excise tax. Pursuant to 9904.413-50(c)(12)(vi), a share of the $15 million net adjustment ($30 million—$15 million) shall be allocated, without limitation, as a credit to CAS-covered contracts.

(19) Assume that, in addition to the facts of 9904.413-60(c)(18), Contractor Q has an accumulated value of prepayment credits of $10 million. Contractor Q has $3 million of unfunded actuarial liability separately identified and maintained pursuant to 9904.412-50(a)(2). The assets used to determine the adjustment amount equal $78 million. This amount is determined as the market value of assets ($85 million) minus the accumulated value of prepayment credits ($10 million) plus the portion of unfunded actuarial liability maintained pursuant to 9904.412-50(a)(2) ($3 million). Therefore, the difference between the assets and the actuarial liability is $23 million ($78 million − $55 million). In accordance with 9904.413-50(c)(12)(vi), the $23 million adjustment is reduced by the $15 million excise tax to equal $8 million. The contracting officer determines that the pension cost data of the most recent eight years reasonably reflects the government's participation in the pension plan. The sum of costs allocated to fixed-price and cost-type contracts subject to this Standard over the eight-year period is $21 million. The sum of costs assigned to cost accounting periods during the last eight years equals $42 million. Therefore, the government's share of the net adjustment is 50% ($21 million divided by $42 million) of the $8 million and equals $4 million.

(20) Contractor R maintains a qualified defined-benefit pension plan. Contractor R amends the pension plan to eliminate the earning of any future benefits; however the participants do continue to earn vesting service. Pursuant to 9904.413-30(a)(7), a curtailment of benefits has occurred. An actuarial accrued liability of $78 million is determined under the accrued benefit cost method using the interest assumption used for the last four actuarial valuations. The market value of assets, determined in accordance with 9904.413-50(c)(12)(ii), is $90 million. Contractor R shall determine the Government's share of the adjustment in accordance with 9904.413-50(c)(12)(vi). The contractor then shall allocate that share of the $12 million adjustment ($90 million − $78 million) determined under 9904.413-50(c)(12) to CAS-covered contracts. The full amount of adjustment shall be made without limitation in the current cost accounting period unless arrangements to amortize the adjustment are permitted and negotiated pursuant to 9904.413-50(c)(12)(vii).

(21) Contractor S amends its qualified defined-benefit pension plan to "freeze" all accrued benefits at their current level. Although not required by law, the amendment also provides that all accrued benefits are fully vested. Contractor S must determine the adjustment for the curtailment of benefits. Fifteen months prior to the date of the plan amendment freezing benefits, Contractor S voluntarily amended the plan to increase benefits. This voluntary amendment resulted in an overall increase of over 10%. All actuarial accrued liabilities are computed using the accrued benefit cost method. The actuarial accrued liability for all accrued benefits is $1.8 million. The actuarial accrued liability for vested benefits immediately prior to the current plan amendment is $1.6 million. The actuarial accrued liability determined for vested benefits based on the plan provisions before the voluntary amendment is $1.4 million. The $1.4 million actuarial liability is based on benefit provisions that have been in effect for six years and is fully recognized. However, the $200,000 increase in liability due to the voluntary benefit improvement adopted 15 months ago must be phased-in on a prorata basis over 60 months. Therefore, only 25% (15 months divided by 60 months) of the $200,000 increase, or $50,000, can be included in the curtailment liability. The current amendment voluntarily increasing vesting was just adopted and, therefore, none of the associated increase in actuarial accrued liability can be included. Accordingly, in accordance with 9904.413-50(c)(12)(iv), Contractor S determines the adjustment for the curtailment of benefits using an actuarial accrued liability of $1.45 million ($1.4 million plus $50,000).

(22) Contractor T has maintained separate qualified defined-benefit plans for Segments A and B and has separately computed pension costs for each segment. Both segments perform work under contracts subject to this Standard. On the first day of the current cost accounting period, Contractor T merges the two pension plans so that segments A and B are now covered by a single pension plan. Because the ratio of assets to liabilities for each plan is materially different from that of the merged plan, the contractor continues the separate computation of pension costs for each segment pursuant to 9904.413-50(c)(3). After considering the assignable cost limitations for each segment, Contractor T determines the potentially assignable pension cost is $12,000 for Segment A and $24,000 for Segment B. The maximum tax-deductible amount for the merged plan is $30,000, which is $6,000 less than the sum of the otherwise assignable costs for the segments ($36,000). To determine the portion of the total maximum tax-deductible amount applicable to each segment on a reasonable basis, the contractor prorates the $30,000 by the pension cost determined for each segment after considering the assignable cost limitations for each segment. Therefore, in accordance with 9904.413-50(c)(1)(i), the assignable pension cost is $10,000 for Segment A ($30,000 times $12,000 divided by $36,000) and $20,000 for Segment B ($30,000 times $24,000 divided by $36,000). Contractor T funds the full $30,000 and allocates the assignable pension cost for each segment to final cost objectives.

