# EXHIBIT 7

Vol. 40—No. 186
9-24-75
PAGES
43873-44189

# federal register

WEDNESDAY, SEPTEMBER 24, 1975

not complete

THE NATIONAL ARCHIVES OF THE UNITED STATES 1934

## highlights

### PART I:

**OIL IMPORTS**
FEA announces collection of supplemental fees for July and August .......... 43950

**PESTICIDE POLICY ADVISORY COMMITTEE**
EPA announces establishment .......... 43947

**BLUEFIN TUNA**
Commerce/NOAA announces closing of season on 9-22-75 .......... 43916

**TRAVEL RESTRICTIONS**
State limits use of U.S. passports for Cambodia, Cuba, North Korea, North and South Vietnam (5 documents); effective 9-19-75 .......... 43931

**CUSTOMS VIOLATIONS**
Treasury/Customs regulations relating to voluntary disclosure; effective 9-24-75 .......... 43894

**HOUSING FOR ELDERLY AND HANDICAPPED**
HUD invites requests for fund reservations from eligible applicants .......... 43943

CONTINUED INSIDE

### PART II:

**CRIME RECORDS**
Justice/LEAA proposal regulating access; hearing on 10-16-75; comments by 10-13-75 .......... 44033

### PART III:

**FEDERAL ELECTIONS**
FEC publishes request for advisory opinion; comments by 10-6-75 .......... 44041
FEC publishes two advisory opinions .......... 44040

### PART IV:

**POSTAL RATES**
Postal Service proposed changes in rates and fees; petitions to intervene filed by 10-3-75 .......... 44043

### PART V:

**PRIVACY ACT OF 1974**
SEC implementation regulations; effective 9-27-75 .......... 44068
SEC adopts exemptions; effective 9-27-75 .......... 44072
DOT publishes additional systems of records .......... 44075

# rules and regulations

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each month.

## Title 4—Accounts

## CHAPTER III—COST ACCOUNTING STANDARDS BOARD

### SUBCHAPTER G—COST ACCOUNTING STANDARDS

### PART 400—DEFINITIONS

### PART 412—COST ACCOUNTING STANDARDS FOR COMPOSITION AND MEASUREMENT OF PENSION COST

### Miscellaneous Amendments

Section 400.1(a) is amended by inserting the following definitions alphabetically.

**§ 400.1 Definitions.**

(a) * * *

*Accrued Benefit Cost Method.* An actuarial cost method under which units of benefit are assigned to each cost accounting period and are valued as they accrue—that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial liability at a plan's inception date is the present value of the units of benefit credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method.)

* * * * *

*Actuarial Assumption.* A prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets.

* * * * *

*Actuarial Cost Method.* A technique which uses actuarial assumptions to measure the present value of future pension benefits and pension fund administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods.

* * * * *

*Actuarial Gain and Loss.* The effect on pension cost resulting from differences between actuarial assumptions and actual experience.

* * * * *

*Actuarial Liability.* Pension cost attributable, under the actuarial cost method in use, to years prior to the date of a particular actuarial valuation. As of such date, the actuarial liability represents the excess of the present value of the future benefits and administrative expenses over the present value of future contributions for the normal cost for all plan participants and beneficiaries. The excess of the actuarial liability over the value of the assets of a pension plan is the Unfunded Actuarial Liability.

* * * * *

*Defined-Benefit Pension Plan.* A pension plan in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits.

* * * * *

*Defined-Contribution Pension Plan.* A pension plan in which the contributions to be made are established in advance and the benefits are determined thereby.

* * * * *

*Funding Agency.* An organization or pension costs for a current or prior cost accounting period that has been paid to a funding agency or, under a pay-as-you-go plan, to plan participants or beneficiaries.

* * * * *

*Funding Agency.* An organization or individual which provides facilities to receive and accumulate assets to be used either for the payment of benefits under a pension plan, or for the purchase of such benefits.

* * * * *

*Multiemployer Pension Plan.* A plan to which more than one employer contributes and which is maintained pursuant to one or more collective bargaining agreements between an employee organization and more than one employer.

*Normal Cost.* The annual cost attributable, under the actuarial cost method in use, to years subsequent to a particular valuation date.

* * * * *

*Pay-As-You-Go Cost Method.* A method recognizing pension cost only when benefits are paid to retired employees or their beneficiaries.

* * * * *

*Pension Plan.* A deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement: *Provided,* That the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an integral part of a pension plan.

* * * * *

*Projected Benefit Cost Method.* Any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers.

* * * * *

(84 Stat. 796, Sec. 103 (50 U.S.C. App. 2168))

The Cost Accounting Standard on Composition and Measurement of Pension Cost is one of a series being promulgated by the Cost Accounting Standards Board pursuant to section 715 of the Defense Production Act of 1950, as amended, Pub. L. 91-379, 50 U.S.C. app. 2168, which provides for the development of Cost Accounting Standards to be used in connection with negotiated national defense contracts. This Standard establishes the components of pension cost, the bases for measuring such cost, and the criteria for assigning pension costs to cost accounting periods.

As part of the Board's early research relating to the subject of pension costs, it developed an Issues Paper in August 1973, and a preliminary draft Standard in September 1974. Both the Issues Paper and preliminary Standard were sent to a large cross-section of companies, Government agencies, industry and professional associations, actuaries, and other interested individuals. The Board received responses to these research papers which were useful in identifying the key issues involved in pension cost accounting and in developing a proposed Standard which was published in the FEDERAL REGISTER of May 5, 1975, with an invitation to interested parties to submit written views and comments to the Board. The Board also supplemented the invitation in the FEDERAL REGISTER by sending copies of the proposed Standard to several hundred organizations and individuals who had provided the Board with comments on the preliminary proposal or who had otherwise expressed interest in the subject of the Standard.

The Board received 80 sets of written comments from companies, Government agencies, professional associations, industry associations, public accounting firms, universities, actuaries and others in response to the FEDERAL REGISTER proposal. All of these comments have been carefully considered by the Board. The Board's views on each of the major issues discussed by commentators are outlined below, together with explanations of the changes made in the Cost Accounting Standard being promulgated.

The Board wishes to take this opportunity to express its appreciation for the helpful suggestions and constructive criticisms it has received, and for the time devoted to assisting the Board in this endeavor by the many organizations and individuals involved.

(1) RELATIONSHIP TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 AND TO GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

The Board received a variety of comments relative to the relationship between the proposed Standard, the Employee Retirement Income Security Act of 1974 (ERISA), and generally accepted accounting principles set forth in "Accounting for the Cost of Pension Plans," Opinion No. 8 by the Accounting Principles Board (APB–8). Some stated that, with the enactment of ERISA, Congress has expressed its will relative to pensions and a Cost Accounting Standard on pension costs which is different than ERISA is unnecessary. Others stated that APB–8 is a viable and proven document which provides sufficient guidance for both financial accounting and cost accounting purposes. Others stated that the combination of ERISA and APB–8 provides all the guidance needed for cost accounting purposes. Still others stated that a Standard should be deferred until the Federal regulations required by ERISA have been promulgated, and/or the Financial Accounting Standards Board (FASB) completes its reevaluation of APB–8.

The purpose of the Board in promulgating this Standard is to establish the accounting bases for measuring the proper amount of pension cost to be assigned to cost accounting periods for subsequent allocation to negotiated Government contracts.

ERISA establishes, among other things, minimum funding standards for pension plans and provisions affecting deductibility of pension costs for tax purposes. Although there is some commonality between the funding provisions of ERISA and the provisions of the Standard, ERISA does not provide for the measurement of pension costs for assignment among cost accounting periods or for the subsequent allocation of such costs to contracts. Accordingly, the Standard contains requirements, not contained in ERISA, to accomplish these purposes. Nevertheless, on the basis of its research, the Board is confident that the Standard being promulgated is compatible with the requirements of ERISA, i.e., compliance with the provisions of the Standard does not violate the provisions of ERISA, although certain provisions of the Standard are more restrictive than is permitted by ERISA.

APB–8 provides criteria for accounting for the cost of pension plans for financial accounting purposes. The Board believes that certain of these criteria are not appropriate for Government contract costing purposes. For example, a fundamental concept of APB–8 is that the annual pension cost to be charged to expense for financial accounting purposes is not necessarily determined by the funding of a pension plan. The Board believes that a requirement of law for annual minimum funding of pension costs on an irrevocable basis, is strong evidence that an obligation for at least such period that amount has been incurred for each.

The Board is aware of the FASB's projects to establish financial accounting and reporting Standards for employee benefit plans and to reevaluate APB–8, as well as the need for the cognizant Government agencies to develop regulations relative to ERISA. It is our understanding that the FASB reevaluation of APB–8 is not likely to result in a Standard that would be applicable before the end of calendar year 1976. The Board believes, however, that the issuance of a Cost Accounting Standard is needed promptly for contract costing purposes.

For example, there does not now exist any authoritative guidance which sets forth the components of pension cost that are properly includable and excludable for contract costing purposes. In addition, there are no existing criteria to resolve how the components of pension cost, once determined, shall be measured and assigned to cost accounting periods. The need for such measurement and assignment criteria for contracts is particularly critical because of the long-range projections used in computing pension cost and because the many techniques available for measuring and assigning such cost have significant impacts thereon. The significant amounts involved in annual pension cost calculations, the changes in the mix of contractors' Government and commercial business, and the settlement of individual contracts long before actual pension costs can be determined create a special need to provide criteria relative to the assignment of pension costs among cost accounting periods and the allocation of such costs to the cost objectives of the periods.

