No. 05-281C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNISYS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

STEPHEN R. DOOLEY
Supervisory Trial Attorney
Defense Contract Management Agency
495 Summer Street
Boston, MA 02210

Dated: January 12, 2007

C. COLEMAN BIRD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: 202.307.0453
Facsimile: 202.514.7965

Attorneys for Defendant
United States

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS .... i

TABLE OF AUTHORITIES .... iii

INDEX TO THE APPENDIX .... v

DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT .... 1

PRELIMINARY STATEMENT .... 2

STATEMENT OF FACTS .... 6

ARGUMENT .... 7

I. Applicable Summary Judgment Standards .... 7

II. The Intent Of The CAS Board Is Dispositive Upon The Proper Interpretation Of CAS 413 .... 8

III. The CAS Board Intended To Require A Contractor To Make A CAS 413 Segment-Closing Adjustment With Respect To Pension Surplus That The Contractor Retains .... 8

A. The Text Of CAS 413.50(c)(12) Neither Supports Nor Requires Unisys's Extreme And Unreasonable Interpretation .... 9

B. The Regulatory History Of CAS 413 Makes Clear The CAS Board's Intent To Require A CAS 413 Segment-Closing Adjustment On Surplus That The Contractor Retains .... 14

1. The CAS Board Intended To Require A Segment-Closing Adjustment Whenever There Are No Future Accounting Periods Within Which To Make Adjustments For Past Over- or Under-Estimates of Pension Costs Charged To The Segment's Contracts .... 15

2. When The Contractor Retains Pension Surplus Allocable To a Closed Segment, There Are No Future Accounting Periods Within Which To Make Adjustments For Past Over- or Under-Charges Of Pension Costs .... 18

3. When The Contractor Transfers Pension Surplus To The Buyer, There Are Future Accounting Periods Within Which Adjustments Can Be Made . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4. The CAS Board Never Intended For The Operation Of A Required Cost Adjustment To Depend Upon An Extra-Contractual Cost Recovery Mechanism . . . . . . . . . . . . . . . . . 22

5. The Benefit To The Government From A Partial Transfer of Surplus In The Amount Of The Segment-Closing Adjustment Will Never Equal The Benefit From A Direct, Lump Sum Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV. The CAS Board Did Not Intend In CAS 413 Merely To Require The Parties To Negotiate An Appropriate Contract Adjustment . . . . . . . . . . . . . . . . . . . 30

V. No Windfall To The Government Would Result From Requiring Unisys To Perform A Segment-Closing Adjustment With Respect To The Many Millions Of Pension Surplus That It Retained . . . . . . . . . . . . . . . . . . . . . . . 31

VI. Unisys's "Net Cost Impact" Argument Is Precluded By This Court's Prior Decision In *Teledyne* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Allegheny Teledyne Inc. v. United States*,
316 F.3d 1366 (Fed. Cir.), *cert. denied sub nom. General Motors Corp. v. United States*, 540 U.S. 1068 (2003) . . . . . . . . . . *passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . . . . . . 8

*Boeing North American, Inc. v. United States*,
298 F.3d 1274 (Fed. Cir. 2002) . . . . . . . . . . 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) . . . . . . . . . . 7, 8

*Citizens Financial Services, FSB v. United States*,
57 Fed. Cl. 64 (2003) . . . . . . . . . . 8

*Dairyland Power Coop. v. United States*,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . 8

*Eastman Kodak Co. v. Rumsfeld*,
317 F.3d 1377 (Fed. Cir. 2003) . . . . . . . . . . 20

*General Electric Co. v. United States*,
60 Fed. Cl. 782 . . . . . . . . . . 9

*Golden Pac. Bancorp v. United States*,
15 F.3d 1066 (Fed. Cir. 1994) . . . . . . . . . . 7

*Lujan v. Nat'l Wildlife Fed.*,
497 U.S. 871 (1990) . . . . . . . . . . 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) . . . . . . . . . . 7, 8

*Mingus Constructors, Inc. v. United States*,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 7

**TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*Teledyne, Inc. v. United States*, *aff'd Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir.), *cert. denied sub nom. General Motors Corp. v. United States*, 540 U.S. 1068 (2003) . . . . . *passim*

*United States v. Boeing Co.*, 802 F.2d 1390 (Fed. Cir. 1986) . . . . . 24

*Viacom Inc. v. United States*, 70 Fed. Cl. 649 (2006) . . . . . 8, 12

**REGULATIONS**

CAS 409.50(j)(1), 4 C.F.R. § 409.50(j)(1) (1992) . . . . . 12

CAS 412.40(a)(1), 4 C.F.R. § 412.40(a)(1) (1992) . . . . . 20

CAS 413.50(c)(12), 4 C.F.R. § 413.50(c)(12) (1992) . . . . . *passim*

CAS 413, 48 C.F.R. § 9904.413 (1995) . . . . . 1

CAS 413.50(c)(12)(vi), 48 C.F.R. § 9904.413-50(c)(12)(vi) (1995) . . . . . 21

CAS 415.50(d)(7), 4 C.F.R. § 415.50(d)(7) (1992) . . . . . 12

CAS 416.50(a)(1)(ii), 4 C.F.R. §§ 416.50(a)(1)(ii) (1992) . . . . . 12

CAS 416.50(a)(1)(vi), 4 C.F.R. § 416.50(a)(1)(vi) (1992) . . . . . 12

CAS 418.40(c), 4 C.F.R. § 418.40(c) (1992) . . . . . 28

48 C.F.R. § 52.216-7 . . . . . 33

48 C.F.R. § 52.230-2 (1995) . . . . . 33

48 C.F.R. § 52.216-7(h)(2) . . . . . 33, 34

48 C.F.R. § 9903.201-4(a) . . . . . 33

48 C.F.R. § 9903.306(e) . . . . . 33

**INDEX TO APPENDIX**

**PAGE**

Notice of Cost Accounting Standard, February 3, 1977 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Restatement of Objectives, Policies and Concepts, May 19, 1977 . . . . . . . . . . . . . . . . . . . . . . . . . 6

CAS 412, *codified in* 4 C.F.R. § 412 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CAS 413, *codified in* 4 C.F.R. § 413(1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Cost Accounting Standards Board, Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs; Final Rule, (60 Fed. Reg. 16534) March 30, 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

DCAA Supplemental Audit Report No. 6701-97D19200123, January 29, 2003 . . . . . . . . . . . 70

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **UNISYS CORPORATION,**<br>**Plaintiff,**<br>**v.**<br>**THE UNITED STATES,**<br>**Defendant.** | **No. 05-281 C**<br>**(Judge Firestone)** |

**DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States, respectfully requests that the Court enter an order under RCFC 56 denying Plaintiff Unisys Corporation's Motion for Summary Judgment ("Pl's Mot."), dated October 27, 2006, granting defendant's cross-motion for partial summary judgment, and determining that:

> When, as part of a segment closing that is subject to the requirements of original CAS 413.50(c)(12), *codified at* 4 C.F.R. § 413.50(c)(12) (1992) (" Original CAS 413"),[1] a contractor transfers part of the closed segment's pension surplus from its pension plan to the buyer's pension plan,
>
> 1. The required CAS 413 segment closing calculation must be made upon the pension surplus that the selling contractor retains, or, in the alternative, if the Court is not persuaded to adopt that interpretation, upon the full amount of the pension surplus that was allocable to the segment at the time of segment closing, without regard to the partial transfer of surplus; and

[1] Unless otherwise indicated, all references to CAS 413 are to Original CAS 413, and not to CAS 413 as amended in 1995, *codified at* 48 C.F.R. § 9904.413 (1995) ("Revised CAS 413").

