**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **UNISYS CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05-281C** |
| **v.** | ) | **(Judge Firestone)** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States, submits the following Response to plaintiff's Proposed Findings of Uncontroverted Fact in Support of Unisys's Motion for Summary Judgment, dated October 27, 2006 ("PPFUFs"). Defendant will respond in accordance with the requirements of RCFC 56(h)(2).

**CLOSING OF THE DSO SEGMENT**

1. Unisys and its various predecessors in interest have performed negotiated Government contracts for many years. Prior to 1995, Unisys and its predecessors in interest operated a number of business units that performed Government contracts and subcontracts that were covered by the Cost Accounting Standards ("CAS"). Those business units were organized in the Government Systems Group ("GSG"). On March 20, 1995, Unisys entered into a contract to sell certain GSG assets, identified as the Defense System Organization ("DSO"), to Loral. The sale included four CAS-covered Unisys segments located at Great Neck, New York; Salt Lake City, Utah; Eagan, Minnesota; and Huntsville, Alabama. The DSO transaction closed on May 4, 1995. Shortly before the sale of DSO, GSG had been combined with Unisys' Federal Systems

Division ("FSD"). The GSG operations that were not sold to Loral were retained by Unisys and continue to operate as FSD.

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that Unisys has performed negotiated Government contracts, and that the sale included Unisys business units located at Great Neck, New York; Salt Lake City, Utah; Eagan, Minnesota; and Huntsville, Alabama. Defendant otherwise disputes this PPFUF because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

2. Prior to the sale of DSO, Unisys calculated and allocated pension costs using separate segment accounting at the GSG level. Pension costs were computed for the GSG businesses in the aggregate on a segmented basis and were then allocated on a composite basis to the segments that comprised GSG, including the four segments that were sold to Loral. The four sold segments participated in three separate qualified pension plans maintained by Unisys. Since 1994, each of the various Unisys pension plans had been "fully funded." As a result, Unisys had made no contributions to the plans since 1993.

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that the four sold segments participated in three separate pension plans maintained by Unisys. Defendant otherwise disputes this PPFUF because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

3. Under the relevant regulations, Unisys had not included pension costs in its cost estimates for new Government contracts after the plans became overfunded. Unisys had recovered no pension costs on any Government contract awarded from 1993 through 1995. The

Unisys situation was common for defense contractors since the early 1980s "due primarily to `the unexpectedly robust growth of the stock market, and to a lesser extent from the shrinking defense industry workforce, dampened wage inflation for salaried employees below the corporate executive level, funding requirements imposed by the Employee Retirement Income Security Act (ERISA) of 1974, and government contract regulations'." *Gen. Elec. Co. v. United States*, 60 Fed. Cl. 782, 785 n.2 (2004) (quoting Karen L. Manos, *Government Claims to Surplus Pension Assets*, 48 Cath. U. L. Rev. 1139 (1999)).

**DEFENDANT’S RESPONSE:**

Defendant disputes the first and second sentences of PPFUF No. 3 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1). Defendant does not dispute that it was common for defense contractors to have overfunded pension plans "due primarily to `the unexpectedly robust growth of the stock market, and to a lesser extent from the shrinking defense industry workforce, dampened wage inflation for salaried employees below the corporate executive level, funding requirements imposed by the Employee Retirement Income Security Act (ERISA) of 1974, and government contract regulations'”, however, defendant disputes that Unisys’s “situation” was “common” to that of other defense contractors, as Unisys has failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

**CAS 413**

4. In 1977, CAS 413 was promulgated by the Cost Accounting Standards Board ("CASB"). 4 C.F.R. § 413 (1978) (later recodified as 48 C.F.R. § 9904.413). CAS 413 became effective on March 10, 1978, and was to be followed by each covered contractor "on or after the start of his next cost accounting period beginning after the receipt of a contract to which this

Cost Accounting Standard is applicable" under 4 C.F.R. § 413.80. Pursuant to this provision, CAS 413 first became applicable to Unisys' Government contracts as of January 1, 1979.

