No. 05-281C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNISYS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S APPENDIX IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

C. COLEMAN BIRD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: 202.307.0453
Facsimile: 202.514.7965

Attorneys for Defendant
United States

OF COUNSEL:

STEPHEN R. DOOLEY
Supervisory Trial Attorney
Defense Contract Management Agency
495 Summer Street
Boston, MA 02210

Dated: January 12, 2007

# INDEX TO APPENDIX

PAGE

Notice of Cost Accounting Standard, February 3, 1977 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Restatement of Objectives, Policies and Concepts, May 19, 1977 . . . . . . . . . . . . . . . . . . . . . . . . 6

CAS 412, *codified in* 4 C.F.R. § 412 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CAS 413, *codified in* 4 C.F.R. § 413(1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Cost Accounting Standards Board, Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs; Final Rule, (60 Fed. Reg. 16534) March 30, 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

DCAA Supplemental Audit Report No. 6701-97D19200123, January 29, 2003 . . . . . . . . . . . 70

Case 1:05-cv-00281-NBF Document 31-4 Filed 01/12/2007 Page 3 of 12



| Description of change | Accounting treatment |
|---|---|
| 6. For a particular class of assets for which technological changes have rarely affected asset lives, a contractor uses a five year average of historical lives to estimate future lives. Last year the five year average resulted in an estimated future life of eight years for this class of assets. This year the five year average predicts a useful life of seven years for the assets acquired this year for this class of assets. | 6. The change in estimate is not a change in cost accounting practice. The contractor has not changed the method or technique used to determine the estimate. The result of the methodology applied to historical data has indicated a change in the estimated life, and this is not a change in cost accounting practice. |
| 7. A contractor has been operating for some time under Cost Accounting Standard 410. The contractor's mix of business changes substantially such that there are significant new projects which have substantially increased quantities of subcontracts and Government furnished material. | 7. The contractor has been allocating his general and administrative expense pool to final cost objectives on a total cost input base in compliance with the Standard. With the addition of the new work, it is agreed that a total cost input base would result in a significant distortion in the allocation of the G&A expense pool. To remain in compliance with the requirements of Standard 410, the contractor is required to change its G&A allocation base from a total cost input base to a value added base. Per the provisions of 331.20(i), this change to remain in compliance with the requirements of the Standard is not a change in cost accounting practice. |
| 8. The marketing department of a segment has reported directly to the general manager of the segment. The costs of the marketing department have been accounted for as part of the segment's G&A expense pool. The company reorganizes and requires the marketing department to report directly to a vice president at corporate headquarters. | 8. While the reporting framework of the organization has changed, the accounting for the cost of the marketing department has not changed. Thus, the organizational change has not resulted in a change in cost accounting practice. |
| 9. A contractor values the assets of a pension fund on the basis of acquisition cost. Pursuant to the provisions of the Employee Retirement Income Security Act of 1974, the value of the pension fund's assets must be determined on the basis of a valuation method which takes into account fair market values. | 9. The requirement to use the new valuation method is a requirement of the Act, but the Act does not spell out any requirement that the contractor reflect the new method (or any higher cost) in contract cost accounting. Nevertheless, applicable provisions of ASPR permit reimbursement to the contractor only of allocable pension costs actually paid into the pension fund. Additionally, Item 7.1.8 of the Disclosure Statement requires a description of the method used for valuing pension fund assets. In these circumstances, for all practical purposes the Act compels the contractor to alter his cost accounting practice. Accordingly, the alteration in accounting made by the contractor to conform to the law is not considered to be a change in cost accounting practice for purposes of paragraphs (a)(4) and (a)(5) of the Cost Accounting Standards clause (4 CFR Part 331.50). |

ARTHUR SCHOENHAUT,
*Executive Secretary.*

[FR Doc.77-3311 Filed 2-2-77;8:45 am]

**[4 CFR Part 413]**

## ADJUSTMENT AND ALLOCATION OF PENSION COST

### Proposed Cost Accounting Standard

Notice is hereby given of a Cost Accounting Standards on the Adjustment and Allocation of Pension Cost, being considered by the Cost Accounting Standards Board for promulgaton to implement further the requirement of section 719 of the Defense Production Act of 1950, as amended, Public Law 91-379, 50 USC App. 2168. When promulgated, the Standard will be used by all relevant Federal agencies and national defense contractors and subcontractors.

The proposed Standard, if adopted, would be one of a series of Cost Accounting Standards which the Board is promulgating "to achieve uniformity and consistency in the cost accounting principles followed by defense contractors and subcontractors under Federal contracts." (See Sec. 719(g) of the Defense Production Act of 1950, as amended.) It is anticipated that any contractor receiving an award of a contract subject to the rules, regulations, and Standards of the Cost Accounting Standards Board on or after the effective date of this Standard will be required to follow it in accordance with the provisions of § 413.80.

This Standard is the second Standard dealing with pension costs. The first Standard, 4 CFR Part 412, establishes the composition of pension cost and the bases to be used for measuring such cost. It provides also the criteria for determining the amount of pension cost to be assigned to cost accounting periods. Although Standard 412 includes actuarial gains and losses as a component of pension costs, it does not state how or when such gains and losses shall be assigned to periods or measured.

The proposed Standard being published today establishes the basis for assigning actuarial gains and losses to cost accounting periods. It establishes also the basis for valuing the assets of a pension fund. Such valuations affect significantly the components of pension cost, including actuarial gains and losses. Finally, the Standard establishes the basis for allocating pension costs to segments of an organization.

In its research leading to the development of this proposed Standard, the Board's staff circulated a staff draft Standard. The staff noted some confusion as to the meaning of the term "segment" in that draft. The definition used in the proposed Standard is the same as that set forth in 4 CFR Part 400. Some commentators construed the term to mean any group of employees performing work for the Government; others construed it to mean product line. It is neither. As defined, a segment is an organizational unit which reports directly to a home office of that organization. The designation of organizational units as segments is a responsibility of the contractor.

Other commentators expressed concern as to whether the provisions of the draft Standard requiring contractors, under certain circumstances, to separately calculate pension costs by segment is applicable to segments that perform commercial work only. The answer is in the negative. The provisions of the proposed Standard are applicable only to those segments having contracts that are subject to Cost Accounting Standards.

Several commentators asked whether the asset valuation criteria set forth in the proposed Standard are to be applied for all actuarial purposes or solely for determining actuarial gains and losses. The proposed Standard specifically provides that the value of a pension fund's assets, as derived pursuant to the proposed Standard, shall be used for purposes of calculating all components of pension cost. Other commentators asked whether the methods currently used for valuing pension fund assets can continue to be used in calculating pension cost. The proposed Standard does not prescribe the asset valuation method to be used. However, it requires that (1) the method be used consistently, and (2) the total asset value produced by the method be no less than 80% or more than 120% of the total market value of all of the assets of the pension fund. The proposed Standard contains an illustration covering the valuation of assets.

In developing the proposed Standard, the Board has researched the Employee Retirement Income Security Act of 1974 and regulations issued thereto. The Board believes that the provisions of this Standard are in consonance with both the provisions of the Act and with regulations issued to date.

The Board solicits comments on the proposed Cost Accounting Standard which will assist the Board in its consideration of the proposal. Interested persons should submit written data and views concerning the proposed Cost Accounting Standard to the Cost Accounting Standards Board, 441 G Street, N.W., Washington, D.C. 20548. To be given consideration by the Board in its determination relative to final promulgation of the Cost Accounting Standard covered by this Notice, written submissions must be made to arrive no later than April 25, 1977.

NOTE.—All written submissions made pursuant to this Notice will be made available for public inspection at the Board's Office during regular business hours.

The proposed Part 413 reads as follows:

## PART 413—ADJUSTMENT AND ALLOCATION OF PENSION COST

Sec.
413.10 General applicability.
413.20 Purpose.



1

HeinOnline -- 42 Fed. Reg. 6594 1977

Sec.
413.30 Definitions.
413.40 Fundamental requirement.
413.50 Techniques for application.
413.60 Illustrations.
413.70 Exemptions.
413.80 Effective date.

AUTHORITY: Sec. 719, Defense Production Act of 1950, as amended, Pub. L. 91-379 (50 USC App. 2168).

§ 413.10 General applicability.

General applicability of this Cost Accounting Standard is established by § 331.30 of the Board's regulations on applicability, exemption, and waiver of the requirement to include the Cost Accounting Standards contract clause in negotiated defense prime contracts and subcontracts (§ 331.30 of this Chapter).

§ 413.20 Purpose.

A purpose of this Standard is to provide guidance for adjusting pension cost by measuring actuarial gains and losses and assigning such gains and losses to cost accounting periods. In doing so, the Standard establishes the basis for valuing the assets of a pension fund. Another purpose of the Standard is to provide the bases on which pension cost shall be allocated to segments of an organization. The provisions of this Cost Accounting Standard should enhance uniformity and consistency in accounting for pension costs.

§ 413.30 Definitions.

(a) The following are definitions of terms prominent in this Standard.

