current cost accounting period, Segment X had a large and unforeseeable reduction of employees because of a contract termination at the convenience of the Government and because the contractor did not receive an anticipated follow-on contract to one that was completed during the period. As a result, the plan has a large net termination gain. As a consequence of this gain a separate calculation of the pension cost for Segment X would result in a materially different allocation of costs to that segment than would a composite calculation and allocation by means of a base. Accordingly, pursuant to § 413.50(c)(2), the contractor must calculate a separate pension cost for Segment X. In doing so, the entire termination gain must be assigned to Segment X and amortized over 15 years. If the actuarial assumptions for Segment X continue to be substantially the same as for the other segments, the termination gain may be separately amortized and allocated only to Segment X; all other Segment X computations may be included as part of the composite calculation. After the gain is amortized, the contractor is no longer required to separately calculate the costs for Segment X unless subsequent events require such separate calculation.

(2) Contractor D has a defined-benefit pension plan covering employees at ten segments, all of which have some contracts subject to Cost Accounting Standards. The contractor uses a spread-gain actuarial cost method and calculates pension cost by developing a pension cost rate and applying that rate to the salaries and wages of the work force. One of the segments (Segment Y) is entirely devoted to Government work. The contractor's policy is to place junior employees in this segment. The age distribution of the employees of the segment is so different from that of the other segments that the pension cost for Segment Y would be materially different if computed separately than if computed as part of a computation which averages the ages of all employees covered by the plan. Pursuant to § 413.50(c)(2), the contractor must compute the pension cost for Segment Y as if it were a separate pension plan. Accordingly, the contractor must allocate a portion of the pension fund's assets to Segment Y. Memorandum records may be used in making the allocation. However, because this portion cannot be readily determined, § 413.50(c)(5)(ii) permits the allocation to be made on the basis of the actuarial cost method or methods used to calculate prior years' pension cost for the plan. Once the assets have been allocated, in future cost accounting periods the contractor shall make separate pension cost calculations for Segment Y based on the actual age distribution for the segment. Because the factors comprising pension cost for the other nine segments are relatively equal, the contractor may compute pension cost for these nine segments by using composite factors and developing a percentage of payroll for the nine segments. The pension cost allocated to each of the nine segments shall be the product of the percentages developed and the payroll of each segment (§ 413.50 (c)(1)).

(3) Contractor E has a defined-benefit pension plan which covers employees at 12 segments. The contractor uses composite actuarial assumptions to develop a pension cost for all segments. Three of these segments primarily perform Government work; the work at the other nine segments is primarily commercial. Employee turnover at the segments performing commercial work is relatively stable. However, employment experience at the Government segments has been very volatile; there have been large fluctuations in employment levels and the contractor assumes that this pattern of employment will continue to occur. It is evident that separate termination assumptions for the Government segments and the commercial segments will result in materially different pension costs for the Government segments. Therefore, the cost for these segments must be separately calculated, using the appropriate termination assumptions for these segments (§ 413.50(c)(2)(iii)).

(4) Contractor F has a defined-benefit pension plan covering employees at 25 segments. Twelve of these segments primarily perform Government work; the remaining segments perform pri-

marily commercial work. The contractor's records show that the termination experience and projections for the 12 segments are so different from that of the average of all of the segments that separate pension cost calculations are required for these segments pursuant to § 413.50(c)(2). However, because the termination experience and projections are about the same for all 12 segments, contractor F may calculate a composite pension cost for the 12 segments and allocate the cost to these segments by use of an appropriate allocation base.

