In view of these considerations, the Board has retained the requirement for annual development of actuarial gains and losses.

(5) *Valuation of pension fund assets.* A substantial number of commentators objected to the provision of § 413.50(b)(2) of the proposed Standard which required that the value of pension fund assets be within 80 to 120 percent of the market value of such assets. Some commentators stated that such an approach could have a significant impact on pension cost in a year in which there is a large market fluctuation. Many of these seemed particularly concerned that a substantial drop in the market value of fund assets would cause an increase in pension costs. Other commentators stated that such a requirement is inconsistent with the fundamental requirement of the proposed Standard which stated that the method in use should minimize the effect of short-term market fluctuations. Some suggested various modifications to the proposed Standard to minimize the possible impact of this provision. For example, it was suggested that the average market value of the fund on several dates be used to determine whether an adjustment is required, or that no adjustment should be required unless the value of the fund is outside of the corridor for a period of several years. Some commentators were of the opinion that the corridor approach was reasonable and should be used except in cases where certain asset valuation methods are used; the most common method cited was the 5-year moving average. Several commentators noted that ERISA requires that, for minimum funding purposes, assets shall be valued on a basis which gives consideration to fair market values. They suggested that this provision obviates a need for a corridor.

The Board notes that there is no opposition to the concept that the actuarial value of pension fund assets should take into account the market value of such assets. It recognizes that there are numerous asset valuation methods which take into account market value in varying degrees. In order to achieve an acceptable relationship between the actuarial value of pension fund assets and thei market values, the Board could hav restricted the use of any of thes market valuation methods. In the ab sence of such restrictions, however the Board believes some limits must b provided to assure that the actuaria value of fund assets on a given dat gives adequate recognition to thei market value. The Board reiterates it often stated concept that assignmen of costs to the proper period is of para mount importance in determining con tract costs. Total reliance on valuatio methods which fail to produce actuar ial values within the specified corrido is not acceptable for contract costing purposes. For the same reasons, the Board does not accept the suggested modifications to the use of a single asset valuation date because these modifications could defeat the objective of assuring that the value of the fund bears an appropriate relationship to current market values.

The Board notes that the requirement to adjust pension fund assets to within a certain range of market value is not a new concept with this Standard. The Armed Services Procurement Regulations (ASPR) has for many years required that appreciation in equity securities be recognized to the extent that 80 percent of their market value exceeds their adjusted book value. The requirement for upward adjustments of pension fund assets in the Standard being promulgated today is thus similar to the existing ASPR provision. No known problems with this provision for upward adjustments have come to the attention of the Board. Early research in connection with the pension cost Standards did, however, indicate widespread dissatisfaction with the existing ASPR provisions because they did not permit adjustment of pension fund assets below cost. The Standard being promulgated today will correct this apparent inequity.

The Board notes also that many of the commentators apparently did not realize that the adjustment to pension fund assets required pursuant to § 413.50(b) would result in an actuarial gain or loss subject to the 15-year amortization period specified in § 413.50 (a)(2). It should be recognized that the



37

15-year amortization period minimizes the effect of short-term market fluctuations in two ways. First, the cost impact of the actuarial gain or loss for any year is spread over 15 years. Secondly, in computing a single year's pension cost, there could be adjustments resulting from market fluctuations in as many as 15 prior years. If, as can be expected, some of these adjustments will be increases to the year's pension costs while others will be decreases, the effect of market fluctuations on a year's pension cost will be further minimized. Accordingly, § 413.50(b)(2), in conjunction with § 413.50(a)(2), is considered to assure adequate recognition of the market value of pension fund assets while at the same time assuring that the effect of short-term market fluctuations is minimized.

