would be difficult and expensive to analyze prior years' pension cost, especially in cases where the mergers arose many years ago. The Board believes that these comments have merit. Accordingly, the Standard being promulgated today specifically provides in § 413.50(c)(4) that a requirement for separate segment pension cost calculations for mergers shall have prospective impact only and that pension costs need not be adjusted for prior years. Section 413.60(c)(5) has also been revised.

One commentator noted that its segments performing Government work had different pension cost factors than did the other segments of the company. However, the commentator noted that these factors were homogeneous for the segments performing Government work. The commentator asked whether the Standard requires a separate cost calculation for each segment under such circumstances. The contractor can make a composite calculation for the Government segments and allocate the cost to these segments by means of an allocation base. The contractor can, of course, do this for the other segments. To highlight this point the Board has added an illustration in § 413.60(c)(4) of the Standard.

Two commentators asked whether a difference between the amount of pension cost required to be funded under ERISA, and the sum of the pension costs developed for all segments could be allocated to the various segments. The board recognizes that it is theoretically possible for the sum of all pension costs calculated for segments of an organization to be materially less than the minimum amount required to be funded pursuant to ERISA. However, such a difference may not be assigned to the period for which funding is required. The Board has previously emphasized that the amount of pension cost assignable to a cost accounting period is not necessarily the same as the amount funded for that period. If the amount required to be funded exceeds the amount calculated, the excess amount funded is subject to the provisions of 4 CFR Part 412 (§ 412.50(c)(1)) which states that "Amounts funded in excess of the pension cost computed for a cost accounting period pursuant to the provisions of this Standard shall be applied to pension costs of future cost accounting periods."

(12) *Closing of a segment.* The proposed Standard contained a requirement in § 413.50(c)(13) that when a segment is closed and a significant number of employees are terminated, the contractor shall calculate a gain or loss from the plan applicable to that segment, irrespective of whether the pension plan is terminated. A number of commentators expressed their concern over this provision. Some questioned whether the "net gain or loss" was an actuarial gain or loss and, if so, how it related to other sections of the Standard. Other commentators presumed that this section dealt with the termination of a plan; they stated that, in such an event, the provisions of ERISA and regulations of the Pension Benefit Guarantee Corporation would prevail. They suggested that this section of the Standard be made applicable only to pension plans that are being continued.

As a general rule, the Standard being promulgated today is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs. This adjustment is not an actuarial gain or loss as defined in the Standard. To clarify its intent, the Board has revised § 413.50(c)(12) of the Standard and the related illustration in § 413.60(c)(8). The Standard now states that when a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment.

The Board recognizes that, in some cases, the closing of a segment could be associated with a termination of a plan. Several commentators noted that, in such a case, the actuarial li-



42

ability for that segment could be greatly influenced by regulations developed pursuant to the provisions of ERISA. The Standard specifically permits the effect of such regulations to be considered in determining the actuarial liability for the segment.

It should be noted that the provisions of this section are appropriate whenever a segment performing a material amount of Government business is closed, irrespective of whether the closing is caused by the completion of a contract or an organizational change, or whether the closing results in a complete or partial termination of the plan. The board emphasizes that the purpose of this provision is to serve as a basis for recognizing and adjusting pension costs previously allocated to the segment being terminated. Such a requirement is independent of whether employees are terminated from the plan.

(13) *Application to defined-contribution and certain other plans.* A number of commentators questioned whether the provisions of the proposed Standard are applicable to defined-contribution and multiemployer pension plans. The Board notes that Standard 412 specifically provides that, for a defined contribution pension plan, the pension cost for a cost accounting period is the net contribution required to be made for that period. Standard 412 provides also that a multiemployer pension plan established pursuant to the terms of a collective bargaining agreement shall be considered to be a defined-contribution pension plan for purposes of this Standard. Thus, the only provisions of this Standard that are applicable to these plans are those dealing with the allocation of costs to segments.

Specific questions were raised with regard to the applicability of the asset valuation requirements to insured plans. Section 413.50(b)(4) of the proposed Standard provided that the asset valuation requirements therein are not applicable to insured plans whose funds are commingled with those of the insurance company. Several commentators stated that this provision was unclear; they questioned whether group deposit administration annuity contracts, immediate participation guarantee contracts, or separate accounts deposit administration contracts are subject to the asset valuation provisions of the Standard. The Board intends that such contracts be subject to these provisions of the Standard. However, the asset valuation provisions do not apply to contracts under which insurance companies guarantee a rate of return. The Board believes that, in such circumstances, the recognition of unrealized appreciation or depreciation on pension fund assets does not alter the basic contractual agreement entered into between the plan sponsor and the insurance company. Section 413.50(b)(4) of the Standard has been revised to clarify this point.

