federal register

Thursday
March 30, 1995

## Part II

# Office of Management and Budget

Office of Federal Procurement Policy

48 CFR Parts 9903 and 9904

Cost Accounting Standards Board; Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs; Final Rule

**OFFICE OF MANAGEMENT AND BUDGET**

**Office of Federal Procurement Policy**

**48 CFR Parts 9903, 9904**

## Cost Accounting Standards Board; Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs

**AGENCY:** Cost Accounting Standards Board, Office of Federal Procurement Policy, OMB.

**ACTION:** Final rule.

**SUMMARY:** The Office of Federal Procurement Policy, Cost Accounting Standards Board (CASB), is revising the Cost Accounting Standards relating to accounting for pension costs under negotiated government contracts. Section 26(g)(1) of the Office of Federal Procurement Policy Act, 41 U.S.C. 422(g)(1), requires that the Board, when promulgating any new or revised Cost Accounting Standard, publish a final rule. This final rule addresses certain problems that have emerged since the original promulgation (in the 1970's) of the pension Standards: CAS 9904.412—"Cost Accounting Standard for composition and measurement of pension cost," and CAS 9904.413, "Adjustment and allocation of pension cost." The changes address pension cost recognition for qualified pension plans subject to the tax-deductibility limits of the Federal Tax Code, problems associated with pension plans that are not qualified plans under the Federal Tax Code, and problems associated with overfunded pension plans.

**EFFECTIVE DATE:** March 30, 1995.

**FOR FURTHER INFORMATION CONTACT:** Richard C. Loeb, Executive Secretary, Cost Accounting Standards Board (telephone: 202–395–3254).

**SUPPLEMENTARY INFORMATION:**

### A. Regulatory Process

The Cost Accounting Standards Board's rules and regulations are codified at 48 CFR Chapter 99. Section 26(g)(1) of the Office of Federal Procurement Policy Act, 41 U.S.C. 422(g)(1), requires that the Board, prior to the establishment of any new or revised Cost Accounting Standard, complete a prescribed rulemaking process. This process consists of the following four steps:

1. Consult with interested persons concerning the advantages, disadvantages and improvements anticipated in the pricing and administration of government contracts as a result of a proposed Standard.
2. Promulgate an Advance Notice of Proposed Rulemaking.
3. Promulgate a Notice of Proposed Rulemaking.
4. Promulgate a final rule.

This final rule is step four in the four step process.

### B. Background

*Prior Promulgations:* The previous CASB published CAS 9904.412—"Cost Accounting Standard for Composition and Measurement of Pension Cost" on September 24, 1975 and CAS 9904.413—"Adjustment and Allocation of Pension Cost" on July 20, 1977. The effective dates of these Standards were January 1, 1976 and March 10, 1978, respectively. These Standards were developed in the early years of the applicability of the Employee Retirement Income Security Act (ERISA). At that time, the problems on which this final rule focuses were not significant. Adequate or minimum, rather than excess funding, concerned pension managers of that era. Over the intervening years, government contractors' pension plans have become more adequately funded. At the same time, limits on the maximum amount of benefits that can be provided by a qualified pension plan have been considerably constrained in real terms. At the time the previous coverage was promulgated, there was little or no inconsistency between an orderly method of accruing pension costs and a contractor's ability to concurrently fund those accruals.

The Tax Reform Act of 1986 amended the Federal Tax Code to impose an excise tax on contributions in excess of the maximum tax-deductible amount for qualified pension plans. Immediately thereafter, the Omnibus Budget Reconciliation Act of 1987 (OBRA 87) added a second, often more restrictive full-funding limitation on the determination of the tax-deductible amount. To avoid the incurrence of an unallowable excise tax, government contractors generally did not fund any accrued pension cost in excess of the maximum tax-deductible pension contribution. However, portions of accrued pension costs that were not funded were not allowable. Furthermore, because the Standards prohibited the reassignment of accrued but unfunded pension costs, contractors could not allocate such costs to contracts when funded in future periods. On April 8, 1991, the Board issued a "Memorandum for Agency Senior Procurement Executives" which granted temporary authority to reassign to future periods pension costs that were not funded in the year of accrual because they lacked tax-deductibility.

An overwhelming majority of respondents to the Board's November 1990 solicitation of agenda items gave a high priority to the problems associated with fully-funded qualified plans and those connected with the growing universe of nonqualified pension plans. The Board sought public comments with a set of Staff Discussion Papers. A Paper addressing the "pay-as-you-go" or unfunded plan issue was published by the Board on June 17, 1991. See 56 FR 27780. A Paper seeking views on the "full funding" problem was published on August 19, 1991. See 56 FR 41151. On January 26, 1993, after consideration of the public comments received on these Staff Discussion Papers, the CASB published an Advance Notice of Proposed Rulemaking (ANPRM) in the **Federal Register**, 58 FR 6103. The ANPRM set forth proposed amendments to deal with both the unfunded pension plan issue related to nonqualified pension plans and the "full-funding" problem of qualified plans.

In the public comments to the ANPRM, the Board found two areas of concern particularly persuasive. These dealt with the ANPRM lacking any full-funding limitation, and the complexities and problems introduced by drastic revisions to the amortization period for actuarial gains and losses.

The ANPRM was premised on the idea that, by reducing such amortization periods, there would be only a relatively short time lag between cost/price recognition and the eventual funding. This premise, as pointed out by the commenters, was unsound. Because the ANPRM lacked any full-funding limitation, it could result in recognition of pension costs in years in which surplus assets existed. This is of particular concern to the Board because of the number of contractors that now have overfunded plans.

The Board also determined that changing amortization periods, in order to improve cost predictability, was unnecessary. Most commenters believed that a satisfactory degree of predictability could be achieved under the existing Standards' amortization rules.

On November 5, 1993, after consideration of the public comments received on the ANPRM, the CASB published a Notice of Proposed Rulemaking (NPRM), 58 FR 58999. The NPRM set forth proposed amendments to resolve the regulatory conflict for qualified pension plans by incorporating into the Standards the ERISA full-funding limitation, while

maintaining the current amortization rules. To address questions concerning overfunded pension plans, the Board added coverage to CAS 9904.413 defining what constitutes a segment closing and providing greater specificity regarding accounting for pension costs when segments are closed or pension plans are terminated. The NPRM retained the accounting approach for nonqualified pension plans included in the ANPRM.

The public comments received in response to the NPRM raised some new issues. In the final rule, the Board addresses these issues focusing on three areas in particular. These deal with the restriction of accrual accounting by an outside limit, incomplete and unclear coverage for segment closings and pension plan terminations, and the lack of accounting for differences between accrued and funded pension costs. A majority of public comments expressed strong opinions, which were divided between support for accrual accounting and support for funding as the basis for determining allocable contract costs. In addition, numerous public comments were submitted concerning specific actuarial and technical issues.

The final rule reflects these and other concerns expressed by commenters to the NPRM. In addition, certain pension actuaries and the Pension Committee of the American Academy of Actuaries submitted suggestions to address the actuarial soundness of the final rule.

*Termination of Temporary Waiver Authority*

The final rule removes the regulatory conflict between the funding limits of ERISA and the period assignment provisions of CAS 9904.412–40(c). Therefore, the Board terminates the temporary waiver authority granted in the "Memorandum for Agency Senior Procurement Executives" issued on April 8, 1991.

