IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNISYS CORPORATION,

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 05-281C
(Judge Firestone)

**UNISYS CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Terry L. Albertson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2635
Fax (202) 628-5116

Attorney of Record for Unisys Corporation

OF COUNSEL:
Amy Laderberg O'Sullivan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2563
Fax (202) 628-5116

Anne H. Warner
Assistant General Counsel
Unisys Corporation
11720 Plaza America Drive
Reston, VA 20190
Tel. (703) 439-5747
Fax: (703) 439-3603

Dated: February 27, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... ii

REVISED INDEX TO APPENDIX .......... iii

I. Neither the Plain Language of CAS 413 Nor the Intent of the CASB Supports the Government's Calculation of Its Share of the Surplus .......... 7

II. The Government's Assumption of No Future Benefits Is Unsupportable and Internally Inconsistent .......... 11

III. Contractors Do Not Have Unilateral Authority to Determine the Manner in Which the Government Obtains Credit for Its Share of the Surplus .......... 18

IV. The Government's Response to Unisys' Calculation of the Net Cost Impact of a Noncompliance Is Misguided .......... 20

## TABLE OF AUTHORITIES

**Pages**

### FEDERAL CASES

*Allegheny Teledyne, Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003)..... 6, 10, 11

*BLH, Inc. v. United States*, 13 Cl. Ct. 265 (1987)........ 19

*In re Bicoastal Corp.*, 136 B.R. 290 (M.D. Fla. 1991)........ 12, 13

*General Electric Co. v. United States*, 60 Fed. Cl. 782 (2004)........ 8

*Giuliani Associates, Inc.*, ASBCA No. 51,672, 00-1, B.C.A. ¶ 30,780 (Feb. 14, 2000)........ 19

*Grumman Data Systems Corp. v. Dalton*, 88 F.3d 990 (Fed. Cir. 1996)........ 10

*Sharman Co., Inc. v. United States*, 2 F.3d 1564 (Fed. Cir. 1993)........ 5

*Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001)........ 5, 15

### FEDERAL STATUTES AND REGULATIONS

41 U.S.C. § 15........ 19

41 U.S.C. § 422(h)(1)(B)........ 20

Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq*........ 20

48 C.F.R. § 9903.201-4(a)........ 4, 20, 21

48 C.F.R. §§ 9903.306(a), (e)........ 4, 20, 21

FAR 52.230-2(a)(5)........ 4, 20

# REVISED INDEX TO APPENDIX


| **Exhibit** | **Description** |
|---|---|
| Exhibit 1 | May 12, 1977 Letter from CASB to IRS |
| Exhibit 2 | 56 Fed. Reg. 41,151 (Aug. 19, 1991); CASB, Staff Discussion Paper, "Accounting for Fully-funded Defined Benefit Pension Plans" (Aug. 19, 1991) |
| Exhibit 3 | 60 Fed. Reg. 16,534 (March 30, 1995) |
| Exhibit 4 | Novation Agreement (May 5, 1995) (excerpts) |
| Exhibit 5 | DCAA Audit Report (January 23, 2003) |
| Exhibit 6 | Contracting Officer's Final Decision (December 9, 2004) |
| Exhibit 7 | 40 Fed. Reg. 43,873 (Sept. 24, 1975) |
| Exhibit 8 | DCMA/DCAA Joint Guidance on Implementing the *Teledyne* Decision on CAS 413.50(c)(12) Segment Closing Adjustments (7/23/2004) |
| Exhibit 9 | October 4, 2000 Letter from Ralph Johnson to Denise Chezek |
| Exhibit 10 | May 26, 2004 Letter from Terry Albertson to Denise Chezek and Attached Report from John McQuade |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNISYS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 05-281C<br>(Judge Firestone) |

**UNISYS CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

The facts in this case are largely undisputed, and the legal issue before this Court is narrow and focused.

- In 1995, Unisys Corporation ("Unisys") sold what was then its Government contracts business to Loral Corporation ("Loral").
- Unisys was obligated under Cost Accounting Standard ("CAS") 413 to make a segment closing adjustment in the total amount of $13,534,954 in connection with the sale to Loral.
- Unisys transferred $27,377,055 in surplus pension assets to Loral as part of the sale.
- It would have been relatively easy for the parties to the transaction in this case (or in any other case) to estimate the benefit that the Government will realize in the form of lower contract pension costs resulting from the transfer of assets and to determine whether the future benefits exceed the amount that the Government would have been entitled to receive in the form of a cash payment at the time of the segment closing.
- Loral was obligated under the regulations (and that obligation was reinforced by an advance agreement and a novation agreement) to use the assets to reduce pension costs on future contracts.
- Loral and its successor, Lockheed Martin, have actually used the pension surplus to reduce pension costs.

