# EXHIBIT 10

crowell moring

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

Terry L. Albertson
202 624-2635
talbertson@crowell.com

May 26, 2004

Ms. Denise D. Chezek
Corporate Administrative Contracting Officer
Defense Contract Management Agency
c/o L-3 Communications Corp.
600 Third Avenue, 15th Floor
New York, New York 10016-2055

Re: Unisys Segment Closing

Dear Ms. Chezek:

You will find enclosed expanded segment closing calculations (our August 14, 2003 submission pertained only to the Great Neck union group) as well as a "cost impact" analysis that we asked John McQuade to prepare in response to your March 31, 2004, determination that Unisys' calculation of the segment closing adjustment due in connection with its May 4, 1995 divestiture of certain business units is not in compliance with the requirements of CAS 413.50(c)(12). We would like to emphasize two key issues that are discussed in the attached analysis.

First, we do not believe that the characterization of this disagreement as a "CAS noncompliance" requiring a "cost impact" analysis is correct. A "cost impact" analysis is typically an attempt to measure the "increased costs," if any, that are paid by the Government as a result of a CAS noncompliance. In every cost impact study I have ever seen, the goal is to measure the difference between the amount that the Government actually paid on CAS-covered contracts affected by the noncompliance versus the amount that the Government would have paid on the same CAS-covered work absent the noncompliance. However, because the Government paid no pension costs to Unisys on behalf of DSO after May 4, 1995, correcting the alleged "noncompliance" will not affect the amount paid by the Government on any contract. Instead, the issue here concerns a difference of opinion as to how the surplus pension assets that were transferred to Loral affect the "adjustment of previously-determined pension costs" under CAS 413.50(c)(12). Thus, the only "cost impact" that can be measured or is relevant in these circumstances is the difference in the parties' CAS 413.50(c)(12) calculation results. Under these circumstances, it is not at all clear that the Government is entitled to a "cost impact proposal" and we do not believe that the rules generally applicable to

cost impact proposals have much relevance in this circumstance. Notwithstanding the misgivings described in this paragraph, we asked Mr. McQuade to develop a "cost impact proposal" in a manner as consistent as possible with traditional cost impact analyses, as requested in your March 31, 2004 determination.

We have pointed out in prior meetings that the asset transfer to Loral must have reduced the pension costs that Loral (and its successors, Lockheed Martin and L-3) recovered from the Government after the 1995 divestiture, and that the amount of the reduction in cost must have exceeded whatever "adjustment" might have been due to the Government under CAS 413. Mr. McQuade's "cost impact" study quantifies that benefit for the first time. With respect to the qualified pension plans, we estimate that the actual pension costs allocated to the relevant Government contracts through 2002 totaled $9,992,006. In contrast, had Unisys retained all pension surplus, the Government (a) would have been entitled to an adjustment of previously-determined costs in the amount of $10,841,246 under CAS 413 but (b) would have incurred pension costs on the affected contracts of $39,000,683; the net pension cost to the Government under this scenario would have been $28,159,437. Accordingly, the bottom line of Mr. McQuade's analysis is that the Government received a benefit of $18,167,431 ($28,159,437 minus $9,992,006) solely because Unisys transferred surplus pension assets to Loral. Even if it is later determined that Unisys' segment closing calculations did not comply with CAS 413, the fact is that the Government's costs will still have been reduced because of Unisys' decision to transfer surplus assets to Loral. If there is a "cost impact," it has benefited the Government.

Second, we want to emphasize again, as we have in the past, the fundamentally inequitable basis for the Government position in this case. As explained above, the Government has received a substantial benefit as a result of Unisys' decision to transfer surplus pension assets to Loral. When Unisys' retention of liability for non-qualified pension plans and PRBs is considered, the inequity of the Government's position is even more striking: Mr. McQuade's analysis shows that the Government has already saved more than $50 million because of the manner in which Unisys structured the DSO transaction.

Moreover, while some of Mr. McQuade's analysis is based on assumptions and extrapolations rather than hard data, the benefit to the Government is so large that it is highly improbable that hard data could change his ultimate conclusion – that the benefits to the Government exceeded the adjustment to which it was entitled. On the contrary, in every prior instance in which we have provided the Government with an analysis based on assumptions and estimates, we have found

that analysis of the hard data actually produced a number that was even more favorable to Unisys.

The Government must now recognize that the way Unisys handled this issue has been more than fair to the Government and has effectively "adjusted" previously-determined costs in a way that is substantially more beneficial to the Government than the regulations would require. We believe that Unisys complied with the requirements of CAS 413, but even if it did not, there has been no damage to the Government. We believe that the attached analysis demonstrates conclusively that the Government's interests were not impaired because of the structure of the DSO transaction.

If you have any questions, or believe that additional discussion would be useful, we would be happy to meet with you at your convenience.

Sincerely yours,

Terry L. Albertson

Enclosure

PINE CLIFF CONSULTING INC.
Specialized Actuarial Services

945 Concord Street • Framingham, MA 01701 • T 508.620.4778 • F 508.879.0698 • www.pinecliffconsulting.com

May 25, 2004

Ms. Donna Q. Obrecht
Mail Stop E5-121
Unisys Way
Unisys Corporation
Blue Bell, PA 19424-0001

***Re: Segment Closing Calculation and Cost Impact Analysis***

Dear Donna:

The Government's responsible Administrative Contracting Officer (ACO), Denise D. Chezek, has determined that Unisys did not comply with Cost Accounting Standard (CAS) 413 in connection with the 1995 sale of DSO to Loral,[1] as set forth in a March 31, 2004 letter (Determination). Specifically, the Government asserted in the Determination that "Unisys' treatment of the $27M [of surplus assets that were transferred to Loral] does not comply with CAS 413." On that basis, the Government requested, in accordance with Federal Acquisition Regulation (FAR) 30.602-2(c), that a cost impact proposal be submitted within 60 days of the Determination.

