**No. 05-281C**
**(Judge Firestone)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**UNISYS CORPORATION,**

**Plaintiff,**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant.**

---

# DEFENDANT'S REPLY BRIEF IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE SURPLUS TRANSFER ISSUE

---

**PETER D. KEISLER**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**C. COLEMAN BIRD**
**Senior Trial Counsel**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: 202.307.0453**
**Fax: 202.514.7965**

**Attorneys for Defendant United States**

**OF COUNSEL:**

**DAVID D'ALESSANDRIS**
**Trial Attorney**
**Commercial Litigation Branch**

**STEPHEN R. DOOLEY**
**Senior Trial Attorney (Supervisory)**
**Defense Contract Management Agency**
**495 Summer Street**
**Boston, MA 02210**

**Dated: August 29, 2007**

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX TO ATTACHMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S REPLY BRIEF IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE SURPLUS TRANSFER ISSUE . . . . . . . . 1

I. The CAS Board Intended To Require A Contractor To Make A CAS 413 Segment-Closing Adjustment With Respect To The Retained Pension Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Unisys Is Required To Perform A Segment Closing Adjustment . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

CASES PAGE(s)

Allegheny Teledyne Inc. v. United States,
316 F.3d 1366 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13, 14

General Electric Co. v. United States,
60 Fed. Cl. 782 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Teledyne, Inc. v. United States,
50 Fed. Cl. 155 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 14

STATUTES AND REGULATIONS

41 U.S.C. § 422(h)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

48 C.F.R. § 52.216-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

48 C.F.R. § 9903.201-4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

48 C.F.R. § 9904.413-50(c)(12)(v) (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

INDEX TO ATTACHMENT

| | |
|---|---|
| Attachment 1 | Appeal of Raytheon Co., ASBCA No. 54907 (Aug. 21, 2007) (slip opinion) |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **UNISYS CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 05-281 C** |
| | ) | **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE SURPLUS TRANSFER ISSUE**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this reply in support of our cross-motion for partial summary judgment upon the surplus transfer issue. In our cross-motion we established that the proper interpretation of Cost Accounting Standard ("CAS") 413 depends upon the intent of the CAS Board, and not the intent or interpretation of other agencies or individuals. Defendant's Cross-Motion for Partial Summary Judgment, and Opposition to Plaintiff's Motion for Partial Summary Judgment, on Surplus Transfer Issue ("Def. Cross-Mot.") at 8. We also demonstrated that the CAS Board intended to require a contractor to make a CAS 413 segment closing adjustment with respect to the pension surplus retained by the contractor, based upon the text of CAS 413, and the regulatory history of CAS 413. Def. Cross-Mot. at 9-30.

In opposition to our cross-motion, Unisys Corporation ("Unisys") asserts that its transfer of assets in excess of its own valuation of the transferred actuarial liabilities of the segment satisfied its segment closing obligations because it transferred more than twice its own estimate of its segment closing obligation, and that the Government is only entitled to its increased costs

in the event of CAS non-compliance. Unisys Corporation's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Cross-Motion for Partial Summary Judgment ("Unisys Opp. & Reply") at 3-4.

## I. The CAS Board Intended To Require A Contractor To Make A CAS 413 Segment-Closing Adjustment With Respect To The Retained Pension Assets

As we demonstrated in our cross-motion, the text of CAS 413 and the CAS Board's published guidance make clear that the Board did not intend to permit a contractor to avoid making a CAS 413 segment closing adjustment merely by transferring a portion of the segment's remaining surplus to the purchasing contractor. Rather, the CAS Board intended that the selling contractor perform a segment closing adjustment with respect to the surplus retained by the selling contractor.

The CAS Board intended that contractors perform a segment closing adjustment whenever, due to a segment closing, there are no future cost accounting periods within which to adjust previously determined pension costs through the amortization of past actuarial gains and losses. When a contractor transfers pension assets greater than the transferred actuarial liabilities to the buyer, along with the segment's contracts, those assets are integrated into the buyer's pension fund where they factor into future periods' pension cost calculations, lowering the pension cost below what it would be absent the transfer. Accordingly, there is no need to perform a segment closing adjustment upon the transferred assets in excess of the transferred actuarial liabilities. However, unless the segment closing adjustment is performed upon the retained surplus, no adjustment will ever be made to correct for past excessive pension cost charged to the Government. Def. Cross-Mot. at 14-22.

