ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Raytheon Company | ) | ASBCA No. 54907 |
| | ) | |
| Under Contract No. DAAH01-96-C-0114 | ) | |

APPEARANCES FOR THE APPELLANT: Karen L. Manos, Esq.
Christyne K. Brennan, Esq.
Jacqueline E. Landells, Esq.
Gibson, Dunn & Crutcher LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: E. Michael Chiaparas, Esq.
Chief Trial Attorney
Lawrence S. Rabyne, Esq.
Trial Attorney
Defense Contract Management Agency
Arlington Heights, IL

OPINION BY ADMINISTRATIVE JUDGE DELMAN
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The parties have filed cross-motions for summary judgment in this appeal. The government contends that appellant failed to comply with CAS 413.50(c)(12), insofar as it failed to timely pay the government's share of a pension fund surplus with respect to the sale of two business segments ("segment closings"), and that the government is entitled to interest, compounded daily, on the increased costs paid by the government due to this noncompliance as a matter of law. Appellant opposed the government's motion, and filed a cross-motion for summary judgment contending, *inter alia*, that its payments complied with CAS 413.50(c)(12), that the government did not incur increased costs due to noncompliance and was not entitled to recover any interest, and that if the government was entitled to interest it must be simple and not compound interest.

We agree with the parties that there are no disputes of material fact and that summary judgment is appropriate. For reasons stated, we grant the government's motion and deny the appellant's motion.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTIONS

I. Relevant Statutes, Regulations, Contract Clause

1. The Cost Accounting Standards (CAS) Board was re-established by Congress in 1988, 41 U.S.C. § 422. Subsection (f) of the statute authorized the Board to make, amend, rescind and interpret cost accounting standards, 41 U.S.C. § 422(f). Subsection (h) authorized the CAS Board to promulgate rules and regulations to implement the cost accounting standards:

> **(h) Implementing regulations**
>
> (1) The Board shall promulgate rules and regulations for the implementation of cost accounting standards promulgated or interpreted under subsection (f) of this section. Such regulations shall be incorporated into the Federal Acquisition Regulation and shall require contractors and subcontractors as a condition of contracting with the United States to –
>
> . . . .
>
> (B) *agree to a contract price adjustment, with interest, for any increased costs paid to such contractor or subcontractor by the United States by reason of a . . . failure by the contractor or subcontractor to comply with applicable cost accounting standards.*
>
> . . . .
>
> (3) Any contract price adjustment undertaken pursuant to paragraph (1)(B) shall be made, where applicable, on relevant contracts between the United States and the contractor that are subject to the cost accounting standards so as to protect the United States from payment, in the aggregate, of increased costs (as defined by the Board). . . .
>
> (4) *The interest rate applicable to any contract price adjustment shall be the annual rate of interest established under section 6621 of Title 26 for such period.* Such interest shall accrue from the time payments of the increased costs were made to the contractor or subcontractor to the time the

> United States receives full compensation for the price adjustment.

(Emphasis added)

2. The interest rate prescribed by (h)(4) above refers to the Internal Revenue Code (IRC), 26 U.S.C. § 6621. Title 26 U.S.C. § 6621 provides in pertinent part as follows:

> **§ 6621. Determination of rate of interest**
>
> **(a) General rule. –**
>
> **(1) Overpayment rate. – . . .**
>
> **(2) Underpayment rate. –** The underpayment rate established under this section shall be the sum of –
>
> (A) the Federal short-term rate determined under subsection (b), plus
>
> (B) 3 percentage points.

3. Federal Acquisition Regulation (FAR) 32.610(b)(2), effective 28 June 1996, provides that with respect to amounts owed to the government under a CAS clause, the "interest will run from the date of overpayment by the Government until repayment by the contractor at the underpayment rate established by the Secretary of the Treasury, for the periods affected, under 26 U.S.C. 6621(a)(2)."

4. With respect to the computation of interest, 26 U.S.C. § 6622 provides in pertinent part as follows:

> **§ 6622. Interest compounded daily**
>
> (a) **General rule** – In computing the amount of any interest required to be paid under this title or sections 1961(c)(1) or 2411 of title 28, United States Code, by the Secretary or by the taxpayer, *or any other amount determined by reference to such amount of interest, such interest and such amount shall be compounded daily.*

(Emphasis added)

5. The FAR contains certain procedures related to CAS noncompliance. FAR 30.602-2, effective 29 April 1996 and during the relevant period, states as follows:

> **30.602-2. Noncompliance with CAS requirements.**
>
> (a) *Determination of noncompliance.* (1) Within 15 days of the receipt of a report of alleged noncompliance from the cognizant auditor, the ACO shall make an initial finding of compliance or noncompliance and advise the auditor.
>
> (2) If an initial finding of noncompliance is made, the ACO shall immediately notify the contractor in writing of the exact nature of the noncompliance and allow the contractor 60 days within which to agree or to submit reasons why the existing practices are considered to be in compliance.
>
> . . . .
>
> (4) If the contractor disagrees with the initial noncompliance finding, the ACO shall review the reasons why the contractor considers the existing practices to be in compliance and make a determination of compliance or noncompliance. If the ACO determines that the contractor's practices are in noncompliance, a written explanation shall be provided as to why the ACO disagrees with the contractor's rationale. The ACO shall notify the contractor and the auditor in writing of the determination. If the ACO makes a determination of noncompliance, the procedures in (b) through (d), as appropriate shall be followed.
>
> . . . .
>
> (c) *Contract price adjustments.* . . .
>
> (2) . . . . [T]he ACO shall include and separately identify, as part of the computation of the contract price adjustment(s), applicable interest on any increased costs paid to the contractor as a result of the noncompliance. Interest shall be computed from the date of overpayment to the time the adjustment is effected. If the costs were incurred and paid evenly over the fiscal years during which the noncompliance

> occurred, then the midpoint of the period in which the noncompliance began may be considered the baseline for the computation of interest. An alternate equitable method should be used if the costs were not incurred and paid evenly over the fiscal years during which the noncompliance occurred. Interest under 52.230-2 should be computed pursuant to Public Law 100-679 [re-enacting the CAS Board, 41 U.S.C. § 422, *supra*].

