**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| UNISYS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 05-281C<br>(Judge Firestone) |

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 99-172C<br>(Judge Firestone) |

**BRIEF *AMICUS CURIAE* OF THE DIRECTV GROUP, INC.**
**ON THE "SURPLUS TRANSFER" ISSUES**

The DIRECTV Group, Inc. respectfully submits this brief *amicus curiae* addressing the "surplus transfer" issues presented in the Motion for Summary Judgment of Unisys Corporation, and the Motion for Partial Summary Judgment on the Surplus Transfer Issue of General Electric Company, currently pending before this Court in the above-captioned cases.

# TABLE OF CONTENTS

**Page**

BRIEF *AMICUS CURIAE* OF THE DIRECTV GROUP, INC. ON THE "SURPLUS TRANSFER" ISSUES. ..... 1

INTEREST OF *AMICUS CURIAE* DIRECTV ..... 2

INTRODUCTION ..... 2

FACTUAL BACKGROUND ..... 4

THE GOVERNMENT'S INTERESTS HAVE BEEN FULLY PROTECTED BY DIRECTV'S TRANSFER OF SURPLUS PENSION ASSETS TO BOEING AND RAYTHEON. ..... 10

CAS IS INTENDED ONLY TO PROTECT THE GOVERNMENT, NOT ENRICH IT ..... 14

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Teledyne Inc. v. United States*,
316 F.3d 1366 (Fed. Cir. 2003)........................................................................ 7, 18

*Dixon v. United States*,
381 U.S. 68 (1965)........................................................................................... 14

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)......................................................................................... 14

*General Motors Corp. v. United States*,
540 U.S. 1068 (2003)......................................................................................... 7

*Lockheed Martin Corp. v. United States*,
70 Fed. Cl. 745 (Fed. Cl. 2006) .................................................................. 14, 15, 17

*Teledyne, Inc. v. United States*,
50 Fed. Cl. 155 (Fed. Cl. 2001) ........................................................................ *passim*

**Statutes and Regulations**

41 U.S.C. § 422(h) ........................................................................................................ 15

FAR § 52.216-7 .............................................................................................................. 19

(Old) CAS 413 …..……………………………………………………………………….*passim*

## **INTEREST OF *AMICUS CURIAE* DIRECTV**

The DIRECTV Group, Inc. ("DIRECTV") is the plaintiff in an action pending before this Court involving a Government claim for a segment closing adjustment pursuant to Cost Accounting Standard ("CAS") 413 in connection with DIRECTV's disposition of its defense and space business units to Raytheon Company and The Boeing Company, respectively. *The DIRECTV Group, Inc. v. The United States*, No 04-1414C. DIRECTV originally filed its Complaint with this Court on September 3, 2004. The above-captioned *Unisys* and *General Electric* cases involve some of the same issues as those in the DIRECTV case.

Currently pending before this Court in the *Unisys* and *General Electric* cases are cross-motions by the parties requesting, *inter alia*, that the Court rule on the treatment of surplus pension assets transferred by the contractor to an acquiring company in connection with the determination of whether any segment closing adjustment may be due the United States pursuant to CAS 413. This is also a central issue in the DIRECTV litigation.

## **INTRODUCTION**

The facts of the DIRECTV case bring into sharp relief the fundamental error of the Government's position that a contractor should receive *no credit whatsoever* for the surplus pension assets it transfers to an acquiring company for purposes of determining whether a segment closing adjustment is due under CAS 413. DIRECTV endeavored to transfer to Raytheon and Boeing all of the surplus pension assets pertaining to its defense and satellite segments, respectively. DIRECTV accordingly transferred billions of dollars in surplus pension assets to those companies, in an amount that was more than *15 times* the Government's share in the surplus under this Court's *Teledyne* formula. *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001). The Government subsequently reaped the benefits from those billions of dollars

of transferred surplus assets in the form of lower pension costs under its on-going contracts with Raytheon and Boeing. That the Government actually and tangibly benefited from the transferred surplus is not a matter of conjecture. For example, in the first three years alone following the Raytheon transaction, the amount of pension costs that the Government avoided as a result of DIRECTV's transfer of surplus pension assets to Raytheon was at least *double* the amount of the Government's entire *Teledyne* share in the surplus pension assets of DIRECTV's defense segment.

