# In the United States Court of Federal Claims

No. 05-281C
(Filed: June 3, 2013)*
*Opinion originally issued under seal on May 14, 2013

| | | |
|---|---|---|
| | ) | |
| UNISYS CORPORATION, | ) | **Original Cost Account Standards** |
| | ) | **("CAS") segment closing adjustment** |
| Plaintiff, | ) | **obligation; CAS 413.50(c)(12);** |
| | ) | **calculation of <u>Teledyne</u> share;** |
| v. | ) | **Retrospective IPG contracts;** |
| | ) | **government cost participation in** |
| THE UNITED STATES, | ) | **fixed-price incentive contracts** |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Terry L. Albertson*, Washington, DC, for plaintiff.  *J. Catherine Kunz*, Washington, DC, and *Anne H. Warner*, Reston, VA, of counsel.

*Jeffrey A. Regner*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, for defendant.  *Stephen R. Dooley*, Defense Contract Management Agency, Boston, MA, of counsel.

*Richard D. Bernstein*, Washington, DC, for *amicus curiae* General Electric Company. *Mei Lin Kwan-Gett* and *Howard Stanislawski*, Washington, DC and *Alan C. Brown*, McLean, VA, of counsel.

## OPINION

**FIRESTONE**, *Judge*.

Pending before the court are the parties' cross-motions for summary judgment

regarding the plaintiff Unisys Corporation's ("Unisys") segment closing adjustment

obligation under Cost Accounting Standard ("CAS") 413.50(c)(12), 4 C.F.R. §

413.50(c)(12) (1978),[1] associated with Unisys's sale of four business segments to Loral

Corporation ("Loral") in May of 1995 along with Unisys's transfer of certain pension

assets to Loral at the time of the sale.  At issue in the parties' motions is whether Unisys

has properly calculated the segment closing adjustment required by Section 413 of the

CAS ("CAS 413") following the sale of the segments to Loral.  It is undisputed by the

parties that a proper CAS calculation yields a surplus in pension assets that must be

allocated between the contractor and the government under the subject regulations.

However, Unisys asserts in its summary judgment motion that under the reasoning

established by the Federal Circuit in <u>DIRECTV Group, Inc. v. United States</u>, 670 F.3d

1370, 1376-79 (Fed. Cir. 2012), it does not owe the government any money because the

financial benefit that the government received from the government's approved transfer

of excess Unisys pension assets to Loral exceeds the amount of the segment closing

adjustment Unisys would otherwise owe the government under CAS 413.  Pl.'s Mot. at

93-94.  The government contends that Unisys's segment closing calculation is based on

an improper methodology and argues that, under the government's proper methodology,

the government is due approximately $12 million in segment closing adjustments, even

taking into account the credit Unisys is owed for the benefit the government received

from the excess pension assets transferred from Unisys to Loral.  Def.'s Cross-Mot. at 52.

---

[1] The segment closing at issue in this case predates the 1995 revisions to the CAS and as such is
governed by the original version of CAS 413, which was promulgated in 1977 and became
effective in 1978.  <u>See</u> <u>Gen. Elec. Co. v. United States</u>, 84 Fed. Cl. 129, 131 n.2 (2008).
References in this opinion to "CAS 413" are to the original CAS 413 unless otherwise noted.

For the reasons that follow, the court concludes that Unisys is entitled to summary judgment regarding two of the government's primary objections to Unisys's calculation and resolving those two issues in Unisys's favor obviates the need to resolve the parties' other disagreements over Unisys's segment closing calculation.  Because Unisys owes nothing to the government with these issues resolved in its favor and does not itself seek any payment from the government, Tr. 887, ECF No. 192, final judgment in favor of Unisys is entered below.

## I.    BACKGROUND

The parties agree that the underlying facts in this case are largely undisputed, and that the only issues before the court concern questions regarding the correct methodology for calculating Unisys's segment closing adjustment under CAS 413, the governing regulation.

### A.    The segment closings and segment closing adjustment obligation.

Unisys has performed government contracts for many years through business units organized in its Government Systems Group ("GSG"), including the four GSG business units at issue in this case:  the Great Neck, Huntsville, Electronic Systems, and Communications Systems segments, collectively referred to as the Defense System Organization ("DSO") segments.  Gen. Elec. Co. v. United States, 84 Fed. Cl. 129, 138 n.14 (2008) ("GE"); Def.'s Cross-Mot. at 6.  Unisys also maintained several defined benefit pension plans for the DSO segments.[2]  As the Federal Circuit has explained, a

---

[2] Specifically, the four segments participated in three qualified pension plans:  the Great Neck Bargaining Plan ("GNB"), the Unisys Pension Plan ("UPP"), and the Unisys Noncontributory Pension Plan ("UNPP").  Great Neck participated in the GNB and the UPP; Huntsville

contractor—like Unisys—that is sponsoring defined benefit pension plans guarantees fixed payments to retired employees, and, based on actuarial assumptions, deposits amounts anticipated to be sufficient to pay the benefits of the employees covered by the plans for their entire life.  Gates v. Raytheon Co., 584 F.3d 1062, 1064 (Fed. Cir. 2009).  These contributions to the pension fund are contract costs that are paid, in part, by the government.  Allegheny Teledyne Inc. v. United States, 316 F.3d 1366, 1370 (Fed. Cir. 2003); Gates, 584 F.3d at 1064.

The CAS were promulgated to provide uniformity in how contractors measure and allocate costs to government contracts.  Gates, 584 F.3d at 1064; Allegheny Teledyne, 316 F.3d at 1370.  CAS 412 governs how a contractor determines its pension costs for each period using actuarial estimates of the pension plan's anticipated earnings and benefit payments.  Allegheny Teledyne, 316 F.3d at 1371.  Under the CAS, the contractor first determines its pension costs as a whole, then allocates those costs among its segments, then further allocates them among its contracts.  Id.  The pension costs allocated to certain government contracts are paid by the government according to the Federal Acquisition Regulations ("FAR") and the terms of the particular contracts.  Id.