(23) Assume the same facts as in 9904.413-60(c)(22), except that the tax-deductible maximum is $40,000 and the ERISA minimum funding requirement is $18,000. Since funding of the accrued pension cost is not constrained by tax-deductibility, Contractor T determines the assignable pension cost to be $12,000 for Segment A and $24,000 for Segment B. If the contractor funds $36,000, the full assigned pension cost of each segment can be allocated to final cost objectives. However, because the contractor funds only the ERISA minimum of $18,000, the contractor must apportion the $18,000 contribution to each segment on a basis that reflects the assignable pension cost of each segment in accordance with 9904.413-50(c)(1)(ii). To measure the funding level of each segment, Contractor T uses an ERISA minimum funding requirement separately determined for each segment, as if the segment were a separate plan. On this basis, the allocable pension cost is determined to be $8,000 for Segment A and $10,000 for

Segment B. In accordance with 9904.412–50(a)(2), Contractor T must separately identify, and eliminate from future cost computations, $4,000 ($12,000 – $8,000) for Segment A and $14,000 ($24,000 – $10,000) for Segment B.

(24) Assume the same facts as in 9904.413–60(c)(23), except that Segment B performs only commercial work. As permitted by 9904.413–50(c)(1)(ii), the contractor first applies $12,000 of the contribution amount to Segment A, which is performing work under Government contracts, for purposes of 9904.412–50(d)(i). The remaining $6,000 is applied to Segment B. The full assigned pension cost of $12,000 for Segment A is funded and such amount is allocable to CAS-covered contracts. Pursuant to 9904.412–50(a)(2), the contractor separately identifies, and eliminates from future pension costs, the $18,000 ($24,000 – $6,000) of unfunded assigned cost for Segment B.

(25) Contractor U has a qualified defined-benefit pension plan covering employees at two segments that perform work on contracts subject to this Standard. The ratio of the actuarial value of assets to actuarial accrued liabilities is significantly different between the two segments. Therefore, Contractor U is required to compute pension cost separately for each segment. The actuarial value of assets allocated to Segment A exceeds the actuarial accrued liability by $50,000. Segment B has an unfunded actuarial liability of $20,000. Thus, the pension plan as a whole has an actuarial surplus of $30,000. Pension cost of $5,000 is computed for Segment B and is less than Segment B's assignable cost limitation of $9,000. The tax-deductible maximum is $0 for the plan as whole and, therefore, $0 for each segment. Contractor U will deem all existing amortization bases maintained for Segment A to be fully amortized in accordance with 9904.412–50(c)(2)(ii). For Segment B, the amortization of existing portions of unfunded actuarial liability continues unabated. Furthermore, pursuant to 9904.412–50(c)(2)(iii), the contractor establishes an additional amortization base for Segment B for the assignable cost deficit of $5,000.

13. Subsection 9904.413–63 is revised to read as follows:

**9904.413–63 Effective date.**

(a) This Standard is effective as of March 30, 1995.

(b) This Standard shall be followed by each contractor on or after the start of its next cost accounting period beginning after the receipt of a contract or subcontract to which this Standard is applicable.

(c) Contractors with prior CAS-covered contracts with full coverage shall continue to follow Standard 9904.413 in effect prior to March 30, 1995, until this Standard, effective March 30, 1995, becomes applicable following receipt of a contract or subcontract to which this revised Standard applies.

14. A new subsection 9904.413–64 is added to read as follows:

**9904.413–64 Transition method.**

(a) To be acceptable, any method of transition from compliance with Standard 9904.413 in effect prior to March 30, 1995, to compliance with Standard 9904.413 in effect as of March 30, 1995, must follow the equitable principle that costs, which have been previously provided for, shall not be redundantly provided for under revised methods. Conversely, costs that have not previously been provided for must be provided for under the revised method. This transition subsection is not intended to qualify for purposes of assignment or allocation, pension costs which have previously been disallowed for reasons other than ERISA funding limitations.

(b) The sum of all portions of unfunded actuarial liability identified pursuant to Standard 9904.413, effective March 30, 1995, including such portions of unfunded actuarial liability determined for transition purposes, is subject to the requirements for assignment of 9904.412–40(c).

(c) Furthermore, this Standard, effective March 30, 1995, clarifies, but is not intended to create, rights of the contracting parties, and specifies techniques for determining adjustments pursuant to 9904.413–50(c)(12). These rights and techniques should be used to resolve outstanding issues that will affect pension costs of contracts subject to this Standard.

(d) The method, or methods, employed to achieve an equitable transition shall be consistent with the provisions of this Standard and shall be approved by the contracting officer.