In developing the accompanying Cost Accounting Standard, the Board has attempted to stay within the general constraints of APB–8 and the funding provisions of ERISA. The Board recognizes that in the FASB's reconsideration of APB–8, the FASB could make significant changes in the manner in which pension costs are to be treated for financial accounting purposes and that the FASB's project on financial accounting and reporting for employee benefit plans may influence the conclusions reached in the reevaluation of APB–8. However, any such changes would be directed to external financial reporting and would not necessarily impact contract costing. The Board is also aware that Federal regulations which may be issued could conflict with a provision of this Standard. The Board maintains constant liaison with the FASB with regard to the two Boards' respective responsibilities for developing Standards. It also maintains liaison with the legislative and regulatory bodies responsible for developing and administering ERISA. The Board will review whatever pronouncements these bodies may issue and will make whatever revisions to the Standard it deems appropriate for contract costing purposes.

(2) NEED FOR TWO STANDARDS RELATIVE TO PENSION COST

Several commentators suggested that this Standard should deal not only with the composition and measurement of pension cost, but also with actuarial gains and losses [1] and the allocation of pension costs. The Board believes that the development of a separate Standard covering the latter two areas is advisable. First, the development of a single Standard would result in an extremely large and complex Standard that could create many problems in implementation and administration. For example, the Issues Paper developed by the Board set forth a total of 50 distinct accounting issues requiring resolution; the Standard being promulgated covers only 24 of these issues. In addition, the Board believes that the subjects covered by the two Standards are separable; a Standard can be issued relative to the composition and measurement of pension cost without creating a concurrent need for a Standard relative to the adjustment and allocation of such costs. Moreover, in computing actuarial gains and losses, it is necessary to determine how fund assets should be valued. APB–8 does not cover this aspect of pension cost accounting. In its project on accounting for pension funds, the FASB is endeavoring to specify the manner in which assets should be valued. The Board intends, as part of its continuing liaison with the FASB on this matter, to exchange research so that any possible differences in concept or approach could be minimized or eliminated entirely.

(3) TREATMENT OF ACTUARIAL GAINS AND LOSSES

The FEDERAL REGISTER proposal noted that an adjustment for actuarial gains or losses is a component of pension cost. Several commentators expressed concern over the Board's intent. Some commentators interpreted the proposed Standard as requiring that actuarial gains and losses be spread over a number of years. Other commentators believed that the proposed Standard required the immediate recognition of actuarial gains and losses.

The Board emphasizes that the Standard does not delineate how actuarial gains and losses shall be accounted for at this time. The Standard being promulgated neither requires nor prohibits immediate recognition of gains and losses or the spreading of such gains and losses to future years. Therefore, actuarial gains and losses should be accounted for in accordance with pertinent laws and regulations, and should be consistently applied. Section 412.50(a)(5) has been amended to clarify this concept.

(4) ACTUARIAL COST METHODS [2]

Many commentators expressed their concern over the section of the FEDERAL REGISTER proposal which limited accept-

[1] "The affect on pension cost resulting from differences between actuarial assumptions and actual experience."

[2] "A technique which uses actuarial assumptions to measure the present value of future pension benefits and pension fund administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods."

able actuarial cost methods to the accrued benefit cost method[3] or to a projected benefit cost method[4] which separately identifies unfunded actuarial liabilities[5] and actuarial gains and losses. This section, in effect, ruled out the use of an aggregate[6] cost method for measuring pension costs for negotiated Government contracts. Most of these commentators noted that ERISA and APB-8 permit these methods to be used.

The Board's primary reason for prohibiting the use of an aggregate cost method in the proposed Standard was because such a method does not disclose actuarial gains and losses. Any method that does not disclose actuarial gains and losses impairs the ability to determine whether actuarial assumptions[7] are reasonable. Actuarial assumptions are significant underlying factors for determining the amount of pension costs to be assigned among cost accounting periods. It is only when such assumptions are visible that a determination can be made that they are reasonable. The most appropriate means for determining such reasonableness is to compare assumed events with actual events.

Also, because most aggregate cost methods do not develop unfunded actuarial liabilities, the Government cannot ascertain the funding status of a plan, i.e., whether it is excessively funded at any point in time. Consequently, the Government could be making larger reimbursements than is required to defray its fair share of pension costs incurred by contractors. Many of the comments received acknowledge that most aggregate cost methods do not disclose overfunded situations.

Nevertheless, the Board is impressed by certain of the views of commentators who advocate the use of an aggregate method. The Board recognizes that aggregate methods are widely used and that they generally spread pension costs evenly and within the periods established in the Standard for amortizing unfunded actuarial liabilities. The Board also notes that commentators stated that a required change in actuarial cost methods may result in substantial actuarial fees and, in some cases, could result in contractors violating current labor commitments.

The Board's solution to this problem was provided generally in several of the comments received. First, several commentators who recognized that an aggregate cost method does not disclose the funding status of a plan, suggested that contractors using such a cost method develop an alternative computation to determine such status. They pointed out that such a computation is required under the full funding limitation of ERISA and is often required by the IRS when it believes a plan may be overfunded.

Other commentators suggested that contractors who use an aggregate cost method provide supplemental information identifying actuarial gains and losses that have occurred and the extent to which such gains and losses have been amortized through subsequent pension contributions or offset by gains and losses in subsequent accounting periods. These commentators informed us that the incremental costs of providing such additional information would be relatively minor.

Accordingly, the Board has added a section (412.50(b)(2)) which permits a contractor to use any projected benefit cost method if the contractor (1) makes an alternative computation (under a projected benefit cost method which separately discloses unfunded actuarial liabilities and actuarial gains and losses) to disclose the funding status of the plan and reduce pension cost as indicated by such computation, (2) provides supplemental information relative to actuarial gains and losses and gains or losses resulting from changed actuarial assumptions, and (3) uses that method in developing costs for financial accounting purposes.

The third requirement was added because the Board has tried unsuccessfully to ascertain criteria for determining the circumstances under which an aggregate cost method is a preferable method for assigning costs to cost accounting periods for Government contracting purposes.

Finally, to assure that the aggregate cost method used spreads pension costs within the time frames set forth in this Standard for other projected benefit cost methods, § 412.50(b)(2) requires that such aggregate cost methods spread the cost of future pension benefits over the average remaining working lives of the work force.

(5) Actuarial Assumptions

A large number of commentators were concerned with the manner in which the Federal Register proposal dealt with actuarial assumptions. They were particularly concerned with that provision of the proposed Standard which stated that when an actuarial assumption differs significantly from historical experience, the contractor shall provide evidence supporting its conclusion that such experience is no longer appropriate. Most commentators who objected to this provision in the Standard interpreted it as requiring separate gain and loss analyses for each assumption each time an actuarial valuation is performed. They cited the large cost of performing such analyses and noted that ERISA merely requires that actuarial assumptions be reasonable "in the aggregate."

Although the Board believes that the basis and rationale for each assumption should be made visible by contractors, it believes that the test of reasonableness of such assumptions should be applied to the end result. It is not the intent of the Board to require a separate gain or loss analysis for each assumption each time an actuarial valuation is made. Rather, the intent is that contractors not use an undocumented composite factor to represent all assumptions used in measuring pension costs, as this practice would inhibit any evaluation of the reasonableness of individual assumptions as applied to future periods. Such evaluations may be necessary when assumptions, taken in the aggregate, are found to be unreasonable, as discussed below.

Once individual actuarial assumptions have been set forth by contractors, the Board believes that the validity of these assumptions can be evaluated by the overall results obtained. Therefore, the Standard provides that the validity of the assumptions used may be evaluated in the aggregate. However, if an actuarial valuation discloses that the assumptions were not reasonable in the aggregate, the Standard requires that the contractor shall identify the major causes for the resultant actuarial gains and losses and set forth the bases and rationale used for either retaining or revising each such assumption.

In order to recognize the long-term nature of pension plans, the Standard provides in § 412.50(b)(5) that actuarial assumptions should reflect long-term trends, rather than short-term fluctuations. Also, the Standard does not specify how often determinations of actuarial gains and losses should be made. ERISA provisions require that such determinations be made not less frequently than once every three years except that more frequent determinations may be prescribed by regulation in particular cases, i.e., for plans which have sustained substantial gains or losses for several periods in succession. The Board believes that the ERISA requirements with respect to the frequency of determinations for gains and losses is equally appropriate for compliance with the provisions of the Standard at this time.

---

[3] "An actuarial cost method under which units of benefit are assigned to each cost accounting period and are valued as they accrue—that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial liability at a plan's inception date is the present value of the units of benefits credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method.)"

[4] "Any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers."

[5] "Pension cost attributable, under the actuarial cost method in use, to years prior to the date of a particular actuarial valuation. As of such date, the actuarial liability represents the excess of the present value of the future benefits and administrative expenses over the present value of future contributions for the normal cost for all plan participants and beneficiaries. The excess of the actuarial liability over the value of the assets of a pension plan is the Unfunded Actuarial Liability."

[6] As used herein, an aggregate cost method is any actuarial cost method which spreads the entire cost of future pension benefits over the average future service lives of the current work force and which does not develop actuarial gains or losses.

[7] "A prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets."

In addition to the foregoing, several commentators stated that the Standard should provide that the judgment of enrolled actuaries, as set forth in ERISA, should be determinate with respect to assumptions as well as other actuarial determinations. The Board recognizes the importance of the functions performed by enrolled actuaries with respect to actuarial determinations. However, contract terms are not imposed on actuaries; rather, it is the contractors who are parties to contracts with the Government and must bear the responsibility for compliance with the terms thereof.

(6) Calculations of Normal Cost[8]

The Federal Register proposal provided that the calculations of normal cost should be the sum of the calculations for the individual employees in the plan, except that homogeneous groupings and averages could be used if the results substantially agree with the results based on individual employee calculations. A number of commentators objected to this provision. They said that it would appear to require that two calculations be made in order to show that the use of groupings and averages gives results that agree with the results based on individual employee calculations. Some commentators stated that this requirement is unrealistic because actuaries frequently use aggregate calculations and that such aggregations can be tested against individual company or industry-wide experience. Other commentators stated that this provision would result in a single calculation for determining the assumed entry age of planned participants.