2. In any and all events, the selling contractor is required under Original CAS 413, at a minimum, to make a segment-closing adjustment with respect to the surplus that it retains.

As we show below, and in Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact in Support of Plaintiff's Motion for Summary Judgment, and Defendant's Proposed Findings of Uncontroverted Fact in Support of Defendant's Cross-Motion for Partial Summary Judgment ("DPFUFs"), both dated January 12, 2007, there is no dispute as to any material fact and the Government is entitled to judgment as a matter of law.

## PRELIMINARY STATEMENT

The essence of Unisys's position is this. As part of Unisys's sale of four business units known as the Defense Systems Organization ("DSO") segment to Loral Corporation ("Loral"), Unisys agreed, without the Government's knowledge or consent, to transfer millions of dollars of pension surplus allocable to the segment to Loral. The Government had a legally protected right under CAS 413 to share in the surplus that Unisys transferred, because this surplus resulted from excessive pension contributions that Unisys had made in the years prior to the segment closing that the Government had reimbursed in part. According to Unisys, its unilateral transfer of pension surplus to Loral discharged any obligation to perform a segment-closing adjustment with respect to the nearly $50 million of pension surplus allocable to the closed segment that Unisys retained, and it has no obligation to pay the Government a penny. Instead, the Government's sole remedy is to take extraordinary measures and undertake extensive monitoring in an effort – that demonstrably cannot succeed – to recover over the course of future years a benefit equal to the payment that Unisys owed upon the pension surplus it retained.

This cannot be the law. A simple example will demonstrate the fundamentally flawed

logic of Unisys's position. Assume that a contractor and the Government own a fund in common that contains $500 in cash, with the Government owning 40% ($200) and the contractor 60% ($300). Without the Government's knowledge or consent, the contractor transfers the Government's share ($200 in cash) to a third party, who will, the contractor earnestly assures the Government, give the Government the benefit of its $200 share over time in the form of certain reduced costs that the Government would otherwise have to pay. The contractor then tells the Government that, by his unilateral action, he has entirely discharged his contractual debt to the Government, and the Government no longer has any right, title, or interest in the remaining funds in the account ($300). To recover any part of its $200 share, the Government must look to the third party, because the contractor no longer has any obligation to the Government.

This Court would never permit this hypothetical contractor to escape its contractual obligation in this way, nor should it permit Unisys to do so in this case by means of an interpretation of CAS 413 that is squarely contrary to the provision's language and its regulatory history.[2] The CAS Board could never have intended such an unfair result, and there is no evidence whatsoever that it had such an intention. As we demonstrate below (at pp. 9 *et seq.*), what the CAS Board clearly did intend was that the contractor perform a segment-closing adjustment whenever, because of a segment closing, there are no future cost accounting periods

[2] We note in passing that, if Unisys were correct in its reading of Original CAS 413, the Government could use this same approach to avoid making a segment-closing adjustment to a contractor that closes a segment that has a pension deficit. The Government could simply make a contribution to a pension plan sponsored by the contractor's subcontractor, and then tell the contractor that the contractor could recover the equivalent of the CAS 413 segment closing adjustment that the Government would otherwise owe the contractor in the form of reduced pension costs that the subcontractor would charge to the contractor in future years, and, therefore, the Government had discharged its CAS 413 obligation to the contractor.

within which to adjust previously-determined pension costs through the amortization of past actuarial gains and losses. When a contractor transfers pension surplus to the buyer along with the segment's contracts, there are future periods in which the needed adjustments can be made in the form of lower pension costs on the segment's contracts that will be charged to the Government in the future by the segment's buyer. Therefore, no segment-closing adjustment need be made upon the transferred surplus. But, unless the required segment-closing adjustment is made upon the surplus that the seller retains, no adjustment will ever be made to correct for the excessive pension costs that created the segment's surplus. This is squarely contrary to the CAS Board's intent. *See* pp. 14-22 below.

We also recognize that the language of CAS 413 itself and the CAS Board's contemporaneous explanatory Preamble makes no mention of partial surplus transfers, and never indicates that, when such transfers occur, there would be future cost accounting periods within which previous costs charged to the segment's contracts can be adjusted by lower costs charged to those contracts, and therefore a segment-closing adjustment with respect to the transferred surplus would be unnecessary. If the Court is not persuaded to accept the Government's interpretation, a reasonable argument could be made that the CAS Board intended that the segment-closing adjustment should be made upon the entire surplus allocable to the closed segment, without regard to the contractor's unilateral transfer of surplus to the buyer. We believe, however, that the better result is that the segment-closing adjustment should be made upon the surplus retained by the seller, and that, in no event, should a contractor be able to avoid making any segment-closing adjustment whatsoever. *See* pp. 15-22 below.

Unisys contends that CAS 413 allows a contractor to defeat the Government's right to a

share of the closed segment's pension surplus merely by transferring a portion of that surplus to a third party, the buyer. According to Unisys, this is what the language of CAS 413 requires and would further the purpose of CAS 413 because "the Government has retained and continues to reap substantial benefits on account of the surplus that Unisys transferred to Loral." Plaintiff Unisys Corporation's Memorandum in Support of Unisys' Motion for Summary Judgment ("Pl. Br.") at 20. So, presumably, would a contractor's donation of the Government's share to a worthy charity of the contractor's choice, but the contractor could not properly convert the Government's share to its own use in this way, even by a donation to a charity that, because of its activities, might arguably reduce certain costs that the Government might otherwise have to pay in the future.

Unisys's argument is more notable for what it fails to say than for what it says. Even though, as we show below, under settled authorities, the intent of the CAS Board is dispositive upon the question of the proper interpretation of CAS 413 (as well as all other CAS), Unisys never suggests, except in the most oblique and indirect of ways, that the CAS Board intended the interpretation of CAS 413 that Unisys posits, *i.e.*, that a contractor could defeat the Government's right to a CAS 413 segment-closing adjustment with respect to surplus retained by the contractor merely by transferring pension surplus (in which the Government also has an interest) to the buyer. Instead, Unisys variously argues that its interpretation does not violate the language of CAS 413 (Pl. Br. at 16-20), that the Government's calculation excludes the benefit from surplus transferred to Loral (Pl. Br. at 20-24), that New CAS 413 does not guide the segment closing calculation (Pl. Br. at 24-25), that the Government would reap a windfall if Unisys's interpretation were to be rejected (Pl. Br. at 26-27), that the Government's approach is

inconsistent with the CAS Board's flexible approach (Pl. Br. at 27-30), and that the net cost impact of noncompliance is the difference between the benefit the Government will receive from reduced pension costs as a result of the amounts transferred to Loral and the benefit the Government would have received if the segment closing adjustment had been paid directly. Unisys's failure to address the CAS Board's intent directly is a glaring omission (Pl. Br. at 30-34). Further, as we demonstrate below, none of Unisys's arguments has any basis in law, logic, or reason.

## STATEMENT OF FACTS

The relevant and material facts are set forth in detail in DPFUFs and in Defendant's Response to Plaintiff's PPFUFs, and need not be set out again at this point. The parties' cross-motions for summary judgment raise primarily questions of law regarding the intent of the CAS Board concerning the treatment of a partial surplus transfer. For present purpose, it is sufficient to note two critical, and undisputed, facts.

First, when Unisys sold the DSO segment to Loral, according to Unisys's motion, the amount of surplus allocable to the DSO segment was $76.3 million, of which Unisys retained approximately 65% ($48.9 million) and transferred the remaining 35% ($27.4 million) to the buyer of the segment, Loral. DPFUF No. 1. In other words, by its own admission, Unisys retained almost $50 million of pension surplus in the DSO transaction.