**DEFENDANT'S RESPONSE:**

Defendant does not dispute the first and second sentences of PPFUF ¶ 4. Defendant otherwise disputes the third sentence of PPFUF ¶ 4 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

5. When there was a "segment closing," the original CAS 413 directed the contractor to "determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated." 4 C.F.R. § 413.50(c)(12). The Standard also provided that the "difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously determined pension costs." *Id.* The purpose of CAS 413.50(c)(12), as described by the CASB, was "to enable the contracting parties to negotiate an appropriate contract adjustment." May 12, 1977 Letter from CASB to IRS, at 2 (Exh. 1).

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that the original CAS 413.50(c)(12), 4 C.F.R. § 413.50(c)(12), stated in part, that a contractor should "determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated," and that the "difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously determined pension costs." Defendant does not dispute that Arthur Schoenhaut, Executive Secretary of the CAS Board, in a letter dated May 12, 1977 to the Internal Revenue

Service, stated in part that the purpose of the version of CAS 413 that the CAS Board had proposed in the Federal Register on February 3, 1977, was "to enable the contracting parties to negotiate an appropriate contract adjustment." Defendant disputes that this was the purpose of CAS 413.50(c)(12) as finally promulgated, and otherwise disputes the third sentence of this PPFUF.

6. On August 19, 1991, the CASB published a notice seeking public comments on a Staff Discussion Paper on the topic of accounting for the pricing of fully-funded defined benefit pension plan costs. 56 Fed. Reg. 41,151 (Aug. 19, 1991)(Exh. 2). In the Background section of the Staff Discussion Paper, the CASB explained that "Overfunding did not rank among one of the original CASB's major concerns." CASB, Staff Discussion Paper, "Accounting for Fully-funded Defined Benefit Pension Plans," at 4 (Aug. 19, 1991) (Exh. 2). The CASB observed that during the 1980s, several factors served to "convert a generally underfunded pension environment into a state tending to overfunding." *Id.* at 5.

**DEFENDANT'S RESPONSE:**

Defendant does not dispute the first sentence of PPFUF No. 6. Defendant does not dispute that the Staff Discussion Paper contains the quoted language, and otherwise disputes the remainder of PPFUF No. 6.

7. On March 30, 1995, the CASB published revisions to the original CAS 413. 60 Fed. Reg. 16,534 (Mar. 30, 1995) (Exh. 3). Among other things, significant changes were made to CAS 413.50(c)(12) regarding the adjustment due as a result of a segment closing. The revised CAS 413 was not applicable to Unisys's Government contracts until January 1, 1996 under 48

C.F.R. § 9904.413-63(b). Thus, the original version of CAS 413 applies to the calculation of the adjustment related to the segment closings in this case.

**DEFENDANT'S RESPONSE:**

Defendant does not dispute the first sentence of PPFUF No. 7. Defendant does not dispute that CAS 413.50(c)(12), pertaining to segment closing calculations, was modified by the amendments contained in this Federal Register notice. Defendant disputes the third and fourth sentences of PPFUF No. 7 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

8. As revised in 1995, CAS 413.50(c)(12)(v) creates what amounts to a "safe harbor" for contractors that sell segments with pension surpluses. Under that provision, if the contractor transfers to the purchaser *all* plan assets and liabilities that are attributable to the sold segment, no additional adjustment in pension costs is due to the Government. CAS 413.50(c)(12) also states in relevant part: "If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor." 60 Fed. Reg. 16,534, 16,552 (Mar. 30, 1995) (Exh. 3). This language did not appear in the original CAS 413, the advance notice of proposed rulemaking, notice of proposed rulemaking, or any of the CASB's public comments on the revisions to CAS 412 and 413; and the new language was not added to CAS 413.50(c)(12) until the Final Rule was published on March 30, 1995. The CASB explained, "To address questions concerning overfunded pension plans, the Board ***added*** coverage to CAS [413] defining what constitutes a segment closing and providing greater specificity regarding accounting for pension

costs when segments are closed or pension plans are terminated." 60 Fed. Reg. 16,534, 16,535 (March 30, 1995) (Exh. 3) (emphasis added).