(1) *Accrued benefit cost method.* An actuarial cost method under which units of benefit are assigned to each cost accounting period and are valued as they accrue—that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial liability at a plan's inception date is the present value of the units of benefit credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method.)

(2) *Actuarial assumption.* A prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets.

(3) *Actuarial cost method.* A technique which uses actuarial assumptions to measure the present value of future pension benefits and pension fund administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods.

(4) *Actuarial gain and loss.* The effect on pension cost resulting from differences between actuarial assumptions and actual experience.

(5) *Actuarial liability.* Pension cost attributable, under the actuarial cost method in use, to years prior to the date of a particular actuarial valuation. As of such date, the actuarial liability represents the excess of the present value of the future benefits and administrative expenses over the present value of future contributions for the normal cost for all plan participants and beneficiaries. The excess of the actuarial liability over the value of the assets of a pension plan is the Unfunded Actuarial Liability.

(6) *Actuarial valuation.* The determination, as of a specified date, of the normal cost, actuarial liability, value of the assets of a pension fund, and other relevant values for the pension plan.

(7) *Immediate-gain actuarial cost method.* Any of the several actuarial cost methods under which actuarial gains and losses are separately determined at a valuation date as a consequence of the actuarial cost method.

(8) *Normal cost.* The annual cost attributable, under the actuarial cost method in use, to years subsequent to a particular valuation date.

(9) *Pension plan.* A deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of decreased employees may be an integral part of a pension plan.

(10) *Pension plan participant.* Any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit from a pension plan which covers employees of such employer or members of such organization, or whose beneficiaries are receiving or may be eligible to receive any such benefit. A participant currently in the employ of an employer is an active participant of the employer's pension plan.

(11) *Projected benefit cost method.* Any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers.

(12) *Segment.* One of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service. The term includes Government-owned contractor-operated (GOCO) facilities, and joint ventures and subsidiaries (domestic and foreign) in which the organization has a majority ownership. The term also includes those joint ventures and subsidiaries (domestic and foreign) in which the organization has less than a majority of ownership, but over which it exercises control.

(13) *Spread-gain actuarial cost method.* Any of the several projected benefit cost methods which includes actuarial gains and losses as part of normal cost as a consequence of the actuarial cost method.

(14) *Termination gain or loss.* An actuarial gain or loss resulting from the difference between the assumed and actual duration of employment of plan participants in a contractor's work force. Termination assumptions do not give consideration to retirement, disability, or death. Assumptions are sometimes made separately for voluntary and for involuntary terminations.

(b) The following modifications of definitions set forth in Part 400 of this chapter are applicable to this Standard: None.

§ 413.40 Fundamental requirement.

(a) *Assignment of actuarial gains and losses.* Actuarial gains and losses shall be calculated annually and shall be assigned to future cost accounting periods.

(b) *Valuation of the assets of a pension fund.* The value of all pension fund assets shall be used in measuring the components of pension cost, and shall be determined under a method which takes into account fair market values and which minimizes the effect of short-term market fluctuation.

(c) *Allocation of pension cost.* Contractors shall allocate pension cost to each segment having participants in a pension plan. The cost of each pension plan shall be separately allocated. Such allocations may always be made by separately computing pension cost for one or more segments. Unless distortions are created, such allocations may instead be made by computing a composite pension cost for two or more segments and allocating the cost to these segments by means of an allocation base. The base shall be representative of the factors on which the pension cost was based.

§ 413.50 Techniques for application.

(a) *Assignment of actuarial gains and losses.* (1) In accordance with the provisions of 4 CFR Part 412, actuarial gains and losses shall be identified separately from unfunded actuarial liabilities being amortized.

(2) Actuarial gains and losses determined under a pension plan whose costs are measured by an immediate-gain actuarial cost method shall be amortized over a 15-year period, beginning with the date as of which the actuarial valuation is made. The gain or loss assignable to each cost accounting period shall be set forth in equal annual installments which shall consist of an amortized portion of the gain or loss plus an interest equivalent on the unamortized portion of such gain or loss. If the actuarial gain or loss determined for a cost accounting period is not material in amount, it may be assigned to a single period.

(3) Actuarial gains and losses applicable to a pension plan whose costs are measured by a spread-gain actuarial cost method are included as part of normal cost and are spread over the remaining average working lives of the work force. Accordingly, no specific amortization period is specified in this Standard for such gains and losses.

(b) *Valuation of the assets of a pension fund.* (1) The value of a pension





HeinOnline -- 42 Fed. Reg. 6595 1977

fund's assets shall be used (i) in determining actuarial gains and losses, and (ii) for purposes of calculating other components of pension cost.

(2) Any recognized method may be used for valuing the assets of a pension fund. However, the total asset value produced by the method used shall fall within a corridor from 80 to 120 percent of the market value of the assets, determined as of the valuation date. If the method produces a value that falls outside the corridor, the value of the assets, as computed under the method in use, shall be adjusted to equal the nearest boundary of the corridor.

(3) The method selected for valuing pension fund assets shall be consistently applied from year to year within each plan and shall recognize appreciation and depreciation of assets in the same manner.

(4) The provisions of paragraphs (b) (1) through (3) of this section are not applicable to insured plans whose funds are co-mingled with the general funds of the insurance company.

(c) *Allocation of pension cost.* (1) For contractors who compute a composite pension cost covering plan participants in two or more segments, the allocation of pension cost to such segments shall be made on the following bases. For a plan whose benefits are based on salaries and wages, the pension cost shall be allocated to each segment on the basis of the salaries and wages for the participants of the segments. For a plan whose benefits are not based on salaries and wages, the pension cost shall be allocated to each segment on the basis of the number of participants in the segments. However, the contracting parties may agree to the use of any other allocation base if such other base establishes a beneficial or casual relationship between the segments and the pension cost.

(2) Unless an equitable allocation of pension cost to segments can be made by means of an allocation base used pursuant to paragraph (c) (1) of this section, separate pension cost for a segment shall be calculated whenever any of the following conditions exist for that segment: (i) there is a significant termination gain or loss attributable to the segment, (ii) the level of benefits, eligibility for benefits, or age distribution is significantly different for the segment than for the average of all segments included in the composite calculation, or (iii) the proper assumptions relating to termination, retirement age, or salary scale are significantly different for the segment than for the average of all segments included in the composite calculation. Pension cost shall also be separately calculated for a segment under circumstances where (A) the pension plan for that segment was, or becomes, merged with that of another segment, and (B) the ratios of assets to actuarial liabilities for each of the merged plans are significantly different from one another after applying the benefits in effect after the merger.

(3) Whenever the pension cost of a segment is required to be calculated separately pursuant to paragraph (c) (2) of this section, such calculations shall be prospective only; prior years' pension costs need not be re-determined.

(4) Calculations of termination gains or losses shall give consideration to factors such as unexpected early retirements, benefits becoming fully vested, and reinstatements or transfers without loss of benefits. An amount may be estimated for future reemployments.

(5) For a segment whose pension costs are required to be calculated separately pursuant to paragraph (c) (2) of this section, there shall be an initial memorandum allocation of pension fund assets to that segment, as follows: (i) If the necessary data are readily determinable the amount of assets to be allocated to the segment shall be the amount of funds contributed by, or on behalf of, the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds; (ii) if the data specified in paragraph (c) (5) (i) of this section, are not readily determinable, assets shall be allocated to the segment in a manner consistent with the actuarial cost method used to determine annual pension cost; (iii) if the costs were determined under differing actuarial cost methods, assets shall be allocated to the segment in the same proportion as the actuarial liability of the segment bears to the actuarial liability of the plan, computed on the accrued benefit cost method. If after the effective date of this Standard a segment's pension plan becomes part of another pension plan, the amount of assets to be allocated to the segment shall be the market value of the segment's assets as of the effective date of the merger.

(6) If prior to the effective date of this Standard a contractor has been calculating pension cost separately for individual segments, the amount of assets previously allocated to those segments need not be changed.

(7) An initial allocation of assets to a segment pursuant to paragraph (c) (5) of this section shall be made only for the active pension plan participants of the segment. The inactive pension plan participants shall be considered as constituting a separate segment; assets shall likewise be allocated to this segment.

(8) After the initial allocation of assets, the contractor shall maintain a record of the portion of subsequent contributions, income, and expenses attributable to the segment; such income and expenses shall include a portion of any actuarial gains and losses attributable to the assets of the pension fund. Fund income and expenses shall be allocated to the segment in the same proportion that the assets allocated to the segment bears to total fund assets.

(9) If plan participants transfer among segments, contractors need not transfer funds unless a transfer is sufficiently large as to distort the segments' ratio of fund assets to actuarial liabilities. However, when an employee of the segment becomes inactive, assets shall be transferred from that segment to the segment established to accumulate the assets and actuarial liabilities for the inactive plan participants. The amount of funds transferred shall be that portion of the actuarial liabilities of the inactive participants that have been funded.