(5) After this Standard becomes applicabale to Contractor G, it acquires Contractor H and makes it Segment H. Prior to the merger, each contractor had its own defined-benefit pension plan. Under the terms of the merger, Contractor H's pension plan and plan assets were merged with those of Contractor G. The actuarial assumptions, current salary scale, and other plan characteristics and about the same for Segment H and Contractor G's other segments. However, based on the same benefits at the time of the merger, the plan of Contractor H had a disproportionately larger unfunded actuarial liability than did Contractor G's plan. Any combining of the assets and actuarial liabilities of both plans would result in materially different pension cost allocation to Contractor G's segments than if pension cost were computed for Segment H on the basis that it had a separate pension plan. Accordingly, pursuant to § 413.50(c)(5), Contractor G must allocate to Segment H a portion of the assets of the combined plan. The amount to be allocated shall be the market value of Segment H's pension plan assets at the date of the merger, adjusted for subsequent receipts and expenditures applicable to the segment (§ 413.50(c)(7)). Contractor G must use these amounts of assets as a basis for calculating the annual pension cost applicable to Segment H.

(6) Contractor I has a defined-benefit pension plan covering employees at seven segments. The contractor has been making a composite pension cost calculation for all of the segments. However, the contractor determines that, pursuant to this Standard, separate pension costs must be calculated for one of the segments. In accordance with § 413.50(c)(9), the contractor elects to allocate fund assets only for the active participants of that segment. The contractor must then create a segment to accumulate the assets and actuarial liabilities for the plan's inactive participants. When active participants of a segment become inactive, the contractor must transfer assets to the segment for inactive participants to cover the actuarial liabilities for the participants that become inactive. However, the amount to be transferred shall be proportionate to the percentage of such liabilities that are funded.

(7) Contractor J has a defined-benefit pension plan covering employees at ten segments. The contractor makes a composite pension cost calculation for all segments. The contractor's records show that the termination experience for one segment—primarily performing Government work—has been significantly different from the average turnover experience of the other segments. Moreover, the contractor assumes that such different experience will continue. Because of this fact, and because the application of a different termination assumption would result in significantly different costs being charged to the Government, the contractor must develop separate pension cost for that segment. In accordance with § 413.50(c)(2), the amount of pension cost must be based on an acceptable termination assumption for that segment; however, as provided in § 413.50(c)(10), all other assumptions for that segment may be the same as those for the remaining segments.

(8) Contractor K has a five-year contract to operate a Government-owned facility. The employees of that facility are covered by the contractor's overall defined-benefit pension plan which covers salaried and hourly employees at other locations. At the conclusion of the five-year period, the Government decides not to renew the contract. Although some employees are hired by the successor contractor, as far as Contractor K is concerned, the facility is closed. Pursuant to § 413.50(c)(12), Contractor K must compute an unfunded actuarial liabil-



33

ity for the pension plan for that facility. The contractor first calculates the actuarial liability as of the date the contract expired. Because many of Contractor K's employees are terminated from the pension plan, the Internal Revenue Service considers it to be a partial plan termination, and thus requires that the terminated employees become fully vested in their accrued benefits to the extent such benefits are funded. Taking this factor into consideration, the actuary calculates the actuarial liability as amounting to $12.5 million. The contractor must then determine the market value of the pension fund assets allocable to the facility, pursuant to § 413.50(c)(5), as of the date agreed to by the contracting parties (§ 413.50(c)(12))—the date the contract expired. In making this determination the contractor establishes the ratio of the actuarial value of the assets allocable to the segment to the total actuarial value of the assets of the pension fund. The product of this ratio and the market value of all pension fund assets is the market value of the assets allocated to the segment. In this case, the market value of the segment's assets amounted to $13.8 million. Thus, for this facility the value of pension fund assets exceeded the actuarial liability by $1.3 million. This amount indicates the extent to which the Government overcontributed to the pension plan for the segment and, accordingly, indicates the extent to which prior years' pension costs are subject to adjustment.

### § 413.70 Exemptions.

None for this Standard.

### § 413.80 Effective date.

(a) The effective date of this Standard is March 10, 1978.

(b) This Standard shall be followed by each contractor on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable.