In summary, the Board continues of the view that wide latitude should be provided for selecting an asset valuation method, but that such latitude should be coupled with the requirement that the assets valued under the method selected fall within a range of the market value of such assets. The requirement that assets be valued at least at 80 percent of market value is consistent with the present provision of ASPR. The requirement that assets be valued at no more than 120 percent of market value is a needed and equitable change to the ASPR concept. These requirements are not expected to result in severe pension cost fluctuations which concerned some of the commentators. Under the circumstances the Board has not adopted those recommendations aimed at deleting or revising the requirement that pension fund assets be valued within 80 to 120 percent of market value.

(6) *Valuation of bonds in a pension fund.* Several commentators expressed their disagreement with the provision of § 413.60(b) of the proposed Standard which required that, in establishing the corridor, market values must be used for all assets, including bonds. They stated that the use of amortized amounts will, over time, produce values less susceptible to short/term market fluctuations than will be produced by the use of market values. They noted also that, for minimum funding purposes, ERISA permits bonds to be valued at cost less amortization. The Board's research shows that assets of a pension fund are acquired for investment purposes and may be liquidated whenever pension fund managers believe that the proceeds therefrom can generate more income elsewhere. The Board's research shows also that the frequent turnover of pension fund assets is the rule rather than the exception. Therefore, the Board continues of the view, that in establishing the corridor, all assets should be valued on the basis of market and no change has been made to § 413.60(b) to provide otherwise. However, the Standard permits a contractor to use amortized values for bonds as a part of the asset valuation method.

(7) *Allocation of pension cost to segments of an organization.* Section 413.40(c) of the proposed Standard provided that pension costs for a segment may always be developed by separate computation. It further provided that composite pension costs for two or more segments may be computed and allocated by means of an allocation base "unless distortions are created." Section 433.50(c)(2) provided that "unless an equitable allocation of pension costs to segments can be made by means of an allocation base." Separate pension costs for the segment shall be calculated under certain specified conditions.

Some commentators were opposed to a requirement to calculate separate pension costs for a segment under any conditions. Others thought that the proposed Standard was unclear as to when separate segment pension cost calculations were required. A number of commentators concluded that separate calculations would have to be made in any event in order to prove that the use of an allocation base is acceptable. A number of these stated that such separate calculations would be costly.

Normally, pension costs are "central payments or accruals" as that term is used in 4 CFR Part 403. Therefore, where pension costs can be computed for an individual segment, 4 CFR Part 403 would ordinarily require that the amount so computed be the amount

allocated to such segment. The calculation of individual segment costs is, in effect, a direct allocation which is not only consistent with CAS 403 but is also consistent with the Board's cost allocation concepts as set forth in the Board's Restatement of Objections, Policies and Concepts (May 1977). Under the circumstances, the Board does not agree with those commentators who are of the view that computation of separate segments pension costs should never be required. Nevertheless, the Board recognizes that the calculation of separate segments pension costs cannot be made without some additional cost and effort. Consistent with its long-standing concepts on materiality, the Board believes that the calculation of separate segment pension cost should be mandatory only when such separate calculations produce materially different results than would result from the use of an allocation base. Therefore the Board sought to provide, in the proposed Standard, criteria to determine when separate calculations would be required.

It is evident that many reviewers of the proposed Standard were uncertain as to when separate segment pension cost calculations would required and when an allocation base could be used. Accordingly, § 413.40(c) has been revised to clearly state that a separate calculation of pension cost for a segment is required only when the conditions set forth in § 413.50(c) (2) and (3) are present. Appropriate changes have also been made in these paragraphs.

The Board recognizes whether separate segment pension cost calculations are required depends in the final analysis on what is considered to be "material" for the purposes of § 413.50(c) (2) and (3). The proposed Standard provided that separate segment costs are to be computed for a segment which had "significant" termination gains; "significantly" different than average benefits, eligibility criteria, or age distribution; or "significantly" different actuarial assumptions.