(14) *Costs and benefits.* The anticipated benefits of this Standard are increased consistency and uniformity in measuring actuarial gains and losses and assigning them to cost accounting periods, and better allocation of pension costs to segments of an organization. The Board believes that such improved measurements and allocations will result in more equitable allocation of pension costs to cost objectives, including Government contracts. By providing criteria for controversial aspects of pension cost accounting, the Standard is also expected to reduce disagreements among contracting parties.

In its research leading to the development of this Standard, the Board noted a number of disagreements between contracting parties relating to the disposition of termination gains attributable to segments performing Government contracts. The Board believes that the Standard will diminish, if not eliminate, such disagreements.

On May 19, 1977, the Comptroller General of the United States issued a report to the Congress entitled "Contractor Pension Plan Costs: More Control Could Save the Department of Defense Millions." The General Accounting Office selected, at random, nine Department of Defense prime contractors and examined the pension costs of these contractors. The report states that a substantial amount of questionable pension plan costs were, or may be, charged to Government contracts. The report attributes much

of the questionable pension costs to the inequitable allocation of pension plan costs between Government and commercial business. The report states that the Standard being promulgated today deals with, and should correct, many of the problems cited. The following are examples of these problems and the provision of the Standard which deals with them.

(a) A contractor, which calculates pension cost by segment, does not equitably allocate assets to these segments each year; the amounts allocated do not recognize net annual capital contributions by the segments nor the segments shares in the capital growth of pension fund investments. Section 413.50(c) (5), (6) and (7) deals with this subject.

(b) The pension fund of a contractor which acquired a commercial subsidiary is in a surplus position. As a result, pension contributions are not being made for either the Government segments or the commercial subsidiary. Because the surplus was accumulated mainly through Government reimbursements that exceeded the amounts required, the Government's proportional share of the surplus has been diluted by the annual pension plan costs of the commercial subsidiary. Section 413.50(c)(3) deals with this subject.

(c) One contractor used corporate-wide assumptions to calculate pension cost. However, the Government-oriented segments had much higher employee termination rates than did the other segments. The cost to the Government would have been much less if separate pension cost calculations were made for the Government-oriented segments, using the appropriate termination assumptions. Section 413.50(c)(2) deals with this subject.

The Board recognizes that the implementation of this Standard may result in some increased administrative costs by defense contractors. The Board's research shows that any incremental administrative costs incurred will be predominantly related to increased actuarial fees. After discussing with actuaries the nature and scope of increased actuarial work required, the Board is confident that the increased administrative costs required to implement the proposed Standard are relatively small and do not approach the benefits that will be achieved by the proposed Standard.

As required by 719(g) of the Defense Production Act of 1950, as amended, the Board has evaluated the potential inflationary effect of this Standard. The Standard may cause a shift of pension costs from earlier periods to later periods or vice versa. It may also cause a shift of pension costs among various portions of a contractor's business. In the long run, however, total pension costs will not increase or decrease as a result of this Standard. As already noted, increased administrative costs attributable to the Standard are expected to be minimal. Accordingly, the Board concludes that this Standard will have no inflationary effect.

(15) *Effective date.* At the time of promulgation of each previous Standard, the Board followed the policy of reserving the effective date of the Standard, pending the expiration of 60 calendar days of continuous session of the Congress following the date on which the Standard was transmitted. Section 413.80 of the Standard being promulgated today specifies the effective date. The date is included at this time to afford contractors and contracting agencies the earliest possible notification so that they can begin to make implementation plans. In the event any subsequent event makes it necessary to rescind or amend that date, such action will be taken by appropriate notice in the FEDERAL REGISTER.

## PART 414—COST ACCOUNTING STANDARD—COST OF MONEY AS AN ELEMENT OF THE COST OF FACILITIES CAPITAL

Sec.
414.10 General applicability.
414.20 Purpose.
414.30 Definitions.
414.40 Fundamental requirement.
414.50 Techniques for application.
414.60 Illustrations.
414.70 Exemptions.
414.80 Effective date.
APPENDIX A—INSTRUCTIONS FOR FORM CASB-CMF
APPENDIX B—EXAMPLE—ABC CORPORATION
PREAMBLE A

AUTHORITY: Sec. 719 of the Defense Production Act of 1950, as amended, Pub. L. 91-379, 50 U.S.C. App. 2168.

SOURCE: 41 FR 22244, June 2, 1976, unless otherwise noted.