*Summary of Proposed Amendments*

The Board's final rule provides for accrual accounting to initially compute the pension cost for a cost accounting period. The Board also recognizes that funding of such cost serves to substantiate the cost and adds to the verifiability of the measurement of cost. For assignment purposes, the computed cost is subject to a corridor with zero as the floor and the maximum tax-deductible amount, where applicable, as the ceiling. The computed cost is also subject to an assignable cost limitation so that cost will not be assigned to an overfunded pension plan. The cost assigned to the period must be funded as specified in the Standard to be allocable to final cost objectives. This four-step process of computing, assigning, funding, and allocating pension cost applies to both qualified and nonqualified defined-benefit pension plans.

This final rule affirms the complementary funding approach for nonqualified plans that takes into account Federal income tax deductibility. The Board views the complementary funding approach as a reasonable compromise addressing the Government's concern that claimed cost be substantiated by funding while providing contractors with relief from adverse cash flow consequences of funding a cost that is not tax-deductible. The Board decided that tax-exempt entities do not experience such cash flow disadvantages, and therefore, they are required to fund all pension cost that is assigned to the period.

For nonqualified defined-benefit plans that do not meet the communication, nonforfeiture, or funding criteria, or for which the contractor chooses to use the pay-as-you-go method, the assigned cost is equal to the amount of benefits paid in that period. To promote consistency between periods, this final rule requires that any lump sum settlements or annuity purchases be amortized.

For qualified defined-benefit pension plans, the conflict between the Standards and ERISA is removed. The cost assigned to a period is limited to the accrued cost that can be funded without penalizing a contractor. A $0 floor was added to the corridor to eliminate any inequity between a requirement to credit negative costs to contracts and the contractor's inability to make withdrawal from the funding agency.

By not requiring the assignment of negative pension cost, the Board has deferred the Government's recovery of excess assets in overfunded plans. This delay is appropriate for on-going pension plans when no assets have reverted or inured to the contractor. The effect of this delay has been mitigated by clarifying and strengthening the Government's rights or obligations for a cost adjustment when there is a segment closing, plan termination, or freezing of benefits.

Portions of pension costs computed for a period that fall outside of the assignable cost corridor ($0 floor and a ceiling based on tax-deductibility) are reassigned to future periods, together with an interest adjustment, as portions of unfunded actuarial liability and are identified as assignable cost deficits or assignable cost credits, respectively. Unfunded portions of assigned cost continue to be separately identified and eliminated from future cost computations.

For nonqualified plans, a clarification in the final rule is made by the addition of the concept of "permitted unfunded accruals"; the portion of the computed and assigned cost of a nonqualified plan exempted from current funding based on the tax rate offset. These amounts are updated and described as the accumulated value of permitted unfunded accruals. All such previously assigned and allocated costs, adjusted for earnings, expenses, and benefit payments, are treated as plan assets retained by the contractor for purposes of assessing the funding status of the plan.

The fundamental requirement for assignment of pension cost has been expanded to include a "CAS balance test" modeled after the Internal Revenue Service "equation of balance". The CAS balance test requires that the entire actuarial accrued liability be accounted for by the assets or the portions of unfunded actuarial liability identified under subparagraphs 9904.412–50(a) (1) and (2). For the CAS balance test to function, the definition of unfunded actuarial liability is revised to clarify that an actuarial surplus exists whenever the actuarial value of assets exceeds the actuarial accrued liability. The accumulated value of prepayment credits, that is, funds that have yet to be applied to assigned costs, is excluded from the assets.

Technical corrections have been made to enhance the actuarial completeness of the final rule. Consistent with recent changes in ERISA and Generally Accepted Accounting Principles, as embodied in Statement 87 of the Financial Accounting Standards Board, and reflecting the sophistication of modern actuarial valuations, this final rule requires the use of explicit actuarial assumptions that are individually reasonable. Revisions have been made to distinguish the actuarial value of assets used for computations of on-going pension costs from the market value of assets used for current period adjustments. In addition, Generally Accepted Actuarial Principles and Practices as promulgated by the Actuarial Standards Board were considered in the drafting of this final rule.

Finally, this rule implements an amendment to the CAS applicability and exemption requirements contained in Section 9903.201–1(b)(11). This amendment is made necessary due to recent statutory changes contained in the Federal Acquisition Streamlining Act, Public Law 103–355.

*Transition*

The Board is aware that contracting officers and contractors have negotiated many pragmatic agreements while awaiting the promulgation of this final rule. The transition methods and illustrations of 9904.412–64 and 9904.413–64 are presented as model solutions. The Board expects that modifications of these methods and alternate approaches may be necessary to ensure equity for both the Government and contractors. Cognizant Federal officials are encouraged to ratify existing agreements that comport with the concepts of this final rule. For prior agreements or interim solutions based on a "fresh-start" amortization of the unfunded actuarial liability of qualified defined-benefit pension plans, the cognizant Federal official should verify that no portion of unfunded actuarial liability for prior unfunded costs that could have been funded, or, for other previously disallowed costs, have in fact been inadvertently included in pension costs.

The transition rules are constructed on a few basic concepts. Prior assigned costs of qualified plans, which were neither funded nor allocated to contracts because they lacked tax-deductibility, may be assigned, with interest, to periods beginning on or after the effective date of this rule. Conversely, unfunded accrued costs of nonqualified plans allocated to contracts should be treated as assets, updated for earnings and benefit payments, and applied against either the actuarial accrued liability used to compute cost accruals or the benefits paid under the pay-as-you-go method.

**C. Paperwork Reduction Act**

The Paperwork Reduction Act, Public Law 96–511, does not apply to this final rule, because this rule imposes no paperwork burden on offerors, affected contractors and subcontractors, or members of the public which requires the approval of OMB under 44 U.S.C. 3501, *et seq*.

**D. Executive Order 12866 and the Regulatory Flexibility Act**

The economic impact of this final rule on contractors and subcontractors is expected to be minor. As a result, the Board has determined that this final rule does not result in the promulgation of a "major rule" under the provisions of Executive Order 12866, and that a regulatory impact analysis will not be required. Furthermore, this final rule does not have a significant effect on a substantial number of small entities because small businesses are exempt from the application of the Cost Accounting Standards. Therefore, this rule does not require a regulatory flexibility analysis under the Regulatory Flexibility Act of 1980.

**E. Public Comments**

*Public Comments*: This final rule is based upon the Board's Notice of Proposed Rulemaking made available for public comment on November 5, 1993, 58 FR 58999. Thirty sets of public comments were received from contractors, Government agencies, professional associations, actuarial firms, law firms, public accounting firms, and individuals. The comments received and the Board's actions taken in response thereto are summarized below:

*Comment*: Twelve commenters expressed concern that the introduction of a funding limit on accrual accounting was a significant departure from the full accrual accounting approach of the ANPRM. Some commenters were also concerned with the complexity inherent in any rule governing pension costs. For these reasons the commenters supported the promulgation of a second NPRM.

*Response*: The Staff Discussion Papers, the ANPRM, and the NPRM each addressed the role of accrual accounting and the role of funding. The Staff Discussion Paper on fully-funded defined-benefit pension plans requested comments on the relative weights the Board should assign to accrual accounting, funding, and predictability as a basis for cost determination. The Staff Discussion Paper on unfunded nonqualified defined-benefit pension plans balanced its avoidance of a funding requirement with a very constrained method of accrual accounting for so-called "accruable" plans.