- The Government has benefited from the transferred surplus in the form of lower costs on new and old contracts with Loral and Lockheed Martin.

Unisys believes that a fair consideration of these simple facts leads to only one rational conclusion – Unisys has complied with the requirements of CAS 413. Even if Unisys has not complied with the requirements of CAS 413, the Government's remedy for that failure would be to recover any increased costs paid by the Government as a result of the failure. If the actual benefit realized by the Government exceeds the credit it would have received if Unisys had simply made a cash payment, then the Government was not damaged by any noncompliance.

Oddly, most of the Government's brief responds to an argument that Unisys has never made. According to the Government, Unisys asserts that it should be permitted to "avoid making a CAS 413 segment-closing adjustment." Defendant's Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Gov't Brief") at 9. That is not what Unisys argued. Unisys agrees that the Government is entitled to a segment closing adjustment in this case. Indeed, Unisys has calculated the amount of that adjustment – $13,534,954. Proposed Findings of Uncontroverted Facts and Memorandum of Points and Authorities in Support of Unisys' Motion for Summary Judgment ("Unisys Brief") at 32-33 n.5. The Government concedes that it has little or no disagreement with that calculation. Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ("DRPPFUF") at 12 n. 2. The issue in this case is not whether a segment closing adjustment is required or even the amount of that adjustment. Instead, it is how that segment closing adjustment may be paid.

Unisys advanced two arguments in its opening brief. First, Unisys argued that it transferred to Loral a portion of the surplus that was more than double the amount of adjustment due to the Government and the transfer was made under terms that prohibited the purchaser from using the surplus for any purpose other than funding pension costs on future contracts. *See* Unisys Brief at 13-14, 20-24. Transfer of surplus in that amount and in a way that could only be used to benefit the future business of the "closed" segment satisfied Unisys' segment closing obligation. *See id.* at 14, 30. The Government's principal response to that argument was to mischaracterize it and then to attack its own mischaracterization. *See* Gov't Brief at 21 ("What Unisys is suggesting is that its partial surplus transfer should wipe out its entire obligation to make any segment-closing adjustment whatsoever."); *Id.* at 2 ("According to Unisys, its unilateral transfer of pension surplus to Loral discharged any obligation to perform a segment-closing adjustment with respect to the nearly $50 million of pension surplus allocable to the closed segment that Unisys retained, and it has no obligation to pay the Government a penny.").

Unisys' second argument addressed the Contracting Officer's Final Decision that there had been a CAS noncompliance in this case. Unisys believes that its surplus transfer satisfied fully its obligations under CAS 413, but if the Final Decision was correct and Unisys was not compliant with the requirements of CAS 413, then the issue before the Court is how to measure the Government's damages resulting from that noncompliance. *See* Unisys Brief at 30-34. The remedy

available to the Government for a failure to comply with CAS is recovery of the "increased costs" paid by the Government as a result of the noncompliance. 48 C.F.R. §§ 9903.201-4(a), 9903.306(a), (e); FAR § 52.230-2(a)(5). The Government has not paid any increased costs in this case. The net monetary benefit realized by the Government as a result of the transfer of surplus assets directly to the purchaser has already exceeded the amount that Unisys would have been required to transfer to the Government if it had transferred cash – and the benefit of the transferred surplus will continue to grow until the surplus assets are exhausted. Unisys argues very simply that the Government has paid no increased costs as a result of any noncompliance that may exist. The Government's response to this argument ignores the content of the Contracting Officer's Final Decision and denies that this case is about an alleged CAS noncompliance. All of the prior decisions of this Court on the pension surplus issue have been focused on calculating the amount of the segment closing adjustment that is due under the Credits provision in FAR § 31.201-5. Misreading the scope of those decisions, the Government insists that because this case is about a "credit," then the requirements that would apply to a CAS noncompliance do not apply here. Gov't Brief at 33-34.