This letter constitutes Unisys' cost impact proposal. As described below, Unisys' treatment of surplus pension assets in connection with the DSO transaction did not result in any increased costs to the Government; accordingly, no contractual cost or price adjustments are required.

The analysis described in this letter addresses the two specific issues:

- ***Segment closing calculation***. Terry Albertson's letter of August 14, 2003, which incorporated our letter dated August 13, 2003, provided segment closing calculations for the Great Neck Bargaining Unit Pension Plan (Great Neck Submission). This letter augments the Great Neck Submission by providing segment closing calculations for all Unisys segments that were closed as a result of the DSO transaction.

---

1 Depending on the context, references to Loral also encompass Lockheed Martin and L-3 Communications as successors.

- ***Cost impact proposal.*** The Government contends that Unisys' segment closing calculations do not comply with CAS 413.50(c)(12). Consistent with the Government's direction provided in the Determination, and notwithstanding Unisys' view that the segment closing methodology described in the Great Neck Submission complied with all applicable CAS requirements, this letter analyzes the impact of the DSO segment-closing adjustment in a way that we believe is consistent with the direction in the ACO's Determination.

***Segment Closing Calculations: Introduction***

The Great Neck Submission provided segment closing calculations for the Great Neck Bargaining Unit Pension Plan (Plan 007[2]) only. This letter extends the earlier analysis by making segment closing calculations for the other pension plans that were maintained by Unisys on behalf of DSO. These other plans include two qualified pension plans: the Unisys Pension Plan (Plan 005) and the Unisys Noncontributory Bargaining Unit Pension Plan (Plan 012). Plans 007, 005 and 012 are collectively referred to as Unisys' "Qualified Plans." In addition, DSO employees participated in nonqualified pension plans sponsored by Unisys.

As was the case in the Great Neck Submission, we have utilized certain aspects of the approach advocated by the DCAA in their Audit Report No. 6181-97D19200123-S1, dated January 23, 2003 (Audit Report) in preparing this analysis. In particular, we (a) assumed that the 1995 sale of DSO resulted in a "segment closing" under the original version of CAS 413.50(c)(12), (b) made our calculations using Unisys' ongoing 1995 actuarial assumptions and (c) adjusted our calculations from January 1, 1995 to May 4, 1995, the date the DSO transaction closed.

With the following exceptions, the cross referencing system used in the accompanying segment closing spreadsheets (which are included at the "SC Spreadsheets" tab) is identical to that described in the Great Neck Submission:

1. ***Segment closing vs. cost impact proposal.*** As noted above, this letter contains information pertaining to both the segment closing and the cost impact analysis. To minimize confusion, the spreadsheets associated with each calculation are included at separate tabs (i.e., "SC Spreadsheets" and "CI Spreadsheets"). In addition, the segment closing spreadsheets utilize page

---

[2] The segment closing and cost impact calculations required an analysis of eight qualified pension plans. Because each of these plans has a unique three-digit "plan number" that is used for Department of Labor reporting purposes, this letter utilizes plan number as a shorthand reference to each plan. For example, the plan number for Unisys' Great Neck Bargaining Unit Pension Plan is 007; see, for example, line 5c of the 1995 Form 5500 at tab F.

numbers that begin with "SC" and the page numbers associated with the spreadsheets that provide cost impact proposal information begin with "CI."

2. ***References to Great Neck Submission.*** This letter contains a number of references to spreadsheets and documents that were contained in the Great Neck Submission.[3] In general, citations in this letter to documents and spreadsheets included in the Great Neck Submission are identified by an asterisk. For example, the citation "L*" in cell F11 and line 29 of ***Segment Closing Adj May*** on page SC2 refers to tab L of the Great Neck Submission. Similarly, the "a*" in cell G5 and line 19 of ***Govt Percentage Share*** on page SC7 refers to the spreadsheet ***Govt Share*** on page S3 of the Great Neck Submission.

In general, the segment closing calculations attached to this letter were made in the same manner as described in the Great Neck Submission.

***Segment Closing Calculations: Estimates***

As reported in the Great Neck Submission, significant historical contribution and business mix data was provided to us for Plan 007. Due to the time constraints imposed in the Determination, it was not possible to compile similar data for the other Qualified Plans and segments of DSO; accordingly, estimates were made. Notwithstanding, it is unlikely that more complete data would yield materially different results than those presented in this letter.[4] The following paragraphs describe the nature of the estimates that were made.

With the exception of the flexibly-priced business mix data that was provided for each segment (see tab B), we assumed that the historical pattern of pension costs developed in the Great Neck Submission would apply to the other Qualified Plans and segments.

> *To illustrate, the CAS 413.50(c)(12) Government share (i.e., the portion of all past costs associated with CAS-covered flexibly priced contracts) for Plan 007 was determined to be 16.58% (see cell J11 of **Govt Share** on page S3 of the Great Neck Submission). As shown at tab B of this report, 44.12% of revenues at Great Neck in the 1991 to 1994 period were devoted to flexibly priced Government contracts; that same page shows that the corresponding percentage for the Huntsville segment was 29.66%.*

---

3 The Great Neck Submission is intended to be incorporated by reference into this letter.

4 As discussed below, there is reason to believe that some of our estimates were beneficial to the Government.

*Based on the preceding paragraph, the percentage of revenues devoted to flexibly priced business at the Huntsville segment was only 67.23% (that is, 29.66% divided by 44.12%) of that for the Great Neck segment. Under the presumption that all other factors were identical between the two segments, we estimated the CAS 413.50(c)(12) Government share for the Huntsville segment by multiplying the Great Neck CAS 413.50(c)(12) Government share percentage of 16.58% by 67.23% to yield the 11.15% reported in cell H7 of page SC7.*

In addition to the Qualified Plans, the DSO segment closing calculations described in this letter also encompass Unisys' nonqualified pension plans. Consistent with CAS 413.50(c)(12),[5] the difference between nonqualified pension assets[6] and liabilities was treated as an adjustment of previously-determined pension costs. While the nonqualified plan segment closing calculations were generally similar to those for the Qualified Plans, the following points identify two unique aspects of calculations:

1. ***Overall DSO***. The nonqualified pension plan liability data was provided to us on a DSO-wide basis; it was not allocated to the segments within DSO.[7] Accordingly, the nonqualified plan segment closing calculation was made on an overall DSO basis, and amounts were not attributed to each of the DSO segments.