A. Unisys's Interpretation Omits Assets From The Segment Closing Adjustment

Unisys asserts that the Government is ignoring the formula adopted in Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001), and affirmed in Allegheny Teledyne Inc. v. United States, 316 F.3d 1366, 1373 (Fed. Cir. 2003), because the Government calculation applies the Government's percentage share to only a portion of the closed segment's surplus (the portion that Unisys retained). Unisys Opp. & Reply at 7. However, it is clear that it is Unisys that is attempting to omit assets from the segment closing adjustment. The crux of the issue before this Court is how to divide the surplus between the Government and Unisys, and this Court's role is to interpret the intent of the CAS Board. Allegheny Teledyne, 316 F.3d at 1373, quoting Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995). Of course the "surplus" is not a separate fund, but rather an accounting calculation representing the amount by which the pension assets exceed the estimated actuarial liability of the segment. According to Unisys, any assets transferred in excess of its own estimate of the actuarial liabilities represent a transfer of "surplus" and this transferred surplus is composed entirely of the Government's share of the segment's pension surplus. According to Unisys's proposed calculations, the "surplus" transferred was not in any way, shape, or form a portion of the segment's surplus attributable to Unisys's commercial work.

As this Court found in General Electric, the CAS requires that the contractor account for "all of the funds contributed by or on behalf of the segment. This necessarily includes assets associated with both Active Employees and Inactive Employees." General Electric Co. v. United States, 60 Fed. Cl. 782, 796 (2004) (emphasis in original). Like the analysis in this Court's previous opinion, Unisys had a "complete" pool of pension fund assets that was the

result of pension contributions allocated to Unisys's commercial contracts, Government firm fixed-priced contracts, and Government flexibly-priced contracts. Accordingly, the transferred assets are in reality an undifferentiated, unsegmented portion of the complete pool of assets, comprised of the results of work on both commercial and Government contracts, and not solely on Government work. Thus, Unisys is attempting to shield its retained surplus from the segment closing adjustment by arguing that the transferred surplus is composed entirely of the Government's share.

B. Any Transferred Surplus Is The Result Of Commercial Work In Addition To Government Work

To the extent that the Court is persuaded by Unisys's argument that it should receive credit in the segment closing adjustment for the amount of surplus transferred, the transferred amount must be recognized to be an undifferentiated and unsegmented portion of the entire pool of assets, and cannot correctly be treated as comprised solely of the Government's share.

Unisys alleges that the Government's interpretation of CAS 413 would lead to an absurd result.[1] Unisys relies upon a hypothetical calculation in an attempt to demonstrate that the Government will receive more than its share of the benefits. In its hypothetical, Unisys assumes that the Government is entitled to 50 percent of the segment's surplus. However, assuming that the segment, both before and after transfer, performs a mix of Government and commercial work, it is clear that the Government does not receive a windfall.

Using Unisys's assumptions, the Government would be entitled to 50 percent of the

[1] We note that, in our cross motion, we erroneously suggested that Unisys would retain hundreds of millions of dollars of pension surplus, rather than the correct amount of approximately $50 million. Def. Cross-Mot. at 31.

retained surplus in a segment closing adjustment. If Unisys were to transfer 60 percent of the surplus to the buyer, that surplus would be composed of Government share, as well as the commercial share attributable to the segment. The Government's share in the transferred surplus is the same as its share in the retained surplus – 50 percent. Thus the benefit to the Government is still 50 percent, comprised of 50 percent of the retained 40 percent (.50 x .40 = .20), plus 50 percent of the transferred 60 percent (.5 x .6 = .30), for a total of 50 percent (20% + 30% = 50%).

Unisys instead argues that the Government would receive 77 percent of the surplus. Unisys Opp. & Reply at 15. Unisys first assumes that the selling contractor's contract mix has been 95 percent cost reimbursable contracts, and would remain unchanged at 95 percent in the hands of the buyer forever. Unisys then assumes that the Government would obtain 95 percent of the benefit for the 60 percent of the surplus transferred, or 57 percent of the total surplus (.6 x .95 = .57). Unisys then assumes that the Government would receive half of the retained 40 percent of the surplus, or 20 percent of the total surplus (.5 x .4 = .2), for a total of 77 percent of the surplus (57 percent plus 20 percent = 77 percent). Unisys Opp. & Reply at 15.