6. Title 48 C.F.R. 9903.201-4 (1996) provides the contract clauses that implement the CAS statute. The FAR, Part 52, also includes the CAS clauses. FAR 52.230-2 included in the relevant contract,[1] incorporates the cost accounting standards and related provisions, and states in pertinent part as follows:

> **COST ACCOUNTING STANDARDS (AUG 1992)**
>
> (a) Unless the contract is exempt under 48 CFR, Subparts 9903.201-1 and 9903.201-2, the provisions of 48 CFR Part 9903 are incorporated herein by reference and the Contractor, in connection with this contract, shall –
>
> . . . .
>
> (5) *Agree to an adjustment of the contract price or cost allowance, as appropriate, if the Contractor or a subcontractor fails to comply with an applicable Cost Accounting Standard,* or to follow any cost accounting practice consistently and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States, *together with interest thereon computed at the annual rate established under section 6621 of the Internal Revenue Code of 1986 (26 U.S.C. 6621) for such period, from the time*

---

[1] Appellant's notice of appeal, dated 26 January 2005, referenced Contract No. DAAH01-96-C-0114, an open CAS-covered contract between Raytheon and the government. By letter to the Board dated 13 July 2007, the parties stipulated that this contract was selected as a "test" contract for purposes of establishing Board jurisdiction over the appeal. See 41 U.S.C. § 607(d). They also stipulate that this contract contained the following clauses: FAR 52.230-2, COST ACCOUNTING STANDARDS (AUG 1992); FAR 52.230-5, ADMINISTRATION OF COST ACCOUNTING STANDARDS (FEB 1995); and FAR 52.232-17, INTEREST (JAN 1991).

> *the payment by the United States was made to the time the adjustment is effected.* . . .

(Emphasis added)

7. Title 48 C.F.R. 9903.306 (1996), Interpretations, states in pertinent part as follows:

> In determining amounts of increased costs in the clauses . . . the following considerations apply:
>
> (a) Increased costs shall be deemed to have resulted whenever the cost paid by the Government results from . . . failure to comply with applicable Cost Accounting Standards, and such cost is higher than it would have been had the . . . applicable Cost Accounting Standards [sic] complied with.

II. <u>CAS 413.50(c)(12) and Segment Closings</u>

8. The cost accounting standards address the treatment of contractor costs under government contracts that are subject to these standards. Generally, CAS 412 addresses the composition and measurement of pension cost. CAS 413 addresses the adjusting of pension cost by measuring actuarial gains and losses and assigning them to cost accounting periods. It also addresses the allocation of pension costs to segments of the organization, and insofar as pertinent here, addresses appropriate accounting treatment when a business segment is "closed". CAS 413 was amended effective 30 March 1995. The parties do not dispute and we find that CAS 413, as amended, governs this appeal.

9. CAS 413.50(c)(12), as amended, 48 C.F.R. 9904.413-50(c)(12) (1996), provides in pertinent part, as follows:

> (c) Allocation of pension cost to segments
>
> . . . .
>
> (12) *If a segment is closed*, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. *The difference between the market value of the assets and the actuarial accrued liability*

*for the segment represents an adjustment of previously-determined pension costs.*

. . . .

(iii) The calculation of the difference between the market value of the assets and the actuarial accrued liability *shall be made as of the date of the event (e.g., contract termination, plan amendment, plant closure) that caused the closing of the segment*, pension plan termination, or curtailment of benefits. If such a date is not readily determinable, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date.

. . . .

(vi) *The Government's share of the adjustment amount determined for a segment shall be the product of the adjustment amount and a fraction*. . . . The numerator of such fraction shall be the sum of the pension plan costs allocated to all contracts and subcontracts (including Foreign Military Sales) subject to this Standard during a period of years representative of the Government's participation in the pension plan. The denominator of such fraction shall be the total pension costs assigned to cost accounting periods during those same years. This amount shall represent an adjustment of contract prices or cost allowance as appropriate. *The adjustment may be recognized by modifying a single contract, several but not all contracts, or all contracts, or by use of any other suitable technique.*

(vii) *The full amount of the Government's share of an adjustment is allocable, without limit, as a credit or charge during the cost accounting period in which the event occurred and contract prices/costs will be adjusted accordingly.* However, if the contractor continues to perform Government contracts, the contracting parties may negotiate an amortization schedule, including interest adjustments. Any amortization agreement shall consider the magnitude of the adjustment credit or charge, and the size and nature of the continuing contracts.