It is DIRECTV's position in its case that it did, in fact, transfer all of the surplus pertaining to the closed segments to Raytheon and Boeing. The Government, however, has challenged DIRECTV's calculations, contending that it retained a tiny portion of those segment's surpluses, and has asserted a claim against DIRECTV for a segment closing adjustment based on that retained amount. For purposes of this *amicus* brief, we assume the Government is correct and that DIRECTV, like Unisys and General Electric, transferred some, but not all, of the surplus to the acquiring companies.

With that assumption, it is quickly evident that the Government's claim represents a blatant attempt to double dip. The Government ignores completely the substantial benefit it has already reaped from the surplus pension assets DIRECTV transferred to Raytheon and Boeing. Despite having transferred sums vastly exceeding the Government's share of its pension surplus, DIRECTV finds itself confronted with exactly the same arguments that the Government asserts against GE and Unisys. In all of these cases, the Government argues that it does not matter what surplus a contractor transfers to its successor, but only what surplus the contractor retains. DIRECTV's facts underscore the absurdity and unfairness of such an interpretation of CAS 413.

DIRECTV's case, like General Electric and Unisys, is governed by the original version of CAS 413, not by the 1995 amendments. Those companies have explained at length why they,

like DIRECTV, are entitled under CAS 413 to full credit for the surplus pension assets they transferred to the successor contractors, and those arguments will not be repeated here Instead, DIRECTV wishes to present to this Court a concrete example that refutes the conjecture proffered by the Government. DIRECTV believes these facts, together with the arguments advanced by General Electric and Unisys, demonstrate fully that the contractors' motions for summary judgment should be granted, and urges the Court to grant those motions and to deny the cross-motions of the Government.

## FACTUAL BACKGROUND

For most of its existence since its founding in 1932, DIRECTV was known as Hughes Aircraft Company, or later Hughes Electronics Company, and was the aerospace and electronics firm founded by aviation pioneer Howard Hughes. Prior to the transactions at issue here, DIRECTV was one of the largest Government contractors in the nation, producing missiles, satellites, radars, and electronics systems for all branches of the military, NASA, the FAA, and other government agencies. From 1979 through 1997, Government contracts accounted for well over half of DIRECTV's total sales.

In 1951, DIRECTV instituted a qualified defined benefit pension plan for many of its employees (later split into two plans). Under the DIRECTV pension plans, the employee benefits to be paid or the basis for determining the benefits to be paid were established in advance, and DIRECTV made contributions in amounts intended to sufficiently provide for the stated benefits. Over the years, the costs of the DIRECTV plans were accounted for on a composite basis and were allocated to the various segments and home offices of the company whose employees were included in the plans. The costs were thereafter charged to Government contracts and other cost objectives of those segments, in accordance with the accounting practices and standards then applicable to Government contracts and DIRECTV. In addition,

prior to August 1, 1990, all DIRECTV employees were required to make employee contributions to the appropriate pension plan, and some employees continued to make contributions thereafter. Employee contributions far exceeded employer contributions in many years. Through prudent investment and unexpectedly healthy growth in the stock market, from 1992 through 2000 the DIRECTV plans were fully funded. As a result, no pension costs arising from the DIRECTV pension plans were charged to Government contracts after 1992. Employee contributions accounted for 100% of the total contributions to the DIRECTV plans after 1992, and accounted for slightly more than half of the total contributions to the DIRECTV plans from inception through 2000.

In 1997 and 2000, DIRECTV, through a pair of major transactions, divested itself of most of its Government contract business. Effective December 17, 1997, DIRECTV completed the Raytheon transaction, a spin off of the defense segment that was immediately followed by a merger of the defense segment with Raytheon Company. The defense segment includes, among other things, DIRECTV's former missile, electronic systems, and radar systems business. Pursuant to the terms of the merger, Raytheon assumed responsibility for performance of the defense segment's Government contracts, and the operations of the defense segment continued uninterrupted.

Effective October 6, 2000, DIRECTV sold its satellite segment to The Boeing Company. In conjunction with the sale, Boeing assumed responsibility for performance of the satellite segment's Government contracts, and the operations of the satellite segment continued uninterrupted.