CAS 413 allows for adjustments to a contractor's pension costs in certain circumstances in order to prevent volatility in the amounts of pension costs charged to the government.  DIRECTV, 670 F.3d at 1372-73.  Under CAS 413, the actuarial gains or losses of a pension plan, which represent differences between the estimates and the actual experience of the pension plan, are amortized in equal annual installments over a fifteen-

---

participated in the UPP; Electronic Systems participated in the UPP and UNPP; and
Communications Systems participated in the UPP.  Def.'s Cross-Mot. at 6.

year period.  Id.; CAS 413.50(a).  This adjustment process is interrupted, however, when

a business segment is closed—"i.e., whenever the segment's contracts have become

separated or closed off from the pension costs such that there are no future periods in

which to adjust . . . [the] pension costs."  DIRECTV, 670 F.3d at 1373 (internal quotation

omitted).  In that case, CAS 413.50(c)(12) provides for adjustments to pension costs to

account for a closed segment's pension surplus or deficit.  Id.; Allegheny Teledyne, 316

F.3d at 1371.

Specifically, when a segment closing occurs, CAS 413 provides that a contractor

must calculate the difference between the market value of the assets in the pension plan

allocated to the segment and the actuarial liability for the segment, to determine the

amount by which the plan is over- or under-funded:

> If a segment is closed, the contractor shall determine the difference between
> the actuarial liability for the segment and the market value of the assets
> allocated to the segment, irrespective of whether or not the pension plan is
> terminated. . . . The calculation of the difference between the market value
> of the assets and the actuarial liability shall be made as of the date of the
> event (e.g., contract termination) that caused the closing of the segment. . . .
> The difference between the market value of the assets and the actuarial
> liability for the segment represents an adjustment of previously-determined
> pension costs.

CAS 413.50(c)(12); see Allegheny Teledyne, 316 F.3d at 1371; GE, 84 Fed. Cl. at 132-

33.  If the difference is positive, the government may be entitled to the share of this

surplus from the contractor.  See Raytheon Co. v. United States, 105 Fed. Cl. 236, 239-40

(2012).  If the difference is negative, the contractor may be entitled to a share of the

deficit from the government.  See id.  "In short, [when a segment closes,] the

Government and contractor terminate the amortization and adjust the outstanding pension

5

obligations by allocating any then-existing surplus or deficiency between them."

DIRECTV, 670 F.3d at 1373.

In this case, Unisys sold the four DSO segments to Loral on May 4, 1995. GE, 84 Fed. Cl. at 138 n.14. Effective May 5, 1995, Unisys, Loral, and the government entered into a Novation Agreement in connection with this sale, pursuant to which Loral "assumed all obligations and liabilities of [Unisys] under the contracts" and became the "successor in interest in and to the contracts" that were part of the sale. Id. As part of the sale, Unisys transferred to Loral all of the pension liabilities associated with active DSO employees and pension assets equal to those liabilities. Id. In addition, at the time of the sale, the Unisys pension plan contained a surplus. Id. Unisys also transferred $43,774,762 dollars of this surplus to Loral.[3] Pl.'s Mot. at 33-34.

The sale of the DSO segments and the transfer of portions of the pension plans to Loral triggered Unisys's obligation to perform a segment closing adjustment calculation under CAS 413. It is undisputed that this calculation yields a surplus in pension assets that must be allocated between the contractor and the government.

**B.      Segment closing adjustment obligation calculation.**

Under the CAS and the precedent of this court and the Federal Circuit, the calculation of a segment closing adjustment payment involves three major steps. First, as noted above, the contractor must determine the difference between the market value of the assets and the actuarial liability in the relevant pension plan as of the date of the

---

[3] This figure has been revised by the parties since the factual background in Unisys was discussed by this court in GE.

segment closing, as provided for in CAS 413.50(c)(12).  Second, the contractor must determine the share of the pension surplus assets (or deficit) attributable to the government.  See DIRECTV, 670 F.3d at 1373.  This share is referred to as the "Teledyne share," and is discussed in more detail below.  GE, 84 Fed. Cl. at 137.  The product of the pension surplus assets calculated under CAS 413 and the Teledyne share is the amount of pension surplus owed by a contractor to the government.  This product is referred to as a contractor's segment closing adjustment obligation ("SCAO").

Third, the SCAO may be offset by the "measurable benefit" that the government received because of an acknowledged surplus of pension assets transferred from the seller of a segment to the buyer of a segment.  GE, 84 Fed. Cl. at 152 n.36; see also DIRECTV, 670 F.3d at 1377-79.  This inquiry is governed by the standards of the FAR, and, in particular, the Allowable Cost and Payment Clause, 48 C.F.R. § 52.216-7(h)(2), and the Credits Clause, 48 C.F.R. § 31.201-5.  DIRECTV, 670 F.3d at 1376-77.  In this case, as noted above, Unisys transferred, with the government's understanding, approximately $44 million in surplus assets to Loral incident to the sale of the four DSO segments, and may offset its SCAO by the benefit the government derived from this transfer.[4]  See id. at 1379.

---

[4] The government argues that, in its view, the government does not benefit from a transfer of a portion of a pension surplus to a buyer and that the "measurable benefit" is not a proper cost reduction under the Credits Clause.  Def.'s Cross-Mot. at 43 n.11.  As the government acknowledges, this argument is foreclosed by the Federal Circuit's holding in DIRECTV, 670 F.3d at 1369.  Id.

### C.       Parties' calculations.

The government and Unisys have cross-moved for summary judgment as to the consistency of their respective segment closing calculations with the requirements of the CAS and the FAR.  The government argues that, based on its calculations, Unisys's SCAO is no less than $38,640,121.  Def.'s Cross-Mot. at 2.  The government further argues that the measurable benefit to the government resulting from the transfer of surplus pension assets to Loral is no more than $26,183,700.[5]  Id.  The difference between the SCAO and the measurable benefit amounts to a $12,456,421 payment that the government contends it is owed for its share of the CAS 413 surplus for the four DSO segments.  Id.

Unisys argues that its SCAO is no more than $16,566,576, approximately $22 million less than the government's calculation.  Pl.'s Mot. at 46.  Unisys also argues that the benefit to the government based on the surplus transfer to Loral is $28,844,417.  Id. at 81.  Based on its calculations, Unisys contends that it owes the government nothing because its measurable benefit value exceeds its SCAO amount.