(e) All adjustments shall be prospective only. However, costs/prices of prior and existing contracts not subject to price adjustment may be considered in determining the appropriate transition method or adjustment amount for the computation of costs/prices of contracts subject to this Standard.

[FR Doc. 95–7555 Filed 3–29–95; 8:45 am]
BILLING CODE 3110–01–P

# EXHIBIT 4

23

# NOVATION AGREEMENT

Unisys Corporation (Transferor), a corporation duly organized and existing under the laws of the State of Delaware with its principal office in Blue Bell, Pennsylvania; Loral Corporation (Transferee), a corporation duly organized and existing under the laws of the State of New York with its principal office in New York, New York; and the UNITED STATES OF AMERICA (Government) enter into this Agreement as of May 5, 1995.

(a) THE PARTIES AGREE TO THE FOLLOWING FACTS:

(1) The Government, represented by various Contracting Officers of the Department of Defense, Federal Aviation Administration, Department of Commerce, and certain other agencies and departments of the Government, has entered into certain contracts with the Transferor, as shown in the attached list marked 'Exhibit A' and incorporated in this Agreement by reference. The term "the contracts," as used in this Agreement, means the above contracts and purchase orders and all other contracts and purchase orders, including all modifications, made between the Government and the Transferor before the effective date of this Agreement (whether or not performance and payment have been completed and releases executed if the Government or the Transferor has any remaining rights, duties, or obligations under these contracts and purchase orders). Included in the term "the contracts" are also all modifications made under the terms and conditions of these contracts and purchase orders between the Government and the Transferee, on or after the effective date of this Agreement.

(2) As of May 5, 1995, the Transferor has transferred to the Transferee all the assets involved in performing the contracts pursuant to (a) that certain Asset Purchase Agreement dated as of March 20, 1995, and (b) the Assignment and Assumption Agreement dated as of May 5, 1995, between the Transferor and the Transferee.

(3) The Transferee has acquired all the assets of the Transferor involved in performing the contracts by virtue of the above transfer.

(4) The Transferee has assumed all obligations and liabilities of the Transferor under the contracts by virtue of the above transfer.

(5) The Transferee is in a position to fully perform all obligations that may exist under the contracts.

(6) It is consistent with the Government's interest to recognize the Transferee as the successor party to the contracts.

(7) Evidence of the above transfer has been filed with the Government.

(b) **IN CONSIDERATION OF THESE FACTS, THE PARTIES AGREE THAT BY THIS AGREEMENT -**

(1) The Transferor confirms the transfer to the Transferee, and waives any claims and rights against the Government that it now has or may have in the future in connection with the contracts.

(2) The Transferee agrees to be bound by and to perform each contract in accordance with the conditions contained in the contracts. The Transferee also assumes all claims and rights which the Transferor has or may have against the Government and all obligations and liabilities of, and all claims against, the Transferor under the contracts as if the Transferee were the original party to the contracts.

(3) The Transferee ratifies all previous actions taken by the Transferor with respect to the contracts, with the same force and effect as if the action had been taken by the Transferee.

(4) The Government recognizes the Transferee as the Transferor's successor in interest in and to the contracts. The Transferee by this Agreement becomes entitled to all rights, titles, and interests of the Transferor in and to the contracts as if the Transferee were the original party to the contracts. Following the effective date of this Agreement, the term "Contractor," as used in the contracts, shall refer to the Transferee.

(5) Except as expressly provided in this Agreement, nothing in this Agreement shall be construed as a waiver of any rights of the Government against the Transferor.

(6) All payments and reimbursements previously made by the Government to the Transferor, and all other previous actions taken by the Government under the contracts, shall be considered to have discharged those parts of the Government's obligations under the contracts. All payments and reimbursements made by the Government after the date of this Agreement in the name of or to the Transferor shall have the same force and effect as if made to the Transferee, and shall constitute a complete discharge of the Government's obligations under the contracts, to the extent of the amounts paid or reimbursed.

(7) (i) Except as set forth in subparagraph (7)(ii) below, the Transferor and the Transferee agree that the Government is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the contracts.