The comments received indicate that there are divergent opinions as to how normal costs shall be calculated under projected benefit cost methods. Nevertheless, the Board concludes that the methods commonly used would not materially affect the results of normal cost calculations. Accordingly, the requirement to compute normal costs on an individual basis for projected benefit cost methods has been deleted from the Standard.

The proposed Standard provided also that the calculation of normal cost shall be based on a percentage of payroll. Many commentators stated that this requirement does not recognize the fact that many pension benefits are not related to salaries. In order to accommodate these views, the Board has revised the Standard (§ 412.50(b)(3)) to provide that the calculation of normal cost shall be based on a percentage of payroll for plans where the pension benefit is a function of salaries and wages and be based on employee service for plans where the pension benefit is not related to salaries and wages.

[8] "The annual cost attributable, under the actuarial cost method in use, to years subsequent to a particular valuation date."

(7) Pay-As-You-Go Pension Methods[9]

Several commentators apparently assumed that the Federal Register proposal prohibited the recognition of pension costs of plans that provide benefits on a pay-as-you-go basis. One commentator stated that the Standard prohibited the recognition of the costs of pay-as-you-go plans which are not qualified for Federal income tax purposes.

The Board's view, as expressed in the Federal Register proposal, is not to prohibit recognizing the cost of pension benefits provided on a pay-as-you-go basis. Rather, the Board's intent is to specify how the cost of such benefits shall be measured and assigned among cost accounting periods. Moreover, the accounting treatment to be afforded to the costs of pay-as-you-go plans is not dependent on the Federal income tax status of the plan.

Accordingly, the Board has revised the provisions of the Standard relative to pay-as-you-go methods (§ 412.50(b)(4) and has added an illustration (§ 412.60 (b)(2)) to clarify its intent.

(8) Unallowable Pension Costs

The Federal Register proposal provided that pension costs applicable to prior years that were disallowed in accordance with then-existing Government contractual provisions should be separately identified and eliminated from any unfunded actuarial liability being amortized pursuant to the provisions of the Standard. Several commentators stated that this provision is not equitable because ERISA requires that such amounts be funded.

The Board recognizes that all elements comprising an unfunded actuarial liability, including unallowable costs included therein, are required to be amortized pursuant to the funding provisions of ERISA. However, ERISA does not deal with contract costing and therefore does not deal with unallowable contract costs. The Board believes that for contract costing purposes, pension costs which were assignable to prior periods and which were specifically determined to be unallowable under then-existing contractual provisions should not be assignable to periods subsequent to the effective date of this Standard. It should be noted that the treatment of amounts funded in excess of the pension cost for a cost accounting period is separately covered in § 412.50(c)(1).

(9) Amortization of Unfunded Actuarial Liabilities

The Federal Register proposal included a provision requiring contractors to establish and consistently follow a policy for selecting specific amortization periods for any unfunded actuarial liabilities. The proposed Standard stated that such policy should give consideration to the size and nature of unfunded actuarial liabilities. Several commentators stated that they did not believe that the size and nature of such liabilities should govern the choice of amortization periods. The Board's intent was to permit contractors to establish different amortization periods for different types and sizes of unfunded actuarial liabilities. The Board still believes that contractors should be permitted to establish such different amortization periods. Accordingly, the Standard has been revised (§ 412.50(a)(3)) to clarify that such determinations are permissive rather than mandatory.

[9] "A method of recognizing pension cost only when benefits are paid to retired employees or their beneficiaries."

(10) Interest Resulting From Delayed Funding of Pension Plans

The Federal Register proposal provided that if any portion of pension cost computed for a cost accounting period is not funded by the time established by the funding provisions of the plan, an interest equivalent on the amount not funded shall not be a component of pension cost of any other cost accounting period. Several commentators stated that this provision is inequitable because, in order for a pension plan to be viable, an amount equivalent to interest should be added to pension costs to compensate the fund for interest that would have been earned if the cost had been funded in a timely manner. Some commentators added that APB-8 requires that interest equivalents be added to pension accruals under such circumstances. Still others understood the proposed Standard to say that such interest equivalent is not a cost; they therefore disagreed with the proposed Standard.

The Board agrees that an interest equivalent should be recognized in order to determine whether the plan is properly funded. However, the Board believes that interest cost resulting from the delayed funding of a pension plan is a consequence of an investment decision and is, therefore, an investment cost rather than a component of pension cost. The interest was caused by a decision of management to use its funds for other purposes; in effect, management borrowed from the pension trust fund.

Several commentators stated that they compute pension cost at the beginning of a cost accounting period and add interest at the valuation rate to the normal cost to the date of funding. They questioned whether the Standard would prohibit this practice. The Standard being promulgated does not prohibit this practice: *Provided*, That funding is made by the end of the cost accounting period. Accordingly, the Board has amended § 412.50(a)(7) to state that if any portion of the cost computed for a cost accounting period is not funded in that period an amount equivalent to interest computed on that portion beyond the end of that period shall not be a component of pension cost of the current or any future cost accounting period.

(11) Assignment of Pension Cost

Certain commentators expressed their disagreement with the sections of the

FEDERAL REGISTER proposal dealing with the assignment of pension costs among cost accounting periods. The concept set forth in the proposal related the assignment of costs to the validity of the liability for such costs. Commentators referred to the concept set forth in APB-8 that the accrual of pension expenses and the funding of pensions are not necessarily related. They stated that cost should be assigned to cost accounting periods irrespective of whether or when funded.

The Board believes that assigning pension costs to cost accounting periods on a cash basis is inappropriate from an accounting viewpoint and could lead to the improper assignment of pension costs among periods. The Board believes also that the concept which states that funding is unrelated to pension accruals is not appropriate for contract costing because, under such a concept, pension costs could be assigned to cost accounting periods and never be funded; yet such costs would be reimbursed by the Government.

The underlying concept of the Standard is that when a valid liability exists, the corresponding costs may be accrued irrespective of when the liability is liquidated. If the liability (to the pension fund or, for pay-as-you-go plans, to retirees) is not valid, it cannot be accrued; in order for it to be allocated to cost objectives of the current period, it must be liquidated (funded) in that period or within a reasonable period of time thereafter. In order to clarify its intent with regard to the allocation of pension costs to cost objectives of individual cost accounting periods, the Board has revised the wording of § 412.40(c) of the Standard.

In the FEDERAL REGISTER proposal, the Board noted that the requirement to fund a pension cost pursuant to ERISA made the liability valid and therefore made the cost assignable to the current period. Several commentators stated that ERISA permits such costs to be waived and funded over a 15-year period. They reasoned that under such circumstances it is no longer appropriate to assign such pension cost in the year for which such costs were computed. The Board believes that if the financial position of a contractor is such that it requests and obtains such a waiver there is doubt as to validity of the liability and therefore of the cost incurred. Accordingly, it has amended the Standard to provide, in § 412.50(c)(3), that if a contractor receives such a waiver the pension costs shall be assigned to the cost accounting periods in which the funding of such cost takes place.

(12) INSURED PLANS

Several commentators stated that the section of the FEDERAL REGISTER proposal dealing with insured plans was confusing. They stated that the definition of a "separate insurance account" set forth in the proposed Standard conflicted with this section. Commentators stated that this section would seem to eliminate from the major requirements of this Standard various forms of insured plans such as deposit administration and immediate participation guarantee contracts.

The Board's intent with regard to insured plans is to treat defined-benefits plans [26] funded exclusively by the purchase of individual or group permanent insurance contracts as defined-contribution plans.[27] The Board's view relative to such plans is consistent with ERISA whose minimum funding requirements are not applicable to these plans. All other insured pension plans are subject to the provisions of this Standard. The Board has revised § 412.50(a)(8) accordingly and has eliminated the definition of separate insurance account.

(13) DEFINITIONS

The Board has received a significant number of comments relative to the definitions used in the Standard. Some commentators stated that the Board should use the definitions contained in ERISA. Others stated that the Board should use the APB-8 definitions. Still others recommended that the Board should establish a single glossary of actuarial terms.

The Board recognizes that a major problem in the field of pension accounting has been the use of various terms which have the same meaning. For example, the term "prior service costs" used in APB-8, "past service costs" used in ASPR, "accrued liability" used in ERISA, and "supplemental liability" used by many actuaries have virtually hte same meaning. In researching the definitions currently in use, the Board noted that one factor seemed to prevail: The glossaries in use were tailor-made for the particular documents which applied to the terms. For example, the definitions in APB-8 were written in the context of the way in which the words were intended for use in that Opinion. Similarly, the definitions used in ERISA were fashioned to be in consonance with the specific provision of the Act. The Board's primary objective in developing the definitions in this Standard is similar; the definitions should help provide a clear understanding of the concept used therein, while at the same time maintaining consistency with the thrust of the definitions used in APB-8 and ERISA.

The Board received some additional comments with regard to specific definitions set forth in the FEDERAL REGISTER proposal. One commentator expressed confusion at the terms "accrued pension liability" and "unfunded accrued pension liability" because the word "accrued" has a specific meaning in an accounting sense which is different than that intended in the Standard. The Board believes that this comment has merit and, accordingly, the Standard has been revised to use the terms "actuarial liability" and "unfunded actuarial liability."

[26] "A pension plan in which the benefits to be paid, or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits."

[27] "A pension plan in which the contributions to be made are established in advance and the benefits are determined thereby."

Other commentators requested elaboration of the definition of a pension plan. Specifically, they questioned whether the definition is applicable to executive compensation plans, excess benefit plans, and other plans that may not be "qualified" for Federal income tax purposes. The Standard provides the accounting treatment for the cost of all pension plans which fall within the definition of a pension plan. Such accounting treatment is not contingent on the manner in which IRS may categorize plans for income tax purposes.

Several additional commentators questioned that portion of the definition of a pension plan which states that benefits shall be paid for life or be payable for life at the option of the employee. They questioned whether a life income settlement for an employee would fall within the meaning of this definition. The Board believes that such a settlement is, in effect, equivalent to a payment for life and thus falls within the intent of the definition.