Second, before entering into the Transaction Agreement in which it sold the DSO segment to Loral, and agreed to transfer millions of dollars of pension surplus to a Loral pension plan, Unisys never disclosed the proposed transaction to the Government. Unisys never asked the Government for its views on whether such a partial transfer would fully satisfy Unisys's

obligation to make a segment-closing adjustment, and never asked the Government to enter into an Advance Agreement that would confirm Unisys's apparent view that the proposed partial transfer would fully satisfy the requirements of CAS 413. DPFUFs Nos. 2 and 3.

## ARGUMENT

### I. Applicable Summary Judgment Standards

This Court has aptly summarized the applicable legal standards for the grant of summary judgment as follows:

> Summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." [RCFC] 56(c); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1071 (Fed. Cir. 1994); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986). Thus, if the nonmoving party produces sufficient evidence to raise a question that would alter the outcome of the case, summary judgment must be denied. In making this determination, the court is mindful that any doubt over a factual issue must be resolved in favor of the nonmoving party. *Id.* at 587-88, 106 S. Ct. 1348.
>
> The party moving for summary judgment has the burden initially of pointing out the absence of any genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986). Once the movant discharges this burden, the non-movant must demonstrate specific facts showing a genuine dispute of fact for trial. *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348; *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). Thus, the nonmoving party must "go beyond the pleadings and by [its] own affidavit, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S. Ct. 2548; *see also Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L.Ed. 2d 695 (1990) ("[T]he object of [Rule 56(e)] is not

> to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). In this connection, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348.

*Citizens Financial Services, FSB v. United States*, 57 Fed. Cl. 64, 68 (2003).

## II. The Intent Of The CAS Board Is Dispositive Upon The Proper Interpretation Of CAS 413

In its decision in *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir.), *cert. denied sub nom. General Motors Corp. v. United States*, 540 U.S. 1068 (2003), affirming this Court's decision in *Teledyne Inc. v. United States*, 50 Fed. Cl. 155 (2001), the court of appeals set forth the definitive "interpretive lens" to be used in interpreting the CAS (and CAS 413, in particular), and reaffirmed that the task before the Court is to determine the intent of the CAS Board when it promulgated the CAS in question. The court of appeals held:

> When interpreting provisions of the CAS our task is "to ascertain the [Board's] intended meaning when it promulgated the CAS." We accomplish this first by looking at the text of the relevant provisions and "any guidance that the [Board] has published to aid in interpretation." We examine the issues that follow through this interpretive lens.

*Allegheny Teledyne*, 316 F.3d at 1373, *quoting from Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995). As this Court has also made clear, the interpretation of CAS provisions in general, and of CAS 413.50(c)(12) in particular, is "purely a legal question," one that is "particularly appropriate" for resolution on summary judgment. *Viacom Inc. v. United States*, 70 Fed. Cl. 649, 655 (2006).

## III. The CAS Board Intended To Require A Contractor To Make A CAS 413 Segment-Closing Adjustment With Respect To Pension Surplus That The Contractor Retains

As we demonstrate below, the text of CAS 413 and the guidance that the CAS Board published to aid in interpretation (what the court of appeals called the "interpretive lens" in *Allegheny Teledyne*, 316 F.3d at 1373) leave no doubt about the proper interpretation. They make clear that the Board never intended to allow a contractor to avoid making a CAS 413 segment-closing adjustment with respect to pension surplus that the contractor retains merely by transferring the segment's remaining surplus (surplus in which the Government also has an interest) to the buyer or other third party. Nothing in the text of CAS 413.50(c)(12) itself, or in its regulatory history, supports such an extreme result. Instead, the CAS Board plainly intended to require a seller that transfers part of the segment's surplus to perform the segment-closing adjustment only with respect to the surplus that the seller retains.

### A. The Text Of CAS 413.50(c)(12) Neither Supports Nor Requires Unisys's Extreme And Unreasonable Interpretation

Unisys argues that its interpretation is permissible pursuant to the Original CAS 413. According to Unisys, excluding the transferred surplus from the CAS 413 segment-closing calculation would be contrary to the language of CAS 413.50(c)(12), and would result in a windfall to the Government.

Unisys argues that the language of CAS 413.50(c)(12) requires that the segment-closing adjustment calculation must be based upon all of the closed segment's pension surplus, and that requiring it to make a segment-closing adjustment with respect to the surplus it retained would be improperly focusing on an "'incomplete' view of the DSO segment" and inconsistent with this Court's decision in *General Electric Co. v. United States*, 60 Fed. Cl. 782. Pl. Br. at 20-21.

The language of CAS 413.50(c)(12) does not compel Unisys's interpretation, however, for at least two reasons. First, excluding the transferred surplus from the segment-closing calculation (and from the Government's recovery) is no more a violation of the language of CAS 413 than excluding the other portions of the surplus that this Court has previously determined in *Teledyne* must be excluded from the calculation and the Government's recovery. In *Teledyne*, this Court determined that the portion of the closed segment's pension surplus attributable to firm-fixed-price contracts, to employee contributions, and to flexibly-priced contracts entered into before the effective date of the Original CAS 413 had to be excluded from the segment-closing calculation and from the Government's recovery. *Teledyne*, 50 Fed. Cl. at 171 *et seq.*, *aff'd Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir.), *cert. denied sub nom. General Motors Corp. v. United States*, 540 U.S. 1068 (2003). If Unisys were correct, each of these exclusions would be invalid as contrary to CAS 413's alleged command that the closed segment's surplus be addressed in its entirety. This Court, therefore, has already rejected Unisys's argument in *Teledyne*, and should do so again in this case. Furthermore, Unisys's own interpretation would violate the alleged command of CAS 413, because it does not address the closed segment's surplus as a whole, but instead would divide it into two separate portions, each of which is treated differently: (i) the retained surplus (as to which no segment-closing adjustment is required), and (ii) the transferred surplus (the transfer of which allegedly discharges the seller's CAS 413 obligations).

Second, even if Unisys were correct that CAS 413 would not permit the exclusion of transferred surplus from the required segment-closing calculation, its conclusion – that the contractor has no obligation to perform a segment-closing adjustment with respect to the surplus

it retains – does not follow. The closed segment's pension surplus could be addressed in its entirety (and the alleged command of CAS 413 complied with) by performing the segment-closing adjustment with respect to the closed segment's entire surplus, without regard to whether the seller had made the unilateral decision to transfer some of that surplus to the buyer. This interpretation would be entirely consistent with the language of CAS 413 upon which Unisys relies.

Thus, even if the Court were to determine that CAS 413 requires that the segment-closing adjustment must encompass all of the closed segment's pension assets and liabilities, Unisys's interpretation would not follow, either as a matter of law, of policy, or of logic,. In that case, the more persuasive and reasonable reading of CAS 413 would be that the segment-closing adjustment must be made with respect to the entirety of the closed segment's assets and liabilities without regard to what, if anything, the contractor may have done with a portion of the closed segment's pension surplus. We set out below (at pp. 15-22) the reasons for our view that the better reading of the language of CAS 413 is that it requires the selling contractor to perform a segment-closing adjustment only upon the surplus that it retains, not upon the entirety of the surplus as if the contractor had not transferred any surplus. But, if the Court is persuaded otherwise, and believes that the language of CAS 413 requires that the closed segment's surplus be addressed in its entirety and that the language, therefore, precludes making a segment-closing adjustment only upon the surplus that the contractor retains, then the Court should require that the segment-closing adjustment be made upon the entirety of the surplus without regard to the partial surplus transfer.