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that the revised CAS 413.50(c)(12)(v) provides:

> If a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment amount pursuant to this paragraph (c)(12) is required. If only some of the pension plan assets and actuarial accrued liabilities of the closed segment are transferred, then the adjustment amount required under this paragraph (c)(12) shall be determined based on the pension plan assert and actuarial accrued liabilities remaining with the contractor.

CAS 413.50(c)(12)(v), 48 C.F.R. § 9904.413-50(c)(12)(v) (1995). Defendant does not dispute that the Federal Register notice referred to stated, in part: "To address questions concerning overfunded pension plans, the Board added coverage to CAS [413] defining what constitutes a segment closing and providing greater specificity regarding accounting for pension costs when segments are closed or pension plans are terminated." Defendant disputes the remainder of PPFUF No. 8 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

9. On August 9, 2001, this Court issued its decision in *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001) *("Teledyne I")* interpreting, *inter alia*, CAS 413.50(c)(12) and addressing the applicability of the 1995 amendments to CAS413. This Court's decision was affirmed by the United States Court of Appeals for the Federal Circuit in *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003) *("Teledyne II"), cert denied sub nom. Gen. Motors Corp. v. United States*, 540 U.S. 1068 (2003) (No. 03-165).

**DEFENDANT'S RESPONSE:**

Defendant does not dispute PPFUF No. 9.

**TRANSFER OF PENSION ASSETS**

10. At the time of the Unisys/Loral transaction in 1995, long before this Court's comprehensive decisions about CAS 413 cited in the preceding paragraph, there was considerable uncertainty about the meaning of CAS 413. Unisys and at least two other contractors (whose cases are also before this Court[1]) that divested Government contract business units under the pre-1995 version of CAS 413 elected to transfer some, but not all, surplus pension assets to the purchaser. Such asset transfers reduced the pension costs that would otherwise have been incurred by the purchaser and charged to the Government after the transaction.

**DEFENDANT'S RESPONSE:**

Defendant disputes PPFUF No. 10 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

11. Unisys (and other contractors) have argued that the transfer of assets to the successors satisfied the requirements of CAS 413.50(c)(12) if the amount of benefit to the Government was at least equal to the segment closing adjustment that would otherwise have been due to the Government. 48 C.F.R. § 9904.306(f) generally authorizes a variety of alternative methods for making adjustments due under CAS: "Whether cost impact is recognized by modifying a single contract, several but not all contracts, or all contracts, or any other suitable

[1] See Gen. Elec. Co. v. United States (No. 99-172C); *The DirecTV Group, Inc. v. United States* (No. 04-1414C).

technique, is a contract administration matter. The Cost Accounting Standards rules do not in any way restrict the capacity of the parties to select the method by which the cost impact attributable to a change in cost accounting practice is recognized."

**DEFENDANT'S RESPONSE:**

Defendant disputes the first sentence of PPFUF ¶11 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1). Defendant does not dispute that 48 C.F.R. § 9903.306(f) (Unisys's citation to §9904.306 is in error) states, in part: "Whether cost impact is recognized by modifying a single contract, several but not all contracts, or all contracts, or any other suitable technique, is a contract administration matter. The Cost Accounting Standards rules do not in any way restrict the capacity of the parties to select the method by which the cost impact attributable to a change in cost accounting practice is recognized."

12. Effective May 5, 1995, Unisys, Loral, and the Government entered into a Novation Agreement in connection with the sale of DSO. Pursuant to the Novation Agreement, Loral "assumed all obligations and liabilities of [Unisys] under the contracts" by virtue of the sale and became the "successor in interest in and to the contracts" that were the subject of the sale. Novation Agreement ¶¶ (a)(4), (b)(4) (Exh. 4). Pursuant to the Novation Agreement, Unisys and Loral agreed that "the Government is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the contracts." Novation Agreement ¶ (b)(6)(i) (Exh. 4).

Accordingly, under the novated contacts, Loral was, and remained, unable to recover more pension costs than Unisys would have recovered absent the sale of the DSO.