(10) Where pension cost is separately calculated for a segment, the total annual pension cost for the segment shall be the amount calculated for the segment, plus an allocated portion of the pension cost calculated for the inactive participants. Such an allocation shall be made on the basis of total pension costs calculated for the segments having active participants.

(11) Where pension cost is separately calculated for one or more segments, the actuarial cost method used for a plan shall be the same for all segments, as required by 4 CFR 412.50(b). Unless a separate calculation of pension cost for a segment is made because of a condition set forth in paragraph (c) (2) (iii) of this section, the same actuarial assumptions may be used for all segments covered by a plan.

(12) Nothing in this section shall preclude contracting parties from agreeing to the establishment of a separate fund for an individual segment.

(13) The requirements of paragraphs (c) (1) and (2) of this section are appropriate only for segments whose productive operations are continuing. However, if a segment is closed and a significant number of employees are thereby terminated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment, irrespective of whether or not the pension plan is terminated. In computing such net gain or loss, the contractor shall determine the amount of any termination gain pursuant to paragraph (c) (4) of this section. The computation shall also establish gains or losses on pension fund assets, as follows: (i) A portion of the assets of the pension fund shall be allocated to the segment in accordance with the requirements of paragraph (c) (5) (i) through (iii) of this section; (ii) all of the assets shall be valued at market as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, the contracting parties shall agree on an appropriate date. The net gain or loss from the plan for the segment shall be used as a basis for negotiating any appropriate adjustments.

§ 413.60 **Illustrations.**

(a) *Assignment of actuarial gains and losses.* Contractor A has a defined-benefit pension plan whose costs are measured under an immediate-gain actuarial cost method. The contractor makes actuarial valuations every other year. At each valuation date, the contractor calculates the actuarial gains and losses that occurred since the previous valuation date and merges such gains and losses with the unfunded actuarial liabilities that are being amortized. Pursuant to § 413.40(a) (1), the contractor must make an actuarial valuation annually. Any actuarial gains or





HeinOnline -- 42 Fed. Reg. 6596 1977

losses measured must be separately amortized over a 15-year period beginning with the date as of which the actuarial valuation is made. (Section 413.50(a) (1) and (2).)

(b) *Valuation of the assets of a pension fund.* Contractor B has a pension plan, the assets of which are invested in equity securities, debt securities, and real property. The contractor, whose cost accounting period is the calendar year, has an annual actuarial valuation of the pension fund in June of each year; the effective date of the valuation is the beginning of that year. The contractor's method for valuing the assets of the pension fund is a follows: debt securities expected to be held to maturity are valued on an amortized basis running from initial cost at purchase to par value at maturity; land and buildings are valued at cost less depreciation taken to date; all equity securities and debt securities not expected to be held to maturity are valued on the basis of a 5-year moving average of market values. In making an actuarial valuation, the contractor must compare the values reached under the asset valuation method used with the market values of all of the assets (§ 413.40 (b)). In this case, the assets are valued as of January 1 of that year. The contractor establishes the following values as of that date.

| | Asset valuation method | Market |
|---|---|---|
| Cash | $100,000 | $100,000 |
| Equity securities | 6,000,000 | 7,800,000 |
| Debt securities expected to be held to maturity | 550,000 | 600,000 |
| Other debt securities | 600,000 | 750,000 |
| Land and buildings, net of depreciation | 400,000 | 750,000 |
| Total | 7,650,000 | 10,000,000 |

Section 413.50(c) (2) requires that the total value of the assets of the pension fund fall within a corridor from 80 to 120 percent of market. The corridor for the plan's assets as of January 1 is from $12 million to $8 million. Because the asset value reached by the contractor—$7,650,000—falls outside the corridor, the value reached must be adjusted to equal the nearest boundary of the corridor: $8 million. In subsequent years the contractor must continue to use the same method for valuing assets § 413.50(b) (3)). If the value produced falls inside the corridor, such value shall be used in measuring pension cost.

(c) *Allocation of pension cost.* (1) Contractor C has a defined-benefit pension plan covering employees at five segments. Pension cost is computed by use of an immediate-gain actuarial cost method. One segment (X) is devoted primarily to performing work for the Government. During the current cost accounting period, Segment X had a large and unforseeable reduction of employees because of a contract termination at the convenience of the Government and because the contractor did not receive an anticipated follow-on contract to one that was completed during the period. As a result, the plan has a large net termination gain. As a consequence of this gain a separate calculation of the pension cost for Segment X would result in a significantly different allocation of costs to that segment than would a composite calculation and allocation by means of a base. Accordingly, pursuant to § 413.50(c) (2), the contractor must calculate the pension cost for Segment X as if it had its own pension plan. In doing so, the entire termination gain must be assigned to Segment X and amortized over 15 years. After the gain is amortized, the contractor is no longer required to separately calculate the costs for Segment X unless subsequent events require such separate calculation.

(2) Contractor D has a defined-benefit pension plan covering employees at ten segments, all of which have some contracts subject to Cost Accounting Standards. The pension plan's benefits are based on final five-year pay. The cost of the plan is calculated by use of a spread-gain actuarial cost method; the contractor computes normal cost as a percentage of payroll of all the segments and adds an amount representing amortization of a frozen initial unfunded actuarial liability. One of the segments (Segment Y) is entirely devoted to Government work. The contractor's policy is to place junior employees in this segment. The age distribution of the employees of the segment is significantly different from that of the other segments so that its pension cost would be significantly different if computed separately than if computed as a part of a computation which averages the ages of all employees covered by the plan. Pursuant to § 413.50 (c) (2), the contractor must compute the pension cost for Segment Y as if it were a separate pension plan. Accordingly, the contractor must allocate a portion of the pension fund's assets to Segment Y. However, because this portion connot be readily determined, § 413.50(c) (5) (ii) permits the allocation to be made on the basis of the actuarial cost method that was used to determine the pension cost for the plan. Once the assets have been allocated, in future cost accounting periods the contractor shall make separate pension cost calculations for Segment Y based on the actual age distribution for the segment. Because the factors comprising pension cost for the other nine segments are relatively equal, the contractor may compute pension cost for these nine segments by using composite factors and developing a percentage of payroll for the nine segments. Unless the contracting parties agree to the use of another allocation base, the pension cost allocated to each of the nine segments shall be the product of the percentage developed and the payroll of each segment (§ 413.50(c) (1)).

(3) In July 1974, Contractor E acquired Contractor F and made it Segment F. Prior to the merger, each contractor had its own pension plan. Under the terms of the merger, contractor F's pension plan was merged with that of Contractor E. The actuarial assumptions, currently salary scale, and other plan characteristics are about the same for Segment F and Contractor E's other segments. However, based on the same benefits at the time of the merger, the plan of Contractor F had a disproportionately larger unfunded actuarial liability than did Contractor E's plan. Any grouping of the assets and actuarial liabilities of both plans would result in significantly different pension cost allocation to Contractor E's segments than if pension cost were computed for Segment F on the basis that it had a separate pension plan. Accordingly, pursuant to § 413.50(c) (5) (i), Contractor E must allocate to Segment F a portion of the assets of combined plan. The amount to be allocated shall be the value of F's pension plan assets at the date of the merger, adjusted for subsequent contributions and expenditures applicable to the segment (Section 413.50(c) (8)). Contractor E must use these amounts of assets as a basis for calculating the annual pension cost applicable to Segment F.

(4) Contractor G has a pension plan covering employees at seven segments. The contractor has been making a composite pension cost calculation for all of the segments. However, the contractor determines that, pursuant to this Standard, separate pension costs must be calculated for one of the segments. In accordance with § 413.50(c) (7), the contractor must allocate fund assets for the active participants of that segment. The contractor must also create a segment to accummulate the assets and actuarial liabilities for the plan's inactive participants. Pursuant to § 413.50(c) (9), when participants become inactive, the contractor must transfer assets to the segment for inactive participants to cover the actuarial liabilities for the participants that become inactive. However, the amount to be transferred shall be proportionate to the percentage of such liabilities that are funded.

(5) Contractor H has a pension plan covering employees at ten segments. The contractor makes a composite pension cost calculation for all segments. The contractor's records show that the termination experience for one segment—primarily performing Government work—has been significantly different from the average turnover experience of the other segments. Moreover, the contractor assumes that such different experience will continue. Because of this fact, and because the application of a different termination assumption would result in significantly different costs being charged to the Government, the contractor must develop separate pension cost for that segment. In accordance with § 413.50(c) (2), the amount of pension cost must be based on the proper termination assumption for that segment; however, as provided in § 413.50(c) (11), all other assumptions for that segment may be the same as those for the remaining segments.