## PREAMBLE A

### Preamble to Original Publication, 6-2-76

The following is the preamble to the orginal publication of Part 413, 42 FR 37191, July 20, 1977.

The cost Accounting Standard on Adjustment and Allocation of Pension Cost is one of a series being promulgated by the Cost Accounting Standards Board pursuant to section 719 of the Defense Production Act of 1950, as amended, Pub. L. 91-379, 50 U.S.C. app. 2168, which provides for the development of Cost Accounting Standards to be used in connection with negotiated national defense contracts.

This Standard is the second Standard dealing with pension costs. The first Standard, 4 CFR Part 412, establishes requirements covering the composition of pension cost and the bases to be used for measuring such cost. The Standard being promulgated today establishes the basis for assigning actuarial gains and losses to cost accounting periods and for allocating pension cost to segments of an organization.

As part of the Board's early research relating to the subject of pension cost, it submitted an issues paper to a large cross-section of companies, Government agencies, industry and professional associations, actuaries, and other interested individuals. On June 18, 1976, this staff draft Standard was sent to those interested parties who had expressed a desire to assist the Board in its research efforts. The responses to the staff draft Standard were considered in developing a proposed Standard which was published in the FEDERAL REGISTER of February 3, 1977, with an invitation to readers to submit written views and comments to the Board. The Board also supplemented the invitation in the FEDERAL REGISTER by sending copies of the proposed Standard to over 1,000 organizations and individuals.

The Board received 67 sets of written comments from companies, Government agencies, professional associations, industry associations, public accounting firms, actuaries, universities, and others in response to the FEDERAL

REGISTER proposal. All of these comments have been carefully considered by the Board. The Board's views on each of the major issues discussed by commentators are outlined below, together with explanations of the changes made to the proposed Cost Accounting Standard.

The Board wishes to take this opportunity to express its appreciation for the helpful suggestions and constructive criticisms it has received, and for the time devoted to assisting the Board in this endeavor by the many organizations and individuals involved.

(1) *Relationship to the Employee Retirement Income Security Act of 1974 and to the Financial Accounting Standards Board.* The Board received a number of comments relative to the relationship between the proposed Standard and the Employee Retirement Income Security Act of 1974 (ERISA). Many of the respondents stated that the proposed Standard contained requirements which are either inconsistent with, more restrictive than, or in conflict with the provisions of ERISA.

The purpose of the Board in promulgating its Standards on pension cost is to establish the criteria for measuring the proper amount of pension cost to be assigned to cost accounting periods for subsequent allocation to negotiated Government contracts. ERISA establishes, among other things, minimum funding Standards for pension plans and provisions affecting deductibility of pension cost for tax purposes. Although there is some commonality between the funding provisions of ERISA and the Standard being promulgated today, ERISA does not provide for the measurement of pension costs for assignment among cost accounting periods or for the subsequent allocation of such costs to contracts.

Notwithstanding the differences in objectives between the proposed Standard and ERISA, the Board believes that compliance with the provisions of the Standard being promulgated today will not violate any provision of ERISA. The Internal Revenue Service confirmed the Board's view on this matter.

One commentator expressed concern over the issuance of a Cost Accounting Standard at this time in view of the active involvement by the Financial Accounting Standards Board in refining the accounting and reporting for both pension plans and employer pension costs. The Board is aware that the FASB may issue a Standard which could be different from the Standard being promulgated today. The Board maintains constant liaison with the FASB with regard to the two Boards' respective responsibilities for developing Standards. It also maintains liaison with the legislative and regulatory bodies responsible for developing and administering ERISA. The Board will review whatever pronouncements these bodies may issue and will consider whether revisions to this Standard are appropriate.

(2) *Definitions.* The Board has received a number of comments relative to the definitions used in the proposed Standard. Some commentators were concerned that the Board is developing still another glossary of actuarial terms. One of the problems in the field of pension accounting has been the words used to express concepts use. Different meanings have been ascribed to the same terms; different terms have been used to describe the same circumstances; and some terms have inferred meanings which have not been present and have not been intended. Thus, the Board's objective in developing the definitions in this Standard is to help provide a clear understanding of the concepts used therein.