The concern of many commentators that they would have to make separate segment pension cost calculations in order to prove that the use of a base is acceptable apparently stemmed in part from uncertainty as to what wa meant by "significant." The Board i one record as stating that Cost Ac counting Standards should be reasona ble and not seek to deal with insignifi cant amounts of costs. The Board ha previously published in its Statemen of Operating Policies, Procedures an( Objectives certain criteria to be con sidered in determining whether ɪ transaction or a decision about an ac counting practice is material. Such cri teria have also been proposed for in clusion in the Board's regulations. It i intended that these criteria be consid ered in determining whether separat( segment pension cost calculations ar( required.

To clarify that the Board's existing materiality criteria apply in this in· stance, § 413.50(c) (2) and (3) in the Standard being promulgated today use the words "material" or "materially' in lieu of the words "significant" or "significantly" contained in the pro· posed Standard. More importantly, a statement has been added to § 413.50(c)(2) to state that separate pension cost calculations are required when the listed conditions are present only if "such conditions materially affect the amount of pension costs allocated to the segment." The Board believes that, in most cases, it will be obvious to the contracting parties whether the presence of one or more of these conditions for a segment will materially affect the pension cost for that segment. In cases where the impact is not obviously known, the Board contemplates that the contracting parties will rely on summary estimates as a basis for determining whether separate calculations are required. The Board believes that over time, the need for such summary estimates will diminish. The Board emphasizes that separate calculations are not routinely required, even though no two segments are likely to be identical with respect to the actuarial factors set forth in the Standard. The Board intends that separate segment calculations will be required only in those instances where they would result in a materially different pension cost allocation to a segment.

Several commentators noted that there are pension plans covering sever-



39

al segments that are almost completely devoted to performing work for the Government. Others noted that they had segments which perform a relatively negligible amount of Government work. In either case, according to these commentators, even significant differences in pension cost factors among segments covered by the plan would not materially affect the amount of pension costs allocated to Government contracts. Accordingly, they recommended that the provisions of the Standard relative to separate computations for a segment not be applicable to such segments.

One of the Board's primary objectives in the Standard being promulgated today is to allocate the proper amount of pension costs to each segment. This objective is appropriate, irrespective of the mix of Government and commercial work of a segment or among all segments covered by a pension plan. Even if several segments are entirely devoted to performing work for the Government, the allocation of pension costs among such segment could materially affect the amount of pension costs that are allocated to particular types of contracts in a cost accounting period. The Board recognizes, however, that if a relatively immaterial amount of a segment's work is performed for the Government, any revised allocation of pension cost for that segment would probably have little or no effect on the costs allocated to Government contracts. In such a case, the Board urges the contracting parties give due consideration to the Board's views on materiality.

(8) *Allocation bases.* The proposed Standard required in § 413.50(c)(1) that contractors who compute a composite pension cost for two or more segments must allocate such costs on a base consisting either of the salary and wages of the participants or the number of participants, except where the contracting parties agree to the use of a different base. A number of commentators stated that in certain cases a better beneficial or causal relationship can be obtained by the use of other than the specified bases. The most commonly listed practice was the use of one base to allocate normal cost and another base to allocate unfunded actuarial liabilities. The Board recognizes that in many cases the use of other bases or a combination of bases would provide an equitable means for allocating pension costs to segments. The Board believes that it should not preclude the use of any appropriate base. Therefore, § 413.50(c)(1) of the Standard being promulgated today has been revised to provide that the base to be used for allocating composite pension costs shall be representative of the factors on which the pension benefits are based.

The Board still believes, however, that under certain circumstances, a specific base provides the best means for allocating pension cost. Accordingly, § 413.50(c)(1) still requires the use of salaries and wages as an allocation base where costs are calculated as a percentage of salaries and wages, and the use of a base consisting of the number of employees where costs are calculated as an amount per employee.