In response to the comments on the Staff Discussion Papers, the ANPRM adopted accrual accounting for both qualified plans and accruable nonqualified plans, which permitted certain portions of computed pension costs to be unfunded. Because the Board supported the need to substantiate the accrual with funding, the ANPRM required that the accrued costs for qualified plans be funded as soon as practicable. The ANPRM presumed there would not be a lengthy delay between accrual and funding, and so it did not link the period assignment of the accrual to current period funding. For nonqualified plans, the assignment of accrued costs was tied to funding, but the ANPRM introduced an exception for the effect of taxes on contractor cashflows. As with the Staff Discussion Paper, non-accruable plans, and accruable plans that so elect, were limited to the pay-as-you-go method.

The NPRM kept the same accounting approach for nonqualified plans as the ANPRM. Comments from the Government and contractors persuaded the Board that the conflict between full accrual accounting and ERISA funding, not predictability, was the significant problem. Finding that there could be indefinitely extended delays in the funding of the accruals of overfunded plans, the Board determined that it was necessary to link the period assignment of costs to current period funding in order to assure the verifiability of the accrued amounts. To resolve the conflict with ERISA's funding limits, the ERISA full-funding limitation was incorporated into the NPRM. Furthermore, aware of the need to address overfunded plans, the Board added clarity and specificity to the current period adjustment required when a segment closes. The Board explicitly included an adjustment for plan terminations because there has been some uncertainty as to the prior Board's intent.

With this final rule, the Board affirms the accounting approaches of the NPRM. Throughout the four-step promulgation process, accrual accounting consistently has been the starting point for the recognition of pension costs. The period assignment rule is tied to ERISA's tax-deductible maximum to prevent conflict with any of ERISA's funding limits. This final rule retains the complementary funding rule for nonqualified plans. The Board adopted many technical corrections suggested in public comments from actuaries and other professionals. To ensure that the technical corrections did not alter the conceptual approach of the NPRM, the Board sought and received input from certain pension actuaries and the American Academy of Actuaries.

Besides continuing support for either unrestricted accrual accounting or cost recognition based solely on funding, the public comments on the NPRM generally addressed details of the coverage requiring clarification or correction. This final rule does not deviate from the conceptual construct of the NPRM. As intended by the four-step promulgation process, this rule has evolved and the Board has found an informed balance between the advantages of accrual accounting and funding. Further public exposure would not alter the conceptual approach exposed in the NPRM and expressed in this final rule.

*Comment*: Thirteen commenters expressed their opposition to the adoption of the ERISA full-funding

limitation. These commenters supported full accrual accounting as the only method that provides true matching of the incurrence of pension costs with the periods during which benefits were earned. They contend that tax law is not good accrual accounting and that the Board should make accounting rules independently of the concerns of taxability.

*Response*: The Board continues to recognize that one of the primary benefits of accrual accounting, and one of the stated goals of the Board, is the proper matching of benefiting contracts with the incurrence of expense. The Board also continues to support accrual accounting as the most effective means to promote consistency between cost accounting periods.

This final rule is based on the use of accrual accounting to initially compute the pension cost for a period. The assignable cost is then determined by comparing the computed pension cost accrual to a minimum of $0 and to the maximum tax-deductible amount. The Board has determined that funding is needed to substantiate the cost allocation because of the magnitude of the liability and the extended delay between the accrual of the cost and the settlement of the liability. This final rule has not adopted ERISA as an accounting method, but has modified accrual accounting to fit within the confines of practicable funding.

*Comment*: Eleven other commenters supported the imposition of the full-funding limit. Two commenters recommended that the cost accrual be subject to a $0 minimum because contractors are prohibited from withdrawing funds from a qualified trust.

*Response*: In this final rule, the Board refines the NPRM concept of a full-funding limitation. The full-funding limitation of the final rule is implemented through the definition and operation of the "assignable cost limitation" which defines the point when the plan is overfunded for cost recognition purposes. When a pension plan is overfunded, the Government would be violating its fiduciary duty to the taxpayers by advancing any further reimbursements to the contractor. The assignable cost limitation is similar to ERISA's pre-OBRA 87 full funding limitation, but uniquely defined to avoid confusion with ERISA terminology. As with the NPRM, whenever a plan is determined to be overfunded, that is, the actuarial value of assets exceeds the liability, all existing amortization bases are deemed fully amortized and eliminated.

The Board concurs that there should be a $0 floor imposed on the assignable pension cost for the period. The Standard requires the funding agency to be established for the "exclusive benefit" of the participants so that withdrawals by the contractor are prohibited, absent a plan termination. To be internally consistent, this final rule eliminates the assignment of negative costs to a period and the allocation of such credit to contracts, except when either assets revert or inure to the contractor or the segment is no longer continuing.

However, when a contractor makes a voluntary investment decision to not fund the assigned cost of its qualified pension plan, which is otherwise allocable to and payable as cost or price under Government contracts, the contractor has knowingly accepted the consequences of its decision. In this case, because there is no conflict between ERISA and the Standards, there is no reason to alter the cost computation and assignment for the period. Permitting arbitrary reassignment of the cost to other periods would be contrary to the Board's stated goal of enhancing the consistency of costs between periods and could create a potential for gaming.

*Comment*: A major concern of thirteen commenters was that the full-funding limitation is difficult to predict. Some commenters opined that the emphasis on funding made the rule unnecessarily complex.

*Response*: In this final rule, full-funding, which is measured by the assignable cost limitation based on the actuarial value of assets and the actuarial accrued liability, is reasonably predictable. Through the smoothing techniques of an asset valuation method, large swings in assets values are dampened. In a relatively stable population, the actuarial accrued liability can be fairly well predicted using actuarial projection techniques for forward pricing purposes. Other events that dramatically affect the liability are addressed in the provisions on cost method changes, segmentation, segment closings, plan terminations, and frozen plans. Finally, contractors have some flexibility in determining the timing of certain other events, such as assumption changes or plan amendments, that affect the size of the actuarial accrued liability.

When pension plan assets and liabilities are sufficiently different in amount, the impact of the tax-deductible limits of ERISA can be forecast with a fair degree of certainty. The tax-deductible limit, computed without regard to the full-funding limitation, is generally based on the normal cost and 10 year amortization of the unfunded actuarial liability and is also relatively predictable.

A predictability problem does arise when a plan is near the threshold of ERISA's full-funding limitations. The impact of these limits is sensitive to small changes in the market value of assets, the actuarial accrued liability, and prevailing Treasury rates. The Board believes that the "all or nothing" nature and the magnitude of the impact are beyond the normal assumption of risk inherent in firm fixed-priced contracting. However, the Board believes that this is a forward-pricing problem that may be addressed by the contracting officer through the negotiation of an advance agreement reflecting the contractor's unique facts, circumstances, and expected level and mix of Government contracting. Such advance agreements could provide a method for achieving equity in the forecasting of pension costs for contractors whose pension plans are close to entering or emerging from the funding limits of ERISA.

While the special problems of forward-pricing will continue to require attention by the contracting officer, this final rule does not add more complication. The concepts of assignable cost limitation, assignable cost deficit, and assignable cost credit contained in this final rule are simply the accounting and actuarial mechanisms necessary to assign computed costs that fall outside of the funding corridor to future periods.

*Comment*: Twelve commenters noted that, despite the full-funding limitation, the cost assigned under the NPRM could still be greater than the tax-deductible maximum. Seven commenters remarked that ERISA requires amortizations to continue, and a new base be established, when the contribution is affected by the OBRA 87 full-funding limitation only. Seven commenters recommended that subparagraph 9904.412–50(b)(1) be clarified.