The Government also advances two arguments in support of its own Cross-Motion for Partial Summary Judgment. Both arguments ignore the benefit the Government received as a result of the surplus transfer to a successor-in-interest, and one pretends that the transfer of surplus never occurred. First, relying primarily on a "plain meaning" or "clear intent" argument, the Government asserts

that its percentage share of the pension surplus, calculated under the formula established in *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001) (*"Teledyne I"*), must be applied to any surplus assets retained by Unisys, no matter how much benefit the Government has derived from assets Unisys transferred to its successor-in-interest. Gov't Brief at 1. Second, the Government argues in the alternative that it should be entitled to a payment equal to its calculated share of the entire pension surplus, regardless of any transfer of funds to a successor-in-interest.[1] Gov't Brief at 4. As explained below, under either Government position, there is a windfall that was clearly not intended by the CAS Board or required by the language of its regulation.

Unisys' interpretation of the segment closing adjustment appropriately accounts for the entire surplus and the full benefit realized by the Government. There is no dispute that the Government would have received some benefit as a result of the $27.4 million surplus transferred. In fact, as in any case like this, it would have been easy for the parties to estimate the future benefit to the Government resulting from the transfer of assets. Where, as here, 90 percent of the contractor's business is on Government contracts, it is almost intuitive that transferring to a buyer surplus worth more than twice the amount of the segment

---

1 This position was not articulated by the Government in the Contracting Officer's Final Decision and has been raised for the first time in the Government's Cross-Motion for Partial Summary Judgment. If the Government advances this argument as a counterclaim, the decision in *Sharman Co., Inc. v. United States,* 2 F.3d 1564, 1568-69 (Fed. Cir. 1993), would suggest that this Court has no jurisdiction over that issue absent a final decision.

closing will produce benefits to the Government that greatly exceed the value of a cash payment from the seller to the Government of less that half that amount – and that intuitive calculation could have been verified with reasonable estimates and projections at the time of the transaction. October 4, 2000 Letter from Ralph Johnson to Denise Chezek (Exh. 9); May 26, 2004 Letter from Terry Albertson to Denise Chezek (at 2) and Attached Report from John McQuade (at 14, 18) (Exh. 10).[2] In the context of this case, of course, we have 12 years of actual history, and there is no need to speculate about whether the Government actually benefited from the surplus transferred to Loral. The Government can easily verify, if it has not already done so, that it has received, and will continue to receive, benefits in the form of cost reductions on CAS-covered contracts that exceed the $13,534,954 credit that the *Teledyne* calculation would require.

In *Teleydne I* and *Allegheny Teledyne, Inc. v. United States,* 316 F.3d 1366 (Fed. Cir. 2003) ("*Teledyne II*"), the decisions focused on interpreting how the parties were required to calculate the segment closing adjustment in accordance with CAS 413.50(c)(12) to determine the Government's share – an issue not disputed in this case. We know the amount of the required segment closing adjustment in this case as well as how much Unisys actually transferred. What is in dispute here is whether Unisys has effectively complied with the regulation by

---

2 Unisys is not offering Exhibit 10 to prove that the precise amount of the benefit to the Government calculated therein is correct, but instead to demonstrate ease in which the benefit to the Government could be calculated, and, indeed, has been calculated in this case.

transferring to a successor in interest an amount that is more than twice the calculated segment closing adjustment and, if not, whether the Government has suffered actual damage in the form of increased costs. The prior decisions do not address those issues.

## I. Neither the Plain Language of CAS 413 Nor the Intent of the CASB Supports the Government's Calculation of Its Share of the Surplus

The Government's brief is devoted primarily to proving that the provisions of CAS 413 plainly require a segment closing adjustment in this case. Because we agree completely with the Government that there is a requirement for a segment closing adjustment, there is no need for us to respond to those arguments. We cannot agree with the Government that the "plain meaning" of the regulation supports the Government argument.

As to the calculation of the amount due, the Government effectively ignores the formula adopted by this Court in *Teledyne I* and affirmed by the Federal Circuit in *Teledyne II*. Unisys has calculated the adjustment due on the entire surplus using that formula – and it is $13,534,954. Unisys Brief at 32-33 n.5. The Government calculation accepts the portion of the *Teledyne* formula that dictates how the Government's percentage share of the surplus should be calculated, but applies that percentage share only to a portion of the surplus. There is nothing in the *Teledyne* decisions that authorizes or permits the deviation from the formula advocated by the Government.