---

5 The Government has contended previously that Unisys' nonqualified plans (sometimes referred to as supplemental executive retirement plans, or SERPs) are not subject to CAS 413.50(c)(12). For example, page 3 of DCAA Audit Report No. 6181-97D19200123, dated 12 April 1998, states "[t]he SERP is not subject to the provisions of CAS 413.50(c)(12) because it is a paygo plan and not an accruable SERP." In its response dated July 20, 1998, Unisys indicated that it did not understand the legal basis for DCAA's assertion. To date, the Government has not responded to this aspect of the July 20, 1998 submission. Nothing in the regulation or prefatory comments suggests that only qualified pension plans and nonqualified pension plans using accrual accounting are subject to CAS 413.50(c)(12), and we are aware of no basis for excluding Unisys' nonqualified plans from the calculation.

6 As stated at CAS 412.60(b)(2)(ii), the "entire liability is always unfunded for a pay-as-you-go plan." Thus, the market value of assets for the nonqualified pension plans was assumed to equal zero for purposes of the segment closing calculation.

7 The nonqualified plan liability for DSO was $1,585,572 as of January 1, 1995, as reported on Enclosure 2 of tab A. Enclosure 1 of tab A contains the "final calculation of the pension asset transfer amount"; because the pension asset transfer of $253,126,653 shown at the bottom of Enclosure 2 is identical to the corresponding amount shown on the second page of Enclosure 1 of tab A, we conclude that the nonqualified pension plan liability of $1,585,572 was determined in accordance with the transaction agreement and was accepted by Loral.

2. ***Business mix***. Because Unisys' nonqualified pension plans were intended to supplement its Qualified Plans, we applied the same historical cost and business mix factors to the nonqualified plans as were used for the Qualified Plans. Because the business mix factors were computed at the individual segment level while the nonqualified segment closing calculation was made on a non-segmented basis, ***Govt Percentage Share*** on page SC7 includes the calculation of a DSO-wide weighted-average Government share.[8]

Cell O20 of ***Govt Share of Surplus*** on page SC4 shows that the Government's share of the January 1, 1995 net surplus for all Unisys pension plans, before taking into account the transfer of surplus pension assets to Loral, was $10,192,155. In other words, the amount of "previously-determined pension costs" that would have been subject to adjustment if Unisys had not transferred surplus pension assets to Loral in conjunction with the sale of DSO were $10,192,155.[9] However, Unisys actually transferred aggregate surplus assets of $27,377,056 to Loral as of January 1, 1995, as calculated in cell O18 of ***Segment Closing Adj Jan*** on page SC3. On this basis, Unisys has argued that it transferred to its successor $17,184,901 more (i.e., $27,377,056 minus $10,192,155) than the regulation required, as shown in cell O27 of page SC3. When adjusted to the May 4, 1995 segment closing date, the excess amount transferred by Unisys increases to $17,916,979, as shown in cell O20 of ***Segment Closing Adj May*** on page SC2.

The preceding points, the accompanying spreadsheets at the "SC Spreadsheets" tab, and the historical documents contained in the appendices, when coupled with the discussion in the Great Neck Submission, explain the basis for our segment closing calculations. As developed on page SC2, the segment closing calculations indicate that Unisys transferred $17,916,979 more to its successor than CAS 413 would require.

***Cost Impact Proposal: Conceptual Framework***

The preceding calculations demonstrate that no segment closing adjustment is due to the Government because the amount of surplus assets that Unisys transferred to Loral exceeded the amount of any CAS-covered Government contract cost adjustments; such a result suggests that Unisys' treatment of the

---

[8] Our calculations computed the weighted-average based on Qualified Plan asset values under the theory that assets represent a reasonable proxy for an accumulation of past pension costs.

[9] The $10,192,155 includes $7,171,498 attributable to Plan 007, as reported in cell O16 on page SC4. This amount is also shown in cell E9 of ***Segment Closing Adj*** on page S2 of the Great Neck Submission.

DSO pension surplus resulted in reduced rather than increased costs to the Government. As set forth in the Determination, however, the Government contends that our calculation approach "contravenes CAS 413.50(c)(12)." Pursuant to the Government's direction, the remainder of this letter presumes, notwithstanding our belief to the contrary, that (1) Unisys' segment closing calculations do not comply with CAS 413.50(c)(12) and (2) that this presumed noncompliance requires the submission of a cost impact proposal prepared on a basis consistent with the ACO's Determination.

At the outset, it is not clear that the present dispute is properly framed as a "CAS noncompliance" requiring a traditional "cost impact analysis." Specifically, the basic unresolved issue between the parties concerns the proper manner in which transferred pension assets are taken into account when making a segment closing calculation under CAS 413.50(c)(12), not the extent to which the Government has paid "increased costs" as a result of a "noncompliance" with CAS 413.50(c)(12). Under these circumstances, it is not clear that the Government is entitled to the "cost impact proposal" as requested in the Determination.

In any event, whether or not the Government is entitled to a cost impact proposal is a legal rather than an actuarial question. Notwithstanding the concerns expressed in the preceding paragraph, we have attempted develop the cost impact calculations requested by the ACO. To this end, we first developed a conceptual approach for applying the generic cost impact proposal requirements to an noncompliance with CAS 413.50(c)(12). We then applied this computational framework to the facts of the DSO transaction to determine the amount of cost or price adjustment that would be required under the presumption that Unisys' alleged noncompliance with CAS 413.50(c)(12) would require the submission of a cost impact proposal.[10]

Taken together, CAS 413.50(c)(12) and the guidance contained in the Teledyne[11] decision offer clear direction for making segment closing calculations in a CAS-compliant manner. Because both CAS 413.50(c)(12) and Teledyne apply whether or not pension assets are transferred to a buyer,[12] and because neither CAS

---

10 The details of the cost impact calculations are contained in the "CI Spreadsheets" tab. Because the treatment of transferred assets formed the basis for the Government's finding of noncompliance, the cost impact calculations exclude Unisys' nonqualified pension plans.