The simple answer to Unisys's contrived and convoluted hypothetical is this. If the Government happens to receive a benefit from transferred surplus in the hands of the buyer that, when combined with the CAS 413 segment closing adjustment that the seller pays to the Government upon the retained surplus, is greater than the Government's assumed 50 percent share of the segment's surplus, that is a benefit that the selling contractor chose to bestow upon the Government by the way that the seller structured its transaction with the buyer (without the Government's prior knowledge or agreement). Contrary to Unisys's contention, even under the

extreme assumptions that Unisys posits (in which the Government's share of the surplus at segment closing (50 percent) is only about half of the Government's share of the supposed benefit in future years according to the segment's contract mix (95 percent Government flexibly-priced contracts)), there is no absurdity or unfairness in that result. This is no different than if the seller had chosen to transfer 100 percent of the surplus to the buyer, instead of the 60 percent that Unisys assumes. In that case, as Unisys correctly notes, there would be no CAS 413.50(c)(12) segment closing adjustment paid by the seller.[2] But the Government's alleged future benefit from the transfer of 100 percent of the surplus (assuming, as Unisys always does, that the segment's contract mix would not change and would remain 95 percent Government flexibly-priced contracts forever), will be 95 percent of the surplus, instead of the assumed 50 percent share. There is nothing absurd or unfair in that result. This demonstrates yet again that the CAS Board was concerned about adjusting the surplus retained in the hands of the seller, not about hypothetical future benefits from transferred surplus in the hands of the buyer.

Thus, Unisys's extreme assumptions, such as its assumption that the selling contractor's mix is 95 percent Government flexibly priced contracts, prove nothing. One could just as easily

---

[2] *See* CAS 413.50(c)(12)(v), 48 C.F.R. § 9904.413-50(c)(12)(v) (1995). The Government's position is and has been that, when the seller transfers 100 percent of the segment's surplus, no segment closing adjustment would be required under the original CAS 413.50(c)(12) as promulgated in 1977. This does not mean, as Unisys contends (Unisys Opp. & Reply at 16), that the CAS Board believed that the Government would receive the same benefit in the future from the surplus in the hands of the buyer that it would from an immediate segment closing adjustment as if the seller had retained the surplus. Instead, it simply reflects that, since the entire surplus was transferred to the buyer along with the segment, there was no need for a segment closing adjustment because the essential link between the transferred surplus and the transferred segment's contracts remained intact, and the amortization of past actuarial gains and losses could continue in the future by adjustments to the segment's future pension cost in the hands of the buyer.

assume a contractor that has recently started performing substantial commercial work, such that the current contract mix is 10 percent Government flexibly priced contracts and 90 percent commercial work, but due to past Government work, the Government would be entitled to the same 50 percent of the surplus. Using the same assumptions, of 60 percent surplus transfer and 40 percent retained surplus, the Government would receive 10 percent of the transferred surplus or 6 percent (.6 x .1 = .06, or 6 percent), plus half of the retained surplus, or 20 percent (.5 x .4 = .20, or 20 percent), for a total of 26 percent (.20 + .06 = .26, or 26 percent). This would be approximately half of the surplus to which the Government would have been entitled if the contractor had retained the entire amount of the surplus.

Unisys notes that new CAS 413.50(c)(12)(v) provides that:

> [i]f a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment pursuant to this paragraph (c)(12) is required.

CAS 413.50.(c)(12)(v). According to Unisys, this language demonstrates that “the CAS Board actually believed that transfers of pension assets to the successor produced a benefit for the Government that was equivalent to a cash payment.” Unisys Opp. & Reply at 16. As we demonstrated in our cross motion, the CAS 413 segment closing adjustment is required because the prior period pension costs were miscomputed. Def. Cross Mot. at 13. Unisys’s position improperly attempts to include presumed “downstream” reductions in the hands of Loral, to correct for excessive pension costs it charged to the Government during the years that it operated the segment. Unisys cannot be permitted to appropriate to itself the Government’s share of the retained assets, the share that resulted from Unisys’s past over-contributions and the

Government's resulting past excessive reimbursements to Unisys.

Obviously, when the segment is closed, there are no future periods within which to make actuarial adjustments with regard to the retained surplus. The surplus will remain in the selling contractor's pension plan, where it will benefit the selling contractor and the selling contractor's future customers, which may be entirely commercial customers if the segment that was sold was the last segment performing any Government business. This creates exactly the problem that the CAS Board intended to address in CAS 413. Unless the seller performs a CAS 413 segment closing adjustment, the CAS Board's clearly expressed intent - to provide for an adjustment whenever, because of a segment closing, the amortization process will be unable to adjust pension cost to correct for past over- and under-estimates will be wholly frustrated.