(Emphasis added)

III. <u>The Sale of Montek Aerospace (Montek)</u>

10. Montek was a business segment of Raytheon and performed work on government contracts subject to CAS and that contained the CAS clause, FAR 52.230-2. Montek's employees participated in one or more defined benefit pension plans, and some of the pension costs for these employees were allocated as indirect costs to government contracts and subcontracts. (Gov't mot., ex. A, ¶¶ 1-3)

11. On or about 1 December 1998, Raytheon sold Montek to Moog Incorporated. The parties do not dispute, and we find that that this sale constituted a "segment closing" under CAS 413.50(c)(12). See 48 C.F.R. 9904.413-30(a)(20)(1996) ("Definitions"). Raytheon retained all the pension assets and actuarial liabilities pertaining to Montek. (Gov't mot., ex. A, ¶¶ 4, 6)

12. On 4 October 2000, almost two years after the Montek sale, Raytheon forwarded to the government an actuarial report covering the Montek segment closing. The report reflected a pension surplus at the date of segment closing in the amount of $6,350,691. (R4, tab 13 at 3) The report, however, did not include a calculation of the government's share of the pension surplus, CAS 413.50(c)(12)(vi), (vii).

13. On 18 April 2001, DCAA issued an audit report, stating that appellant was noncompliant with CAS 413 because it had not submitted a segment closing calculation for the Montek sale (R4, tab 10).

14. By letter dated 30 April 2001, the Defense Corporate Executive/Corporate Administrative Contracting Officer (DCE) requested appellant to provide a milestone schedule for the submission of segment closing adjustments for a number of segment closings, including Montek (R4, tab 11). Pursuant to this schedule, appellant submitted its segment closing calculation for Montek on 15 August 2001. Raytheon revised its calculation of the pension surplus to $6,768,131. Raytheon did not calculate or estimate the government's share of the surplus. (R4, tab 13)

15. After an audit of appellant's figures, the DCE issued a letter to appellant dated 4 October 2002, which stated in pertinent part as follows:

> The purpose of this letter is to notify you of my initial finding that Raytheon Company is in noncompliance with CAS 413-50(c)(12) for failure to agree to an adjustment of previously determined pension costs in conjunction with the

> sale of Montek Aerospace to Moog Incorporated in December 1998. It is my position that the sale of Montek Aerospace constitutes a segment closing under CAS 413-50(c)(12), that the market value of assets allocated to Montek Aerospace exceeded the actuarial liability for the segment by approximately $6.8 million, and that the government is entitled to an allocable share of this surplus based on its participation in pension plan funding at Montek Aerospace.
>
> . . . .
>
> DCAA issued Audit Report No. 2671-2002A19500001 (copy enclosed) on their review of Raytheon's August 15, 2001 CAS 413 calculation proposal for Montek Aerospace. DCAA did not take exception to the calculation amount of approximately $6.8 million, but noted that Raytheon did not provide an analysis regarding the Government share of that amount. DCAA discussed the results of audit with Mr. Michael Garvey (Raytheon Director of Benefits) on June 12, 2002. Mr. Garvey agreed with the DCAA report, but stated that no further action on the calculation proposal will be taken until the results of the pending appeals in the Teledyne litigation is known.[[2]]

(R4, tab 21)

16. Raytheon replied by letter dated 21 October 2002, disputing the government's initial finding of noncompliance. Raytheon contended that it had complied with the "fundamental requirement provisions of the standard and as stipulated by CAS 413-50(c)(12)." Raytheon, however, did not contest that it had failed to calculate or estimate the government's share of the surplus, contending that the methodology for

---

[2] On 9 August 2001, the United States Court of Federal Claims issued a decision that addressed a number of issues related to the proper interpretation of CAS 413 before and after it was amended in 1995 ("old" CAS 413; "new" CAS 413) related to the sale of business segments and the government's share of a pension surplus. *Teledyne Inc. v. United States*, 50 Fed. Cl. 155 (2001). Both parties appealed from that portion of the court's decision related to the interpretation of old CAS 413, and that portion of the decision was affirmed on appeal on 23 January 2003. *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir 2003) ("the Teledyne litigation"). The Federal Circuit did not address the new CAS 413 amendments, with which we are concerned here.

determining government participation was under review in the Teledyne litigation. Raytheon proposed that the government and Raytheon enter an agreement providing *inter alia,* that the government's share not be determined until all litigation was resolved, and that Raytheon not be cited for noncompliance pending resolution of the outstanding litigation. (R4, tab 22) The government declined to enter into such an agreement.

17. By letter dated 18 November 2002, the government advised appellant that since it was not willing to negotiate a determination of the government's share of the relevant pension surplus as required by CAS 413.50(c)(12), it was the government's view that appellant failed to comply with CAS 413, and the government's initial finding of noncompliance was valid (R4, tab 23).

18. By late 2002, it appears that appellant was willing to pay $2,707,252 as the share of the government's participation in the pension fund surplus, in accordance with an earlier DCAA audit report. On 23 January 2003, the Federal Circuit affirmed the lower court's decision in *Teledyne* (see note 2, *supra).* As a result of the appellate decision, the parties agreed to revisit the calculation of the government's share of the pension fund surplus.

19. By letter dated 14 October 2003, Raytheon requested the assistance of the Defense Contract Management Agency (DCMA) and DCAA to provide certain historical data to help appellant prepare the government's participatory share of the pension fund surplus (R4, tab 30). The record does not show why appellant did not request this historical data at or about the date of the segment closing in December 1998. On 12 February 2004, DCAA provided certain historical data, and also provided a revised computation of the government's share of the pension fund surplus, in the amount of $487,306. (Supp. R4, tab 125 at 2)

20. By letter to the government dated 24 February 2004, Raytheon agreed with the revised DCAA calculation of the government's share of $487,306 (R4, tab 31). However, a DCAA audit report, dated 15 July 2004, determined the credit adjustment to be $487,305 (R4, tab 38).