At the time of the Raytheon transaction in 1997, the DIRECTV plans had assets of approximately $7.6 billion, and accrued liabilities valued at $4.8 billion. Thus, on that date, the plans had a funding surplus of approximately $2.8 billion over accrued actuarial liabilities. In

connection with the Raytheon transaction, DIRECTV transferred the DIRECTV plans' assets and liabilities pertaining to the defense segment to Raytheon. Actuarial accrued liabilities of $3.31 billion pertaining to the defense segment's current employees, vested terminated employees and retirees were transferred to new pension plans established by Raytheon specifically for DIRECTV's former defense segment. At the same time, DIRECTV transferred to Raytheon all of the pension assets pertaining to the defense segment ($5.77 billion), including surplus assets of $2.46 billion. McQuade Declaration ¶ 2.[1]

In 2000, at the time of the Boeing transaction, the DIRECTV plans had accrued actuarial liabilities of approximately $1.4 billion and plan assets of approximately $2.3 billion. Thus, on that date, the plans had a funding surplus of approximately $900 million over accrued actuarial liabilities. In connection with the Boeing transaction, DIRECTV transferred all of the plans assets and liabilities pertaining to the satellite segment to Boeing. Actuarial accrued liabilities of $1.03 billion pertaining to the satellite segment's current employees, vested terminated employees and retirees were transferred to new pension plans established by Boeing for the satellite segment. At the same time, DIRECTV transferred to the new Boeing plans all of the pension assets pertaining to the satellite segment ($1.84 billion), including surplus assets of $803 million. McQuade Declaration ¶ 3.

Thus, after the Raytheon and Boeing transactions were concluded, DIRECTV had transferred all of the liabilities ($4.34 billion) and all of the plan assets ($7.61 billion), including all surplus assets, associated with the defense and satellite segments to Raytheon and Boeing, respectively. DIRECTV retained only approximately 5 percent of the DIRECTV plans' assets

---

[1] Declaration of John B. McQuade dated September 20, 2007, filed herewith.

and liabilities, which were associated with the corporate home office and business units not included in either transaction.

The Raytheon and Boeing transactions occurred at a point in time after promulgation of the 1995 Amendments to CAS 413, but before the decision of this Court rejecting the Government's assertion that the new CAS 413 applied to transactions like DIRECTV's, notwithstanding that no pension costs had been charged to the Government for many years. *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (Fed. Cl. 2001), *aff'd sub nom.*, *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003), *cert denied sub nom.*, *General Motors Corp. v. United States*, 540 U.S. 1068 (2003). At the time of these transactions, the Court had yet to clarify how CAS 413 would apply to transactions such as the Raytheon and Boeing transactions.

DIRECTV intended to transfer *all* pension assets and liabilities of the divested segments to the acquiring companies. Together with the active employees, all retirees and other inactive employees of the divested segments, and their pension liabilities, were transferred to the acquiring companies, and DIRECTV endeavored to transfer all of the pension assets of those segments, including those segments' share of the surplus pension assets (over $3.2 billion in surplus pension assets) to Raytheon and Boeing. In these transactions, DIRECTV made no effort to retain any surplus pertaining to the divested segments, but rather endeavored to transfer those segments' full share of the surplus to Raytheon and Boeing.[2]

DIRECTV subsequently retained John B. McQuade, a consulting actuary, to prepare a Segment Closing Analyses for the defense segment and satellite segment. The calculations were

2 As previously indicated, the Government has challenged DIRECTV's calculations and contends that DIRECTV retained a tiny portion of surplus that the Government believes should also have been transferred. A decision in favor of the contractors on the pending motions would

prepared in accordance with this Court's *Teledyne* decision. Because so much of the DIRECTV pension surplus was attributable to employee contributions, and because of the sizeable proportions attributable to pre-CAS contracts and firm fixed price contracts, the Government's share of the DIRECTV surplus at the time of the transactions was quite small – only 6.41% for the Raytheon transaction, and 5.89% for the Boeing transaction. McQuade Declaration ¶¶ 2 and 3.

Thus, the Government's share of the pension surplus under CAS 413 in connection with the Raytheon transaction was only $157,970,493, yet DIRECTV transferred to Raytheon $2,461,386,754 in surplus pension assets – over *fifteen times* the Government's share. Similarly the Government's share of the pension surplus under CAS 413 in connection with the Boeing transaction was only $47,513,833, yet DIRECTV transferred to Boeing $803,510,821 in surplus pension assets, over *sixteen times* the Government's share.