The parties' specific disagreements that lead to these differing values arise under all three aspects of the segment closing adjustment calculation—the valuation of the surplus that results from the segment closing adjustment under CAS 413.50(c)(12), the Teledyne share calculation, and the value of the "measurable benefit" derived by the

---

[5] The government in its reply brief has conceded that this number should be increased by $249,687 based on a calculation error.  See Def.'s Reply at 19; Pl.'s Mot., Chart B.  However, for ease of reference to the parties' briefs and because the government has not yet recalculated its measurable benefit value to account for this error, the court's summary of the disputes reflects the parties' original calculations as presented in their opening summary judgment motions.

government due to the surplus pension transfer from Unisys to Loral.  The bulk of the parties' dispute centers on methodological disagreements involving the calculation of the Teledyne share.  The court discusses the details of two of these disagreements, which account for an approximately $14 million difference in the parties' SCAO calculation, below, and, for the reasons discussed in Part III, infra, resolves these disputes in favor of Unisys.  Based on the parties' representations of the value of each disputed issue in their motions, the court has determined that the resolution of these two issues in Unisys's favor reduces the segment closing adjustment obligation owed to the government to zero, even if all remaining issues are resolved in favor of the government.  It is for this reason that the court, as noted above, declines to address the parties' remaining disputes.

Briefing on the parties' SCAO calculations, measurable benefit calculations, and ultimate segment closing payment was completed on January 4, 2013.  Oral argument was held from April 8, 2013 to April 16, 2013.[6]  The court now turns to the parties' arguments.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Rule 56(a) of the Rules of the Court of Federal Claims; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283

---

[6] At oral argument, both parties' experts were heard as to their positions regarding each party's segment closing valuation.  Expert presentations were exchanged by the parties in advance, cross-examination was not permitted, and each expert was forbidden from presenting any new opinion or calculation outside of their expert reports and depositions.  As such, the experts' testimony acted as a "living affidavit," and was solely used to provide the court with a better understanding of the many calculations performed in this case.

(Fed. Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law," and an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue, in fact, does exist.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient."  <u>Radar Inds., Inc. v. Cleveland Die and Mfg. Co.</u>, 424 F. App'x 931, 936 (Fed. Cir. 2011) (quoting <u>SRI Int'l v. Matsushita Elec. Corp. of Am.</u>, 775 F.2d 1107, 1116 (Fed. Cir. 1985)) (internal quotation omitted).  A party asserting that a fact is genuinely disputed must support its assertions with actual evidence.  <u>Long Island Sav. Bank, FSB v. United States</u>, 503 F.3d 1234, 1244 (Fed. Cir. 2007); <u>Matsushita Elec. Indus.</u>, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (internal quotation omitted)).  Where there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the non-movant.  <u>Unigene Labs., Inc. v. Apotex, Inc.</u>, 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing <u>Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.</u>, 520 F.3d 1358, 1360-61 (Fed. Cir. 2008)).  With respect to cross-motions for summary judgment, each motion is evaluated on its

own merits and reasonable inferences are resolved against the party whose motion is

being considered.  Marriot Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968-69

(Fed. Cir. 2009).

Summary judgment is particularly appropriate where the issue decided

fundamentally concerns questions of law.  Huskey v. Trujillo, 302 F.3d 1307, 1310 (Fed.

Cir. 2002) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999)

("Summary judgment was appropriate here because no material facts were disputed,

many being stipulated, and the only disputed issues were issues of law.")).  In making

legal interpretations of the provisions and requirements of the CAS, the court looks to

any guidance the CAS Board ("CASB") has published.  See Perry v. Martin Marietta

Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995).  In addition, the court will read the subject

CAS section "together with the other provisions of the regulation" in order to ensure that

the court construes the CAS provision in context.  Gen. Elec. Co. v. United States, 92

Fed. Cl. 798, 812 (2010).  Finally, to the extent the CAS requirements are not clear from

the face of the regulation or available CASB guidance, the court will consider how

various actuarial terms found in CAS 413 are used in practice to guide its legal

interpretation of the CAS.  Raytheon, 105 Fed. Cl. at 271.

## III.   DISCUSSION

The court now resolves two of the parties' disputes involving the calculation of the

Teledyne share in this case.  In 2004, the Defense Contract Management Agency

("DCMA") and the Defense Contract Audit Agency ("DCAA") issued a Joint Guidance

regarding CAS 413 segment closing adjustments based on the ruling of the Court of

Federal Claims in <u>Teledyne, Inc. v. United States</u>, 50 Fed. Cl. 155 (2001), as affirmed by the Federal Circuit in <u>Allegheny Teledyne</u>, 316 F.3d 1366 (Fed. Cir. 2003) (collectively referred to as the "<u>Teledyne</u> decisions").  Expert Report of John B. McQuade, Tab 13 at 2 ("Joint Guidance"), ECF No. 87.  Both parties rely on the Joint Guidance to calculate the <u>Teledyne</u> share.  As explained above, the <u>Teledyne</u> share represents the portion of the CAS 413 segment closing surplus recoverable by the government, and is meant to capture "the costs actually paid by the government."  <u>Allegheny Teledyne</u>, 316 F.3d at 1381. Under the <u>Teledyne</u> decisions, the government may not recover pension surplus assets derived from contracts that predate CAS 413, firm-fixed price government contracts, or employee contributions to pension plans.  <u>See</u> <u>Teledyne, Inc.</u>, 50 Fed. Cl. at 191.

The <u>Teledyne</u> share is calculated as a fraction that incorporates these principles. The numerator of this fraction equals the government's contributions made to flexibly-priced contracts that provide for CAS 413.  Joint Guidance, Att. at 1.  The denominator of the <u>Teledyne</u> fraction equals the total pension contributions from all sources since the date of the pension plan's inception.  <u>Id.</u>  Approximately $14 million dollars of the difference in the parties' SCAO calculation is based on two disputes regarding the types of pension contributions that should be included in the numerator and the denominator of the <u>Teledyne</u> share.  The court now turns to these disputes.

### A.      Pre-1968 contributions.

At the time of the segment closing in 1995, the four DSO segments at issue participated in three qualified pension plans.[7]  One of those pension plans is the Great

---

[7] <u>See</u> <u>supra</u> note 2.

Neck Bargaining Plan ("GNB"), which covered bargaining unit employees at the Great

Neck segment.  The Unisys Pension Plan ("UPP") and the Unisys Noncontributory

Pension Plan ("UNPP") are the other two pension plans at issue, which resulted from the

1986 merger of a number of predecessor plans when Sperry Corporation ("Sperry") and

Burroughs Corporation ("Burroughs") merged to form Unisys.