(ii) The Government recognizes that restructuring by the Transferee incidental to the acquisition/merger may be in the best interest of the Government. Restructuring costs that are allowable under Part 31 of the Federal Acquisition Regulation (FAR) or Part 231 of the Defense Federal Acquisition Regulation Supplement (DFARS) may be reimbursed under flexibly-priced novated contracts, provided that the Transferee demonstrates that the restructuring will (1) reduce overall costs to the Department of Defense (DoD), and the requirements included in DFARS 231.205-70 are met. These costs and the contracting parties' responsibilities shall be addressed in a Memorandum of Understanding to be negotiated between the cognizant contracting officer and the Transferee. The Memorandum of Understanding will specify the types and treatment of restructuring costs and the methodology to be used to demonstrate reduced costs to DoD. Restructuring costs shall not be allowed on novated contracts unless there is an audit of the restructuring proposal; a determination by the contracting officer of overall reduced costs to DoD; and an Advance Agreement setting forth cost ceiling amounts on restructuring projects and the period to which such costs shall be assigned. The Government and the Transferee acknowledge that other applicable regulations, or changes to the provisions of interim rule 242.1204 of the DFARS, may have an impact on the reimbursement of the costs of external restructuring activities. Therefore, any Advance Agreement relating to restructuring costs negotiated between the cognizant contracting officer and the Transferee shall be entered into in accordance with the regulations applicable as of the date of execution of the Advance Agreement. To the extent that agencies or departments of the Government other than the DoD recognize any of the costs of restructuring by the Transferee, an Advance Agreement addressing such restructuring costs shall be negotiated by the cognizant Contracting Officer and the Transferee.

(8) The parties to this Novation Agreement recognize that a number of administrative and procedural issues related to costs and other contractual matters remain unresolved between the parties. These issues and the parties' respective rights and responsibilities therein are identified in the Advance Agreements listed as Exhibit B and Exhibit C which are incorporated herein by reference.

(9) The Transferor guarantees payment of all liabilities and the performance of all obligations that the Transferee (i) assumes under this Agreement or (ii) may undertake in the future should these contracts be modified under their terms and conditions. The Transferor waives notice of, and consents to, any such future modifications.

(10) The contracts shall remain in full force and effect, except as modified by this Agreement. Each party has executed this Agreement as of the day and year first above written.

UNISYS CORPORATION

By: ______________________

Title: Senior V.P., General Counsel & Secretary

CERTIFICATE

I, Ronald C. Anderson certify that I am the Assistant Corporate Secretary of Unisys; that Harold S. Barron, who signed this Agreement for this corporation, was then Sr.V.P., Gen.Counsel & Sec. of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.

Witness my hand and the seal of this corporation this 2nd day of April 1996.

By: ______________________

[CORPORATE SEAL]

LORAL CORPORATION

By: ______________________

Title: Vice President & General Counsel

CERTIFICATE

I, Michael B. Targoff, certify that I am the Senior Vice President & Secretary of Loral Corporation; that Eric J. Zahler, who signed this Agreement for this corporation, was then Vice President & General Counsel of this corporation; and that this agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.

Witness my hand and the seal of this corporation this 4th day of April 1996.

By: ______________________

[CORPORATE SEAL]

UNITED STATES OF AMERICA

By: Patricia S. Malone

Title: Defense Corporate Executive

EXHIBIT B

# ADVANCE AGREEMENT

BY and AMONG

THE UNITED STATES OF AMERICA, UNISYS CORPORATION AND LORAL CORPORATION

UNDER FAR 31.109

RELATING TO LORAL CORPORATION's ACQUISITION OF THE ASSETS

OF

UNISYS DEFENSE SYSTEMS

## ADVANCE AGREEMENT CONTENTS


I. INTRODUCTION

- A. Purpose
- B. Facts and Representations

II. COST TERMS AND CONDITIONS

- A. General Covenants
- B. Contracts and Subcontracts between Loral and the Defense Systems Business
- C. Existing Overhead and G&A Items
- D. Existing Defense Systems Business Advance Agreements
- E. Restructuring Costs
- F. Post Transfer Services
- G. Unallowable Costs
- H. Prepaid Expenses
- I. Pension and Post Retirement Benefits
- J. Environmental Costs
- K. CAS Changes Resulting from Sale
- L. Loral Systems Company
- M. Corporate Assessments
- N. Final Rates for Year of Sale

III. OTHER TERMS AND CONDITIONS

I. INTRODUCTION

A. Purpose

This Agreement is entered into by and among Loral Corporation ("Loral"), Unisys Corporation ("Unisys"), and the United States of America (the "Government").

In accordance with Federal Acquisition Regulation (FAR) 31.109 Advance Agreements, the parties are entering into this Advance Agreement regarding the treatment of costs and other issues associated with the sale to Loral of certain assets of Unisys (hereafter, the "Defense Systems Business").

B. Facts and Representations

This Agreement is made with reference to the following facts and representations:

1. Asset Purchase Agreement

Unisys entered into an Asset Purchase Agreement with Loral dated as of March 20, 1995, providing for the sale to Loral of certain assets of the Defense Systems Business. The Closing Date on which these assets and contracts of the Defense Systems Business were transferred from Unisys to Loral was May 5, 1995.

2. Effective Date

The effective date of this Advance Agreement shall be May 5, 1995.