(14) COSTS AND BENEFITS

The anticipated benefits of this Standard are improved cost measurement and increased consistency and uniformity in accounting for pension costs and assigning such costs to cost accounting periods, leading ot increased assurance that the measured and assigned costs will be allocated to the proper cost objectives, including Government contracts.

When the preliminary draft Standard on pension cost was submitted to a wide cross-section of companies and individuals, the recipients were specifically asked to comment on the costs of implementing the Standard. The overwhelming majority of the respondents stated that the incremental costs of implementation should be small. In commenting on the proposed Standard published in the FEDERAL REGISTER, several respondents stated that the prohibition against use of an aggregate projected benefit cost method and the requirement to make annual gain or loss analyses of each actuarial assumption would involve additional administration costs of any significance. Since the Board has essentially eliminated these problem areas in the Standard, it believes that increased administrative costs occasioned by this Standard will be minimal. In summary, the Board believes that the benefits to be derived from this Standard clearly outweigh the costs of implementation.

The Board expects that this Standard will become effective on January 1, 1976.

There is also being published today an Amendment to Part 400, Definitions, to incorporate in that part terms defined in § 412.30(a) of this Cost Accounting Standard.

Part 412—Cost Accounting Standard for Composition and Measurement of Pension Cost is added to read as follows:

Sec.
412.10 General applicability.
412.20 Purpose.
412.30 Definitions.
412.40 Fundamental requirement.
412.50 Techniques for application.
412.60 Illustrations.
412.70 Exemptions.
412.80 Effective date.

AUTHORITY: 84 Stat. 796, sec. 103 (50 U.S.C. App. 2168)

§ 412.10 General applicability.

General applicability of this Cost Accounting Standard is established by § 331.30 of the Board's regulations on applicability, exemption, and waiver of the requirement to include the Cost Accounting Standards contract clause in negotiated defense prime contracts and subcontracts (§ 331.30 of this chapter).

§ 412.20 Purpose.

The purpose of this Standard is to provide guidance for determining and measuring the components of pension cost. The Standard establishes the basis on which pension costs shall be assigned to cost accounting periods. The provisions of this Cost Accounting Standard should enhance uniformity and consistency in accounting for pension costs and thereby increase the probability that those costs are properly allocated to cost objectives.

§ 412.30 Definitions.

(a) The following definitions of terms which are prominent in this Standard are reprinted from Part 400 of this chapter for convenience. Other terms which are used in this Standard and are defined in Part 400 of this chapter have the meaning ascribed to them in that part unless the text demands a different definition or the definition is modified in paragraph (b) of this section:

(1) *Accrued benefit cost method*. An actuarial cost method under which units of benefit are assigned to each cost accounting period and are valued as they accrue—that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial liability at a plan's inception date is the present value of the units of benefit credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method.)

(2) *Actuarial assumption*. A prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets.

(3) *Actuarial cost method*. A technique which uses actuarial assumptions to measure the present value of future pension benefits and pension fund administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods.

(4) *Actuarial gain and loss*. The effect on pension cost resulting from differences between actuarial assumptions and actual experience.

(5) *Actuarial liability*. Pension cost attributable, under the actuarial cost method in use, to years prior to the date of a particular actuarial valuation. As of such date, the actuarial liability represents the excess of the present value of the future benefits and administrative expenses over the present value of future contributions for the normal cost for all plan participants and beneficiaries. The excess of the actuarial liability over the value of the assets of a pension plan is the Unfunded Actuarial Liability.

(6) *Defined-benefit pension plan*. A pension plan in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits.

(7) *Defined-contribution pension plan*. A pension plan in which the contributions to be made are established in advance and the benefits are determined thereby.

(8) *Funded pension cost*. The portion of pension costs for a current or prior cost accounting period that has been paid to a funding agency or, under a pay-as-you-go plan, to plan participants or beneficiaries.

(9) *Funding agency*. An organization or individual which provides facilities to receive and accumulate assets to be used either for the payment of benefits under a pension plan, or for the purchase of such benefits.

(10) *Multiemployer pension plan*. A plan to which more than one employer contributes and which is maintained pursuant to one or more collective bargaining agreements between an employee organization and more than one employer.

(11) *Normal cost*. The annual cost attributable, under the actuarial cost method in use, to years subsequent to a particular valuation date.

(12) *Pay-as-you-go cost method*. A method of recognizing pension cost only when benefits are paid to retired employees or their beneficiaries.

(13) *Pension plan*. A deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an integral part of a pension plan.

(14) *Projected benefit cost method*. Any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers.

(b) The following modifications of definitions set forth in Part 400 of this chapter are applicable to this Standard: None.

§ 412.40 Fundamental requirement.

(a) *Components of pension cost*. (1) For defined-benefit pension plans, the components of pension cost for a cost accounting period are (i) the normal cost of the period, (ii) a part of any unfunded actuarial liability, (iii) an interest equivalent on the unamortized portion of any unfunded actuarial liability, and (iv) an adjustment for any actuarial gains and losses.

(2) For defined-contribution pension plans, the pension cost for a cost accounting period is the net contribution required to be made for that period, after taking into account dividends and other credits, where applicable.

(b) *Measurement of pension cost*. (1) For defined-benefit pension plans, the amount of pension cost of a cost accounting period shall be determined by use of an actuarial cost method which measures separately each of the components of pension cost set forth in paragraph (a)(1) of this section, or which meets the requirements set forth in § 412.50(b)(2).

(2) Each actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations. The validity of the assumptions used may be evaluated on an aggregate, rather than on an assumption-by-assumption, basis.

(c) *Assignment of pension cost*. The amount of pension cost computed for a cost accounting period is assignable only to that period. Except for pay-as-you-go plans, the cost assignable to a period is allocable to cost objectives of that period to the extent that liquidation of the liability for such cost can be compelled or liquidation is actually effected in that period. For pay-as-you-go plans, the entire cost assignable to a period is allocable to cost objectives of that period only if the payment of benefits earned by plan participants can be compelled. If such payment is optional with the company, the amount of assignable costs allocable to cost objectives of that period is limited to the amount of benefits actually paid to retirees or beneficiaries in that period.

§ 412.50 Techniques for application.

(a) *Components of pension cost*. (1) Any portion of an unfunded actuarial liability included as a separately identified part of the pension cost of a cost accounting period shall be included in equal annual installments. Each installment shall consist of an amortized portion of the unfunded actuarial liability plus an interest equivalent on the unamortized portion of such liability. The period of amortization shall be established as follows:

(i) If amortization of an unfunded actuarial liability has begun prior to the date that Standard first becomes applicable to a contractor, no change in the amortization period is required by this Standard.

(ii) If amortization of an unfunded actuarial liability has not begun prior to the date this Standard first becomes applicable to a contractor, the amortization period shall begin with the period in which the Standard becomes applicable and shall be no more than 30 years nor less than 10 years. However, if the plan was in existence as of January 1, 1974, the amortization period shall be no more than 40 years nor less than 10 years.

(iii) Each unfunded actuarial liability resulting from the institution of new pension plans or from adoption of improvements to pension plans subsequent to the date this Standard first becomes applicable to a contractor shall be amortized over no more than 30 years nor less than 10 years.

(2) Pension costs applicable to prior years that were specifically unallowable in accordance with then existing Government contractual provisions shall be separately identified and eliminated from any unfunded actuarial liability being amortized pursuant to the provision of paragraph (a)(1) of this section, or from future normal costs if the actuarial cost method in use does not separately develop an unfunded actuarial liability. Interest earned on funded unallowable pension costs, based on the valuation rate of return, need not be included by contractors as a reduction of future years' computations of pension costs made pursuant to this Standard.

(3) A contractor shall establish and consistently follow a policy for selecting specific amortization periods for unfunded actuarial liabilities, if any, that are developed under the actuarial cost method in use. Such policy may give consideration to factors such as the size and nature of unfunded actuarial liabilities.

(4) Actuarial assumptions used in calculating the amount of an unfunded actuarial liability shall be the same as those used for other components of pension cost. If any assumptions are changed during an amortization period, the resulting increase or decrease in an unfunded actuarial liability shall be separately amortized over no more than 30 years nor less than 10 years.

(5) Actuarial gains and losses shall be identified separately from unfunded actuarial liabilities that are being amortized pursuant to the provisions of this Standard. The accounting treatment to be afforded to such gains and losses shall be consistently applied for each pension plan.

(6) An excise tax assessed pursuant to a law or regulation because of inadequate or delayed funding of a pension plan is not a component of pension cost.

(7) If any portion of the pension cost computed for a cost accounting period is not funded in that period, no amount for interest on the portion not funded in that period shall be a component of pension cost of any future cost accounting period. Conversely, if a contractor prematurely funds pension costs in a current cost accounting period, the interest earned on such premature funding, based on the valuation rate of return, may be excluded from future years' computations of pension cost made pursuant to this Standard.

(8) For purposes of this Standard, defined-benefit pension plans funded exclusively by the purchase of individual or group permanent insurance or annuity contracts shall be treated as defined-contribution pension plans. However, all other defined-benefit pension plans administered wholly or in part through insurance company contracts shall be subject to the provisions of this Standard relative to defined-benefit pension plans.

(9) If a pension plan is supplemented by a separately-funded plan which provides retirement benefits to all of the participants in the basic plan, the two plans shall be considered as a single plan for purposes of this Standard. If the effect of the combined plans is to provide defined-benefits for the plan participants, the combined plan shall be treated as a defined-benefit plan for purposes of this Standard.

(10) A multiemployer pension plan established pursuant to the terms of a collective bargaining agreement shall be considered to be a defined-contribution pension plan for purposes of this Standard.

(11) A pension plan applicable to colleges and universities that is part of a State pension plan shall be considered to be a defined-contribution pension plan for purposes of this Standard.