The language of CAS 413.50(c)(12) is clear, express, and unconditional – the difference

between the market value of the closed segment's pension assets and its actuarial liability "*represents* an adjustment of previously-determined pension costs." CAS 413.50(c)(12) (emphasis added). The CAS 413 adjustment is an adjustment of " previously-determined pension costs" that is made in the current cost accounting period. *Id.* These costs were "determined" in prior accounting periods and, because of the segment closing event, an adjustment is required in the current period. This Court has found that the Board's purpose in requiring the CAS 413 segment-closing adjustment was "to correct for the government's past over or under contribution to the closed segment's pension costs." *Viacom Inc. v. United States*, 70 Fed. Cl. at 659; *see also Teledyne, Inc. v. United States*, 50 Fed. Cl. 155, 181 ("the purpose of the CAS 413 segment closing provision is to *look back* and determine whether the government over contributed or under contributed to the segment's pension plan"). This cost adjustment looks back in time to pension costs that were determined and charged based upon estimates in previous cost accounting periods to various final cost objectives, including Government contracts, which costs ultimately turned out to be greater than were needed to fully fund the segment's pension obligations.

These pension cost adjustments, like other cost adjustments that are provided in other CAS,[3] are made of necessity, because certain costs have to be charged currently even though the

[3] There are a number of other CAS that require the contractor to make adjustments in certain types of costs upon the happening of certain events. These include the adjustment of depreciation cost for excess depreciation cost upon the disposition of a tangible capital asset (CAS 409.50(j)(1), 4 C.F.R. § 409.50(j)(1) (1992)), of compensation cost for the forfeiture of deferred compensation (CAS 415.50(d)(7), 4 C.F.R. § 415.50(d)(7) (1992)), and of insurance cost for an insurance refund or dividend (CAS 416.50(a)(1)(ii), 416.50(a)(1)(vi), 4 C.F.R. §§ 416.50(a)(1)(ii), 416.50(a)(1)(vi) (1992)). If Unisys's interpretation were correct, then a contractor that had charged depreciation costs that, when the tangible capital asset was later sold, proved to be greater than necessary (because the asset was sold for more than its depreciated

precise amount of the cost cannot be determined until the unfolding of future events. The cost adjustment is required as a means to adjust (in the current cost accounting period) for the differences between past projections of future experience and the actual experience in the intervening period. The segment-closing adjustment is retrospective by nature, not prospective. It looks back at the difference between projected and actual experience, and has no concern with whether or how the Government or the contractor may realize any recovery from the making of the cost adjustment in the future. Nothing in the retrospective language of CAS 413.50(c)(12) suggests, much less states, that how the segment-closing adjustment is to be made is to depend upon whether the Government could expect to recover the equivalent of the adjustment from someone other than the contractor by reason of a separate transaction that the contractor entered into without the Government's knowledge or consent. *Id.*

Further, Unisys's argument ignores the fundamental nature of the CAS 413.50(c)(12) adjustment. This is an adjustment that is made because *prior period* pension costs were miscomputed, in the sense that, in retrospect, they were greater or lesser than what was required to fully fund the plan. Everything relevant to the cost adjustment in the year of segment closing is in place at the time of segment closing, and the financial relationship of the parties relating to pension costs up to the date of segment closing is concluded with finality by the segment-closing adjustment. Unisys is attempting to include purported reductions in "downstream" pension costs

---

value), could avoid having to make an adjustment for the excess depreciation cost by transferring some of the gain to the buyer. This anomalous result could never have been the CAS Board's intent. There is no suggestion in the language or regulatory history of CAS 409 or any of these other cost adjustment provisions that the contractor could defeat the Government's right to the required adjustment merely by transferring to another Government contractor part of the gain that triggered the obligation to make the adjustment.

in the segment-closing calculation, and to offset such presumed reductions against its CAS 413 obligation to correct for excessive pension costs it charged to the Government in the years before the segment closing. In this way, Unisys hopes to liquidate its CAS 413 obligation for pension cost overcharges in prior years through purported reductions in future years' pension costs. This is wrong in concept and practice, and utterly contrary to the nature of the CAS 413 adjustment itself.

Therefore, nothing in the language of CAS 413 compels the conclusion that a partial surplus transfer discharges the contractor's obligations with regard to the segment-closing adjustment with respect to the surplus that the contractor retains. We turn to the regulatory history of CAS 413, which leaves no doubt that a contractor cannot evade the requirement to make a segment-closing adjustment with respect to the surplus that it retains merely by transferring the remainder of the segment's surplus to the buyer.

### B. The Regulatory History Of CAS 413 Makes Clear The CAS Board's Intent To Require A CAS 413 Segment-Closing Adjustment On Surplus That The Contractor Retains

The regulatory history of CAS 413 (the remainder of the "interpretive lens" that the court of appeals referred to) demonstrates in a number of different, but equally compelling, ways that the CAS Board intended to require a contractor that retains surplus to make a segment-closing adjustment with respect to the retained surplus.

First, the CAS Board clearly and unmistakably intended to require the contractor to make a segment-closing adjustment whenever, because of a segment closing, there are no future accounting periods in which to make adjustments for past over- or under-estimates of pension costs and resulting over- or under-charges of such costs to the Government. When the contractor

retains pension surplus, there are no future accounting periods and the segment-closing adjustment is required. When the contractor transfers surplus to the buyer, however, there are future accounting periods in which the presence of the transferred surplus in the buyer's pension plan applicable to the transferred segment can have the effect of reducing the amount of pension cost that the buyer charges to the Government with respect to the closed segment's transferred contracts.

Second, the CAS Board was very much aware of the limitations upon its authority, and could never have intended for the operation of a required cost adjustment to depend upon whether the Government would be able to recover – in transactions that the CAS Board never identified or described with parties that were strangers to the selling contractor's contracts with the Government – the equivalent of the amount that the contractor would have been required to pay if the contractor had made the adjustment as the CAS Board had required.

### 1. The CAS Board Intended To Require A Segment-Closing Adjustment Whenever There Are No Future Accounting Periods Within Which To Make Adjustments For Past Over- or Underestimates of Pension Costs Charged To The Segment's Contracts

The CAS Board clearly described in its Preamble to CAS 413 the fundamental problem that it was addressing in CAS 413: when a contractor closes a segment, it is no longer possible to continue to make adjustments to correct for pension costs charged to the segment in the past based upon estimates that, with the benefit of perfect 20/20 hindsight, were greater or lesser than the amounts that were needed to fully fund the payment of promised future benefits. Until the segment is closed, this adjustment process is made through the required amortization of actuarial gains and losses (and the amortization of the effects of other changes, such as changes in the

plan's actuarial assumptions and benefit changes caused by plan amendments). Actuarial gains and losses result from the difference between the actuarial assumptions used to calculate the pension costs charged to the segment's contracts (such assumptions as projected earnings upon pension assets, how long plan participants will live, *etc.*) and the plan's actual experience. *See* CAS 413.30(a)(1) (defining "actuarial assumption" as "[a] prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets") (Defendant's Appendix in Support of Defendant's Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def. App.") at 27).

As the Court is aware, CAS 413 requires that actuarial gains and losses be amortized over a 15-year period. For a segment that is continuing in operation, the amortization requirement means that in each future year there will be added to, or subtracted from, the amount of pension cost otherwise calculated for that year under CAS 412 the sum of all the amortization amounts from the actuarial gains and losses of the previous 15 years.[4] *See* CAS 413.50(a)(2) (Def. App. at 28). The CAS Board intended that, through this amortization process, the amount of pension

---

[4] An example may help clarify how the amortization process works. For a continuing segment, the amount of pension cost for the year 2006 would first be calculated without regard to actuarial gains and losses. Then, the amortized portions of the actuarial gain or loss for 1991 and each succeeding year to and including 2005 would be added together (in each case, because CAS 413 requires amortization over a 15-year period, the amount of each prior year's actuarial gain or loss that would be amortized in any later year would be 1/15th of the actuarial gain or loss experienced in the previous year). The resulting total would then either be subtracted from, or added to, the pension cost calculated for the year 2006 (depending upon whether, when added together, the amortized portions of actuarial gains in previous years was greater than the amortized portions of actuarial losses in previous years). For the next year (2007), the calculation would be identical, except that the actuarial gain or loss from the year 1991 would have been fully amortized, and there would be an actuarial gain or loss from the year 2007 that would have to be amortized (at the rate of 1/15th per year).

cost charged to the segment's contracts would be corrected over time to correct for the past over- or under-estimates of pension cost, due to the inevitable difference between projected experience (experience that was projected in the form of the plan's actuarial assumptions) and the plan's actual experience.