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that the Novation Agreement between the Government, Unisys, and Loral, effective May 5, 1995, stated, in part, that Loral "assumed all obligations and liabilities of [Unisys] under the contracts" by virtue of the sale and became the "successor in interest in and to the contracts" that were the subject of the sale. Additionally, defendant does not dispute that ¶ (b)(7)(i) of the Novation Agreement (Unisys's citation to ¶ (b)(6)(i) is in error) states, in part, "the Government is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the contracts." Defendant disputes the last sentence of PPFUF No. 12 as it is a conclusion of law.

13. Effective May 5, 1995, Unisys, Loral, and the Government also entered into an Advance Agreement under FAR 31.109 relating to Loral's acquisition of Unisys' assets. Pursuant to this agreement, Loral agreed to "maintain segmented pension plan accounting for the employees of the [DSO] unless it adopts a change in cost accounting practices as provided by regulation." Novation Agreement, Exh. B ¶(II)(I) (Exh. 4). Pursuant to a separate Advance Agreement Addressing Pension Funds (dated April 9, 1996), Unisys, Loral, and the Government "acknowledge that this Agreement is not intended to enlarge the rights of the parties but, rather,

is intended to preserve . . . existing rights of the parties as of the effective date of the novation agreement." Novation Agreement, Exh. C at 1 (Exh. 4).

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that the Government, Unisys, and Loral entered into an Advance Agreement that stated that it was entered into pursuant to FAR 31.109, and which contained an effective date of May 5, 1995. Defendant further does not dispute that the Advance Agreement states, in part, that Loral will "maintain segmented pension plan accounting for the employees of the [DSO] unless it adopts a change in cost accounting practices as provided by regulation." Defendant does not dispute that the Government, Unisys, and Loral entered into a separate Advance Agreement Addressing Pension Funds, signed by the Government on April 9, 1996, which stated in a "WHEREAS" clause that the parties "acknowledge that this Agreement is not intended to enlarge the rights of the parties but, rather, is intended to preserve . . . existing rights of the parties as of the effective date of the novation agreement."

14. When Unisys sold the DSO assets to Loral, the Unisys plan contained assets sufficient to cover all liabilities under the plans, plus a total surplus attributable to the sold segments of $76,253,238. Unisys transferred to Loral all of the pension liabilities associated with currently active employees, along with pension assets in the Unisys plan equal to those liabilities. Unisys also transferred to Loral an additional $27,377,055 in pension assets over and above the assets equal to the liability transferred to Loral. Unisys retained the remaining $48,876,182 of the total pension surplus of $76,253,238.

**DEFENDANT'S RESPONSE:**

Defendant disputes PPFUF No. 14 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

15. At the time of the sale, if there had been no transfer of assets to Loral, the adjustment due to the Government under CAS 413.50(c)(12) as of May 4, 1995 would have been no more than $13,534,954.[2]

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that the contracting officer's final decision calculated the Government share for the closed segments as 20.70 percent for Great Neck, 13.92 percent for Huntsville, 6.14 percent for Eagan, and 27.90 percent for Salt Lake City. Defendant otherwise disputes PPFUF No. 15 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

16. Unisys could not have withdrawn surplus assets from the plan in 1995 or thereafter in order to transfer cash to the Government equal to the amount of the segment closing adjustment due under CAS 413 without triggering substantial excise taxes and penalties on the amounts withdrawn.

---

[2] The parties have not agreed on the precise dollar amount of the adjustment that would have been due in 1995, but we do not believe that there is any significant difference in the parties' positions. The total assets and liabilities for the DSO are undisputed. In arriving at the total amount due to the Government if no assets or liabilities had been transferred to Loral, Unisys utilized the Government's own calculation of its share for each of the closed segments (20.70 percent for Great Neck, 13.92 percent for Huntsville, 6.14 percent for Eagan, and 27.90 percent for Salt Lake City). Final Decision at 4-5. Unisys reserves its right to contest portions of the Government calculation if this Motion is denied, but for purposes of this Motion, Unisys has used the Government's numbers.