(6) Contractor I has a five-year contract to operate a Government-owned facility. The pension plan for the employees of that facility is a part of the con-





HeinOnline -- 42 Fed. Reg. 6597 1977

tractor's single pension plan which covers salaried and hourly employees at other locations. At the conclusion of the five-year period, the Government decides not to renew the contract. Although some employees are hired by the successor contractor, Contractor I must still terminate many employees. Pursuant to § 413.50(c) (12), Contractor I must compute a gain or loss on the pension plan for that facility. The contractor first calculates the termination gain or loss. Because of the size of the termination, the Internal Revenue Service considers it to be a partial plan termination. As such, the terminated employees become fully vested in their accrued benefits. As a result, there is a termination loss of $2.5 million. The contractor must then determine the market value of the pension fund assets allocated to the facility. The difference between the market value of the assets and the expected value of the assets represents the gain or loss on the assets. In this case, there was a gain of $1.5 million. Thus, for this facility, there was a net loss of $1 million for the plan. However, there may be other factor to be considered in arriving at the net cost of a plan (such as transfer of pension funds for employees transferring to the successor contractor, or, in case of a whole or partial plan termination, requirements imposed by other Federal agencies). The net gain or loss from all factors shall be used as a basis for negotiating any appropriate adjustments.

**§ 413.70 Exemptions.**

None for this Standard.

**§ 413.80 Effective date.**

(a) The effective date of this Standard is [effective date of final rulemaking].

(b) This Standard shall be followed by each contractor on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable.

ARTHUR SCHOENHAUT,
*Executive Secretary.*

[FR Doc.77-3312 Filed 2-2-77;8:45 am]

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### [14 CFR Part 39]

[Docket No. 77-GL-2]

### McCAULEY MODEL D2AF34C65 AND D2AF34C81 SERIES PROPELLERS

### Proposed Airworthiness Directives

The Federal Aviation Administration is considering amending Part 39 of the Federal Aviation Regulations by adding an airworthiness directive applicable to McCauley Model D2AF34C65 and D2AF34C81 series propellers. There have been cracks and failures of the hubs that could result in blade separation. Since this condition is likely to exist or develop in other propellers of the same design, the proposed airworthiness directive would require periodic inspection of the hubs for fatigue cracks until replaced by McCauley oil-filled hubs containing a dyed oil crack detection system.

Interested persons are invited to participate in the making of the proposed rule by submitting such written data, views or arguments as they may desire. Communications should identify the docket number and be submitted in duplicate to the Federal Aviation Administration, Office of the Regional Counsel, Attention: Rules Docket, 2300 East Devon Avenue, Des Plaines, Illinois 60018. All communications received on or before March 23, 1977 will be considered by the Administrator before taking action upon the proposed rule. The proposals contained in this notice may be changed in light of comments received. All comments will be available, both before and after the closing date for comments, in the Rules Dockets for examination by interested persons.

This amendment is proposed under the authority of sections 313(a), 601 and 603 of the Federal Aviation Act of 1958 (49 U.S.C. 1354(a), 1421, 1423) and section 6(c) of the Department of Transportation Act (49 U.S.C. 1655(c)).

In accordance with Departmental Regulatory Reform dated March 23, 1976, we have determined that the expected impact of this proposed regulation is so minimal that it does not warrant an evaluation.

In consideration of the foregoing, it is proposed to amend § 39.13 of Part 39 of the Federal Aviation Regulations by adding the following new airworthiness directive:

McCAULEY PROPELLERS. Applies to the following Model D2AF34C65 and D2AF34C81 series propellers installed on but not limited to Cessna Model 310J, E310J, 310K, 310L, and 310N aircraft.

D2AF34C65 or -XM
D2AF34C65-A or -AM
D2AF34C65-F or -FM
D2AF34C65-J or -JM
D2AF34C65-K or -KM
D2AF34C65-L or -LM
D2AF34C65-N or -NKM
D2AF34C81 or -XM
D2AF34C81-A or -AM
D2AF34C81-F or -FM
D2AF34C81-J or -KM
D2AF34C81-K or -KM
D2AF34C81-L or -LM
D2AF34C81-M
D2AF34C81-N

Compliance required as indicated, unless already accomplished. To detect propeller hub cracks and prevent possible failure, accomplish the following:

(a) Model D2AF34C65, -A, -F, -J, -K, or -L, and D2AF34C81, -A, -F, -J, -K, or -L propellers.

(1) Propeller hubs with less than 500 hours time in service, inspect in accordance with paragraph (c)(1) within 525 hours total time and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(2) Propeller hubs with 500 or more but less than 1200 hours time in service, inspect in accordance with paragraph (c)(1) within the next 25 hours time in service after the effective date of this AD and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(3) Propeller hubs with 1200 or more hours time in service, or whose total time in service is unknown, inspect in accordance with paragraph (c)(2) within the next 25 hours time in service after the effective date of this AD, unless already accomplished within the last 300 hours time in service and reinspect in accordance with paragraph (c)(2) every 300 hours time in service from the last inspection.

(b) Model D2AF34C65-XM, -AM, -FM, -JM, -KM, -LM, -M, -N, or -NKM, and D2AF34C81-XM, -AM, -FM, -JM, -KM, -LM, -M, or -N propellers.

(1) Propeller hubs with less than 1200 hours time in service, inspect in accordance with paragraph (c)(2) within 1250 hours total time in service and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(2) Propeller hubs with 1200 or more but less than 1800 hours time in service, inspect in accordance with paragraph (c)(2) within the next 50 hours time in service after the effective date of this AD unless already accomplished within the last 300 hours, and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(3) Propeller hubs with 1800 hours or more time in service or whose total hours in service are unknown inspect in accordance with paragraph (c)(2) within the next 50 hours time in service after the effective date of this AD, unless already accomplished within the last 300 hours time in service and reinspect in accordance with paragraph (c)(2) every 300 hours time in service from the last inspection.

(c) Required action.

(1) Inspect all external surfaces of propeller hub for cracks by dye penetrant method. Replace before further flight any cracked hub with an oil-filled Model D2AF34C65-XMO, -AMO, -FMO, -JMO, -KMO, -LMO, -MO, -NO, -NKMO, -O; or D2AF34C81-XMO, -AMO, -FMO, -JMO, -KMO, -LMO, -MO, -NO, or -O oil-filled hub as applicable in accordance with McCauley Service Bulletin No. 125 dated February 15, 1977.

(2) Remove propeller from aircraft and disassemble to allow complete inspection of hub. Inspect all external and internal hub surfaces including retention threads for cracks using dye penetrant method in accordance with McCauley Service Letter 1974-3 dated March 29, 1974. Replace before further flight any cracked hub with a Model D2AF34C65 or D2AF34C81 series oil-filled hub as in paragraph (c)(1).

(d) The foregoing inspections may be discontinued after replacement of Model D2AF34C65 or D2AF34C81 series hubs with McCauley oil-filled hubs as in paragraph (c)(1).

The manufacturer's specifications and procedures identified and described in this directive are incorporated herein and made part hereof pursuant to 5 U.S.C. 522(a)(1). All persons affected by the directive who have not already received these documents from the manufacturer, may obtain copies upon request to McCauley Accessory Division, Cessna Aircraft Company, Box 7, Roosevelt Station, Dayton, Ohio 45417. These documents may also be examined at the Great Lakes Regional Office, 2300 East Devon Avenue, Des Plaines, Illinois 60018, and at FAA Headquarters, 800 Independence Avenue, S.W., Washington, D.C. 20591. A historical file on this AD which includes incorporated material is maintained by the FAA, at its headquarters in Washington, D.C. and at the Great Lakes Region.

NOTE.—The Federal Aviation Administration has determined that this document does not contain a major proposal requiring preparation of an Inflation Impact Statement



HeinOnline -- 42 Fed. Reg. 6598 1977

tional Marine Fisheries Service, Department of Commerce, Washington, D.C. 20235 on or before June 20, 1977.

ROBERT J. AYERS,
*Acting Associate Director for Fisheries Management.*

MAY 13, 1977.

[FR Doc.77-14326 Filed 5-18-77;8:45 am]

# COST ACCOUNTING STANDARDS BOARD

## RESTATEMENT OF OBJECTIVES, POLICIES AND CONCEPTS

In March 1973, the Cost Accounting Standards Board published a Statement of its operating policies, procedures and objectives within which the Board was formulating Cost Accounting Standards and related rules and regulations in carrying out its legislative mandate under Pub. L. 91-379. The Board published that document to improve general understanding of the Board's fundamental objectives and concepts. The Board stated at that time that it may from time-to-time amplify, supplement or modify its views as it proceeds with consideration of individual issuances.

The Board is now publishing a restatement of its objectives, policies and concepts. This publication is intended to make known the current views of the Cost Accounting Standards Board in these matters. Interested members of the public should, on the basis of this Statement, be better able to focus on the complex and difficult issues which the Board faces in promulgating Cost Accounting Standards. Anticipating that the Board, from time-to-time, expects to revise this document, the Board welcomes the views of interested persons on the objectives, policies and concepts stated herein.

MAY 1977.