With regard to the specific definitions used in the proposed Standard, the most common problem related to the term "segment." Some commentators construed the term to mean any group of employees performing work for the Government. The definition used in the proposed Standard is the same as that set forth in 4 CFR Part 400. As defined, a segment is an organizational unit which reports directly to a home office of that organization. The designation of organizational units as segments is the responsibility of the contractor; the proposed Standard does not change such designations.

(3) *Assignment of Actuarial Gains and Losses to Cost Accounting Periods.* Section 413.50(a)(2) of the proposed Standard required that for contractors using an immediate-gain actuarial cost method, actuarial gains and losses shall be amortized over a 15-year period. Several commentators stated that immediate recognition of actuarial gains and losses should be required when there are "abnormal forfeitures" (i.e., exceptionally large termination gains). Some commentators expressed a desire for a 10–15-year amortization period; some desired a 10–20-year period; others merely wanted sufficient flexibility to permit them to use whatever amorization period they deem appropriate.

The 15-year amortization period is the same as that set forth in the minimum funding provisions of ERISA. It is also consistent with Opinion No. 8 of the Accounting Principles Board (APB-8) covering the accounting for the cost of pension plans. The Board believes that the amortization period set forth in ERISA is a reasonable basis for adjusting past pension cost accruals without creating significant distortions to current year's accruals. The Board is opposed to the use of various amoritization periods because it would be contrary to the Board's objective of attaining greater consistency and uniformity in the measurement of pension cost and the assignment of such costs to cost accounting periods.

The Board believes also that there is no valid basis for immediate recognition of gains or losses simply because they are exceptionally large. Recognizing gains and losses in the current year generally is not appropriate because the gains or losses are often an adjustment of costs of a number of years. In this regard, the Board notes that APB-8 states also that gains and losses should be recognized immediately only if they arise from a single occurrence not directly related to the operation of the pension plan such as the closing of a plant. The Standard is consistent with this concept. Accordingly the 15-year amortization period has been retained in the Standard being promulgated today.

(4) *Annual calculation of actuarial gains and losses.* A number of commentators objected to the requirement in § 413.40(a) of the proposed Standard that actuarial gains and losses be developed annually. They pointed out that this provision, in effect, requires an annual actuarial valuation. They stated that such a requirement may impose a burden on small contractors, is contrary to ERISA which requires a valuation no less frequently than once every three years, and will result in increased administrative costs.

The Board's primary reason for requiring annual calculations of actuarial gains and losses is to assure that the proper cost is assigned to each cost accounting period. Postponing such calculations may well obscure large fluctuations in pension costs which should be recognized on a timely basis. Because many contracts begin and end within a two or three-year period, such postponements can result in incorrect costs being allocated to these contracts. The Board notes that the overwhelming majority of contractors perform annual actuarial valuations.

In addition, it should be noted that annual actuarial valuations need not be made for all pension plans. Section 412.40(a)(2) of 4 CFR Part 412 provides that for defined-contribution pension plans, the pension cost for a cost accounting period is the net contribution required to be paid for that period. Similarly, § 412.50(a) of 4 CFR Part 412 provides that multiemployer plans, certain insured plans, and certain plans applicable to colleges and universities shall be considered to be defined-contribution pension plans. Accordingly, the requirement to develop actuarial gains and losses annually is not applicable to these plans.

With regard to small contractors, the Board notes that it has not received a single comment from a small contractor stating that the requirement for an annual actuarial valuation for certain pension plans will result in a financial hardship to the contractor. Every comment it has received on this point has come from a major contractor. As for increased actuarial fees, the Board was informed by several actuaries that the difference between the cost of three annual valuations and the cost of a single, three-year valuation is relatively small.