(9) *Allocation of pension fund assets to segments.* When pension cost must be separately calculated for a segment, it will generally be necessary to allocate pension fund assets to such segments. Section 413.50(c)(5)(iii) of the proposed Standard provided that if contractors used different actuarial cost methods in prior years, the allocation of assets must be based on actuarial liabilities developed under the Accrued Benefit actuarial cost method. Several commentators noted that this provision could result in an allocation of assets to segments which is inconsistent with the bases used to accumulate the assets. The Board agrees with this observation. Accordingly, § 413.50(c)(5) of the Standard being promulgated today provides that the allocation of assets shall be made in a manner consistent with the actuarial cost method or methods used to give rise to such assets. It should be noted, however, that such an allocation is permitted only when contributions, disbursements, income, and expenditures made by, or in behalf, of a segment are not readily determinable.

Several commentators suggested that the Standard should be clarified with regard to whether the value of the assets to be allocated shall be the cost of the assets, the actuarial value

of the assets, or the market value of the assets. Accordingly, the Board has provided in § 413.50(c)(5)(ii) of the Standard that the allocation shall be the actuarial value of the assets.

Several other commentators expressed concern that the Standard would require that specific assets be allocated to segments. The Board never intended an allocation of specific assets; rather, it intended that there be an initial allocation of assets for accounting purposes only. All of the assets of a pension fund remain available to provide benefit payments for participants in any segment. To clarify this point, § 413.50(c)(5) of the Standard being promulgated today has been revised to state that there shall be an initial allocation of a share in the undivided pension fund assets.

During the course of the Board's research several contractors and actuaries questioned whether the proposed asset allocation requirements prohibited contractors from establishing a separate fund for a segment. The Board does not intend such a prohibition in the Standard being promulgated today.

(10) *Pension costs of inactive participants.* The proposed Standard provided in § 413.50(c)(7) that inactive pension plan participants shall be considered as constituting a separate segment. This provision was included on the basis of research indicating that the accumulation of pension costs applicable to inactive employees would facilitate the allocation of such costs. However, a large number of commentators objected to this provision, stating that it would be much simpler and less costly to merely assign inactive participants to segments. The Board continues to believe that in certain cases the use of a separate segment to accumulate costs applicable to inactive employees will facilitate cost allocation. It recognizes, however, that in other cases assignment of inactive employees to active segments will ease administrative problems. The Board believes that either technique should result in an equitable allocation of pension cost. Accordingly, the Standard being promulgated today specifically provides in § 413.50(c)(9) for the use of either technique.

Section 413.50(c)(10) of the proposed Standard required that the pension cost calculated for the segment created for inactive participant shall be allocated to the active segments on the basis of the pension cost calculated for those segments. Several commentators pointed out that such a basis may be inappropriate in some cases. The Board concurs and has revised § 413.50(c)(9) of the Standard to permit more flexibility in selecting an allocation base under such circumstances.

(11) *Other cost allocation matters.* Several commentators questioned whether contractors must always allocate assets, and continue developing fund data for a segment simply for the purpose of amortizing an identified one-time actuarial gain or loss attributable to a segment. If an equitable allocation of pension cost can be achieved without allocating assets, it is not necessary to do so. For example, in the case of a one-time termination gain or loss, a contractor could isolate this gain or loss from the other composite actuarial gains or losses and separately credit or charge the former gain or loss over the next fifteen years to the segment from which it arose. The contractor could then continue using the composite cost allocation method (except for such separate adjustment) so long as there is no further unusual experience for that segment. The Board has amended the illustration in § 413.60(c)(1) of the Standard to embody this concept.

Section 413.50(c)(1) of the proposed Standard contained a requirement that costs shall be calculated on a segment basis under circumstances where (1) a pension plan for a segment was, or becomes, merged with that of another segment, and (2) the ratio of assets to actuarial liabilities for each of the merged plans are significantly different from one another after applying the benefits in effect after the merger. In illustrating this point in § 413.36(c)(3), it was indicated that this provision is applicable to mergers which occurred prior to the effective date of the Standard. Several commentators expressed concern over the provision, stating that retroactivity was inequitable. They stated that it