*Response*: This has been corrected in the final rule by using the maximum tax-deductible amount, however determined, as the limit on assignable cost for qualified plans. The accrued pension cost not assigned to the current period is reassigned to future periods as an assignable cost deficit. This final rule also specifies that any negative accrued cost be reassigned to future periods as an assignable cost credit.

This final rule specifies that all existing amortization bases are deemed fully amortized when the accrued cost is affected by the assignable cost limitation. This rule provides that any

unfunded actuarial liability, including an actuarial surplus, existing in the next accounting period is deemed to be an actuarial gain or loss unless it is attributable to a change in assumptions, plan amendment, or separately identified portions of unfunded actuarial liability attributable to unfunded and/or disallowed pension costs.

*Comment*: Fifteen commenters stated that funding would not be needed to validate the liability of nonqualified defined-benefit plans if the Board retained the existing requirement that the benefits be "compelled".

*Response*: The Board believes it is reasonable for the Government to require that pension cost of both qualified and nonqualified pension plans allocated to contracts, which the Government pays for through cost or price, be subject to funding. This final rule ensures that any unfunded portion of assigned cost is isolated from the computation of future cost accruals. To prevent windfall gains or losses and to minimize the need for advance agreements discussed above, costs allocated to fixed-priced contracts must be funded to the extent possible.

The Board notes that the excess funding, which occurs when a contractor funds more than the assigned pension cost for the period, is carried forward to future periods with interest. This final rule retains the premature funding provisions of the original Standard through the definition and operation of prepayment credits.

*Comment*: Five commenters stated that current period funding of assigned costs for nonqualified pension plans is necessary to enhance the verifiability of all costs allocated to contracts and to reduce the risk that the promised benefits might never be paid.

*Response*: As already discussed, the Board is persuaded that funding of the assigned cost is necessary to substantiate the liability. The Board is also persuaded that requiring a taxable contractor to fund 100% of the pension cost could impose a cash flow penalty to the extent the amount funded may not be tax-deductible. The Board has modified the funding requirement accordingly. However, the Board does not wish to provide a cash flow advantage to tax-exempt contractors for whom no such cash flow penalty exists. Accordingly, the complementary funding rule is restricted to taxable entities only.

This final rule addresses the risk that unfunded costs will not be verified by providing for an accounting of all assigned costs. Funded costs are captured and accounted for within the assets of the funding agency. Amounts exempted from funding based on the tax-rate are retained in the general assets of the contractor and accounted for within the accumulated value of permitted unfunded accruals. Portions of assigned cost not substantiated by complementary funding must be separately identified and accounted for pursuant to 9904.412–50(a)(2). This final rule ensures that all portions of assigned cost and allocated cost are tracked and accounted for, and thereby removes much of the risk.

*Comment*: Eight commenters were concerned that a "Rabbi" trust would not satisfy the "exclusive benefit" requirement in the definition of a funding agency since creditors might have superior rights to those of the plan participants. Other commenters asked if other nonqualified trust arrangements could qualify as a funding agency under the Standard.

*Response*: The Board's intention when revising the definition of a funding agency was to prohibit the use of bookkeeping reserves, escrow accounts, or any other arrangement under which the rights of the plan participants were not clearly superior to those of the plan sponsor. The basic test of "exclusive benefit" is whether the contractor has relinquished all rights to the funds and that, except for the extraordinary event of bankruptcy, the participants have primary rights to the funds. The solvency of a contractor is always a concern to the Government that is not restricted merely to pension costs.

The Board does not intend that a "Rabbi trust" be the only funding arrangement that satisfies the funding agency definition. Other arrangements such as so-called secular trusts can be satisfactory. The Board expects that as tax law changes and as qualified plan benefit limits possibly become more or less restrictive, other funding arrangements may become more effective and more widely adopted.

The Board does not intend for the "exclusive benefit" clause to prohibit asset reversions where, after settling all benefit obligations to plan participants, the residual assets of the trust revert or inure to a contractor. The funding agency coverage in the pension Standards is intended to be consistent with the coverage for funded insurance reserves found at 9904.416–50(a)(1)(v)(B), which permits a reversion of assets only after all benefit obligations have been satisfied through insurance.

*Comment:* Nine commenters were concerned that taxes and administrative costs associated with Rabbi trusts will increase pension costs. Five commenters believe that the NPRM (and prior ANPRM) complementary funding rule for nonqualified plans creates an administrative burden.

*Response:* The Board recognizes that there will be some additional expenses associated with the use of complementary funding and the use of nonqualified trust funds. The specificity of the final rule gives contractors clear rules under which they can choose to compute, assign, and allocate the costs of a nonqualified plan. The benefits of an accurate accounting of all assigned costs will offset any increased administrative expense to the Government and contractors.

There will be an increase in the cost of such plans for the taxes on the earnings of the nonqualified trust fund that are directly paid by or reimbursed from the fund. These taxes are a valid expense of the pension plan incurred in response to the final rule's requirement that a portion of the assigned cost be funded. The Board notes that, in fact, such increased costs are being returned to the Government through the payment of the tax.

The rule specifies that income taxes on the earnings of a nonqualified trust are treated as administrative expenses and not as decrements to the assumed investment earning rate. This technical correction clarifies that the interest assumption used to compute actuarial values is not reduced to reflect taxes on fund earnings. This rule is not intended to prevent contractors from expressing the actuarial assumption for administrative expenses as a percentage of the earnings.

*Comment:* Two commenters suggested that the final rule address how ERISA's funding limits are allocated to segments.

*Response:* Only the maximum tax-deductible amount and the contribution to the funding agency are determined for the pension plan in its entirety. Under segmented accounting, all other aspects of period cost; i.e., normal cost, unfunded actuarial liability, assignable cost limitation, are measured at the segment level. This final rule requires that the tax-deductible maximum, determined for the plan as a whole, must be apportioned to segments using a basis that considers the assignable costs or the funding levels of the segments. Illustrations of how plan-wide values are apportioned to segments have been added.

In addition, to ease the funding of costs attributable to Government contracts, this final rule allows contractors with predominantly commercial business to apportion contributions for qualified defined-

benefit plans to their Government segments first, but only if the contractor uses segmented accounting. Unfunded assigned costs, whether attributable to Government contracts or commercial business, will be separately identified under 9904.412–50(a)(2) and thereby isolated from future cost computations and future allocation. This provision allows the contractor to determine when to fund costs of its qualified defined-benefit plan for segments that are associated solely with commercial business.

Although the assets of a pension plan are subject to the claims of all plan participants, the Board believes the funding requirements and protections of ERISA will prevent any untenable differences in funding levels of segments from arising. Because nonqualified plans lack the funding requirement protection of ERISA, the funding of such plans must be apportioned across all segments.

*Comment:* Four commenters suggested that the definition of a segment closing should be clarified. Concerns were raised that an internal reorganization would require a current period adjustment for a segment closing even though neither the segment's nor the contractor's relationship to the Government had changed.

*Response:* The definition has been revised to delineate three conditions requiring a current period adjustment. The first condition occurs when there is a change in ownership of the segment, not just a simple reorganization within the contractor's internal structure. The second event is the one addressed in the NPRM; that is, when the contractual relationship ends because the segment operationally ceases to exist. The third case addresses the end of the contractual relationship with the Government, whether the segment continues in operation or not.