In fact, as the Government has conceded, there is little or no disagreement between the parties about how the segment closing adjustment should be calculated

under the *Teledyne* formula. DRPPFUF at 12 n.2. Ignoring the asset transfer to Loral and applying the *Teledyne* formula to the Unisys history and surplus, the segment closing adjustment that is due is $13,534,954. The primary issue in this case is whether the transfer of surplus to Loral satisfies the Unisys obligations and, if so, how much of the obligation has been satisfied. It is basically a form-of-payment issue.

The original CAS Board did not specifically address the mechanics of payment for segment closing adjustments. As we pointed out in our opening brief, there was ample evidence in the regulation before 1995 that the CAS Board intended that all adjustments due under the regulation would be made based on agreement of the parties. Unisys Brief at 3-4, 17-18. Consistent with the flexible approach to the implementation of price adjustments due under the Standards that has been in the regulations from the beginning, the current version of CAS 413 specifically permits contractors to meet their obligations to the Government by transferring surplus to the successor-in-interest. In explaining the application of the *Teledyne* formula, this Court itself has observed that "this is not to say that the parties cannot work out a method for using the surplus." *Gen. Elec. Co. v. United States*, 60 Fed. Cl. 782, 800 n.10 (2004). If there were no flexibility about payment, that observation would not make sense.

The weakness in the Government case is highlighted by the inconsistencies and contradictions in the Government's own brief. For example, the Government argues that the "*better* reading of CAS 413 is that it requires the selling contractor

to perform a segment-closing adjustment only upon the surplus that it retains, not upon the entirety of the surplus as if the contractor had not transferred any surplus." Gov't Brief at 11 (emphasis added). The use of the term "better reading" itself concedes that there is more than one possible and plausible reading of the regulation. The Government reading is what the 1995 revisions to the regulations explicitly require, but there is nothing at all in the pre-1995 regulations that even remotely suggests that the selling contractor must perform a segment-closing adjustment only upon the surplus that it retains. None of the CAS Board's several notices of proposed rule-making for the 1995 regulations included that requirement – it appeared for the first time in the final 1995 promulgation of the new CAS 413. *See* Unisys Brief at 4-5, 24-25. Before 1995, there was no language anywhere that even came close to requiring the very specific calculation that that the Government would impose on contractors.

Moreover, the Government concedes that "the language of [the original] CAS 413 itself and the CAS Board's contemporaneous explanatory Preamble makes no mention of partial surplus transfers." Gov't Brief at 4. That is an admission that there was nothing in the plain language of the regulation that supported the Government argument before 1995. On the contrary, the fact that the language was changed in 1995 to introduce the calculation method first advanced by the Government in this case is itself strong evidence that the original language did not encompass that same requirement.

While all lawyers understand that inconsistent alternative arguments may sometimes be appropriate, we cannot pass without commenting on the Government's use of inconsistent alternate arguments at the same time it is arguing that the plain meaning and intent are clear on the face of the regulation. In order to sustain an alternate reading argument as a matter of logic, a party needs to acknowledge that either reading of the regulation is plausible. If both readings are plausible, then there is no "plain meaning" or "clear intent." *See, e.g., Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996) (holding that an ambiguity exists when a plain reading could result in more than one reasonable interpretation).

The Government argues repeatedly and at length that "the intent of the CAS Board is dispositive." Gov't Brief at 5. That is certainly true as a legal matter, but in order for the CASB's intent to be "dispositive," it must have been expressed. On the mechanical issue about how payment of the adjustment due would be accomplished, there is no expression of the CASB's intent that supports the Government's position. Unisys has presented an argument about the CASB's flexible intent that is consistent with language about the flexibility of approaches to price adjustment and settlement that has been in the regulation for over 30 years. In the absence of a plain statement of the CASB's intent, this Court must determine which party's "reading of the regulation is the more reasonable interpretation." *Teledyne II*, 316 F.3d at 1375.

The Government has offered no support (regulatory history, case law, the parties' course of dealing, or otherwise) for its assertion that a formula first announced in the final version of the 1995 amendments of CAS 413.50(c)(12) and inconsistent with the formula approved in *Teledyne I* should control the interpretation of the original language in CAS 413. If the regulations have a plain meaning, it is that the mechanics of actual payment of any amount due should be negotiated by the parties. In this case, it would be unreasonable for the Government to refuse to consider the benefits it actually received from Unisys.