11 United States Court of Federal Claims, Nos. 96-782C, 97-792C, and 97-659C, August 9, 2001. 45 CCF ¶77,803. Affirmed by United States Court of Appeals for the Federal Circuit, 02-5008, 02-5009, 02-5010, 02-5011, January 23, 2003, 45 CCF ¶78,020. All cites to Teledyne in this letter refer to the lower court ruling.

12 Although the Teledyne ruling does not address the treatment of transferred pension assets, the court was well aware that Teledyne had transferred a portion, and retained a portion, of the

413.50(c)(12) nor Teledyne address the treatment of transferred pension assets in the segment closing calculations, it logically follows that making a segment closing calculation under the presumption that Unisys retained all surplus pension assets provides a CAS-compliant baseline to be used for cost impact purposes.

Application of CAS 413.50(c)(12) and Teledyne to the sale of DSO, under the presumption that surplus pension assets were retained by Unisys, is relatively straightforward. If Unisys had retained all surplus pension assets, the Government's share of the adjustment of "previously-determined pension costs" required by CAS 413 would have been $10,841,246 as of the May 4, 1995 segment closing date for the Qualified Plans.[13]

If Unisys had retained all surplus assets, a clearly CAS-compliant approach would have provided the Government with an immediate benefit of $10,841,246 as of May 4, 1995. Unisys did not provide such a payment or credit to the Government at the time of the DSO transaction, but rather transferred $27,377,056 in surplus assets to Loral as of January 1, 1995.[14] When the $27,377,056 is adjusted to May 4, 1995 using the 4.26% factor described in the Great Neck Submission,[15] the amount of surplus that was transferred to Loral as of the segment closing date was $28,543,319.

It is undisputed that the surplus assets transferred pursuant to the DSO transaction reduced Loral's ongoing pension costs, and thereby reduced the amount of those pension costs that were allocated to Loral's ongoing Government contracts. Thus, the critical question to be addressed in the "cost impact analysis" is this: on balance, were the Government's costs increased because Unisys transferred surplus assets of $28,543,319 to Loral instead of providing the Government with an adjustment of "previously-determined pension costs" in the amount of $10,841,246? If the benefit that the Government has received as a result of the asset transfer equals or exceeds the adjustment of previously determined costs required by CAS 413, there is no "cost impact" to the

---

assets associated with the Teledyne segment that was closed. See page 9 of Teledyne at tab C.

[13] See cell G38 of ***Pension Surplus Cost Impact*** on page CI3. The Government's share of the January 1, 1995 surplus amounts were derived on lines 15 through 17 of ***Govt Share of Surplus*** on page SC4.

[14] See cell O18 of ***Segment Closing Adj Jan*** on page SC3.

[15] See item 3. on page 15 of our letter dated August 13, 2003 that was contained in the Great Neck Submission.

Government, even if it is determined that Unisys' calculation of the segment closing adjustment did not comply with CAS 413.50(c)(12).

To address the fundamental question posed in the preceding paragraph, we calculated and compared pension costs two ways, as follows:

- ***Actual asset transfer***. As described above, Unisys transferred surplus pension assets to Loral with a value of $28,543,319 as of May 4, 1995. Because the transferred surplus was applied to reduce Loral's ongoing pension costs, the Government benefited through reduced pension cost allocations at the former Unisys business segments. The Government's net pension cost under this scenario equals the sum of the pension costs that were allocated to Loral's Government contracts.

- ***Hypothetical alternate asset transfer***. The alternate asset transfer scenario presumes that Unisys retained all surplus pension assets associated with the closed segments. Under this hypothetical scenario, we presumed that the Government would have been entitled to an immediate credit of $10,841,246 as of May 4, 1995, as explained earlier. Because the amount of pension assets transferred to Loral under this scenario would have excluded pension surplus, however, higher ongoing pension costs would have emerged vis-à-vis the actual transfer scenario – and these higher pension costs would have been allocated to Loral's Government contracts. Accordingly, the Government's net pension cost under this hypothetical alternate asset transfer scenario equals the excess of the pension costs that would have been allocated to Loral's Government contracts minus the credit of $10,841,246 discussed above.

The aggregate cost impact (i.e., the increased cost to the Government) equals the excess, if any,[16] of (1) the amount of ongoing pension cost that would have been allocated to Government contracts based on the amount of assets actually transferred over (2) the net pension cost that would have been paid by the Government under the clearly CAS-compliant hypothetical asset transfer scenario.

The cost impact analysis described below is based upon pension cost and business mix estimates for periods following Unisys' sale of DSO on May 4, 1995. We do not have access to the detailed accounting information for Loral and its successors that would be needed to determine, with precision, the amount of CAS pension costs that would have been allocated to Government contracts under each of the two asset transfer scenarios described above. Accordingly, our

---

[16] The cost impact proposal requirements provide that the Government may not recover amounts that exceed the extent of its increased costs. See paragraph (5) of the CAS clause at FAR 52.230-2.

analysis used Unisys records as well as publicly-available information to estimate the amount of CAS pension costs that would have been allocated to Government contracts of the former Unisys businesses during the period commencing May 5, 1995.[17] Because the same computational approach was used for the actual and hypothetical alternate asset transfer scenarios, the difference in allocable CAS pension cost amounts between the two scenarios – which forms the core of the "cost impact" analysis – should be reasonably accurate.

***Cost Impact Proposal: Data Used***

The "cost impact" analysis described below used two types of data: plan financial data and business mix data. In general, pension plan financial data was extracted from Form 5500 filings and business mix data was extrapolated from Unisys' historical records. The following paragraphs provide more details.