When the contractor transfers all or part of the pension surplus to the buyer, there will be future accounting periods within which adjustments can be made to correct for pension costs previously charged to the closed segment. The transferred surplus in the buyer's pension plan will reduce the amount of pension costs that will be charged to the segment in the future, and, as a result to the segment's contracts, including the transferred contracts. While this is not the same as a continuation of the amortization process in the hands of the selling contractor, it serves a similar purpose. Both a partial transfer of a surplus, and a full surplus transfer present the same risk that the contract mix of the sold segment may change in the future. In fact, all segments present this same problem on an on-going basis, whether or not they are sold. The contract mix can always change to the benefit or detriment of the Government.

There is still another reason why the CAS Board could never have intended the interpretation that Unisys advances – in all likelihood, the amount of the surplus in the hands of

the buyer (and the resulting supposed benefit to the Government in the future) will be different from the amount of the surplus in the hands of the seller. This is true because what Unisys refers to as the transfer of surplus is in fact the transfer of pension assets and pension liabilities. Although the value of the transferred assets may be the same in the hands of the buyer as previously in the hands of the seller, it would be most unlikely that that would also be true of the transferred liabilities. The buyer's valuation of the transferred liabilities would be equal to the seller's valuation of these same liabilities only if the buyer and seller happened to use exactly the same actuarial assumptions (regarding interest rate, expected retirement age, mortality, amortization periods, etc.) and the same actuarial cost method. This would occur only by sheer happenstance. And, unless there was such an absolute congruence of actuarial assumptions and actuarial cost methods between the buyer and the seller, the value of the surplus in the hands of the buyer would necessarily be different from the value of the surplus in the hands of the seller.

Further, as we demonstrated in our cross-motion, Unisys's interpretation is also squarely contrary to the CAS Board's express understanding of its jurisdiction and authority. Def. Cross Mot. at 22-26. According to Unisys, the CAS Board intended that whether a cost adjustment was required upon pension surplus that the selling contractor retained was to depend upon whether the Government could recover the benefit of that adjustment from a third party (the buyer) in a transaction outside of any contracts between the selling contractor and the Government, through reduced pension cost that the buyer would charge to its Government contracts, including the transferred contracts, in future years. According to Unisys, the CAS Board intended that a contractor, in its sole and unfettered discretion, could choose to deprive the Government of its rights to an immediate cost adjustment under the Government's contracts with

the seller simply by transferring pension assets to the buyer.

The CAS Board well knew, and made its understanding clear, that it had no authority to prescribe cost accounting standards that governed the allowability or recoverability of costs on Government contracts. Having clearly expressed its understanding in this regard, the CAS Board could never have intended to make the operation of a required cost adjustment depend at the contractor's election upon cost recovery questions, and, in particular, upon the Government's ability to recover an amount equivalent to the benefit of the cost adjustment through some alternative mechanism.

The CAS Board that promulgated Original CAS 413 in 1977 well understood that its authority only extended to the measurement, assignment, and allocation of cost, and not to the allowability of any cost. As this Court recognized, "[a]lthough Congress gave the [the original CAS Board] wide authority in promulgating standards governing the measurement, assignment, and allocation of costs, Congress gave [the Board] only very limited authority over cost 'allowability' or other matters relating to the pricing of contracts." Teledyne, 50 Fed. Cl. at 162 (emphasis in original), citing Defense Production Act Amendments of 1970, Pub. L. No. 91-379, §§ 719(g), 719(h)(1), 84 Stat. 796 (1970), codified at 50 U.S.C. App. § 2168 (repealed 1988). As the Court also recognized, the Board's only authority over allowability was the requirement in § 719(h)(1) that the CAS Board's regulations implementing the cost accounting standards were to provide that the contractor agree to a contract price adjustment for any increased costs that the Government pays because of a contractor's failure to comply with CAS or to follow its disclosed cost accounting practices. Id.

Thus, there can be no doubt that the CAS Board viewed matters of cost allowability and

cost recovery as beyond its authority. It cannot be the case that this Board promulgated cost accounting standard that went beyond measurement, assignment, and allocation of cost and invaded the province of the FAR and the procuring agencies by making the operation of a required cost adjustment of previously-determined pension costs depend upon the recoverability of the adjustment amount in contracts between the Government and a third party (the buyer).