21. On 16 April 2004, the DCE requested DCAA to compute interest on the adjustment admittedly owed by Raytheon under CAS 413.50(c)(12):

> It is requested that you develop an interest computation on any increased costs paid to the contractor as a result of the noncompliance in accordance with FAR 30.602-2(c). Interest shall be computed from the date of overpayment to the time the adjustment is effected. Interest under FAR 52.230-2 should be computed pursuant to Public Law 100-679. We

> will include in the final decision document of the Contracting Officer, as part of the computation of the contract price adjustment, applicable interest on any increased costs paid to the contractor as result of the noncompliance. Therefore, we are requesting that you develop the interest computation from December 1998 (segment closing) to April 30, 2004 (the targeted time the adjustment is effected).

(R4, tab 34)

22. By memorandum dated 11 August 2004, the DCAA replied to the DCE, enclosing interest figures. DCAA presented alternative interest calculations on the principal amount of $487,305, both running from 1 January 1999 through 30 September 2004. One calculation was entitled "simple interest" in the amount of $186,337 and the other was entitled "compounded interest" in the amount of $224,592. (R4, tab 41)

23. By letter to appellant dated 30 August 2004, the DCE requested payment of the segment closing adjustment of $487,306, plus simple interest on the adjustment amount, in the amount of $184,740, calculated from 1 January 1999 to 31 August 2004, for a total payment of $672,046. The government indicated it would close the CAS noncompliance upon receipt of this payment. (R4, tab 42)

24. By letter to the government dated 21 September 2004, Raytheon transmitted a check for the principal in the amount of $487,306, but refused to pay any interest, contending among other things, that there was no noncompliance with CAS 413; that the subject adjustment was in the nature of a "contract debt"; and that the debt was paid within 30 days of the government's "demand letter" of 30 August 2004. (R4, tab 44)

25. By letter to appellant dated 5 October 2004, the DCE advised that it had "no authority to waive interest required by the CAS statute and CAS clause for noncompliances" (R4, tab 45). On 18 November 2004, the government issued to Raytheon a final determination of noncompliance with CAS 413. In this letter, the government mitigated the interest assessment, citing "judicial developments" involving CAS 413-50(c)(12) that might have contributed to delay. The DCE sought simple interest for the period 1 October 2001 through 30 September 2004, in the amount of $76,777. (R4, tab 46)

26. Appellant, however, still refused to pay any interest. On 17 December 2004, the government issued a contracting officer's decision, stating that appellant failed to comply with CAS 413 with respect to the pension-surplus adjustment owed to the government relating to the Montek sale, and as a result, appellant owed the government interest from the date of segment closing until payment of the adjustment. The

government asserted the simple interest computation provided by DCAA, in the amount of $186,337. The contracting officer's decision also included the government's findings of noncompliance with respect to the sale of Raytheon Engineers and Constructors (see below). (R4, tab 48) This appeal followed.

IV. <u>The Sale of "Raytheon Engineers and Constructors" (RE&C)</u>

27. RE&C was a business segment of Raytheon that performed under government contracts subject to CAS and that contained the CAS clause, FAR 52.230-2. RE&C's employees participated in one or more defined benefit pension plans, and some of the pension costs for these employees were allocated as indirect costs to government contracts and subcontracts. (Gov't mot., ex. A, ¶¶ 23-24, 26)

28. On 7 July 2000, Raytheon sold RE&C to Washington Group International, formerly known as Morrison Knudsen (gov't mot., ex. A, ¶ 25). At the date of sale, the market value of the pension assets allocated to RE&C exceeded the actuarial accrued liability for the segment (gov't mot., ex. A, ¶ 27). Raytheon retained all the pension assets and liabilities for RE&C (gov't mot., ex. A, ¶ 28).

29. On 13 December 2000, Raytheon submitted a segment closing calculation for RE&C (R4, tab 7 at 1). The calculation reflected a pension surplus on the date of segment closing in the amount of $416,393,803, and a government share of the surplus in the amount of $4,935,197 (R4, tab 7 at 5, 7).

30. In January 2001, the parties met to discuss the CAS 413 adjustment. Appellant proposed a government share of $5,100,000 (R4, tab 8 at 3). DCAA was tasked to review appellant's proposal.

31. On 7 September 2001, Raytheon resubmitted its CAS 413 calculation, proposing a government share of $5,209,125 (gov't mot., ex. A., ¶ 32). DCAA and the DCMA Contractor Insurance and Pension Review (CIPR) team were tasked to review the revised proposal (R4, tab 16).

32. In meetings in early 2002, DCAA advised appellant of the DCAA position that the government's share of the surplus should be $38,315,050 (R4, tab 28 at 2, 3). Appellant did not accept this position. In late 2002, the parties agreed to await the outcome of the Teledyne litigation appeal before settling the subject adjustment (supp. R4, tabs 110, 111). The Federal Circuit's decision was issued on 23 January 2003 (note 2, *supra*).

33. By letter dated 23 May 2003, Raytheon proposed a new CAS 413 calculation for the RE&C segment closing. This revised calculation reflected a government share of the pension surplus in the amount of $14,681,268. (Gov't mot., ex. A, ¶ 33)

34. On 10 June 2003, the DCMA CIPR team issued a report which reviewed Raytheon's 23 May 2003 submission and concluded that the government's share of the surplus was $19.2 million (R4, tab 27). DCAA also reviewed Raytheon's revised submission, and on 8 April 2004 issued an audit report which recommended a government adjustment of $19.2 million (R4, tab 32). However, after further discussion and additional CIPR and DCAA reviews, the government agreed with appellant's revised proposal of 23 May 2003, in the amount of $14,681,268.