The Government reaped substantial, tangible cost savings as a result of DIRECTV's transfer of billions of dollars of surplus pension assets to Raytheon and Boeing. Indeed, as explained below, in the first four years after the Raytheon transaction, the Government was able to avoid between $363 million and $589 million in pension costs as a result of DIRECTV's transfer of billions of dollars in surplus assets to Raytheon. McQuade Declaration ¶ 4**.** Thus, in the first four years following the Raytheon transaction alone, the Government received actual cost savings that at least doubled, and may have quadrupled, the amount the Government would have received had DIRECTV simply written the Government a check for its *Teledyne* share and retained the balance of the surplus attributable to the defense segment. Accordingly, the Government has already received a direct benefit from DIRECTV's transfer of surplus pension

---

likely obviate the need to ever address that issue.

assets to Raytheon that dwarfs the amount of the Government's *Teledyne* share in those surplus assets.

Nevertheless, the Government has asserted a claim against DIRECTV in an effort to recover even more surplus pension assets, arguing that DIRECTV should have allocated assets to liabilities for its defense and satellite segments as of a date earlier than the transaction dates. Although the legal basis for the Government's contention remains unclear, the Government has suggested that DIRECTV was required to perform "segment accounting" pursuant to section 413.50(c)(2) of Old CAS 413 beginning in 1994, with the creation of DIRECTV's consumer segment. However, the Government ignores the fact that it did not pay a single dollar in pension costs under any DIRECTV contract since 1992. Thus, the necessary legal predicate for a segment accounting obligation under section 413.50(c)(2) – namely, a condition that materially affects the Government's pension costs – is absent. Nevertheless, on this basis, the Government contends that DIRECTV owes a segment closing adjustment payment to the Government – even in the face of DIRECTV's massive transfer of surplus pension assets to Raytheon and Boeing.

As explained below, the vast over-transfer of pension assets to the acquiring contractors fully protected the Government, and as a matter of law fully satisfied any possible obligation of DIRECTV under CAS 413. Moreover, the Government's claim against DIRECTV would result in pure windfall to the Government, which has already benefited many times over from DIRECTV's approach to the transactions. The DIRECTV case exposes the fallacies of the Government's hypotheticals and speculation offered in opposition to the Motions for Summary Judgment of Unisys and General Electric on the surplus transfer issue. The Motions of those companies should be granted.

**THE GOVERNMENT'S INTERESTS HAVE BEEN FULLY PROTECTED BY DIRECTV'S TRANSFER OF SURPLUS PENSION ASSETS <u>TO BOEING AND RAYTHEON.</u>**

Plainly, the Government retains its interest in surplus pension assets transferred to an acquiring company. That very interest is the predicate for the Government's claim against Lucent in *Lucent Technologies Inc. v. United States*, No. 04-1511C, currently pending before this Court, and the Government admits in its Reply Brief in Support of Defendant's Cross-Motion for Partial Summary Judgment on the Surplus Transfer Issue in *Unisys*, that previously determined pension costs can, in fact, continue to be adjusted after the transfer of pension assets to the acquiring contractor. The Government states at page 12:

> When the contractor transfers all *or part* of the pension surplus to the buyer, there will be future accounting periods within which adjustments can be made to correct for pension costs previously charged to the closed segment. The transferred surplus in the buyer's pension plan will reduce the amount of pension costs that will be charged to the segment in the future, and, as a result to the segment's contracts, including the transferred contracts. *While this is not the same as a continuation of the amortization process in the hands of the selling contractor, it serves a similar purpose.*

(emphasis added).

In fact, this is the very situation that is acknowledged in the "safe harbor" provision contained in New CAS 413.50(c)(12)(v), which provides that if all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no segment closing adjustment is required. In that situation, the Government's interest in the surplus is protected by the reduction in pension costs on contracts performed by the acquiring company. The Government has offered no explanation of why its interests can be fully protected by future reduction in pension costs at the buyer when 100 percent of the surplus is transferred, but can't be when over 99 percent of those assets are transferred in an amount far in excess of its share. In fact, there is no explanation. The Government's interests can be, and

have been, protected in precisely the same way in the DIRECTV situation as they would have been if all of the surplus of the segments had been transferred to Raytheon and Boeing.