The parties disagree over whether Unisys should have included certain pre-1968

pension contributions made from the inception of a predecessor pension plan in the

denominator of the <u>Teledyne</u> share.  Specifically, the GNB, and, in part, the UPP began

as Group Annuity Contract No. 50 ("GAC 50") that Sperry entered into with John

Hancock Mutual Life Insurance Company ("John Hancock") in 1941.[8]  GAC 50 began as

a "deferred annuity plan."  Under the deferred annuity plan, each year, John Hancock's

actuaries determined the value of the benefits earned by Sperry employees during the

year, based on mortality rates and an interest assumption for determining the present

value of the stream of future benefits.  Sperry contributed an amount to GAC 50

sufficient to purchase from John Hancock a guaranty that John Hancock would provide

those benefits in the future.  John Hancock guaranteed the future benefits even if the

ultimate cost exceeded the amount originally contributed by Sperry.

The contributions made by Sperry were deposited by John Hancock into an

account that generated investment income.  The GAC 50 deferred annuity plan was

"participating," meaning that if the amount charged for the benefits purchased exceeded

---

[8] Unisys's expert also believes that the third pension plan, UNPP, has roots in GAC 50.  Expert
Rebuttal Report of John B. McQuade at II-40, ECF No. 119.  This disagreement is not material
to the court's resolution of this issue.

the cost to John Hancock to provide the benefits, a dividend could be paid to the plan. This is also referred to as participating in the "experience" of the plan, meaning that Sperry participated in John Hancock's investment experience under GAC 50 by receiving dividends if that experience exceeded the interest assumptions incorporated into the contract. However, because benefits were guaranteed by John Hancock, Sperry did not participate in any down-side risk if its contributions were not sufficient to cover benefits.

Effective July 1, 1967, the GNB plan was separated from GAC 50 under a type of insurance contract known as an "immediate participation guarantee" ("IPG") contract. Under the IPG contract, John Hancock maintained a fund account based on actuarial assumptions concerning covered employees and returns on investment, and Sperry continued to pay premiums based on these assumptions. A 1971 letter from John Hancock to Sperry explained Sperry's role in the IPG contract:

> Under the IPG section of the contract the employer receives immediately the full effect of his own experience on both active and retired lives. More-over, the employer gets the credit for all interest earnings immediately. Benefit payments are made out of the fund and of course actual expenses are charged against the fund.
> …
> The nature of the IPG part of the funding medium places the employer on the risk for plan experience.

Pl.'s Reply, Ex. 18 at UNISYS0009223-24.

The new IPG plan was known as GAC 1150. See, e.g., Expert Report of Colin England at 27, ECF No. 93. At its inception, GAC 1150 consisted of an IPG contract, described above, to accumulate amounts intended to fund benefits earned on and after July 1, 1967, and a deferred annuity contract for a "closed group of annuities" purchased

before July 1, 1967.  Pl.'s Reply, Ex. 18 at UNISYS0009223.  It is undisputed that the

deferred annuity contracts produced two dividends in 1969 and 1970 that together totaled

$1.4 million, and were credited to the IPG fund.  Def.'s Cross-Mot. at 25 n.6; see Pl.'s

Reply, Ex. 18 at UNISYS0009223-24 ("Under the deferred annuity section of the

contract, any gains are first used to provide the contingency reserves of the contract.

However, when these contingency reserves are in excess of the insurance companies'

requirements for guaranteeing the payment of these purchased benefits, they revert to the

contractholder in the form of dividends which will be credited to the IPG fund.").

As of January 1, 1968, the rest of GAC 50 was converted into a "retrospective

IPG" ("retro-IPG") plan.  Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.,

122 F. Supp. 2d 444, 449 (S.D.N.Y. 2000).  GAC 1150 was also converted into a retro-

IPG plan as of July 1, 1970.[9]  Under the retro-IPG plans, the pre-1968 deferred annuities

---

[9] The parties both rely on the district court's decision in Harris Trust and Savings Bank v. John
Hancock Mutual Life Insurance Co., 122 F. Supp. 2d 444 (S.D.N.Y. 2000), to support their
understanding of the operation of GAC 50 and GAC 1150 before and after they were converted
to retro-IPG plans.  While this district court opinion addresses only GAC 50, Unisys has
provided contemporaneous documents indicating that GAC 1150 underwent the same
transformation as GAC 50.  Def.'s Cross-Mot., App. at 151 (a September 15, 1970 letter stating,
"We are going to . . . . convert [GAC 1150] to a Retrospective IPG Contract as of July 1, 1970");
Expert Rebuttal Report of John B. McQuade, Tab 189 at UNISYS0009261 (a 1972 IRS form
describing GAC 1150 as only an IPG contract, not a deferred annuity contract).

The government disputes this fact, and points to a document describing GAC 1150 as of May 1,
1970 that includes deferred annuity contracts in accounting for GAC 1150's pension fund.  See
Def.'s Cross-Mot., App. at 157.  The government argues that this document is inconsistent with
Unisys's assertion that the GAC 1150 deferred annuity contracts were cancelled in the same
manner as GAC 50.  However, the document is dated May 1, 1970, before the June 1, 1970
conversion of GAC 1150 to a retro-IPG plan.  The court thus finds that the document is not
inconsistent with the other evidence in the record and does not create a genuine dispute of
material fact.  In addition, it is undisputed that GAC 1150 received a transfer of engineers from
GAC 50 after GAC 50 had been converted to a retro-IPG plan, such that the assets related to

were cancelled with retroactive effect, and the assets supporting them were placed in a

Pension Administration Fund ("PAF").  Sperry continued to pay premiums under the

retro-IPG plans and to participate in the experience of John Hancock.  John Hancock

maintained the PAF at a level sufficient to meet the liabilities of the fund ("LOF"), which

was calculated using certain assumptions about rates of return and mortality.  As such,

John Hancock continued to guarantee the benefits of participants in the pre-1968

annuities because the PAF would never fall below its 1968 level.

However, under the retro-IPG plans, Sperry was responsible for the benefit

payments from the fund and assumed the risk for all plan experience.  See Pl.'s Reply,

Ex. 18.  Sperry was also required to maintain the PAF at 105% of the LOF, called the

"minimum operating level" or "MOL."[10]  If the PAF fell below the MOL, the PAF would

---

some pre-1968 annuity contributions were transferred to GAC 1150.  Def.'s Cross-Mot., App. at
176 ("These deferred annuities remained cancelled in the transfer to 1150 GAC.").