3. Contract Applicability

The Government, as represented by various Contracting Officers, has entered into contracts, purchase orders, and other agreements with Unisys performed by its Defense Systems Business. The Government recognizes Loral as the successor-in-interest to these contracts, purchase orders and agreements, pursuant to the terms and conditions of a Novation Agreement executed by the cognizant Contracting Officer.

4. Definitions

a. Due Diligence shall mean the process by which Loral analyzed the Defense Systems Business to determine whether to acquire its assets from Unisys.

b. Federal Acquisition Regulation (FAR) - References to Federal Acquisition Regulation (FAR) in this Advance Agreement are deemed to include the DOD FAR Supplement (DFARS), the NASA FAR Supplement, and all other civilian agency supplements to FAR, unless clearly indicated otherwise. Effective 1 April 1984, the FAR and DFARS replaced the Defense Acquisition Regulation (DAR), previously known as the Armed Services Procurement Regulation (ASPR). As and when applicable to a particular contract, references in this Advance Agreement to FAR or DFARS provisions are deemed to be references to the appropriate DAR or ASPR provisions.

c. Novated Contracts shall mean all of the contracts of the Unisys Defense Systems Business that are subject to the provisions of the Novation Agreement executed by the cognizant Contracting Officer by which Loral is recognized as Unisys' successor-in-interest in the contracts.

II. COST TERMS AND CONDITIONS

A. General Covenants

1. The parties agree that the provisions contained in this Advance Agreement that address the treatment of costs constitute, *inter alia*, an Advance Agreement on Costs as provided by the FAR 31.109. Further, Loral agrees that this Advance Agreement shall be applicable to and, as appropriate, be incorporated by reference into all of the Novated Contracts. To the extent that any provision of this Advance Agreement may conflict with the terms and conditions of any individual contract, the terms and conditions contained in such contract shall prevail.

2. Loral agrees to be bound by and guarantees the performance of each Novated Contract in accordance with the terms and conditions contained therein, and further agrees to assume all obligations and liabilities arising under or relating to said contracts, as if Loral were the original party to the contracts.

3. Loral agrees to notify the Defense Contract Executive (DCE) and/or the cognizant Contracting Officer, as appropriate, of any of the following actions:

a. Organizational changes, including but not limited to, plant closures, consolidations, etc., consistent with Loral's established practices as set forth in its applicable disclosure statements.

b. Loral's default on any of the liabilities assumed under the provisions of the Asset Purchase Agreement.

c. Loral's default on any financing of the transaction made pursuant to the provisions of the Asset Purchase Agreement.

B. Treatment of Contracts and Subcontracts between Loral and the Unisys Defense Systems Business

Loral agrees that any contracts and subcontracts between Loral and Unisys' Defense Systems Business open on the Effective Date will continue in full force and effect as previously negotiated in good faith at arms length. Loral agrees that verification of the aforementioned "arms length" negotiations may be required. All new contracts and subcontracts between other divisions and business units of Loral and its Defense Systems Business, and modifications to existing contracts executed after the Effective Date, will be negotiated in accordance with government accepted and/or disclosed practices of Loral and the Defense Systems Business regarding interdivisional work.

C. Treatment of Existing Overhead and G&A Issues

1. Without prejudice to any adjustment or contribution rights between Loral and Unisys, Loral agrees to incorporate into its claims/certifications whatever amounts are allocated to the Defense Systems Business as a result of negotiations with the cognizant

Contracting Officer concerning open issues related to Unisys Corporation Headquarters allocations (e.g., state income taxes, franchise taxes, insurance and corporate benefits) or provide another alternative for adjustment to the Government. These negotiations are expected to cover open years for Unisys prior to the Effective Date.

2. The parties agree that issues of the individual Defense Systems Business units related to open years and issues deferred from negotiations of closed years will be negotiated with the cognizant Contracting Officer.

D. <u>Treatment of Existing Defense Systems Business Advance Agreements</u>

Unless inconsistent with the terms of this Advance Agreement, Loral agrees to comply with the terms of all existing advance agreements between the Government and Unisys applicable to the Defense Systems Business, including but not limited to any agreements, understandings or accounting practices relating to the treatment of lease costs for occupancy of formerly owned facilities. Loral's and the Government's ability to terminate and/or amend any of these agreements shall be limited by the terms of each such agreement.

E. <u>Treatment of Restructuring Costs</u>

The parties recognize that Loral's acquisition of the Defense Systems Business may result in restructuring costs, including but not limited to: closing facilities, disposing of assets, eliminating jobs, employee outplacement costs and relocation expenses. The Government recognizes that restructuring by Loral incidental to the acquisition/merger may be in the best interest of the Government. Restructuring costs that are allowable under Part 31 of Federal Acquisition Regulation (FAR) or Part 231 of Defense Federal Acquisition Regulation Supplement (DFARS) may be reimbursed under flexibly-priced Novated Contracts, provided that the cognizant Contracting Officer determines that overall reduced costs should result for the Department of Defense (DoD), and the requirements included in DFARS 231.205-70 are met. To the extent that agencies or departments of the Government other than DoD recognize any of the costs of restructuring by Loral, an Advance Agreement addressing such restructuring costs shall be negotiated by the cognizant Contracting Officer and Loral.