(b) *Measurement of pension cost.* (1) The amount of pension cost assignable to cost accounting periods shall be measured by the accrued benefit cost method or by a projected benefit cost method which identifies separately normal costs, any unfunded actuarial liability, and periodic determinations of actuarial gains and losses, except as provided in paragraph (b)(2) of this section.

(2) Any other projected benefit cost method may be used, provided that:

(i) The method is used by the contractor in measuring pension costs for financial accounting purposes;

(ii) The amount of pension cost assigned to a cost accounting period computed under such method is reduced by the excess, if any, of the value of the assets of the pension fund over the actuarial liability of the plan as determined by a projected benefit cost method set forth in paragraph (b)(1) of this section;

(iii) The contractor accumulates supplementary information identifying the actuarial gains and losses (and, separately, gains or losses resulting from changed actuarial assumptions) that have occurred since the last determination of gains and losses and the extent to which such gains and losses have been amortized through subsequent pension contributions or offset by gains and losses in subsequent cost accounting periods, and

(iv) The cost of future pension benefits is spread over the remaining average working lives of the work force.

(3) Irrespective of the projected benefit cost method used, the calculation of normal cost shall be based on a percentage of payroll for plans where the pension benefit is a function of salaries and wages and on employee service for plans where the pension benefit is not a function of salaries and wages.

(4) The cost of benefits under a pay-as-you-go pension plan shall be measured in the same manner as are the costs of defined-benefit plans whose benefits are provided through a funding agency.

(5) Actuarial assumptions should reflect long-term trends so as to avoid distortions caused by short-term fluctuations.

(6) Pension cost shall be based on provisions of existing pension plans. This shall not preclude contractors from making salary projections for plans whose benefits are based on salaries and wages, or from considering improved benefits for plans which provide that such improved benefits must be made.

(7) If the evaluation of the validity of actuarial assumptions shows that, in the aggregate, the assumptions were not reasonable, the contractor shall (i) identify the major causes for the resultant actuarial gains or losses and (ii) provide information as to the basis and rationale used for retaining or revising such assumptions for use in the ensuing cost accounting period(s).

(c) *Assignment of pension cost.* (1) Amounts funded in excess of the pension cost computed for a cost accounting period pursuant to the provisions of this Standard shall be applied to pension costs of future cost accounting periods.

(2) Evidence that the liquidation of a liability for pension cost can be compelled includes (i) provisions of law such as the funding provisions of the Employee Retirement Income Security Act of 1974, except as provided in paragraph (c)(3) of this section, (ii) a contractual agreement which requires liquidation of the liability, or (iii) the existence of rights by a third party to require liquidation of the liability.

(3) Any portion of pension cost computed for a cost accounting period that is deferred to future periods pursuant to a waiver granted under provisions of the Employee Retirement Income Security Act of 1974, shall not be assigned to the current period. Rather, such costs shall be assigned to the cost accounting period(s) in which the funding takes place.

(4) A liability for pension cost for a cost accounting period (or, for pay-as-you-go plans, for payments to retirees or beneficiaries for a period) shall be considered to be liquidated in the period if funding is effected by the date established for filing a Federal income tax return (including authorized extensions). For contractors not required to file Federal income tax returns, the date shall be that established for filing Federal corporation income tax returns.

§ 412.60 Illustrations.

(a) *Components of pension cost.* (1) Contractor A has a defined-benefit pension plan for its employees. The con-

tractor's policy has been to compute and fund as annual pension cost normal cost plus only interest on the unfunded actuarial liability. Pursuant to § 412.40(a) (1), the components of pension cost for a cost accounting period must now include not only the normal cost for the period and interest on the unfunded actuarial liability, but also an amortized portion of the unfunded actuarial liability. The amortization of the liability and the interest equivalent on the unamortized portion of the liability must be computed in equal annual installments.

(2) Contractor B has insured pension plans for each of two small groups of employees. One plan is funded through a group permanent insurance contract; the other plan is funded through a group deferred annuity contract. Both plans provide for defined benefits. Pursuant to § 413.50(a) (8), for purposes of this Standard the plan financed through a group permanent insurance contract shall be considered to be a defined-contribution pension plan; the net premium required to be paid for a cost accounting period (after deducting dividends and any credits) shall be the pension cost for that period. However, the group deferred annuity plan is subject to the provisions of this Standard that are applicable to defined-benefit plans.

(3) Contractor C provides pension benefits for certain hourly employees through a multiemployer defined-benefit plan. Under the collective bargaining agreement, the contractor pays six cents into the fund for each hour worked by the covered employees. Pursuant to § 412.50(a) (10), the plan shall be considered to be a defined-contribution pension plan. The payments required to be made for a cost accounting period shall constitute the assignable pension cost for that period.

(4) Contractor D provides pension benefits for certain employees through a defined-contribution pension plan. However, the contractor has a separate fund which is used to supplement pension benefits provided for all of the participants in the basic plan in order to provide a minimum monthly retirement income to each participant. Pursuant to § 412.50(a) (9), the two plans shall be considered as a single plan for purposes of this Standard. Because the effect of the supplemental fund is to provide defined-benefits for the plan's participants, the provisions of this Standard relative to defined-benefit pension plans shall be applicable to the combined plan.

(b) *Measurement of pension cost.* (1) Contractor E has a pension plan whose costs are assigned to cost accounting periods by use of an actuarial cost method which does not separately identify actuarial gains and losses or the effect on pension cost resulting from changed actuarial assumptions. If this cost method is used to measure costs for financial accounting purposes, it may be used for purposes of this Standard, provided that the contractor develops the supplementary information set forth in § 412.50(b) (2) (iii) regarding such gains and losses and changed actuarial assumptions. In addition, the contractor must develop an actuarial liability determined by a projected benefit cost method set forth in § 412.50(b) (1). If the resultant actuarial liability is less than the value of the pension fund, the pension cost computed for the cost accounting period must be reduced by that amount (§ 412.50(b) (2) (ii)).

(2) For a number of years Contractor F has had a pay-as-you-go pension plan which provides for payments of $200 a month to employees after retirement. The contractor is currently making such payments to several retired employees and charges such payments against current income as its pension cost. For the current cost accounting period, the contractor paid benefits totaling $24,000. Contractor F's method of accounting for pension cost does not comply with the provisions of this Standard relative to pay-as-you-go plans as set forth in §§ 412.40(c) and 412.50(b) (4). The contractor should:

(i) Compute, by use of an actuarial cost method, its actuarial liability for benefits earned by plan participants. This entire liability is always unfunded for a pay-as-you-go plan.

(ii) Compute a level amount which, including an interest equivalent, would amortize the unfunded actuarial liability over a period of no less than 10 or more than 40 years.

(iii) Compute, by use of the actuarial cost method selected, a normal cost for the period.

The sum of paragraphs (b)(2) (ii) and (iii) of this section represents the amount of pension cost assignable to the period. If payment of benefits earned by plan participants can be compelled, the entire amount of cost assignable to the period is allocable to cost objectives of that period. If such payments cannot be compelled, the amount of assignable cost allocable to cost objectives of that period is limited to the amount of benefits actually paid in that period ($24,000).

(3) Contractor G has two defined-benefit pension plans which provide for fixed dollar payments to hourly employees. Under one plan, the contractor's actuary believes that the contractor will be required to increase the level of benefits by specified percentages over the next several years. In calculating pension costs, the contractor may not assume future benefits greater than that currently required by the plan. With regard to the second plan, a collective bargaining agreement negotiated with the employee's labor union provided that pension benefits will increase by specified percentages over the next several years. Because the improved benefits are required to be made, the contractor can consider such increased benefits in computing pension costs for the current cost accounting period (§ 412.50(b) (6)).

(c) *Assignment of pension cost.* Contractor H has a trusteed pension plan for its salaried employees. It computes $1 million of pension cost for a cost accounting period. Pursuant to the funding provisions of the Employee Retirement Income Security Act of 1974, the company must fund at least $800,000. Because liquidation of the liability for the portion of pension cost required by law to be funded ($800,000) can be compelled, such cost is allocable to cost objectives of the period, in accordance with § 412.40(c). If Contractor H can be compelled by the trustee or the plan participants to fund the remaining $200,000, the liability therefor is also allocable to cost objectives of that period.

§ 412.70 Exemptions.

None for this Standard.

§ 412.80 Effective date.

(a) The effective date of this Standard is [reserved].

(b) This Standard shall be followed by each contractor on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable.

ARTHUR SCHOENHAUT,
*Executive Secretary.*

[FR Doc.75-25464 Filed 9-23-75;8:45 am]

---

## Title 5—Administrative Personnel

## CHAPTER XIV—FEDERAL LABOR RELATIONS COUNCIL AND FEDERAL SERVICE IMPASSES PANEL

### SUBCHAPTER B—FEDERAL LABOR RELATIONS COUNCIL

### PART 2411—REVIEW FUNCTIONS OF THE COUNCIL

### PART 2413—CRITERIA FOR DETERMINING COMPELLING NEED FOR AGENCY POLICIES AND REGULATIONS

On May 16, 1975, there was published in the FEDERAL REGISTER (40 FR 21488) a notice of proposed adoption of amendments of Part 2411 and proposed adoption of a new Part 2413 of the Council's rules.

Interested persons were invited to submit their views and suggestions in writing on or before June 6, 1975. All relevant matter which was submitted has been carefully considered, and the Council has decided to adopt the proposed rules, with changes, as set forth below.

Accordingly, the Council amends Title 5 of the Code of Federal Regulations, Chapter XIV, Subchapter B, Part 2411, and adds a new Part 2413 to read as follows:

1. Part 2411 is revised to read as follows:

### PART 2411—REVIEW FUNCTIONS OF THE COUNCIL

#### Subpart A—General Provisions

Sec.
2411.1 Scope.
2411.2 Coverage.
2411.3 Definitions.
2411.4 Policy questions.