The Board recognized in the Preamble to CAS 413 that this essential corrective mechanism (the CAS 413 amortization process) breaks down when the segment is closed. When a segment is closed, it is no longer possible through the amortization process to make adjustments to correct for past over-or under-estimates of pension costs that were charged to the segment's contracts. After the segment closing, the pension costs that will be charged to the segment's transferred contracts in the future will be the pension costs that the buyer calculates based upon its own pension plan, without regard to any actuarial gains or losses that the seller's pension plan may have experienced before the segment closing. For example, if the segment had experienced a $15 million actuarial gain two years before the segment closing, so that only $1 million of the gain had been amortized in the year before the segment closing, unless there was a segment-closing adjustment, the remaining $14 million actuarial gain would never be recognized, and the past "overcharge" to the segment's contracts (both Government and commercial, if any) in the year that the actuarial gain was experienced would never be corrected.

This is precisely the problem that the CAS Board intended to solve in requiring a segment-closing adjustment under CAS 413.50(c)(12). In its contemporaneous explanatory Preamble that accompanied the original promulgation of CAS 413 in 1977, the Board explained:

> As a general rule, the Standard being promulgated today is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost

> accounting periods in determining the costs for a segment. However, a problem arises in cases where a segment is closed. *Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.* This adjustment is not an actuarial gain or loss as defined in the Standard. To clarify its intent, the Board has revised § 413.50(c)(12) of the Standard and the related illustration in § 413.60(c)(8). The Standard now states that when a segment is closed, the contractor shall determine the difference between the actuarial liability of the segment and the market value of the assets allocated to the segment.

Preamble, § 12, CAS 413, 4 C.F.R. § 413 (1992) (Def. App. at 42) (emphasis added).

In short, the clear and unmistakable intent of the CAS Board was to require the contractor to make a segment-closing adjustment whenever, because of a segment closing, the amortization process could no longer operate to adjust for past over- or under-estimates of pension costs charged to the segment. As we demonstrate in the next section, this is precisely the situation when the contractor retains all or a portion of the pension surplus allocable to the closed segment.

**2. When The Contractor Retains Pension Surplus Allocable To a Closed Segment, There Are No Future Accounting Periods Within Which To Make Adjustments For Past Over- or Under-Charges Of Pension Costs**

The amortization process cannot perform its required function of making adjustments for past pension costs when a contractor retains some of the pension surplus allocable to a closed segment. There are no future accounting periods in which an adjustment can be made to correct for the pension costs previously charged to the segment that, with hindsight, were greater than the costs required to fully fund the closed segment's actuarial liability. The retained surplus will remain in the contractor's pension plan, where it will benefit both the selling contractor (in the

form of a reduced need to fund the plan) and the contractor's future customers (in the form of lower pension costs). It will, however, never benefit the customers of the closed segment, because their future pension costs (which are determined by the segment's buyer) will never be reduced because of surplus retained in the seller's pension plan. Although, after the segment closing, the amortization process will continue at the seller (and the actuarial gains and losses from the years prior to the segment closing will continue to be amortized), this process will affect only the pension costs charged to the seller's remaining contracts in the future after the segment closing. It will have no effect upon the pension costs charged to the closed segment's contracts that were transferred to the buyer, because the buyer cannot reflect in the pension cost it charges to the transferred contracts the unamortized portion of the actuarial gains and losses that the seller experienced before the segment closing.

When the seller retains pension surplus allocable to the closed segment, therefore, it creates precisely the same problem that the CAS Board intended to correct when it required the segment-closing adjustment. The segment closing (and contractor's retention of surplus) breaks the connection between the amortization process and the closed segment's contracts, and makes it impossible for the amortization process to make the necessary adjustments for past actuarial gains and losses in the costs charged to the closed segment's contracts.

Consequently, unless the CAS 413 segment-closing adjustment is performed with respect to the surplus retained by the seller, the CAS Board's clearly expressed intent – to provide for an adjustment whenever, because of a segment closing, the amortization process will be unable to adjust pension cost to correct for past over- and underestimates will be wholly frustrated. This Court should not permit Unisys to retain any portion of the closed segment's pension surplus free

and clear of any obligation to make the segment-closing adjustment that CAS Board intended was to substitute for the amortization process that can no longer serve its intended function because of the segment closing.

### 3. When The Contractor Transfers Pension Surplus To The Buyer, There Are Future Accounting Periods Within Which Adjustments Can Be Made

This is not the case, however, with respect to pension surplus that the contractor transfers to the buyer's pension plan covering the closed segment. When surplus is transferred, there are future accounting periods within which adjustments can be made to correct for pension costs charged to the closed segment in the past that, in hindsight, were higher than necessary. When a portion of the surplus is transferred to the buyer's pension plan that covers the transferred segment, the additional surplus in the buyer's pension plan will reduce the amount of pension cost that will be charged to the segment in the future, and, as a result, to the segment's contracts, including the transferred contracts.[5] This mechanism is not the same thing as a continuation of the amortization process, but it serves a similar purpose by providing a way of adjusting pension costs charged to the transferred segment's contracts in the future after the segment closing to correct for past over-charges.

---

[5] The transferred surplus will reduce future pension cost calculated under CAS 412 by reducing the plan's unfunded actuarial liability. Under CAS 412, a portion of a plan's unfunded actuarial liability and an interest equivalent upon the unamortized portion of the plan's unfunded actuarial liability are included in pension cost. CAS 412.40(a)(1), 4 C.F.R. § 412.40(a)(1) (1992). When the plan's unfunded actuarial liability is reduced, both of these cost components are also reduced. If the buyer's plan is already fully funded (*i.e.*, it has no unfunded actuarial liability), no pension cost could be allocated to, or charged to, to the transferred segment's Government contracts (*Eastman Kodak Co. v. Rumsfeld*, 317 F.3d 1377, 1381 (Fed. Cir. 2003)), and the effect of the transferred surplus will be to extend the length of time that the plan is fully funded and that no pension costs can be charged to the segment's Government contracts.

Therefore, because there are future accounting periods within which to make adjustments when the contractor transfers surplus to the buyer's pension plan, no segment-closing adjustment should be required with respect to the transferred surplus. This is the approach taken by the new CAS Board in the 1995 Amendments to CAS 413. *See* CAS 413.50(c)(12)(vi), 48 C.F.R. § 9904.413-50(c)(12)(vi) (1995) (if contractor transfers part of the closed segment's pension assets and actuarial accrued liabilities "the adjustment amount required under this paragraph (c)(12) shall be determined *based on the pension assets and actuarial accrued liabilities remaining with the contractor*") (emphasis added) (Def. App. at 64). The approach taken by the 1995 CAS Board is consistent with the original CAS Board's expressed intent to require a segment-closing adjustment where there are no future accounting periods within which to make adjustments. It is an approach that is reasonable, fair, and equitable, and, as noted above, is not precluded by the language of CAS 413, although we recognize that it is not the only permissible interpretation of that language.