**DEFENDANT'S RESPONSE:**

Defendant disputes PPFUF ¶ 16 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

17. After the purchase of DSO, Loral and its successor in interest were and would continue to be required to recognize the transferred surplus in pricing new Government contracts and in charging contracts that were novated. As a result of the surplus transfer, Loral and its successor in interest have actually charged lower amounts of pension cost to the Government in years following the sale than would have been charged if no surplus had been transferred. The Government auditors have conceded that "since Unisys transferred $27,377,055 of the $76,253,238 surplus pension assets to the successor-in-interest (Loral), the Government and other customers of the sold segments will continue to benefit from these transferred surplus assets." DCAA Audit Report (January 23, 2003) at 6 (Exh. 5).

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that a DCAA Audit Report No. 6181-97D19200123-S1, dated January 23, 2003, with the Subject: "Supplemental Audit Report on Unisys's Noncompliance with CAS 413.50(c)(12): Failure to Make the Required 1995 Pension Cost Adjustments Due to Sale and Closure of Four CAS Segments," stated "since Unisys transferred $27,377,055 of the $76,253,238 surplus pension assets to the successor-in-interest (Loral), the Government and other customers of the sold segments will continue to benefit from these transferred surplus assets." Defendant otherwise disputes PPFUF No. 17 because Unisys failed to provide adequate support as required by RCFC 56(c) and 56(h)(1).

18. The DCAA Audit Report confirms that "[t]he proper accounting for the $27,377,055 asset transfer to the successor-in-interest (Loral) . . . is the primary difference between the contractor's computation of the required pension cost adjustment and our audit [DCAA] recommended pension cost adjustment." DCAA Audit Report (Jan. 23, 2003) at 5 (Exh. 5). The Government contends that "[t]he contractor's method represents an `out-of-sequence' application of the *original* CAS 413.50(c)(12) requirements and does not result in the logical recovery of previously overstated pension costs . . . ." DCAA Audit Report (Jan. 23, 2003) at 6 (Exh. 5) (emphasis in original).

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that the January 23, 2003 DCAA Audit Report states, in part, that "[t]he proper accounting for the $27,377,055 asset transfer to the successor-in-interest (Loral) . . . is the primary difference between the contractor's computation of the required pension cost adjustment and our audit [DCAA] recommended pension cost adjustment," and further states, in part, that "[t]he contractor's method represents an `out-of-sequence' application of the *original* CAS 413.50(c)(12) requirements and does not result in the logical recovery of previously overstated pension costs . . . ." Defendant otherwise disputes the remainder of PPFUF No. 18 as unsupported by the document cited.

19. The Government argues that it is entitled to an additional cash payment equal to the product of the assets remaining in the plan after the transfer to the successor multiplied by the Government share of the total surplus assets calculated in accordance with the requirements of CAS 413.50(c)(12). The Final Decision cites the original provision of CAS 413.50(c)(12) as the authority for the adjustment that the Government seeks.

**DEFENDANT'S RESPONSE:**

Defendant does not dispute that defendant's position is that the Government is entitled to a segment-closing adjustment with respect to the pension surplus allocable to the closed segments that plaintiff retained calculated in accordance with the requirements of CAS 413.50(c)(12) as promulgated in 1977. Defendant does not dispute that the Contracting Officer's Final Decision, dated December 9, 2004, stated that "original CAS 413, prior to its amendment in 1995, applies to this segment closing." Contracting Officer's Final Decision, dated December 9, 2004 (Ex. 5, Plaintiff's Appendix), at 1. Defendant otherwise disputes the remainder of PPFUF No. 19.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ C. Coleman Bird
C. COLEMAN BIRD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: 202.307.0453
Facsimile: 202.514.7965

Attorney for Defendant United States

OF COUNSEL:

STEPHEN R. DOOLEY
Supervisory Trial Attorney
Defense Contract Management Agency
495 Summer Street
Boston, MA 02210

Dated: January 12, 2007

**CERTIFICATE OF FILING**

I hereby certify that on the 12th day of January, 2007, a copy of the foregoing Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact in Support of Plaintiff's Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ C. Coleman Bird