TABLE OF CONTENTS


Objectives ........ 1
Uniformity ........ 2
Consistency ........ 2
Allowability and allocability........ 3
Fairness ........ 4
Verifiability ........ 5
Cost Allocation Concepts........ 6
Hierarchy for allocating costs........ 7
Accounting standards and the flow of costs........ 12
Operating Policies........ 14
Relationship to other authoritative bodies........ 14
Transition method........ 15
Applicability to nondefense contracts ........ 15
Single government representative........ 16
Responsibilities for compliance........ 17
Interpretations ........ 18
Exemptions and waivers........ 19
The Process of Developing Standards........ 20
Research and development of standards ........ 20
Format of standards........ 24
Prefatory comments........ 25
Comparing costs and benefits........ 26


OBJECTIVES

The primary objective of the Cost Accounting Standards Board is to implement Pub. L. 91-379 by issuing clearly stated Cost Accounting Standards to achieve (1) an increased degree of uniformity in cost accounting practices among Government contractors in like circumstances, and (2) consistency in cost accounting practices in like circumstances by individual Government contractors over periods of time. In accomplishing this primary objective, the Board takes into account the probable costs of implementation, including inflationary effects, if any, compared to the probable benefits of such Standards.

Increased uniformity and consistency in accounting improve understanding and communication, reduce the incidence of disputes and disagreements, and facilitate equitable contract settlements.

A Cost Accounting Standard is a statement formally issued by the Cost Accounting Standards Board that (1) enunciates a principle or principles to be followed, (2) establishes practices to be applied, or (3) specifies criteria to be employed in selecting from alternative principles and practices in estimating, accmulating, and reporting costs of contracts subject to the rules of the Board. A Cost Accounting Standard may be stated in terms as general or as specific as the Cost Accounting Standards Board considers necessary to accomplish its purpose.

UNIFORMITY

Uniformity relates to comparison of two or more accounting entities and the Board's objective in this respect is to achieve comparability of results of entities operating under like circumstances. The Board recognizes the impracticality of defining or attaining absolute uniformity, largely because of the problems related to defining like circumstances. The Board will, nonetheless, seek ways to attain a practical degree of uniformity in cost accounting.

Absolute uniformity would be achieved only if contractors in the same circumstances (with respect to a given subject) always followed the same cost accounting practices. The Board does not seek to establish a single uniform accounting system or chart of accounts for all the complex and diverse businesses engaged in defense contract work. Any increase in uniformity, however, will provide more comparability among contractors whose circumstances are similar. Therefore, if the Board were to be satisfied that circumstances among all concerned contractors are substantially the same in a given subject area the Board would not be precluded from establishing a single cost accounting treatment for use in such circumstances.

CONSISTENCY

Consistency pertains to the use by one accounting entity of compatible cost accounting practices which permit comparability of contract results under similar circumstances over periods of time. Like uniformity, the attainment of absolute consistency can only be measured when like circumstances can be defined. Essentially, consistency relates to the allocation of costs, both direct and indirect, and to the treatment of cost with respect to individual cost objectives as well as among cost objectives in like circumstances. The Board believes that consistency within an entity enhances the usefulness of comparisons between estimates and actuals. It also improves the comparability of cost reports from one time period to another where there are like circumstances.

ALLOWABILITY AND ALLOCABILITY

The CASB does not determine categories or individual items of cost that are allowable. Allowability is a procurement concept affecting contract price and in most cases is established in regulatory or contractual provisions. An agency's policies on allowability of costs may be derived from law and are generally embodied in its procurement regulations. A contracting agency may include in contract terms or in its procurement regulations a provision that will refuse to allow certain costs incurred by contratcors that are unreasonable in amount or contrary to public policy. In accounting terms, those same costs may be allocable to the contract in question.

Allocability is an accounting concept involving the ascertainment of contract cost; it results from a relationship between a cost and a cost objective such that the cost objective appropriately bears all or a portion of the cost. For a particular cost objective to have allocated to it all or part of a cost there should exist a beneficial or causal relationship between the cost objective and the cost.

Cost Accounting Standards provide for the definition and measurement of costs, the assignment of costs to particular cost accounting periods, and the determination of the bases for the direct and indirect allocation of the total assigned costs to the contracts and other cost objectives of these periods. The use of Cost Accounting Standards has no direct bearing on the allowability of those individual items of cost which are subject to limitations or exclusions set forth in the contract or which are otherwise specified as unallowable by the Government.

The Board recognizes that contract costs are only one of several important factors which should be involved in negotiating contracts. Therefore, the promulgation of Cost Accounting Standards, and the determination of contract costs thereunder, cannot be considered a substitute for effective contract negotiation. It should be emphasized that where Cost Accounting Standards are applicable, they are determinative as to the costs allocable to contracts. It is a contracting agency's prerogative to negotiate the allowability of costs which are allocated to contracts; however, the definition defense contracts and how the amount thereof is to be allocated is a function of Cost Accounting Standards.

FAIRNESS

The Board considers a Cost Accounting Standard to be fair when, in the Board's best judgment, the Standard shows neither bias nor prejudice to either party to affected contracts.

The results of contract pricing may ultimately be regarded as fair or unfair by either or both parties to that contract. But if the Cost Accounting Standards uutilized in the negotiation, administration, and settlement of the contract provided the contracting parties with accounting data which are representative of the facts, the Standards themselves are fair.

VERIFIABILITY

Verifiability is generally accepted as an important goal for information used in cost accounting. Contract cost accounting systems should provide for verifiability to the greatest extent practical. Contract costs should be auditable by examination of appropriate data and documents supporting such costs or by reference to the facts and assumptions used to allocate the costs to the contract.

The Board recognizes that under some Cost Accounting Standards individual contractors may accumulate or allocate certain contract costs on a different basis, or in greater detail, than would otherwise be provided in a contractor's general books of account. The Board has stated in the prefatory comments of certain Standards that contractors may use memorandum accounting records to meet the requirements of Stand-



6

HeinOnline -- 42 Fed. Reg. 25751 1977

ards. These statements reflect the Board's intent that, for these Standards and else where, only such detail of cost allocation and record keeping should be required as is necessary to provide the verifiability that is needed to satisfy regulatory contract cost audit requirements. Detailed contractor accounting records of contract costs should be reconcilable with the general books of account.

COST ALLOCATION CONCEPTS

In order to achieve increased uniformity and consistency in accounting for costs of negotiated defense contracts, Cost Accounting Standards should provide criteria for the allocation to cost objectives of the costs of resources used. As used in this discussion cost is the monetary value of the resources used. A cost objective as defined by the Board is "a function, organizational subdivision, contract, or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost of processes, products, jobs, capitalized projects, etc." Standards deal with all aspects of cost allocability, including:

1. The definition and measurement of costs which may be allocated to cost objectives,

2. The determination of the cost accounting period to which such costs are assignable, and

3. The determination of the methods by which costs are to be allocated to cost objectives.

The Board will adhere to the concept of full costing whenever appropriate. Full allocation of all costs of a period, including general and administrative expenses and all other indirect costs is considered by the Board generally to be the basis for determining the cost of negotiated defense contracts.

Under the full costing concept, all costs initially allocated to intermediate cost objectives must be subsequently reallocated to final cost objectives. For this purpose, a final cost objective may be established to include unreasonable costs or costs unallowable for other reasons. The bases selected for allocation of costs from intermediate cost objectives to final cost objectives are the devices used to associate costs with final cost objectives when such costs are not directly identifiable with those cost objectives. If the base selected is a reasonable measure of the relationship between the cost and cost objectives, the cost will be reasonably allocated to such cost objectives. The Board has referred to this conceptual relationship in Standards as the beneficial or causal relationship between costs and cost objectives. In addition to the expression of this concept, Standards define in appropriate circumstances what criteria should be used to select the allocation base which best expresses this conceptual relationship.

HIERARCHY FOR ALLOCATING COSTS

As an ideal, each item should be assigned to the cost objective which was intended to benefit from the resource represented by the cost or, alternatively, which caused incurrence of the cost. To approach this goal, the Board believes in the desirability of direct identification of costs with final cost objectives where the following allocation characteristics exist:

1. The beneficial or causal relationship between the incurrence of cost and cost objectives is clear and exclusive.

2. The amount of resource used is readily and economically measurable.

However, if all items of cost incurred for the same purpose in like circumstances do not have these characteristics, then none of these items should be identified directly with final cost objectives.

In addition, the Board recognizes that there are circumstances where although the units of resource used can be directly identified with a final cost objective, it would be inappropriate or unnecessary to directly identify the cost with the final cost objective. Where the units of resource used are interchangeable, as for example in the use of like machinery and equipment, consumption of materials and supplies or utility services, the amount of cost to be allocated to cost objectives may more appropriately be determined on the basis of an average cost and not on the actual cost of each unit used. The Board believes that this averaging concept should be applied in appropriate circumstances. Individual Standards treat with specific instances where, although the incidence of resource use is directly identified with particular final cost objectives, the cost of the resource used should be determined on an averaging or indirect basis.