*Comment:* Two commenters opposed using the accrued benefit cost method (ABCM) to determine the actuarial liability for a segment closing or plan termination adjustment. These commenters believe the ABCM understates the liability. Four commenters supported limiting the actuarial assumptions used to determine the segment closing and plan termination adjustment. These commenters also supported a phase-in of benefit improvements adopted within 5 years of a segment closing or plan termination.

*Response:* In this final rule, the actuarial accrued liability, used for determining the adjustment for a segment closing or curtailment of benefits, is determined using the accrued benefit cost method. For a curtailment of benefits or for plan participants who are terminated from employment in a segment closing, the accrued benefit is the appropriate measure of the ultimate benefit that will be paid under the plan. If plan participants remain employed by the contractor, whether in the same or another segment, the Board believes the responsibility for future salary increases, which are attributable to future productivity, merit, and inflation, belongs to the future customers that benefit from the participants' continued employment. The Board notes that the ABCM does recognize the cost of vesting earned by the participants' future service.

The Board also believes that when there is an immediate period liquidation of the liability through the payment of lump sum settlements or the purchase of annuities, the cost of such settlements and annuities is an exact measure of the liability, although the Government does have a right to share in any future dividends or refunds. This final rule has been revised accordingly.

Consistent with the requirement that actuarial assumptions be individual best-estimates of future long-term economic and demographic trends, this final rule requires that the assumptions used to determine the actuarial liability be consistent with the assumptions that have been in use. This is consistent with the fact that the pension plan is continuing even though the segment has closed or the earning of future benefits has been curtailed. The Board does not intend this rule to prevent contractors from using assumptions that have been revised based on a persuasive actuarial experience study or a change in a plan's investment policy.

This final rule does include a sixty-month phase-in of voluntary benefit improvements to forestall an increase in the liability in contemplation of a segment closing or plan termination. Improvements mandated by law or granted though collective bargaining negotiations are not considered voluntary. A plan termination or curtailment of benefits is viewed as negating the intent of any recent voluntary benefit improvements.

Under the revised definition of a segment closing, some employees may remain in a segment performing non-Government work while other employees may be transferred to other segments. For consistency, the provisions for transfers of either active or retired participants specify that the assets transferred must equal the actuarial accrued liability determined under the accrued benefit cost method.

*Comment:* One commenter asked if a contractor must determine whether a termination of plan gain or loss has occurred before an adjustment is required. Another commenter asked if a termination of plan gain or loss occurs when a pension plan is "frozen."

*Response:* The definition has been changed to refer to an event; that is, the termination of a pension plan. Any resultant gain or loss for Government contracting purposes is determined by the 9904.413–50(c)(12) adjustment. The "freezing" of a pension plan is addressed by the addition of a definition for a "Curtailment of Benefits."

*Comment:* Two commenters supported the amortization of any segment closing adjustment, rather than an immediate period adjustment.

*Response:* Under this final rule, the 9904.413–50(c)(12) adjustment is determined as a current period adjustment, whether or not assets actually revert from the trust. The Board believes a current period adjustment is appropriate when there is a disruption of the contracting relationship, a discontinuance of the operational segment, or a discontinuance of the pension plan. When such events occur, pension costs can no longer be computed and adjusted on an on-going basis since there are either no future accounting periods in which credits or charges can be allocated to contracts or no future periods in which benefits will be earned.

If a contractor will continue to have a contracting relationship with the Government, the final rule does permit the cognizant Federal official and the contractor to negotiate an amortization schedule. This provision will allow a contractor to allocate an adjustment credit to future years during which it can recover the amount of credited assets either through decreased pension costs or through prices charged to other customers benefiting from the future work performed by plan participants.

*Comment:* Eleven commenters requested that the Board clarify that the 9904.413–50(c)(12) adjustment could result in a charge to final cost objectives if the liabilities exceeded the assets.

*Response:* The final rule refers to the "difference" between assets and liabilities without prejudice towards either adjustment credits or adjustment charges. An illustration of the adjustment when liabilities exceed assets has been added.

*Comment:* Four commenters asked the Board to clarify how the Government's share of the adjustment was to be determined. Five commenters opposed the inclusion of fixed-price contracts in

any formula used to determine the Government's share.

*Response:* The asset value used to determine the adjustment amount is the market value of the assets, including permitted unfunded accruals, plus portions of unfunded liability identified pursuant to 9904.412–50(a)(2), i.e., plan assets retained by the contractor due to allocated but unfunded costs. The asset value is reduced for the accumulated value of any prepayment credits since such assets have never been assigned to past periods nor allocated to Government contracts. Because this asset value represents the current value of assigned costs of prior periods, the sum of previously assigned pension costs is the denominator of the fraction. The portion of these assets attributable to the Government's participation in the funding of the pension plan through cost or price is measured by the sum of costs allocated to Government contracts. The fraction is determined based on data from years that are representative of the Government's participation, which is a factual determination best made by the contracting officer.

Costs allocated to fixed-price contracts subject to CAS 9904.412 and 9904.413 are included since the Government has participated in the funding of the plan through the payment of the estimated pension cost considered in the pricing of the contract. A risk/reward of a fixed-price contract is the deviation of actual costs from the estimated cost considered in the price. If a single period event, e.g., segment closing, plan termination, or benefit curtailment, alters the on-going nature of the pension plan or segment, the effect on fixed-price contracts should be similar to that of an accounting practice change.

*Comment:* Four commenters supported amending the NPRM coverage to explicitly state that the 9904.413–50(c)(12) adjustment is determined net of the excise tax on pension plan asset reversions.

*Response:* The Board agrees. Before applying the fraction that determines the Government's share, subdivision 9904.413–50(c)(12)(vi) reduces the adjustment amount for any excise taxes assessed on assets that revert to the contractor as part of a pension plan termination. The excise tax is intended to discourage plan sponsors from terminating their qualified pension plans, and under this final rule, Government contractors are subject to the same termination penalty as their commercial counterparts. Since the excise tax is returned to the Government, albeit the Internal Revenue Service, the Board believes equity warrants determining the Government's share based on the net adjustment amount.

While the Board believes the Government's allocable share of any adjustment should be net of any reversion excise tax, the allowability of such excise taxes continues to be determined by the applicable cost principles. Income taxes, which are paid to the Internal Revenue Service as an offset against prior tax deductions, continue not to be allocable.

*Comment:* Six commenters suggested that a segment closing adjustment is not necessary if the assets and liabilities of the segment were transferred to the successor contractor.

*Response:* The Board agrees. The appropriate coverage and illustrations have been added.

**List of Subjects in 48 CFR Parts 9903 and 9904**

Cost accounting standards, Government procurement.

**Richard C. Loeb,**

*Executive Secretary, Cost Accounting Standards Board.*

## PART 9903—CONTRACT COVERAGE

1. The authority citations for Parts 9903 and 9904 continue to read as follows:

**Authority:** Public Law 100–679, 102 Stat 4056, 41 U.S.C. 422.

### 9903.201 [Amended]

2. Subsection 9903.201–1 is amended by removing and reserving paragraph (b)(11).

## PART 9904—COST ACCOUNTING STANDARDS

3. Subsection 9904.412–30 is amended by revising paragraph (a) to read as follows:

### 9904.412–30 Definitions.

(a) The following are definitions of terms which are prominent in this Standard. Other terms defined elsewhere in this chapter 99 shall have the meanings ascribed to them in those definitions unless paragraph (b) of this subsection requires otherwise.

(1) *Accrued benefit cost method* means an actuarial cost method under which units of benefits are assigned to each cost accounting period and are valued as they accrue; that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial accrued liability at a plan's inception date is the present value of the units of benefit credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method without salary projection.)