## II. <u>The Government's Assumption of No Future Benefits Is Unsupportable and Internally Inconsistent</u>

The Government asserts that "the benefit to the Government from a partial transfer of surplus in the amount of the segment-closing adjustment will *never* equal the benefit from a direct, lump sum payment." Gov't Brief at 27 (emphasis added). We cannot agree that the benefit would "never" be equal. More importantly, we cannot agree with the Government's refusal to consider the possibility that transferring to a buyer twice the amount of the Government's share of the segment closing adjustment due will never provide it with a benefit equal to the value of a direct payment from the seller. For example, as the Government concedes, if the buyer's business is comprised of 100 percent cost-reimbursement Government contracts, the transfer of assets in lieu of cash would be "equivalent." *Id.*

If a contractor applies a portion of the surplus to commercial business or competitively awarded fixed-price government contracts, and the Government takes

no protective action, Unisys agrees that the impact of transferred pension assets on future Government costs could be diluted. That is why it is so important in this case that (1) the value of surplus assets transferred by Unisys to Loral was more than twice the segment closing adjustment due under the *Teledyne* formula and (2) Government contracts accounted for more than 90 percent of the revenues of the business that Unisys transferred to Loral. Exh. 9. The question is whether Unisys transferred enough pension surplus to Loral to be at least the equivalent of transferring the full segment closing adjustment that was due directly to the Government.

In fact, the Government concedes *some* benefit. For example, the Government admits (as it must) that it receives a benefit when transferred surplus is applied to reduce pension costs on flexibly priced Government contracts at the buyer.[3] The Government also acknowledges that "negotiated firm-fixed-price contracts that the buyer enters into after the segment closing presumably would benefit in the form of lower projected pension costs utilized for forward pricing."[4]

---

3 Specifically, the Government apparently concedes that "the benefit of the transferred surplus is by reducing the pension costs charged to the buyer's contracts," (Gov't Brief at 27), which can only be a reference to pension costs allocated to flexibly-priced contracts.

4 Consistent with the Government's view that it has "an interest" in the transferred surplus, (Gov't Brief at 5, 9), Courts have likewise recognized that the Government retains its interest in its share of the surplus transferred to a successor-in-interest. *See, e.g., In re Bicoastal Corp.*, 136 B.R. 290, 294 (M.D. Fla. 1991) (holding that following a segment closing, the Government had a right to an "equitable share" (in the form of a cash refund) in the pension surplus transferred to the successor-in-interest).

Gov't Brief at 28. The Government's own auditors have also conceded that the Government will continue to benefit from the surplus transferred to Loral: "[S]ince Unisys transferred $27,377,055 of the $76,253,238 surplus pension assets to the successor-in-interest (Loral), *the Government and other customers of the sold segments will continue to benefit from these transferred surplus assets.*" Unisys Brief, Exh. 5 at 6; *see also id.* at 11 ("The surplus transferred to the successor-in-interest (Loral) will benefit all continuing work sold to Loral.").

Even if the Government's share is diluted in a specific case for one or more of the reasons described above, there is much in this world that is uncertain, and contractors and the Government deal with many of those uncertainties every day, agreeing on estimates of future costs and future business. It would be very easy for the Government and contractors to estimate the benefit of future pension cost reductions on Government business. That estimate would not be accurate to the penny, but when the amount actually transferred to the successor is more than twice the amount of the Government's share of the segment closing adjustment, the estimate is likely to be accurate enough to satisfy the Government that its interests are protected.

Moreover, the practical effect of the *Teledyne* formula is to *increase* rather than dilute the Government's benefit in the case of surplus transfers. The Government states:

> [I]f the Government's share of the surplus was 10% in the hands of the seller (because 10% of the surplus was attributable to CAS 413-covered, flexibly-priced contracts), *there is no reason to think* that the

> benefit to the Government in the hands of the buyer would be any more than 10% . . . .

Gov't Brief at 32 (emphasis added). That argument has a certain common sense appeal, but it ignores the way the Government's share of the surplus is calculated under CAS 413.50(c)(12). Assume, for example, that the contractor's business now and for many years has been 100 percent cost-reimbursement CAS-covered contracts, but that 90 percent of the surplus in the plan at the time of the segment closing is attributable to contributions made before 1978 on pre-CAS business. The Government share of that surplus "in the hands of the seller" is only 10 percent, but there is good reason to believe that 100 percent of the surplus "in the hands of the buyer" will be used to benefit the future cost-reimbursement contracts that constitute all of the contractor's business.