Sponsors of qualified pension plans are required to file Form 5500 each year. These publicly available filings, in combination with filings provided from Unisys' records, have enabled us to trace the evolution of DSO pension coverage from the time of the segment closing through December 31, 2002. The flow chart included at tab D illustrates the lineage of these plans, and the following points provide additional explanation.

1. ***Pre-DSO transaction***. As described earlier, and as illustrated on the top line of tab D, DSO employees participated in the three Qualified Plans of Unisys prior to the sale of DSO to Loral: the Unisys Pension Plan (Plan 005), the Great Neck Bargaining Unit Pension Plan (Plan 007) and the Unisys Noncontributory Bargaining Unit Pension Plan (Plan 012). Relevant excerpts from the 1995 Form 5500 filings for these plans are included in tabs E, F and G, respectively.

2. ***Impact of DSO transaction***. Sponsors of qualified pension plans must file a Form 5310-A whenever assets and liabilities are transferred from one pension plan to another. In connection with the DSO transaction, assets and liabilities were transferred from Unisys' Plans 005, 007 and 012 to a single new Loral pension plan that was created effective with the May 5, 1995 DSO acquisition: the Loral Defense Systems Retirement Plan (Plan 009). Tab H contains

---

[17] Notwithstanding, Lockheed Martin included CAS assignable pension cost information in its Form 5500 disclosures for certain years. As shown on ***Costs Compared to Known Amounts*** on page CI8, our estimates of assignable CAS costs for these plans and years were within 1% of the actual amounts determined by Lockheed Martin (see cell K31 on page CI8). The actual assignable costs data corresponded to about 42% of our overall assignable cost estimates (see cell K30 on page CI8).

copies of the Form 5310-A filings made by Unisys in connection with these transfers of assets and liabilities; these filings confirm that all former Unisys employees were covered by Plan 009. Tab I contains the 1995 Form 5500 (covering the period May 5, 1995 through December 31, 1995) for the newly created Plan 009.[18]

The assets transferred out of Plans 005, 007 and 012 are identical to those transferred into Plan 009. For example, the aggregate amount transferred out of Plans 005, 007 and 012 as of January 1, 1995 was $253,126,653, as reported on Enclosure 2 at tab A as well as in tab K of the Great Neck Submission.[19] When increased to the date of the transaction using the 4.26% factor discussed above, the resulting amount of assets is $263,909,848, which matches the line 1b(1) on the 1995 Form 5500 Schedule B for Plan 009 at tab I.

3. ***Impact of Loral/Lockheed Martin Transaction***. In 1996, Lockheed Martin acquired a significant portion of Loral's businesses, including the components that Loral had acquired from Unisys in 1995. In conjunction with this transaction, Plan 009, which had been created by Loral for the benefit of acquired Unisys employees, was transferred in its entirety to Lockheed Martin.[20]

   As described in note 1. to the auditor's statement attached to the 1995 Form 5500 (see tab I), the Loral Defense Systems Retirement Plan (Plan 009) was renamed as the Lockheed Martin Tactical Defense Systems Retirement Plan

---

18 Line 5b of the 1995 Form 5500 for Plan 009 reports an effective date of May 5, 1995, the first day that DSO was part of Loral.

19 The total amount of assets transferred to Loral as of January 1, 1995 of $253,126,653 consists of $233,152,442 for the DSO segments that were closed and $19,974,211 associated with the ongoing S&T Services and Federal Systems segments (see page 10 of 11 of Appendix 1 at tab K of the Great Neck Submission). Because only a portion of the two ongoing Unisys segments was transferred to Loral, cell O9 of ***Assets and Liab. Transferred*** on page SC5, which focuses only on segment closing calculations, reports assets transferred of $233,152,443 (the $1 difference is due to rounding).

Also note that each of the two scenarios described above analyze the impact of varying the asset transfer amounts for the closed segments only; both scenarios are based upon the actual asset transfer amounts for S&T Services and Federal Systems. Thus, the difference in pension costs between the two scenarios (i.e., the cost impact analysis) is due solely to the closed segments.

20 See Item 21 of the auditor's statement attached to the 1996 Form 5500 at tab J.

(Plan 076) as a consequence of the Loral/Lockheed Martin transaction;[21] the name change is illustrated on the third line of the chart at tab D. Also note that the 1996 Plan 076 beginning-of-year asset amount of $274,154,065, as reported on line 31l on page 5 of the 1996 Form 5500 at tab J, is identical to the end-of-year value reported on line 31l of the 1995 Plan 009 Form 5500 at tab I. Tab J includes Form 5500 excerpts for Plan 076 from January 1, 1976 through December 31, 1979.

4. ***Impact of L-3 Spinoff.*** Effective May 1, 1997, L-3 Communications acquired certain businesses from Lockheed Martin, including the business in Salt Lake City that comprised Unisys' Communications Systems segment prior to the Loral transaction. In connection with this spinoff, assets and liabilities were transferred from Plan 076 to a new L-3 plan, the L-3 Communication Systems – Salt Lake Retirement Plan (Plan 003). As indicated on Line 10a of the 1997 Form 5500 for Plan 076 (see tab J), assets and liabilities were transferred to Plan 003 in 1997. Similarly, note 1. to the auditor's statement of the 1997 Form 5500 for Plan 003 refers to the transfer of assets and liabilities from Plan 076.[22] Tab M includes excerpts from Plan 003 Form 5500 filings for the period May 1, 1997 through December 31, 2002.