Unisys can point to no other cost accounting standard in which the Board required a cost adjustment but allowed the contractor to satisfy its obligation to make such an adjustment by making transfers of property to a third party without the Government's consent, because there are none. If Unisys were correct, the Board intended to allow a contractor to evade a required cost adjustment because the Government would allegedly be able to recover from the buyer an amount equivalent to what the contractor should have paid to the Government directly as a result of the cost adjustment, by entering into additional contractual undertakings with a party other than the selling contractor that would require extensive monitoring efforts over a period of years and would involve complex and detailed cost accounting.

Unisys alleges that the Government was aware of the surplus transfer and protected its interests. Unisys Opp. & Reply at 16-20. While Unisys does not dispute that the Government was not informed of the transaction before it was announced, Unisys nevertheless alleges that the Government protected its interests through the advance agreement, and the novation agreement. However, the actuarial liabilities to be transferred and the amount of assets to be transferred had already been negotiated between Unisys and Loral. Unisys could not subsequently change the terms of the transaction agreement to account for Government concerns, without breaching the terms of the transaction agreement with Loral. There would be no way for the Government to

negotiate with Unisys and Loral regarding the terms of the transfer of the actuarial liabilities and assets, as the terms of the transfer had already been set in the transaction agreement, before the Government knew of the sale.

The novation agreement protects the Government from paying increased costs only upon the novated contracts. The transferred surplus will be diluted as it lower the pension costs upon all of the segment's contracts, commercial as well as Government. Even assuming that the segment's contract mix does not change in the future, the novation agreement does not obtain for the Government the benefit of the transferred surplus. The novation agreement cannot protect the Government's interest in the surplus from being diluted by commercial work performed by the segment. While the CAS does address the issue of dilution of transferred pension surplus, it would not protect the Government in this instance, because the CAS only addresses the issue of dilution between segments, and does not address the issue of dilution within a segment. Specifically, CAS 413.50(c)(3) provides that:

> Pension cost shall also be separately calculated for a segment where (i) The pension plan for that segment becomes merged with that of another segment and (ii) The ratios of assets to actuarial liabilities for each of the merged plans are materially different from one another after applying the benefits in effect after the merger.

CAS 413.50(c)(3). By its plain terms, the standard applies only to the merger of a plan, something which did not occur as part of this transaction. Moreover, even if there were a plan merger, which there was not, the standard refers to a material difference in the ratio of assets to actuarial liabilities for the plans. In a full transfer of undifferentiated pension fund assets, the only diminution of the Government's share therein that can occur is that the Government's participation share in the future work of the sold segment may decrease. In a partial transfer of

just the Government's share of assets, the normal operation of CAS compliant pension cost calculations by the buyer will itself diminish the Government's realization of economic benefit from the assets transferred. The Government share of the transferred surplus will factor into and reduce pension costs for all customers of the segment, including commercial customers.

Moreover, as Unisys correctly notes, there is no requirement that the contractor enter into a novation agreement with the Government. Unisys Opp. & Reply at 19. If the Government cannot require the seller and the buyer to enter into a novation agreement upon terms satisfactory to the Government, the possibility that the Government could insure that it got certain benefits from the transferred surplus if both the seller and the buyer agreed to such terms in a novation agreement cannot be a substitute for the payment of the CAS 413 segment closing adjustment that the CAS Board required. Unisys does not explain how the Government's right to withhold its consent to a novation agreement would protect the Government from increased costs. Moreover, if novation agreements were sufficient to protect the Government's interests, there would be no need for CAS 413.50(c)(12).

II. Unisys Is Required To Perform A Segment Closing Adjustment

Unisys asserts that, even if its partial surplus transfer does not satisfy its CAS segment closing adjustment obligations, the Government's damages are limited to "increased costs" as a result of the CAS noncompliance. Unisys Opp. & Reply at 20. According to Unisys, the "CAS statute, the CAS regulations, and the CAS clause all specify that the measure of damages for a failure to comply with CAS is the 'increased costs' paid by the Government as a result of the noncompliance." Id. Unisys cites to 41 U.S.C. § 422(h)(1)(B), 48 C.F.R. §§ 9903.201-4(a) and 9903.306(a), (e), and FAR 52.230-2(a)(5). As we noted in our cross motion, Unisys's reliance

upon these provisions ignores that this Court has already determined in Teledyne that the Government's recovery of its share of a closed segment's surplus is made pursuant to the FAR's Allowable Cost and Payment clause (FAR § 52.216-7, 48 C.F.R. § 52.216-7) and the Credits provision found at FAR § 31.201-5. Teledyne, 50 Fed. Cl. at 182; Allegheny Teledyne, Inc., 316 F.3d at 1370 n.3. Unisys's argument is simply addressed to the wrong clause.