35. On 16 July 2004, the DCE requested DCAA to compute interest on the adjustment admittedly owed by Raytheon under CAS 413.50(c)(12):

> It is requested that you develop an interest computation on any increased costs paid to the contractor ($14.7M) as a result [sic] the noncompliance in accordance with FAR 30.602-2(c). Interest shall be computed from the date of overpayment to the time the adjustment is effected. Interest under FAR 52.230-2 should be computed pursuant to Public Law 100-679. We will include in the final decision document of the Contracting Officer, as part of the computation of the contract price adjustment, applicable interest on any increased costs paid to the contractor as result of the noncompliance. Therefore, we are requesting that you develop the interest computation from July 2000 (segment closing) to September 30, 2004 (the targeted time the adjustment is effected). In addition, it is requested that you provide both simple and compound CAS interest computations.

(R4, tab 39)

36. By memorandum dated 11 August 2004, the DCAA replied to the DCE, enclosing interest figures. DCAA presented alternative interest calculations on the principal amount of $14,681,268, both running from the date of segment closing, 7 July 2000 through 30 September 2004. One calculation was entitled "simple interest" in the amount of $3,833,371, and the other was entitled "compounded interest" in the amount of $4,339,970. (R4, tab 40)

37. By letter to Raytheon dated 31 August 2004, the DCE requested payment of the segment closing adjustment owed the government, $14,681,268, plus simple interest

in the amount of $3,785,236 calculated from 7 July 2000 to 31 August 2004, for a total payment of $18,466,504. The government stated that "upon receipt of this payment, the noncompliance with CAS 413-50(c)(12) regarding the sale of RE&C will be closed" (R4, tab 43). However, the government had not formally issued an initial finding of noncompliance regarding the RE&C sale in accordance with FAR 30.602-2(a).

38. By letter dated 21 September 2004, Raytheon transmitted a check to the government for the principal in the amount of $14,681,268, but refused to pay any interest, contending among other things, that there was no noncompliance with CAS 413; and that the subject adjustment was in the nature of a "contract debt" and the debt was paid within 30 days of the government's "demand letter" of 31 August 2004 (R4, tab 44).

39. The DCE acknowledged receipt of appellant's check by letter dated 5 October 2004, but advised appellant that he had "no authority to waive interest required by the CAS statute and CAS clause for noncompliances" (R4, tab 45).

40. By letter to appellant dated 18 November 2004, the government issued to Raytheon a final determination of noncompliance with CAS 413 regarding the sale of RE&C. The government mitigated a portion of the claimed interest, due to "judicial developments" involving CAS 413-50(c)(12) that might have contributed to delay. The government requested payment of simple interest in the amount of $1,395,226 so as to "complete the RE&C segment closing adjustment and close out the noncompliance." (R4, tab 47)

41. Raytheon, however, still refused to pay any interest. On 17 December 2004, the government issued a contracting officer's decision, stating that appellant failed to comply with CAS 413 regarding the RE&C sale and that it owed the government interest from the date of segment closing until the date of payment of the adjustment. It asserted its claim for simple interest in full as computed by DCAA, in the amount of $3,833,371. This decision also included the government's findings of noncompliance with respect to the Montek sale (finding 26). (R4, tab 48) This appeal followed.

## CONTENTIONS OF THE PARTIES

The government contends that appellant did not comply with CAS 413.50(c)(12) because, among other reasons, it failed to provide the government a current period adjustment for its share of the pension surplus arising out of the sale of the Montek segment in 1998 and the sale of the RE&C segment in 2000. According to the government, this noncompliance caused the government to pay increased costs for which appellant was liable, plus interest compounded daily, as required by the CAS statute, regulations and contract. In brief, appellant contends that it complied with CAS 413.50(c)(12) in all material respects and to the best of its ability and did not

unreasonably delay the segment closing adjustments; that its payments were timely and did not result in any increased costs paid by the United States; that the Board has no jurisdiction to address the government's claim for compound interest; and in any event, a CAS 413 noncompliance requires computation of simple, not compound interest. It also contends that the government's RE&C claim is barred because the government failed to issue an initial finding of noncompliance in accordance with the FAR. We address these contentions below.

## DECISION

Whether the Government Failed to Follow FAR Procedures

Appellant contends that the government's RE&C claim is barred because the government failed to issue to appellant an "initial finding of noncompliance", FAR 30.602-2(a), regarding the RE&C segment closing adjustment.

Appellant's position is without merit for a number of reasons. The primary purpose of providing a contractor with an initial finding of noncompliance is to provide the contractor with notice of the government's position and a reasonable opportunity to respond. The government's letter dated 31 August 2004 advised appellant that the government sought the payment of the RE&C closing adjustment, plus interest. It further advised that receipt of this payment would close out appellant's noncompliance with CAS 413.50(c)(12) and gave appellant the opportunity to respond. (Finding 37)

This government letter was not expressly designated as an "initial finding of noncompliance," but it served this purpose in all material respects. In effect, appellant viewed it as such; appellant's reply letter dated 21 September 2004, objected to the government's position, and contended that appellant had fully complied with its obligations under CAS 413 and was not liable for any interest. The government disputed appellant's position and issued a final determination of noncompliance by letter dated 18 November 2004.