Although in responding to both Unisys and General Electric the Government posits various extreme scenarios under which the Government's interest in the pension surplus in the hands of the acquirer *might* be diluted by a change in business mix or utilized to pay for pensions earned on commercial work, no hypotheticals or speculation are required in the case of DIRECTV. The reality is that the DIRECTV transactions occurred as part of the major defense industry consolidation during the 1990s, and in each case, the acquiring company was and remains one of the largest defense contractors in the nation. In 2006, 84% of the sales of Raytheon, the acquirer of DIRECTV's defense segment, were to the Government.[3] That same year, 46% of Boeing's revenues were derived from Government contracts.[4] Because the transferred segments have remained relatively intact, the actual percentage of Government business in those segments is even higher. The massive surplus transferred by DIRECTV to these companies has reduced the pension costs charged by these companies to the Government by amounts vastly exceeding the Government's share of the DIRECTV pension surplus.

In 2004, DIRECTV's consulting actuary, John B. McQuade, prepared an analysis of the benefit actually received by the Government through a reduction in CAS pension costs on Raytheon's Government contracts. Mr. McQuade calculated that the amount of pension costs that have been avoided by the Government as a direct result of the surplus pension assets that were transferred by DIRECTV to Raytheon was between $363 million and $589 million in the

---

[3] Raytheon 2006 Annual Report at 10, http://media.corporateir.net/media_files/irol/84/84193/reports/AR06.pdf.

[4] The Boeing Company, Form 10K for the fiscal year ended December 31, 2006 at 6, http://www.sec.gov/Archives/edgar/data/12927/000119312507033902/d10k.htm.

first four years alone after the transaction. McQuade Declaration at ¶ 4. Utilizing the low end of Mr. McQuade's range, this still reflects that in just the first four years following the transaction, the Government had already benefited by an amount well more than double its share in the DIRECTV pension surplus. Moreover, Mr. McQuade found that the benefits to the Government would continue to grow as more pension costs were avoided over time, stating "the Government will realize additional pension cost savings on a going forward basis." *Id.*

DIRECTV agrees with General Electric that when a contractor transfers to the acquirer an amount of pension surplus equal to the Government's share in the closed segment's surplus, the Government has the ability to take, and with some companies has taken, steps to ensure that the full amount of that transferred surplus is used exclusively on Government contracts. But the DIRECTV-Raytheon transaction goes well beyond that situation, and manifests beyond cavil the absurdity of the Government's single-minded focus on any surplus retained by the seller. *See, e.g.,* Defendant's Cross-Motion for Partial Summary Judgment, and Opposition to Plaintiff's Motion for Partial Summary Judgment, on Surplus Transfer Issue in *General Electric* at 9 et. seq.

The Government ignores that because much of DIRECTV's surplus, and that of many other contractors, arose from contributions in which the Government has no protectable interest under the *Teledyne* decision (such as, for example, employee contributions, pre-CAS contracts and fixed price contracts), the Government's actual interest in the pension surplus of a closed segment is often far less than the percentage of Government contracts in that business. Frequently, the Government's interest in the overall surplus may, and in DIRECTV's case is, also far less than the proportion of ongoing Government business at the buyer. Thus, although the revenue of DIRECTV's defense segment was over 80 percent derived from Government contracts, and although Raytheon and the particular Raytheon business units that are the successor to the defense segment remain over 80% Government contracts, the Government's

share of the DIRECTV surplus on a segment closing basis is only 6.4 percent. Thus, as the surplus is used to eliminate pension costs at Raytheon, the Government continues to receive far more in direct savings from each dollar of pension cost reductions than its 6 percent share would suggest, and contrary to the Government's assertions, its share of the cost reductions at the buyer is actually higher than was its interest at the seller.

The Government, on the other hand, attempts to prop up its assertion that transferred surplus does not equal cash payments by assuming that the percentage share of the surplus the Government will receive at the buyer is the same as the Government's *Teledyne* share of the surplus in the hands of the seller:

> Using Unisys's assumptions, the Government would be entitled to 50 percent of the retained surplus in a segment closing adjustment. If Unisys were to transfer 60 percent of the surplus to the buyer, that surplus would be composed of Government share, as well as the commercial share attributable to the segment. The Government's share in the transferred surplus is the same as its share in the retained surplus – 50 percent. Thus the benefit to the Government is still 50 percent, comprised of 50 percent of the retained 40 percent (.50 x .40 = .20), plus 50 percent of the transferred 60 percent (.5 x .6 = .30), for a total of 50 percent (20% + 30% = 50%).

Defendant's Reply Brief In Support Of Defendant's Cross-Motion For Partial Summary Judgment On The Surplus Transfer Issue in *Unisys* at 4-5.