[10] There is an apparent dispute as to whether John Hancock or Sperry was responsible for
maintaining the PAF at the MOL.  As explained in the Harris Trust opinion, John Hancock
maintained the PAF at a level sufficient to meet the LOF.  122 F. Supp. 2d at 449; see also
Expert Rebuttal Report of John B. McQuade at II-39 n.46, ECF No. 119.  The Harris Trust
opinion goes on to explain that the 1968 amendment to GAC 50 "required the PAF to be
maintained" at the MOL.  122 F. Supp. 2d at 450.  The government argues based on this
ambiguous statement that John Hancock, not Sperry, was required to maintain the fund at the
MOL.  However, Unisys has produced evidence that states that Sperry, not John Hancock, was
required to maintain the MOL.  John Hancock described this feature of its IPG plans in a
February 18, 1971 letter regarding GAC 1150's IPG plan:

> The [PAF] must be maintained by the employer at a level in excess of the
> contractual liability for retired lives.  This requirement is to allow the insurance
> company to guarantee payment . . . in the event no future contributions are made
> by the employer.  It should be noted, however, that the responsibility for
> maintaining the fund in excess of this minimum level, and, more importantly, at a
> level necessary for sound long-range funding, rests solely with the employer.

terminate, and John Hancock would repurchase deferred annuities for the benefits already guaranteed.  The parties agree that during the relevant timeframe, the PAF never fell below the MOL and thus the retro-IPG contracts were never repurchased as deferred annuities.  Accumulated funds above the MOL were called "free funds."

Under the new retro-IPG plans, additional benefit payments could be guaranteed by John Hancock.  For GAC 50, upon retirement of an eligible employee after 1968, John Hancock would determine the amount by which the LOF would increase if the retirement benefit were to be guaranteed.  Harris Trust, 122 F. Supp. 2d at 450.  If the PAF balance exceeded 105% of the increased LOF, John Hancock would guarantee the payment of the additional pension benefits.  Id.  Both parties include post-1968 contributions to the retro-IPG plan in the Teledyne share calculation, despite these guarantees for post-1968 benefits.

In 1977, the GAC 50 retro-IPG plan was amended again to eliminate guarantees for new retirement benefits.  The population of retirees became frozen, and the liabilities of the fund decreased while the PAF continued to increase.  Harris Trust, 122 F. Supp. 2d at 451.  The gap between the liabilities and the PAF assets continued to grow, and on several occasions, Sperry or Unisys withdrew over $60 million in free funds and

---

Pl.'s Reply, Ex. 18 (emphasis added).  In addition, an earlier circuit decision in the Harris Trust case states that Sperry was required to maintain fund balances at or above the MOL.  Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co., 970 F.2d 1138, 1141 (2d Cir. 1992), aff'd, 510 U.S. 86 (1993) ("If Sperry failed to maintain Fund balances at or above MOL, termination of the PAF would be triggered.").  The court finds that the government's interpretation of the Harris Trust district court opinion, which is ambiguous on this point, is inconsistent with the evidence and the circuit decision, and does not create a disputed issue of material fact.

transferred those funds to other money managers of the company's pension fund.  Id. at 452, 453; Def.'s Cross-Mot., App. at 160.

### 1.    Parties' positions.

The parties disagree as to whether the pre-1968 contributions[11] made to the GAC 50 deferred annuity plan are properly included in the denominator of the Teledyne share. If the contributions are included in the Teledyne share denominator, the government's share of the segment closing surplus is reduced by $7,275,320.

In support of inclusion, Unisys contends that the Joint Guidance directs that all contributions made since the "inception" of a pension plan should be included in the denominator of the Teledyne share.  Joint Guidance, Att. at 1.  Unisys further argues that under CAS 412, deferred annuities are properly categorized as defined benefit plans, and this court's and the Federal Circuit's decisions in Teledyne, Inc. and Allegheny Teledyne make clear that the contributions to a defined benefit plan should be included in the Teledyne share calculation.  Thus, Unisys argues, the case law and Joint Guidance instruct that the pre-1968 contributions to GAC 50 should be included in the denominator of the Teledyne share.

In addition, Unisys contends that even if, as the government argues, contributions to deferred annuity contracts should be excluded from the SCAO calculation, the deferred annuity contracts at issue here were "cancelled with retroactive effect," and the funds previously invested in those contracts were transferred to the retro-IPG funds well before

---

[11] The blanket term "pre-1968 contributions" is used by the parties to mean contributions made to the GNB prior to July 1, 1967 and to the UPP and the UNPP prior to January 1, 1968, to cover both the conversion of the GNB, and then the rest of GAC 50, to IPG contracts.

the CAS became effective.  Unisys asserts that both experts agree that an IPG plan is a defined benefit plan that should be included in the SCAO.  Accordingly, Unisys argues, all of the assets and liabilities involved in the retroactive cancellation were transferred to the retro-IPG funds, and the pre-1968 contributions that generated these assets must be included in the <u>Teledyne</u> share calculation.

The government excludes the pre-1968 contributions from the denominator of its <u>Teledyne</u> share calculation.  The government concedes that under CAS 412, deferred annuities are categorized as defined benefit plans.  However, the government argues, the CAS 412 characterization of the deferred annuities should not be determinative of their inclusion in the SCAO calculation.  Rather, the government argues that to be included in the SCAO calculation, the contributions in question must generate a surplus or deficit for the plan by producing actuarial gains or losses.  The government contends that under GAC 50's deferred annuity framework, the assets of the plan always equaled its actuarial liabilities.  According to the government, therefore, the contributions should not be included in the SCAO calculation, which is meant to determine government over- or under-funding based on a mismatch between assets and actuarial liabilities.[12]

---

[12] Despite this argument, the government includes these contributions in its calculation of the CAS 413 adjustment.  The government's expert concluded that the value of the liabilities for the pre-1968 annuities, as well as the amount of assets supporting the liabilities, should ideally be excluded from the SCAO.  However, the government did not do so, "because the amount of the benefits and related liabilities are not readily available as of the segment closing date."  Expert Report of Colin England at 52, ECF No. 93.  The government's expert later explained at oral argument that because the assets supporting the pre-1968 guaranteed benefits always equaled their liabilities, their inclusion would not impact the SCAO calculation because the net effect on the calculation would be zero.  Tr. 975, ECF No. 192.

Specifically, the government argues that under the GAC 50 deferred annuity plan, once Sperry paid the contractual premium, John Hancock guaranteed that pension benefits would be paid, even if the premium was not sufficient to cover the benefits. Although John Hancock occasionally paid retrospective dividends where the premiums it received exceeded a certain level, the government argues that these dividends were, before 1968, used as credit to cover other premiums.  As a result, the government contends, GAC 50 shifted any risk of actuarial losses to the insurer and did not generate any surplus assets.  Thus, the government argues that the pre-1968 contributions to GAC 50's deferred annuities did not contribute to a pension surplus or deficit.