F. Post Transfer Services

1. Pursuant to the Asset Purchase Agreement and the Transitional Services and Separation Agreement, with an effective date of May 5, 1995, Unisys agreed to continue to provide the Defense Systems Business with certain operational and administrative support services for a transitional period following Loral's acquisition of the Defense Systems Business. The costs for these services, to the extent that they are allowable and allocable, will be charged to Novated Contracts and, to the extent required by applicable law and regulation, will be subject to Government audit in accordance with applicable FAR and Cost Accounting Standards (CAS) provisions. Notwithstanding the above, the government's audit rights in connection with post transfer commercial products and services provided by Unisys to the Defense Systems Business shall be no greater than they were immediately prior to the Loral acquisition of the Defense Systems Business.

2. Loral agrees to notify the Government through its normal cost disclosure process of any decision to discontinue or modify these transitional services.

G. Unallowable Costs

1. Costs which are specifically and expressly identified and defined and which the parties agree to be expressly unallowable, shall be treated as "mutually agreed to be unallowable" under CAS and FAR. These costs shall be unallowable on all of the Novated Contracts. Such costs shall be unallowable whether incurred, accrued, or claimed prior to or after the Effective Date. Other items of costs shall be treated in accordance with the applicable FAR and CAS provisions.

2. Loral agrees that the Government shall not be obligated under any contracts to pay or reimburse Loral for any unallowable Organization costs as defined in FAR 31.205-27.

3. Loral agrees that for Government cost accounting purposes, it will not recognize any costs or charge any costs to its Government contracts resulting from the step-up of assets or reevaluation of existing Defense Systems Business assets, such as

additional depreciation resulting from increases in asset book value or the amortization of goodwill. The parties recognize, however, that the FAR section on asset reevaluation is being challenged at this time, and there is a possibility that litigation of this issue could result in a revision of the relevant sections of FAR and/or CAS. The parties agree in that circumstance to amend this section of the Advance Agreement retroactively or prospectively, as applicable, consistent with the revised FAR, CAS, and/or any Board or Court decision reached after the exhaustion of all appeals.

4. The costs of payments to any Defense Systems Business employee, in excess of normal salary and bonuses, which are made as a result of Loral's acquisition of the Defense Systems Business, for the purpose of ensuring that the employee remained with Loral after May 5, 1995, are unallowable.

5. The parties agree that normal administrative costs, including economic planning costs and other such planning costs, are allowable.

6. Loral and the Government agree that, for purposes of this Advance Agreement, the commencement date of due diligence activities performed by representatives of Loral's Corporate Office shall be December 22, 1994. This represents the date on which formal discussions commenced between Unisys and Loral concerning the sale of the Defense Systems Business.

H. Prepaid Expenses

With regard to prepaid expenses which are allocable to the Defense Systems Business, the parties agree to the following provisions:

1. All taxes, refunds, and settlements associated with such prepaid items related to the Defense Systems Business for periods after the Effective Date are the responsibility of Loral and will be allocated to the Novated Contracts in accordance with Loral's disclosed or established cost accounting practices.

2. Any adjustments to allowable prepaid items (increase or decrease including penalties and interest) made after the Effective Date but applicable to periods prior to the Effective Date will be recorded in the year received. Loral agrees to provide an appropriate credit to the Government for refunds of any prepaid items. Credits and adjustments will be charged/allocated in accordance with Loral disclosed or established cost accounting practices.

I. Pension and Post Retirement Benefits

Transfer methodology of pension liabilities and assets related to the Defense Systems Business will be reviewed with the Government and is the subject of a separate Advance Agreement Addressing Pension Funds among the Government, Unisys and Loral. Issues relating to the pension transfer will be resolved by mutual agreement and/or statutory disputes mechanisms. Loral will maintain segmented pension plan accounting for the employees of the Defense Systems Business unless it adopts a change in cost accounting practices as provided by regulation.

J. Environmental Costs

1. The parties agree that to be allowable, environmental costs must:

a. Meet the reasonableness tests of FAR;
b. Be allocable to the Novated Contracts; and
c. Not be expressly unallowable under FAR.

2. Costs of fines and penalties resulting from violations of, or failure of a contractor to comply with Federal, State, local, or foreign laws and regulations, are unallowable to the extent provided in FAR 31.205-15.

3. Loral shall comply with all applicable terms and conditions and take all affirmative actions reasonably required to preserve and enforce the provisions relating to Environmental Matters set forth in the Asset Purchase Agreement.