Subpart B—Review of Decisions of the Assistant Secretary

2411.11 Purpose.
2411.12 Considerations governing review.
2411.13 Who may file a petition; time limits for filing; opposition; service.
2411.14 Content of petition.

# EXHIBIT 8

**DEFENSE CONTRACT AUDIT AGENCY**
**DEPARTMENT OF DEFENSE**
**8725 JOHN J. KINGMAN ROAD, SUITE 2135**
**FORT BELVOIR, VA 22060-6219**

IN REPLY REFER TO

PAC 730.3.B.08/2003-09

July 23, 2004
04-PAC-040(R)

MEMORANDUM FOR REGIONAL DIRECTORS, DCAA
DIRECTOR, FIELD DETACHMENT, DCAA

SUBJECT: DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments

DCMA/DCAA joint guidance implementing the decision in Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001) *(Teledyne)* on the calculation of the Government's share of CAS 413.50(c)(12) segment closing adjustments is enclosed. This guidance, which was developed jointly by DCMA and DCAA in coordination with the Department of Justice, is being issued concurrently by DCMA.

If FAO personnel have any questions, they should contact regional personnel. If regional personnel have any questions, they should contact the Headquarters, Accounting and Cost Principles Division, at (703) 767-3250 or DCAA-PAC@dcaa.mil.

/Signed/
Robert DiMucci
Assistant Director
Policy and Plans

Enclosure:
DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments

DISTRIBUTION: C

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

**Summary**

The U.S. Court of Federal Claims decision in Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001) *(Teledyne),* which was affirmed by the U.S. Court of Appeals for the Federal Circuit, requires certain exclusions when calculating the Government's share of the CAS 413 segment closing adjustment. Specifically, the portion of a closed segment's pension surplus or deficit that is attributable to pension costs that were allocated to contracts that predate CAS 413, as well as the portion that is attributable to pension costs allocated to firm-fixed price (FFP) contracts entered into under the original CAS 413 must be excluded from the calculation of the Government's share of the CAS 413 segment closing adjustment. When there is a segment closing surplus, the portion of the surplus attributable to employee contributions made from the date of the inception of the pension plan until the date upon which the contractor first had to follow CAS 413, as amended March 30, 1995 (revised CAS 413), must also be excluded.

The required exclusions are made by adjusting the numerator and the denominator of the fraction that is applied to the segment closing surplus or deficit to determine the Government's share.

**Background**

In its August 9, 2001 decision in *Teledyne* (which addresses common issues raised in cases brought by three contractors, i.e., Teledyne, General Electric and General Motors), the U.S. Court of Federal Claims held that for segment closings subject to the original CAS 413, certain portions of the closed segment's pension surplus or deficit must be excluded from the determination of the Government's share of the segment closing adjustment. The court ruled that when the segment closing is subject to the original CAS 413 provisions, (1) the pension surplus or deficit that is attributable to pension costs that had been allocated to contracts that predated the original CAS 413 must be excluded from the portion of the closed segment's pension surplus or deficit that is subject to recovery; (2) the Government is not entitled to recover the portion of the closed segment's surplus that is attributable to pension contributions made by employees; and (3) the portion of the closed segment's surplus or deficit that is attributable to pension costs that were allocated to FFP contracts must be excluded from the calculation of the Government's share unless there is an express contract provision providing for recovery. The court also held (4) that applying the revised CAS 413 segment closing adjustment provisions to FFP contracts that were entered into under the original CAS 413 amounted to a Government-mandated accounting practice change that entitled the contractor to an equitable adjustment to the extent that the contractor would have been required to pay a greater amount under revised CAS 413 than under original CAS 413. The practical effect of this equitable adjustment is to exclude the portion of the closed segment's surplus or deficit that is attributable to FFP contracts entered into under original CAS 413 from the calculation of the Government's share of the segment closing adjustment.

The first three rulings, which were related to the original CAS 413, were affirmed by the United States Court of Appeals for the Federal Circuit in its January 23, 2003 decision (Allegheny Teledyne, Inc. v. United States, 316 F.3d 1366 (Fed. Cir. 2003)). Only the third

ruling was appealed to the U.S. Supreme Court and certiorari was denied on December 1, 2003. The fourth ruling, which was related to revised CAS 413, was not appealed.

CAS 413 became effective March 10, 1978. A contractor had to follow the standard on or after the start of its next cost accounting period beginning after the receipt of a contract to which the standard applied. CAS 413 was amended, effective March 30, 1995. A contractor had to follow the revised CAS 413 on or after the start of its next cost accounting period beginning after the receipt of a contract or subcontract to which the revised standard applied.

It should be noted that the portion of the Teledyne decision that concerns revised CAS 413 addresses a situation where a segment closed after the contractor had to follow revised CAS 413 but the contractor had made no pension contributions under revised CAS 413 (i.e., the pension plan had become overfunded prior to when the contractor had to follow revised CAS 413). This portion of the decision effectively entails a three step process; (1) determine the Government's share of the segment closing adjustment under revised CAS 413; (2) determine what the Government's share of the segment closing adjustment would have been under original CAS 413, considering the rulings in the *Teledyne* decision applicable to original CAS 413; and (3) determine the dollar amount of the difference; an amount for which the contractor is entitled to an equitable adjustment. In addition to the situation specifically addressed in this portion of the *Teledyne* decision, this audit guidance also addresses circumstances not specifically addressed in the decision and compresses the *Teledyne* decision's three steps into a mathematically equivalent one-step calculation.

It should also be noted that in order to determine the Government's share of a segment closing surplus or deficit in strict compliance with the *Teledyne* decision, the segment closing surplus or deficit would need to be traced back to the specific contributions made over the years that gave rise to it. Given the complexity of pension accounting and the significant time period that must be considered in the calculations, tracing a segment closing surplus or deficit back to specific contributions made over the years that gave rise to it would require incredibly complicated calculations and historical data that, in most, if not all cases is not available. Therefore, the methodology in this audit guidance, by necessity, includes estimates and assumptions and provides a reasonable approximation given the circumstances.

**Guidance**

Pre-CAS Contracts and Employee Contributions

Most of the trial court's decision, which was upheld by the U.S. Court of Appeals for the Federal Circuit, related to a segment closing that was subject to the requirements of the original CAS 413. In that context, the court held that the closed segment's pension surplus or deficit that was attributable to employee contributions and to pension costs that had been allocated to pre-CAS 413 contracts must be treated as follows:

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

> The court agrees with Teledyne and GE that the pension surplus or deficit attributable to contracts that predate the original CAS 413 must be excluded from the portion of the CAS 413 segment closing adjustment that is subject to recovery.... Thus, neither the government nor the contractor can recover any surplus or deficit attributable to contracts that did not contain the original CAS 413....
>
> The court also agrees with GE's assertion that under the Allowable Costs and Payment and Credits clauses, the government is only entitled to recover the amounts attributable to government contributions to the segment's pension plan.... Nothing in [original] CAS 413.50(c)(12) suggests that the government is entitled to recover the amounts attributable to pension contributions made by employees.

*Teledyne*, 50 Fed. Cl. at 183-184.

When a segment closing is subject to the original CAS 413 and the closed segment has a pension surplus, a plain reading of these two rulings requires removal of the portions of the closed segment's surplus that are attributable to pre-CAS 413 contracts and to employee contributions when calculating the Government's share of the segment closing adjustment. Because of the court's decision that required an equitable adjustment when a segment closing is subject to revised CAS 413, but the pension plan had become overfunded before the contractor had to follow revised CAS 413 (the fourth ruling referred to on page 1 of this guidance), the portions of the surplus that are attributable to pre-CAS 413 contracts and to employee contributions made under original CAS 413 are also excluded when calculating the Government's share of the segment closing adjustment for segment closings subject to revised CAS 413.

The court found nothing in the original CAS 413.50(c)(12) to suggest that the Government is entitled to recover amounts attributable to employee contributions. In contrast, revised CAS 413 provides a specific formula for calculating the Government's share of the segment closing adjustment: a formula that does not adjust for employee contributions. Therefore, no adjustment is required for employee contributions made after the contractor had to follow revised CAS 413. As a result, when a segment closing is subject to revised CAS 413 and there are employee contributions made after the contractor had to follow revised CAS 413, the total surplus of the closed segment must be allocated between the periods before and after the contractor had to follow revised CAS 413 based on the assigned pension costs and employee contributions in each period to the total assigned pension costs and employee contributions. Then original CAS 413 is applied to the portion of the surplus attributable to the period prior to when the contractor had to follow revised CAS 413. Likewise, revised CAS 413 is applied to the portion of the surplus attributable to the period in which the contractor was subject to revised CAS 413.

When the closed segment has a pension deficit, there is no adjustment for employee contributions. Since employee contributions are fixed, any variance between actual and assumed earnings on employee contributions becomes part of the contractor's future pension cost in

which the Government shares. When there is a segment closing surplus, the court ruled that the Government is not entitled to a share of the surplus attributable to employee contributions. This ruling is based on the court's reliance on the FAR Allowable Cost and Payment clause (FAR 52.216-7) and Credits provision (FAR 31.201-5), that restrict the Government's share of the surplus to credits or refunds attributable to costs that the Government had actually reimbursed. While there are contract clauses that may also restrict the contractor's recovery of a segment closing deficit, the application of those clauses is not limited to the employee contribution share of the deficit and is addressed later in this guidance. Therefore, when calculating the Government's share of a segment closing deficit, the portion of the deficit attributable to employee contributions is not removed.

It should also be noted that employee contributions generally will not continue if a pension plan remains fully funded for an extended period of time. Therefore, it should not be assumed that employee contributions continued for the entire period of full funding unless there is documentation to support such a conclusion.