What is plainly unreasonable, however, is the construction that Unisys urges upon the Court – under which the contractor would be excused from making any segment-closing adjustment with respect to the surplus it retains because it has transferred the remainder of the segment's surplus to the buyer. Allowing the contractor to avoid making a segment-closing adjustment with respect to the surplus that it transfers is a far cry from allowing the contractor to equate the transfer of surplus to the payment of the segment-closing adjustment with respect to the surplus that the contractor retained. What Unisys is suggesting is that its partial surplus transfer should wipe out its entire obligation to make any segment-closing adjustment whatsoever. This is an utter *non sequitur*. That the partial surplus transfer may be a rough

approximation, with respect to the surplus transferred, of the amortization process that would have occurred had the segment not been closed can provide no basis for depriving the Government of the benefit of its proper share of the closed segment's surplus that the contractor retained and did not transfer. The amount of pension surplus that the contractor retained will *never* benefit the Government by reducing the pension costs charged to the segment's transferred contracts that the buyer is performing. For this reason, a partial surplus transfer can never be a proper substitute, rough, approximate, or otherwise, for the full segment-closing adjustment that the CAS Board intended be performed upon the surplus the contractor retains.

**4. The CAS Board Never Intended For The Operation Of A Required Cost Adjustment To Depend Upon An Extra-Contractual Cost Recovery Mechanism**

There is another, equally compelling reason for the rejection of Unisys's reading of CAS 413. Unisys's interpretation is squarely contrary to the CAS Board's express understanding of its jurisdiction and authority. According to Unisys, the CAS Board intended that whether a cost adjustment was required upon pension surplus that the selling contractor retained was to depend upon whether the Government could recover the benefit of that adjustment from a third party (the buyer) in a transaction outside of any contracts between the selling contractor and the Government, through reduced pension cost that the buyer would charge to its Government contracts, including the transferred contracts, in future years. According to Unisys, the CAS Board intended that a contractor, in its sole and unfettered discretion, could choose to deprive the Government of its rights to an immediate cost adjustment under the Government's contracts with the seller simply by transferring pension assets to the buyer.

Unisys's proposed extra-contractual cost recovery scheme is the antithesis of a cost

adjustment, however, and utterly contrary to the Board's expressed understanding of its role and the limits of its authority. The CAS Board well knew, and made its understanding clear, that it had no authority to prescribe cost accounting standards that governed the allowability or recoverability of costs on Government contracts. Having clearly expressed its understanding in this regard, the CAS Board could never have intended to make the operation of a required cost adjustment depend at the contractor's election upon cost recovery questions, and, in particular, upon the Government's ability to recover an amount equivalent to the benefit of the cost adjustment through some alternative mechanism.

The CAS Board that promulgated Original CAS 413 in 1977 well understood that its authority only extended to the measurement, assignment, and allocation of cost, and not to the allowability of any cost. As this Court recognized, "[a]lthough Congress gave the [the original CAS Board] wide authority in promulgating standards governing the measurement, assignment, and allocation of costs, Congress gave [the Board] only very limited authority over cost "*allowability*" or other matters relating to the *pricing* of contracts." *Teledyne*, 50 Fed. Cl. at 162 (emphasis in original), *citing* Defense Production Act Amendments of 1970, Pub. L. No. 91-379, §§ 719(g), 719(h)(1), 84 Stat. 796 (1970), *codified at* 50 U.S.C. App. § 2168 (repealed 1988). As the Court also recognized, the Board's only authority over allowability was the requirement in § 719(h)(1) that the CAS Board's regulations implementing the cost accounting standards were to provide that the contractor agree to a contract price adjustment for any increased costs that the Government pays because of a contractor's failure to comply with CAS or to follow its disclosed cost accounting practices. *Id.*

Thus, the original CAS Board was to be supreme in the sphere of the measurement of

costs, the assignment of costs to cost accounting periods, and the allocation of such measured and assigned costs to the contractor's final cost objectives in the assigned period (*i.e.*, to individual contracts). By statute, therefore, the CAS Board's standard-setting authority extends only to cost measurement, assignment, and allocation, and no further. Most significantly, the Board has no authority concerning the *allowability* of costs once they have been properly measured, assigned, and allocated to particular contracts. Allowability is the exclusive province of the FAR and the procuring agencies, and, to a limited extent, the contracting parties themselves (to the extent that the parties may agree that costs that would otherwise be allowable costs under the FAR or FAR supplemental regulations would not be allowable under a specific contract). *United States v. Boeing Co.*, 802 F.2d 1390, 1393-94 (Fed. Cir. 1986) (CAS "gover[n] the determination and measurement of pension costs, assignment of such costs to accounting periods[,] and allocation of such costs to final cost objectives[;]" cost allowability "remains the province of the procuring agencies"). *See also Boeing North American, Inc. v. United States*, 298 F.3d 1274, 1280 (Fed. Cir. 2002) (cost allowability "concerns whether a particular cost can be recovered from the government in whole or in part" and "is governed by the FAR regulations, *i.e.*, the cost principles expressed in Part 31 of the FAR and pertinent agency supplements," and not by the CAS).

The CAS Board that promulgated Original CAS 413 was acutely aware of the limits upon its authority, and expressly disavowed any intent to issue standards that would affect cost allowability, *i.e.*, whether a particular cost could be recovered from the Government. In May 1977, just two months before it issued CAS 413 (in July 1977), the Board issued a Restatement of Objectives, Policies, and Concepts, in which it specifically disclaimed any intent to issue

standards that affected the allowability of cost. *See* Restatement of Objectives, Policies, and Concepts, 42 Fed. Reg. 25751 (May 19, 1977) ("Restatement") (Def. App. at 6 *et seq*.). In its Restatement, the Board made clear its understanding that its mandate extended to the promulgation of cost accounting standards governing the measurement, assignment, and allocation of costs, and not to the allowability of any such measured, assigned, and allocated costs. The Board stated:

> The CASB does not determine categories of individual items of cost that are allowable. Allowability is a procurement concept affecting contract price and in most cases is established in regulatory or contractual provisions. . . . A contracting agency may include in contract terms or in its procurement regulations a provision that will refuse to allow certain costs incurred by contractors that are unreasonable in amount or contrary to public policy. In accounting terms, those same costs may be allocable to the contract in question. . . .
>
> Cost Accounting Standards provide for the definition and measurement of costs, the assignment of costs to particular cost accounting periods, and the determination of the bases for the direct and indirect allocation of the total assigned costs to the contracts and other cost objectives of these periods. The use of Cost Accounting Standards has no direct bearing on the allowability of those individual items of cost which are subject to limitations or exclusions set forth in the contract or which are otherwise specified as unallowable by the Government.

Restatement, 42 Fed. Reg. at 25751 (Def. App. at 6).

Thus, there can be no doubt that the CAS Board viewed matters of cost allowability and cost recovery as beyond its authority. Yet, to accept Unisys's argument, the Court would have to be persuaded that this same Board when it issued CAS 413, just two months after it reaffirmed in its Restatement these settled limits upon its authority, promulgated a CAS that looked to the extra-contractual recoverability of a cost adjustment to determine whether the contractor had

satisfied its obligation to make the required cost adjustment. This is a CAS Board that, by statute and its own pronouncements, was to have nothing whatsoever to do with cost allowability and cost recovery. It cannot be the case that this Board promulgated a cost accounting standard that went beyond measurement, assignment, and allocation of cost and invaded the province of the FAR and the procuring agencies by making the operation of a required cost adjustment of previously-determined pension costs depend upon the recoverability of the adjustment amount in contracts between the Government and a third party (the buyer).