Where units of resource used are not directly identified with final cost objectives, the cost of such resources should be grouped into logical and homogeneous pools for allocation to cost objectives in accordance with a hierarchy of preferable techniques. Homogeneity means that the costs of functions allocated by a single base have the same or a similar relationship to the cost objectives for which the functions are performed, and the grouping of such costs in homogeneous pools for allocation to benefited cost objectives results in a better identification of cost with cost objectives. There are circumstances where unlike functions will have the same or a similar relationship to cost objectives; it may be appropriate to group the cost of such functions and use a measure of the common relationship as the base for cost allocation purposes. Finally, where the final output of either goods or services is the same or similar (i.e., homogeneous), all indirect functions attributable to the common output may be grouped for allocation of the costs of those functions.

The Board believes that the preferable allocation techniques for distributing homogeneous pools of cost are as follows:

1. The preferred representation of the relationship between the pooled cost and the benefiting cost objectives is a measure of the activity (input) of the function or functions represented by the pool of cost. This relationship can be measured in circumstances where there is a direct and definitive relationship between the function or functions and the benefiting cost objectives. In such cases, a single unit of measure can generally represent the consumption of resources in performance of the activities represented by the pool of cost. Measures of the activity ordinarily can be expressed in such terms as labor hours, machine hours, or square footage. Accordingly, costs of these functions can be allocated by use of a rate, such as a rate per labor hour, rate per machine hour or cost per square foot of the support activity.

2. Where such measures are unavailable or impractical to ascertain the basis for allocation can be a measurement of the output of the function or functions represented by the pool of cost. Thus the output becomes a substitute measure for the use of resources, and is a reasonable alternative where direct measurement of input its impractical. Output can be measured in terms of units of end product produced by the functions, as for example, number of printed pages for a print shop, number of purchase orders processed by a purchasing department, number of hires by an employment office.

3. Where neither activity (input) nor output of the functions can be measured practically, a surrogate must be used to measure the resources used. Surrogates used to represent the relationship generally measure the activity of the cost objectives receiving the service and should vary in proportion to the services received. For example, a personnel department may provide various services which cannot be measured practically on an activity or output basis. Number of personnel served may reasonably represent the use of resources of the personnel function for the cost objectives receiving the service, where this base varies in proportion to the services performed.

4. Pooled costs which cannot readily be allocated on measures of specific beneficial or causal relationship generally represent the cost of overall management activities. Such costs do not have a direct and definitive relationship to the benefiting cost objectives. These costs should be grouped in relation to the activities managed and the base selected to measure the allocation of these indirect costs to cost objectives should be a base representative of the entire activity being managed. For example, the total cost of plant activities managed might be a reasonable base for allocation of general plant indirect costs. The use of a portion of a total activity, such as direct labor costs or direct material costs only, as a substitute for a total activity base, is acceptable only if the base is a good representative of the total activity being managed.

In developing allocation techniques for individual Standards, the Board will define the circumstances where direct identification or an appropriate level of the allocation hierarchy should be used.

ACCOUNTING STANDARDS AND THE FLOW OF COSTS

Standards on cost allocation treat with the accounting for the flow of incurred costs as resources are used. The costs of resources used are initially allocated to a cost pool or to final cost objectives. The cost pools are intermediate cost objectives under the full costing concept of cost allocation as used by the Board. Cost pools are either service centers, overhead pools or general and administrative (G&A) cost pools. Costs are allocated from cost pools to other cost pools and to final cost objectives until all costs are accumulated in final cost objectives, thus determining the total cost of those final cost objectives. Costs accumulated in service center pools can be allocated to other service center pools, to overhead pools, to G&A pools and to final cost objectives. The costs accumulated in the overhead and G&A cost pools are allocated only to final cost objectives.

The particular distribution and cost flow characteristics of a cost pool can be identified by relating the cost flow concept described above with the hierarchy of preferable allocation techniques described previously. As stated, costs initially allocated to the various cost pools and final cost objectives are costs which can be directly identified with those cost objectives. Cost pools which are identified as service centers normally will distribute their costs on a base which measures the activity or output of the service center and, as a result, those costs can be allocated to any cost objective benefitting from that service including other cost pools. Cost pools which are identified as overhead pools will distribute their costs using an allocation base which measures the total activity of a period. These costs are allocated only to cost objectives which ultimately reflect that total activity, i.e., the final cost objectives of a business unit.





HeinOnline -- 42 Fed. Reg. 25752 1977

As Standards are developed for the treatment of pools of cost, each pool is categorized either as a function of general support (e.g., overhead pool) or specific support (e.g., service center). The classification is determined by the type of allocation base and flow of cost that is prescribed for that pool.

### OPERATING POLICIES

The following descriptions of policies show a number of important considerations which will be relevant to the Board as it seeks the objectives discussed previously.

#### RELATIONSHIP TO OTHER AUTHORITATIVE BODIES

A number of authoritative bodies have been established to issue pronouncements affecting accounting and financial reporting. The Cost Accounting Standards Board views its work as relating directly to the preparation, use, and review of cost accounting data in the negotiation, administration, and settlement of negotiated defense contracts. The Board is the only body established by law with the specific responsibility to promulgate Cost Accounting Standards. Furthermore, its Cost Accounting Standards have the force and effect of law in the negotiation, administration and settlement of defense contracts.

The accounting areas of interest to the Board which are also of interest to others for financial and tax accounting purposes are: (1) Definition and measurement of costs; (2) assignment of the cost of resources consumed to time periods; and (3) allocation of direct labor, direct material, and indirect costs to the goods and services produced in a period.

The Cost Accounting Standards Board seeks to avoid conflict or disagreement with other bodies having similar responsibilities and will through continuous liaison make every reasonable effort to do so. The Board will give careful consideration to the pronouncements affecting financial and tax reporting, and in the formulation of Cost Accounting Standards it will take those pronouncements into account to the extent it can do so in accomplishing its objectives. The nature of the Board's authority and its mission, however, is such that it must retain and exercise full responsibility for meeting its objectives.

#### TRANSITION METHOD

The process of converting from preexisting cost accounting practices to the practice required by a new Standard could be a source of disagreement between the contracting parties. To eliminate such disagreements, the Board has on occasion spelled out means by which a new Standard can be put into operation so as to place the contracting parties in a position where any amounts that might be left to be dealt with by an equitable adjustment would be immaterial. For other Standards, the impact of changes in cost accounting practices required by new Standards will be accommodated by price adjustments for covered prime contracts and subcontracts through the equitable adjustment provision of the contract clause.

#### APPLICABILITY TO NONDEFENSE CONTRACTS

As a matter of administrative policy the General Services Administration has elected to apply Standards to some but not all nondefense contracts. As a result, there may be instances where contractors have contracts which, because they are with defense agencies, are subject to Standards, whereas similar contracts with nondefense agencies are not. The Board recognizes that this situation can be the source of some difficulty in administration by contractors. Nonetheless, nondefense contracts are beyond the jurisdiction of the Cost Accounting Standards Board. The Board has encouraged Government agencies to adopt regulations to achieve consistency among defense and nondefense contracts wherever possible. The Board will continue to work in this direction.

#### SINGLE GOVERNMENT REPRESENTATIVE

To assure maximum uniformity of interpretation of its promulgations, the Board believes that it is highly desirable to have Federal agencies agree upon a single representative to deal with a given contractor regarding application of the requirements of the Board. Because of its conviction of the merit of such a procedure, the Board recommended that the agencies arrange for a single contracting officer for each contractor, or major component thereof, to be designated to negotiate as needed to achieve consistent practices relating to the Standards issued by the Board.

As a result, agencies have established procedures by which a Government contractor may be certain that only one contracting officer will deal with him to resolve issues that may arise under the contractor's Government contracts concerning the application of Cost Accounting Standards, rules and regulations.

The Board is optimistic about the benefits to be derived by both the Government and contractors from this single-representative system and will continue to encourage and assist Government agencies in assuring that the system matures and functions effectively.

#### RESPONSIBILITIES FOR COMPLIANCE

The Board recognizes that the basic responsibility for securing compliance by contractors with Board promulgations, as with all contractual matters, rests with the relevant Federal contracting agencies. They are responsible for such things as:

1. Incorporating all applicable CASB promulgations into their procurement regulations;
2. Including the contract clause in all covered contracts;
3. Receiving Disclosure Statments;
4. Reviewing and approving the adequacy of such Statements;
5. Reviewing contractors' records to determine whether or not contractors have (a) followed consistently their disclosed cost accounting practices and (b) complied with promulgated Cost Accounting Standards;
6. Making appropriate contract price adjustments because of changed accounting practices, failure to follow existing Standards, or the issuance of new Standards; and
7. Evaluating the validity of claims by contractors for exemptions and waivers under criteria established by the Board, or exclusions as established by Pub. L. 91-379.

It should be noted that section 719(j) of the Act gives to any authorized representative of the head of the agency concerned, of the Board, or of the Comptroller General of the United States, the right to examine and make copies of any documents, papers, or records relating to compliance with Board promulgations.

Another element of compliance concerns the manner in which relevant contracting agencies implement the requirements established by the Board. Special and recurring reviews of agencies' compliance with Board promulgations should be performed by the agencies' internal review staffs and by the U.S. General Accounting Office.