(2) *Actuarial accrued liability* means pension cost attributable, under the actuarial cost method in use, to years prior to the current period considered by a particular actuarial valuation. As of such date, the actuarial accrued liability represents the excess of the present value of future benefits and administrative expenses over the present value of future normal costs for all plan participants and beneficiaries. The excess of the actuarial accrued liability over the actuarial value of the assets of a pension plan is the Unfunded Actuarial Liability. The excess of the actuarial value of the assets of a pension plan over the actuarial accrued liability is an actuarial surplus and is treated as a negative unfunded actuarial liability.

(3) *Actuarial assumption* means an estimate of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, earnings on pension plan assets, changes in values of pension plan assets.

(4) *Actuarial cost method* means a technique which uses actuarial assumptions to measure the present value of future pension benefits and pension plan administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods. The actuarial cost method includes the asset valuation method used to determine the actuarial value of the assets of a pension plan.

(5) *Actuarial gain and loss* means the effect on pension cost resulting from differences between actuarial assumptions and actual experience.

(6) *Actuarial valuation* means the determination, as of a specified date, of the normal cost, actuarial accrued liability, actuarial value of the assets of a pension plan, and other relevant values for the pension plan.

(7) *Assignable cost credit* means the decrease in unfunded actuarial liability that results when the pension cost computed for a cost accounting period is less than zero.

(8) *Assignable cost deficit* means the increase in unfunded actuarial liability that results when the pension cost computed for a qualified defined-benefit pension plan exceeds the maximum tax-deductible amount for the cost accounting period determined in accordance with the Employee Retirement Income Security Act of 1974

(ERISA), 29 U.S.C. 1001 *et seq.*, as amended.

(9) *Assignable cost limitation* means the excess, if any, of the actuarial accrued liability plus the current normal cost over the actuarial value of the assets of the pension plan.

(10) *Defined-benefit pension plan* means a pension plan in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits.

(11) *Defined-contribution pension plan* means a pension plan in which the contributions are established in advance and the benefits are determined thereby.

(12) *Funded pension cost* means the portion of pension cost for a current or prior cost accounting period that has been paid to a funding agency.

(13) *Funding agency* means an organization or individual which provides facilities to receive and accumulate assets to be used either for the payment of benefits under a pension plan, or for the purchase of such benefits, provided such accumulated assets form a part of a pension plan established for the exclusive benefit of the plan participants and their beneficiaries. The fair market value of the assets held by the funding agency as of a specified date is the Funding Agency Balance as of that date.

(14) *Immediate-gain actuarial cost method* means any of the several cost methods under which actuarial gains and losses are included as part of the unfunded actuarial liability of the pension plan, rather than as part of the normal cost of the plan.

(15) *Market value of the assets* means the sum of the funding agency balance plus the accumulated value of any permitted unfunded accruals belonging to a pension plan. The Actuarial Value of the Assets means the value of cash, investments, permitted unfunded accruals, and other property belonging to a pension plan, as used by the actuary for the purpose of an actuarial valuation.

(16) *Multiemployer pension plan* means a plan to which more than one employer contributes and which is maintained pursuant to one or more collective bargaining agreements between an employee organization and more than one employer.

(17) *Nonforfeitable* means a right to a pension benefit, either immediate or deferred, which arises from an employee's service, which is unconditional, and which is legally enforceable against the pension plan or the contractor. Rights to benefits that do not satisfy this definition are considered forfeitable. A right to a pension benefit is not forfeitable solely because it may be affected by the employee's or beneficiary's death, disability, or failure to achieve vesting requirements. Nor is a right considered forfeitable because it can be affected by the unilateral actions of the employee.

(18) *Normal cost* means the annual cost attributable, under the actuarial cost method in use, to current and future years as of a particular valuation date, excluding any payment in respect of an unfunded actuarial liability.

(19) *Pay-as-you-go cost method* means a method of recognizing pension cost only when benefits are paid to retired employees or their beneficiaries.

(20) *Pension plan* means a deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an integral part of a pension plan.

(21) *Pension plan participant* means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit from a pension plan which covers employees of such employer or members of such organization who have satisfied the plan's participation requirements, or whose beneficiaries are receiving or may be eligible to receive any such benefit. A participant whose employment status with the employer has not been terminated is an active participant of the employer's pension plan.

(22) *Permitted unfunded accrual* means the amount of pension cost for nonqualified defined-benefit pension plans that is not required to be funded under 9904.412–50(d)(2). The Accumulated Value of Permitted Unfunded Accruals means the value, as of the measurement date, of the permitted unfunded accruals adjusted for imputed earnings and for benefits paid by the contractor.

(23) *Prepayment credit* means the amount funded in excess of the pension cost assigned to a cost accounting period that is carried forward for future recognition. The Accumulated Value of Prepayment Credits means the value, as of the measurement date, of the prepayment credits adjusted for interest at the valuation rate and decreased for amounts used to fund pension costs or liabilities, whether assignable or not.

(24) *Projected benefit cost method* means either (i) any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers, or (ii) a modification of the accrued benefit cost method that considers projected compensation levels.

(25) *Qualified pension plan* means a pension plan comprising a definite written program communicated to and for the exclusive benefit of employees which meets the criteria deemed essential by the Internal Revenue Service as set forth in the Internal Revenue Code for preferential tax treatment regarding contributions, investments, and distributions. Any other plan is a Nonqualified Pension Plan.

(b) * * *

4. Subsection 9904.412–40 is revised to read as follows:

**9904.412–40 Fundamental requirement.**

(a) *Components of pension cost.* (1) For defined-benefit pension plans, except for plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are (i) the normal cost of the period, (ii) a part of any unfunded actuarial liability, (iii) an interest equivalent on the unamortized portion of any unfunded actuarial liability, and (iv) an adjustment for any actuarial gains and losses.

(2) For defined-contribution pension plans, the pension cost for a cost accounting period is the net contribution required to be made for that period, after taking into account dividends and other credits, where applicable.

(3) For defined-benefit pension plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are:

(i) The net amount of periodic benefits paid for that period, and

(ii) An amortization installment, including an interest equivalent on the unamortized settlement amount, attributable to amounts paid to irrevocably settle an obligation for periodic benefits due in current and future cost accounting periods.

(b) *Measurement of pension cost.* (1) For defined-benefit pension plans other than those accounted for under the pay-as-you-go cost method, the amount of pension cost of a cost accounting period shall be determined by use of an immediate-gain actuarial cost method.

(2) Each actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations. The validity of each assumption used shall be evaluated solely with respect to that assumption. Actuarial assumptions used in calculating the amount of an unfunded actuarial liability shall be the same as those used for other components of pension cost.

(c) *Assignment of pension cost.* Except costs assigned to future periods by 9904.412–50(c) (2) and (5), the amount of pension cost computed for a cost accounting period is assignable only to that period. For defined-benefit pension plans other than those accounted for under the pay-as-you-go cost method, the pension cost is assignable only if the sum of (1) the unamortized portions of assignable unfunded actuarial liability developed and amortized pursuant to 9904.412–50(a) (1), and (2) the unassignable portions of unfunded actuarial liability separately identified and maintained pursuant to 9904.412–50(a)(2) equals the total unfunded actuarial liability.