In this case, the "Government's share of the surplus . . . in the hands of the seller" was 17 percent, and "the benefit to the Government in the hands of the buyer" is at least 41 percent (based only on flexibly-priced Government contracts) and as much as 91 percent (based on all Government contracts). Exh. 9. Because the surplus will be applied proportionately to all business (both through forward pricing rates and as actual costs), an actual benefit of 91 percent is more likely. Those percentages are based on the history of the segments sold by Unisys. The future business might be different, but that difference could be estimated. It is simply not true that there is no way to quantify the value of the transferred assets. *See, e.g.*, Exh. 10.

Because of the difference between the benefit to the Government in the seller's versus the buyer's hands, the Government's approach creates real potential for "absurd" results. *Teledyne I*, 50 Fed. Cl. at 181. To illustrate, consider a situation where the Government's share of the surplus as calculated under *Teledyne* is 50 percent; on this basis, assume the seller transfers 60 percent of the surplus to the buyer. The seller's contract mix has been 95 percent Government cost-reimbursement business for years, and the buyer's contract mix is expected to be about the same. That means that 95 percent of the surplus will benefit Government business by reducing future costs. The Government would agree that to the extent the transferred surplus is applied to cost-reimbursement contracts, it "is equivalent to a direct Government payment." Gov't Brief at 27. When 95 percent of the 60 percent of the surplus transferred to the seller benefits the Government, 57 percent of the surplus has effectively been transferred for the future benefit the Government's business. Nevertheless, under the argument made in its brief in this case, the Government's position is that it is still entitled to 50 percent of 40 percent of the surplus the seller retained. Thus, in a situation where the Government is clearly entitled only to 50 percent and where it would actually benefit from 57 percent of the surplus, it nonetheless claims entitlement to another 20 percent. Such a result is clearly "absurd" and must be rejected.

The Government's assertion that it will not benefit from the surplus transferred to the buyer is also contradicted by the 1995 version of CAS 413.50(c)(12)(v), which acknowledges, at least in part, the recognition of future

benefits to the Government from transfers of surplus. We are reluctant to argue that any portion of the 1995 version of the regulation has any relevance to the pre-1995 requirements, but the relevance of this provision is that it proves that the Government recognizes that the transfer of surplus can satisfy the segment closing adjustment requirements. CAS 413.50(c)(12)(v) provides that "[i]f a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment pursuant to this paragraph (c)(12) is required." CAS 413.50(c)(12)(v). That provision would make no sense unless the CAS Board actually believed that transfers of pension assets to the successor produced a benefit for the Government that was equivalent to a cash payment.

In a single footnote, the Government disavows any protection afforded to its interest in its share of the pension surplus provided by the terms of the parties' Novation Agreement and incorporated advance agreements. Gov't Brief at 28-29 n. 6. Pursuant to the Novation Agreement, Unisys, Loral, and the Government agreed that "the Government is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the contract." Unisys Brief, Exh. 4 ¶ (b)(6)(i). The Government contends that such provisions do

not offer the requisite protection because they do not "address[ ] the complexities of pension issues." Gov't Brief at 28 n. 6. The Government does not explain why that limitation on effectiveness (even if true) would apply here, where the parties entered into a separate Advance Agreement focused exclusively on pension issues that includes similar protections. Unisys Brief, Exh. 4, Exh. C at 1; *see also id.* at 2 ("By entering into the novation agreement, the Government will not waive or compromise any rights that the Government may have regarding the Pension Funds.").

The notion that asset transfers do not provide sufficient benefit to the Government to substitute for a cash payment is particularly offensive from a practical point of view. Successor contractors generally continue the business of their predecessors – selling the same products and services to the same customers on roughly the same terms and conditions. As we pointed out in our opening brief, transfers of surplus assets to the successor contractor benefit customers because they have the effect of reducing costs on future contracts. Unisys Brief at 33 n.6. When a contractor writes a check to the Government, the check is deposited in the Treasury and provides no benefits to the prior customers who actually paid for the surplus. In the real world, the Government usually prefers that surplus be transferred in a way that will benefit future contracts rather than paid into the Treasury.