5. ***Impact of 1999 Spinoffs.*** All of the assets of Plan 076 were transferred to other pension plans in 1999.[23] As shown on line 5b of Part IV of Schedule H of the 1999 Form 5500 filing at tab J (and as illustrated on the bottom row of tab D), the assets of Plan 076 were transferred to the following three plans:

   a. ***Plan 003.*** In 1999, a final transfer was made from Plan 076 to Plan 003 to complete the 1997 L-3 spinoff described above. Specifically, note 1. to the auditor's statement attached to the 1999 Form 5500 for Plan 003 at tab M states that "[i]n 1999, it was determined that certain retired participants were not transferred from [Plan 076]. The assets, including interest were transferred to the Plan in August 1999."

   b. ***Plan 043.*** Effective December 31, 1999, participants of Plan 076 who were subject to a collectively bargaining agreement were transferred to the newly created Lockheed Martin Tactical Defense Systems Retirement Plan II for Bargaining Unit Employees (Plan 043).[24] In essence, this plan covers the

21 See also line 3 of the 1996 Form 5500 for Plan 076 at tab J.

22 See tab M.

23 See line 4k of Part IV of Schedule H of the 1999 Form 5500 filing at tab J.

24 See the discussion at note 3. of the auditor's report attached to the 2001 Form 5500 at tab K.

same employee groups that were covered by Plans 007 and 012 prior to the Unisys/Loral transaction. Tab K includes Form 5500 excerpts for this plan for 2000, 2001 and 2002.

c. ***Plan 023.*** Pension assets and liabilities of nonunion members of Plan 076 were transferred effective December 31, 1999 to the Lockheed Martin Corporation Retirement Income Plan III (Plan 023),[25] which covers a large number of employees and former employees of many Lockheed Martin businesses. Form 5500 excerpts for 1999 through 2002 for Plan 023 are contained in tab L.

Due to the complexity of the various spinoffs from Plan 076, a separate spreadsheet (***Transfers from Plan 076*** on page CI19-20) was created.

As noted above, the second major source of information – presumed business mix data – was extrapolated from past Unisys data. Tab N contains detailed business mix data for each of the DSO segments for 1994 (the year prior to the Loral transaction) as reported in Ralph Johnson's letter dated October 4, 2000 to Denise Chezek.[26] Because we do not have access to business mix data for periods after the segment closing date, the cost impact analysis presumes that the percentage of revenues derived from CAS-covered Government contracts at Unisys' successors would remain at 1994 levels for all future periods.

***Cost Impact Proposal: Calculation Overview***

Earlier sections have described the conceptual framework as well as the data to be used for the "cost impact" calculations. The following points provide an overview of the calculations made for "cost impact" purposes:

1. ***CAS costs based on actual DSO asset transfer.*** CAS pension costs were estimated for each of the pension plans with a DSO heritage (as described above) for the period May 5, 1995 through December 31, 2002 based on the actual amount of assets transferred from Unisys. These calculations are included on the following spreadsheets in the "CI Spreadsheets" tab: ***Plans***

---

25 See footnote "**" on page T-6 of note 2. to the auditor's report attached to the 1999 Form 5500 of Plan 023 in tab L.

26 ***Reconcile Business Mix Data*** on page CI12 demonstrates that the business mix data reported at tab N, which was utilized in the cost impact analysis, is consistent with the flexibly priced information included at tab B, which was used in the segment closing calculations described above.

***009 076 Actual Transfer***,[27] ***Plan 003 Actual Transfer***, ***Plan 043 Actual Transfer*** and ***Plan 023 Actual Transfer***.

2. ***CAS costs based on hypothetical DSO asset transfer.*** As described above, Unisys actually transferred $28,543,319 in surplus pension assets to Loral as of May 4, 1995. The hypothetical asset transfer scenario contemplates that Unisys would have retained these surplus assets, thus leading to increased pension costs in the period commencing May 5, 1995. CAS pension costs were estimated on this hypothetical asset transfer scenario for each of the pension plans that originated with the DSO transaction; these calculations are included on the following spreadsheets in the "CI Spreadsheets" tab: ***Plans 009 076 Alt Transfer***, ***Plan 003 Alt Transfer***, ***Plan 043 Alt Transfer***, and ***Plan 023 Alt Transfer***. Note that each of these spreadsheets has an actual asset transfer scenario counterpart as described in the preceding paragraph.

3. ***Government contract business.*** ***Business Mix Data*** on pages CI10-11 illustrates the proportion of pension costs that we assumed would have been allocable to CAS-covered Government contracts during the periods commencing May 5, 1995. As shown in lines 12 through 14 of page CI10, separate U.S. Government business mix percentages were derived for Government Systems (GS)[28] including Communications Systems (CS), CS only and GS excluding CS. These separate percentages enabled us to better estimate the amount of allocable pension cost for each plan following the spinoff of CS to L-3 Communications in 1997.[29]

---

[27] As explained above, Plan 009 was renamed to be Plan 076 effective January 1, 1996. Since Plans 009 and 076 are effectively the same plan, CAS pension cost calculations under both plan numbers are included on a single spreadsheet, ***Plans 009 076 Actual Transfer***, on pages CI13-15.

[28] We understand that "GS" and "DSO" are synonymous. We use the "GS" terminology here only to maintain consistency with the historical document at tab N.

[29] In practice, actual business mixes have likely varied to some extent in the years after 1994. However, the overall conclusions of the cost impact analysis – that Unisys' treatment of the pension surplus did not increase costs to the Government – are not that sensitive to relatively small changes in business mix. Lines 12 through 14 of ***Business Mix Data*** on page CI10 show that 89.9% to 99.4% of the pension costs of the former DSO businesses were presumed to have been allocable to CAS-covered Government contracts. Our analysis indicates that as long as Government contracts continued to account for 40% or more of revenues of the DSO businesses, Unisys' treatment of the pension surplus would not have resulted in increased costs to the Government. It seems inconceivable that the Government share of the business mix, on average, fell below 40% during the years at issue.

4. ***Allocable costs.*** Allocable pension costs were estimated under both scenarios for each year and plan, as shown on ***Allocated Costs Actual Transfer*** (pages CI4-5) and ***Allocated Costs Alt Transfer*** (pages CI6-7). Because CAS pension costs must be allocated to both fixed price and flexibly priced Government contracts for purposes of a "cost impact proposal," these allocable cost estimates were based on all types of Government contracts.