Unisys now argues that "[n]o court has ever held that it was or is improper to apply the clauses at 48 C.F.R. §§ 9903.201-4(a) and 9903.306(a), (e) to the determination of the cost impact of a CAS noncompliance." Unisys Opp. & Reply at 21. However, Unisys's argument again misses the point. The Government's recovery is under the Allowable Cost and Payment clause (FAR § 52.216-7, 48 C.F.R. § 52.216-7) and the Credits provision (FAR § 31.201-5). The required CAS 413 segment closing adjustment would have reduced the costs paid by the Government on the segment's contracts. The failure to make the CAS 413 segment closing adjustment has therefore increased the costs paid by the Government. Nothing in the statute or clauses upon which Unisys relies states or suggests that a contractor can escape paying the cost impact of its CAS noncompliance by suggesting that, because of a transaction that the contractor entered into unilaterally without the Government's prior knowledge or consent, the Government will likely (allegedly) get in the future a benefit from reduced payments by a third party that would be equal to what the contractor itself should have paid the Government. And, nothing in these clauses suggests that the Government cannot recover from a contractor that flouts the requirements of CAS the increased costs occasioned by the contractor's noncompliance without engaging in a laborious and burdensome accounting exercise of attempting to trace the amount of the alleged benefit that the Government will allegedly receive from the third party.

Further, in a decision issued last week, the Armed Services Board of Contract Appeals squarely rejected a similar argument. Appeal of Raytheon Co., ASBCA No. 54907 (Aug. 21, 2007) (slip opinion attached as Attachment 1). That case involved a contractor's failure to make a timely CAS 413 segment closing adjustment. The contractor argued that, because the Government had allegedly failed to prove that its CAS noncompliance had caused increased costs on specific contracts, the Government had failed to make out a prima facie case for recovery under CAS 413. The board rejected this argument, and held that the contractor's "CAS 413 noncompliance i.e., its failure to timely 'settle up' with the government as required by CAS 413, resulted in increased costs paid by the United States." Id. (slip op. at 18-19), citing Allegheny Teledyne Inc. v. United States, 316 F.3d 1366, 1381 (Fed. Cir. 2003). This Court should reach the same result here.

## CONCLUSION

For the reasons stated above and in Defendant's Cross-Motion, we respectfully request that the Court grant summary judgment upon the surplus transfer issue in favor of the United States, deny Unisys's motion for partial summary judgment upon the surplus transfer issue, and determine that:

> When, as part of a segment closing that is subject to the requirements of Original CAS 413, a contractor transfers part of the closed segment's pension surplus from its pension plan to the buyer's pension plan,
>
> 1. The required CAS 413 segment closing calculation must be made upon the pension surplus that the selling contractor retains, or, in the alternative, if the Court is not persuaded to adopt that interpretation, upon the full amount of the pension surplus that was allocable to the segment at the time of segment closing, without regard to the partial transfer of surplus; and

2. In any and all events, the selling contractor is required under Original CAS 413, at a minimum, to make a segment-closing adjustment with respect to the surplus that it retains.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ Jeanne E. Davidson by
s/ Kirk Manhardt
JEANNE E. DAVIDSON
Director

OF COUNSEL:

DAVID D'ALESSANDRIS
Trial Attorney
Commercial Litigation Branch
Civil Division

STEPHEN R. DOOLEY
Senior Trial Attorney (Supervisory)
Defense Contract Management Agency
495 Summer Street
Boston, MA 02210

Dated: August 29, 2007

s/ C. Coleman Bird
C. COLEMAN BIRD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: 202.307.0453
Facsimile: 202.514.7965
E-Mail: Coleman.Bird@usdoj.gov

Attorneys for Defendant United States

**CERTIFICATE OF FILING**

I hereby certify that on the 29th day of August, 2007, a copy of the foregoing Defendant's Reply Brief in Support of Defendant's Cross-Motion for Partial Summary Judgment on the Surplus Transfer Issue was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ C. Coleman Bird