We believe that appellant had adequate notice of the government's position and had a reasonable opportunity to respond to it. Hence, we believe the government materially complied with the subject regulation.

Assuming *arguendo*, that the government materially violated this regulation, appellant has the burden to show that the regulation was promulgated for the benefit of contractors, and must show a causal connection between any violation and prejudice or financial injury. *See DeMatteo Construction Co. v. United States*, 600 F.2d 1384, 1392 (Ct. Cl. 1979). We grant that notice provisions of this sort may serve to benefit contractors. However, appellant failed to show that it was financially injured or

prejudiced by the government's action or inaction. We must reject appellant's contention for this reason as well.

For reasons stated, we hold that the government's RE&C claim is not barred for its alleged failure to follow the subject regulatory procedures.

Noncompliance with CAS 413.50(c)(12)

The purpose of the CAS 413 segment closing adjustment is to identify whether the government has over or under contributed to pension costs on prior contracts with the closed business segment. *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366, 1381 (Fed. Cir. 2003). As stated in *General Motors Corp. v. United States*, 66 Fed. Cl. 153, 160 (2005):

> The CAS 413 adjustment is an adjustment of "previously determined" pension costs for the entire segment. If the calculation results in a deficit, then the government's share must be increased. If the calculation results in a surplus, then the government is entitled to be reimbursed.

The CAS 413.50(c)(12) adjustment constitutes "an eventual settling-up of pension costs between contractors and the government when a segment belonging to the contractor ceases to engage in government contracting." *General Electric Co. v. United States*, 60 Fed. Cl. 782, 785 (2004).

The CAS 413.50(c)(12) segment closing adjustment is required to be a *current period adjustment*. *See Teledyne, Inc. v. United States*, 50 Fed. Cl. 155, 181, *aff'd*, *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003):

> Although CAS 413.50(c)(12) contemplates a look back to the past contracts to determine the recoverable amount of the adjustment, *CAS 413.50(c)(12), by its terms, calls for an adjustment in the current period at the time of the segment closing.*

(Emphasis added) *See also* Section E. Public Comments, "Preamble to Amendments of CAS 412 and 413, 3-30-95":[3]

[3] This Preamble is not published in the Code of Federal Regulations, *see* 48 C.F.R. 9903.307(1996), but it can be found at 60 Fed. Reg. 16,534, 16,539 (Mar 30, 1995).

> Comment: Two commenters supported the amortization of any segment closing adjustment, rather than an immediate period adjustment.
>
> Response: *Under this final rule, the 9904.413-50(c)(12) adjustment is determined as a current period adjustment,* whether or not assets actually revert from the trust. The Board believes *a current period adjustment* is appropriate when there is a disruption of the contracting relationship, a discontinuance of the operational segment, or a discontinuance of the pension plan. When such events occur, pension costs can no longer be computed and adjusted on an on-going basis since there are either no future accounting periods in which credits or charges can be allocated to contracts or no future periods in which benefits will be earned.

(Emphasis added)

We acknowledge that the Courts' pronouncements above were made construing "old" CAS 413, but these principles apply equally to the "new" CAS 413, that is, to the 1995 amendments with which we are concerned here.

More specifically, CAS 413.50(c)(12)(vii) obligates the contractor to provide the government with a credit of its share of the adjustment "during the cost accounting period" of the sale and to adjust contract prices/costs accordingly. This obligation requires the contractor to account for this adjustment by applying it as a credit against contracts during the cost accounting period of the sale, or through any other suitable technique, per CAS 413.50(c)(12)(vi).

Appellant contends that CAS 413.50(c)(12) does not specify when a contractor must effect the adjustment, and that it acted timely and reasonably under the circumstances. We do not agree on both accounts. The CAS 413.50(c)(12) adjustment is required to be a current period adjustment, that is, the full amount of the government's share is to be "allocable, without limit, as a credit or charge during the cost accounting period in which the event [the segment sale] occurred and contract prices/costs will be adjusted accordingly", CAS 413.50(c)(12)(vii). Based upon the calendar year, the cost accounting period surrounding the Montek sale was 1998, and the cost accounting period surrounding the RE&C sale was 2000. Appellant failed to allocate the government's adjustment as a credit or charge during or for these cost accounting periods.

Appellant argues that it takes time for appropriate and accurate calculations to be made, audited and/or negotiated, and that CAS 413.50(c)(12) must be read to allow the parties a reasonable amount of time for these purposes. We have no problem with this notion. However, CAS compliance is not defined or determined by the speed in which these events occur, and over which party may be "responsible" for any delays related thereto. For there to be compliance with CAS 413.50(c)(12) a current period adjustment, as defined therein, must be shown. Appellant did not effect current period adjustments for the 1998 Montek sale and for the 2000 RE&C sale. We conclude that the government has shown that appellant failed to comply with CAS 413.50(c)(12) as a matter of law.

We next address whether this failure resulted in increased costs paid by the United States.

Under CAS 413.50(c)(12), a contractor is required, where a segment is closed, to determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment as of the date of segment closing with exceptions not relevant here, CAS 413.50(c)(12)(iii). The difference between the market value of the assets and the actuarial accrued liability is not a pension cost, *per se*, but "represents an adjustment of previously-determined pension costs", CAS 413.50(c)(12). Accordingly, where there is a pension surplus, it follows that unless and until appellant timely provides this current period adjustment to the government as a credit or otherwise as required by CAS 413, the government has paid increased costs.