But plugging DIRECTV's actual numbers into this calculation paints a remarkably different picture. A major error in the Government's position is its assumption that the share that it enjoys in the transferred surplus is the same as its share in the retained surplus. In reality those shares are markedly different. The Government had only a 6 percent interest in the surplus in the hands of DIRECTV and even under its own theory would be entitled in a segment closing adjustment to only that 6 percent of any surplus retained by DIRECTV. But because the business mix at Raytheon remains over 80 percent Government, the Government's share in the pension costs savings resulting from the transferred surplus is actually that 80+ percent – over 13

times its 6 percent share in the retained surplus. Moreover, DIRECTV transferred over 99 percent of the segment's surplus. Thus, under the Government's approach set forth in the quote above, the benefit to the Government is no longer 6 percent but is now over 79 percent, comprised of 6 percent of the retained 1 percent (.06 x .01 = .0006), plus 80 percent of the transferred 99 percent (.8 x .99 = .792), for a total of over 79 percent (.0006 + .792 = .7926). The bottom line is that using the Government's model, it is evident that the Government is benefiting by 79 percent of the transferred surplus – far more than its 6 percent interest – and its claim for an additional 6 percent of any possible retained surplus is unfounded. In any sense of the word, allowing any additional recovery in these circumstances would be a sheer windfall to the Government. Neither the words nor the intent of CAS compel such an inequitable result.

## CAS IS INTENDED ONLY TO PROTECT THE GOVERNMENT, NOT ENRICH IT

The Government states repeatedly that the intent of the CAS Board must control these cases. But even the CAS Board cannot exceed the will of Congress or the authority provided to it by law. "The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'" *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976), *quoting Dixon v. United States*, 381 U.S. 68, 74 (1965). See also, *Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745 (Fed. Cl. 2006). Neither the CAS Board nor the contracting agencies may impose liability on contractors for violation of CAS beyond that authorized by Congress. And Congress imposed a major limitation on the Government's remedies.

From the origin of the Cost Accounting Standards it has been the law that a violation of CAS alone is not actionable and provides the Government with no right to compensation.

Instead, the CAS statute has always required that the Government establish that it has suffered increased costs as a result of the violation. Thus, actual damages are an element of liability.

The current statute, 41 U.S.C. § 422(h), enacted in 1988, provides in pertinent part:

> (1) The Board shall promulgate rules and regulations for the implementation of cost accounting standards promulgated or interpreted under subsection (f) of this section. Such regulations shall be incorporated into the Federal Acquisition Regulation and shall require contractors and subcontractors as a condition of contracting with the United States to. . .
>
> (B) agree to a contract price adjustment, with interest, *for any increased costs paid to such contractor or subcontractor by the United States* by reason of a change in the contractor's or subcontractor's cost accounting practices or by reason of a failure by the contractor or subcontractor to comply with applicable cost accounting standards. . .
>
> (3) Any contract price adjustment undertaken pursuant to paragraph (1)(B) shall be made, where applicable, on relevant contracts between the United States and the contractor that are subject to the cost accounting standards *so as to protect the United States from payment, in the aggregate, of increased costs* (as defined by the Board). *In no case shall the Government recover costs greater than the increased cost (as defined by the Board) to the Government, in the aggregate, on the relevant contracts subject to the price adjustment*, unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government.

(emphasis added).

The CAS Board's fundamental definition of "increased costs" is set forth at 48 CFR 9903.306 (a):

> Increased costs shall be deemed to have resulted whenever the cost paid by the Government results from a change in a contractor's cost accounting practices or from failure to comply with applicable Cost Accounting Standards, and such cost is higher than it would have been had the practices not been changed or applicable Cost Accounting Standards complied with.

These provisions were explored at length by Judge Allegra in *Lockheed Martin, supra.* Judge Allegra concluded in that case that the contractor's cost allocation method violated CAS. But that was only half the inquiry. He then asked, "But, did this violation increase defendant's costs?" There, the Government promoted a far too restrictive universe of contracts to be

considered in assessing whether any increased costs *in the aggregate* had been incurred, which was rejected by the Court:

> Based upon this guidance, not to mention the plain wording of the statute and FAR provisions at issue, defendant is incorrect in suggesting that decreased costs associated with other fixed-price contracts it had with Lockheed cannot have the effect of diminishing or even eliminating the cost increases associated with the noncompliance of the CAS in question. Were defendant correct, a contractor that used a computer only to service government contracts might still end up owing the government increased costs for a CAS violation, even if, rather than using that computer in a flexibly-priced contract as forecasted, the contractor instead used the computer entirely for other fixed-priced government contracts. This result, of course, would be anomalous and provide the government with a windfall. More importantly, it is precisely the result that Congress sought to avoid in admonishing that – "[i]n no case shall the Government recover costs greater than the increased cost . . . to the Government, in the aggregate, on the relevant contracts subject to the price adjustment." 41 U.S.C. § 422(h); *see also* 48 C.F.R. § 9903.201-4 (requiring the contracting officer to insert similar language in covered contracts). Indeed, while the statute limits this aggregation principle, stating that it applies "unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government," defendant has not alleged, let alone shown, that this limitation was triggered here. This court will not allow defendant to create out of whole cloth yet another exception to the aggregation rule – one that finds no support in common sense, let alone the statute, the regulations thereunder, or the guidance thereon.

70 Fed. Cl. at 753.

No matter how one looks at the contracts at issue in the DIRECTV transaction, it is evident that no increased costs have been incurred by the Government. With respect to the contracts being performed at the time of the transaction that were transferred to Raytheon, there certainly were no increased costs. DIRECTV had charged no pension costs to Government contracts since 1992, and charged no costs to the transferred contracts after the transaction. Raytheon, because of the enormous surplus transferred by DIRECTV, would have charged no pension costs to those contracts after the transaction. With respect to the contracts that gave rise to the surplus, the Government more than recouped any previously determined pension costs through the savings on contracts performed at Raytheon, which, as Mr. McQuade recounts, far exceed any Government share in the DIRECTV surplus. With respect to new Raytheon

contracts entered into after the transaction, the Government again received a benefit rather than suffered increased costs, as that massive over-transfer by DIRECTV continued for many years to eliminate pension costs that would otherwise have been charged to Government contracts. And compared to the alternative of a cash payment, the Government again came out ahead. While DIRECTV could have fully satisfied any obligation under CAS 413 in connection with the Raytheon transaction by writing a check for $158 million, it instead transferred over $2.4 *billion* in surplus pension assets to Raytheon, resulting in savings to the Government of hundreds of millions of dollars.

DIRECTV firmly believes that it complied fully with all requirements of CAS in connection with the Raytheon and Boeing transaction, but even assuming *arguendo* that DIRECTV's calculations were not fully CAS compliant, this Court should ask the same question that was posed by Judge Allegra in *Lockheed Martin*. "[D]id this violation increase defendant's costs?" The only possible answer to this question is "no."

In its Cross-Motions for Partial Summary Judgment, the Government argues that "the present value of the benefit to the Government from the transferred surplus in the hands of the buyer will *always* be less than the present value of a direct payment of a lump sum in the same amount," in light of the "time value of money" and the fact that the Government's recovery "would take the form of reduced pension costs that the buyer will charge to the Government over a period of years in the future." Defendant's Cross-Motion for Partial Summary Judgment in *General Electric* at 27. The Government's argument proves too much. In the situation of an ongoing contractor, the Government's recoupment of its interest in surplus pension assets takes the form of reduced pension costs over a period of years, and there is no right to an immediate cash payment whenever a surplus arises. This recoupment over time fully protects the Government's interests. Likewise, nothing in Old CAS 413 entitles the Government to an

immediate cash payment of a segment closing adjustment, and the Government's interest can likewise be protected through reduced future pension costs that the buyer will charge to the Government over a period of years. That is exactly what happens when all surplus is transferred, and it occurs as well when surplus equaling or exceeding the Government's interest is transferred to the successor. Rather than guarding against increased costs, the Government is distorting the segment closing rules to extract an immediate cash payment and thereby to put itself in a *better* position than if the contractor had not sold the segment in the first instance. Plainly, the purpose and intent of CAS 413 was never to put the Government in a better position than if no segment closing took place.