The government further contends that any assets from the deferred annuities that were cancelled and placed into the retro-IPG funds should likewise be excluded because, under the retro-IPG contracts, John Hancock's guaranty of the benefits for the pre-1968 annuities survived.  Thus, the government argues, Unisys also did not experience any "actuarial risk" under the retro-IPG contracts for the original annuities, and the pre-1968 contributions should be excluded regardless of the fact that they were retroactively cancelled.

In support, the government primarily relies on two documents in the record.  The first is a letter accounting for the transfer of pension assets from Unisys to Loral following the segment closing.  Part of the amount transferred was $768,880, representing "the annuity value of guaranteed benefits under group annuity contracts issued by the John Hancock Life Insurance Company."  Def.'s Cross-Mot., App. at 164-65 (also referred to as "asset value of cloned Hancock contracts").  The second is a letter

20

that breaks down the remaining John Hancock annuities by different types of accounts, including GAC 50 and GAC 1150.  This letter lists the "liability amounts" under the remaining John Hancock annuities as also totaling $768,880.  Def.'s Cross-Mot., App. at 173.  These two documents together, the government argues, demonstrate that, at the segment closing, the pre-1968 deferred annuity guaranteed benefits survived, and that the assets of those guaranteed annuities equaled their liabilities.

In response, Unisys argues that there was, in fact, up-side actuarial risk associated with GAC 50 even before 1968, because John Hancock paid dividends on pre-1968 contributions.  Unisys further argues that its actuarial risk under the deferred annuity plan is irrelevant, because the funds previously invested in the deferred annuities were cancelled with retroactive effect and transferred to the retro-IPG funds.  While John Hancock continued to guarantee pre-1968 benefits, Sperry was at risk for all plan experience under the retro-IPG plans.

In addition, Unisys argues that the "guarantee" under the retro-IPG contracts, which would have caused the plan to be repurchased as deferred annuities if the funds fell below the MOL, was never triggered, and therefore never relieved Unisys of the actuarial risks normally associated with IPG contracts.  Finally, Unisys argues, it is undisputed that Sperry and Unisys withdrew assets from the PAF and transferred those assets to other money managers for the company's pension plan.  These assets in turn contributed to the assets in Unisys's pension plan at segment closing.  While it is not possible to trace the assets back to the contributions, Unisys contends that it is undisputed that these transfers occurred, and that some of the transferred assets could be derived from the pre-1968

21

contributions.  Therefore, Unisys asserts, the facts support its conclusion that the deferred annuity contributions contributed to the ultimate pension surplus and should thus be included in the Teledyne share.

> **2.    Pre-1968 contributions should be included in the denominator of the Teledyne share because those assets contributed to the pension surplus.**

After careful consideration of these arguments, the court holds that the pre-1968 contributions should not be excluded from the denominator of the Teledyne share.  As explained in detail below, the government's argument that the pre-1968 contributions failed to accumulate assets and generate actuarial gains or losses—and thus should not be included in the Teledyne share—is contrary to the undisputed facts of this case.  While the assets used by the parties in the segment closing calculation cannot be specifically traced back to the pre-1968 contributions, the evidence produced by Unisys and undisputed by the government indicates that the pre-1968 contributions, even in their deferred annuity form, produced a surplus under the GAC 1150 IPG plan.  In addition, the pre-1968 contributions were transferred to the retro-IPG funds, under which Sperry and eventually Unisys was responsible for plan experience.  The mechanism used to "guarantee" the pre-1968 deferred annuity benefits under the retro-IPG plans was never triggered in this case, and substantial assets from the PAF were subsequently withdrawn and put into Unisys's pension plan's other money managers.  Given these facts, the court rejects the government's argument that the pre-1968 contributions should be excluded from the Teledyne share because those contributions never contributed to the segment closing surplus in this case.  In this regard, the court finds no reason to treat the pre-1968

22

contributions differently from the post-1968 contributions made to the retro-IPG contracts, some of which were also guaranteed by John Hancock.  Indeed, as discussed below, including the pre-1968 contributions in the total pool of pension plan assets and in the Teledyne share is supported by the Joint Guidance that Unisys was bound to follow.

To begin, the government's argument fails to account for the undisputed fact that the pre-1968 deferred annuity contracts did produce $1.4 million in dividends in 1969 and 1970, after GAC 1150 was spun off as an IPG plan, and that these dividends generated a pension surplus.  The government argues that the $1.4 million in dividends is negligible compared to the now $7.5 million difference in the parties' SCAO based on this issue.  However, the government does not dispute that the $1.4 million reflects actuarial gains.  Moreover, the government's position also ignores additional undisputed evidence that the pre-1968 contributions were eventually co-mingled with other contributions in the Unisys pension plan.  In particular, after GAC 50 and 1150 were converted to retro-IPG plans, the assets used to support the pre-1968 deferred annuities were transferred to the retro-IPG funds.  Both parties agree that, at the very least, funds contributed to "standard" IPG funds should be included in the Teledyne share because under an IPG contract, the contractor is generally responsible for the benefits and participates in any actuarial gains and losses.  See Expert Report of Colin England at 26, ECF No. 93.

The government's attempt to distinguish the retro-IPG contracts from "standard" IPG contracts here is contrary to the undisputed facts and inconsistent with its position on post-1968 contributions.  To begin, the government argues that because John Hancock

23

continued to guarantee the pre-1968 pension benefits under the retro-IPG plans, Sperry continued to be unexposed to actuarial risk.  However, as established by contemporaneous evidence, Sperry, not John Hancock, was responsible for maintaining the PAF at the MOL.  See supra note 10.  The undisputed evidence in this regard also demonstrates that Sperry, not John Hancock, was immediately responsible for the actuarial risks associated with the maintenance of the retro-IPG plan.  See Pl.'s Reply, Ex. 18 ("The nature of the IPG part of the funding medium places the employer on the risk for plan experience.").  The court therefore rejects the government's contentions that, under the retro-IPG arrangement, Sperry never experienced actuarial risk.