4. To the extent required by applicable law, regulation or contract, Loral will credit the Government with an allocable share of insurance policy proceeds or other credits or recoveries received pursuant to the provisions of the Asset Purchase Agreement. Unisys will continue to pursue existing legal actions against insurance companies in connection with those environmental remediation costs relating to Environmental Matters set forth in the Asset Purchase Agreement. Unisys shall have the right to manage these actions consistent with its sound business and legal judgment and may enter into settlements that, in its sole discretion, Unisys considers reasonable.

5. The parties further recognize that specific FAR coverage in the area of environmental costs may be forthcoming. This coverage will likely define more specifically the categorization of environmental costs and the guidelines regarding allowability. Compliance with any new regulations will be implemented in the ordinary course of business.

K. CAS Changes Resulting From Sale

Loral agrees to consider all applicable accounting and allocation issues involved in effecting the acquisition of the Defense Systems Business and identify "accounting changes" consistent with CAS rules and Loral's disclosed practices. Negotiations to assess the impact, if any, of changes to established or disclosed cost accounting practices, shall be in accordance with FAR for all CAS-covered contracts and subcontracts.

L. Loral Systems Company

Loral Systems Company (LSC) is a partnership among many of the divisions of Loral Corporation, formed for the purpose of bringing together technologies and expertise of the various divisions of Loral to pursue specific contract opportunities. Loral agrees that the policies and procedures established for Loral business units entering into contracts as partners in LSC shall meet the criteria set forth in DCAA Headquarters Memorandum dated July 22, 1994. Loral further agrees that the LSC Partnership Agreement will be amended to address the acquisition of the Defense Systems Business; that the criteria for designating a contracting opportunity as mandating the use of LSC shall take into account Loral's acquisition of the Defense Systems Business; and that the policies and procedures to be agreed to among Loral, the DCE and DCAA for handling LSC contracts, including any

required Disclosure Statement revisions, will be implemented in a manner that treats the Defense Systems Business consistently and appropriately.

M. Corporate Assessments

1. The parties agree that up to and including May 4, 1995, the Defense Systems Business will be part of the Unisys Corporation Headquarters allocation base.

2. The parties agree that effective May 5, 1995, the Defense Systems Business will be part of the Loral Corporate home office allocation base.

N. Final Rates for Year of Sale

1. On a one-time basis, Loral will utilize a 15 month (1 January 1995 through 31 March 1996) period for the indirect rate structure applicable to the Defense Systems Business. Unisys will certify the indirect expenses allocated to the Defense Systems Business open contracts through May 4, 1995. Loral will certify the indirect expenses allocated to the Defense Systems Business open contracts beginning May 5, 1995.

2. Unisys will prepare and certify its Headquarters cost allocation submissions related to the Defense Systems Business for periods prior to May 5, 1995.

3. Loral will prepare and certify the corporate home office cost allocation submissions related to the Defense Systems Business for periods after May 5, 1995.

III. OTHER TERMS AND CONDITIONS

A. Disputes

Execution of this Agreement does not constitute either an admission on the part of the Government, Unisys or Loral as to the validity of any claim or liability, or the acceptance of the position of any party reflected in any part of this Agreement. This Agreement may be introduced as evidence by any one of the parties in an administrative or judicial proceeding only to enforce the provisions of this Agreement. This Agreement is solely for the benefit of the parties and is not intended to be applicable to the transactions

of any other persons or entities. Nothing in this Agreement is intended or shall be construed to alter or interpret the rights and obligations of Unisys or Loral under their Asset Purchase Agreement. Further, the Government's rights with respect to any Novated Contract are governed by the Novation Agreement. Any disagreement between the Government and Unisys or Loral arising under this Agreement shall be considered a dispute under the Contract Disputes Act of 1978 (Public Law 95-563, 41 U.S.C. 601 et seq.) relating to the contract(s) covered by this Agreement.

B. Access to Records

In accordance with applicable law and FAR provisions, the Government shall have access to and the right to examine any of Unisys' and Loral's directly pertinent books, documents, papers or other records for purposes of the proper implementation of this Advance Agreement.

C. Agreement is Not a Waiver

Nothing in this Agreement shall be construed as a waiver of any right of the Government against Unisys or Loral, nor shall anything in this Agreement be construed as a waiver of any rights which Unisys or Loral may have against the Government.

D. Enforcement of Agreement

Enforcement by the Government of any right or remedy against Unisys or Loral under this Agreement shall not be subject to or conditioned upon the enforcement of any right or remedy which the Government may have against any other party to this Agreement.

E. Full Force and Effect of Existing Contracts

Notwithstanding any express or implied provisions of this Agreement, all Novated Contracts shall remain in full force and effect in accordance with their terms.