Based on the foregoing, the appropriate adjustments for pre-CAS contracts and employee contributions are achieved by adjusting the denominator of the fraction used to calculate the government's share. (This fraction is specifically provided for in revised CAS 413 at CAS 413.50(c)(12)(vi).) When there is a segment closing surplus, the denominator is the sum of employee contributions from the date of the pension plan's inception until the contractor first had to follow revised CAS 413 and total assigned pension costs from the date of the pension plan's inception until the date of segment closing. However, as discussed previously, when a segment closing is subject to revised CAS 413 and employee contributions were made after the contractor had to follow revised CAS 413, the total surplus of the closed segment must be allocated between the periods before and after the contractor had to follow revised CAS 413. In such cases, a separate fraction is calculated for each period based on the requirements of the appropriate version of CAS 413 (i.e., original or revised) and the denominator of each period's fraction includes the assigned pension costs applicable to that period. For the period prior to when the contractor had to follow revised CAS 413, the denominator also includes employee contributions. This is demonstrated in Scenario 2 of the calculation examples in the attachment.

When there is a segment closing deficit, there is no adjustment for employee contributions; therefore, the denominator of the fraction equals the total assigned pension costs from the date of the pension plan's inception until the date of segment closing. Regardless of whether there is a surplus or a deficit, the numerator is the same: the sum of all pension costs allocated to contracts and subcontracts subject to the CAS 413 requirements during the same period of time covered by the denominator. (However, the amount included in the numerator for the years prior to CAS applicability would be zero since there would be no contracts or subcontracts subject to the requirements of CAS 413.)

<u>Fixed Priced Contracts Entered into under Original CAS 413</u>

The court ruled that when the segment closing is subject to the original CAS 413 provisions, the portion of the segment closing adjustment related to FFP contracts must be excluded from the calculation of the Government's share unless there is an express contract

provision providing for recovery. The court also ruled that revised CAS 413 could not be applied to permit Government recovery of a segment closing surplus on FFP contracts entered into under original CAS 413. The court likened such application to a Government-mandated accounting practice change entitling the contractor to an equitable adjustment.

These rulings require that the portion of the pension surplus or deficit that is attributable to pension costs allocated to FFP contracts entered into under the original CAS 413 be excluded from the calculation of the Government's share of the segment closing adjustment whether the segment closing is subject to original CAS 413 or revised CAS 413. Therefore, in both cases, the numerator of the fraction used to calculate the Government's share of the adjustment should exclude pension costs allocated to FFP contracts entered into under the original CAS 413.

Representative Period

Original CAS 413 does not expressly provide a method or formula for calculating the Government's share of the segment closing adjustment. However, the Government's share of the segment closing adjustment is expressly calculated in revised CAS 413, which provides for a fraction using data from "a period of years representative of the Government's participation in the pension plan." See CAS 413.50(c)(12)(vi). Revised CAS 413 does not explain how to determine the representative period and the Teledyne decision did not specifically address this issue. However, following the rationale of the court, when there is a segment closing deficit, the calculation would include data from all years in which pension costs were assigned. When there is a segment closing surplus, the calculation would include data from all years in which pension costs were assigned and/or employee contributions were made, except for those years in which the contractor was subject to revised CAS 413 and employee contributions were made but no pension costs were assigned. Those years are excluded because such years would not be representative of the Government's participation in the contractor's pension plan under revised CAS 413. Because of the significant period of time that must be considered in the calculation, the historical data needed may not be available for the entire period. Therefore, if a shorter period results in an equitable calculation and the parties agree, we see nothing to preclude the use of a shorter period.

Funding Requirement for Pension Deficits

When there is a segment closing deficit, the Government's share of the deficit is an allowable cost only if the contractor has funded it no later than the contractor's Federal income tax deadline for the year of the segment closing (including extensions) in accordance with FAR 31.205-6(j)(1)(i) and (j)(2)(i)(A). Therefore, any portion of a segment closing deficit not funded by such time should be disallowed. Even when the segment closing deficit is funded, in certain cases, the contracting officer may have other considerations in determining the amount of contractor recovery (e.g., the limitation of cost/funds clauses found at FAR 52.232-20 (Limitation of Cost) and FAR 52.232-22 (Limitation of Funds)).

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

Other Comments

In the event that the specific data needed to perform the calculations discussed in this guidance are not available, reasonable surrogates may be used. In such cases, the DCAA auditor and DCMA pension specialist should work together with the contractor to develop the most reasonable representation considering the data available.

Calculation steps and examples for typical scenarios are included in the Attachment.

Attachment:
Calculation Steps and Examples

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

**Calculation Steps and Examples**

1. If there is a segment closing surplus and there are no employee contributions; or if there are employee contributions, but none were made after the contractor had to follow revised CAS 413:
   a. Determine the total pension costs allocated to all contracts and subcontracts subject to the requirements of CAS 413 (including non-CAS covered contracts subject to FAR 31.205-(6)(j)(1)) from the date the contractor first had to follow original CAS 413 until the date of segment closing.
   b. Determine the pension costs allocated to FFP contracts entered into under original CAS 413.
   c. The numerator of the fraction for determining the Government's share of the segment closing adjustment equals 1a minus 1b.
   d. Determine total employee contributions from the date of the pension plan's inception until the contractor first had to follow revised CAS 413.
   e. Determine total assigned pension costs for the segment (for both Government and commercial contracts) from the date of the pension plan's inception until the date of segment closing.
   f. The denominator of the fraction for determining the Government's share of the segment closing adjustment equals 1d plus 1e.
   g. The Government's share of the segment closing adjustment equals the total segment closing surplus times 1c divided by 1f.

[See Scenario 1, on page 4 for an example demonstrating calculation #1.]

2. If there is a segment closing surplus and employee contributions were made after the contractor had to follow revised CAS 413:
   a. To allocate the segment closing surplus between the periods before (pre-revised CAS 413 period) and after (revised CAS 413 period) the contractor had to follow revised CAS 413:
      i. For the pre-revised CAS 413 period, i.e., from the date of the pension plan's inception until the contractor first had to follow revised CAS 413, determine total assigned pension costs for the segment (for both Government and commercial contracts) plus total employee contributions.
      ii. For the revised CAS 413 period, i.e., from the date the contractor first had to follow revised CAS 413 until the date of segment closing, determine total assigned pension costs for the segment (for both Government and commercial contracts) plus total employee contributions.
      iii. The portion of the surplus attributable to the pre-revised CAS 413 period equals the total segment closing surplus times 2.a.i divided by the total of 2.a.i and 2.a.ii.
      iv. The portion of the surplus attributable to the revised CAS 413 period equals the total segment closing surplus times 2.a.ii divided by the total of 2.a.i and 2.a.ii.

   b. Apply original CAS 413 to the pre-revised CAS 413 period portion of the surplus:
      i. The numerator of the fraction for determining the Government's share of the segment closing surplus for the pre-revised CAS 413 period equals the total pension costs allocated to cost-type contracts and subcontracts subject to the requirements of

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

**Calculation Steps and Examples**

CAS 413 (including non-CAS covered contracts subject to FAR 31.205-(6)(j)(1)) from the date the contractor first had to follow original CAS 413 until the date the contractor first had to follow revised CAS 413.

ii. The denominator of the fraction for determining the Government's share of the segment closing surplus for the pre-revised CAS 413 period equals the total assigned pension costs for the segment (for both Government and commercial contracts) plus total employee contributions each from the date of the pension plan's inception until the contractor first had to follow revised CAS 413.

iii. The Government's share of the segment closing surplus for the pre-revised CAS 413 period equals the 2.a.iii times 2.b.i divided by 2.b.ii.

c. Apply revised CAS 413 to the revised CAS 413 period portion of the surplus:
   i. Determine the total pension costs allocated to all contracts and subcontracts subject to the requirements of CAS 413 (including non-CAS covered contracts subject to FAR 31.205-(6)(j)(1)) from the date the contractor first had to follow revised CAS 413 until the date of segment closing.
   ii. Determine the pension costs allocated to FFP contracts entered into under original CAS 413 from the date the contractor first had to follow revised CAS 413 until the date of segment closing.
   iii. The numerator of the fraction for determining the Government's share of the segment closing surplus for the revised CAS 413 period equals 2.c.i minus 2.c.ii.
   iv. The denominator of the fraction for determining the Government's share of the segment closing adjustment for the revised CAS 413 period equals total assigned pension costs for the segment (for both Government and commercial contracts) from the date the contractor first had to follow revised CAS 413 until the date of segment closing.
   v. The Government's share of the segment closing surplus for the revised CAS 413 period equals 2.a.iv times 2.c.iii divided by 2.c.iv.

d. The Government's total share of the segment closing surplus equals 2.b.iii plus 2.c.v.

[See Scenario 2, on page 5 and 6 for an example demonstrating calculation #2.]

3. If there is a segment closing deficit:
   a. Determine the total pension costs allocated to all contracts and subcontracts subject to the requirements of CAS 413 (including non-CAS covered contracts subject to FAR 31.205-6(j)(1)) from the date the contractor first had to follow CAS 413 until the date of segment closing.
   b. Determine the pension costs allocated to FFP contracts entered into under original CAS 413.
   c. The numerator of the fraction for determining the Government's share of the segment closing adjustment equals 3a minus 3b.
   d. The denominator of the fraction for determining the Government's share of the segment closing adjustment equals total assigned pension costs for the segment (for both

Government and commercial contracts) from the date of the pension plan's inception until the date of segment closing.

e. The Government's share of the segment closing adjustment equals the total segment closing deficit times 3c divided by 3d.

[See Scenario 3, on page 7 for an example demonstrating calculation #3.]