Unisys can point to no other cost accounting standard in which the Board required a cost adjustment but allowed the contractor to satisfy its obligation to make such an adjustment by making transfers of property to a third party without the Government's consent, because there are none. If Unisys were correct, the Board intended to allow a contractor to evade a required cost adjustment because the Government would allegedly be able to recover from the buyer an amount equivalent to what the contractor should have paid to the Government directly as a result of the cost adjustment, by entering into additional contractual undertakings with a party other than the selling contractor that would require extensive monitoring efforts over a period of years and would involve complex and detailed cost accounting. And, according to Unisys, the CAS Board had this intent to allow this extraordinary series of complicated undertakings, transactions, and monitoring (which is very reminiscent of a Rube Goldberg invention) to be a complete and sufficient substitute for the segment-closing adjustment that it required, but kept that intent in the silence of its heart and said not a word, leaving the Government contracting community to divine its intent in this regard with no support whatsoever in the Board's own pronouncements.

### 5. The Benefit To The Government From A Partial Transfer of Surplus In The Amount Of The Segment-Closing Adjustment Will Never Equal The Benefit From A Direct, Lump Sum Payment

Further, the fundamental – but unstated – premise of Unisys's argument is flawed. Unisys simply assumes that the Government will benefit to the same extent from a transfer of surplus to the buyer in the amount of the required segment-closing adjustment as it would from a direct, lump sum payment to the Government in the same amount. Because of the time value of money, and because the Government's recovery, according to Unisys, would take the form of reduced pension costs that the buyer will charge the Government over a period of years in the future, the present value of the benefit to the Government from the transferred surplus in the hands of the buyer will *always* be less than the present value of a direct payment of a lump sum in the same amount.

Even apart from the time value of money, Unisys's attempt to equate the transfer of surplus to a buyer to a direct, lump sum payment to the Government in the same amount must fail except in the rarest of circumstances, circumstances that are plainly not present in this case. The only situation in which surplus in the hands of the buyer is equivalent to a direct Government payment in the same amount would be if the buyer's contract mix were to be 100% Government contracts. This is because the mechanism by which the Unisys contends the Government will receive the benefit of the transferred surplus is by reducing the pension costs charged to the buyer's contracts. If the buyer has 50% commercial work, for example, the commercial customers of the buyer will receive a substantial portion of the benefit of the transferred surplus, by having their pension costs reduced. Similarly, if the buyer has 50% firm-fixed-price contracts, those contracts will have reduced pension costs charged to them, which

will have no effect upon the amount the Government pays because, by assumption, these are firm-fixed-price contracts (although negotiated firm-fixed-price contracts that the buyer enters into after the segment closing presumably would benefit in the form of lower projected pension costs utilized for forward pricing). Thus, in almost every instance, the benefit that the Government receives from the transferred surplus would be diluted.

Unisys may suggest in reply that the Government could recover its share of the closed segment's pension surplus from the buyer, by the allocation of the transferred surplus to the buyer's flexibly-priced contracts with the Government. The Government could not agree to such an allocation, however, because it would violate the CAS, specifically CAS 413 and 418. It would violate these provisions because, after pension cost has been properly calculated under CAS 412 and allocated to segments under CAS 413, CAS 418 requires that the segment's allocated pension costs, as indirect costs in indirect cost pools, be allocated to the segment's final cost objectives "in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives." CAS 418.40(c), 4 C.F.R. § 418.40(c) (1992). Allocation of pension surplus only to flexibly-priced contracts would plainly violate CAS 418's requirements. This is because annual pension costs (computed actuarially as a function of plan liabilities and plan assets and earnings – including any transferred surplus assets and earnings thereon) bear the same beneficial or casual relationship to all final cost objectives of the segment being performed in the accounting period, not just to flexibly priced final cost objectives.[6]

---

[6] Unisys argues that the novation agreement will protect the Government's interest in the transferred surplus. Pl. Br. at 22 *et seq*. But the language of the standard form novation agreement found in FAR § 42.1204(b) never addresses the complexities of pension issues, and does not clearly and unequivocally require the transferee of the transferred contracts to protect the Government's interest in whatever surplus the seller chooses to transfer by applying that

Therefore, even without regard to the time value of money, the Government's benefit from a direct, lump sum payment of the segment-closing adjustment would in almost every instance be greater than the benefit to be expected from the transfer of the same amount of pension surplus to the buyer. It is only in the most exceptional circumstances that a partial surplus transfer would be comparable to a direct payment. Absent these extraordinary circumstances, the Government would always be disadvantaged by a partial surplus transfer in lieu of a direct payment.

The CAS Board could never have intended to allow the contractor, at its choosing, to shortchange the Government in this way and deprive it of the benefit of the required segment-closing adjustment. And, if the Board had in fact ever entertained such an intent, at the very least it would have given the contracting community, and particularly the Government, some inkling of such an intent, so that the Government would know that it needed to act in an attempt to take

---

surplus solely and exclusively towards reducing pension cost charged to Government flexibly-priced contracts and to no other contracts or final cost objectives. Nor does the language of FAR 42.1204 itself anywhere give the Government the clear and unequivocal right to refuse to consent to the novation of a closed segment's contracts unless the buyer will agree to such a provision.

Unisys contends that the language of the standard form novation agreement precluding any cost increase to the Government on novated contracts due to the sale guarantees that the pension cost charged to the Government with respect to the novated contracts in the hands of the buyer would not increase beyond the pension cost that would have been incurred had the segment closing not occurred. Pl. Br. at 22-24. Unisys suggests that this insures that the Government will get the full benefit of the transferred surplus. *Id.* But, if Unisys were correct, there would never be a need for the CAS 413 segment-closing adjustment when a contractor sells a segment and retains all of the surplus. If Unisys were correct, this novation agreement language alone would be sufficient because it allegedly does not allow the buyer to charge more in pension cost on the transferred and novated contracts than the seller itself could have charged, meaning that the buyer would have to reduce future pension cost by the amount of the seller's unamortized actuarial gains and losses. This is plainly not the case, however. If it were the case, the CAS 413 segment-closing adjustment would be unnecessary whenever there was a novation agreement. That is plainly not what the CAS Board intended.

the extraordinary measures that Unisys suggests to prevent further dilution of the benefit it will receive.

## IV. The CAS Board Did Not Intend In CAS 413 Merely To Require The Parties To Negotiate An Appropriate Contract Adjustment

Unisys asserts that the "purpose of the original CAS 413.50(C)(12) as described by the CASB, was 'to enable the contracting parties to negotiate an appropriate contract adjustment.'" Pl. Br. at 18. Unisys relies upon a May 12, 1977, letter from Arthur Schoenhaut, the CAS Board's Executive Secretary, describing the *proposed* version of CAS 413 that was published in the Federal Register on February 3, 1977. Pl. App. at 1. Unisys additionally argues that the CAS Board's comments demonstrate that the Board "expected the parties to negotiate the mechanics of payment." Pl. Br. at 28. According to Unisys, the Government's interpretation of CAS 413 is "wholly inconsistent with the CASB's intent, which contemplated case-by-case negotiation and resolution of adjustments in a way that is fair and practical." Pl. Br. at 29. Unisys also asserts that it and other contractors "structured the transaction on the basis of what they believed to be reasonable interpretations of the regulations." *Id.*

Unfortunately for Unisys, this very same argument was advanced by General Motors in *Teledyne*, and soundly rejected by this Court. This Court held:

> Where, as here, GM's interpretation of CAS 413.50(c)(12) hinges on language that was eliminated from the final rule, the argument has no merit. *See Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 185 (1st Cir.1999) (holding that "Congress sometimes can speak as clearly by opting not to enact proffered language as by enacting it") (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other

> language.")). Because the CASB deleted any reference to a negotiation in the final version of the CAS 413 segment closing provision, the court finds that no such requirement exists.

*Teledyne*, 50 Fed. Cl. at 173.