The Board must retain responsibility for evaluating the effectiveness of the Standards, rules, and regulations that it promulgates. Some of the Board's evaluative needs can be met by reviewing reports from contracting and audit organizations. To this end, the Board and the major contracting agencies have worked cooperatively to establish reporting requirements which have been embodied in the agencies' procurement regulations.

The Board also recognizes its responsibility for receiving evaluations of promulgating Standards and regulations from contractors, professional associations, and other associations and persons outside the Government who are concerned with the effectiveness of the Board's Standards, rules and regulations. The Board holds periodic Evaluation Conferences on promulgated Standards and Regulations. Additionally, the Board welcomes comments and inquiries at any time.

#### INTERPRETATIONS

The Board notes the existence of contractual and administrative provisions for the resolution or settlement of disputes arising under a contract, and the Board will not intervene in or seek to supersede such provisions. When there are widespread and serious questions of the Board's intention or meaning in its promulgations, however, the Board may at its discretion respond to requests for authoritative interpretations of its rules, regulations, and Cost Accounting Standards. Such interpretations will be published in the FEDERAL REGISTER and will be considered by the Board as an integral part of the rules, regulations, and Standards to which the interpretations relate. This formalized procedure does not preclude unofficial consultation between inquirers and the Executive Secretary and members of the Board's staff.

#### EXEMPTIONS AND WAIVERS

The Board is authorized by law to grant exemptions to such classes or categories of contractors or contracts as it determines are appropriate and consistent with the purposes sought to be achieved by the Board's basic legislation. In previous years the Board has used the authority granted to it to (1) exempt from its rules and regulations certain categories of contractors, (2) grant waivers of its requirements for certain individual contracts, (3) limit the requirements for formal disclosure of accounting practices to the larger defense contractors, (4) limit the application of some individual Standards either by exempting certain categories of contractors or by establishing a dollar threshold for the application of the Standard, and (5) exempt certain classes of contractors from the requirement to comply with Standards on the condition that they accept application of the Disclosure Statement regulations.

The Board anticipates that it will grant waivers only in rare and unusual cases. The Board notes that the granting of an exemption or a waiver from Standards or the disclosure regulation reduces the extent to which the primary goals of increased uniformity and consistency are achieved.

### THE PROCESS OF DEVELOPING STANDARDS

#### RESEARCH AND DEVELOPMENT OF STANDARDS

The promulgation of any Cost Accounting Standard is characterized by an in-depth study of the subject and by participation of various interested parties. The Board is not committed to any specific research process, but uses those techniques and resources which are appropriate to the topic. Typical research steps in the development of Standards are briefly described below.

1. *Selection of topics.* The Board's objectives are clearly set forth in Pub. L. 91-379; the Board seeks to develop Cost Accounting Standards to provide increased uniformity



8

HeinOnline -- 42 Fed. Reg. 25753 1977

and consistency in cost accounting practices of contractors. Specific subjects for research and possible development of Cost Accounting Standards are selected after considering the nature and magnitude of the costing problems related to the subject, as well as the relationship of the subject to other Standards and other staff research projects. The Board has sought advice from interested parties in the selection of topics of research. Board approval of a work project or its continuance does not imply the ultimate promulgation of a Standard.

2. *Research of concepts and existing practices.* Early research generally involves review of the accounting concepts and existing practices. This review includes examination of available literature, and often involves discussions with representatives of professional accounting and other organizations. Early research also usually involves review of the treatment of the cost in connection with negotiated contracts. This requires examination of Government procurement regulations, and the decisions of courts and of Boards of Contract Appeals. It also involves meeting with representatives of procurement agencies and of contractors. Reviews are made of the Disclosure Statements filed with the Board and various reports received from Government agencies as to practices currently being followed. Personal interviews and plant visits are made to review existing practices further in connection with contracts. The extent of this phase of the research and the amount of participation by interested parties depend on the nature of the topic.

3. *Analysis of alternatives.* Information gained from the early research into a subject, including field visits to contractors, helps to identify relevant issues. The Board develops analytical discussions of such issues and prepares questions designed to elicit opinions and empirical data concerning the subject. Upon development of an issues paper, it is distributed widely to interested parties whose responses are considered in connection with the development of a preliminary draft of a Cost Accounting Standard.

4. *Staff draft of a standard.* Analysis of problems, practices, and the possible choices for action, usually leads to the development of a staff draft of a possible Cost Accounting Standard which is distributed to interested parties for comment. Frequently such drafts are accompanied by questions designed to elicit information concerning potential administrative problems and estimated costs of implementation. The comments received are helpful in developing a proposed Standard for exposure in the FEDERAL REGISTER.

5. *Federal Register proposal.* The proposed Cost Accounting Standard is published in the FEDERAL REGISTER. This publication serves as an important part of the research process. It also serves as a formal public notice by the Board of the proposal on which comments are invited. FEDERAL REGISTER publication is supplemented by direct mailing to the organizations and individuals on a mailing list maintained by the Board. The Board seeks comments from all interested parties, and allows an ample period for response. The FEDERAL REGISTER publication provides an opportunity for participation by all those who are interested in the work of the Board. The Board reviews the responses received, and determines what changes may be warranted in its proposal. When major changes are made in the proposal, the Board will consider republishing the proposal in the FEDERAL REGISTER for additional comments. Follow-up visits to Government agencies and contractors may be arranged in connection with particular comments received. Sometimes, representatives of interested groups may be invited to meet with the Board.

6. *Promulgation.* After careful consideration of all comments and further discussions held with interested parties, the Board makes appropriate revisions to the proposed Cost Accounting Standard. The revised Standard is promulgated and published in the FEDERAL REGISTER along with prefatory comments setting forth the Board's analysis of the major issues identified in the comments received.

7. *Submission to Congress.* Standards promulgated by the Board are sent to the Congress at the time of final publication in the FEDERAL REGISTER along with an evaluation of the costs versus the benefits. The Standards become effective unless the Congress, within 60 days of continuous session, passes a concurrent resolution stating in substance that it does not favor the proposed Standard. In the absence of such a resolution and upon completion of the 60-day period, the Board's promulgations have the full force and effect of law.

8. *Continuing review.* The Board has provided for annual reports from Government agencies. Industry views are obtained through conferences for this purpose. The Board also keeps informed on the operation of Standards in actual contract situations. The Board will publish authoritative interpretations where there are widespread and serious questions of the Board's intention or meaning in its promulgations. The Board will also modify any of its promulgations if experience shows that modification is desirable.

FORMAT OF STANDARDS

The Board uses the same general format for all of its Standards to facilitate their use.

The "General Applicability" Section establishes the overall coverage of each Cost Accounting Standard. The "Purpose" Section normally provides a brief description of the goals of the Board in promulgating the Standard. The "Definition" Section reprints from the "Definitions" part of the Board's regulations, terms which are prominent in a particular Standard.

The "Fundamental Requirement" Section contains the broad principles or practices to be applied in accounting for the costs covered by the Standard.

The "Techniques for Application" Section provides criteria for the selection of alternative practices to implement the concepts contained in the "Fundamental Requirement." The techniques for application may describe the practices to be followed with respect to particular fundamental requirements or in particular circumstances. As a general rule, the techniques for application will narrow the accounting options in accordance with the concepts in the fundamental requirement. This Section may also provide special techniques for applying the concepts of the fundamental requirement to give consideration to materiality or special circumstances.

Examples of how the Standard is to operate in specific circumstances appear under "Illustrations." Usually this Section describes actual or hypothetical accounting practices and specifies whether or not such practices would comply with the provisions of the Standard. This Section may also illustrate specific practices which may be followed in particular circumstances.

The final two Sections of a Standard are "Exemptions," and "Effective Date." Where necessary, this format of a Standard may be supplemented by additional material, such as appendices, which also are an integral part of the Standard.

No one Section of a Standard stands alone, and all Sections must be read in the context of the Standard as a whole.

PREFATORY COMMENTS

The Board prefaces its issuance of Standards, rules, and regulations with analytical comments to provide additional insight into the process by which the issuance was developed and the factors which led to the provisions set out in the issuance. The prefatory comments summarize the comments received in response to the initial publication and explain the reasons for any significant changes made as well as the reasons for not making changes which were suggested. Although these prefatory comments are not a formal part of any promulgation, they nonetheless are authoritative statements by the Board. As such, the Board encourages their use as aids in applying Standards, rules, and regulations to specific situations.

COMPARING COSTS AND BENEFITS

Section 719 of the Defense Production Act of 1950, as amended by Pub. L. 94-152 requires the Board, in promulgating Standards, to take into account "the probable costs of implementation, including inflationary effects, if any, compared to the probable benefits, including advantages and improvements in the pricing, administration, and settlement of contracts."