(d) *Allocation of pension cost.* Pension costs assigned to a cost accounting period are allocable to intermediate and final cost objectives only if they meet the requirements for allocation in 9904.412–50(d). Pension costs not meeting these requirements may not be reassigned to any future cost accounting period.

5. Subsection 9904.412–50 is revised to read as follows:

**9904.412–50 Techniques for application.**

(a) *Components of pension cost.* (1) The following portions of unfunded actuarial liability shall be included as a separately identified part of the pension cost of a cost accounting period and shall be included in equal annual installments. Each installment shall consist of an amortized portion of the unfunded actuarial liability plus an interest equivalent on the unamortized portion of such liability. The period of amortization shall be established as follows:

(i) If amortization of an unfunded actuarial liability has begun prior to the date this Standard first becomes applicable to a contractor, no change in the amortization period is required by this Standard.

(ii) If amortization of an unfunded actuarial liability has not begun prior to the date this Standard first becomes applicable to a contractor, the amortization period shall begin with the period in which the Standard becomes applicable and shall be no more than 30 years nor less than 10 years. However, if the plan was in existence as of January 1, 1974, the amortization period shall be no more than 40 years nor less than 10 years.

(iii) Each increase or decrease in unfunded actuarial liability resulting from the institution of new pension plans, from the adoption of improvements, or other changes to pension plans subsequent to the date this Standard first becomes applicable to a contractor shall be amortized over no more than 30 years nor less than 10 years.

(iv) If any assumptions are changed during an amortization period, the resulting increase or decrease in unfunded actuarial liability shall be separately amortized over no more than 30 years nor less than 10 years.

(v) Actuarial gains and losses shall be identified separately from unfunded actuarial liabilities that are being amortized pursuant to the provisions of this Standard. The accounting treatment to be afforded to such gains and losses shall be in accordance with Cost Accounting Standard 9904.413.

(vi) Each increase or decrease in unfunded actuarial liability resulting from an assignable cost deficit or credit, respectively, shall be amortized over a period of 10 years.

(vii) Each increase or decrease in unfunded actuarial liability resulting from a change in actuarial cost method, including the asset valuation method, shall be amortized over a period of 10 to 30 years. This provision shall not affect the requirements of 9903.302 to adjust previously priced contracts.

(2) Except as provided in 9904.412–50(d)(2), any portion of unfunded actuarial liability attributable to either (i) pension costs applicable to prior years that were specifically unallowable in accordance with then existing Government contractual provisions or (ii) pension costs assigned to a cost accounting period that were not funded in that period, shall be separately identified and eliminated from any unfunded actuarial liability being amortized pursuant to paragraph (a)(1) of this subsection. Such portions of unfunded actuarial liability shall be adjusted for interest at the valuation rate of interest. The contractor may elect to fund, and thereby reduce, such portions of unfunded actuarial liability and future interest adjustments thereon. Such funding shall not be recognized for purposes of 9904.412–50(d).

(3) A contractor shall establish and consistently follow a policy for selecting specific amortization periods for unfunded actuarial liabilities, if any, that are developed under the actuarial cost method in use. Such policy may give consideration to factors such as the size and nature of the unfunded actuarial liabilities. Except as provided in 9904.412–50(c)(2) or 9904.413–50(c)(12), once the amortization period for a portion of unfunded actuarial liability is selected, the amortization process shall continue to completion.

(4) Any amount funded in excess of the pension cost assigned to a cost accounting period shall be accounted for as a prepayment credit. The accumulated value of such prepayment credits shall be adjusted for interest at the valuation rate of interest until applied towards pension cost in a future accounting period. The accumulated value of prepayment credits shall be reduced for portions of the accumulated value of prepayment credits used to fund pension costs or to fund portions of unfunded actuarial liability separately identified and maintained in accordance with 9904.412–50(a)(2). The accumulated value of any prepayment credits shall be excluded from the actuarial value of the assets used to compute pension costs for purposes of this Standard and Cost Accounting Standard 9904.413.

(5) An excise tax assessed pursuant to a law or regulation because of excess, inadequate, or delayed funding of a pension plan is not a component of pension cost. Income taxes paid from the funding agency of a nonqualified defined-benefit pension plan on earnings or other asset appreciation of such funding agency shall be treated as an administrative expense of the fund and not as a reduction to the earnings assumption.

(6) For purposes of this Standard, defined-benefit pension plans funded exclusively by the purchase of individual or group permanent insurance or annuity contracts, and thereby exempted from ERISA's minimum funding requirements, shall be treated as defined-contribution pension plans. However, all other defined-benefit pension plans administered wholly or in part through insurance company contracts shall be subject to the provisions of this Standard relative to defined-benefit pension plans.

(7) If a pension plan is supplemented by a separately-funded plan which provides retirement benefits to all of the participants in the basic plan, the two plans shall be considered as a single plan for purposes of this Standard. If the effect of the combined plans is to provide defined-benefits for the plan participants, the combined plans shall

be treated as a defined-benefit plan for purposes of this Standard.

(8) A multiemployer pension plan established pursuant to the terms of a collective bargaining agreement shall be considered to be a defined-contribution pension plan for purposes of this Standard.

(9) A pension plan applicable to a Federally-funded Research and Development Center (FFRDC) that is part of a State pension plan shall be considered to be a defined-contribution pension plan for purposes of this Standard.

(b) *Measurement of pension cost.* (1) For defined-benefit pension plans other than those accounted for under the pay-as-you-go cost method, the amount of pension cost assignable to cost accounting periods shall be measured by an immediate-gain actuarial cost method.

(2) Where the pension benefit is a function of salaries and wages, the normal cost shall be computed using a projected benefit cost method. The normal cost for the projected benefit shall be expressed either as a percentage of payroll or as an annual accrual based on the service attribution of the benefit formula. Where the pension benefit is not a function of salaries and wages, the normal cost shall be based on employee service.

(3) For defined-benefit plans accounted for under the pay-as-you-go cost method, the amount of pension cost assignable to a cost accounting period shall be measured as the sum of:

(i) The net amount for any periodic benefits paid for that period, and

(ii) The level annual installment required to amortize over 15 years any amounts paid to irrevocably settle an obligation for periodic benefits due in current or future cost accounting periods.

(4) Actuarial assumptions shall reflect long-term trends so as to avoid distortions caused by short-term fluctuations.

(5) Pension cost shall be based on provisions of existing pension plans. This shall not preclude contractors from making salary projections for plans whose benefits are based on salaries and wages, or from considering improved benefits for plans which provide that such improved benefits must be made.

(6) If the evaluation of the validity of actuarial assumptions shows that any assumptions were not reasonable, the contractor shall:

(i) Identify the major causes for the resultant actuarial gains or losses, and

(ii) Provide information as to the basis and rationale used for retaining or revising such assumptions for use in the ensuing cost accounting period(s).

(c) *Assignment of pension cost.* (1) Amounts funded in excess of the pension cost computed for a cost accounting period pursuant to the provisions of this Standard shall be accounted for as a prepayment credit and carried forward to future accounting periods.

(2) For qualified defined-benefit pension plans, the pension cost computed for a cost accounting period is assigned to that period subject to the following adjustments, in order of application:

(i) Any amount of computed pension cost that is less than zero shall be assigned to future accounting periods as an assignable cost credit. The amount of pension cost assigned to the period shall be zero.