Finally, whatever may be the value to the Government of surplus asset transfers in other cases, in this case we have the benefit of the insight from 12 years

of actual experience. As the Government well knows, Loral and Lockheed Martin have continued to apply the surplus assets to reduce or eliminate pension costs on their sales to the Government, and the savings realized on those contracts already exceeds by several orders of magnitude the economic benefit that the Government would have received from a cash payment. Exh. 10 at 14, 18. That is easily verifiable by the Government, and there has been no Government disagreement with our assertion on this issue. The Government has benefited in very real and very substantial ways from the surplus assets transferred to Loral. That economic benefit cannot be ignored in assessing the adequacy of Unisys' compliance with the segment closing adjustment requirements.

## III. Contractors Do Not Have Unilateral Authority to Determine the Manner in Which the Government Obtains Credit for Its Share of the Surplus

The Government claims that the CAS Board could not have intended for contractors to have "unilateral authority" to determine the manner in which the Government obtains credit for its share of the pension surplus. *See* Gov't Brief at 22. As this litigation itself demonstrates, no contractor can unilaterally impose its will on the Government. If the Government disagrees, it has all the tools that it needs to protect its interests. For example, the Government was fully aware of the asset transfer to Loral before it agreed to novate Unisys' contracts to Loral. Had the Government disagreed with either the transfer of pension surplus from Unisys to Loral or the manner in which Loral would protect the Government's interests in the transferred surplus, it could have refused to novate the contracts to Loral or it could have insisted on additional protections. There is a statutory prohibition on

the transfer of Government contracts without the Government's completely discretionary waiver in the form of a novation agreement, and that statutory prohibition is absolute. 41 U.S.C. § 15;[5] *see, e.g., Giuliani Assocs., Inc.*, ASBCA No. 51,672, 00-1 BCA ¶ 30,780, 18,735 (Feb. 14, 2000) (noting the undisputed fact that the Contracting Officer's failure to execute the novation stopped the transfer of assets as proposed and prevented it from being carried out). Refusal to novate the contracts at issue without adequate protection of the Government's interest in the pension surplus would have been well within the bounds of the Government's authority. The novation process as set forth in FAR 42.1204(a) is permissive, providing that the Government "may, when in its interest, recognize a third party as the successor in interest to a Government contract . . . ."[6] *See, e.g., BLH, Inc. v. United States*, 13 Cl. Ct. 265, 267 (1987) (noting that the Government refused to agree to a novation because the contractor would not agree to the Government's demand for an extension of warranty conditions at no cost in exchange for the novation).

The Government attributes great significance to its contention that it had no "knowledge or consent" of the decision to transfer part of the pension surplus to

---

5 41 U.S.C. § 15 provides that "[n]o contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned."

6 Contrary to the assertion in the Government's Brief, the plain language of FAR 42.1204 "give[s] the Government the clear and unequivocal right to refuse to consent to the novation of a closed segment's contracts . . . ." Gov't Brief at 29 n. 6.

Loral. Gov't Brief at 2. Even if true, that fact would be irrelevant, because the Government was undeniably aware of the decision to transfer surplus to Loral long before the Government signed the Novation Agreement on April 4, 1996 (over one year following the date of execution of the asset purchase agreement).

## IV. The Government's Response to Unisys' Calculation of the Net Cost Impact of a Noncompliance Is Misguided

Every case brought under the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.*, must start with the contracting officer's final decision and must be about that final decision. The Contracting Officer's Final Decision in this case is a decision about Unisys' compliance with CAS. In its brief, however, the Government simply ignores the subject matter of that Final Decision. The Contracting Officer found Unisys to be noncompliant with the requirements of CAS 413 and asserted a claim for the amount of damage allegedly suffered by the Government as a result of that noncompliance. Unisys Brief, Exh. 6 at 4-5. Under the authority of the CAS interest provisions, she demanded interest on those damages at the rates specified for CAS. *Id.* at 5. This entire case is about Unisys' alleged failure to comply with CAS.

The CAS statute, the CAS regulations, and the CAS clause all specify that the measure of damages for a failure to comply with CAS is the "increased costs" paid by the Government as a result of the noncompliance. 41 U.S.C. § 422(h)(1)(B); 48 C.F.R. §§ 9903.201-4(a), 9903-306(a), (e); FAR 52.230-2(a)(5). "Increased costs" are measured by estimating the difference between the Government's costs using the non-compliant cost accounting practice and the costs using a compliant practice.