5. ***Cost impact.*** The aggregate results of the "cost impact" analysis are developed on ***Pension Surplus Cost Impact*** on pages CI2 and CI3. The actual costs to the Government are based upon the excess of (a) allocable pension costs based upon the actual asset transfer (column E on page CI2) over (b) the net CAS-compliant costs based on the hypothetical alternative asset transfer (column G on page CI2). The net cost under the alternate transfer scenario equals the excess of the CAS-compliant ongoing pension costs during the period May 5, 1995 to December 31, 2002 (lines 4-11 of column G on page CI2) over the Government's share of the segment closing adjustment as of May 4, 1995 (cell G3 on page CI2). Cell I13 of page CI2 shows that Unisys' alleged noncompliance with CAS 413.50(c)(12) reduced costs to the Government by $18,167,431.[30]

***Cost Impact Proposal: Calculation Details***

The preceding discussion, coupled with the calculations included at the "CI Spreadsheets" tab, provide the information necessary to assess the results of the cost impact analysis. While the CAS pension costs were computed in the customary manner and do not require additional explanation, the following points provide additional information and explanation regarding unique aspects of the "cost impact" calculations:

1. ***Hypothetical asset scenario: impact on subsequent spinoffs.*** As described above, the hypothetical alternate asset transfer scenario is predicated upon a smaller asset transfer to Plan 009 in conjunction with the Unisys/Loral transaction. The smaller initial asset transfer would flow through

---

In practice, there is some evidence that the percentage of business devoted to Government contracts actually increased following the Unisys/Loral transaction. To illustrate, tab N shows that 10.9% of Unisys' 1994 business at Great Neck was devoted to "Non US Gov't" contracts. However, my notes indicate that, in the March 14, 2003 meeting between representatives of the Government and Unisys, Denise Chezek stated that "virtually all" of Loral's work at the Great Neck facility was devoted to "Government work."

[30] While a more precise cost impact analysis could be made when Form 5500 data becomes available for periods after December 31, 2002, this additional information would not alter the conclusions of the analysis.

to Plan 076 (which is Plan 009 but with a new name) and later to Plans 003, 043 and 023 (because all the assets of Plan 076 were transferred to these three plans).

Our calculations presumed that, for purposes of the alternate asset transfer scenario, Plans 003, 043 and 023 would receive the same percentage of Plan 076's assets as occurred in the actual transfer scenario (see lines 32-34 on ***Transfers from Plan 076*** page CI19). The reduction in assets transferred for each of these subsequent spinoffs is shown in cells E8 and I8 of ***Plan 003 Alt Transfer*** (page CI24), cell E8 of ***Plan 043 Alt Transfer*** (page CI30) and cell E8 of ***Plan 023 Alt Transfer*** (page CI36).

2. ***Treatment of prepayment in connection with spinoffs***. Under both asset transfer scenarios, the "cost impact" analysis indicates that prepayment credits would have been present in Plan 076 as of December 31, 1999.[31] Consistent with typical industry practice, we presumed that prepayments were not transferred to Plan 003 in connection with the Lockheed Martin/L-3 transaction. As shown on lines 18 to 20 and lines 36 to 38 of ***Transfers from Plan 076*** on page CI19, the December 31, 1999 Plan 076 prepayment was split between Plans 043 and Plans 023 in proportion to the amount of assets transferred to each plan. The transferred prepayment credit was then posted to cell E30 of the CAS cost spreadsheets, under both the actual and alternate asset transfer scenarios, for Plans 043 and 023. For example, cell I20 of ***Transfers from Plan 076*** on page CI19 shows that a prepayment of $4,352,766 was to be transferred to Plan 043 in connection with the actual asset transfer scenario; accordingly, this amount was posted to cell E30 of ***Plan 043 Actual Transfer*** on page CI27.

3. ***Market value of assets: hypothetical scenario***. The spreadsheets illustrating the calculation of CAS pension costs based upon the actual amount of transferred assets also determine the actual rate of investment return; for example, cell E10 of ***Plans 009 076 Actual Transfer*** on page CI13 shows that Plan 009 earned a return of 3.88% for the period May 5, 1995 to December 31, 1995. The 3.88% was posted to cell E10 of ***Plans 009 076 Alt Transfer*** on page CI16, and was used to develop the market value of assets as of December 31, 1995 under the alternate asset transfer scenario.

---

[31] See cell M35 of ***Plans 009 076 Actual Transfer*** on page CI13 and cell M35 of ***Plans 009 076 Alt Transfer*** on page CI16.

4. ***Actuarial asset value.*** Our calculations presumed that the actuarial asset value reported for minimum funding purposes on Form 5500, as adjusted for any CAS prepayment credits, was also used for purposes of CAS 412. In addition, the "actual transfer" spreadsheets calculate the relationship between the actuarial value of assets and the market value of assets; the actuarial asset values used in the alternate asset transfer scenarios are predicated upon the same actuarial value/market value relationship. To illustrate, cell G23 of ***Plans 009 076 Actual Transfer*** on page CI13 shows that the actuarial value as of January 1, 1996 was equal to 100.98% of the corresponding market value. The 100.98% was posted to cell G23 of ***Plans 009 076 Alt Transfer*** on page CI16, and was multiplied by the alternate market value of assets as of that date to yield the actuarial asset value reported in cell G38 of page CI16.

5. ***Amortization period.*** Because the cost accounting practices of Loral, Lockheed Martin and L-3 are not publicly available, the amortization periods used by each entity for CAS 412 purposes was not known.[32] In addition, the Form 5500 information does not permit annual actuarial gains and losses to be separated from plan, assumption and method changes. Accordingly, we treated all newly created amounts of unfunded actuarial liabilities as actuarial gains or losses and, consistent with CAS 413, amortized these amounts over 15 years.[33] The same approach was used for the actual and alternate asset transfer scenarios.

---

32 As described elsewhere, some information was available with respect to pension cost accounting practices of Loral and its successors. However, this information did not describe the established CAS 412 amortization periods.