Appellant has filed a "Supplemental Citation of Authority" in support of its cross-motion, citing the recent Board decision in *Lockheed Martin Corp.*, ASBCA No. 53822, 2007 WL 1978046 (27 June 2007). In *Lockheed*, the Board did not address CAS 413.50(c)(12), nor the government's right to interest for CAS noncompliance. In *Lockheed* we held that for purposes of determining possible cost increases to the government and related price adjustments under the CAS clause, a contract that was repriced and rephased using the voluntary cost accounting practice change in issue was not an "affected contract", and need not be included amongst other contracts in the cost impact proposal process required by the contract and regulations. Appellant argues that since the government here has failed to show that there was any particular contract impacted or a "affected" by a noncompliant practice for purposes of estimating, accumulating and reporting costs, see FAR 30.001, revised effective 8 April 2005, the government has failed to prove increased costs and has failed to make out a *prima facie* case of recovery under CAS 413.

We disagree. Appellant's reasoning is based upon a flawed understanding of the operation and purpose of CAS 413.50(c)(12). It is true that the CAS clause and relevant regulations generally require that the parties address cost impacts on specific "affected" contracts when assessing whether a particular changed accounting practice or CAS

noncompliance caused the government to incur increased costs. However, CAS 413.50(c)(12) is different in operation and in purpose. The current period adjustment provided for under CAS 413, by its terms, represents an adjustment of previously-determined pension costs for the segment as a whole, and does not require an impact analysis of individual contracts within the segment. This adjustment is not contract specific, nor does it involve a cost adjustment of any individual contract. *Viacom, Inc. v. United States*, 70 Fed. Cl. 649, 657, 661 (2006), *modified on other grounds sub nom. CBS Corp. v. United States*, 75 Fed. Cl. 498 (2007).

As such, this CAS adjustment does not envision the parties addressing the details of the negotiation and pricing of individual "affected" contracts to determine impact and the amount of the adjustment owed the government, see *Lockheed* above. Rather, once a pension surplus is determined under CAS 413.50(c)(12), the government's share is determined by a fraction using in its numerator "*the sum of the pension plan costs allocated to all contracts and subcontracts (including Foreign Military Sales)* subject to this Standard during a period of years representative of the Government's participation in the pension plan." CAS 413.50(c)(12)(vi) (finding 9) (emphasis added). Under this formulation, the typical "cost impact process" for individual contracts has no application.

We conclude that neither the holding nor the legal discussion in *Lockheed* supports a different conclusion regarding appellant's failure to comply with CAS 413 and the increased costs paid by the government. We believe the government has shown that appellant's CAS noncompliance, *i.e*, its failure to timely "settle up" with the government as required by CAS 413, resulted in increased costs paid by the United States. *See Allegheny Teledyne*, 316 F.3d at 1366, 1381.

We now address the issue of the payment of interest for this CAS noncompliance.

<u>Interest for CAS Noncompliance</u>

As a threshold matter, appellant contends that the Board has no jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq*. (CDA), to determine whether the government is entitled to compound interest under its claim for CAS noncompliance because the contracting officer's decision under the Act assessed simple interest.

This contention is without merit. Under 41 U.S.C. § 605(a), all claims by the government shall be subject of a contracting officer's decision. The government complied with this requirement. The government first asserted a demand for a specific adjustment, plus interest, for this CAS noncompliance. Appellant paid the principal but declined to pay the interest component of the government claim, and left the government no choice but to seek the balance of its claim through the issuance of a contracting

officer's decision under the CDA. This decision asserted the government's right to interest in writing, and appellant timely appealed the decision to this Board.

We have jurisdiction over this government claim. That the government on appeal seeks a different method of interest computation is of no jurisdictional significance. The matter of interest is properly before us, and we have jurisdiction over the manner and method of its calculation. We believe we have jurisdiction under the CDA to determine whether the government has a right to daily compounded interest for a CAS noncompliance under the CAS statute and the CAS clause.

We begin our analysis with a review of the relevant language of the statutory provisions. *Bull v. United States*, 479 F.3d 1365, 1376 (Fed. Cir. 2007). The CAS statute, 41 U.S.C. § 422, as implemented by the CAS clause, FAR 52.230-2, requires that the contractor pay a price adjustment, plus interest for any increased costs paid by the United States by reason of a CAS violation. Section (h)(4) of the statute specifies the interest rate as that prescribed by the IRC, 26 U.S.C. § 6621. Section 6622 of the IRC provides that any interest amounts that refer to interest under the IRC title shall be compounded daily.

We believe that that these statutory provisions, when read together, support the conclusion that the interest owed the government for a CAS noncompliance is to be compounded daily.

Appellant argues that absent a Congressional intention to the contrary, we should rely on the original, superseded CAS statute enacted in 1970, which provided for payment of interest on CAS noncompliance based upon the interest rate established by the Secretary of the Treasury pursuant to section 105(b)(2) of the Renegotiation Act of 1951, under which simple interest was assessed. However Congress, in re-enacting the CAS Board in 1988, did in fact address the issue of interest. Instead of providing for the payment of interest for CAS noncompliance under the Renegotiation Act as was done in the past, Congress provided for interest as determined under the IRC, which provided for different rates and a different method of computation.