The principle embodied in the CAS statute and the purpose of the segment closing provisions of CAS 413 are completely parallel. Like CAS in general, CAS 413 is not intended to generate cash for the United States, but rather, as the Court of Appeals held, the "undeniable purpose of the segment closing provision" is "to allow an adjustment where there will be no future periods in which to do so." *Allegheny Teledyne*, 316 F.3d at 1374. In other words, the sole purpose of the CAS 413 segment closing provision is to protect the Government's interest, if any, in surplus that was generated through prior payments on flexibly priced CAS-covered Government contracts. Writing a check or transferring the entire surplus are not the only options for protecting the Government's interests. As the Government agrees, "when the contractor transfers all *or part* of the pension surplus to the buyer, there will be future accounting periods within which adjustments can be made to correct for pension costs previously charged to the closed segment." Reply Brief in Support of Defendant's Cross-Motion for Partial Summary Judgment on the Surplus Transfer Issue in the Unisys case at 8 (emphasis added). When adjustments and savings exceeding the Government's interest have already been made, then the "undeniable purpose" of the CAS 413 segments closing provisions has already been fulfilled, and

because there are no increased costs to the Government, there is no basis under the CAS statute or regulations for demanding further payments.[5]

In connection with the Raytheon and Boeing transactions, it is undeniable that the Government's interests have been fully protected, and then some. There are no issues regarding changes in business mix, or dilution through commercial business on the part of Raytheon and Boeing. There is no dispute that the surplus transferred vastly exceeds any interest the Government may have had in the surplus. The Government has already received, in fact, far more money through reduced contract costs and prices than it would have received through a cash payment.

CAS 413-50(c)(12) simply does not direct how transferred surplus is to be treated. The Government promotes a rigid, indeed punitive, interpretation that ignores economic reality and creates a windfall. Not only does CAS 413 not compel such a result, but an interpretation that simply enriches the Government after it has already been fully protected cannot stand in the face

[5] To no avail is the Government's effort to avoid this necessary result by claiming that "The Government's recovery is under the Allowable Cost and Payment clause (FAR § 52.216-7, 48 C.F.R. § 52.216-7) and the Credits provision (FAR § 31.201-5). Defendant's Reply Brief In Support Of Defendant's Cross-Motion For Partial Summary Judgment On The Surplus Transfer Issue in *Unisys* at 14. Those clauses do not provide the requirement for a segment closing adjustment, but are merely the means identified by the Court for making the contract adjustments when required by CAS. These cases rest entirely on alleged violations of CAS 413 in connection with the calculation of segment closing adjustments. By law, a violation of CAS is not actionable unless it has resulted in increased costs, in the aggregate, to the Government. Similarly, the decision by the Board in *Appeal of Raytheon Co.*, ASBCA No. 54907 (Aug. 21, 2007) cited by the Government at page 15 of its *Unisys* Reply Brief is inapposite. In that case, the Board found that the contractor's failure to timely "settle up" resulted in increased costs to the Government. The Board cited the relevant statutory provisions, but there was no discussion whatsoever of whether savings received by the Government on contracts performed by the acquiring Company negate any claim of "increased costs," and the treatment of transferred surplus was not at issue in that case. Moreover, the Board focused on whether there was a requirement under CAS 413 to determine the impact in individual contracts. Again, that issue is irrelevant here where it is evident that, in the aggregate, the Government has suffered no increased costs. The terms of the statute are clear and controlling.

of Congress's intent that CAS merely protect the Government from paying increased costs. Plainly, any interpretation of CAS 413 that says "no matter how much we have already received over and above our share, you still owe us more" cannot be reconciled with the purpose of the segment closing adjustment as described by the Court of Appeals, or with the CAS statute. When sufficient surplus is transferred to protect the Government's interest, the Court need never reach the question of whether the contractor's calculations were compliant with CAS. The total absence of any damages or increased costs to the Government ends the discussion. The DIRECTV transactions present a stark example of the actual overreaching by the Government, devoid of complexities and complications. The Government's interests have been fully protected, the Government has received more than its share of the DIRECTV pension surplus, the Government has suffered no increased costs as a result of any alleged compliance with CAS 413 by DIRECTV, and there is no basis for any further claim for a segment closing adjustment.

//

//

//

## CONCLUSION

For the foregoing reasons, and for those set forth in the briefs of Unisys and General Electric, DIRECTV urges the Court to grant the motions for summary judgment of those companies on the surplus transfer issue, and deny the cross-motions by the Government.

Respectfully submitted,

__________/s/______ ____________
Alexander F. Wiles
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010
(310) 203-7199 (fax)

Attorney of Record for
THE DIRECTV GROUP, INC.

OF COUNSEL:
Alan C. Brown
Enterprise Business Law Group LLC
8405 Greensboro Drive, Suite 210
McLean, Virginia 22102
(703) 584-3250
(703) 848-8333 (fax)

Dated: September 20, 2007