The court also rejects the government's contention that the "guarantee" of pre-1968 pension benefits should serve to exclude the pre-1968 contributions.  Although John Hancock continued to guarantee the pre-1968 benefits under the retro-IPG plans, the mechanism supporting this guarantee was never triggered.  As explained above, Sperry was required to maintain the PAF in excess of the "contractual liability of the fund for retired lives . . . to allow the insurance company to guarantee payment of the retired life benefits."  Id.  If the amount in the fund fell below the required level, John Hancock would repurchase the annuities.  In this way, the benefit payments for retired lives were guaranteed.  However, it is undisputed that the PAF did not fall below the MOL, and that for the duration of the contract until the segment closing, Sperry and its successors continued to be at risk.

Moreover, some post-1968 contributions to the retro-IPG plans, which both parties agree should be included in the Teledyne share, were also guaranteed by John Hancock

when certain conditions were met.  Specifically, under the 1968 amendment to GAC 50

and until 1977, if the PAF was funded above 105% of an LOF that incorporated newly

retired lives, John Hancock would guarantee those new benefit payments as well.  See

Harris Trust, 122 F. Supp. 2d at 450-52.  The government provides no reasoned basis

why the contributions supporting these post-1968 guaranteed benefits should be included

in the Teledyne share while at the same time insisting that the pre-1968 contributions

should not.

Finally, the evidence demonstrates that millions of dollars of "free funds" were

transferred from GAC 50's PAF to Unisys's pension plan's other money managers.

Harris Trust, 122 F. Supp. 2d at 452, 453.  Those assets certainly made their way into the

assets involved in the segment closing calculation, and as explained above, the assets in

the PAF included, in part, the pre-1968 contributions.  Fundamentally, it is usually

impossible to trace a pension surplus or deficit back to specific contributions.  The Joint

Guidance[13] expressly recognizes the complexity of tracing surplus or deficit back to

specific contributions and states that tracing is not required:

> Given the complexity of pension accounting and the significant time period
> that must be considered in the calculations, tracing a segment closing
> surplus or deficit back to specific contributions made over the years that
> gave rise to it would require incredibly complicated calculations and
> historical data that, in most, if not all cases is not available.  Therefore, the
> methodology in this audit guidance, by necessity, includes estimates and
> assumptions and provides a reasonable approximation given the
> circumstances.

---

[13] While the court is not bound by the Joint Guidance, the Joint Guidance provides "persuasive evidence" of the requirements of the CAS.  CBS Corp. v. United States, 75 Fed. Cl. 498, 505 (2007).

Joint Guidance at 2. Here, the historical data is not perfect and assumptions must be made. Nevertheless, Unisys has presented undisputed evidence which demonstrates that the annuities attributable to the pre-1968 contributions were retroactively cancelled, the assets were then co-mingled with the assets in the PAF, continued to accumulate, and were eventually co-mingled with the pension assets under other funding arrangements in Unisys's pension plan. In such circumstances, the court finds that including the pre-1968 contributions in the Teledyne share denominator comports with both the facts and the Joint Guidance. For all of these reasons, the court holds that Unisys is entitled to summary judgment on its inclusion of the pre-1968 pension contributions in the Teledyne share denominator.

**B.     Fixed-price incentive contracts should be included in the numerator of the Teledyne share at a 30% government participation rate.**

The parties also disagree over how to determine the government's participation rate in Unisys's fixed-price incentive contracts. This disagreement affects the numerator of the Teledyne share and accounts for a $6,845,443 difference in the parties' SCAO calculations.

It is not disputed that the government is entitled to recover its share of surplus pension costs associated with cost-reimbursement contracts as part of the Teledyne share. It is also undisputed that costs allocated to firm-fixed price contracts ("FFP"), which are not adjusted for changes in costs and where the contractor bears all cost risks, are not included in the Teledyne share. See Allegheny Teledyne, 316 F.3d at 1375-76. At issue in this case is how much of the costs for a third type of government contract, a fixed-price

26

incentive ("FPI") contract, should be included in the government's share of the segment closing surplus.

The FAR defines an FPI contract as "a fixed-price contract that provides for adjusting profit and establishing the final contract price by application of a formula based on the relationship of total final negotiated cost to total target cost. The final price is subject to a price ceiling, negotiated at the outset." 48 C.F.R. § 16.403. An FPI contract is made up of several pieces: a target cost, a target profit, a price ceiling, and a profit adjustment formula. Id. § 16.403-1. Under the terms of an FPI contract, the price ceiling is the most that can be paid to the contractor. Id. Up to that amount, the contractor is paid its final costs, plus a profit that varies based on whether the contractor's actual incurred cost under- or over-runs the target cost and on a profit adjustment formula. See id. If the contractor under-runs the target cost, it receives the share of those cost savings as increased profit. Id. If the contractor over-runs its target cost but does not exceed the price ceiling, it shares in those cost over-runs in the form of a decreased profit. Id. If the contractor's final costs exceed the price ceiling, then the contractor absorbs the difference as a loss. Id. In other words, under an FPI contract, a contractor is wholly responsible for the costs incurred after the price ceiling is reached. Otherwise, the government and the contractor share the risk of cost over-runs or under-runs.

The question now before the court is at what percentage should the government share in the pension costs allocated to FPI contracts to reflect this risk-sharing characteristic. This determination largely affects the Great Neck segment, which accounts for the bulk of the SCAO and had a significant share of FPI contracts in its

27

contract mix.  See Expert Rebuttal Report of John B. McQuade, Tab 194 at

UNISYS0005909 (reflecting contract mix data for the segments at issue), ECF No. 119.

The participation rate in FPI contracts affects the numerator of the Teledyne share.  A

larger percentage increases the government's share of the pension closing surplus.

It is undisputed that contemporaneous documentation or data is not available to

determine whether Unisys experienced a certain percentage of cost under- or over-runs

on its FPI contracts.  Unisys uses a 30% government cost participation rate, which it

argues is based on a reasonable proxy for government participation in its FPI contracts.

This proxy is derived from a 1998 settlement agreement between the government and

Lockheed Martin, as a successor in interest to Unisys.  The settlement agreement

allocated a property tax refund between the government and Lockheed Martin for

contracts at Unisys's Great Neck segment.  In that settlement, the government agreed that

it was entitled to share in 30% of the portion of the property tax refund that was allocable

to FPI contracts for the years 1991-1996.  See Def.'s Cross-Mot, App. at 109-20.