F. Implementation of Agreement

The parties to this Agreement intend that this Agreement is to be implemented as a whole; however, if any of its individual provisions are determined to be unenforceable by the Armed Services Board of Contract Appeals or a court of competent jurisdiction, it is the intent of the parties that the remaining provisions shall remain in effect.

G. Impact on All Government Contracts

This Agreement is applicable to contracts with the Department of Defense, and all other agencies and departments of the Government that have entered into contracts that are subject to the Novation Agreement among the Government, Unisys and Loral. Nothing in this Agreement is intended or shall be construed to relieve Unisys or Loral from compliance with Federal law or regulation.

H. Representations by Unisys Corporation

Unisys hereby represents and warrants to the Government that:

1. Unisys possesses and has duly exercised all requisite power and authority to enter into this Agreement and to perform any obligations arising hereunder.

2. This Agreement has been duly signed and delivered and is legally binding and enforceable.

I. Representations by Loral Corporation

Loral hereby represents and warrants to the Government that:

1. Loral possesses and has duly exercised all requisite power and authority to enter into this Agreement and to perform any obligations arising hereunder.

2. This Agreement has been duly signed and delivered and is legally binding and enforceable.

In WITNESS WHEREOF each of the parties hereto have signed this Agreement to become effective in accordance with the terms and conditions hereof.

**UNISYS CORPORATION**

Harold S. Barron

Harold S. Barron

Sr. V.P., Gen.Counsel & Secretary

Date: April 2, 1996

**UNITED STATES OF AMERICA**

Patricia S. Matura

Patricia S. Matura

Defense Corporate Executive

Date: April 9, 1996

**LORAL CORPORATION**

Eric Zahler

Eric J. Zahler

Vice President & General Counsel

Date April 4, 1996

**UNITED STATES OF AMERICA**

Denise D. Chezek

DENISE D. CHEZEK

DEFENSE CORPORATE EXECUTIVE

Date April 4, 1996

EXHIBIT C

# ADVANCE AGREEMENT ADDRESSING PENSION FUNDS

**Whereas**, the United States of America (the "Government") has from time to time paid Unisys Corporation ("Unisys") for allocable and allowable costs incurred by Unisys in funding its pension plans for its employees performing work on certain contracts awarded by the Government (the "Pension Funds");

**Whereas**, Unisys has sold certain of the assets of Unisys Defense Systems (the "Assets") to Loral Corporation ("Loral") pursuant to the Asset Purchase Agreement by and between Unisys and Loral dated as of March 20, 1995;

**Whereas**, the Assets sold by Unisys to Loral include certain contracts between Unisys and the Government (the "Unisys Contracts");

**Whereas**, the Assets sold by Unisys to Loral also include a portion of the Pension Funds that were treated as allocable and allowable costs and paid in whole or in part by the Government pursuant to the Unisys Contracts;

**Whereas**, Unisys and Loral have requested, pursuant to Federal Acquisition Regulation 42.12, that the Government enter into a novation agreement whereby the Government would recognize the transfer of the Unisys Contracts to Loral ;

**Whereas**, Unisys and the Government have not reached agreement regarding whether Unisys must repay to the Government any of the Pension Funds that were not transferred from Unisys to Loral in accordance with applicable contractual and regulatory provisions, including but not limited to the Federal Acquisition Regulation, the Defense Federal Acquisition Regulation Supplement and the Cost Accounting Standards. The parties acknowledge that this Agreement is not intended to enlarge the rights of the parties but, rather, is intended to preserve, as described herein, existing rights of the parties as of the effective date of the novation agreement; and

**Whereas**, the parties agree that it is in the best interest of the parties to enter into the novation agreement prior to and separately from the Government and Unisys reaching agreement regarding the Pension Funds;

**NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:**

1. The Government will not defer entering into the novation agreement until agreement is reached between Unisys and the Government regarding the Pension Funds;

2. The parties agree that the Government may make a claim(s) against Unisys for payment of the Pension Funds pursuant to the novated contracts even after the parties enter into the novation agreement. The parties further agree that this Agreement will be incorporated into such novation agreement.

3. By entering into the novation agreement , the Government will not waive or compromise any rights that the Government may have regarding the Pension Funds.

4. Except as provided herein, the parties retain any rights and defenses each may have relating to or arising from the Unisys Contracts with respect to the Pension Funds, including, but not limited to, rights related to retirement benefits other than pensions, if any.

Unisys Corporation

By: [signature] Date: April 2, 1996

Title: Sr. V.P., Gen.Counsel & Secretary

Loral Corporation

By: [signature] Date: April 4, 1996

Title: Vice President & General Counsel

United States of America

By: Patricia S. Mitchell Date: April 9, 1996

Title: Defense Corporate Executive