Calculation Examples

Calculation examples for three different scenarios are below. In all examples assume the following:

| | |
|---|---|
| Date of Plan Inception | 1/1/1954 |
| Date contractor first had to follow CAS 413 | 1/1/1979 |
| Date contractor first had to follow revised CAS 413 | 1/1/1996 |
| Date of Segment Closing | 12/31/2001 |
| Employee Contributions per Year | $10 |

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

**Calculation Steps and Examples**

Scenario 1 – Surplus; Plan Overfunded Prior to Revised CAS 413, No Employee Contributions Made Under Revised CAS 413

| Year | | Employee Contribu-tions | Total Assigned Pension Cost | Total Assigned Cost & Employee Contribu-tions | Costs Allocated to CAS 413 * Cost-type Contracts | Costs Allocated to CAS 413 * FFP Contracts | Costs Allocated to All CAS 413 * Contracts | Costs Allocated to Non-CAS 413 Contracts |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3=1+2 | 4 | 5 | 6=4+5 | 7=2-6 |
| 1954 - 1978 | a | 240 | 2,400 | 2,640 | 0 | 0 | 0 | 2,400 |
| 1979 – 1995 *** | b | 160 | 900 | 1,060 | 500 | 320 | 820 | 80 |
| 1996 - 2001 | c | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| Total 1954 - 1995 | d=a+b | 400 | 3,300 | 3,700 | 500 | 320 | 820 | 2,480 |
| Total 1979 - 2001 | e=b+c | 160 | 900 | 1,060 | 500 | 320 | 820 | 80 |
| Total 1954 - 2001 | f=a+b+c | 400 | 3,300 | 3,700 | 500 | 320 | 820 | 2,480 |

| | | | |
|---|---|---|---|
| Segment Closing Surplus/(Deficit) | g | 2,000 | (given) ** |
| | | | |
| Costs Allocated to All Contracts Subject to CAS 413 Requirements (1979 - 2001) | h | 820 | (6e) |
| Less Costs Allocated to FFP Contracts with Original CAS 413 (1979 – 1995 ***) | i | 320 | (5b) |
| Numerator | j | 500 | (h-i) |
| | | | |
| Total Employee Contributions from Plan Inception to Applicability of Revised CAS 413 (1954 – 1995) | k | 400 | (1d) |
| Plus Total Assigned Pension Cost from Plan Inception to Segment Closing (1954 – 2001) | l | 3,300 | (2f) |
| Denominator | m | 3,700 | (k+l) |
| Government Participation Percent | n | 13.5% | (j/m) |
| | | | |
| Government Share of Segment Closing Surplus/(Deficit) | o | 270 | (g*n) |

* "CAS 413 contracts" include CAS covered contracts and subcontracts as well as non-CAS covered contracts and subcontracts subject to FAR 31.205-6(j)(1).

** Per CAS 413.50(c)(12) this amount represents the difference between the market value of assets and the actuarial accrued liability for the segment as of the date of the segment closing.

*** This example assumes that all contracts entered into under original CAS 413 ended on or before 12/31/1995.

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

**Calculation Steps and Examples**

Scenario 2 – Surplus; Plan Overfunded After Revised CAS 413, Employee Contributions Made Under Revised CAS 413

| Year | | Employee Contribu-tions | Total Assigned Pension Cost | Total Assigned Cost & Employee Contribu-tions | Costs Allocated to CAS 413 * Cost-type Contracts | Costs Allocated to CAS 413 * FFP Contracts | Costs Allocated to All CAS 413 * Contracts | Costs Allocated to Non-CAS 413 Contracts |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3=1+2 | 4 | 5 | 6=4+5 | 7=2-6 |
| 1954 - 1978 | a | 240 | 2,400 | 2,640 | 0 | 0 | 0 | 2,400 |
| 1979 – 1995 *** | b | 160 | 1,600 | 1,760 | 800 | 640 | 1,440 | 160 |
| 1996 - 2001 | c | 30 | 300 | 330 | 130 | 150 | 280 | 20 |
| | | | | | | | | |
| Total 1954 - 1995 | d=a+b | 400 | 4,000 | 4,400 | 800 | 640 | 1,440 | 2,560 |
| Total 1979 - 2001 | e=b+c | 190 | 1,900 | 2,090 | 930 | 790 | 1,720 | 180 |
| Total 1954 - 2001 | f=a+b+c | 430 | 4,300 | 4,730 | 930 | 790 | 1,720 | 2,580 |

Allocate Segment Closing Surplus Between Pre-Revised CAS 413 Period and Revised CAS 413 Period

| | | | |
|---|---|---|---|
| Segment Closing Surplus | g | 2,000 | (given) ** |
| Total Assigned Cost & Employee Contribution during Pre-revised CAS 413 Period (1954 - 1995) | h | 4,400 | (3d) |
| Total Assigned Cost & Employee Contributions under Revised CAS 413 (1996 - 2001) | i | 330 | (3c) |
| Total Assigned Costs & Employee Contributions (1954 - 2001) | j | 4,730 | (h+i) |
| Surplus Attributable to Pre-revised CAS 413 Period | k | 1,860 | (g*h/j) |
| Surplus Attributable to Revised CAS 413 Period | l | 140 | (g*i/j) |

Apply Original CAS 413 to Determine Government's Share for Pre-revised CAS 413 Period

| | | | |
|---|---|---|---|
| Surplus Attributable to Pre-revised CAS 413 Period | m | 1,860 | k |
| <u>Numerator</u> - Costs Allocated to Cost- Type Contracts Subject to Original CAS 413 Requirements (1979 - 1995) | n | 800 | (4b) |
| <u>Denominator</u> - Total Assigned Pension Cost & Employee Contributions from Plan Inception to Applicability of Revised CAS 413 (1954 - 1995) | o | 4,400 | (3d) |
| Government Participation Percent for Pre-revised CAS 413 Period | p | 18.2% | (n/o) |
| Government Share of Surplus Attributable to Pre-revised CAS 413 Period | q | 338 | (m*p) |

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

**Calculation Steps and Examples**

Apply Revised CAS 413 to Determine Government's Share for Revised CAS 413 Period

| | | | |
|---|---|---|---|
| Surplus Attributable to Revised CAS 413 Period | r | 140 | 1 |
| Costs Allocated to All Contracts Subject to CAS 413 Requirements during Revised CAS 413 Period (1996 - 2001) | s | 280 | (6c) |
| Less Costs Allocated to FFP Contracts with Original CAS 413 during Revised CAS 413 Period **** | t | 0 | **** |
| Numerator | u | 280 | (s-t) |
| Denominator - Total Assigned Pension Cost from Applicability of Revised CAS 413 to Segment Closing (1996 - 2001) | v | 300 | (2c) |
| Government Participation Percent for Revised CAS 413 Period | w | 93.3% | (u/v) |
| Government Share of Surplus Attributable to Revised CAS 413 Period | x | 130 | (r*w) |

| | | | |
|---|---|---|---|
| Total Government Share of Segment Closing Surplus | y | 468 | (q+x) |

* "CAS 413 contracts" include CAS covered contracts and subcontracts as well as non-CAS covered contracts and subcontracts subject to FAR 31.205-6(j)(1).

** Per CAS 413.50(c)(12) this amount represents the difference between the market value of assets and the actuarial accrued liability for the segment as of the date of the segment closing.

*** This example assumes that all contracts entered into under original CAS 413 ended on or before 12/31/1995.

**** Since this example assumes all contracts entered into under original CAS 413 ended on or before 12/31/1995; there were no costs allocated to FFP contracts entered into under original CAS 413 during the revised CAS 413 period to deduct. However, in actual situations, pension costs incurred after 12/31/1995 may be allocated to FFP contracts entered into under original CAS 413. In that case those pension costs would be deducted here.

**DCMA/DCAA Joint Guidance Implementing the Teledyne Decision on CAS 413.50(c)(12) Segment Closing Adjustments**

**Calculation Steps and Examples**

Scenario 3 – Deficit

| Year | | Employee Contribu-tions | Total Assigned Pension Cost | Total Assigned Cost & Employee Contribu-tions | Costs Allocated to CAS 413 * Cost-type Contracts | Costs Allocated to CAS 413 * FFP Contracts | Costs Allocated to All CAS 413 * Contracts | Costs Allocated to Non-CAS 413 Contracts |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3=1+2 | 4 | 5 | 6=4+5 | 7=2-6 |
| 1954 - 1978 | a | 240 | 2,400 | 2,640 | 0 | 0 | 0 | 2,400 |
| 1979 – 1995 *** | b | 160 | 1,600 | 1,760 | 800 | 640 | 1,440 | 160 |
| 1996 - 2001 | c | 50 | 500 | 550 | 210 | 250 | 460 | 40 |
| | | | | | | | | |
| Total 1954 - 1995 | d=a+b | 400 | 4,000 | 4,400 | 800 | 640 | 1,440 | 2,560 |
| Total 1979 - 2001 | e=b+c | 210 | 2,100 | 2,310 | 1,010 | 890 | 1,900 | 200 |
| Total 1954 - 2001 | f=a+b+c | 450 | 4,500 | 4,950 | 1,010 | 890 | 1,900 | 2,600 |

| | | | |
|---|---|---|---|
| Segment Closing Surplus/(Deficit) | g | (3,000) | (given) ** |
| | | | |
| Costs Allocated to All Contracts Subject to CAS 413 Requirements (1979 - 2001) | h | 1,900 | (6e) |
| Less Costs Allocated to FFP Contracts with Original CAS 413 (1979 – 1995 ***) | i | 640 | (5b) |
| Numerator | j | 1,260 | (h-i) |
| | | | |
| Denominator - Total Assigned Pension Cost from Plan Inception to Segment Closing (1954 - 2001) | k | 4,500 | (2f) |
| Government Participation Percent | l | 28% | (j/k) |
| | | | |
| Government Share of Segment Closing Surplus/(Deficit) | m | (840) | (g*l) |

* "CAS 413 contracts" include CAS covered contracts and subcontracts as well as non-CAS covered contracts and subcontracts subject to FAR 31.205-6(j)(1).

** Per CAS 413.50(c)(12) this amount represents the difference between the market value of assets and the actuarial accrued liability for the segment as of the date of the segment closing.

*** This example assumes that all contracts entered into under original CAS 413 ended on or before 12/31/1995.