The Court should also find unavailing Unisys's argument that its interpretation of CAS 413 is reasonable because it and two other defense contractors structured transactions in similar manners. Unisys has not presented any evidence whatsoever that it and the other contractors developed their interpretations of CAS 413 independently. Moreover, to the extent that Unisys's proposed interpretation, as well as that of other contractors, relies upon language that was deleted from the final version of the standard, it cannot be regarded as a reasonable interpretation.

## V. No Windfall To The Government Would Result From Requiring Unisys To Perform A Segment-Closing Adjustment With Respect To The Many Millions Of Dollars of Pension Surplus That It Retained

Unisys argues that the Government would receive a windfall if it is able to receive a segment-closing adjustment with respect to the millions of dollars of pension surplus that it retained, and get the benefit of the transferred surplus in the future in the hands of Loral. Pl. Br. at 26-30. There are at least two problems with this argument.

First, it is Unisys that would enjoy the windfall, not the Government, if Unisys's erroneous position were to be accepted, because Unisys would retain hundreds of millions of dollars of pension surplus in its pension plan, surplus that was created by excess pension contributions that the Government reimbursed in part, but would never pay a penny to the Government as a segment-closing adjustment. This surplus would benefit only Unisys's remaining segments, not the Government customers of the transferred segment, and that is precisely what the CAS Board intended to prevent.

Second, as demonstrated above, when there is a partial transfer of surplus, the Government will never receive at the hands of the buyer the equivalent of a direct, lump sum payment of the segment-closing adjustment with respect to the retained surplus. Unisys posits a hypothetical example (Pl. Br. at 26), in which the closed segment's pension surplus is $100, the Government's share of which (calculated according to this Court's decision in *Teledyne*), absent any transfer of surplus, is 10%, or $10. The seller transfers $50 of surplus. According to Unisys, unless the seller is excused from making a segment-closing adjustment with respect to the $50 of surplus that it retains, the Government will get more than its $10 share, because it will get $55 (the Government's share of the retained surplus (10% of $50)), plus "the benefit from the transfer of the $50 in surplus." *Id.* This is demonstrably not the case. As demonstrated above, the transfer of $50 of surplus to the buyer's plan can *never* produce the same benefit to the Government as a direct payment of $50 to the Government. In fact, if the Government's share of the surplus was 10% in the hands of the seller (because 10% of the surplus was attributable to CAS 413-covered, flexibly-priced contracts), there is no reason to think that the benefit to the Government from the transferred surplus in the hands of the buyer would be any more than 10% of $50 (without regard to the reduction in value due to the time value of money because the Government would receive the benefits only over time rather than in a single lump sum). There is no reason to anticipate that the closed segment's contract mix would change from 10% CAS-413-covered, flexibly-priced contracts to 100% CAS 413-covered, flexibly-priced contracts (and new negotiated firm-fixed-price contracts), yet that is the only way (again without regard to the time value of money) that the benefit to the Government could equal the $55 that Unisys assumes.

## VI. Unisys's "Net Cost Impact" Argument Is Precluded By This Court's Prior Decision In *Teledyne*

Finally, Unisys contends that, even if its partial surplus transfer did not satisfy its obligation to make a CAS 413 segment-closing adjustment, the Government can only recover "the net impact of [Unisys's] noncompliance on all CAS-covered contracts in effect on the date of the transaction." Pl. Br. at 30 *et seq*. According to Unisys, the Government's only remedy for Unisys's failure to make the required segment-closing adjustment is an adjustment under the Cost Accounting Standards clause referred to at 48 C.F.R. § 9903.201-4(a) (a clause that is also found at FAR § 52.230-2, 48 C.F.R. § 52.230-2 (1995)), an adjustment that "shall provide for recovery of the increased costs to the United States . . . " *Id.* Unisys also relies upon the language of 48 C.F.R. § 9903.306(e). As a result, according to Unisys, the Government can get no recovery until, after a laborious accounting process over a period of years, if not decades, the amount of benefit that the Government allegedly received from the partial surplus transfer is determined.

The principal flaw in Unisys's argument is that it is addressed to the wrong clause. This Court has already determined in *Teledyne* that the Government's recovery of its share of a closed segment's pension surplus is made under the FAR's Allowable Cost and Payment clause (FAR § 52.216-7, 48 C.F.R. § 52.216-7) and the Credits provision found at FAR § 31.201-5. The Court held:

> Because the court concludes that the CAS 413 segment closing adjustment allows for recovery in the current period at the time of the segment closing, the terms of the Allowable Cost and Payment and Credits clauses will govern. . . . Under the Allowable Cost and Payment clause, if the CAS 413 calculation shows a surplus, the contractor will be required "to pay to the Government

> any refunds, rebates, credits, or other amounts . . . accruing to or received by the Contractor . . . to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government." 48 C.F.R. § 52.216-7(h)(2). The provision is then implemented through the Credits clause, which states that, "The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by a cash refund." *Id.* § 31.201-5.

*Teledyne*, 50 Fed. Cl. at 182 (citations omitted). The Court then reiterated its holding in the Conclusion of its decision, stating unequivocally: "The portion of the surplus or deficit attributable to flexibly-priced contract under which pension costs were reimbursed by the government is recoverable under the Allowable Cost and Payment clause, FAR 52.216-7(h), and the Credits clause, FAR 31.201-5." *Id.* at 191.

The court of appeals squarely affirmed this Court's holding in this regard. The court of appeals held that, under the Allowable Cost and Payment clause, "if the CAS 413 calculation shows a surplus, the contractor is required 'to pay the Government any refunds, rebates, credits, or other amounts . . . accruing to or received by the Contractor . . . to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government.,'" *Allegheny Teledyne Inc.*., 316 F.3d at 1370 n.3. The court of appeals also noted that the Credits clause "implements the allowable cost clause." *Id.* n.4, *quoting* 48 C.F.R. § 31.201-5. Later in its decision, the court of appeals rejected an argument advanced by Teledyne, stating "In any event, following Teledyne's approach would eviscerate the requirements of the mandatory Allowable Cost and Payment clause that require the contractor to pay all allocable credits to the government while the contract is open." *Allegheny Teledyne Inc.*, *id.* at 1383.

Under this settled authority, Unisys's argument should be rejected. As this Court has

determined, and the court of appeals has affirmed, the Government is entitled to recover the full amount of the segment-closing adjustment that Unisys owes, through the Allowable Cost and Payment clause and the Credits provision.

## Conclusion

For the foregoing reasons, the Court should grant defendant's cross-motion for partial summary judgment, deny Unisys's motion, and determine that:

> When, as part of a segment closing that is subject to the requirements of Original CAS 413.50(c)(12), a contractor transfers part of the closed segment's pension surplus from its pension plan to the buyer's pension plan,
>
> 1. The required CAS 413 segment closing calculation must be made upon the pension surplus that the selling contractor retains, or, in the alternative, if the Court is not persuaded to adopt that interpretation, upon the full amount of the pension surplus that was allocable to the segment at the time of segment closing, without regard to the partial transfer of surplus; and
>
> 2. In any and all events, the selling contractor is required under Original CAS 413, at a minimum, to make a segment-closing adjustment with respect to the surplus that it retains.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

OF COUNSEL:

STEPHEN R. DOOLEY
Supervisory Trial Attorney
Defense Contract Management Agency
495 Summer Street
Boston, MA 02210

Dated: January 12, 2007

s/ C. Coleman Bird

C. COLEMAN BIRD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: 202.307.0453
Facsimile: 202.514.7965

Attorney for Defendant United States

**CERTIFICATE OF FILING**

I hereby certify that on the 12th day of January, 2007, a copy of the foregoing Defendant's Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ C. Coleman Bird