The Board views costs and benefits in a broad sense. All disruptions of contractors' and agencies' practices and procedures are viewed as costs. Prior to making a final promulgation decision, the Board makes specific inquiries into the likely costs of implementing proposed Standards, both for contractors and for affected agencies of the Government. In this inquiry, an effort is made to distinguish transitional costs from those that may persist on a recurring basis. Also, the Board makes a distinction between (1) incremental administrative costs, i.e., the cost of added activities over and above that which would otherwise have been incurred, and (2) costs that are absorbed in implementing and administering Standards, i.e., the cost of effort or resources diverted to the implementation and administration of Standards that otherwise would have been applied elsewhere.

Out-of-pocket administrative expenses can be estimated, albeit with difficulty, and any increase in such expenses must be regarded as a cost.

Benefits from CAS include anticipated reductions in the number of time-consuming controversies stemming from unresolved aspects of cost allocability as well as greater equity to all concerned. The Board also expects that benefits will be achieved through simplified negotiation, administration, audit, and settlement procedures. Also, Standards should serve to reduce the opportunities for the manipulation of accounting methods alleged to have existed prior to establishment of the Board. Finally, and most importantly, the availability of better cost data stemming from the use of Cost Accounting Standards will permit improved comparability of offers and facilitate better negotiation of resulting contracts. The Board believes that it would be extremely difficult, if not impossible, to quantify the benefits which are sought from Standards.

The Board is interested in data which will enable it to gauge the impact of a proposed Standard on the amount of costs that will shift to or from Government contracts as a result of one or more Standards. The Board recognizes that a fair Cost Accounting Standard may result in a shift of cost either to or from Government contracts. In formulating Standards, the Board will not regard such shifts of costs as determinative.

The likely impact of a Cost Accounting Standard on a contract is to modify the distribution of his costs among time periods or among his projects in a given time period. Standards may increase administrative costs



HeinOnline -- 42 Fed. Reg. 25754 1977

which, if not offset by the benefit of increased productivity in defense contracting, would contribute to inflation; the Board considers the total of benefits relative to the total cost.

ARTHUR SCHOENHAUT,
*Executive Secretary.*

MAY 16, 1977.

[FR Doc.77-14291 Filed 5-18-77;8:45 am]

## DEPARTMENT OF DEFENSE

### Department of the Air Force

### USAF SCIENTIFIC ADVISORY BOARD

### Cancelled Meeting

MAY 12, 1977.

The meeting of the USAF Scientific Advisory Board Tactical Panel scheduled for June 1, 1977, as published in the FEDERAL REGISTER May 9, 1977, 42 FR 23533, has been cancelled. This meeting has not been rescheduled.

For further information contact the Scientific Advisory Board Secretariat at 202-697-4811.

FRANKIE S. ESTEP,
*Air Force Federal Register Liaison, Directorate of Administration.*

[FR Doc.77-14304 Filed 5-18-77;8:45 am]

### USAF SCIENTIFIC ADVISORY BOARD

### Meeting

MAY 9, 1977.

The USAF Scientific Advisory Board Aerospace Vehicles Panel will hold a meeting on June 20-21, 1977, at Kelly AFB, Texas from 8:30 a.m. to 5 p.m. both days.

The Panel will receive classified briefings and conduct classified discussions concerning maintenance and operational support requiremets of several critical weapon systems.

The meeting concerns matters listed in Section 552b(c) of Title 5, United States Code, specifically subparagraph (1) thereof, and accordingly, will be closed to the public.

For further information contact the Scientific Advisory Board Secretariat at 202-697-8845.

FRANKIE S. ESTEP,
*Air Force Federal Register Liaison, Directorate of Administration.*

[FR Doc. 77-14303 Filed 5-18-77;8:45 am]

## DELAWARE RIVER BASIN COMMISSION

### COMPREHENSIVE PLAN AMENDMENTS AND PROJECT APPROVALS

### Public Hearing

Notice is hereby given that the Delaware River Basin Commission will hold a public hearing on Wednesday, May 25, 1977, commencing at 2 p.m. The hearing will be held in the Titian Peale Room of the Holiday Inn, 18th and Market Streets, Philadelphia, Pa. The subject of the hearing will be applications for approval of the following projects as amendments to the Comprehensive Plan pursuant to Article 11 of the Compact and/or as project approvals pursuant to Section 3.8 of the Compact:

1. *Myerstown Water Authority (D-77-31 CP).* A well water supply project to augment public water supplies in Myerstown Borough and portions of Jackson Township, Lebanon County, Pa. Designated as Well No. 5, the new facility is expected to yield 500,000 gallons per day.

2. *Wernersville Municipal Authority (D-77-21 CP).* A well water supply project to augment public water supplies in Wernersville Borough, Berks County, Pa. Designated as Well No. 8, the new facility is expected to yield 180,000 gallons per day and will be used to provide service in Wernersville Borough and portions of Lower Heidelburg and South Heidelburg Townships.

3. *Borough of Alburtis (D-77-22 CP).* A well water supply project to augment public water supplies in the Borough of Alburtis, Lehigh County, Pa. Designated as Well No. 3, the new facility is expected to yield approximately 170,000 gallons per day.

4. *Metropolitan Edison Co. (D-76-73).* Modification to existing cooling water discharge structures and industrial waste treatment facilities at the company's Portland Generating Station, Upper Mount Bethel Township, Montgomery County, Pa. New outfall facilities will improve thermal mixing for a cooling water discharge to the Delaware River of approximately 313 million gallons per day. Approximately 2.5 million gallons per day of treated industrial wastes will also discharge to the Delaware River.

5. *Quaker Alloy Casting Co. (D-77-34).* An existing cooling water discharge at the company's manufacturing facility in Myerstown Borough and Jackson Township, Lebanon County, Pa. Approximately 500,000 gallons per day of non-contact cooling water discharges to Tulpehocken Creek.

6. *Colebrookdale Builders, Inc. (D-77-11).* A leachate treatment plant at the Colebrookdale Landfill in Earl Township, Berks County, Pa. Removal of 95 percent of $BOD_5$ and 88 percent of suspended solids will be provided to a wastewater flow of about 50,000 gallons per day. Treated effluent will discharge to Furnace Run, tributary to Manatawny Creek, tributary to the Schuylkill River.

7. *Delaware Valley Industrial Sewage Co., Inc. (D-76-76).* An industrial waste-water treatment project for the A & P Dairy milk processing plant in Upper Dublin Township, Montgomery County, Pa. Chlorination will be added to existing pre-treatment facilities which will be considered as a complete treatment plant and will provide 95 percent removal of $BOD_5$ and suspended solids from a wastewater flow of about 130,000 gallons per day. Treated effluent will discharge to Pine Run in the Wissahickon Creek Watershed.

Documents relating to the above-listed projects may be examined at the Commission's offices. Persons wishing to testify are requested to notify the Secretary prior to the hearing.

W. BRINTON WHITALL,
*Secretary.*

MAY 13, 1977

[FR Doc.77-14305 Filed 5-18-77;8:45 am]

## ENVIRONMENTAL PROTECTION AGENCY

[FRL 725-5]

### CALIFORNIA STATE MOTOR VEHICLE POLLUTION CONTROL STANDARDS

### Waiver of Federal Preemption

#### I. INTRODUCTION AND BACKGROUND

By this decision, issued under section 209(b) of the Clean Air Act, as amended (hereinafter the "Act") (42 U.S.C. 1857f-6a(b)), I am deciding not to withdraw those waiver actions announced in the January 11, 1977, decision, see 42 FR 3192 (January 17, 1977), which were concerned with the application of the California fuel evaporative emission standard and test procedures (SHED test)[1] to 1978 and subsequent model year gasoline-powered medium duty and heavy duty[2] motor vehicles. I am also granting the State of California a waiver of Federal preemption to enforce the California fuel evaporative emission standard and SHED test procedures, as amended on October 5, 1976, applicable to 1978 and subsequent model year gasoline-powered passenger cars and light duty trucks.

Under section 209(b) of the Act, the Administrator is required to grant the State of California a waiver of Federal preemption, after opportunity for a public hearing, unless he finds that California does not require standards more stringent than applicable Federal standards to meet compelling and extraordinary conditions, or that such State standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. State standards and enforcement procedures are deemed not to be consistent with section 202(a) if there is inadequate lead time to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within that time frame, or if the Federal and California test procedures are inconsistent. For the reasons given below, I have concluded that the statutory criteria of section 209(b) have all been met in the case of the California

[1] The most important aspect of the California evaporative emission (SHED) regulations is that the standard is measured under the SHED test. The SHED test is a method used to determine evaporative emission levels by placing a vehicle in a sealed enclosure. However, in addition to a SHED test, the California test procedure regulations include provisions for demonstrating compliance with the evaporative emission standard, such as requiring SHED tests to be run at periodic intervals on 50,000 mile durability vehicles. This aspect of the California regulations will be referred to as "50,000 mile SHED durability testing" throughout this decision.

[2] When the term "heavy duty" vehicles is used throughout this decision, it will mean all heavy duty vehicles except medium duty vehicles. As defined by California, the medium duty vehicles class is a subset of the heavy duty vehicle category.



10

HeinOnline -- 42 Fed. Reg. 25755 1977