(ii) When the pension cost equals or exceeds the assignable cost limitation:

(A) The amount of computed pension cost, adjusted pursuant to paragraph (c)(2)(i) of this subsection, shall not exceed the assignable cost limitation,

(B) All amounts described in 9904.412–50(a)(1) and 9904.413–50(a), which are required to be amortized, shall be considered fully amortized, and

(C) Except for portions of unfunded actuarial liability separately identified and maintained in accordance with 9904.413–50(a)(2), any portion of unfunded actuarial liability, which occurs in the first cost accounting period after the pension cost has been limited by the assignable cost limitation, shall be considered an actuarial gain or loss for purposes of this Standard. Such actuarial gain or loss shall exclude any increase or decrease in unfunded actuarial liability resulting from a plan amendment, change in actuarial assumptions, or change in actuarial cost method effected after the pension cost has been limited by the assignable cost limitation.

(iii) Any amount of computed pension cost of a qualified pension plan, adjusted pursuant to paragraphs (c)(2)(i) and (ii) of this subsection that exceeds the sum of (A) the maximum tax-deductible amount, determined in accordance with ERISA, and (B) the accumulated value of prepayment credits shall be assigned to future accounting periods as an assignable cost deficit. The amount of pension cost assigned to the current period shall not exceed the sum of the maximum tax-deductible amount plus the accumulated value of prepayment credits.

(3) The cost of nonqualified defined-benefit pension plans shall be assigned to cost accounting periods in the same manner as qualified plans (with the exception of paragraph (c)(2)(iii) of this subsection) under the following conditions:

(i) The contractor, in disclosing or establishing his cost accounting practices, elects to have a plan so accounted for;

(ii) The plan is funded through the use of a funding agency; and,

(iii) The right to a pension benefit is nonforfeitable and is communicated to the participants.

(4) The costs of nonqualified defined-benefit pension plans that do not meet all of the requirements in 9904.412–50(c)(3) shall be assigned to cost accounting periods using the pay-as-you-go cost method.

(5) Any portion of pension cost computed for a cost accounting period that exceeds the amount required to be funded pursuant to a waiver granted under the provisions of ERISA shall not be assigned to the current period. Rather, such excess shall be treated as an assignable cost deficit, except that it shall be assigned to future cost accounting periods using the same amortization period as used for ERISA purposes.

(d) *Allocation of pension costs.* The amount of pension cost assigned to a cost accounting period allocated to intermediate and final cost objectives shall be limited according to the following criteria:

(1) Except for nonqualified defined-benefit plans, the costs of a pension plan assigned to a cost accounting period are allocable to the extent that they are funded.

(2) For nonqualified defined-benefit pension plans that meet the criteria set forth at 9904.412–50(c)(3), pension costs assigned to a cost accounting period are fully allocable if they are funded at a level at least equal to the percentage of the complement (i.e., 100%-tax rate % = percentage of assigned cost to be funded) of the highest published Federal corporate income tax rate in effect on the first day of the cost accounting period. If the contractor is not subject to Federal income tax, the assigned costs are allocable to the extent such costs are funded. Funding at other levels and benefit payments of such plans are subject to the following:

(i) Funding at less than the foregoing levels shall result in proportional reductions of the amount of assigned cost that can be allocated within the cost accounting period.

(ii) (A) Payments to retirees or beneficiaries shall contain an amount drawn from sources other than the funding agency of the pension plan that is, at least, proportionately equal to the

accumulated value of permitted unfunded accruals divided by an amount that is the market value of the assets of the pension plan excluding any accumulated value of prepayment credits.

(B) The amount of assigned cost of a cost accounting period that can be allocated shall be reduced to the extent that such payments are drawn in a higher ratio from the funding agency.

(iii) The permitted unfunded accruals shall be identified and accounted for year to year, adjusted for benefit payments directly paid by the contractor and for interest at the actual annual earnings rate on the funding agency balance.

(3) For nonqualified defined-benefit pension plans accounted for under the pay-as-you-go method, pension costs assigned to a cost accounting period are allocable in that period.

(4) Funding of pension cost shall be considered to have taken place within the cost accounting period if it is accomplished by the corporate tax filing date for such period including any permissible extensions thereto.

6. Subsection 9904.412–60 is revised to read as follows:

**9904.412–60 Illustrations.**

(a) *Components of pension cost.* (1) Contractor A has insured pension plans for each of two small groups of employees. One plan is exclusively funded through a group permanent life insurance contract and is exempt from the minimum funding requirements of ERISA. The other plan is funded through a deposit administration contract, which is a form of group deferred annuity contract that is not exempt from ERISA's minimum funding requirements. Both plans provide for defined benefits. Pursuant to 9904.412–50(a)(6), for purposes of this Standard the plan financed through a group permanent insurance contract shall be considered to be a defined-contribution pension plan; the net premium required to be paid for a cost accounting period (after deducting dividends and any credits) shall be the pension cost for that period. However, the deposit administration contract plan is subject to the provisions of this Standard that are applicable to defined-benefit plans.

(2) Contractor B provides pension benefits for certain hourly employees through a multiemployer defined-benefit plan. Under the collective bargaining agreement, the contractor pays six cents into the fund for each hour worked by the covered employees. Pursuant to 9904.412–50(a)(8), the plan shall be considered to be a defined-contribution pension plan. The payments required to be made for a cost accounting period shall constitute the assignable pension cost for that period.

(3) Contractor C provides pension benefits for certain employees through a defined-contribution pension plan. However, the contractor has a separate fund that is used to supplement pension benefits for all of the participants in the basic plan in order to provide a minimum monthly retirement income to each participant. Pursuant to 9904.412–50(a)(7), the two plans shall be considered as a single plan for purposes of this Standard. Because the effect of the supplemental plan is to provide defined-benefits for the plan's participants, the provisions of this Standard relative to defined-benefit pension plans shall be applicable to the combined plan.

(4) Contractor D provides supplemental benefits to key management employees through a nonqualified defined-benefit pension plan funded by a so-called "Rabbi Trust." The trust agreement provides that Federal income taxes levied on the earnings of the Rabbi trust may be paid from the trust. The contractor's actuarial cost method recognizes the administrative expenses of the plan and trust, such as broker and attorney fees, by adding the prior year's expenses to the current year's normal cost. The income taxes paid by the trust on trust earnings shall be accorded the same treatment as any other administrative expense in accordance with 9904.412–50(a)(5).

(5) (i) Contractor E has been using the entry age normal actuarial cost method to compute pension costs. The contractor has three years remaining under a firm fixed price contract subject to this Standard. The contract was priced using the unfunded actuarial liability, normal cost, and net amortization installments developed using the entry age normal method. The contract was priced as follows:

ENTRY AGE NORMAL VALUES

| Cost component | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Normal cost | $100,000 | $105,000 | $110,000 |
| Amortization | 50,000 | 50,000 | 50,000 |
| Pension cost | 150,000 | 155,000 | 160,000 |

(ii) The contractor, after notifying the cognizant Federal official, switches to the projected unit credit actuarial cost method. The unfunded actuarial liability and normal cost decreased when redetermined under the projected unit credit method. Pursuant to 9904.412–50(a)(1)(vii), the contractor determines that an annual installment credit of $20,000 will amortize the decrease in unfunded actuarial liability (UAL) over ten years. The following pension costs are determined under the projected unit credit method:

PROJECTED UNIT CREDIT VALUES

| Cost component | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Normal cost | $80,000 | $85,000 | $90,000 |
| Amortization: | | | |
| Prior method | 50,000 | 50,000 | 50,000 |
| UAL decrease | (20,000) | (20,000) | (20,000) |
| Pension cost | 110,000 | 115,000 | 120,000 |