In this case, the increased costs paid by the Government are, in fact, less than zero. The Government has actually paid lower costs than it would have paid on a net basis if Unisys has written a check for the amount due under the *Teledyne* formula on the day the transaction closed.

The Government has offered no substantive response to Unisys' CAS cost impact argument, other than to state, erroneously, that Unisys' argument "is addressed to the wrong clause." Gov't Brief at 33. This Court in *Teledyne I* and the Federal Circuit in *Teledyne II* addressed the formula to be used to calculate the segment closing adjustment. There is no dispute about that calculation or about the amount produced by the formula approved in those decisions. *Teledyne I* and *Teledyne II* tell contractors and the Government how to calculate the amount of the adjustment that is required in order to be compliant with CAS 413. Neither decision addresses what remedy the Government has when a contractor fails to comply with that requirement. No court has ever held that it was or is improper to apply the clauses at 48 C.F.R. §§ 9903.201-4(a) and 9903.306(a), (e) to the determination of the cost impact of a CAS noncompliance.

Unisys believes it has complied with the requirements of CAS 413, but if it has not, the Government's remedy is clear. If there is any regulatory provision in this case that has a plain meaning, it is the identification of "increased costs paid" as the measure for Government damages resulting from a CAS noncompliance.

Unisys relied on the formula established by this Court's decision in *Teledyne* to calculate the segment closing adjustment due in this case. Unisys has applied

that formula to the amounts identified by the Government in the DCAA audit report to calculate the Government's $13,534,954 share in the surplus. Unisys Brief, at 32-33 n. 5. That formula establishes the economic baseline for compliance with CAS. If there has been a CAS noncompliance here, its impact is measured by calculating the increased costs, if any, that the Government has had to pay because Unisys did not comply with CAS requirements. That calculation must take into account the actual benefit realized by the Government as a result of the asset transfer.

The Government's position is apparently that if the Court agrees with the Government and concludes that Unisys' transfer of assets to Loral did not comply with the pre-1995 provisions of CAS 413, the statutory and regulatory provisions concerning CAS noncompliances may be ignored because the CAS clause is irrelevant. That argument ignores the sole basis for the Government claim asserted in the final decision that confers jurisdiction on this Court. Unisys Brief, Exh. 6 at 4-5. A major portion of the amount claimed in the Contracting Officer's Final Decision in this case is for interest, based solely on the statutory and contractual provisions concerning interest on CAS noncompliances. *Id.* at 5. If there is no CAS noncompliance, we trust that the Government will agree that the Court should strike the claim for interest that could only be due for a CAS noncompliance.

## Conclusion

Unisys' transfer of the pension surplus to Loral in 1995 satisfied Unisys' obligations to make a segment closing adjustment under the original CAS

413.50(c)(12). It is consistent the regulatory language, history, case law, and equity. It appropriately accounts for the entire DSO surplus and the true benefit realized by the Government; it is fair and equitable.

In any case, even assuming that Unisys' transfer of pension surplus to Loral was not compliant with CAS 413, the Government is only entitled to an additional payment if it has paid increased costs as a result of that noncompliance. If the transfer of pension assets to Loral has conferred on the Government an economic benefit that equals or exceeds the amount of the segment closing adjustment due under the *Teledyne* formula, Unisys has no further liability to the Government.

For the foregoing reasons as well as those reasons set forth in Unisys' Motion for Summary Judgment, the Court should grant Unisys' Motion for Summary Judgment and deny the Government's Cross-Motion for Partial Summary Judgment.

Respectfully submitted,

s/Terry L. Albertson

Terry L. Albertson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel. (202) 624-2635
Fax (202) 628-5116

Attorney of Record for Unisys Corporation

OF COUNSEL:
Amy Laderberg O'Sullivan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

Tel. (202) 624-2563
Fax (202) 628-5116

Anne H. Warner
Assistant General Counsel
Unisys Corporation
11720 Plaza America Drive
Reston, VA 20190
Tel. (703) 439-5747
Fax: (703) 439-3603

Dated: February 27, 2007

**CERTIFICATE OF FILING**

I hereby certify that on the 27th day of February, 2007, a copy of the foregoing Reply in Support of Unisys' Motion for Summary Judgment and Opposition to Defendant's Cross-Motion for Partial Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Terry L. Albertson