33 This simplifying assumption does not have a material affect on the cost impact analysis. Under the actual asset transfer scenario, Plan 009 was overfunded as of May 5, 1995 (see cell E47 of ***Plans 009 076 Actual Transfer*** on page CI14); because the cost was zero, the amortization period had no effect, and subsequent unfunded liabilities would have been amortized over 15 years pursuant to CAS 412-50(c)(2)(ii)(C).

Under the alternate asset transfer scenario, the unfunded liability as of May 5, 1995 was $3,230,379, as shown in cell E47 of ***Plans 009 076 Alt Transfer*** on page CI17 (while the unfunded liability would have been expected to be zero for purposes of the alternate transfer, the actuarial accrued liability used to determine the $3,230,379 was determined by Loral's actuary, who apparently determined a slightly different liability amount than did Unisys' actuary). The alternate scenario CAS cost for the May 5, 1995 to December 31, 1995 period of $7,927,452 (cell E64 on page CI17) includes an amortization component of $239,019 (which equals the annual payment of $358,529 in cell E54 adjusted by the ratio of 8 months to 12 months). If the unfunded liability was amortized over 10 years, the shortest permissible period under CAS 412, the cost would have risen by $67,313, or 0.8%. Alternatively, if the unfunded liability was amortized over 30 years, the longest permissible period under CAS 412, the cost

6. ***New CAS 412***. Because Loral's fiscal year ended on March 31, 1995,[34] the revised version of CAS 412 (as published in the Federal Register on March 30, 1995) would have been effective for Loral as of the closing of the DSO transaction on May 5, 1995 if Loral received any CAS-covered contracts on March 30 or 31 of 1995. Our calculations presumed that Loral did indeed receive such contracts; accordingly, we utilized the revised version of CAS 412 for all cost calculations in the May 5, 1995 to December 31, 2002 period.

7. ***Additional contributions under hypothetical scenario***. Under the alternate asset transfer scenario, Loral and its successors would have incurred higher CAS pension costs as described earlier; in addition, larger pension contributions would also have been required. In general, our calculations presumed that additional contributions would have been made as needed to fully fund the CAS costs determined under the hypothetical scenario; in this manner, no pension costs would have become forever unallowable under CAS 412-40(d). To illustrate, cell E32 of ***Plans 009 076 Alt Transfer*** on page CI16 reports that an additional contribution of $8,051,034 was made at the end of the 1995 year ("EOY" stands for "end of year"); this amount was exactly sufficient to cover the CAS cost in line 33 (which includes interest based on a quarterly funding assumption) plus interest on the CAS cost in line 34 to the end of the year. These additional contributions are likewise included in the market value of assets; for example, see cell E14 of ***Plans 009 076 Alt Transfer*** on page CI16.

8. ***ACL and tax maximum***. Our calculations of CAS costs incorporated the "assignable cost limitation" (ACL) of CAS 412 but not the maximum tax deductible amount as defined in the Internal Revenue Code. Under the alternate asset transfer scenario, the smaller initial asset transfer and the resulting additional pension contributions (as described in the preceding paragraph) would have impacted the calculation of the maximum tax deductible amounts; however, we did not attempt to estimate the revised tax limits. We do not believe this simplification had a material impact on the results of the "cost impact" analysis.

---

would have declined by $57,597, or 0.7%. Thus, the simplified amortization approach does not materially impact our analysis.

[34] See http://www.sec.gov/Archives/edgar/data/60357/0000950123-95-001513.txt.

***Summary***

As explained above, the Government's share of the DSO pension surplus for the Qualified Plans, determined in accordance with CAS 413.50(c)(12) and Teledyne, was $10,841,246 as of May 4, 1995.[35] Because Unisys transferred surplus assets to Loral of $28,543,319[36] as of that date, the segment closing calculations described above indicate that Unisys transferred $17,702,073 in excess of the amount required by CAS 413.[37] This calculation methodology is consistent with prior Unisys' submissions, and we continue to believe that is the correct approach.

On a purely common sense basis, the preceding paragraph suggests that the Government must have benefited from Unisys' decision to transfer substantial surplus assets to Loral in connection with the DSO transaction. The "cost impact" analysis confirms this impression: as explained above, Unisys' treatment of the surplus for the Qualified Plans reduced the Government's cost by $18,167,431 through December 31, 2002.[38]

The Government has also realized savings in addition to those associated with the Qualified Plans. For example, the nonqualified plan liabilities for DSO participants were $1,585,572 as of January 1, 1995 (see tab A); the Government has saved approximately 91.0%[39] of the payments made pursuant to these plans since May 4, 1995. More significantly, Mellon has estimated that, since May of 1995, Unisys has provided retiree medical benefits to Great Neck retirees in the amount of $36.2 million[40]; using the same 91.0% factor, the Government has avoided retiree medical costs of roughly $32.9 million.

The preceding paragraphs indicate that the Government has saved combined pension and retiree medical costs in excess of $50 million due solely to the manner in which Unisys structured the DSO transaction. Although the calculations described in this letter are based upon a number of assumptions and approximations, it is inconceivable that our fundamental conclusion – that the

---

35 See cell G38 of ***Pension Surplus Cost Impact*** on page CI3.

36 See cell E8 of ***Plans 009 076 Alt Transfer*** on page CI16.

37 This amount can also be calculated (within rounding) as the sum of the Qualified Plan amounts in cells O15, O16 and O17 of ***Segment Closing Adjustments May*** on page SC2.

38 See cell I13 of ***Pension Surplus Cost Impact*** on page CI2.

39 See cell M12 of ***Business Mix Data*** on page CI10.

40 See tab O.

Government's costs were reduced as a result of Unisys' treatment of the pension surplus – would be altered through the use of more refined data.

* * *

Subject to the limitations described above, all calculations were made in accordance with CAS 412 and 413. I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained in this letter, and am available to respond to any questions concerning this material.

Sincerely,

John B. McQuade, F.S.A.

Enclosures

cc: Terry L. Albertson
Anne H. Warner
James F. Buss