The compounding of interest provision, codified under 26 U.S.C. § 6622, was enacted under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248. The legislative history, specifically House Conference Report No. 97-760, demonstrates that Congress clearly intended that all interest amounts computed by reference to IRC rates should be compounded daily:

> House Conference Report No. 97-760
>
> . . . .
>
> gg. Daily Compounding of interest
>
> Present Law
> Under present law, interest payable to or by the United States under the internal revenue laws is not compounded.
>
> House bill
> No provision.
>
> Senate Amendment
> All interest payable under the internal revenue laws would be compounded daily. *The change would also affect any other amounts computed by reference to the interest rate provided for in the Code.*
>
> Conference agreement
> The Conference agreement follows the Senate amendment .... *In a case in which the principal portion of an obligation is satisfied, and interest remains outstanding, such interest will, of course, be compounded.*

(Emphasis added) H.R. Rep. No. 97-760 at 595, *reprinted* in 1982 U.S.C.C.A.N. 781, 1367.

Case law in our Circuit also supports the proposition that the computation of interest based upon section 6621 interest rates is to be compounded daily. In *Canadian Fur Trappers Corp. v. United States*, 691 F. Supp. 364, 372, n.4 (Ct. Int'l. Trade 1988), *aff'd*, 884 F.2d 563 (Fed. Cir. 1989), the Court construed, *inter alia*, an amendment to the Tariff Act of 1930, 19 U.S.C. § 1677g (Supp. 1985), that established an interest rate in accordance with section 6621, and stated as follows:

> Under 26 U.S.C. § 6622, any interest calculated by reference to § 6621 is to be compounded daily, effective for interest accruing after December 31, 1982 (pursuant to the effective date of 26 U.S.C. § 6622).

In affirming, the Federal Circuit stated as follows, 884 F.2d at 568:

> The Court of International Trade concluded that the 1979 simple interest provision was applicable for the interest accruing prior to the effective date of the 1984 Act, but determined for interest accruing subsequent to the effective date, the appropriate method for calculating interest could be found in 26 U.S.C. § 6621. We agree. *The clear meaning of the statutory language is to start compounding interest on or after November 4, 1984.*

(Emphasis added)

Appellant suggests that there is an inconsistency between using compound interest for CAS noncompliance and simple interest for certain other calculations under CAS 414 through CAS 417. We see no inconsistency. The latter calculations have nothing to do with contractor payments of interest due to CAS noncompliance. Rather, they involve simple interest calculations related to the following: to determine the imputed cost of capital committed to facilities under CAS 414, 48 C.F.R. 9904.414-40(b)(1996); to compute the present value of future deferred compensation benefits under CAS 415, 48 C.F.R. 9904.415-50(d)(5)(1996); to determine the present value of an insurance loss paid over an extended period of time under CAS 416, 48 C.F.R. 9904.416-50(a)(3)(ii)(1996); and to determine a cost of money rate for the cost of money attributable to capital assets as defined under CAS 417, 48 C.F.R. 9904.417-50(a)(1)(1996).

Appellant also cites to the standard FAR Interest clause, effective June 1996, which provides for the computation of simple interest at rates established under section 12 of the CDA. However, this clause expressly excludes interest computations under a CAS clause, FAR 52.232-17(a).

Appellant also points out that the FAR includes a contract clause implementing an unrelated statute, the Truth in Negotiations Act, 10 U.S.C. § 2306a (TINA), which Act also calls for interest on government overpayments under 26 U.S.C. § 6621, but the contract clause calls for the application of simple, not compound interest, FAR 52.215-10(d)(1). However given the weight of authority above, we believe that this TINA clause does not control the interpretation of the CAS statute and the CAS clause. We view the relevant statutory provisions along with the relevant legislative history to evince a clear Congressional intent in favor of daily compounded interest. As was stated in *Bull* at 1376:

> "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question in issue, that intention is the law and must be given effect," [citation omitted], and an agency's alternative interpretation of the statute is not entitled to deference . . . .

We have duly considered appellant's remaining contentions, but find them unpersuasive. We hold that pursuant to the CAS statute, the CAS clause and relevant regulations, a contractor that is liable for increased costs due to CAS noncompliance with CAS 413.50(c)(12) is required to pay interest, compounded daily, on the amounts owed. 41 U.S.C. § 422(h); 26 U.S.C. §§ 6621, 6622. The subject interest is to be calculated from the "date of overpayment," FAR 32.610(b)(2) (finding 3), which under the circumstances here, is the date of segment closing for each segment. As of that date, appellant's CAS 413.50(c)(12) computation showed a pension plan surplus for each segment, and therefore it is the date that established appellant's indebtedness to the government, albeit the parties did not agree to the exact amount of the indebtedness until a later time. The interest period is to end on the date on which the contractor effects the required adjustment.

In summary, we conclude that appellant failed to timely and properly effect the segment closing adjustments for the Montek sale in 1998 and the RE&C sale in 2000. As a result, appellant was not in compliance with CAS 413.50(c)(12), as amended. We believe that this noncompliance caused the government to pay increased costs. We believe that as a result of this noncompliance the government is entitled to recover interest on the principal amount of the adjustment, compounded daily in accordance with law.

CONCLUSION

For reasons stated, we grant the government's motion for summary judgment and deny appellant's cross-motion, and remand to the parties for the appropriate computation of interest for CAS noncompliance, consistent with this opinion.

The appeal is denied.

Dated: 21 August 2007

JACK DELMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 54907, Appeal of Raytheon Company, rendered in conformance with the Board's Charter.

Dated:

AUG 2 2 2007

CATHERINE A. STANTON
Recorder, Armed Services
Board of Contract Appeals