Unisys's expert viewed the property tax as analogous to the segment closing here because

both situations entailed substantial and unanticipated costs that arose over a number of

years and that were related to costs that had been charged through indirect cost rates to all

affected contracts.  Pl.'s Mot. at 16, Ex. 5 at 90-91.  Because of the lack of any other

records or data, Unisys argues that, under the Joint Guidance, "reasonable approximation

given the circumstances" is necessary, and the best and only available evidence of the

government's cost participation in FPI contracts is the government-approved property tax

refund settlement.  Joint Guidance at 2; <u>see also</u> <u>id.</u> at 6 (permitting the use of "reasonable surrogates" to calculate the <u>Teledyne</u> share).

The government disputes Unisys's application of the Joint Guidance and instead argues that the court should equate FPI contracts to cost-reimbursement contracts. Specifically, the government uses a 100% government participation rate (with apparent disregard of the fixed-price aspect of FPI contracts) in calculating its <u>Teledyne</u> share. The government contends that the use of a 30% rate implies that Unisys incurred significant costs over and above the price ceiling on its FPI contracts, a situation which the government argues is implausible.  Def.'s Cross-Mot. at 31.  The government further argues that, due to the lack of evidence as to the actual participation rate, it is reasonable to assume that Unisys was able to position itself to meet the target price on all or nearly all of its FPI contracts, and was therefore able to recover all of its costs from the government.  Def.'s Reply at 7.  The government argues based on its reasoning that it can be assumed that the government's share of cost risk under Unisys's FPI contracts was 100%.  <u>Id.</u>

After consideration of these arguments and the facts before it, the court holds that the government's FPI participation rate in this case should be valued at 30%.  As discussed below, the 30% share rate in FPI contracts was negotiated and approved by the government for FPI contracts concerning one of the largest segments at issue in this case. The government has not provided any evidence by way of facts or expert opinion to suggest that the 30% rate is not compliant with the CAS.  Likewise, the government does not support its proposed 100% rate with factual evidence.  In addition, the government's

argument that its FPI participation rate must be equivalent to its cost-reimbursement participation rate improperly assumes that FPI contracts are the same as cost-reimbursement contracts for CAS 413 purposes.  This assumption is contrary to both experts' opinions, the fixed-price aspects of FPI contracts, and the Teledyne decisions.

As the Joint Guidance suggests, where actual records or data are not available, "reasonable approximation" may be necessary in calculating the Teledyne share.  Joint Guidance at 2.  Here, the only and best evidence presented by the parties of the government's FPI cost participation rate is a property tax refund settlement negotiated between Lockheed Martin and the government several years after the segment closing.  An examination of the documentation supporting the 30% calculation in that settlement agreement reveals that it was calculated based on data concerning "Major FPI Contract Performance."  Def.'s Cross-Mot., App. at 118.  Consistent with the principles used by the Joint Guidance and the Teledyne decisions, the settlement excluded costs associated with FFP contracts from the government's share of the property tax refund, and included costs associated with cost-reimbursement contracts.  Id., App. at 111.  The settlement was negotiated and accepted by government contracting officials.  Id., App. at 116.

Neither the government's nor Unisys's experts claim an expertise in government contracts in this case.  See, e.g., Pl's Mot., Ex. 2 at 98.  The settlement agreement is thus the only evidence before the court of an FPI share rate approved by government officials with expertise in government contracts.  The government has not presented any evidence to suggest that the government would not have tried to increase its FPI share under the settlement agreement if it believed that the 30% rate did not accurately reflect the shared

cost risk under FPI contracts.  Nor did the government's expert express an opinion on the reasonableness of the use of the proxy under CAS 413.  See Pl.'s Mot., Ex. 2 at 99-100; see also Raytheon, 105 Fed. Cl. at 270 (holding that the government bears the burden of establishing that a contractor's segment closing calculation violated the CAS).  Thus, the best and only evidence before the court on this issue is the 30% proxy rate.

The court finds that the government's arguments to the contrary are factually and legally flawed.  First, the government argues that the 30% rate is implausible because it implies significant cost over-runs on Unisys's FPI contracts.  However, the bare assertion of implausibility, unsupported by factual evidence or expert opinion, is not sufficient to challenge the reasonableness of the proxy rate.  See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (holding that an opponent to a summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts").  Moreover, it is contrary to other supporting evidence provided by Unisys that suggests that Unisys was experiencing losses on its government contracts during the relevant time period.  See Pl.'s Mot., Ex. 13.

In addition, the government's assumption that its participation rate should be valued at 100% ignores both parties' experts, who agree that the actual costs reimbursed by the government under an FPI contract is less than that made under cost-reimbursement contracts when the price ceiling is reached.[14]  Pl.'s Mot., Ex. 2 at 94-95 (deposition testimony of the government's expert).  In addition, the government's argument also

---

[14] In this regard, a DCAA auditor for Unisys's segment closing initially proposed a 58% cost participation rate.  Pl.'s Mot. at 16.  This participation rate is not used by either party and was later rejected by a subsequent DCAA auditor.

ignores the fact that the contractor must absorb the loss if it incurs costs above the price

ceiling in an FPI contract, much like in an FFP contract.  The government's 100%

participation rate disregards the fixed-price characteristics of FPI contracts and is thus

contrary to this court's and the Federal Circuit's opinions in the Teledyne cases, which

excluded FFP contracts from the Teledyne share numerator.

In sum, the court finds that the government has failed to create a genuine dispute

of material fact as to the reasonableness of the government-approved 30% cost

participation rate proxy supported by Unisys.  The government has provided no other

factually-based alternative calculation.  Nor has the government provided an expert

opinion that the proxy is non-compliant under CAS 413.  Moreover, the government's

own calculation equating FPI contracts to cost-reimbursement contracts ignores the

differences between these two types of contracts.  For all of these reasons, the court finds

that in this specific case, the government's participation rate in FPI contracts should be

valued at 30%.

## IV.    CONCLUSION

For the above-stated reasons, the court holds that (1) the pre-1968 contributions to

GAC 50 are properly included in the denominator of the Teledyne share, and (2) the

government's FPI participation rate in this case is 30%.  Based on the parties'

calculations, the court concludes that there is now an approximately $14 million

reduction in the government's estimated SCAO.  As a result, the amount owed to the

government by Unisys is reduced to zero, even if all other issues are resolved in favor of

the government.[15]   The Clerk is directed to enter judgment in favor of the plaintiff.  Each

party shall bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[15] The parties were given the opportunity to confirm the accuracy of the court's calculation, and both parties agreed that the court's opinion resolves this case without addressing any additional issues in the parties' motions for summary judgment.